D.C. No. 1:22-cv-00441-JAO-KJM

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

————————

In Re:  PANIOLO CABLE COMPANY, LLC,

Debtor.

WAIMANA ENTERPRISES INC.,

Appellant,

v.

HAWAIIAN TELCOM, INC., et al.,

Appellees.

————————

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

NO. HI-22-01180

HON. ROBERT J. FARIS

**APPENDIX**

WILLIAM MEHEULA          2277
MEHEULA LAW, LLLC
Three Waterfront Plaza, Suite 499
500 Ala Moana Boulevard
Honolulu, Hawaii 96813
Telephone No.: (808) 599-9554
Email:  bill@meheulalaw.com

Attorney for Appellant
WAIMANA ENTERPRISES INC.;
PA MAKANA LLC; and
CLEARCOM, INC

# TABLE OF CONTENTS

Volume 1

2021/10/18 (Dkt. 480, at 1-5) Sandwich Isles Communications Inc's Memorandum In Opposition to Motion of Hawaiian Telcom, Inc. to Enforce Sale Order [Dkt. 459] ................................................................................................ 1-22

2022/04/04 (Adv. No. 22-90008 Dkt. 1) Defendant Hawaiian Telcom Inc.'s Notice of Removal of State Court Action to Bankruptcy Court ..................... 23-226

2022/04/27 (Dkt. 10) Plaintiff Waimana Enterprises Inc.'s Motion to Remand Case to State Court, or in the Alternative, for Abstention ..................... 227-240

2022-05-02 (Dkt. 713) Sandwich Isles Communications, Inc.'s Statement of Objections to the Final Relief Requested by Hawaiian Telcom [Dkt. 637] .. 241-301

2022/05/18 (Adversary Proceeding No. 22-90008, Dkt. 22) Tentative Ruling on Motion to Dismiss ........................................................................ 302-309

Volume 2

2022/05/27 (Dkt. 28) First Amended Complaint ..................................... 1-288

2022/05/31 (Dkt. 31) Order Granting Motion by Hawaiian Telcom, Inc. to Dismiss the Complaint in its Entirety, or in the Alternative, to Stay the Adversary Proceeding, Filed April 11, 2022. And Granting Plaintiffs Leave to Amend Complaint ........................................................................ 289-292

2022/06/10 (Dkt. 35) Motion by Hawaiian Telcom, Inc. to Dismiss the First Amended Complaint in its Entirety ............................................... 293-348

2022/07/01 (Dkt. 40) Plaintiffs' Memorandum in Opposition to Motion by Hawaiian Telcom, Inc. to Dismiss the First Amended Complaint it its Entirety, Filed June 10, 2022 [Dkt. 35] ...................................................... 349-365

2022/07/08 (Dkt. 47) Reply in Support of Motion by Hawaiian Telcom, Inc. to Dismiss the First Amended Complaint in its Entirety ....................... 366-388

2022/08/18 (Dkt. 67) Order Granting Motion By Hawaiian Telcom, Inc. To Dismiss The First Amended Complaint In Its Entirety ⋯⋯⋯⋯⋯⋯⋯⋯ 389-392

2022/08/22 (Dkt. 70) Order Denying Plaintiff Waimana Enterprises Inc.'s Motion to Remand Case to State Court, or in the Alternative, for Abstenion ⋯⋯⋯⋯ 393-397

2022/08/30 (Dkt. 77) Notice of Appeal and Statement of Election ⋯⋯⋯⋯⋯ 398-405

1852357

KOBAYASHI SUGITA & GODA, LLP
LEX R. SMITH            3485-0
MARIA Y. WANG          8842-0
999 Bishop Street, 26th Floor
Honolulu, Hawaii 96813
Tel:  808-535-5700
Fax:  808-535-5799
lrs@ksglaw.com; myw@ksglaw.com

Attorneys for Interested Party
SANDWICH ISLES COMMUNICATIONS, INC.

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| In re: | ) | Case No. 18-01319 (RJF) |
| | ) | (Chapter 11) |
| PANIOLO CABLE COMPANY, LLC, | ) | |
| | ) | SANDWICH ISLES |
| | ) | COMMUNICATIONS INC'S |
| Debtor. | ) | MEMORANDUM IN OPPOSITION |
| | ) | TO MOTION OF HAWAIIAN |
| | ) | TELCOM, INC TO ENFORCE SALE |
| | ) | ORDER [DKT #459]; |
| | ) | DECLARATION OF LEX R. SMITH; |
| | ) | EXHIBITS "A" – "E" |
| | ) | |
| | ) | |
| | ) | |
| | ) | Hearing: |
| | ) | Date:   November 1, 2021 |
| | ) | Time:  2:00 p.m. |
| | ) | Judge: Honorable Robert J. Faris |
| | ) | |
| | ) | |
| | ) | |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Aickin v. Ocean View Investments Co., Inc.,
  84 Hawai'i 447, 935 P.2d 992 (1997) ............................................................16, 18

Golf Carts, Inc. v. Mid-Pacific Country Club,
  53 Haw. 357, 493 P.2d 1338 (1972) ..................................................................15

Kahawaiolaa v. Hawaiian Sun Investments, Inc.,
  146 Hawai'i 424, 463 P.3d 1081 (2020)..............................................................17

Katzenstein and Hawaiian Telcom,
  Adv. No. 21-90017 ..........................................................................................19

**Other Authorities**

Rule 65 ..............................................................................................................1

Rule 9019 ...........................................................................................................1

**TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................1

1.    THE SETTLEMENT AGREEMENT, MASTER RELATIONSHIP AGREEMENT, AND THE SCHEDULES ATTACHED TO IT ARE THE FOUNDATION OF THIS COURT'S ORDERS AUTHORIZING AND APPROVING THE SALE TO HAWAIIAN TELCOM .............................................5

2.    THE COURT APPROVED MASTER RELATIONSHIP AGREEMENT CONTAINS A CLEAR DISPUTE RESOLUTION PROVISION .............................................7

3.    THE MASTER RELATIONSHIP AGREEMENT MANDATED THAT THE TRUSTEE MIGRATE SIC'S TRAFFIC ON THE NETWORK TO FREE FIBERS PROMISED TO SIC.  THE TRUSTEE DELEGATED THAT RESPONSIBILITY TO HAWAIIAN TEL .........................................8

4.    WHEN HAWAIIAN TEL DEMANDED PAYMENT FOR THE COLOCATION SPACE, SIC POINTED OUT THAT THE TRUSTEE AND HAWAIIAN TEL WERE REQUIRED TO RECONFIGURE SIC'S TRAFFIC FIRST ................................10

5.    THE ENTIRE DISPUTE IS CAUSED BY TRUSTEE'S VIOLATION OF THE DEADLINE FOR CONDUCTING THE SALE .......................................................11

6.    DHHL'S DECLARATION IS TO ENSURE CONTINUED SERVICE - NOTHING MORE .........................................13

7.    THE TRUSTEE AND HAWAIIAN TELCOM HAVE NO BASIS TO CLAIM THE AGREEMENTS WITH SIC ARE TERMINATED ................................................14

CONCLUSION ...................................................................................19

### SANDWICH ISLES COMMUNICATIONS INC'S MEMORANDUM IN OPPOSITION TO MOTION OF HAWAIIAN TELCOM, INC TO <u>ENFORCE SALE ORDER [DKT #459]</u>

## <u>INTRODUCTION</u>

Hawaiian Telcom asks the Court to assume the "SIC Parties" in default, and requests the Court "direct the SIC Parties to provide the necessary and material operational information as HTI requested in its August 31, 2021 letter, to **turn over** certain Transferred Assets, and to remove the SIC Parties' personal property, waste and e-waste from the Paniolo premises and the Paniolo Network."  See Motion at pdf 20 and 21 of 70 (emphasis added).  Without citation movant claims that a "separate adversary proceeding is not required . . . ."  Id. at pdf 22 of 70.

This Court cannot grant injunctive relief against the SIC Parties without some modicum of due process, such as an evidentiary hearing.   See FBKR 7065, incorporating Rule 65.  The Court cannot grant the requested relief at a non-evidentiary motions hearing.   Indeed, the contract the court approved regarding the SIC parties expressly provides:

> After consummation of the Paniolo 363 Sale and all orders approving same become final and non-appealable, Ownership and SIC affiliates shall have no further duties hereunder.

Rule 9019 Settlement Agreement Page 6, Section 3(i)

More to the point, Hawaiian Telcom, the Trustee and the Department of Hawaiian Home Lands are seeking rulings they are not entitled to based on an

unsupported assemblage of false accusations.  The Court should carefully examine, and reject, the many statements in the parties' memoranda that are unsupported by any fact.

The truth is that Hawaiian Telcom bought only the formerly-SIC-owned assets described in Exhibit "A2."  No order of this Court nor anything else gives Hawaiian Telcom any right to any SIC-owned asset not specifically identified on Exhibit A2.  Hawaiian Telcom is trying to get the Court to order SIC to give Hawaiian Telcom assets that (1) were never executed upon by the Trustee; and therefore (2) Paniolo never sold to Hawaiian Telcom; because (3) Paniolo never owned them and had no right or ability to sell them.

The truth is that the Trustee entered, with Court approval and authorization, a series of agreements that guaranteed SIC the ability to serve its customers without interruption regardless of the purchaser.  Among other things the agreements included a lease in perpetuity of 2 fiber pairs in the undersea cable. The Trustee needed those agreements in order to facilitate the Trustee's effort to sell Paniolo's assets; and the Trustee used those agreements for that exact purpose. Those agreements contained an express dispute resolution procedure.  After the Trustee had taken advantage of its agreements to find the best possible sale, he (in concert with Hawaiian Telcom) purported to "terminate" his obligations under the agreements, violating all of his promises under them.  It is Hawaiian Telcom and

2

the Trustee who are seeking to "frustrate[d] the intent and directives of the Sale Order" by taking the benefits of SIC's agreements, while denying SIC the benefits they promised.  See <u>SIC vs Katzenstein,</u> (and Hawaiian Telcom); adv proceeding no. 21-90017, commenced October 12, 2021.

The alleged obligations that Hawaiian Telcom seeks to enforce are contained in the very agreements Hawaiian Telcom disingenuously claims were terminated. SIC stands ready to perform any obligations that are determined to exist, upon Hawaiian Telcom and the Trustee withdrawing their repudiation of their own obligations under those agreements and, to the extent there are disagreements, participating in the dispute resolution process spelled out in the MRA..

The truth is that Waimana Enterprises Ltd. continues to hold a valid, proper and enforceable license over the Hawaiian Home Lands that remains in full force and effect.   SIC holds a partial assignment of that license that continues to be owned by SIC.  Hawaiian Telcom did not buy SIC's license.  Hawaiian Telcom has no right or authority to evict SIC or Waimana or Clearcom from the property that remains licensed to them.  Again, Hawaiian Telcom is asking the Court to take actions that are contrary to law.  The Court has no authority to evict SIC. Hawaiian Telcom's is deliberately trying to mislead the Court by comparing Hawaiian Home Lands with fee simple property in Hawaii.  Hawaiian Telcom operates and maintains other property on Hawaiian Home Lands.  It is

3

knowledgeable of the special conditions resultant from Hawaiian Home Lands

being trust lands.  Additionally, Hawaiian Telcom no longer owns any of the poles

on which their aerial cable is attached.  They therefore are very knowledgeable of

shared rights.  Waimana Enterprises Inc. holds License 372 from the Hawaiian

Homes Commission.  That license has been partially assigned to SIC.  (it has also

been partially assigned to Clearcom Inc. and Pa Makani LLC).  SIC's interest in

License 372 was deliberately **not** the subject of the Trustee's execution sale of

certain specified SIC-owned assets to Paniolo.  Thus, Hawaiian Telcom does not

own that license.[1]  SIC, Pa Makani and Clearcom still hold their rights under

License 372 in Hawaiian Home Lands.  Hawaiian Telcom's statements, such as the

following, are simply made to deliberately mislead the Court:

> It is important for safety, environmental and economic
> reasons that the SIC Parties promptly remove all of the
> foregoing items from the Paniolo premises without
> further delays. As the Sale
> Order transferred the Paniolo property to HTI free and
> clear, there is no basis for the SIC Parties to continue to
> occupy these premises through the continued storage of
> these items

In truth and in fact, the "SIC Parties" hold valid licenses and have every right to

store, operate and maintain their assets on the licensed property and in facilities

---

[1] Under Schedule 2 of the Master Relationship Agreement (that Hawaiian Telcom and the Trustee are erroneously claiming they terminated) SIC did not transfer the license but did give Paniolo the right to use it:  "For the avoidance of doubt, the Parties acknowledge and agree that DHHL License will not be assigned by SIC to Paniolo, but that SIC shall, and hereby does, grant to Paniolo the full benefit and use of the DHHL License for the IRU Term provided Paniolo does not exercise its rights under such grant to impair service to HHL."

4

that were not part of the A2 assets.  This is an example of the false bases on which

this motion has been made.  The Trustee and Hawaiian Telcom are baselessly

screaming "obstruction" and "no cooperation" in an effort to deny SIC the benefits

that were promised.

1.      __THE SETTLEMENT AGREEMENT, MASTER RELATIONSHIP
        AGREEMENT, AND THE SCHEDULES ATTACHED TO IT ARE
        THE FOUNDATION OF THIS COURT'S ORDERS AUTHORIZING
        AND APPROVING THE SALE TO HAWAIIAN TELCOM__

        This Court's orders authorizing the settlement are founded upon the

Trustee's repeated express promises that SIC would receive the benefits of the

Settlement Agreement, MRA and schedules thereto.  The Trustee's counsel

represented to the Court, the Settlement Agreement and related documents would:

> allow for replacement of the existing Paniolo Network
> Cable Lease ("SIC Lease") and Joint Use Agreement
> ("JUA") between the Debtor and SIC with a new Master
> Relationship Agreement which **will help to facilitate the
> sale of substantially all of the Debtor's assets in this
> case**

(emphasis added). See dkt # 316 Quoted from Trustee Katzenstein's Memorandum
in Support of Motion To Approve Settlement, at page 2; See also Settlement
Agreement (Exhibit "B ") page 2 recital G

        Accordingly, the Trustee's counsel represented to the Court that the Trustee

entered these Agreements because they are:

> vital to SIC's ability to continue to provide
> telecommunication services to the residents of the
> Hawaiian Home Lands, a matter

5

of public policy for both the State of Hawaii and the
USA. As a result, the Settlement Agreement and related
documents, **provided SIC with virtually all rights of
use and benefits of ownership of the A.2 Assets.**

(emphasis added).  Id at 7.

The Trustee promised:

> **"Any purchaser or assignee approved by the Court
> <u>shall</u> be bound by the terms of the Master
> Relationship Agreement."**

See Settlement Agreement (Exhibit "B") at Section 3(h)
(emphasis added)

In  his motion asking the Court to approve the sale to Hawaiian Telcom, the

Trustee represented that SIC's access to the network would continue because of the

Settlement and MRA:

> SIC's access to and use of the A.2 Assets was not
> interrupted and **will continue into the future**.

Trustee's Memorandum in Support of Its Motion To Sell To Hawaiian
Telcom, page 7 (emphasis added).

> **The assets** are being sold subject to an indefeasible right
> of use (IRU) granted to Paniolo which will be assigned to
> Buyer, and **subject to a below market (actually de
> minimus cost) leaseback to SIC for use in SIC's retail
> service to residents of the Hawaiian Home Lands**

<u>Id</u>., page 25 (emphasis added).

> Paniolo's obligations to provide Leased Fiber and
> Transport Services O&M Services pursuant to Section
> 3.3 will be effective as of the date a sale of under Section
> 363 of the Bankruptcy Code of all or substantially all of

6

Paniolo's assets that comprise Paniolo Network is consummated and approved by the Bankruptcy Court.

Court approved Master Relationship Agreement Section 3.5

Hawaiian Telcom's filing in support of the Trustee's Motion to Approve the Sale to was made without any exceptions.  There can be no doubt that the Court's Order approving the sale to Hawaiian Telcom was based on the Trustee's repeated representations that the MRA and exhibits, (which the buyer is now trying to repudiate) would remain  in place.

**2.** **THE COURT APPROVED MASTER RELATIONSHIP AGREEMENT CONTAINS A CLEAR DISPUTE RESOLUTION PROVISION**

The MRA recognized that there could be disagreements in the course of the transition to a new owner.  Accordingly it described how those disagreements would be addressed:

> 13.2. The Parties will attempt to resolve any dispute arising out of this Agreement promptly through discussions at the operational level. In the event that a resolution is not achieved, the disputing Party shall provide the other Party with written notice of the same and the Parties shall attempt to resolve such dispute between the **respective vice presidents of operations (or equivalent position with the power to resolve the dispute) of the disputing Parties**. All negotiations conducted by such officers shall be confidential and shall be treated as compromise and settlement negotiations for purposes of federal and state rules and regulations. If the disputing Parties fail to resolve such dispute within thirty (30) days of the non-disputing Party's receipt of the

7

written notice, either such Party may initiate legal action as set forth below.

(a) Failing resolution of a dispute in accordance with Section 13.2 above and notwithstanding anything to the contrary contained in this Agreement, the Parties hereby irrevocably agree that any legal action, suit or proceeding with respect to any matter under or arising out of or in any way connected with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding shall be brought in the courts of the State of Hawaii, and each Party hereby agrees to the personal and exclusive jurisdiction of such courts. The prevailing Party in any litigation shall be entitled to its costs and reasonable attorneys' fees.

See Master Relationship Agreement Section 13.2 (emphasis added)).

Although the parties have disagreed on various matters, neither party ever invoked the process for resolving the disagreements.

A careful reading of the dispute resolution clause supports the intent that the purchaser of the Paniolo assets would be bound by the MRA and its dispute resolution procedure.  The highlighted portion specifies a VP of operations.  The Trustee never indicated it would operate the Paniolo assets.  Doing so would require an VP of operations or equivalent.

**3. THE MASTER RELATIONSHIP AGREEMENT MANDATED THAT THE TRUSTEE MIGRATE SIC'S TRAFFIC ON THE NETWORK TO FREE FIBERS PROMISED TO SIC.  THE TRUSTEE DELEGATED THAT RESPONSIBILITY TO HAWAIIAN TEL**

Under the Master Relationship Agreement, SIC's traffic on the network needed to be moved to the two fiber pairs that the Trustee agreed would be leased

8

at no cost to SIC.  Paniolo (presumably acting through the Trustee or buyer) agreed

to be responsible for that migration:

> Paniolo shall be responsible for the cost, if any, of
> reconfiguring current SIC traffic onto the Leased Fiber;
> provided further that Paniolo shall have the sole
> discretion to determine how and when such
> reconfiguration shall be implemented.

The Trustee delegated this responsibility to Hawaiian Telcom in the

Operational Support and Sales Agreement that was approved by the Court:

> 3.5 … The Parties further acknowledge and agree that the
> Network Inventory [that Hawaiian Telcom agreed to
> prepare] is necessary for the timely and proper grooming
> and migration of SIC's consumption of network assets to
> align with the **Settlement Agreement and Master
> Relationship Agreement** between the Trustee and SIC.
> Trustee shall use commercially reasonable efforts (which
> shall include enforcing the terms of the Settlement
> Agreement) in support of Service Provider's preparation
> of the Network Inventory

> 3.6 … the Service Provider **shall** perform the migration
> of existing Fiber Strands and network circuits consumed
> by SIC onto the Leased SIC Fiber and Transport Services
> in connection with the SIC Fiber in accordance with the
> provisions of the Settlement Agreement and Master
> Relationship Agreement. The Service Provider will
> develop a network plan, engineering designs, applicable
> work orders, circuit designs, network inventory, and
> implementation plan or method of procedure, to complete
> the migration. Work shall be performed in accordance
> with industry best practices in maintenance windows
> coordinated by the Service Provider, acting on behalf of
> the Trustee. In the event SIC does not have the
> equipment necessary to interface with the Leased SIC
> Fiber and related Transport Services, Service Provider

9

and Trustee shall cooperate to determine an appropriate
migration scope to achieve the necessary interface, prior
to the closing
of the Proposed Transaction.

Operational Support Agreement approved by the Court, Sections 3.5 and 3.6.

The Operational Support Agreement ended with the closing of the sale (Operational Support Agreement Section 2.2). The Trustee and Hawaiian telcom failed to perform this requirement.

## 4. WHEN HAWAIIAN TEL DEMANDED PAYMENT FOR THE COLOCATION SPACE, SIC POINTED OUT THAT THE TRUSTEE AND HAWAIIAN TEL WERE REQUIRED TO RECONFIGURE SIC'S TRAFFIC FIRST

The MRA provides that SIC will pay for colocation space beginning January of 2021. However, SIC's agreement to make these payments was based on the Trustee's agreement to reconfigure SIC's use of the network, which would have reduced the amount of colocation space SIC needed by 90%.

When Hawaiian Telcom demanded payment for colocation space, SIC responded that it would not because the Trustee and Hawaiian Telcom had not performed their responsibility to reconfigure SIC's traffic. Exhibit "C." Neither party pursued the procedures spelled out in the MRA to resolve their disagreement on this issue.

10

Instead, the Trustee did nothing until the day of closing the sale to Hawaiian Telcom and then sent a letter purporting to terminate the parties' agreement with no dispute resolution process at all.  The Trustee's letter says:

> Specifically, Sandwich Isles Communications, Inc. ("SIC") has defaulted on its obligations under the SIC Lease by, among other things, failing to pay Paniolo the amounts due under the MRA for monthly invoices beginning January 1, 2021 for Collocation Space

Exhibit "D"

Under the terms of the MRA the Trustee's notice was ineffective because the Trustee did not follow the dispute resolution provisions spelled out in the MRA

The fact that the Trustee's letter was given in bad faith is confirmed by the fact that he had SIC's position and rather than invoke the dispute resolution process he waited for months and then gave an 11th hour notice of termination.

## 5.   THE ENTIRE DISPUTE IS CAUSED BY TRUSTEE'S VIOLATION OF THE DEADLINE FOR CONDUCTING THE SALE

In the Settlement Agreement, the Trustee promised that the sale of the Paniolo assets would be conducted pursuant to the deadlines set by the Court:

> Trustee will conduct a sales process for the Paniolo 363 Sale, including assumption and assignment of executory contracts and nonresidential releases **pursuant to orders of the Bankruptcy Court governing procedures and deadlines**, of substantially all of Paniolo's assets.

> Settlement Agreement (Exhibit "B"), Section 3(h).

11

The procedures and deadlines governing the sale of assets were set forth in the Court's order dated June 3, 2020, and were never extended:

| Event | New Date |
|---|---|
| Deadline to file Notice of Cure Costs | June 5, 2020 |
| Bid Deadline | July 13, 2020 |
| Auction (if needed) | July 31, 2020 |
| File Notice of Sale | August 10, 2020 |
| Objection Deadline (including Cure Cost Objections and Adequate Assurance Objections) | August 17, 2020 |
| Reply Deadline | August 24, 2020 |
| Sale Hearing | September 3, 2020 |
| Closing | September 14, 2020 |
| | |

See dkt #270 Order establishing these deadlines is attached hereto as Exhibit "D."

The Trustee took almost an extra year after the above deadlines to close the sale to Hawaiian telcom.   The Trustee's breach of his promise toc "conduct a sales process … **pursuant to orders of the Bankruptcy Court governing procedures and deadlines**" is the cause of the dispute regarding colocation fees.  If the Trustee had timely performed his agreement, all of this would have been resolved long

12

before January of 2021.  The Trustee (and Hawaiian Telcom) cannot take advantage of their own breach which caused this entire issue.

Moreover, SIC never agreed to pay operational costs of the network and definitely cannot be held responsible for the time period after the September 14, 2020.   SIC has billed the Trustee for these costs, but the Trustee has ignored those bills.   SIC is entitled to a set-off against any claims made by the Trustee or Hawaiian Telcom, for all of the operational costs borne by SIC.  The amount of the operating costs for which SIC is entitled to reimbursement exceeds the amount claimed in colocation charges.  Accordingly, it is actually the Trustee and Hawaiian Telcom who owe SIC.

**6.**    **DHHL'S DECLARATION IS TO ENSURE CONTINUED SERVICE -
NOTHING MORE**

Hawaiian Telcom and the Paniolo Trustee has spent a considerable amount of time deliberately misleading DHHL that service can only be continued with Hawaiian Telcom's version of the sale.  This is completely false.  As the Trustee has repeatedly represented to this Court, under the Settlement Agreement and MRA service to SIC's customers will continue uninterrupted.  It is Hawaiian Telcom's attempts to close the purchase without the agreements that jeopardizes service.  Hawaiian Telcom has not told anyone, including the Court, how service to SIC customers will continue uninterrupted without the Settlement Agreement and MRA.

Furthermore, SIC continues to own the lines and conduits connecting each homesteader without which service cannot be received.  The Paniolo Trustee and Hawaiian Telcom deliberately chose not to acquire those SIC assets.  Hawaiian Telcom is orchestrating a massive public relations scheme to deflect the truth by claiming SIC non-cooperation threatens continued service.  SIC's cooperation, in accordance with the Settlement Agreement and MRA, resulted in Hawaiian Telcom's purchase.  Under the agreements, continued service is not dependent on SIC's cooperation.

7.   **THE TRUSTEE AND HAWAIIAN TELCOM HAVE NO BASIS TO CLAIM THE AGREEMENTS WITH SIC ARE TERMINATED**

Even if it were ultimately determined (after the Master Relationship Agreement Section 13.2 is followed) that SIC is owes some money under the Master Relationship Agreement, the Trustee and Hawaiian Telcom have no basis to terminate the Master Relationship Agreement and Schedules thereto.

> 'A rescission is not warranted by a mere breach of contract not so substantial and fundamental as to defeat the object of the parties in making the agreement. Before partial failure of performance of one party will give the other the right of rescission, the act failed to be performed must go to the root of the contract or the failure to perform the contract must be in respect of matters which would render the performance of the remainder a thing different insubstance from that which was contracted for.'

14

Golf Carts, Inc. v. Mid-Pacific Country Club, 53 Haw. 357, 493 P.2d 1338  (1972) quoting Yucca Mining & Petroleum Co. v. Howard C. Phillips Oil Co., 69 N.M. 281, 285, 365 P.2d 925, 927 (1961).

     In Golf Carts, Inc., as in the instant case, there was a disagreement over the interpretation of the contract.  The Hawaii Supreme Court held that expressing disagreement with the other party's interpretation of the contract, does not justify termination of the contract (even if the interpretation is ultimately held to be incorrect):

> "In the instant case, termination by appellee was clearly not justified. A difficulty arose over the percentage of receipts appellee was to be entitled to, a secondary consideration under the agreement. The terms of that portion of the contract were disputed by the parties. Appellant offered to continue its performance while the issue as to the correct amount of proceeds appellee was to receive was resolved separately. It has been held that 'an offer to perform made in accordance with the promisor's interpretation of the contract, if made in good faith although it may be erroneous, is not such a clear refusal to perform as to constitute an anticipatory breach.' Walker v. Shasta Minerals & Chemical Co., 352 F.2d 634, 638 (10th Cir. 1965).  Surely such a demonstrated desire to continue to fulfill appellant's obligation under the contract did not amount to a distinct, unequivocal, and absolute refusal to perform. As such, it cannot be said that appellant's actions constituted a breach or repudiation, justifying appellee's termination."

     53 Haw. at 360

     Similarly, in the instant case, SIC expressed disagreement about whether Paniolo's promise of reconfiguration was a condition precedent to SIC's promise

15

to begin paying for collocation space.  SIC never repudiated the contract and

therefore there was no permissible basis to terminate

     In <u>Aickin v. Ocean View Investments Co., Inc</u>., 84 Hawai'i 447, 935 P.2d

992 (1997) the Hawaii Supreme Court again held that a contract could not be

terminated because the alleged breach was "not so substantial and fundamental as

to defeat the object of the parties in making the agreement."

> A material default or breach does not result simply
> because a party to a contract violates one of the
> agreement's provisions. In <u>Golf Carts, Inc. v. Mid–
> Pacific Country Club</u>, 53 Haw. 357, 493 P.2d 1338
> (1972), this court defined a material breach, albeit in a
> different context:
>
> > A rescission is not warranted by a mere breach of
> > contract not so substantial and fundamental as to
> > defeat the object of the parties in making the
> > agreement. Before partial failure of performance of
> > one party will give the other the right of rescission,
> > the act failed to be performed must go to the root
> > of the contract or **the failure to perform the
> > contract must be in respect of matters which
> > would render the performance of the remainder
> > a thing different in substance from that which
> > was contracted for**.

     84 Haw. at 460, 935 P.2d at 1005 (emphasis added).

     In the instant case, the object of the parties is clear from the Trustee's own

words.  The Trustee sought to make easier his task of selling the Paniolo network

(a purpose that the Trustee has already fully enjoyed) and SIC sought to assure

service for decades into the future through the free lease offered by the Trustee.

16

Neither of these purposes has been harmed in any way by SIC's disagreement about whether payments for collocation only begin after the Trustee (or Hawaiian Telcom) has fulfilled its obligation to reconfigure SIC's traffic on the network.  If any money is owed, it will be paid after the dispute resolution process has been complied with.  The fact that a dispute exists does not authorize termination of the agreement.

The rule that "a material default or breach does not result simply because a party to a contract violates one of the agreement's provisions" and that it does not justify termination of the agreement unless it goes "to the root of the contract or the failure to perform the contract must be in respect of matters which would render the performance of the remainder a thing different in substance from that which was contracted for" was recently confirmed in <u>Kahawaiolaa v. Hawaiian Sun Investments, Inc</u>., 146 Hawai'i 424, 463 P.3d 1081 (2020).  Since the MRA and related agreements call for application of Hawaii law, the result is clear.  The MRA, Lease and related agreements are not terminated.

The Hawaii Supreme Court recognized in <u>Aickin</u>

> The facts of this case indicate that the parties contemplated a long-term relationship, in which Lessees would provide needed services to the area, in return for the right to conduct business on the premises for an extended period of time. Furthermore, Lessees have testified that Lessor was not damaged or inconvenienced by the delay, and Lessor has adduced no evidence to the contrary. Accordingly, we hold that the circuit court

17

> erred in COL D when it held that Lessees' failure to
> register the underground storage tank was a material
> default under the terms of the lease.

Similarly, the parties to the MRA also intended the agreement would last for decades into the future.  A dispute over a few months' collocation fees is not a basis to terminate the MRA or any part of it.

The Hawaii Supreme Court further recognized, that imposing a forfeiture under such circumstances is improper:

> the potential harshness inherent in abruptly declaring a
> lease at an end, especially where the party in breach
> stands to suffer substantial loss from its termination,
> makes courts reluctant to enforce forfeiture clauses or to
> allow other involuntary termination of leases, and has
> resulted in the widely accepted "material breach" rule.
> Nearly all courts hold that, regardless of the language of
> the lease, to justify a cancellation, forfeiture, or other
> premature termination of a lease, the breach must have
> been "material," "serious," "substantial," or the like....

Aickin, 84 Haw. at 461, 935 P.2d at 1006, quoting University of Hawaii Professional Assembly v. University of Hawaii, 66 Haw. 214, 219, 659 Pl.2d 720, 724 (1983).

This could not be more true in the instant case.  Because of a dispute over the beginning date for collocation payments, the Trustee and Hawaiian Telcom seek to deprive residents of the Hawaiian Home Lands the assurance the MRA provided that they would have telecommunications service for decades into the future including a free lease of capacity on the undersea and underground cable.

18

**CONCLUSION**

Hawaiian Telcom is trying to get things that the Trustee never sold to them (such as exclusive access to the premises licensed to SIC). They are seeking to enforce SIC's agreements that **Hawaiian Telcom itself has improperly repudiated**! The Court should recognize Hawaiian Telcom's conduct for what it is.

The facts of Hawaiian Telcom's wrongful conduct are further set out in the adversary proceeding filed by SIC last week, <u>Sanwich Isles Communications vs. Katzenstein and Hawaiian Telcom</u>, Adv. No. 21-90017, The Court is urged to review the exhibits attached thereto in order to gain a more complete understanding of what is being attempted.

Dated: <u>October 18, 2021</u>.                    Respectfully submitted,


                                        <u>/s/ Lex R. Smith</u>
                                        LEX R. SMITH
                                        MARIA Y. WANG
                                        Attorneys for Interested Party SANDWICH
                                        ISLES COMMUNICATIONS, INC.

19

CASE LOMBARDI & PETTIT
A LAW CORPORATION

TED N. PETTIT                          4287-0
Email: tnp@caselombardi.com
DAVID G. BRITTIN                       8686-0
Email: dgb@caselombardi.com
Pacific Guardian Center, Mauka Tower
737 Bishop Street, Suite 2600
Honolulu, Hawaii 96813
Telephone: (808) 547-5400 | Fax: (808) 523-1888

MORGAN, LEWIS & BOCKIUS LLP
ANDREW J. GALLO *(Pro Hac Vice Admittance Granted)*
Boston, MA 02110-1726
Phone: +1 (617) 951-8117
Email: andrew.gallo@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
MELISSA Y. BOEY *(Pro Hac Vice Admittance Granted)*
1400 Page Mill Road | Palo Alto, CA 94304
Phone: 1 (650) 843-4000
Email: melissa.boey@morganlewis.com

Attorneys for HAWAIIAN TELCOM, INC.

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>PANIOLO CABLE COMPANY, LLC,<br><br>Debtor. | CASE NO. 18-01319<br>(Chapter 11) |
| WAIMANA ENTERPRISES INC. and SANDWICH ISLES COMMUNICATIONS INC., | ADV NO. _____ |

|  | [Removed from Circuit Court of the First Circuit, State of Hawaii Civil No. 1CCV-22-0000321] |
| --- | --- |
| Plaintiffs, | |
| vs. | **DEFENDANT HAWAIIAN TELCOM. INC.'S NOTICE OF REMOVAL OF STATE COURT ACTION TO BANKRUPTCY COURT; EXHIBITS "1" AND "2"** |
| HAWAIIAN TELCOM INC., | |
| Defendant. | |

## DEFENDANT HAWAIIAN TELCOM INC'S NOTICE OF REMOVAL OF STATE COURT ACTION TO BANKRUPTCY COURT; EXHIBITS "1" AND "2"

To:   The Clerk of the United States Bankruptcy Court for the District of Hawaii and Plaintiffs WAIMANA ENTERPRISES INC. and SANDWICH ISLES COMMUNICATIONS INC.

PLEASE TAKE NOTICE that Defendant HAWAIIAN TELCOM INC. (**"Defendant"**), by and through its co-counsel, CASE LOMBARDI & PETTIT, and MORGAN LEWIS, pursuant to Rule 9027 of the Federal Rules of Bankruptcy, hereby gives Notice of Removal to the United States Bankruptcy Court for the District of Hawaii of the entire state court action captioned *WAIMANA ENTERPRISES INC. and SANDWICH ISLES COMMUNICATIONS INC. vs. HAWAIIAN TELCOM INC.*, Civil No. 1CCV-22-0000321 (Other Civil Action) in the Circuit Court of the First Circuit, State of Hawaii (**"State Court Action"**). Defendant bases this Notice of Removal on the following:

2

## I.    SHORT AND PLAIN STATEMENT OF FACTS

Plaintiffs Sandwich Isles Communications Inc. ("**SIC**") and its affiliate, Waimana Enterprises Inc. ("**Waimana**") (together "**Plaintiffs**"), initiated the State Court Action against Defendant in the State of Hawaii, Circuit Court of the First Circuit, seeking, among other things, to forcibly evict Defendant from certain Paniolo buildings and premises that Defendant purchased through the sale approved by this Court under Section 363 of the U.S. Bankruptcy Code (the "<u>363</u> Sale"), and otherwise deprive Defendant of assets it purchased through the 363 Sale.

**A.    Parties:**  The Complaint filed on March 22, 2022 and all attachments to the Complaint are attached hereto as **Exhibit "1."** The Complaint concerns the following Parties:

> Plaintiffs are separate corporations organized and existing under the law of the State of Hawaii.
> Defendant is a corporation organized under the law of the State of Hawaii. There are no other defendants.

**B.    Specific Allegations of the Complaint:**  The basic allegations with corresponding paragraph numbers of the Complaint (in single space format) are as follows:

4.    Section 207(c)(l)(A) of the Hawaiian Homes Commission Act (**"HHCA"**) authorizes the Hawaiian Homes Commission (**"HHC"**) to grant licenses, for lots, as easements for public purposes including utility facilities. Waimana is the owner and holder of License No. 372 issued by the State of Hawaii

3

Department of Hawaiian Home Lands **("DHHL")** pursuant to authorization from the HHC (hereinafter **"License 372")**.

5.      Under HHCA 207(c)(l), License 372 is an interest in real estate issued to Waimana pursuant to HHCA. 207(c)(l) and Hawaii Administrative Rules 10-4-21 and 22. A true copy of License 372 is attached hereto as **Exhibit "A"** and incorporated herein by this reference.

6.      By instrument dated January 15, 1996, Waimana partially assigned License 372 to SIC (the **"Partial Assignment")**. The Partial Assignment is expressly limited to "IntraLata and Intrastate telecommunication **("voice")** services" on the Hawaiian Home Lands **("HHL")**. A true copy of the Partial Assignment is attached hereto as **Exhibit "B."** By instrument dated October 6, 2008, the HHC consented to the Partial Assignment. A true copy of the Consent is attached hereto as **Exhibit "C"**. Partial Assignment remains in full force and effect, and SIC is not in breach of the License 372 and has not abandoned License 372.

7.      The DHHL has confirmed as recently as January 6, 2022 that License 372 remains in full force and effect, is valid and has not been cancelled. Waimana and SIC also are not in breach of the License 372 and have not abandoned License 372.

8.      License 372 in relevant part provides:

LICENSOR [DHHL] determines that the LICENSE established herein is essential in order to provide broad band telecommunication  services of all types (including but not limited to local, intrastate, interstate and international telephone; video on demand; interactive communication; cable television; medical and educational links; and electronic data transmission) to LICENSOR'S lands in a timely manner;

NOW THEREFORE, LICENSOR, in consideration of the services to be provided by LICENSEE [Waimana], and the terms, conditions and covenants herein contained on the part of LICENSEE to be kept, observed and performed, hereby grants and issues to LICENSEE, and its legal successors and assigns, the exclusive right and privilege to build, construct, repair, maintain and operate a broad band telecommunications network including poles, overhead and/or underground lines, appliances, microwave and/or other types of equipment  over,  across,  under and throughout all lands under the administration and jurisdiction of LICENSOR, and

4

its legal successors and assigns, including the right to trim and keep trimmed any vegetation, shrubbery, bushes or trees in the way of its lines and appurtenances, and including also the right of entry upon the easement area and adjoining land of LICENSOR for the construction, maintenance, operation and removal of LICENSEE'S line and appurtenances over, across and under the LICENSE area.

TO HAVE AND TO HOLD the same unto LICENSEE, its legal successors and assigns, in perpetuity, commencing on May 1, 1995, unless sooner terminated as hereinafter provided,

5.    LEVEL OF TELECOMMUNICATION SERVICES. LICENSEE shall provide at a minimum the same level of telecommunication service being provided in adjacent areas not subject to this LICENSE. LICENSEE shall use its best effort to provide a higher level of telecommunication service than that being provided in adjacent areas not subject to this LICENSE. LICENSEE shall not provide a lower level of service than that level being provided in adjacent areas not subject to the LICENSE unless LICENSOR shall agree in writing.

6.    COST OF TELECOMMUNICATIONS SERVICES. LICENSEE shall provide to the beneficiaries of LICENSOR living in areas subject to this LICENSE, telecommunications services at a cost less than or equal to the cost for comparable services being provided in adjacent areas not subject to this LICENSE. LICENSEE shall not charge beneficiaries living in the LICENSE area more for telecommunication services than being charged in adjacent areas not subject to this LICENSE unless LICENSOR consents in writing.

9.    Pursuant to License 3 72, SIC developed telecommunications facilities, including Central Offices, warehouses and security fencing (**"Licensee Buildings"**) and underground conduits throughout HHL to beneficiary lessee residences (collectively **"Licensed Property."**) SIC used those facilities for the provision of voice services. SIC was granted a Certificate of Authority from the Hawaii Public Utilities Commission to provide voice services ONLY on HHL. Waimana caused other subsidiaries to provide other telecommunications services (internet, wireless etc.) by using, in part, the excess capacity on SIC's facilities.

10.    Paniolo Cable Company Inc. (**"Paniolo"),** which is a third-party mainland undersea cable company not owned or controlled by Waimana, developed and leased to SIC, certain telecommunication facilities (undersea and underground cables and switches) outside of HHL which connected various HHL parcels on each Hawaiian island except Lanai. Paniolo's facilities were connected

5

to and housed in SIC's existing facilities on the Licensed Property, pursuant to SIC's joint use agreement with Paniolo. All of Paniolo's facilities were leased to SIC. Paniolo had no interest in any HHL, as the Licensed Property was licensed to Waimana pursuant to its rights under License 372 and SIC pursuant to its rights under its partial assignment. The assets owned by Paniolo and leased to SIC including the assets on the Licensed Property are hereinafter referred to as the **"Paniolo Assets."**

11.    In 2018, an involuntary bankruptcy petition was filed against Paniolo and in 2019, the U.S. Bankruptcy Court appointed Michael K.atzenstein to serve as the Trustee in Bankruptcy for Paniolo **("Katzenstein").**

12.    Because SIC was delinquent in its rent payments to Paniolo, in 2019, K.atzenstein sued SIC and obtained a money judgment against SIC for the amount of unpaid rent that SIC owed to Paniolo.

13.    With the money judgment, K.atzenstein obtained a Writ of Execution and caused the United States Marshal to hold an execution sale of certain specifically identified telecommunications assets of SIC all of which  were on the License Property. Katzenstein, however, did not acquire any interest in License Property as a result of the execution sale. (The SIC assets acquired by Katzenstein in the execution sale are hereinafter referred to as   the    **"Katzenstein-Acquired SIC Assets."**)

14.    The Katzenstein-Acquired SIC Assets covered only a portion of SIC's facilities on the Licensed Property. Katzenstein did not want SIC's "last mile" or "local loop" facilities (**"last mile facilities"**) that connect each home on HHL to the local, national and international communication networks or the warehouses and security fencing. Katzenstein and Hawaiian Tel did not want responsibility to service **ALL** customers on the HHL. Katzenstein and Hawaiian Tel wanted the assets that could be used to improve service to Hawaiian Tel's customers off of HHL. These assets continue to be owned by SIC and are essential to sustaining and expanding service to SIC's, Waimana's and/or Waimana's other subsidiaries' customers on the HHL.

15.    By order entered March 16, 2020 the U.S. Bankruptcy Court confirmed the sale of the Katzenstein-Acquired SIC Assets to Trustee Katzenstein. A true copy of the March 16, 2020 Order is attached hereto as **Exhibit "D."**

16.     Katzenstein knew that he could not obtain rights to the Licensed Property. He therefore negotiated with SIC and obtained from SIC the right to use the Licensed Property. In exchange, Katzenstein committed to amongst other conditions not impair telecommunications service to HHL and granted SIC the right to use Paniolo Fiber Pairs on the Paniolo Assets to continue to provide telecommunications services to HHL. This agreement, entitled the Master Relationship Agreement dated March 6, 2020 (**"MRA,** ") attached hereto as **Exhibit "E,"** which was approved by the Bankruptcy Court by order dated June 4, 2020, allowed Katzenstein to use License 372 for the purposes  authorized by SIC:

> For the avoidance of doubt, the Parties acknowledge and agree that DHHL License will not be assigned by SIC to Paniolo, but that SIC shall, and hereby does, grant to Paniolo the full benefit and use of the DHHL License for the IRU Term provided Paniolo does not exercise its rights under such grant to impair service to HHL.

Id. at Schedule 2, section 2.3.

17.     Katzenstein then sold the Katzenstein-Acquired SIC Assets (together with Paniolo's Assets) to defendant Hawaiian Tel.  A copy of the Asset Purchase Agreement dated November 30, 2020 ("**APA**") is attached hereto as **Exhibit "F."**

18.     On December 16, 2020, Ryan K. P. Kanakaole, Esq., the Deputy Attorney General representing DHHL filed papers in the Bankruptcy Court confirming that because Hawaiian Tel did not acquire the right to use License 372, "The Buyer will need to acquire a new license for the use ofDHHL lands." The same message was confirmed by HHC Chainnan William Aila, in emails dated January 6, 2021 to alhee@waimana.com that state that License 372 has not been cancelled, and: "The License remains valid. DHHL informed the Court that any purchaser of the assets would require a license from DHHL."

19.     Katzenstein never had any rights to any real estate on HHL including the Licensed Property. License 372 was never assigned to Katzenstein. Because Katzenstein never owned any interest in License 372, he could not, and did not, sell to Hawaiian Tel any rights to occupy the Licensed Property.

20.     Hawaiian Tel had the opportunity to assume from Katzenstein all of the benefits of MRA including the use and enjoyment of SI C's rights under License 372.

21.     Hawaiian Tel, however, chose not to assume that agreement that would have given it the right to use the Licensed Property. At the time Hawaiian Tel made its choice not to assume this agreement with SIC, Hawaiian Tel knew that it was buying facilities located on Waimana's and SIC's Licensed Property.

22.     Hawaiian Tel's failure to assume the right to use the Licensed Property was not inadvertent. Hawaiian Tel has repeatedly emphasized that its decision not to assume the agreement that allowed Katzenstein to use the License Property was deliberate and intentional. For example, in Hawaiian Tel's motion filed in the U.S. Bankruptcy Court on November 16, 2021, attached hereto as **Exhibit "H,"** Hawaiian Tel boldly asserted that the agreements giving Paniolo the right to use License 372:

> were solely "Assignable Contracts" which means they were contracts that could have been assigned by the Trustee to HTI at HTI's sole election. … **HTI, however, did not elect to designate any of the SIC  Agreements as agreements to be assigned by the Trustee to HTI**

Id. at 14 (emphasis added).

23.     Thus, Hawaiian Tel had the opportunity to acquire the right to use the Licensed Property but chose not to do so.

24.     On August 31, 2021, the AP A sale of Paniolo' s Assets from Katzenstein to Hawaiian Tel closed.

25.     Hawaiian Tel is a trespasser on the Licensed Property or in the alternative, a "hold over tenant" from Katenzstein's use rights under the MRA,          which is unlikely because Hawaiian Tel knowingly rejected assignment of those rights.

26.     On and after August 31, 2021, Hawaiian Tel had no right to locate the assets it had purchased on the Licensed Property. Hawaiian Tel does not have a license allowing its assets to be on Licensed Property.

27.     Hawaiian Tel purchased from Katzenstein certain facilities located on the Licensed Property, but has absolutely no interest in the land surrounding and under facilities. The rights to that land are held by Waimana and SIC pursuant to

8

License 372. Hawaiian Tel has no license nor any other right to use the Licensed Property under and surrounding its facilities on HHL.

28.    License 372 places strict and expensive obligations on Waimana and SIC to assure service to every customer on HHL.

29.    Hawaiian Tel acknowledges that it needs a license to operate its facilities on HHL, but to date has not obtained one.

30.    In License 372, DHHL granted Waimana the exclusive right to provide telecommunication service on HHL **("Exclusive Service Right").** However, in addition to this Exclusive Service Right, License 3 72 also granted Waimana the exclusive right to possess the Licensed Property.

31.    Hawaiian Tel may argue that the Federal Communications Commission ("FCC") order dated July 3, 2017 **("FCC Order"),** attached hereto as **Exhibit** "I," requires DHHL to provide access to the Licensed Property on the grounds that the FCC Order prohibits DHHL from granting an exclusive license to only one company to provide telecommunications services on HHL, i.e. the Exclusive Service Right. However, the order does not require Waimana and SIC to share use of the Licensed Property. The FCC Order only preempts the portion of the License that:

> grants one entity the "exclusive" right "to build, construct, repair, maintain and operate a ... telecommunications network" for the purpose of providing service to the residents of the Hawaiian home lands and therefore prohibits other entities from doing so.

Id. at Page 7, Paragraph 16

32.    Under the severability provision of the License 372 at section 22,while the Exclusive Service Right may have been invalidated by the FCC Order, the order did not invalidate and FCC does not have jurisdiction to invalidate Waimana's and SIC's right to exclusive possession of the Licensed Property subject to DHHL's rights set forth in License 372. Waimana and SIC require exclusive possession to perform its telecommunications obligations Thus, Waimana's and SIC's right to exclusive possession of the Licensed Property survived the FCC Order, as did their rights and obligations to provide telecommunications services to HHL. An internal DHHL memo to the HHC dated January 18, 2022 states "DHHL has informed its lessees, tenants, and permittees

that under Federal law they may obtain broadband telecommunications services from any provider of their choice." confirming that the FCC ORDER dealt with License 372 Exclusive Service Right, a copy of which is attached hereto as **Exhibit "G."**

33.     Waimana and SIC are the owners of numerous improvements on the properties licensed under License 3 72 that were not obtained by Katzenstein and thus were **not** purchased by Hawaiian Tel and are still owned, maintained and used by SIC and/or Waimana and/or Waimana's other subsidiaries to provide service to their HHL customers. Hawaiian Tel's destructive actions are interfering with Waimana and its subsidiaries' including SIC's ability to continue to provide service to the residents of the HHL. Hawaiian Telcom are using these Licensed Properties without authorization or paying for such use.

34.     Waimana and SIC have repeatedly urged Hawaiian Tel to negotiate terms on which Hawaiian Tel can be allowed to use the Licensed Property, as Katzenstein did. Hawaiian Tel has refused to do so. Hawaiian Tel wants something it and Katzenstein knew was illegal and unfair-Hawaiian Tel wants to use the Licensed Propeliy for free and without committing to not impair telecommunications service to HHL and the obligations of License 372 which DHHL and the HHC granted Waimana and SIC.

35.     Because Hawaiian Tel has no right to locate its facilities on Waimana and SIC's Licensed Property, and Hawaiian Tel has refused to negotiate satisfactory tenns for the use of those licensed lands, and Hawaiian Tel continues to damage assets they do not own, Waimana had no choice but to demand that Hawaiian Tel remove its facilities from Waimana and SIC's licensed lands. A true copy of the February 10, 2022, demand letter is attached as **Exhibit "J".**

36.     Since August 31, 2021, Hawaiian Tel has changed the locks on SIC warehouses, continues to damage SIC's security fencing, including cutting SIC's locking mechanisms, and has caused SIC to cut Hawaiian Tel's locks to gain access to Waimana and SIC's facilities located on Waimana and SIC's licensed lands. Numerous police reports of these incidents have been made.

37.     Despite SIC's and Waimana's demands to follow its security protocols, Hawaiian Tel has failed and refused to stop destroying SIC's property trespassing and remove its facilities from Waimana and SIC's licensed lands.

38.     License 372 grants Waimana and SIC an interest **in land.**

39. Despite warnings from Waimana and SIC, Hawaiian Tel has repeatedly cut locks and damaged Waimana's and SIC's improvements that Katzenstein has never owned and therefore Hawaiian Tel does not, and could not own. A copy of Hawaiian Tel's letter asserting their alleged "justification" for doing so is attached hereto as **Exhibit "K,"** which only proves that Hawaiian Tel is unfairly competing with Waimana and SIC by usurping Waimana' s and SIC's Licensed Property and SIC's "last mile" facilities without compensation, and destroying relations with DHHL and HHL customers.

See attached Exhibit "A."

### C.   Plaintiffs' Claims:

COUNT I   Injunction (barring Hawaiian Tel from access), Damages and Punitive Damages

COUNT II  Judgment for property damage, last profits and compensation and disgorgement of Hawaiian Tel profits and punitive damages.

COUNT III  Unfair Methods of Competition

### D.   Relief Sought by Plaintiffs:

Judgment for eviction of Defendant; issuance of a Writ of Possession; temporary and permanent injunctions enjoining Defendant from occupying Licensed Property and damaging Plaintiffs' facilities; Damages, and; fees and costs.

## II.   PRIOR ORDERS

No prior orders have been issued in the State Court Action.

## III.   TIMELINESS OF REMOVAL

**A.**   This Notice of Removal is timely as Defendant is filing it within the time limits prescribed by F.R.Bk.P. 9027(a)(3).  The deadline to file a timely notice of removal is 30 days following "receipt" of the Complaint. Rule 9027(a)(3) states:

11

*(3)* Time for filing; civil action initiated after commencement of the case under the Code. *If a claim or cause of action is asserted in another court after the commencement of a case under the Code, a notice of removal may be filed with the clerk only within the shorter of (A) 30 days after receipt, through service or otherwise, of a copy of the initial pleading setting forth the claim or cause of action sought to be removed, or (B) 30 days after receipt of the summons if the initial pleading has been filed with the court but not served with the summons.*

**B.** The Return and Acknowledgement of Service states that service was effected on Defendant on March 22, 2022. The deadline to file the Notice of Removal is 30 days after receipt or April 21, 2022.

## IV.  **JURISDICTION OF THE BANKRUPTCY COURT**

28 U.S.C. § 1452(a) authorizes removal of the State Court Action as follows:

A party may remove any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power, to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title.

*See also* 28 U.S.C. § 1441(a). This Court has jurisdiction over this matter under 28 U.S.C. § 1334(b). *In re Menk*, 241 B.R. 896 (B.A.P. 9th Cir. 1999). The State Court Action that is being removed arises under and is related to the Paniolo bankruptcy proceeding because the State Court Action concerns a core proceeding, as it is related to (i) the administration of a debtor's bankruptcy estate pursuant to 28 U.S.C. § 157(b)(2)(a), (ii) an order approving the sale of property pursuant to 28 U.S.C. § 157(b)(2)(n), and (iii) the liquidation of the assets of the estate

12

pursuant to 28 U.S.C §157(b)(2)(o). *Celotex Corp. v. Edwards*, 514 U.S. 300, 115 S.Ct. 1493, 131 L.Ed. 2d 403 (1995) ("The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy* .... Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate."(emphasis in original; citations omitted), citing and affirming *Pacor, Inc.* v. *Higgins,* 743 F.2d 984, 994 (3rd Cir. 1984)).

The enforcement and interpretation of orders issued in core proceedings, such as the order approving the 363 Sale (the "363 Sale Order") [ECF 336], the order granting the Chapter 11 Trustee's motion for confirmation of the execution sale [ECF 65 in Adv. Pro. 19-90022], the order confirming the Chapter 11 Trustee's plan of liquidation [ECF 606], the *Order Granting in Part and Denying in Part Hawaiian Telcom's Motion to Enforce Sale Order* [ECF 537] and the judgment therefor [ECF 559], and other related orders at issue here, are considered core proceedings within the bankruptcy court's jurisdiction. *See*, *e.g.*, *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 153-55 (2009) (holding that the "bankruptcy

13

court plainly had jurisdiction to interpret and enforce its own prior orders . . . .").

In fact, this Court retained "exclusive jurisdiction over any matters related to or

arising from . . . the implementation of the Sale Order, including without

limitation, the enforcement of the US Marshal Sale . . . ." 363 Sale Order ¶ 52.

Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

If this Court determines that this proceeding is not a core proceeding,

Defendant consents to entry of a final order or judgment by the bankruptcy judge.

## V.    <u>NOTICE OF REMOVAL TO PARTIES AND STATE COURT</u>

This Notice of Removal will be promptly served on Plaintiffs and filed with

the Clerk of the Circuit Court of the First Circuit, State of Hawaii. Attached, per 28

U.S.C. § 1446(a) and Rule 9027(a)(1), as **Exhibit "2,"** is a true and correct copy of

the Court Docket in the State Court Action. True and correct copies of all of the

process, pleadings and orders served on Defendant in this action are filed

concurrently with this Notice of Removal as "**Process and Pleadings**

**Accompanying Defendant's Notice of Removal.**"

WHEREFORE, Defendant requests that the entire State Court Action

pending before the Clerk of the Circuit Court of the First Circuit, State of Hawaii

be removed to the United States Bankruptcy Court for the District of Hawaii.

DATED:           Honolulu, Hawaii,  _____April 4, 2022_____

                            _____*/s/ Ted N. Pettit*_____
                            TED N. PETTIT
                            DAVID G. BRITTIN
                            Attorneys for HAWAIIAN TELCOM, INC
                            And
                            MORGAN, LEWIS & BOCKIUS LLP
                            ANDREW J. GALLO
                            MELISSA Y. BOEY

                            Attorneys for HAWAIIAN TELCOM, INC.

31167/1/3751960.2

Of Counsel:
SULLIVAN MEHEULA LEE, LLLP

WILLIAM K. MEHEULA III          2277
Pacific Guardian Center, Makai Tower
733 Bishop Street, Suite 2900
Honolulu, Hawaii 96813
Telephone:  (808) 628-7535
Facsimile:  (808) 533-2467
Email:  meheula@smlhawaii.com
Attorney for Plaintiff
WAIMANA ENTERPRISES INC.

Of Counsel:
KOBAYASHI SUGITA & GODA, LLP

LEX R. SMITH          3485
First Hawaiian Center
999 Bishop Street, Suite 2600
Honolulu, Hawaii  96813
Telephone:  (808) 535-5700
Facsimile:  (808) 535-5799
Email:  lsmith@ksglaw.com

Attorney for Plaintiff
SANDWICH ISLES COMMUNICATIONS INC.

**Electronically Filed
FIRST CIRCUIT
1CCV-22-0000321
18-MAR-2022
05:07 PM
Dkt. 1 CMPS**

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

| | |
|---|---|
| WAIMANA ENTERPRISES INC. and SANDWICH ISLES COMMUNICATIONS INC.,<br><br>Plaintiffs,<br><br>vs.<br><br>HAWAIIAN TELCOM INC.,<br><br>Defendant. | CIVIL NO. _____<br>(Other Civil Action)<br><br>COMPLAINT; EXHIBITS "A" – "K"; SUMMONS |

<u>COMPLAINT</u>

Waimana Enterprises Incorporated ("**Waimana**") and Sandwich Isles Communications, Inc. ("**SIC**") for their complaint against Hawaiian Telcom Inc. ("**Hawaiian Tel**") alleges and avers as follows.

Waimana and SIC are the owners and holders of License 372 requiring Waimana and SIC to provide all infrastructure necessary to provide modern telecommunications services to every resident of the Hawaiian Home Lands ("**HHL**"), no matter how remote their residence may be. Many of its customers do not have electricity or water and one family lives in a tent. License 372 mandates that no matter how expensive the infrastructure may be in order to provide such service, Waimana's and SIC's monthly charge to the customer will be no more than is charged for comparable service in urban areas in the state of Hawaii. The provisions of License 372 are the reason the residents of the HHL have modern telecommunication service today, including in many cases fiber-optic cable to their homes. It is essential to sustaining, expanding and upgrading modern service to the HHL residents in the future that the requirements of License 372, or equivalent, be continued. Hawaiian Telcom does not have any license for the Paniolo facilities on Waimana's and SIC's Licensed Property under License 372 that it purchased in 2021 and, even if Hawaiian Tel had a license for the Licensed Property (which it does not), Hawaiian Tel is not meeting the requirements of License 372. This lawsuit is brought in order to remedy that critical situation which is damaging the residents of the Hawaiian Home Lands.

1.      SIC is a corporation organized and existing under the laws of the State of Hawaii.

2.      Waimana is a corporation organized and existing under the laws of the State of Hawaii.

3.      Hawaiian Tel is a corporation organized under the laws of the State of Hawaii.

4.      Section 207(c)(1)(A) of the Hawaiian Homes Commission Act ("**HHCA**")

authorizes the Hawaiian Homes Commission ("**HHC**") to grant licenses, for lots, as easements

for public purposes including utility facilities.  Waimana is the owner and holder of License No.

372 issued by the State of Hawaii Department of Hawaiian Home Lands ("**DHHL**") pursuant to

authorization from the HHC (hereinafter "**License 372**").

5.      Under HHCA 207(c)(1), License 372 is an interest in real estate issued to

Waimana pursuant to HHCA. 207(c)(1) and Hawaii Administrative Rules 10-4-21 and 22.   A

true copy of License 372 is attached hereto as **Exhibit "A"** and incorporated herein by this

reference.

6.      By instrument dated January 15, 1996, Waimana partially assigned License 372 to

SIC (the "**Partial Assignment**").  The Partial Assignment is expressly limited to "IntraLata and

Intrastate telecommunication ("**voice**") services" on the Hawaiian Home Lands ("**HHL**").   A

true copy of the Partial Assignment is attached hereto as **Exhibit "B."**  By instrument dated

October 6, 2008, the HHC consented to the Partial Assignment.  A true copy of the Consent is

attached hereto as **Exhibit "C"**.  Partial Assignment remains in full force and effect, and SIC is

not in breach of the License 372 and has not abandoned License 372.

7.      The DHHL has confirmed as recently as January 6, 2022 that License 372

remains in full force and effect, is valid and has not been cancelled. Waimana and SIC also are

not in breach of the License 372 and have not abandoned License 372.

8.      License 372 in relevant part provides:

LICENSOR [DHHL] determines that the LICENSE established herein is essential
in order to provide broad band telecommunication services of all types (including but not
limited to local, intrastate, interstate and international telephone; video on demand;
interactive communication; cable television; medical and educational links; and
electronic data transmission) to LICENSOR'S lands in a timely manner;

3

NOW THEREFORE, LICENSOR, in consideration of the services to be provided by LICENSEE [Waimana], and the terms, conditions and covenants herein contained on the part of LICENSEE to be kept, observed and performed, hereby grants and issues to LICENSEE, and its legal successors and assigns, the exclusive right and privilege to build, construct, repair, maintain and operate a broad band telecommunications network including poles, overhead and/or underground lines, appliances, microwave and/or other types of equipment over, across, under and throughout all lands under the administration and jurisdiction of LICENSOR, and its legal successors and assigns, including the right to trim and keep trimmed any vegetation, shrubbery, bushes or trees in the way of its lines and appurtenances, and including also the right of entry upon the easement area and adjoining land of LICENSOR for the construction, maintenance, operation and removal of LICENSEE'S line and appurtenances over, across and under the LICENSE area.

TO HAVE AND TO HOLD the same unto LICENSEE, its legal successors and assigns, in perpetuity, commencing on May 1, 1995, unless sooner terminated as hereinafter provided,

5.    LEVEL OF TELECOMMUNICATION SERVICES.  LICENSEE shall provide at a minimum the same level of telecommunication service being provided in adjacent areas not subject to this LICENSE.  LICENSEE shall use its best effort to provide a higher level of telecommunication service than that being provided in adjacent areas not subject to this LICENSE.  LICENSEE shall not provide a lower level of service than that level being provided in adjacent areas not subject to the LICENSE unless LICENSOR shall agree in writing.

6.    COST OF TELECOMMUNICATIONS SERVICES.  LICENSEE shall provide to the beneficiaries of LICENSOR living in areas subject to this LICENSE, telecommunications services at a cost less than or equal to the cost for comparable services being provided in adjacent areas not subject to this LICENSE.  LICENSEE shall not charge beneficiaries living in the LICENSE area more for telecommunication services than being charged in adjacent areas not subject to this LICENSE unless LICENSOR consents in writing.

9.    Pursuant to License 372, SIC developed telecommunications facilities, including Central Offices, warehouses and security fencing ("**Licensee Buildings**")and underground conduits throughout HHL to beneficiary lessee residences (collectively "**Licensed Property.**") SIC used those facilities for the provision of voice services.  SIC was granted a Certificate of Authority from the Hawaii Public Utilities Commission to provide voice services ONLY on HHL.  Waimana caused other subsidiaries to provide other telecommunications services (internet, wireless etc.) by using, in part, the excess capacity on SIC's facilities.

4

10.     Paniolo Cable Company Inc. ("**Paniolo**"), which is a third-party mainland undersea cable company not owned or controlled by Waimana, developed and leased to SIC, certain telecommunication facilities (undersea and underground cables and switches) outside of HHL which connected various HHL parcels on each Hawaiian island except Lanai. Paniolo's facilities were connected to and housed in SIC's existing facilities on the Licensed Property, pursuant to SIC's joint use agreement with Paniolo. All of Paniolo's facilities were leased to SIC. Paniolo had no interest in any HHL, as the Licensed Property was licensed to Waimana pursuant to its rights under License 372 and SIC pursuant to its rights under its partial assignment. The assets owned by Paniolo and leased to SIC including the assets on the Licensed Property are hereinafter referred to as the "**Paniolo Assets**."

11.     In 2018, an involuntary bankruptcy petition was filed against Paniolo and in 2019, the U.S. Bankruptcy Court appointed Michael Katzenstein to serve as the Trustee in Bankruptcy for Paniolo ("**Katzenstein**").

12.     Because SIC was delinquent in its rent payments to Paniolo, in 2019, Katzenstein sued SIC and obtained a money judgment against SIC for the amount of unpaid rent that SIC owed to Paniolo.

13.     With the money judgment, Katzenstein obtained a Writ of Execution and caused the United States Marshal to hold an execution sale of certain specifically identified telecommunications assets of SIC all of which were on the License Property. Katzenstein, however, did not acquire any interest in License Property as a result of the execution sale. (The SIC assets acquired by Katzenstein in the execution sale are hereinafter referred to as the "**Katzenstein-Acquired SIC Assets**.")

5

14.     The Katzenstein-Acquired SIC Assets covered only a small specified portion of SIC's facilities on the Licensed Property.  Katzenstein did not want SIC's "last mile" or "local loop" facilities (**"last mile facilities"**) that connect each home on HHL to the local, national and international communication networks or the warehouses and security fencing.  Katzenstein and Hawaiian Tel did not want responsibility to service **ALL** customers on the HHL.  Katzenstein and Hawaiian Tel wanted the assets that could be used to improve service to Hawaiian Tel's customers off of HHL.  These assets continue to be owned by SIC and are essential to sustaining and expanding service to SIC's, Waimana's and/or Waimana's other subsidiaries' customers on the HHL.

15.     By order entered March 16, 2020 the U.S. Bankruptcy Court confirmed the sale of the Katzenstein-Acquired SIC Assets to Trustee Katzenstein.  A true copy of the March 16, 2020 Order is attached hereto as **Exhibit "D."**

16.     Katzenstein knew that he could not obtain rights to the Licensed Property.  He therefore negotiated with SIC and obtained from SIC the right to use the Licensed Property.  In exchange, Katzenstein committed to amongst other conditions not impair telecommunications service to HHL and granted SIC the right to use Paniolo Fiber Pairs on the Paniolo Assets to continue to provide telecommunications services to HHL.  This agreement, entitled  the Master Relationship Agreement dated March 6, 2020 (**"MRA,"**)  attached hereto as **Exhibit "E,"** , which was approved by the Bankruptcy Court by order dated June 4, 2020, allowed Katzenstein to use License 372 for the purposes authorized by SIC:

> For the avoidance of doubt, the Parties acknowledge and agree that DHHL License will not be assigned by SIC to Paniolo, but that SIC shall, and hereby does, grant to Paniolo the full benefit and use of the DHHL License for the IRU Term provided Paniolo does not exercise its rights under such grant to impair service to HHL.

6

Id. at Schedule 2, section 2.3.

17.     Katzenstein then sold the Katzenstein-Acquired SIC Assets (together with Paniolo's Assets) to defendant Hawaiian Tel.  A copy of the Asset Purchase Agreement dated November 30, 2020 ("**APA**") is attached hereto as **Exhibit "F."**

18.     On December 16, 2020, Ryan K. P. Kanakaole, Esq., the Deputy Attorney General representing DHHL filed papers in the Bankruptcy Court confirming that because Hawaiian Tel did not acquire the right to use License 372, "The Buyer will need to acquire a new license for the use of DHHL lands."   The same message was confirmed by HHC Chairman William Aila, in a emails dated January 6, 2021 to alhee@waimana.com that state that License 372 has not been cancelled, and: "The License remains valid.  DHHL informed the Court that any purchaser of the assets would require a license from DHHL."

19.     Katzenstein never had any rights to any real estate on HHL including the Licensed Property.  License 372 was never assigned to Katzenstein.  Because Katzenstein never owned any interest in License 372, he could not, and did not, sell to Hawaiian Tel any rights to occupy the Licensed Property.

20.     Hawaiian Tel had the opportunity to assume from Katzenstein all of the benefits of MRA including the use and enjoyment of SIC's rights under License 372.

21.     Hawaiian Tel, however, chose not to assume that agreement that would have given it the right to use the Licensed Property.    At the time Hawaiian Tel made its choice not to assume this agreement with SIC, Hawaiian Tel knew that it was buying facilities located on Waimana's and SIC's Licensed Property.

22.     Hawaiian Tel's failure to assume the right to use the Licensed Property was not inadvertent.  Hawaiian Tel has repeatedly emphasized that its decision not to assume the

7

agreement that allowed Katzenstein to use the License Property was deliberate and intentional. For example, in Hawaiian Tel's motion filed in the U.S. Bankruptcy Court on November 16, 2021, attached hereto as **Exhibit "H,"** Hawaiian Tel boldly asserted that the agreements giving Paniolo the right to use License 372:

> were solely "Assignable Contracts" which means they were contracts that could have been assigned by the Trustee to HTI at HTI's sole election. … **HTI, however, did not elect to designate any of the SIC Agreements as agreements to be assigned by the Trustee to HTI**

Id. at 14 (emphasis added).

23.     Thus, Hawaiian Tel had the opportunity to acquire the right to use the Licensed Property but chose not to do so.

24.     On August 31, 2021, the APA sale of Paniolo's Assets from Katzenstein to Hawaiian Tel closed.

25.     Hawaiian Tel is a trespasser on the Licensed Property or in the alternative, a "hold over tenant" from Katenzstein's use rights under the MRA, which is unlikely because Hawaiian Tel knowingly rejected assignment of those rights.

26.     On and after August 31, 2021, Hawaiian Tel had no right to locate the assets it had purchased on the Licensed Property.  Hawaiian Tel does not have a license allowing its assets to be on Licensed Property.

27.     Hawaiian Tel purchased from Katzenstein certain facilities located on the Licensed Property, but has absolutely no interest in the land surrounding and under facilities. The rights to that land are held by Waimana and SIC pursuant to License 372.  Hawaiian Tel has no license nor any other right to use the Licensed Property under and surrounding its facilities on HHL.

28.     License 372 places strict and expensive obligations on Waimana and SIC to assure service to every customer on HHL

29.     Hawaiian Tel acknowledges that it needs a license to operate its facilities on HHL, but to date has not obtained one.

30.     In License 372, DHHL granted Waimana the exclusive right to provide telecommunication service on HHL ("**Exclusive Service Right**").  However, in addition to this Exclusive Service Right, License 372 also granted Waimana the exclusive right to possess the Licensed Property.

31.     Hawaiian Tel may argue that the Federal Communications Commission ("FCC") order dated July 3, 2017 ("**FCC Order**"), attached hereto as **Exhibit "I,"** requires DHHL to provide access to the Licensed Property on the grounds that the FCC Order prohibits DHHL from granting an exclusive license to only one company to provide telecommunications services on HHL, i.e. the Exclusive Service Right.  However, the order does not require Waimana and SIC to share use of the Licensed Property.  The FCC Order only preempts the portion of the License that:

> grants one entity the "exclusive" right "to build, construct, repair, maintain and operate a . . . telecommunications network" for the purpose of providing service to the residents of the Hawaiian home lands and therefore prohibits other entities from doing so.

Id. at Page 7, Paragraph 16

32.     Under the severability provision of the License 372 at section 22, while the Exclusive Service Right may have been invalidated by the FCC Order, the order did not invalidate and FCC does not have jurisdiction to invalidate Waimana's and SIC's right to exclusive possession of the Licensed Property subject to DHHL's rights set forth in License 372.  Waimana and SIC require exclusive possession to perform its telecommunications obligations

required under License 372.  Thus, Waimana's and SIC's right to exclusive possession of the Licensed Property survived the FCC Order, as did their rights and obligations to provide telecommunications services to HHL.  An internal DHHL memo to the HHC dated January 18, 2022 states "DHHL has informed its lessees, tenants, and permittees that under Federal law they may obtain broadband telecommunications services from any provider of their choice." confirming that the FCC ORDER dealt with License 372 Exclusive Service Right, a copy of which is attached hereto as **Exhibit "G."**

33.    Waimana and SIC are the owners of numerous improvements on the properties licensed under License 372 that were not obtained by Katzenstein and thus were **not** purchased by Hawaiian Tel and are still owned, maintained and used by SIC and/or Waimana and/or Waimana's other subsidiaries to provide service to their HHL customers.  Hawaiian Tel's destructive actions are interfering with Waimana and its subsidiaries' including SIC's ability to continue to provide service to the residents of the HHL.  Hawaiian Telcom are using these Licensed Properties without authorization or paying for such use.

34.    Waimana and SIC have repeatedly urged Hawaiian Tel to negotiate terms on which Hawaiian Tel can be allowed to use the Licensed Property, as Katzenstein did.  Hawaiian Tel has refused to do so.  Hawaiian Tel wants something it and Katzenstein knew was illegal and unfair—Hawaiian Tel wants to use the Licensed Property for free and without committing to not impair telecommunications service to HHL and the obligations of License 372 which DHHL and the HHC granted Waimana and SIC.

35.    Because Hawaiian Tel has no right to locate its facilities on Waimana and SIC's Licensed Property, and Hawaiian Tel has refused to negotiate satisfactory terms for the use of those licensed lands, and Hawaiian Tel continues to damage assets they do not own, Waimana

10

had no choice but to demand that Hawaiian Tel remove its facilities from Waimana and SIC's licensed lands.  A true copy of the February 10, 2022, demand letter is attached as **Exhibit "J"**.

36.    Since August 31, 2021, Hawaiian Tel has changed the locks on SIC warehouses, continues to damage SIC's security fencing, including cutting SIC's locking mechanisms, and has caused SIC to cut Hawaiian Tel's locks to gain access to Waimana and SIC's facilities located on Waimana and SIC's licensed lands.  Numerous police reports of these incidents have been made.

37.    Despite SIC's and Waimana's demands to follow its security protocols, Hawaiian Tel has failed and refused to stop destroying SIC's property trespassing and remove its facilities from Waimana and SIC's licensed lands.

38.    License 372 grants Waimana and SIC an interest **in land**.

39.    Despite warnings from Waimana and SIC, Hawaiian Tel has repeatedly cut locks and damaged Waimana's and SIC's improvements that Katzenstein has never owned and therefore Hawaiian Tel does not, and could not own.  A copy of Hawaiian Tel's letter asserting their alleged "justification" for doing so is attached hereto as **Exhibit "K,"** which only proves that Hawaiian Tel is unfairly competing with Waimana and SIC by usurping Waimana's and SIC's Licensed Property and SIC's "last mile" facilities without compensation, and destroying relations with DHHL and HHL customers.

COUNT I

40.    Waimana and SIC incorporate by reference the allegations contained in paragraphs 1 through 39 hereinabove.

11

41.     Hawaiian Tel is a trespasser or holdover tenant, squatting on land licensed to Waimana and SIC pursuant to License 372 and preventing Waimana and SIC from using the Licensed Property and serving HHL lessees.

42.     Hawaiian Tel has no license, nor any other legal right, to occupy SIC's and Waimana's Licensed Property.

43.     SIC is entitled to: (a) an injunction barring Hawaiian Tel from access to the Licensed Property, and/or a judgment for possession of the Licensed Property under License 372 and an order evicting of Hawaiian Tel from the Licensed Property and an order to remove any property of Hawaiian Tel located thereon, (b) damages for wrongfully using the Licensed Property in violation of Waimana and SIC's rights under License 372 including damages for use of the Licensed Property and disgorgement of Hawaiian Tel profits; and (c) punitive damages.

## COUNT II

44.     Waimana and SIC incorporate by reference the allegations contained in paragraphs 1 through 43 hereinabove.

45.     Hawaiian Tel has willfully damaged Waimana's and SIC's property located on Waimana's and SIC's licensed premises, and used without authorization or compensation SIC's "last mile" facilities that constitutes conversion.

46.     Waimana and SIC are entitled to judgment for damages in an amount to be proved at trial for: (a) the property damage caused by Hawaiian Tel's tortious actions in deliberately, repeatedly damaging Waimana's and SIC's property; (b) lost profits and compensation for use of the Licensed Property and disgorgement of Hawaiian Tel profits for use of SIC's "last mile" facilities; and (c) punitive damages.

## COUNT III

12

47.     Waimana and SIC incorporate by reference the allegations contained in paragraphs 1 through 46 hereinabove.

48.     Hawaiian Tel is a competitor with Waimana and SIC in the telecommunications business.

49.     Hawaiian Telecom engaged in unfair methods of competition by usurping Waimana and SIC's land rights under the License 372 and SIC's "last mile" facilities without compensation, and destroying relations with DHHL and HHL customers.

50.     Hawaiian Tel's above-described conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

51.     Hawaiian Tel's conduct negatively affects competition and harms fair competition by impeding Waimana and SIC's operation on HHL.

52.     Waimana and SIC have been damaged in its business and property by Hawaiian Tel's unfair methods of competition in an amount to be proven at trial

WHEREFORE, Plaintiffs pray the Court grant the following relief:

1.     Issuance of a judgment for eviction against Hawaiian Tel, evicting Hawaiian Tel from Licensed Areas and to remove its property therefrom;

2.     Issuance of a Writ of Possession in favor of plaintiffs and against defendant Hawaiian Tel directing the sheriff to remove Hawaiian Tel from the lands covered by plaintiffs' License 372;

3.     For a temporary restraining order and preliminary and permanent injunctions enjoining occupying the Licensed Property and prohibiting Hawaiian Tel from damaging Wamana's and SIC's facilities located on the Licensed Property and last mile facilities on HHL.

4.     For damages in an amount to be determined at trial.

13

5.       For treble damages in an amount be determined at trial.

6.       For punitive damages in an amount to be determined at trial.

7.       For plaintiffs' reasonable costs and attorneys' fees incurred herein.

8.       For such other and further relief as the Court deems just.

Dated: Honolulu, Hawaii March 18, 2022.


/s/Lex R. Smith
LEX R. SMITH

Attorney for Plaintiff
SANDWICH ISLES COMMUNICATIONS INC.


/s/ William Meheula
WILLIAM MEHEULA

Attorney for Plaintiff
WAIMANA ENTERPRISES INC.

THE ORIGINAL OF THIS DOCUMENT
RECORDED AS FOLLOWS.
STATE OF HAWAII

BUREAU OF CONVEYANCE
Electronically Filed **37x**
DATE: MAY 1 2 1995  TIME: **95-064**
FIRST CIRCUIT
DOCUMENT NO.
1CCV-22-0000321
18-MAR-2022
05:07 PM
Dkt. 2 EXH

## STATE OF HAWAII

## DEPARTMENT OF HAWAIIAN HOME LANDS

### LICENSE AGREEMENT NO. 37x

THIS LICENSE made and entered into this **9th** day
of **May**, 19**95**, by and between the State of Hawaii,
DEPARTMENT OF HAWAIIAN HOME LANDS, whose place of business is
335 Merchant Street, Honolulu, Hawaii 96813, and whose mailing
address is P. O. Box 1879, Honolulu, Hawaii 96805, hereinafter
referred to as "LICENSOR," and WAIMANA ENTERPRISES,
INCORPORATED, a native Hawaiian corporation (Federal I.D. No.
99-0263871), whose principal place of business and mailing
address is 1001 Bishop Street, Pauahi Tower, Suite 1520,
Honolulu, Hawaii 96813, hereinafter referred to as "LICENSEE."

### W I T N E S S E T H   T H A T:

LICENSOR, pursuant to the authority granted to it by
Section 207(C)(1)(A), HHCA, is authorized to grant licenses as
easements for railroads, telephone lines, electric power and
light lines, gas mains and the like;

LICENSOR, pursuant to the provisions under Section 10-4-22,
Title 10, State of Hawaii, Department of Hawaiian Home Lands,
Administrative Rules 1981, as amended (DHHL Administrative
Rules), may grant licenses for public purposes for any length of
term subject to reverter to LICENSOR upon termination or
abandonment, on such terms and conditions as may be prudently
and reasonably set by the LICENSOR;

LICENSOR, pursuant to the provisions under Section 10-4-21,
DHHL Administrative Rules, may allow the rental for licenses to
be nominal should the use benefit LICENSOR or its native
Hawaiians beneficiaries;

LICENSOR determines that the LICENSE established herein is
essential in order to provide broad band telecommunication
services of all types (including but not limited to local,
intrastate, interstate and international telephone; video on
demand; interactive communication; cable television; medical and
educational links; and electronic data transmission) to
LICENSOR'S lands in a timely manner;

FURTHER, LICENSOR determines that the issuance of this
LICENSE established herein is essential for LICENSEE to obtain
necessary funds needed to construct and operate the necessary
telecommunications infrastructure;

EXHIBIT A

63201

LICENSOR believes and intends that the issuance of this Exclusive "Benefit" LICENSE will also fulfill the purpose of advancing the rehabilitation and the welfare of native Hawaiians.

NOW THEREFORE, LICENSOR, in consideration of the services to be provided by LICENSEE, and the terms, conditions and covenants herein contained on the part of LICENSEE to be kept, observed and performed, hereby grants and issues to LICENSEE, and its legal successors and assigns, the exclusive right and privilege to build, construct, repair, maintain and operate a broad band telecommunications network including poles, overhead and/or underground lines, appliances, microwave and/or other types of equipment over, across, under and throughout all lands under the administration and jurisdiction of LICENSOR, and its legal successors and assigns, including the right to trim and keep trimmed any vegetation, shrubbery, bushes or trees in the way of its lines and appurtenances, and including also the right of entry upon the easement area and adjoining land of LICENSOR for the construction, maintenance, operation and removal of LICENSEE'S line and appurtenances over, across and under the LICENSE area.

TO HAVE AND TO HOLD the same unto LICENSEE, its legal successors and assigns, in perpetuity, commencing on May 1, 1995, unless sooner terminated as hereinafter provided, LICENSOR agreeing and LICENSEE understanding that the nominal rental of ONE AND NO/100 DOLLARS ($1.00) for the entire term is waived.

AND LICENSEE hereby covenants with LICENSOR, each for itself and not for the other that:

1. INITIAL DEMONSTRATION PERIOD. BOTH PARTIES agree to allow LICENSEE an initial period of not more than FIVE (5) YEARS in which LICENSEE shall demonstrate satisfactory performance of the applicable terms and conditions contained in this License. LICENSEE shall demonstrate financial capability to complete the initial project within ONE (1) YEAR from date of the LICENSE. Financial capability may be demonstrated by providing a bond, letter of credit, corporate guarantee, bank loan commitment letter, loan approval from a government agency or other similar instrument in the amount of the telecommunications construction. When LICENSEE has demonstrated its ability to fund, install and operate the telecommunications network for the selected project, the remaining provisions, terms and conditions of this LICENSE shall automatically take effect. No other action shall be required from either party.

2. NEW CONSTRUCTION TELECOMMUNICATION INFRASTRUCTURE COSTS. LICENSEE agrees to construct and install all telecommunications infrastructure on LICENSOR'S lands at LICENSEE'S cost for all new construction to include but not limited to residential, agricultural, pastoral, commercial

- 2 -

and/or industrial subdivisions developed after January 1, 1996 in the LICENSE area at LICENSEE'S cost. In the alternative, LICENSEE at its option, may choose to reimburse LICENSOR for all costs to install telecommunications infrastructure provided the telecommunications infrastructure is installed to LICENSEE'S specifications.

3. EXISTING TELECOMMUNICATIONS INFRASTRUCTURE. LICENSOR agrees to sell and LICENSEE agrees to purchase at LICENSOR'S cost and/or install telecommunications infrastructure on LICENSOR'S land at LICENSEE'S cost including but not limited to all existing residential, agricultural, pastoral, commercial and/or industrial subdivisions. If the existing infrastructure is not owned by the LICENSOR, LICENSEE shall have the option, to be exercised in LICENSEE'S sole discretion, to either purchase or install new telecommunications infrastructure. After LICENSEE activates the existing and/or new telecommunications infrastructure, LICENSOR agrees not to allow any other telecommunications provider to use any remaining telecommunications infrastructure to continue to provide or initiate service on LICENSOR'S lands.

4. ACCESS TO TELECOMMUNICATIONS INFRASTRUCTURE. LICENSEE shall make available to LICENSOR the use of all available telecommunications equipment and services then under LICENSEE'S control at LICENSEE'S cost. LICENSOR'S use under this paragraph shall be limited to emergency, public and official purposes only.

5. LEVEL OF TELECOMMUNICATION SERVICES. LICENSEE shall provide at a minimum the same level of telecommunication service being provided in adjacent areas not subject to this LICENSE. LICENSEE shall use its best effort to provide a higher level of telecommunication service than that being provided in adjacent areas not subject to this LICENSE. LICENSEE shall not provide a lower level of service than that level being provided in adjacent areas not subject to the LICENSE unless LICENSOR shall agree in writing.

6. COST OF TELECOMMUNICATIONS SERVICES. LICENSEE shall provide to the beneficiaries of LICENSOR living in areas subject to this LICENSE, telecommunications services at a cost less than or equal to the cost for comparable services being provided in adjacent areas not subject to this LICENSE. LICENSEE shall not charge beneficiaries living in the LICENSE area more for telecommunication services than being charged in adjacent areas not subject to this LICENSE unless LICENSOR consents in writing.

7. JOB TRAINING/EDUCATION. LICENSEE agrees to expend an amount equal to at least one-half percent (1/2%) of LICENSEE'S annual net profit for job training and/or educational

opportunities for beneficiaries of LICENSOR each year.  For purposes of demonstrating compliance with this paragraph, LICENSEE agrees to allow LICENSOR access to LICENSEE'S financial statement, provided, that all material and information will be kept strictly confidential.

8.  EMPLOYMENT.  LICENSEE agrees to offer employment opportunities to qualified beneficiaries of LICENSOR.

9.  CAPITAL EXPENDITURES/CONTRACTS.  LICENSEE agrees to utilize qualified companies controlled or owned by beneficiaries of LICENSOR provided such beneficiary company is qualified to perform the terms of the contract and such beneficiary company's bid price is not more than 5% higher than the lowest bid from an equally qualified non-beneficiary company.

10. TAXES.  During the term of this LICENSE, LICENSEE shall pay when due, all real property taxes and any other assessments, including all charges for utility services, which shall, during the term of this LICENSE, be lawfully charged, assessed, imposed, or become due and payable upon or on account of the licensed premises and the improvements now on or hereafter erected thereon.

11. DUE CARE AND DILIGENCE.  LICENSEE shall use due care and diligence in the operation and maintenance of the premises and shall keep the grounds and improvements in good and safe condition and repair.

12. INDEMNITY.  LICENSEE shall, to the extent permitted by law, indemnify and hold harmless, LICENSOR, from any and all claims and demands against LICENSOR for any loss or damage or injury or death to persons or property resulting from, or in any way connected with, the condition or use of the premises covered by this LICENSE not caused by the negligence of LICENSOR, their agents, servants or employees acting within the scope of their employment, and from and against all damages, costs, counsel fees, or liabilities incurred or brought thereon.

13. ASSIGNMENTS.  Except as expressly provided in this LICENSE, this LICENSE is not transferable. At no time during the term of this LICENSE, shall LICENSEE assign, mortgage or pledge its interest in this LICENSE or its interest in the improvements now or hereafter erected on the premises without the prior written consent of LICENSOR, which consent will not be withheld unreasonably.

14. CONDEMNATION.  If at any time the premises across which this LICENSE extends, or any part thereof, shall be condemned or taken for any public project by a governmental authority, LICENSEE shall have the right to claim and recover from the condemning authority, but not from LICENSOR, such

compensation as is payable for the LICENSE and LICENSEE'S improvements, if any, used in connection with this LICENSE, which shall be payable to LICENSEE as its interests appear.

15. ABANDONMENT. In the event the easement area hereby granted shall be abandoned or shall remain unused for a continuous period of one year, all rights granted hereunder shall terminate, and LICENSEE will remove its equipment and improvements and restore the land as nearly as is reasonably possible to the condition existing immediately prior to the signing of this License. Failure of LICENSEE to remove its equipment and improvements and to restore the land within 90 days after notification to do so from LICENSOR by certified mail at LICENSEE'S last known address, will constitute a breach of this LICENSE and LICENSOR may thereafter remove LICENSEE'S equipment and improvements and restore the land to a condition similar to that existing immediately prior to the signing of this LICENSE and LICENSEE will reimburse LICENSOR for all reasonable costs in connection with the removal and restoration.

16. RELOCATION. If LICENSOR determines that the continued exercise of the easement rights granted herein constitutes an undue interference with a subdivision or other development of the land over which the granted easement crosses, LICENSOR shall have the right to terminate the easement granted to the extent necessary to eliminate such interference; provided, that it shall grant to LICENSEE without payment of any monetary consideration, a substitute easement of similar width within the reasonable vicinity to permit LICENSEE to effect relocation of any facility or portion thereof, installed, placed or constructed on the easement area at LICENSEE'S own cost and expense, which substitute easement shall be subject to the same terms and conditions as this LICENSE contains.

17. CONSTRUCTION OF IMPROVEMENTS. LICENSEE shall undertake no construction until LICENSOR has reviewed and approved the plans. All buildings or structures or other major improvements of whatever kind that LICENSEE constructs or erects on the premises shall remain the property of LICENSEE and LICENSEE shall have the right, prior to termination of this LICENSE, or within such additional period as LICENSOR in its reasonable discretion may allow, to remove its property from the premises; provided that in the event LICENSEE shall fail to so remove such property within thirty (30) days after written notice to remove, LICENSOR may at its option retain the property or remove the same and charge the cost of removal and storage, if any, to LICENSEE.

18. MAINTENANCE OF PREMISES. During the term of this LICENSE, LICENSEE shall repair and maintain all improvements heretofore and hereafter erected upon the premises, including all glass, water and gas plumbing, electrical wiring, and all

other fixtures in or on the premises with all necessary reparations and amendments whatsoever; shall keep the premises and all improvements thereon in a strictly clean and sanitary condition, and shall comply with all laws, ordinances, rules and regulations of the Federal, State, County or municipal governments that are applicable to the premises and improvements; and shall allow LICENSOR or its agents, at all reasonable times, free access to the premises for the purpose of examining the same or determining whether the conditions herein are being fully observed and performed, and shall make good at its own cost and expense all defects within sixty (60) days after receipt of written notice by certified mail to the last known address of LICENSEE.

19. **BREACH.**  If LICENSEE shall substantially fail to observe or perform any of the conditions herein contained and on its part to be observed or performed and such failure or lack of substantial compliance shall continue for sixty (60) days after the receipt by certified mail or written notice of such failure to the address of LICENSEE, or if LICENSEE shall abandon the premises, then and in any such event LICENSOR may, at its option, cancel this LICENSE Agreement and, thereupon, take immediate possession of the premises, allowing LICENSEE reasonable time to remove its property therefrom, without prejudice to any remedy or right of action that LICENSOR may have against LICENSEE.

20. **RIGHT OF ENTRY.**  LICENSOR and its duly authorized representatives shall have the right to enter the Premises at all times for the purposes of conducting its own inspection and to ensure that LICENSEE is in compliance with the provisions of this LICENSE.

21. **WAIVER.**  That notwithstanding any provision contained herein to the contrary, wherever applicable, LICENSOR may for good cause shown, extend the time for compliance and/or waive any of the terms, conditions and covenants contained herein that LICENSEE, must observe and perform.

22. **SEVERABILITY.**  Whenever possible each provision of this LICENSE shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this LICENSE should be prohibited or invalidated under applicable law or for any other reason whatsoever, such provision shall not invalidate any other portion of this License.

23. **DEFINITION.**  The word "premises", when it appears herein, includes and shall be deemed to include the lands described above and improvements whenever and wherever erected or placed thereon.

24. **SINGULAR/PLURAL**. The singular or plural depends on its appropriate use.

25. **AGREEMENT**. This agreement shall be binding upon and inure to the benefit of the parties hereto and their respective legal successors and assigns.

IN WITNESS WHEREOF, the parties hereto have caused these presents to be duly executed the day and year first above written.

Approved by the HHC
at its meeting held on
December 20, 1994

State of Hawaii
DEPARTMENT OF HAWAIIAN HOME LANDS

By _____
Kali Watson, Chairman
Hawaiian Homes Commission

LICENSOR

Approved as to form:

_____
Deputy Attorney General
State of Hawaii

WAIMANA ENTERPRISES, INC.
a Hawaii corporation

By _____
Albert S.N. Hee, President

LICENSEE

STATE OF HAWAII                          )
                                         )  ss
CITY AND COUNTY OF HONOLULU              )

        On this ___9th___ day of ____May____, 19 _95_,
before me personally appeared Albert S.N. Hee, to me personally
known, who, being by me duly sworn, did say that he is the
President of Waimana Enterprises, Inc., a Hawaii corporation,
and that the instrument was signed on behalf of the corporation
and he acknowledged the instrument to be the free act and deed
of the corporation.

                        _____
                        Notary Public, State of Hawaii
                        My commission expires: 12/27/95

**PARTIAL ASSIGNMENT OF LICENSE**

Electronically Filed
FIRST CIRCUIT
1CCV-22-0000321
18-MAR-2022
05:07 PM

FOR VALUE RECEIVED, WAIMANA ENTERPRISES, INC., (Assignor) hereby assigns, transfers and sets over to SANDWICH ISLES COMMUNICATIONS, INC. (Assignee) those certain rights, title and interest necessary to provide IntraLata and Intrastate telecommunication services in and to the following described License:

> License Agreement No. 372, dated May 9, 1995, between the Hawaiian Home Lands and Waimana Enterprises, Inc., recorded in the Bureau of Conveyances, State of Hawaii as Document No. 95-064099.

The Assignor warrants and represents that said License is in full force and effect and is fully assignable.

The Assignee hereby assumes and agrees to perform all the obligations of the Assignor under the License and guarantees to hold the Assignor harmless from any claim or demand made thereunder.

Signed under seal this 15th day of January, 1996.

_____
Albert S.N. Hee, President
Assignor

_____
Albert S.N. Hee, President
Assignee

STATE OF HAWAII        )
                       ) SS.
COUNTY OF HONOLULU     )

On this 15th day of January, 1996, before me personally appeared Albert S.N. Hee, being first duly sworn, deposes and says that he is the President of Sandwich Isles Communications, Inc. and Waimana Enterprises, Inc.to me known to be the person who executed the foregoing instrument and acknowledged that he executed the same as his free act and deed.

Witness my hand and seal.

_____

My commission expires: 3/24/99

EXHIBIT B



**STATE OF HAWAII**

**DEPARTMENT OF HAWAIIAN HOME LANDS**

**CONSENT TO PARTIAL ASSIGNMENT OF LICENSE AGREEMENT NO. 372**

Electronically Filed
FIRST CIRCUIT
1CCV-22-0000321
18-MAR-2022
05:07 PM
Dkt. 4 EXH

**KNOW ALL MEN BY THESE PRESENTS:**

The **STATE OF HAWAII**, by its Hawaiian Homes Commission, is the "Licensor" named in that certain License Agreement No. 372, dated May 9, 1995, in favor of Waimana Enterprises, Incorporated, a native Hawaiian corporation ("Licensee"), recorded in the Bureau of Conveyances, State of Hawaii as Document No. 95-064099.

**WHEREAS THE LICENSOR DOES HEREBY CONSENT** to that certain Partial Assignment of License, dated January 15, 1996, by and between Licensee, as Assignor, and Sandwich Isles Communications, Inc., a Hawaii corporation, as Assignee, with respect to those certain rights, title and interest necessary to provide IntraLata and Intrastate telecommunication services in and to the License Agreement, upon the following conditions:

      (1)    This consent shall not authorize, nor deemed to authorize, any further or other assignment of the License Agreement;

      (2)    This consent shall not be deemed nor construed to be a waiver of any of the terms, covenants or provisions of said License Agreement; all rights of Licensor under said License Agreement being hereby reserved;

      (3)    Should there be any conflict between the terms of said License Agreement and the terms of said Partial Assignment of License, the former shall control, and nothing herein shall be construed as being a waiver of any of the terms, covenants, conditions, or provisions of said License Agreement;

      (4)    All rights of the Licensor or against the Licensee under the License Agreement are reserved; and

      (5)    All other conditions upon which the approval of this consent was made subject to by the board of the Hawaiian Homes Commission on May 21, 1996.

**WHEREAS**, the Hawaiian Homes Commission unanimously approved said Partial Assignment of License at its meeting on May 21, 1996, and this consent shall be effective as of said date.

EXHIBIT C

 

**IN WITNESS WHEREOF,** the **STATE OF HAWAII,** by its Hawaiian Homes Commission, has executed these presents this _6th_ day of _October_, 2008.

Approved by the Hawaiian Homes
Commission on May 21, 1996

**STATE OF HAWAII**
**DEPARTMENT OF HAWAIIAN HOME LANDS**

By _____
Micah A. Kane, Chairman
Hawaiian Homes Commission

APPROVED AS TO FORM:

Deputy Attorney General
State of Hawaii

2

STATE OF HAWAII                )
                               ) ss:
CITY AND COUNTY OF HONOLULU    )


On this 6th day of October, 2008, before me appeared MICAH A. KANE, to me personally known, who, being by me duly sworn, did say that he is the Chairman of the Hawaiian Homes Commission and the person who executed the foregoing instrument and acknowledged to me that he executed the same freely and voluntarily for the use and purposes therein set forth.

_____
Notary Public, State of Hawaii

**ABIGAIL L. TUBERA**
_____
Print Name of Notary Public

My commission expires: _____

Doc. Date: _10/6/08_                          # Pages: _3_

Notary Name: _Abigail L. Tubera_              _First_ Circuit

Doc. Description: _Consent to Partial Assignment to LA 372 - Waimana Enterprises, Inc._

_____    _10/6/08_
Notary Signature                       Date

3

**Date Signed:**
**March 16, 2020**



SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

Electronically Filed
FIRST CIRCUIT
1CCV-22-0000321
18-MAR-2022
05:07 PM
Dkt. 5 EXH

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF HAWAII

|  |  |
|---|---|
| In re:<br><br>PANIOLO CABLE COMPANY, LLC,<br><br>Debtor. | Case No. 18-01319 (RJF)<br>(Chapter 11) |
| MICHAEL KATZENSTEIN, as<br>CHAPTER 11 TRUSTEE,<br><br>Plaintiff,<br><br>v.<br><br>SANDWICH ISLES<br>COMMUNICATIONS, INC.,<br><br>Defendant. | Adversary No. 19-90022<br><br>ORDER GRANTING PLAINTIFF<br>MICHAEL KATZENSTEIN, AS<br>CHAPTER 11 TRUSTEE'S MOTION FOR<br>CONFIRMATION OF EXECUTION SALE<br><br>Hearing:<br>Date: March 13, 2020<br>Time: 11:00 a.m.<br>Judge: Hon. Robert J. Faris |

**ORDER GRANTING PLAINTIFF MICHAEL KATZENSTEIN, AS
CHAPTER 11 TRUSTEE'S MOTION FOR
<u>CONFIRMATION OF EXECUTION SALE</u>**

EXHIBIT D

The Court considered Plaintiff Michael Katzenstein, as Chapter 11

Trustee's ("Plaintiff" or the "Trustee") *Motion for Confirmation of Execution Sale*

[Dkt. no. 57] (the "Motion") pursuant to the Order Shortening Notice [Dkt. no. 61],

at 11:00 a.m. on March 13, 2020.  Johnathan C. Bolton appeared for Plaintiff.  Lex

R. Smith appeared for Defendant SANDWICH ISLES COMMUNICATIONS,

INC. ("Defendant").  Toby L. Gerber appeared for Interested Party DEUTSCHE

BANK TRUST COMPANY AMERICAS, as Agent for the Noteholders.

        The Court, after finding that due and adequate notice of the Motion

having been given, and that no other or further notice being needed under the

circumstances, after consideration of the Motion, the Memorandum in Support of

the Motion, the Declaration of William Jessup, the Declaration of Counsel, and the

exhibits attached thereto, finds and determines that:

        A.    The execution sale by public auction (the "Execution Sale")

conducted at 12:00 p.m. on March 6, 2020, by the United States Marshal for the

District of Hawaiʻi (the "Marshal"), wherein (i) the real property of Defendant

located at 77-808 Kamehameha Highway, Mililani, Hawaii 96789, TMK No. (1)-

9-5-2-3, being all of the land described in Transfer Certificate of Title No. 600,112

(the "Real Property"), was sold to Plaintiff as the highest bidder for the sum of two

million dollars ($2,000,000.00) via credit bid, and (ii) certain personal property

assets of Defendant (the "A.2. Assets" and together with the Real Property, the

"Property") was sold to Plaintiff as the highest bidder for the sum of five hundred thousand dollars ($500,000.00) via credit bid, was properly conducted in accordance with the Orders of this Court and applicable law;

B.      The purchase price to be paid by Plaintiff for the Property is fair and equitable, constitutes fair consideration, and is the highest price that could be obtained for the Property under the circumstances;

C.      The Marshal's fees and costs in the total amount of $50,613.75 are reasonable and should be allowed.

D.      The fees and costs of the substitute custodian, All Civil Process, Inc., in the amount of $10,143.00 are reasonable and should be allowed.

It is THEREFORE ORDERED, ADJUDGED and DECREED that:

1.      The Motion is APPROVED in all respects.

2.      The Execution Sale by the Marshal is hereby ratified, approved and confirmed.

3.      The Marshal is ordered and directed to make good and sufficient conveyance of the Property to Plaintiff by way of a quitclaim deed, quitclaim bill of sale (certificate of purchase or such other document or deed) in a form acceptable to Plaintiff.

4.      The Clerk of Court shall issue a Writ of Possession with respect to the Property in favor of Plaintiff upon request.

-3-

6435833.3

U.S. Bankruptcy Court - Hawaii - #19-00022 Dkt # 65   Filed 03/10/22   Page 3 of 5
U.S. Bankruptcy Court - Hawaii - #22-90008 Dkt # 1-1   Filed 04/04/22   Page 29 of 183

5.      Plaintiff shall pay the Marshal's fees and costs in the total amount of $50,613.75, and the fees and costs of the substitute custodian, All Civil Process, Inc., in the amount of $10,143.00, at the closing of the sale of the Property.

6.      Defendant and all persons claiming any interest in the Property, by or through the Defendant's interest in the Property, are forever barred and foreclosed of and from all right, title and interest, and claims at law or in equity in and to the Property and every part thereof, and to the proceeds therefrom arising up to the date of closing.

7.      Any and all other encumbrances affecting the Property, or any part thereof (except for any holders of liens or security interests that are senior in priority to the judgment lien of Plaintiff) are perpetually barred of and from any and all right, title and interest, and claims at law or in equity, in the Property or any part thereof.  Any liens or security interests that are junior to the judgment lien of Plaintiff shall be extinguished by the Execution Sale.

8.      This Court maintains jurisdiction for of the purposes of interpretation, implementation and enforcement of this Order.

**END OF ORDER**

6435833.3

U.S. Bankruptcy Court Hawaii #22-90008 Dkt # 11 Filed 03/09/22 Page 30 of 183

Prepared by:

GOODSILL ANDERSON QUINN & STIFEL
A LIMITED LIABILITY LAW PARTNERSHIP LLP

JOHNATHAN C. BOLTON
CHRISTOPHER P. ST. SURE
First Hawaiian Center
999 Bishop Street, Suite 1600
Honolulu, Hawaii 96813
Telephone: (808) 547-5600
Facsimile: (808) 547-5880

Attorneys for Plaintiff
MICHAEL KATZENSTEIN,
as Chapter 11 Trustee

6435833.3

U.S. Bankruptcy Court - Hawaii #19-00022 Dkt # 65  Filed 02/26/20  Page 5 of 5
U.S. Bankruptcy Court - Hawaii #22-90008 Dkt # 1-5  Filed 04/04/22  Page 31 of 183

EXECUTION VERSION

**MASTER RELATIONSHIP AGREEMENT**

Electronically Filed
FIRST CIRCUIT
1CCV-22-0000321
18-MAR-2022
05:07 PM
Dkt. 6 EXH

This Master Relationship Agreement (this "MRA" and, together with all Schedules and Exhibits hereto, the "Agreement") is entered into as of March 6, 2020, by and between Sandwich Isles Communications, Inc., a Hawaii corporation ("SIC") and Paniolo Cable Company, LLC, a Delaware corporation ("Paniolo").  SIC and Paniolo are each referred to as a "Party" and are collectively referred to as the "Parties".

## RECITALS:

A.      WHEREAS, Paniolo owns and operates a submarine cable system and related terrestrial assets ("the Paniolo System") connecting certain islands in Hawaii;

B.      WHEREAS, SIC owns and operates certain facilities and provides telecommunications services in the Hawaiian Home Lands;

C.      WHEREAS, in connection with that certain Adversary Proceeding No. 19-90022, *Katzenstein Trustee v. Sandwich Isles Communications, Inc.* (the "Adversary") pending in *In re Paniolo Cable Company, LLC*, Debtor, Case No. 18-01319 (RJF), in the United States Bankruptcy Court for the District of Hawaii (the "Paniolo Bankruptcy Proceeding"), the Parties have entered into that certain Rule 9019 Settlement Agreement ("Settlement Agreement") in order to restructure their business and financial affairs;

D.      WHEREAS, the Settlement Agreement sets forth the Parties' agreement, in general terms, with respect to:  (a) the grant by SIC to Paniolo of an indefeasible right to access, occupy, and use certain assets for the purpose of operating and maintaining the Paniolo System (which assets, together with the Paniolo System, are referred to as the "Paniolo Network"); and  (b) the assignment, transfer, conveyance, sublease, sublicense or grant of the indefeasible right of use by SIC to Paniolo of certain easements, leases, licenses, permits and rights of way necessary to operate and maintain the Paniolo Network;  (c) the lease by Paniolo to SIC of fiber pairs on the Paniolo Network for the sole purpose of providing retail telecommunications service in the Hawaiian Homelands;  (d) the lease by Paniolo to SIC of collocation space and conduit access necessary to use such fiber pairs;  (e) the lease by Paniolo to SIC of certain transport services utilizing existing Fujitsu transport assets in the Paniolo Network; and  (f) the provision of related operations and maintenance services and power by one Party to the other;

E.      WHEREAS, the Parties desire to enter into this Agreement to more specifically memorialize the terms of the Settlement Agreement;

F.      Accordingly, in consideration of the mutual promises set forth below and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## EXHIBIT E

EXECUTION VERSION

## ARTICLE 1
## DEFINITIONS

1.1.   "<u>Adversary</u>" is defined in Recital C.

1.2.   "<u>Affiliate</u>" means any entity that now or in the future, directly or indirectly controls, is controlled with or by, or is under common control with a Party.  For purposes of the foregoing, "control" means the ownership, directly or indirectly, of fifty percent (50%) or more of the voting power to elect directors (or the equivalent thereof, *i.e.,* limited liability company members or managers) of such entity, or such lesser percentage interest if coupled with the power to direct the management of such entity.

1.3.   "<u>Agreement</u>" is defined in the Preamble.

1.4.   "<u>Assets IRU</u>" is defined in Section 3.2 and Schedule 2.

1.5.   "<u>Bankruptcy Event</u>" means any proceeding instituted by a Party voluntarily or involuntarily commenced against any Party (and such proceeding is not dismissed or permanently stayed within thirty (30) days): (a) seeking an order for relief with respect to such Party under any bankruptcy, insolvency, reorganizations or similar law, including the Bankruptcy Code; (b) seeking to appoint a receiver, trustee, custodian, or other similar official for such Party or for any or all of a Party's assets or property; or (c) making an assignment for the benefit of that Party's creditors.  For the avoidance of doubt, "Bankruptcy Event" shall not include the pending Paniolo Bankruptcy Proceeding with respect to Paniolo.

1.6.   "<u>Business Day</u>" means any official working day other than a legal or bank holiday in the State of Hawaii.  Unless otherwise specifically indicated as a "Business Day" the word "days" as used in the Agreement means calendar days.

1.7.   "<u>Charges</u>" means the fees and charges set out in the Agreement or a Schedule and may include recurring and non-recurring charges.

1.8.   "<u>Claims</u>" is defined in Section 7.1.

1.9.   "<u>Collocation Space</u>" means the space leased by Paniolo to SIC for the purposes of installing and operating equipment for the provision of retail telecommunications services pursuant to Section 3.1 and Schedule 1, as more particularly defined in that Schedule and Exhibit C thereto.

1.10.   "<u>Conduits</u>" means the conduits and ducts to which Paniolo grants SIC access to and use of pursuant to Section 3.1 and Schedule 1, as more particularly defined in that Schedule.

1.11.   "<u>Confidential Information</u>" means information disclosed by one Party to the other Party under this Agreement that is marked as confidential or would normally under the circumstances be considered the confidential information of the disclosing Party.  Confidential Information does not include information that the recipient already knew, that becomes public through no fault of the recipient, that was independently developed by the recipient, or that was rightfully given to the recipient by another Party under no confidentiality obligation.

**EXECUTION VERSION**

1.12.    "Default" is defined in Section 11.

1.13.    "Dispute" is defined in Section 13.1.

1.14.    "Effective Date" means the latter of:  (a) the date on which this Agreement is fully executed; and (b) the date on which it is approved by the Presiding Judge in the Paniolo Bankruptcy Proceeding.

1.15.    "Entitlements" means the various easements, leases, licenses, license agreements, letters of approval, special area management permits, rights of way or rights of entry assigned, transferred, sublicensed, or subleased by SIC to Paniolo  (or to which SIC grants Paniolo an indefeasible beneficial right of use) pursuant to Section 3.2 and Schedule 2, as more particularly defined in that Schedule.

1.16.    "Fiber Pair" means two dark fibers used to transmit and receive optical signals on the Paniolo System.

1.17.    "Force Majeure Event" is defined in Article 12.

1.18.    "Indemnified Parties" is defined in Section 7.1.

1.19.    "Indemnifying Party" is defined in Section 7.1.

1.20.    "Intellectual Property" means any and all intellectual property (and rights thereto, whether registered or unregistered) and including, but not limited to, technology, patents, rights to inventions, trademarks, service marks, registered designs, copyrights and related rights, database rights, design rights, domain names, trade dress and other intellectual property, and all registrations, applications for registrations, continuations, continuations-in-part, divisional applications, renewals or extensions of, and rights to claim priority from, those rights, and any similar right recognized from time to time in any jurisdiction, together with all rights of action in relation to the infringement of any of the above.

1.21.    "IRU Assets" means the assets subject to the Assets IRU granted to Paniolo by SIC pursuant to Section 3.2 and Schedule 2, as more particularly defined in that Schedule.

1.22.    "Law" means any national, regional, state or local law, statute, rule, regulation, code, ordinance, administrative ruling, judgment, decree, order or directive of any jurisdiction applicable to this Agreement.

1.23.    "Leased Fiber" means the Paniolo Network Fiber Pairs leased to SIC by Paniolo pursuant to Section 3.1 and Schedule 1, as more particularly defined in that Schedule.

1.24.    "MRA" means the main body of this Agreement.

1.25.    "O&M Services" means the operations and maintenance services provided by one Party to another pursuant to this Agreement, and includes "Assets O&M Services" (O&M Services provided by SIC with respect to the IRU Assets) and "Leased Fiber and Transport Services O&M

99754430.1

**EXECUTION VERSION**

Services (O&M Services provided by Paniolo with respect to the Leased Fiber), all such O&M Services to be provided on commercially reasonable terms and conditions.

1.26.   "Paniolo" means Paniolo Cable Company, LLC, and its permitted successors and assigns.

1.27.   "Paniolo Bankruptcy Proceeding" is defined in Recital C.

1.28.   "Paniolo Equipment" means any equipment owned or leased, or to which Paniolo has an indefeasible right of use (other than the IRU Assets), that Paniolo uses to operate the Paniolo Network.

1.29.   "Paniolo Network" is defined in Recital D.

1.30.   "Paniolo System" is defined in Recital A.

1.31.   "Party" refers to each of SIC and Paniolo, and their respective permitted successors and assigns.

1.32.   "Released Claims" is defined in Section 3.2.

1.33.   "SIC" means Sandwich Isles Communications, Inc. and its permitted successors and assigns.

1.34.   "Settlement Agreement" is defined in Recital C.

1.35.   "SIC Equipment" means any equipment installed by or on behalf of SIC and/or its Affiliates in the Collocation Space or Conduits for the purpose of using the Leased Fiber as permitted under this Agreement, including any electronic or optronic equipment. For the avoidance of doubt, "SIC Equipment" does not include any IRU Assets.

1.36.   "SIC Lease" is defined in Section 3.1.

1.37.   "Specifications" means the technical and performance specifications applicable to the Leased Fiber, as more particularly identified in Section 2.2 of Schedule 1 and Exhibit A thereof.

1.38.   "Taxes" means any and all applicable federal, state, local, and foreign sales, use, excise, utility, gross receipts, value added, and other taxes, tax-like charges and other assessments and surcharges imposed on a Party.

1.39.   "Term" is defined in Section 2.1.

1.40.   "Transport Services" means DS1, DS3, OC3, OC12, and OC48 circuits provided by Paniolo leveraging the Paniolo Network Fujitsu equipment existing in the Paniolo Network central offices (*i.e.,* those offices where the Paniolo Network Fiber Pairs interconnect).

**EXECUTION VERSION**

## ARTICLE 2
## TERM

2.1.     Term.  This MRA is effective as of the Effective Date and shall remain in force until all Schedules hereto have terminated ("Term").

2.2.     Termination of Schedules.  Any Schedule may be terminated by the written agreement of both Parties.  In addition, any Schedule other than Schedule 2 may be terminated by a Party in the event the other Party is in Default.  For the avoidance of doubt, the Parties expressly agree that Schedule 2 is irrevocable and non-terminable.  SIC's remedies for a Paniolo Default with respect to Schedule 2 shall be damages at law, or equitable remedies pursuant to Section 6.

2.3.     Effect of Termination.  Termination of this Agreement or a Schedule shall not affect the rights or obligations of either Party that have arisen before the date of termination or expiration.

## ARTICLE 3
## SCHEDULED SERVICES AND RIGHTS OF USE

3.1.     SIC Lease.  In consideration for the Assets IRU, Paniolo shall lease to SIC, and SIC shall lease from Paniolo, the Leased Fiber for the sole purpose of providing retail telecommunications services in the Hawaiian Home Lands (the "SIC Lease").  The SIC Lease is subject to the terms and conditions more particularly set forth in Schedule 1, attached hereto and incorporated herein by reference. To facilitate SIC's use of the Leased Fiber, Paniolo shall also: (a) lease to SIC, and SIC shall lease from Paniolo, the Collocation Space to use the Leased Fiber as well as space on related fiber patch panels to connect to the Leased Fiber as well as Collocation Space for other SIC Equipment occupying the Paniolo Network central office space; (b) lease to SIC, and SIC shall lease from Paniolo, Conduits used by SIC for connectivity to the Hawaiian Home Lands as of the Effective Date; (c) lease to SIC, and SIC shall lease from Paniolo, the Transport Services in connection with the Leased Fiber as of the Effective Date; and (d)  provide to SIC Fiber O&M Services and power, subject to the terms and conditions more particularly set forth in Schedule 1. Nominal Charges shall apply to (a) the Leased Fiber and related Transport Services leased to SIC as of the Effective Date, and (b) Collocation Space and Conduits occupied by SIC and its Affiliates as of the date of this Agreement (but in the case of such Collocation Space and Conduits, only for the period beginning with the Effective Date and ending at midnight December 31, 2020).  For the avoidance of doubt, such Nominal Charges shall not apply to (a) any Fiber Pairs and related Transport Services other than the Leased Fiber leased to SIC as of the Effective Date and Transport Services related to such Leased Fiber, (b) any Collocation Space or Conduits for any time after December 31, 2020; or (c) O&M Services and power; instead market rates shall be charged to SIC therefor.

3.2.     Paniolo Assets IRU.   In consideration for the nominal Charges for Leased Fiber, Collocation Space,  Conduits and Transport Services provided for in the SIC Lease, and the release of certain claims identified in the Settlement Agreement ("Released Claims"), SIC shall grant to Paniolo, and Paniolo shall purchase from SIC, an indefeasible right to use the IRU Assets ("Assets IRU") on the terms and conditions more particularly set forth in Schedule 2, attached hereto and incorporated herein by reference.  To facilitate Paniolo's use of the IRU Assets, SIC shall also:  (a) assign, transfer, convey, sublease, sublicense or grant an indefeasible right to the beneficial use of

99754430.1

5

the Entitlements to Paniolo; and (b) provide Assets O&M Services and power to Paniolo, also on the terms and conditions as may be agreed upon by the Parties pursuant to Schedule 2.

3.3.   Additional Services. The Parties may, from time to time, agree on additional services to be provided by one Party to the other. Any such services shall be set forth in a Schedule, which Schedule shall be attached hereto and incorporated herein by reference.

3.4.   No Additional Rights; No Liens. Nothing in this Agreement shall grant to either Party any rights in and to the real and personal property of the other Party, except as expressly provided herein. Each Party shall indemnify and hold the other Party harmless from, and shall keep the other Party's personal and real property free and clear of and from, all mechanics' and materialmen's liens and claims of liens, and all other liabilities, liens, claims and demands of any kind (other than any pre-existing, perfected liens and security interests of the United States Rural Utilities Services, if any). If any such lien is filed on account of a Party at any time against the other Party's real or personal property, such Party shall cause such lien to be discharged of record within ten (10) days after the filing thereof. For purposes of this Section 3.4, Paniolo's real and personal property includes the IRU Assets.

## ARTICLE 4
## CHARGES AND INVOICING

4.1.   Charges. All Charges shall be identified in the relevant Schedules. The Parties acknowledge and agree that the Charges for Leased Fiber and Transport Services as of the Effective Date are nominal, as such Charges reflect the offset of the value of the IRU Assets and value of the Released Claims.

4.2.   Invoicing and Payment. Charges shall be invoiced and paid pursuant to the terms set forth in the relevant Schedule. Invoices shall be delivered to the Parties at the following physical and electronic addresses:

| If to Paniolo: | Paniolo Cable Company, LLC<br>Attention: Michael Katzenstein, Chapter 11 Trustee<br>Three Times Square, 9th Floor<br>New York, NY 10036 |
| --- | --- |
| If to SIC: | Sandwich Isles Communications, Inc.<br>77-808 Kamechameha Highway<br>Mililani, Hawaii 96789<br>Attention: Breanne Kahalewai |

4.3.   No Other Offset. Except as expressly provided in Section 4.1 or in a Schedule, neither Party shall have any rights of offset or deduction.

99754430.1

6

4.4.   Disputes. Either Party may dispute an invoice by providing notice to the other Party within sixty (60) days of receipt of the disputed invoice, which notice provides sufficient explanation of the nature of the dispute. The Parties will cooperate in good faith to resolve any such disputes within a sixty (60) day period after the disputing Party provides notice. Neither Party shall be entitled to withhold any disputed amount pending resolution of a dispute. Upon resolution of a dispute, the non-prevailing Party shall promptly credit any amount determined to be owed, if any, to the other Party's account. In the event the Parties are unable to resolve a billing dispute, the billing dispute will be deemed a "Dispute" as defined in and subject to Article 13.

4.5.   Late Payments; Interest. In the event a Party fails to make any payment owed hereunder when due, such Party shall pay interest on the unpaid amount at the rate of one and one-half percent (1.5%) per month or the highest rate permitted by law, whichever is lower, until such sum is paid in full.

**ARTICLE 5**
**TAXES**

5.1.   From and after the Effective Date, each Party is responsible, as required under applicable Law, for identifying and paying all Taxes (and any penalties, interest, and other additions thereto) that are imposed on that Party upon or with respect to the transactions and payments under this Agreement. The Parties shall cooperate to minimize adverse tax consequences.

(a)   An invoicing Party may charge, and the invoiced Party will pay (1) applicable national, state or local sales or use Taxes or value added Taxes that the invoicing Party is legally obligated to charge and (2) applicable regulatory Taxes that the invoicing Party is legally permitted to charge, including the Universal Service Fund surcharge. The invoiced Party may provide the invoicing Party with an exemption certificate or equivalent information acceptable to the relevant taxing authority, in which case the invoicing Party will not charge or collect the Taxes covered by that certificate. All invoiced Taxes must be identified as a separate line upon an invoice.

(b)   From and after the Effective Date, Paniolo shall be solely responsible for any real or personal property Taxes, if any, relating in any way to the IRU Assets.

**ARTICLE 6**
**LIMITED WARRANTY; LIMITATION OF LIABILITY; EQUITABLE REMEDIES**

6.1.   LIMITED WARRANTY. EXCEPT AS SET FORTH ELSEWHERE IN THIS AGREEMENT, NEITHER PARTY MAKES ANY WARRANTIES, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, WITH RESPECT TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO ANY WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

6.2.   Limitation on Liability. Subject to Section 6.3, no Party shall be liable under this Agreement, whether in contract, tort (including, but not limited to, negligence and strict liability)

99754430.1

or otherwise for any special, indirect, punitive, reliance, or consequential damages (whether or not such losses were within the contemplation of the Parties) suffered or incurred by the other Party.

6.3.    <u>Limitation on Liability Not Applicable</u>.  Nothing in this Agreement shall exclude or limit any Party's liability:

(a)    For death or personal injury resulting from the negligence or willful misconduct of a Party or their servants, agents or employees;

(b)    For fraud and/or fraudulent misrepresentation;

(c)    For misuse of Confidential Information;

(d)    Under Article 7 (Indemnification);

(e)    For payment of sum property due and owing to the other in the course of normal performance; or

(f)    For matters which cannot be excluded under applicable Law.

6.4.    Subject to Section 6.2 and Section 6.3, each Party's maximum liability under or in connection with this Agreement shall be limited to direct damages proven.

6.5.    The Parties acknowledge and agree that a breach or threatened breach of a material term or condition of this Agreement, may cause the non-breaching Party irreparable harm, and accordingly such Party shall be entitled to seek equitable relief.

## ARTICLE 7
## INDEMNIFICATION

7.1.    Each Party (as "<u>Indemnifying Party</u>") shall indemnify, defend and hold harmless the other Party, its employees, officers, directors, members, subcontractors and agents (the "<u>Indemnified Parties</u>") from and against all third-party liability, loss, cost, damage, expense, or claim, demand, allegation, cause of action (or threat thereof) of any nature whatsoever (including the infringement of any third-party Intellectual Property, environmental damages, property damage, and personal injury (including death) to the Paniolo Indemnitees), together with expenses (including reasonable attorneys' fees and court costs through appeal) (collectively, "<u>Claims</u>"), arising from Indemnifying Party's negligence or willful misconduct in connection with performance by Indemnifying Party of its obligations (or breach thereof) or the exercise by Indemnifying Party of its rights under this Agreement.

7.2.    In connection with the indemnification provided pursuant to this <u>Article 7</u>, the Indemnified Party shall:  (a) promptly notify the Indemnifying Party in writing of any Claim and grant the Indemnifying Party control of the defense and all related settlement negotiations;  and (b) cooperate with the Indemnifying Party, at its expense, in defending or settling such Claim; <u>provided</u> that if any settlement results in any ongoing liability to, or prejudices or detrimentally impacts the Indemnified Party, and such obligation, liability, prejudice, or impact can reasonably be expected to be material, then such settlement shall require the Indemnified Party's written

99754430.1

8

EXECUTION VERSION

consent.  In connection with any Claim, the Indemnified Party may have its own counsel in attendance at all public interactions and substantive negotiations at its own cost and expense.

## ARTICLE 8
## INSURANCE

8.1.    During the Term, each Party, at its sole costs and expense, will obtain and maintain with financially reputable insurers that are licensed to do business in all jurisdictions where any work is performed and that hold a current rating of not less than A-, (according to A.M. Best), not less than the following insurance coverages, which may be satisfied through a combination of primary and excess (umbrella) policies:

(a)    Workers' Compensation, as provided for under any Worker's Compensation or similar Law in the jurisdiction where any work is performed with an Employer's Liability limit of not less than $500,000 for each incident;

(b)    Commercial General Liability, including coverage for Contractual Liability and Products/Completed Operations Liability, with a limit of not less than $1,000,000 per occurrence for bodily injury, personal injury and property damage liability;

(c)    "All Risk" Property Insurance covering not less than the full replacement cost of a Party's personal property while on the other Party's site;

(d)    Business Auto Insurance covering the ownership, maintenance or use of any owned, non-owned or hired automobile with a limit of not less than $1,000,000 combined single limit per accident for bodily injury and property damage liability;

(e)    "All Risk or Special Form" Property Insurance covering not less than the full replacement cost of a Party's property including business interruption; and

(f)    Umbrella form excess liability insurance with limits of not less than $5,000,000.

8.2.    Each insurance policy, except Workers' Compensation and Property Insurance, will include each Party as an additional insured for their acts or omissions under the Agreement.

8.3.    Each insurance policy shall contain a waiver of subrogation in favor of the other Party.

8.4.    Each insurance policy shall be endorsed to give the other Party at least thirty (30) calendar days' prior written notice of cancellation.

8.5.    Each Party's insurance will be primary for their own acts or omissions.

8.6.    Nothing contained herein limits either Party's liability to the other Party to the limits of insurance certified or carried.

99754430.1

9

**EXECUTION VERSION**

8.7.    Each Party shall provide proof of insurance either in the form of a Certificate of Insurance (ACORD form 25 or equivalent).  Such proof shall be provided within fifteen (15) calendar days of the Effective Date, and again within fifteen (15) calendar days of the renewal or replacement of each policy.

**ARTICLE 9**
**NOTICES**

All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by a reputable overnight courier service, by facsimile or registered or certified mail (postage prepaid, return receipt requested), or by email (under normal service conditions, with confirmation of receipt) to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Article 9).

| | |
|---|---|
| If to Paniolo: | Paniolo Cable Company, LLC<br>Attention: Michael Katzenstein, Chapter 11 Trustee<br><br>-with a copy to-<br><br>Goodsill Anderson Quinn & Stifel<br>A Limited Liability Law Partnership<br>999 Bishop Street, Suite 1600<br>Honolulu, Hawaii 96813<br>Attention:  Johnathan C. Bolton |
| If to SIC: | Sandwich Isles Communications, Inc.<br>77-808 Kamechameha Highway<br>Mililani, Hawaii 96789<br>Attention:  Breanne Kahalewai<br><br>-with a copy to-<br><br>Kobayashi Sugita & Goda, LLP<br>999 Bishop Street, 26th Floor<br>Honolulu, HI 96813<br>Attention:  Lex R. Smith |

A Party may change its address and point of contact by notifying the other Party in writing in accordance with this Article.

99754430.1

10

EXECUTION VERSION

## ARTICLE 10
## CONFIDENTIALITY

10.1.    Each Party shall preserve the other Party's Confidential Information provided to it hereunder with the same degree of care in protecting its own Confidential Information, but in no event less than a reasonable standard of care shall be used.  A Party shall not disclosure the other Party's Confidential Information without the prior written consent of the disclosing Party. Notwithstanding the foregoing, the receiving Party may disclose certain Confidential Information of the disclosing Party, without violating the obligations of this Agreement, to the extent such disclosure is required by a valid order of a court or other governmental body having jurisdiction, *provided that* the receiving Party provides the disclosing Party with reasonable prior written notice of such disclosure (if legal to do so) and, if requested by the disclosing Party, assists such Party in obtaining a protective order preventing or limiting the disclosure and/or requiring that the Confidential Information so disclosed be used only for the purposes for which the law or regulation requires, or for which the order was issued.

(a)    Nothing herein shall be construed as granting any right or license under any Intellectual Property now or hereafter owned, licensed or controlled by a Party to the other Party.

(b)    The receiving Party shall not, without first obtaining written consent of the disclosing Party, use any service mark, logo, trademark, trade name, or other Intellectual Property of the disclosing Party or refer to the other Party in any promotional activity.  For the avoidance of doubt, a breach of this provision shall be a material breach of this Agreement, entitling the non-breaching Party to exercise all rights available under this Agreement or applicable Law.

10.2.    The provisions of this Article 10 shall survive expiration or other termination of this Agreement.

## ARTICLE 11
## DEFAULT

11.1.    A Default shall be deemed to have occurred under this Agreement (including any Schedule hereto) if a Party:

(a)    fails to timely pay any amount due under this Agreement, which failure is not remedied within ten (10) days from receipt of notice thereof;

(b)    violates any applicable Law with respect to its rights and obligations under this Agreement and such violation(s) are not remedied within thirty (30) days after written notice thereof;

(c)    fails to perform any of its material obligations (other than the timely payment of amounts due, which is subject to the 10-day cure period identified above) under this Agreement, and such non-performance is not remedied within thirty (30) days after notice thereof; or

(d)    undergoes a Bankruptcy Event.

99754430.1

11

11.2.   In the event of any Default hereunder, the non-Defaulting Party may (subject to Article 6) pursue any legal remedies it may have under this Agreement, applicable Law, or principles of equity, including specific performance.

11.3.   A waiver by either Party at any time of any of its rights as to anything herein contained shall not be deemed to be a waiver of any breach of covenant or other matter subsequently occurring.

## ARTICLE 12
## FORCE MAJEURE

In no event shall a Party have any claim or right against the other for any failure of performance (other than a failure to pay) due to causes beyond its control (a "Force Majeure Event") including: acts of God, fire, explosion, vandalism, cable or fiber cut not due to a Party's negligence, adverse weather conditions, flood or other similar occurrences; any change in Law; national emergencies; pandemic; insurrections; riots; wars; terrorism; strikes, lock-outs, work stoppages, or other labor difficulties (other than those of a Party's own workforce); or any other cause or circumstance, whether of a similar or dissimilar nature to the foregoing, beyond the reasonable control of the affected Party.

## ARTICLE 13
## GOVERNING LAW; DISPUTE RESOLUTION

13.1.   The Agreement is governed by the laws of the State of Hawaii, without regard to conflict of laws principles.

13.2.   The Parties will attempt to resolve any dispute arising out of this Agreement promptly through discussions at the operational level. In the event that a resolution is not achieved, the disputing Party shall provide the other Party with written notice of the same and the Parties shall attempt to resolve such dispute between the respective vice presidents of operations (or equivalent position with the power to resolve the dispute) of the disputing Parties. All negotiations conducted by such officers shall be confidential and shall be treated as compromise and settlement negotiations for purposes of federal and state rules and regulations. If the disputing Parties fail to resolve such dispute within thirty (30) days of the non-disputing Party's receipt of the written notice, either such Party may initiate legal action as set forth below.

(a)   Failing resolution of a dispute in accordance with Section 13.2 above and notwithstanding anything to the contrary contained in this Agreement, the Parties hereby irrevocably agree that any legal action, suit or proceeding with respect to any matter under or arising out of or in any way connected with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding shall be brought in the courts of the State of Hawaii, and each Party hereby agrees to the personal and exclusive jurisdiction of such courts. The prevailing Party in any litigation shall be entitled to its costs and reasonable attorneys' fees.

## ARTICLE 14
## REPRESENTATIONS, WARRANTIES AND ACKNOWLEDGMENTS

14.1.   Each Party represents and warrants that:

(a)   it has the full right and authority to enter into, execute, deliver and perform its obligations under this Agreement;

(b)   this Agreement constitutes a legal, valid and binding obligation enforceable against such Party in accordance with its terms, subject to bankruptcy, insolvency, creditors' rights and general equitable principles; and

(c)   its execution of and performance under this Agreement does not violate any applicable existing regulations, rules, statutes or court orders of any local, state or federal government agency, court or body.

14.2.   During the Term, each Party shall secure and maintain all necessary permits, licenses, and other authorizations required to perform its obligations and enjoy its rights as provided under this Agreement.

14.3.   During the Term, each Party shall comply with all applicable Laws including the U.S. Foreign Corrupt Practices Act of 1977, all export control regulations, and the rules and regulations of the Federal Communications Commission.

## ARTICLE 15
## RELOCATION

Either Party may relocate any physical component or asset to which it has legal title that is the subject of this Agreement:  (a) due to a court order or the requirements of governmental authorities (including but not limited to condemnation) or third parties with the right to require any such change;  (b) due to adverse changes in environmental conditions;  (c) in the event of destruction or damage thereto;  (d) to allow the installation of additional cables, facilities or equipment;  or (e) due to operational requirements.  Any such changes shall be at the relocating Party's sole cost and expense (subject to the last sentence hereof), except in the event that the need for same has been caused by the acts or omissions of the other Party, its agents or contractors, in which case such other Party shall be solely responsible for the entire cost and expense thereof.  Notwithstanding the foregoing reference to legal title: (i) Paniolo shall have the right to relocate the IRU Assets for any reason specified in this Article 15; provided, however, that any voluntary relocation shall not adversely affect (in Paniolo's commercially reasonable judgment) SIC's ability to provide service in the Hawaiian Home Lands; and (ii) SIC shall have the right to relocate IRU Assets only if such relocation arises pursuant to subsection (a), and in such instance Paniolo shall have the right to approve any relocation site, which approval shall not be unreasonably withheld, conditioned, or delayed.  A Party shall reimburse the relocating Party for its pro rata shares of any costs and expenses relating to any changes made pursuant to subsections (a), (b), and (c) above (based on its respective percentage interest in the use of the relocated asset(s)) to the extent the relocating Party is not otherwise reimbursed by reason of insurance, condemnation award, or otherwise.

99754430.1

13

**EXECUTION VERSION**

## ARTICLE 16
## GENERAL PROVISIONS

16.1.   Binding Agreement.  This Agreement shall be binding upon and inure solely to the benefit of the Parties and their respective permitted successors and assigns, and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

16.2.   Waiver. A Party may (a) extend the time for the performance of any of the obligations or other acts of any other Party, (b) waive any inaccuracies in the representations and warranties of any other Party contained herein or in any document delivered or made available by the other Party pursuant hereto or (c) waive compliance with any of the agreements of the other Party or conditions to such Party's obligations contained herein.  Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the Party to be bound thereby. Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement. The failure of a Party to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

16.3.   Assignment.   Paniolo may assign this Agreement, or any of its rights and corresponding  obligations hereunder, for any reason upon prior notice to SIC.  SIC may not assign this Agreement without the prior written consent of Paniolo (such consent not to be unreasonably withheld, conditioned, or delayed), except as provided in this Section 16.3. SIC may transfer or assign this Agreement to any entity providing retail telecommunication services to the Hawaiian Home Lands. SIC may sublease rights under the Lease, as long as all restrictions on use contained herein fully apply to the sublessee.  Any purported assignment or sublease in contravention of this Section 16.3 shall be void.

16.4.   Interpretation.  In this Agreement, except to the extent otherwise provided or that the context otherwise requires:

(a)   when a reference is made in this Agreement to an Article, Section, Schedule, or Exhibit, such reference is to an Article or Section of, or a Schedule to, the MRA, Schedule or Exhibit where referenced unless otherwise indicated;

(b)   the headings in this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(c)   whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

(d)   the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms, all tenses, and both noun and verb forms, as context dictates; and

(e)   when calculating the period of time before which, within which or following which any act is to be done or any step taken pursuant to this Agreement, the date that is the

99754430.1

14

**EXECUTION VERSION**

reference date in calculating such period shall be excluded, and if the last day of such period is not a business day, the period shall end on the immediately following business day.

16.5.    Joint Participation. The Parties have participated jointly in the negotiation and drafting of this Agreement and each has been represented by counsel of its choosing and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

16.6.    Performance Standard.  The Parties shall perform all actions, activities, consents, approvals and other undertakings in this Agreement in a reasonable and timely manner, and each expressly acknowledges and understands that time is of the essence in the performance of obligations required to be performed by a date expressly specified herein.  Except as specifically set forth herein, for the purpose of this Agreement the standards and practices of performance within the telecommunications industry in the relevant market shall be the measure of a Party's performance.

16.7.    Entire Agreement. This Agreement (inclusive of all Schedules and Exhibits) constitutes the entire and final agreement and understanding between the Parties with respect to the subject matter hereof and supersedes all prior agreement relating to the subject matter hereof, which are of no further force or effect.

16.8.    Amendment.  This Agreement may not be amended or modified except (a) by an instrument in writing signed by, or on behalf of, SIC and Paniolo or (b) by a waiver in accordance with Section 16.2.

16.9.    Relationship. The relationship between Paniolo and SIC shall not be that of partners, agents, or joint venturers, and nothing contained in this Agreement shall be deemed to constitute a partnership or agency agreement between them for any purposes, including federal income tax purposes.  Paniolo and SIC, in performing any of their obligations hereunder, shall be independent contractors or independent parties and shall discharge their contractual obligations at their own risk subject, however, to the terms and conditions hereof.

16.10.    Invalidity.  If any term, obligation or other provision of this Agreement is invalid, illegal or incapable of being enforced by any applicable Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect for so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to either of the Parties.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated by this Agreement are consummated as originally contemplated to the greatest extent

16.11.    Priority.  In the event of an inconsistency between the terms of the MRA and any Schedule, the terms of the Schedule will prevail with respect to the specific subject matter thereof.  In all other respects, this MRA shall prevail.

99754430.1

15

16.12. Further Actions. The Parties agree to provide such additional information and take such additional action, including the execution of and delivery of further agreements, instruments, and other documents, as may be reasonably necessary to carry out the purposes of the Agreement.

16.13. Counterparts and Electronic Signatures. This Agreement may be executed and delivered (including by facsimile or other means of electronic transmission, such as by electronic mail in "pdf" form) in counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one-and-the-same agreement.

In witness whereof, and intending to be legally bound hereby, the Parties have executed this Agreement as of the dates identified below.

SANDWICH ISLES COMMUNICATIONS, INC.

By: _____

Title: _Presidcnt_____

Date: _4/15/2020_____

PANIOLO CABLE COMPANY, LLC

By: _____

Title: _Chapter 11 Trustee_____

Date: _4/17/20_____

99754430.1

16

EXECUTION VERSION

## SCHEDULES AND EXHIBITS

**Schedule 1:**   SIC Lease

           Exhibit A:   Leased Fiber Specifications and Service Levels

           Exhibit B:   Collocation Space

           Exhibit C:   Conduits

           Exhibit D:   Leased Fiber O&M Services

**Schedule 2:**   Assets IRU

           Exhibit A:   IRU Assets

           Exhibit B:   Entitlements

           Exhibit C:   Assets O&M Services

**Schedule 3:**   [Reserved]

**Schedule 4:**   [Reserved]

99754430.1

EXECUTION VERSION

## SCHEDULE 1

## SIC LEASE

This SIC Lease is entered into as of March 6, 2020 by and between Sandwich Isles Communications, Inc., a Hawaii corporation ("SIC") and Paniolo Cable Company, LLC, a Delaware corporation ("Paniolo"), and sets forth the specific terms and conditions applicable to Paniolo's lease to SIC, and SIC's lease from Paniolo, of Leased Fiber, Transport Services, Collocation Space, and Conduits pursuant to that certain Master Relationship Agreement to which this Schedule 1 (SIC Lease) is attached. Capitalized terms used herein have the meanings assigned to them in the MRA or in the Section where first introduced.

## ARTICLE 1
## TERM AND TERMINATION

1.1.    Term. Except as set forth in Section 3.5 below, this SIC Lease is effective as of the Effective Date and shall remain in force until terminated as provided in Section 2.2 below (the "Lease Term").

1.2.    Termination by Paniolo. Paniolo may terminate this SIC Lease either: (a) upon an SIC Default; or (b) in its sole discretion in the event Paniolo decides to decommission the Paniolo System.

1.3.    Termination by SIC. SIC may terminate this SIC Lease for any reason.

1.4.    Automatic Termination. This SIC Lease will terminate immediately and without further action or notice by Paniolo in the event SIC purports to assign, transfer, or sublease any of its interest in the Leased Fiber (including the sale of any wholesale capacity), except as permitted pursuant to Section 2.5.

1.5.    Mutual Termination. The Parties may terminate this SIC Lease upon mutual written agreement.

1.6.    Effect of Termination. In the event of termination, the following provisions shall apply:

(a)    SIC shall within sixty (60) days disconnect and remove all SIC Equipment installed in the Collocation Space and Conduits, leaving the Collocation Space and Conduits in the same condition (wear and tear excepted) as existed on the Effective Date. In the event it fails to do so, Paniolo shall have the right to remove and store all such SIC Equipment, at SIC's sole cost and expense, or sell such SIC Equipment and retain the proceeds.

(b)    If termination is pursuant to Section 1.2(b), Paniolo may, but is not obligated to, transfer ownership of the Paniolo System, including all associated liabilities, to SIC upon commercially reasonable terms, in which case subsection (a) shall not apply.

(c)     For the avoidance of doubt, the Parties acknowledge and agree that any termination of this SIC Lease shall have no effect on the Assets IRU, nor on any Charges due thereunder, if any, except as expressly provided in Schedule 2.

## ARTICLE 2
## SIC LEASE; LEASED FIBER; COLLOCATION; CONDUITS

2.1.     Underline SIC Lease; Leased Fiber.  Paniolo hereby leases to SIC, and SIC leases from Paniolo Fiber Pairs on the Paniolo Network (the "Leased Fiber") as specified in Exhibit A denoted by a quantity of Fiber Pairs (which shall initially be two (2) Fiber Pairs) throughout the Paniolo Network effective as of the Effective Date.  The number of Fiber Pairs that comprise the Leased Fiber may be adjusted from time to time by the written agreement of the Parties, which agreement shall set forth the particular, commercially reasonable terms and conditions applicable to such additional Fiber Pairs.  The Parties acknowledge and agree that the Nominal Charges and other commercial terms applicable to the Leased Fiber leased to SIC as of the Effective Date shall not automatically apply to additional Fiber Pairs unless otherwise stated.  The number of Fiber Pairs that comprise the Leased Fiber shall not be less than two (2) and shall in all cases be limited to the number of Fiber Pairs necessary for SIC to provide retail telecommunications services in the Hawaiian Home Lands.

2.2.     Fiber Specifications.  The Parties acknowledge and agree that the Leased Fiber has been tested and meets the technical and performance specifications set forth at Exhibit A hereto ("Specifications").

2.3.     SIC Lease; Transport Services.  Paniolo hereby leases to SIC, and SIC leases from Paniolo Transport Services on the Paniolo Network as provided as of the Effective Date, which Transport Services are identified on Exhibit A by circuit type and transmission speed (DS1, DS3, OC3, OC12, or OC48) and demarcation points (i.e., the Paniolo offices between which the Transport Services are provided).  The quantity of circuits that comprise Transport Services may be adjusted from time to time by the written agreement of the Parties, which agreement shall set forth the particular, commercially reasonable terms and conditions applicable to such additional Transport Services.  The Parties acknowledge and agree that the Nominal Charges applicable to Transport Services shall not automatically apply to additional Transport Services.  In all cases, the quantity of circuits that comprise the Transport Services shall not exceed the number necessary for SIC to provide retail telecommunications services in the Hawaiian Home Lands.  Paniolo shall be responsible for the cost, if any, of reconfiguring current SIC traffic onto the Leased Fiber; provided further that Paniolo shall have the sole discretion to determine how and when such reconfiguration shall be implemented.

2.4.     Applicability of Nominal Charges.  For the avoidance of doubt, Paniolo and SIC agree that Nominal Charges shall apply only to the following: (a) for the entire term of this Lease: (i) SIC's use of the Leased Fiber leased as of the Effective Date; (b) Transport Services in connection with SIC's use of the Leased Fiber leased as of the Effective Date; and (b) for the period beginning on the Effective Date and ending December 31, 2020, SIC's use of Collocation

99754430.1

Space and Conduits used by SIC and Affiliates as of the Effective Date. All other charges shall be at market rates.

2.5.　Restricted Use. SIC may only use the Leased Fiber, Transport Services, Collocation Space, and Conduits to provide retail telecommunications services in the Hawaiian Home Lands in compliance with all applicable Laws. SIC may sublease, assign, transfer, or convey any interest in and to the Leased Fiber upon prior notice to Paniolo. The Parties acknowledge and agree that the use restriction set forth in this Section 2.4 shall apply to any such assignment or sublease.

2.6.　Collocation Space. Paniolo hereby leases to SIC, and SIC hereby leases from Paniolo, the Collocation Space (including allocated power) depicted and described on Exhibit B. SIC shall have access to the Collocation Space 24 hours a day, 7 days a week, subject to Section 2.8. The Collocation Space is delivered "AS IS", and SIC agrees that SIC's act of occupying and using the Collocation Space shall be an acknowledgement that such Collocation Space is in good condition.

(a)　Types of Collocation Space. Collocation Space shall consist of cageless space in the central office that will be shared with Paniolo and other third-party collocators. Collocation Space will be made available in Relay Rack increments. "Relay Rack" is defined as the space necessary to place the framing material to mount telecommunications equipment into a lineup of telecommunications equipment. Relay Rack increments will be provided in two types: (a) Cabinetized Relay Racks such as SIC is presently utilizing for its Alcatel/Lucent 5ESS equipment that includes sufficient width and depth in the lineup to contain the telecommunications equipment in a secure cabinet; and (b) Non-Cabinetized Relay Racks that are typically 19-inch wide spaces where the telecommunications equipment is placed but without additional space needed for providing a secure cabinet around the telecommunications equipment. Charges for these two types of Relay Racks will be separately identified.

(b)　DC Power. Paniolo will provide DC Power (48 Volt) to the Relay Racks that is protected by both battery backup and generator backup in the event of a longer term commercial AC outage. The rental rates for Cabinetized Relay Racks and Non-Cabinetized Relay Racks will be inclusive of the average cost for DC Power usage.

2.7.　Conduits. Paniolo hereby leases to SIC, and SIC hereby leases from Paniolo, the Conduits identified on Exhibit C during the Lease Term. SIC shall have access to the Conduits 24 hours a day, 7 days a week, subject to Section 2.8. The Conduits shall be delivered "AS IS", and SIC agrees that SIC's act of occupying and using the Conduits shall be an acknowledgement that such Conduits are in good condition.

2.8.　Security. SIC's access to and use of Collocation Space and Conduits shall at all times be subject to Paniolo's security policies and procedures, as updated from time to time in Paniolo's sole discretion.

2.9.　Additional SIC Equipment. The Parties acknowledge and agree that SIC may replace existing SIC Equipment or install additional SIC Equipment in SIC's Collocation Space subject to Paniolo's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

99754430.1

- 3 -

**ARTICLE 3**
**LEASED FIBER AND TRANSPORT SERVICES O&M SERVICES; ADDITIONAL**
**SERVICES**

3.1.   Paniolo System Maintenance.  Paniolo shall maintain the Paniolo System in a manner which will permit SIC's use of the Leased Fiber, Transport Services, Collocation, and Conduit as permitted under this Schedule 1. Paniolo shall maintain all components of the Paniolo System in accordance with manufacturers' specifications, and shall maintain the Leased Fiber, Transport Services, Collocation, and Conduit in accordance with the Specifications.

3.2.   Leased Fiber and Transport Services O&M Services.  Paniolo shall provide the Leased Fiber and Transport Services O&M Services identified on Exhibit D, which O&M Services will initially cover O&M Services related to the central office buildings, DC power equipment (batteries, rectifiers, backup generator, and related control equipment, security equipment, grounds maintenance, Fiber monitoring and maintenance, Transport Services monitoring and maintenance, and other services. Except as set forth herein, SIC will be solely responsible for providing and paying for any and all maintenance for all SIC Equipment used in connection with the operation of the Leased Fiber and Transport Services, none of which is included in the Leased Fiber and Transport Services O&M services to be provided hereunder.

3.3.   Subcontracting. Paniolo may subcontract any of the Leased Fiber and Transport Services O&M Services provided that Paniolo shall require the subcontractor(s) to perform in accordance with the requirements and procedures identified on Exhibit D.  The use of any such subcontractor shall not relieve Paniolo of any of its obligations hereunder.

3.4.   Additional Services.  SIC may order additional services from Paniolo from time to time, including additional operations and maintenance services and interconnection services. Any such additional services shall be on commercially reasonable terms and conditions no less favorable than the terms and conditions offered to third parties.

3.5   Effective Date of Leased Fiber and Transport Services O&M Services. Paniolo's obligations to provide Leased Fiber and Transport Services O&M Services pursuant to Section 3.3 will be effective as of the date a sale of under Section 363 of the Bankruptcy Code of all or substantially all of Paniolo's assets that comprise Paniolo Network is consummated and approved by the Bankruptcy Court. The Parties acknowledge and agree that all maintenance and repair obligations with respect to Leased Fiber and Transport Services shall continue to be performed by SIC until such date.

**ARTICLE 4**
**ACCEPTABLE USE; MANDATORY MONITORING**

4.1.   Acceptable Use. SIC's access to and use of the Leased Fiber, Transport Services, Collocation Space, Conduits and SIC Equipment associated therewith shall fully comply with Paniolo's security policies and procedures and further shall not:  (a) interrupt, interfere with, or impair service over the Paniolo Network;  (b) interrupt, interfere with, or impair Paniolo's customers' use of the Paniolo Network; (c) except as required by applicable Law, impair the privacy of any communications transmitted over the Leased Fiber;  or (d) cause damage or create

99754430.1

- 4 -

hazards to the Paniolo Network, Paniolo personnel, Paniolo's customers, their interconnecting companies, or the general public.

4.2.    Suspension.    In the event that Paniolo has a reasonable belief that SIC is in breach of Section 4.1, in addition to any other remedy it may have, Paniolo may suspend SIC's right to access and use the Leased Fiber.  Any such suspension shall be lifted as soon as Paniolo, acting reasonably, determines that the event giving rise to the suspension has been cured.

4.3.    Mandatory Monitoring.    Paniolo represents and warrants that it will not capture, modify, or intercept the contents of any data destined or sourced from the Leased Fiber, with the exception of control traffic used for operational engineering, unless Paniolo deems it reasonably necessary to protect the security or operation of the Paniolo Network or as required by Law ("Mandatory Monitoring").  In such case, Paniolo must immediately notify SIC of any Mandatory Monitoring (if lawful to do so), and must cease such Mandatory Monitoring as soon as possible and lawful to do so.

### ARTICLE 5
### CHARGES AND INVOICING

5.1.    Charges.    The Charges for the Leased Fiber, Transport Services, Collocation, Conduit, and Transport Services O&M Services shall be set out in Exhibit E.  Paniolo reserves the right to modify the Charges annually with the exception of the nominal Charges established as of the Effective Date for existing Fiber Pairs comprising Leased Fiber and Transport Services.  All such Charges shall be commercially reasonable.

5.2.    Invoicing; Payment.    Paniolo shall invoice SIC on the Effective Date for the first quarter's Charges.  Thereafter, Paniolo shall invoice SIC monthly in advance of each successive quarter during the Lease Term.  All Charges for additional services shall be separately invoiced at the time the service is performed.  All invoices are due within thirty (30) days of receipt.

### ARTICLE 6
### FURTHER ACTIONS

The Parties agree to provide such additional information and take such additional action, including the execution of and delivery of further agreements, instruments, and other documents, as may be reasonably necessary to carry out the purposes of the Agreement and this Schedule 1.

In witness whereof, and intending to be legally bound hereby, the Parties have executed this SIC Lease as of the dates identified below.

99754430.1

- 5 -

SANDWICH ISLES COMMUNICATIONS, INC.

By: _____

Title: _____President_____

Date: _____4/15/20_____


PANIOLO CABLE COMPANY, LLC

By: _____

Title: _____Chapter 11 Trustee_____

Date: _____4/17/20_____

**EXHIBIT A**

**LEASED FIBER SPECIFICATIONS AND SERVICE LEVELS**

**Demarcation Points**

| Demarcation A | Demarcation Z | Strands | Notes |
|---|---|---|---|
| Anahola | Kekaha | 4 | |
| Lateral (Anahola-Kekaha) | Lihue (Verizon) | 4 | Lateral from Anahola-Kekaha Cable to Lihue Only |
| Lateral (Anahola-Kekaha) | Hanapepe | 4 | Lateral from Anahola-Kekaha Cable to Lihue Only |
| Kakaha | Nanakuli | 4 | |
| Waimanalo | Kalamaula | 4 | |
| Kalamaula | Hoolehua Airport DLC | 4 | |
| Lateral (Kalamaula-Hoolehua Airport DLC) | Hoolehua East DLC | 4 | Lateral from Kalamaula-Hoolehua Airport DLC Cable to Hoolehua East DLC Only |
| Kalamaula | Puunene | 4 | |
| Puunene | Waiehu | 4 | |
| Puunene | Puukapu | 4 | |
| Puukapu | Laiopua CO | 4 | |
| Hilo | DLC Locations | 4 | Need to Be Identified |

**Technical Performance Specifications**

1. Sandwich Isles, by using the fiber provided in Demarcation Points Table indicated above, warrants that the fiber meets the technical specifications necessary for Sandwich Isles to provide the services needed.

2. Paniolo warrants that the minimum capacity for the fiber will be 10 Gigabits per second.

**Service Level Commitments**

1. For the terrestrial network, Paniolo will respond to a fiber outage within 24 hours with a crew sufficient to provide a temporary repair to the affected fiber.

99754430.1

2.   For the marine network, Paniolo will respond commensurate with the capabilities of the marine contractor (Global Marine) to make resources available to provide a temporary repair to the affected fiber.

## EXHIBIT B

## COLLOCATION SPACE

| Node | Island | Cabinets | Relay Racks |
|------|--------|----------|-------------|
| Anahola Central Office | Kauai | 9 | 6 |
| Kekaha Terminal Building | Kauai | 0 | 6 |
| Nanakuli Terminal Building | Oahu | 0 | 10 |
| Waimanalo Terminal Building | Oahu | 11 | 5 |
| Kalamaula Terminal Building | Molokai | 13 | 7 |
| Puunene Terminal Building | Maui | 0 | 7 |
| Waiehu Central Office | Maui | 9 | 6 |
| Puukapu Terminal Building | Hawaii | 0 | 7 |
| Laiopua Central Office | Hawaii | 11 | 5 |
| Hilo Central Office | Hawaii | 11 | 5 |

## EXHIBIT C

## CONDUITS

Conduits require either receiving documentation as requested on an inventory of assets from the Marshal Sale or from discussion with Sandwich Isles. The Conduits that must be identified are those that are utilized to reach Hawaiian Home Lands (HHL) locations.

**EXHIBIT D**

**LEASED FIBER O&M SERVICES**

1. The services provided under Exhibit D are limited to Lease Fiber Services which are for specific strands on fiber cables owned and operated by Paniolo.

2. Operations and Maintenance Services for the fiber cable will be commensurate with those that Paniolo provides for its own use of the remaining strands in the fiber cable. Sandwich Isles will receive the same Operations and Maintenance Services as it provides for the remainder of the cable containing the fibers.

3. Under a failure or impairment on Sandwich Isles strands, Paniolo will provide patch or repair services to the Sandwich Isles strands in conformance with the intervals indicated in Exhibit A.

4. To the extent that the failure or impairment relates to only the Sandwich Isles fiber strand, the issue will be diagnosed at the equipment level and repair and maintenance to the fiber strand will be provided within the intervals indicated in Exhibit A.

99754430.1

**EXHIBIT E**

**CHARGES**

1.  Existing Leased Fiber Services are provided at a nominal charge for the fibers indicated in Exhibit A. Additional fibers will be provided at the then-current market rate.

2.  Existing Conduit is provided at a nominal charge for the Conduit indicated in Exhibit C. Additional Conduit will be provided at the then-current market rate.

3.  The following charges for Collocation are inclusive of average power usage as well as space as indicated below:

    a.  Cabinetized Relay Racks:  $900.00 per Month

    b.  Non-Cabinetized Relay Racks:  $600.00 per Month

99754430.1

EXECUTION VERSION

## SCHEDULE 2

## ASSETS IRU

This Assets IRU is entered into as of March 6, 2020 by and between Sandwich Isles Communications, Inc., a Hawaii corporation ("SIC"), and Paniolo Cable Company, LLC, a Delaware corporation ("Paniolo"), and sets forth the specific terms and conditions applicable to the grant by SIC to Paniolo, and the purchase by Paniolo from SIC, of an indefeasible right to use the IRU Assets, and the assignment, conveyance, transfer, sublease, or sublicense by SIC to Paniolo of the Entitlements pursuant to that certain Master Relationship Agreement to which this Schedule 2 (Assets IRU) is attached. Capitalized terms used herein have the meanings assigned to them in the MRA or in the Section where first introduced.

## ARTICLE 1
## TERM AND TERMINATION

1.1.   Term.  This Assets IRU is effective as of the Effective Date and shall remain in force until terminated as provided in Sections 1.2 through 1.4 below (the "IRU Term").

1.2.   Termination by Paniolo.  Paniolo may terminate this Assets IRU upon an SIC Default.

1.3.   Automatic Termination.  This Assets IRU shall terminate automatically upon the decommissioning of the Paniolo System.

1.4.   Mutual Termination.  The Parties may terminate this SIC Lease upon mutual written agreement.

1.5.   Effect of Termination.  In the event of termination, Paniolo shall cease all use of the IRU Assets and shall within sixty (60) days disconnect and remove all Paniolo Equipment installed in or connected to the IRU Assets, leaving the IRU Assets in the same condition (normal wear and tear excepted) as existed on the Effective Date. In the event it fails to do so, SIC shall have the right to remove and store all such Paniolo Equipment, at Paniolo's sole cost and expense or to sell such Paniolo Equipment and retain the proceeds.

## ARTICLE 2
## IRU ASSETS; ENTITLEMENTS

2.1.   Grant of Assets IRU; IRU Assets.  SIC hereby grants to Paniolo, and Paniolo purchases from SIC, as of the Effective Date, an exclusive, indefeasible right of use to the IRU Assets, as more particularly identified on Exhibit A hereto.

2.2.   Purchase Option.  At any time during the IRU Term, Paniolo shall have the right to purchase any or all of the IRU Assets from SIC. Should Paniolo exercise this right, the Parties shall negotiate in good faith to agree upon a purchase price and to prepare and execute a bill of sale and to execute all other necessary documents that will be required to transfer legal title to the

purchased IRU Assets, including, but not limited to, the assignment, transfer, or conveyance of any Entitlements. In the event the Parties are not able to agree upon a purchase price, the purchase price shall be determined by an appraisal process in which each Party selects a neutral, qualified appraiser with knowledge of the type of assets subject to the transaction to conduct an appraisal, and the purchase price shall be the average of the two appraisals.

    2.3.    <u>Entitlements</u>. The Parties acknowledge and agree that: (a) that certain Department of Hawaiian Home Lands License Agreement No. 372 ("<u>DHHL License</u>"), together with (b) the easements, leases, license agreements, letters of approval, special area management permits, rights of way or rights of entry granted to SIC or an SIC Affiliate and identified on Exhibit B hereto (the "<u>Entitlements</u>") are necessary for the operation and maintenance of the Paniolo Network (or were necessary for the construction of the Paniolo Network). SIC hereby agrees to assign, transfer, or convey to Paniolo all Entitlements (other than the DHHL License) that may by their terms be so assigned or transferred and to the extent such assignment, transfer, or conveyance would not, in Paniolo's reasonable judgment, adversely affect service in the Hawaiian Home Lands. To the extent any Entitlement may not, by its terms, be so assigned or transferred, SIC shall (i) sublease or sublicense (as applicable) the Entitlement to Paniolo; or (ii) grant to Paniolo the broadest possible right to use the Entitlement. For the avoidance of doubt, the Parties acknowledge and agree that DHHL License will not be assigned by SIC to Paniolo, but that SIC shall, and hereby does, grant to Paniolo the full benefit and use of the DHHL License for the IRU Term provided Paniolo does not exercise its rights under such grant to impair service to HHL.

    2.4.    <u>SIC Compliance</u>. During the IRU Term, SIC shall fully comply with the terms, covenants, and conditions of all Entitlements not transferred or conveyed by SIC to Paniolo pursuant to section 2.3, including the payment of any fees due thereunder, and take such additional actions as may be necessary to maintain the Entitlements in full force and effect.

    2.5.    <u>Paniolo Compliance</u>. Paniolo shall assume all rights and obligations under any Entitlement assigned, transferred, or conveyed by SIC to Paniolo hereunder, and shall fully comply with all terms, covenants, and conditions thereof, including the payment of any fees or charges due thereunder. Paniolo shall also comply with the terms, covenants, and conditions applicable to any Entitlement to which it has acquires a leasehold-, license-, or IRU-interest or other right.

    2.6.    <u>Security</u>. Paniolo shall have the right to establish and implement security policies and procedures to protect the IRU Assets and the Paniolo Network. To the extent SIC retains any rights to or beneficial use of the Entitlements (pursuant to the SIC Lease or otherwise), SIC shall comply with all such security policies and procedures. Paniolo shall have the right to update such policies and procedures from time to time, in its sole discretion.

**ARTICLE 3**
**BANKRUPTCY EVENTS**

    SIC represents, warrants and covenants that for all purposes, including without limitation those of Section 541(d) of the Bankruptcy Code: (a) Paniolo shall hold an equitable interest in the IRU Assets for the IRU Term; (b) SIC retains only legal title to the IRU Assets and not any equitable interest; and (c) Paniolo has exclusive possession, use and control over, and is for all purposes the equitable owner of, the IRU Assets during the IRU Term. SIC agrees and

99679422.3

acknowledges that, from the Effective Date, it has no right to use the IRU Assets (except as otherwise leased to SIC pursuant to the SIC Lease). For the avoidance of doubt, any rights of Paniolo to the IRU Assets are not intended to be a revocable license or a lease, but rather to provide the broadest possible legal rights to Paniolo over such IRU Assets consistent with this Agreement. The Parties acknowledge that in the event of an SIC Bankruptcy Event, Paniolo shall be deemed to have acquired and completed, in advance of any petition or proceeding and on an indefeasible basis, a beneficial ownership in such IRU Assets. The Parties further acknowledge that: (a) obtaining such beneficial interest or IRU is intended to be non-executory in nature; (b) Paniolo shall have full and unfettered rights of access to the IRU Assets; and (c) denying Paniolo access to the IRU Assets under such circumstances would render Paniolo's rights hereunder nugatory. Such rights to access and use the IRU Assets will run for the remainder of the IRU Term.

## ARTICLE 4
## ASSETS O&M; ADDITIONAL SERVICES

4.1.     Assets O&M Services. In the event Paniolo and SIC determine that SIC shall provide Assets O&M Services, such services shall be identified on Exhibit D and attached hereto. For the purposes of Assets O&M Services, these services may cover O&M Services related to the central office buildings, DC power equipment (batteries, rectifiers, backup generator, and related control equipment, security equipment, grounds maintenance, Fiber monitoring and maintenance, Transport Services monitoring and maintenance, and other services. SIC shall provide such Assets O&M Services (if any) for successive one (1) year terms, which may be terminated by Paniolo pursuant to Section 4.5 or by either Party by providing written notice to the other Party sixty (60) days prior to the expiration of the then-current term. For the avoidance of doubt, the term of any Assets O&M Services shall automatically terminate without further notice or action if this IRU is terminated pursuant to Section 1.

4.2.     Subcontracting. SIC may subcontract any of the Assets O&M Services provided that SIC shall require the subcontractor(s) to perform in accordance with the requirements and procedures identified on Exhibit D. The use of any such subcontractor shall not relieve SIC of any of its obligations hereunder.

4.3.     Additional Services. Paniolo may order additional services from SIC from time to time, interconnection services. Any such additional services shall be on commercially reasonable terms and conditions no less favorable than the terms and conditions offered to third parties, and shall be set forth on an updated Exhibit D.

4.4.     Other Service Providers. Paniolo has the right, in its sole discretion, to hire any third party to perform any operations or maintenance services with respect to the IRU Assets.

4.5.     SIC Breach. In the event of an SIC breach relating to the performance or non-performance of Assets O&M Services, which breach is not cured within thirty (30) days of notice thereof, Paniolo may, without further notice, terminate SIC's provision of such O&M Services, without any further obligation.

99679422.3

## ARTICLE 5
## CHARGES AND INVOICING

5.1.    <u>Charges for IRU Assets</u>.  There shall be no Charges for the IRU Assets, it being acknowledged and agreed that the Released Claims and nominal Leased Fiber Charges are the consideration for the IRU Assets.

5.2.    <u>Assets O&M Charges</u>.  The Charges for the Assets O&M shall be [$●] per quarter.

5.3.    <u>Charges for Entitlements</u>.  The Charges for the Entitlements shall be [$●] per quarter.  The Parties acknowledge and agree that these Charges are a pass-through of fees and charges payable by SIC pursuant to the terms of the Entitlements, without any mark-up.  In the event such fees and charges increase, the Charges due hereunder will correspondingly increase, unless such increase arises out of an act or omission by SIC.

5.4.    <u>Invoicing; Payment</u>.  SIC shall invoice Paniolo on the Effective Date for the first quarter's Charges.  Thereafter, SIC shall invoice Paniolo thirty (30) days in advance of each successive quarter during the IRU Term.  All Charges for additional services shall be separately invoiced at the time the service is performed.  All invoices are due within thirty (30) days of receipt.

## ARTICLE 6
## FURTHER ACTIONS

The Parties agree to provide such additional information and take such additional action, including the execution of and delivery of further agreements, instruments, and other documents, as may be reasonably necessary to carry out the purposes of the Agreement and this Schedule 2.

In witness whereof, and intending to be legally bound hereby, the Parties have executed this Assets IRU as of the dates identified below.

SANDWICH ISLES COMMUNICATIONS, INC.

By: _____

Title: _President_____

Date: _4/15/20_____

PANIOLO CABLE COMPANY, LLC

By:  _____

Title:  _Chapter 11 Trustee_

Date:  _4/17/20_

99679422.3

- 5 -

# EXHIBIT A

# IRU ASSETS

### Schedule A.2 Assets

*Kaua'i*

| Assets | Description |
|---|---|
| Terrestrial Structure | 3625 Feet of Subduct extending from near the Kekaha beach manhole to the Kekaha terminal building. |
| Anahola Central Office | Central Office located in Anahola, Hawaii, including access rights to the land on which the central office resides. |
| HVAC System | Included with the Anahola Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Anahola Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Anahola Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Anahola Central Office providing structure for fiber and other cables to be brought and terminated within the central office. |
| Cable Rack and Frame Structure | Internal support structure within the Anahola Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Anahola Central Office. |
| Fujitsu 4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the Schedule A.2 equipment function within the network. |
| Terrestrial Structure | 41 Miles of Subduct extending from the Kekaha terminal building towards the Anahola Central Office. Unknown Manholes. |

99679422.3

6

| Fiber Cable | 41 Miles of Fiber extending from the Kekaha terminal building towards the Anahola Central Office. |
|---|---|

99679422.3

7

*Oahu-Nanakuli*

| Assets | Description |
|---|---|
| Terrestrial Structure | 9200 Feet of Subduct extending from near the Nanakuli terminal building to Farrington Highway where it meets the Paniolo Cable Network Terrestrial Structure. Unknown number of manholes. |
| Nanakuli Terminal Building | Terminal building located in Nanakuli, Hawaii including access rights to the land on which the terminal building resides. |
| HVAC System | Included with the Nanakuli Terminal Building is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Nanakuli Terminal Building. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Nanakuli Terminal Building. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Nanakuli Terminal Building providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Nanakuli Terminal Building providing for cable infrastructure between equipment and frames or equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Nanakuli Terminal Building. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC- 192/0C-48. Includes all cards installed in the system, software, and spares |
| Fujitsu 7200 | Wave Division Platform and transmitter platform for fiber terminations that works with the Fujitsu 4500/4300 to provide optical services. |
| Fujitsu 9500 | Dense Wave Division Platform and transmitter platform for fiber terminations. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.1 and Schedule A.2 equipment function within the network. |

*Oahu - Waimanalo*

| Assets | Description |
|---|---|
| Terrestrial Structure | 2160 Feet of Subduct extending from near the Waimanalo terminal building o the manhole near Kalanianaole Highway where it meets the Paniolo Terrestrial structure. 1 Manhole. |
| Waimanalo Terminal Building | Terminal building located in Waimanalo, Hawaii including access rights to the land on which the terminal building resides. |
| HVAC System | Included with the Waimanalo Terminal Building is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Waimanalo Terminal Building. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Waimanalo Terminal Building. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Waimanalo Terminal Building providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Waimanalo Terminal Building providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Waimanalo Terminal Building. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-192/OC-48. Includes all cards installed in the system, software, and spares. |
| Fujitsu 7200 | Wave Division Platform and transmitter platform for fiber terminations that works with the Fujitsu 4500/4300 to provide optical services. |
| Fujitsu 9500 | Dense Wave Division Platform and transmitter platform for fiber terminations. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.2 equipment function within the network. |

*Molokai - Kalamaula*

| Assets | Description |
|---|---|
| Terrestrial Structure | 1000 Feet of Subduct extending from near the Kalamaula terminal building to Kamehameha V Highway where it meets the Paniolo Cable Network Terrestrial Structure. |
| Kalamaula Terminal Building | Terminal building located in Kalamaula, Hawaii including access rights to the land on which the terminal building resides. |
| HVAC System | Included with the Kalamaula Terminal Building is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Kalamaula Terminal Building. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Kalamaula Terminal Building. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Kalamaula Terminal Building providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Kalamaula Terminal Building providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Kalamaula Terminal Building. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-192/OC-48. Includes all cards installed in the system, software, and spares. Paniolo seeks to have the Fujitsu 4500/4300 system in Kalamaula (if additional to he already identified Paniolo system). |
| Fujitsu 7200 | Wave Division Platform and transmitter platform for fiber terminations that works with the Fujitsu 4500/4300 to provide optical services. Paniolo seeks to have the Fujitsu 7200 systems in Kalamaula (if additional to the already identified Paniolo system). |
| Fujitsu 9500 | Dense Wave Division Platform and transmitter platform for fiber terminations. Paniolo seeks to have the Fujitsu 9500 system in Kalamaula (if not included as a Schedule A.1 asset). |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.2 equipment function within the network. |

*Molokai - Hoolehua*

| Assets | Description |
|---|---|
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure at Hoolehua. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within Hoolehua. |
| Terrestrial Structure | 7 Miles of Subduct extending from the Kalamaula terminal building towards the Hoolehua Airport DLC and Hoolehua East DLC locations. Unknown Manholes. |
| Fiber Cable | 7 Miles of Fiber extending from the Kalamaula terminal building towards the Hoolehua Airport DLC and Hoolehua East DLC locations. |

*Maui*

| Assets | Description |
|---|---|
| Terrestrial Structure | 13,800 Feet of Subduct extending from near the Puunene terminal building to Kuihelani Highway where it meets the Paniolo Terrestrial Structure. [Unknown Manholes. |
| Waiehu Central Office | Central Office located in Waiehu, Hawaii including access rights to the land on which the central office resides. |
| HVAC System | Included with the Waiehu Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Waiehu Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Waiehu Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Waiehu Central Office providing structure for fiber and other cables to be brought and terminated within the central office. |
| Cable Rack and Frame Structure | Internal support structure within the Waiehu Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Waiehu Central Office. |
| Fujitsu 4300/4100 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes .11 cards installed in the system, software, and spares. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.2 equipment function within the network. . |
| Terrestrial Structure | 1.7 Miles of Subduct extending from the Puunene terminal building near Kuihelani Highway towards the Waiehu central office. Unknown Manholes. |
| Fiber Cable | 4.3 Miles of Fiber extending from the Puunene terminal building towards he Waiehu central office. |
| Terrestrial Structure | 1.1 Miles of Subduct extending from Pakalani to Kahikinui. Unknown Manholes. |
| Fiber Cable | 1.1 Miles of Fiber extending from Pakalani to Kahikinui. |

Hawaii - Laiopua

| Assets | Description |
|---|---|
| Terrestrial Structure | 73,600 Feet of Subduct extending from near the Puukapu terminal building to Kawaihae-Mahukona Road where it meets the Paniolo Terrestrial Structure. Unknown Manholes. |
| Laiopua Central Office | Central Office located in Laiopua, Hawaii including access rights to the land on which the central office resides. |
| HVAC System | Included with the Laiopua Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Laiopua Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Laiopua Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Laiopua Central Office providing structure for fiber and other cables to lbe brought and terminated within the central office. |
| Cable Rack and Frame Structure | Internal support structure within the Laiopua Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Laiopua Central Office. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.2 equipment function within the network. |
| Terrestrial Structure | 32.6 Miles of Subduct extending from the Puukapu terminal building near Kawaihae-Mahukona Road where it meets the Paniolo Terrestrial Structure towards the Laiopua central office. Unknown Manholes. |
| Fiber Cable | 46.5 Miles of Fiber extending from the Puukapu terminal building towards he Laiopua central office. |

*Hawaii - Hilo*

| Assets | Description |
|---|---|
| Hilo Central Office | Central Office located in Hilo, Hawaii including access rights to the land on which the central office resides. |
| HVAC System | Included with the Hilo Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Hilo Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers Utilized to convert AC to DC power and provide backup in the event of a power failure within the Hilo Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Hilo Central Office providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Hilo Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Hilo Central Office. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. Paniolo seeks to have the Fujitsu 4500/4300 systems both in Puukapu (if additional to the already identified Paniolo system) and Hilo. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.1 and Schedule A.2 equipment function within the network. |
| Terrestrial Structure | 8.7 Miles of Subduct extending from the Hilo central office towards the Waiakea Area and Akolea Area. Unknown Manholes. |
| Fiber Cable | 8.7 Miles of Fiber extending from the Hilo central office towards the Waiakea Area and Akolea Area. Unknown Manholes. |

*Other Related Assets*

| Assets | Description |
|---|---|
| Information and Records | -Financial statements (reviewed/audited, to the extent available) and detail of operational costs for the facilities<br>-Asset listing of all infrastructure and equipment indicated in Schedule A.2 (Asset Register including websites, URLs, IP Addresses, etc.)<br>-All contracts associated with the network and maintenance of the network<br>-Wet and dry maintenance records and maintenance agreements<br>-Engineering drawings including "as built" and engineering specifications attached to schedule of spend to date<br>-All inspection reports of the network (wet, dry, facilities, batteries, generators, Etc.)<br>-Operating agreements for the monitoring and maintenance of the network<br>-Existing agreements and related materials for leasing capacity to third parties<br>-Detailed logical and physical inventory of the network linked to the asset list by item - to the extent this information is maintained in Operating Systems, provide the information in this form as requested below<br>-Inventory of all electronics equipment used to provide circuits in the Paniolo Cable Network System including assignment information for specific assets to the provision of specific circuits including card assignment, fiber cross-connects, fiber assignments, and other related information<br>-All maintenance records for the HVAC, batteries, rectifiers, and backup generator equipment located at terminal buildings and central offices identified in Schedule A.2<br>-All notices, citations or reports received from government agencies in relation to the Paniolo assets indicated in Schedule A.2<br>-All deeds to real property, plus all title insurance policies and title search results<br>-All land user permits and certificates of compliance with land use permits<br>-List of major suppliers, with copies of supply and support agreements<br>-Provide all third party agreements that are utilized to provide maintenance to the Schedule A.2 assets including SONET equipment, patch panel equipment, terrestrial fiber, marine fiber, power equipment, grounds maintenance, etc. |

| | |
|---|---|
| Operating Systems | -Software and all related hardware and data associated with the circuit inventory, monitoring, and maintenance of the Schedule A.1 and Schedule A.2 assets<br>-IT system vendors and maintenance agreements<br>-Location of the network assets and to the extent available provide geocoded locations of manhole access to fiber infrastructure, and map data of your files in a standard GIS format showing the location of all fiber infrastructure |
| Access Keys | -All keys for access to the 10 terminal buildings and central offices identified in Schedule A.1 and Schedule A.2 including keys to any fences on the perimeter of the terminal buildings and central offices |
| Licenses | -All licenses necessary to build, construct, repair, maintain and operate the Schedule A.2 assets, including without limitation SIC's interest in License Agreement No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands.<br>-All existing and pending entitlements (including without limitation, SIC's interests in memoranda of agreement, easements, leases, license agreements, letters of approval, special area management permits, rights of way or rights of interest, necessary to build, construct, repair, maintain and operate the Schedule A.2 assets. |

## EXHIBIT B

## ENTITLEMENTS

### EXISTING ENTITLEMENTS

<u>Federal</u>

1.      Finding of No Significant Impact, January 2006 – Rural Utilities Branch

2.      Section 10 of the River and Harbor Act, October 11, 2006 – Dept. of Army

3.      Cable Landing License, June 2, 2004 – Federal Communications Commission

4.      Section 106 of the National Historic Preservation Act.  Individual Memorandum of Agreements have been executed between SIC, USDA Rural Utilities Service (RUS), and SHPD in compliance with Section 106. These agreements govern the archaeological and cultural monitoring during construction of the project (see nos. 17, 20, 26, 29 and 39 below).

<u>State</u>

5.      Final Environmental Assessment/Finding of No Significant Impact, June 8, 2004 – DLNR

6.      Hawaii Coastal Zone Management (CZM) Program Federal Consistency, June 14, 2006 – Dept. of Business, Economic Development & Tourism (DBEDT), Office of Planning

7.      Conservation District Use Permit (all sites except Sandy Beach) ST 05-3176, July 16, 2004 – Dept. of Land and Natural Resources (DLNR), Office of Conservation and Coastal Lands

      7.1.      Extension to Conservation District Use Permit (all sites except Sandy Beach), ST 05-3176, June 23, 2005 - DLNR, Office of Conservation and Coastal Lands.

8.      Conservation District Use Permit (Sandy Beach), OA-3360, August 2, 2006 – DLNR, Office of Conservation and Coastal Lands

9.      DLNR Right-of-Entry Permit to Sandwich Isles Communications, Inc. to Enter Upon State-Owned Lands, June 25, 2007

10.     Dept. of Health, Notice of General Permit Coverage (NPDES) permits have been completed for each of the terrestrial routes to the landing sites and for the landing sites:

- Notice of General Permit Coverage (NGPC) Hanamaulu to Kekaha Fiber Optics Ductline Project, September 12, 2002 (File No. HI R10B320)

- Termination of Notice of General Permit Coverage (NGPC) Hanamaulu to Kekaha Fiber Optics Ductline Project, August 8, 2006 (File No. HI R10B320)

- Notice of General Permit Coverage (NGPC) Nanakuli to Kili Drive Fiber Optics Ductline Project, March 30, 2005 (File No. HI R10C084)

- Notice of General Permit Coverage (NGPC) Kalanianaole to Waimanalo Fiber Optics Ductline Project, March 29, 2005 (File No. HI R10C127)

- Letter dated June 5, 2006, re Compliance with Conditions 9.b., c., e., f., g., and h. of the Notice of General Permit Coverage (NGPC) Kalanianaole to Waimanalo Fiber Optics Ductline Project Phase 6 (File No. HI R10C127)

- Authorization to Discharge Under the National Pollutant Discharge Elimination System (NPDES) Kalanianaole to Waimanalo Fiber Optics Ductline Project, June 9, 2006 (Permit No. HI S000061)

- Notice of General Permit Coverage (NGPC) Kalamaula to Alii Fish Pond Fiber Optics Ductline Project, December 3, 2004 (File No. HI R10B984)

- Notice of General Permit Coverage (NGPC) Puunene to Makena Fiber Optics Ductline Project, March 29, 2005 (File No. HI R10C133)

- Notice of General Permit Coverage (NGPC) Honokowai to Waiko Road Fiber Optics Ductline Project, March 30, 2005 (File No. HI R10C132)

- Notice of General Permit Coverage (NGPC) Kawaihae to Upolu Fiber Optics Ductline Project, November 23, 2004 (File No. HI R10B890)

- Notice of General Permit Coverage (NGPC) Sandwich Isles Communications, Inc. Submarine Fiber-Optic Cable Network Lahaina and Kula, Maui, Hawaii, July 20, 2007 (File No. HI R10C888)

- Notice of General Permit Coverage (NGPC) Sandwich Isles Communications, Inc. Submarine Fiber-Optic Cable Network Waiane and Honolulu, Oahu, Hawaii, July 23, 2007 (File No. HI R10C880)

11.   Finding of No Significant Impact (FONSI) for Kauai terrestrial segments, June 23, 2001, Department of Transportation (DOT)

12.   Finding of No Significant Impact (FONSI) for Oahu terrestrial segments, June 23, 2001, DOT

13.   Finding of No Significant Impact (FONSI) for Maui County (Maui and Molokai) terrestrial segments, August 8, 2001, DOT

14.   Finding of No Significant Impact (FONSI) for Hawaii County terrestrial segments, June 23, 2001, DOT


Kauai

15.   Special Management Area (SMA) exemption letter, June 30, 2004 – County of Kauai Planning Dept.

16.   Hanamaulu to Kekaha Fiber Optic Duct Line (Akiohala Road (Kekaha)) Conditional Letter – Dated 9/19/02 and Executed 9/24/02 construction plan approval.

17.   Memorandum of Agreement (MOA) between USDA, RUS, Hawaii SHPO, and SIC regarding SIC's Kauai Fiber Optic Duct Lines Project - Dated October 10, 2001

Oahu

18.    SMA (2004/SMA-67) and SSV (2004/SV-18), Makaha (Kili Drive) December 13, 2004 – City & County of Honolulu, Dept. of Planning and Permitting

19.    Nanakuli to Kili Drive Fiber Optic Duct Line (Kili Drive (Makaha)) Conditional Letter – Dated 6/23/05 and Executed 6/28/05 and construction plan approval

20.    MOA regarding SIC's Oahu Rural Fiber Optic Duct Lines Project - Dated October 10, 2001

21.    SMA (2004/SMA-58), Sandy Beach Park, December 27, 2004 – City & County of Honolulu, Dept. of Planning and Permitting

22.    Kalanianaole to Waimanalo Fiber Optic Duct Line (Sandy Beach to Waimanalo) Conditional Letter – Dated 11/28/06 and Executed 12/6/06 and construction plan approval

23.    SSV (2004/SV-17), November 30, 2004 – City & County of Honolulu, Dept. of Planning and Permitting

Molokai

24.    SMA exemption letter for Onealii landing site, Molokai, December 10, 2004 – County of Maui, Dept. of Planning

25.    Kalamaula to Alii Fish Pond (Onealii Homestead (Kalamaula)) Conditional Letter – Dated 10/20/04 and Executed 11/1/04 and construction plan approval

26.    MOA regarding SIC's Molokai Rural Fiber Optics Duct Lines Project - Dated October 10, 2001

Maui

27.    SMA (SM2 2004/0075) and Shoreline Setback Approval (SSA 2004/0016), Poolenalena Park, July 22, 2004 – County of Maui, Dept. of Planning

    27.1.    Extension to SMA (SM2 2004/0075) and SSA (SSA 2004/0016), Poolenalena Park, February 1, 2005 – County of Maui, Dept. of Planning

    27.2.    Extension to SMA (SM2 2004/0075) and SSA (SSA 2004/0016), Poolenalena Park, February 8, 2006 – County of Maui, Dept. of Planning

28.    Puunene to Makena Fiber Optic Duct Line (Poolenalena Park (Makena) Conditional Letter – Dated 3/5/07 and Executed 3/7/07 and construction plan approval

29.    First Amended MOA between USDA, RUS, Hawaii HPO, and SIC with Concurrence by the Maui/Lanai Islands Burial Counsel – Dated April 2004

30.    DLNR right of entry for archaeological site work at Poolenalena landing site:

    •    Right of Entry Permit dated January 8, 2003, issued by DLNR (Ref. PSF 02OD-417)

- Right of Entry Permit dated January 23, 2004, issued by DLNR (Ref. PSF 02OD-417)

- Extension of Right of Entry Permit dated March 9, 2007, issued by DLNR (Ref. PSF 02OD-417)

31.   SMA (SM2 2004/0074) and SSA (SSA 2004/0015), Wahikuli, July 22, 2004 – County of Maui Dept. of Planning

    31.1.   Extension of SMA (SM2 2004/0074) and SSA (SSA 2004/0015), Wahikuli, February 1, 2005 – County of Maui Dept. of Planning

    31.2.   Extension of SMA (SM2 2004/0074) and SSA (SSA 2004/0015), Wahikuli, February 8, 2006 – County of Maui Dept. of Planning

32.   Honokowai to Waiko Fiber Optic Duct Line (Wahikuli (Lahaina)) Conditional Letter – Dated 3/23/07 and Executed 3/27/07 and construction plan approval

33.   Decision and Order and Findings of Fact and Conclusions of Law each dated June 6, 2007 (Docket No. 07-NR-VN-14, V-462) issed by State Department of Health (noise variance for nighttime work obtained with Henkels & McCoy as contractor along Wahikuli route; HDD only)

34.   State DLNR, Division of Boating and Ocean Recreation (DOBOR) letter of no objection to laying of Undersea fiber optic within the Kaanapali Water

35.   Maui County Dept. of Parks and Recreation letters of no objection to submarine fiber optic cable at Poolenalena Beach Park and Wahikuli Wayside Park dated Feb. 13, 2007

36.   Maui County Dept. of Parks and Recreation letter of no objection to relocated alignment of submarine fiber optic cable at Poolenalena Beach Park dated Feb. 23, 2007

Hawaii

37.   SMA Permit No. 152, April 13, 2004 – County of Hawaii, Planning Dept.

    37.1.   Extension to SMA Permit No. 152, July 14, 2005 – County of Hawaii, Planning Dept.

    37.2.   Extension of SMA Permit No. 152, June 27, 2007 – County of Hawaii, Planning Dept.

38.   Kawaihae to Maluokalani (Kaewa Place (Kawaihae)) Conditional Letter – Dated 6/23/05 and Executed 7/13/05 and construction plan approval

39.   MOA regarding SIC's Hawaii Rural Fiber Optic Duct Lines Project – Dated October 10, 2001

DHHL

40.   Construction Plan Approval by Dept. of Hawaiian Home Lands (DHHL) pursuant to License Agreement No. 372 for (i) temporary construction site for Kekaha landing site, (ii) Molokai landing at Onealii, and (iii) construction on DHHL lands at Kaewa, Kawaihae

**PENDING ENTITLEMENTS**

State

1.  Extension to CDUP, ST 05-3176 for all marine landing sites, except Sandy Beach (approved by Board of Land and Natural Resources on July 27, 2007; awaiting extension letter from DLNR)

2.  Extension to CDUP, ST 04-3360, for Sandy Beach landing site (approved by Board of Land and Natural Resources on July 27, 2007; awaiting extension letter from DLNR)

3.  SDOT conditional letters and approval of plans for landing sites

Kauai

4.  Amendment to State Governor's Executive Order No. 3346 to County for Park Purposes for Kekaha

5.  Easement for Kekaha Landing Site. Dept. of Land and Natural Resources (DLNR) to process after completion with construction (DLNR approved easements June 22, 2007)

Oahu

6.  City & County Easement for use of City Parks (Sandy Beach and Makaha landing sites)

Molokai

7.  DHHL easement for Molokai landing at Onealii

Maui

8.  Amendment to State Governor's Executive Order No. 3346 to County for Park Purposes for Poolenalena

9.  Easement for Poolenalena Landing Site. Dept. of Land and Natural Resources (DLNR) to process after completion with construction (DLNR approved easements June 22, 2007)

10.  County of Maui Parks Department approval of plans for Wahikuli

11.  Archaeological inventory survey of the proposed area to be bored at Poolenalena

12.  Easement from County of Maui for marine fiber running under Wahikuli Wayside Park (to be obtained after completion of construction)

Hawaii

13.  DHHL easement for use of DHHL lands at Kaewa, Kawaihae

**EXHIBIT C**

**ASSETS O&M SERVICES**

1.     Periodic maintenance within keeping with the particular asset category in question will be performed.

2.     Regular testing of the backup generator and battery systems will be performed. To the extent that issues are found with these components, remediation will be performed in keeping with normal industry practice.

3.     Routine monitoring and maintenance of electronic assets will be performed as consistent with manufacturer guidelines and industry standard practice. To the extent that issues are found with the electronic assets, remediation will be performed in keeping with normal industry practice.

4.     Maintenance of the grounds will be performed in keeping with the requirements given the state of vegetation growth and in accordance with the requirements of the leaseholder for the land (if applicable).

5.     Routine maintenance of the building will be performed including roof, facia, and environmental systems in keeping with normal industry practice. To the extent that issues are found with the building or environmental systems, remediation will be performed in keeping with normal industry practice.

Execution Version

Electronically Filed
FIRST CIRCUIT
1CCV-22-0000321
18-MAR-2022
05:07 PM
Dkt. 7 EXH

## ASSET PURCHASE AGREEMENT

by and between

### MICHAEL KATZENSTEIN, as Seller

solely in his capacity as chapter 11 trustee for

the bankruptcy estate of

### PANIOLO CABLE COMPANY, LLC, as Debtor

### and HAWAIIAN TELCOM, INC., as Buyer

dated

**November 30, 2020**

EXHIBIT F

# TABLE OF CONTENTS

Page

ARTICLE I    DEFINITIONS ................................................................................................... 1

    Section 1.1    Definitions .................................................................................................... 1

    Section 1.2    Rules of Construction ................................................................................... 7

ARTICLE II    PURCHASE AND SALE OF THE PURCHASED ASSETS ........................... 8

    Section 2.1    Purchase and Sale of the Purchased Assets; Assumption of Liabilities ....................................................................................................... 8

    Section 2.2    Purchase Price ............................................................................................ 11

    Section 2.3    Deliveries by Seller ................................................................................... 11

    Section 2.4    Deliveries by Buyer ................................................................................... 12

    Section 2.5    Escrow Agreement for Earnest Money ...................................................... 12

    Section 2.6    Payment of Purchase Price; Delivery of Closing Documents; Allocation of Purchase Price ....................................................................... 13

    Section 2.7    Closing ....................................................................................................... 13

    Section 2.8    As is, Where is Nature of Sale ................................................................... 13

ARTICLE III    REPRESENTATIONS AND WARRANTIES OF SELLER ........................... 14

    Section 3.1    Authority; Execution and Delivery ........................................................... 14

    Section 3.2    Non-Contravention; Approvals and Consents ........................................... 14

    Section 3.3    Title to the Purchased Assets ..................................................................... 15

    Section 3.4    No Subsidiaries .......................................................................................... 15

    Section 3.5    Seller's Brokerage Agreements ................................................................. 15

    Section 3.6    Litigation .................................................................................................... 15

    Section 3.7    Assignable Contracts, Assigned Claims, Assigned Permits, and Assigned Rights ......................................................................................... 15

    Section 3.8    Real Estate ................................................................................................. 16

ARTICLE IV    REPRESENTATIONS AND WARRANTIES OF BUYER ........................... 16

    Section 4.1    Organization and Good Standing ............................................................... 16

    Section 4.2    Authorization of Agreement; Execution and Delivery ............................. 16

    Section 4.3    Non-Contravention; Approvals and Consents ........................................... 16

    Section 4.4    Financial Ability ........................................................................................ 16

    Section 4.5    Buyer's Brokerage Agreements ................................................................. 17

    Section 4.6    No Affiliates of Debtor .............................................................................. 17

-i-

## TABLE OF CONTENTS
(continued)

Page

Section 4.7    Adequate Assurances Regarding Assignable Contracts and
Assigned Rights ........................................................................ 17

ARTICLE V    COVENANTS ........................................................................... 17

Section 5.1    Conduct of the Business............................................................ 17

Section 5.2    Risk of Loss; Duty to Repair .................................................... 17

Section 5.3    No Solicitation ........................................................................ 17

Section 5.4    Pre-Closing Access .................................................................. 17

Section 5.5    Notification ............................................................................. 18

Section 5.6    Additional Agreements ............................................................ 18

Section 5.7    Investigation and Agreement by Buyer ..................................... 18

Section 5.8    Permits or Consents of Governmental Authorities ..................... 19

Section 5.9    Injunctions.............................................................................. 20

Section 5.10   Adequate Assurances Regarding Assignable Contracts and
Assigned Rights ........................................................................ 20

Section 5.11   Cure of Defaults...................................................................... 20

Section 5.12   Bankruptcy Covenants ............................................................ 20

Section 5.13   Migration of Capacity ............................................................. 20

ARTICLE VI    CONDITIONS TO THE CLOSING .............................................. 21

Section 6.1    Conditions to Obligations of Each Party ................................... 21

Section 6.2    Conditions to Obligation of Buyer............................................ 21

Section 6.3    Conditions to Obligation of Seller ............................................ 22

ARTICLE VII   TERMINATION ....................................................................... 23

Section 7.1    Termination............................................................................. 23

Section 7.2    Effect of Termination............................................................... 24

Section 7.3    Survival .................................................................................. 24

ARTICLE VIII OFFSET AMOUNTS ................................................................. 24

Section 8.1    Costs Relating to the Purchased Assets ..................................... 24

Section 8.2    Limitations ............................................................................. 24

Section 8.3    Claim Procedures .................................................................... 24

## TABLE OF CONTENTS
(continued)

Page

ARTICLE IX   MISCELLANEOUS ....................................................................................... 24

    Section 9.1   Post-Closing Access .................................................................... 24

    Section 9.2   Public Announcements .................................................................. 24

    Section 9.3   Further Assurances ....................................................................... 25

    Section 9.4   Expenses ...................................................................................... 25

    Section 9.5   Notices ......................................................................................... 25

    Section 9.6   Confidentiality ............................................................................ 26

    Section 9.7   Entire Agreement; Amendment; Waiver ..................................... 26

    Section 9.8   Severability ................................................................................. 26

    Section 9.9   Successors and Assigns; Third Party Beneficiaries .................... 27

    Section 9.10   Governing Law ........................................................................... 27

    Section 9.11   Captions ...................................................................................... 27

    Section 9.12   Counterparts ................................................................................ 27

    Section 9.13   Enforcement of Agreement ........................................................ 27

    Section 9.14   Time of Essence; Specified Dates .............................................. 28

    Section 9.15   No Director or Affiliate Liability ............................................... 28

    Section 9.16   No Personal Liability .................................................................. 28

    Section 9.17   No Successor Liability ................................................................ 28

EXHIBITS

| | | |
|---|---|---|
| EXHIBIT A | - | Form of Sale Order |
| EXHIBIT B | - | Form of Assignment and Assumption Agreement |
| EXHIBIT C | - | Form of Bill of Sale |
| EXHIBIT D | - | Allocation of Purchase Price |
| EXHIBIT E | - | Form of Escrow Agreement |
| EXHIBIT F | - | Form of Credit Agreement |
| EXHIBIT G | - | Form of Security Agreement |
| EXHIBIT H | - | Form of Operational Support and Sales Services Agreement |

SCHEDULES

| | | |
|---|---|---|
| 1.1(a) | - | ASSIGNABLE CONTRACTS |
| 1.1(b) | - | ASSIGNED PERMITS |
| 1.1(c) | - | ASSIGNED RIGHTS |

2.1(a)   -   DEBTOR ASSETS

SELLER DISCLOSURE SCHEDULE

3.3(a)   -   TITLE TO PURCHASED ASSETS
3.5      -   SELLER'S BROKERAGE AGREEMENTS

BUYER DISCLOSURE SCHEDULE

4.5      -   BUYER'S BROKERAGE AGREEMENTS
4.6      -   NO AFFILIATES OF DEBTOR

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of November 30, 2020 (the "Execution Date"), by and between Michael Katzenstein, solely in his capacity as chapter 11 trustee ("Seller") for the bankruptcy estate of Paniolo Cable Company, LLC, a limited liability company organized under the laws of the State of Delaware ("Debtor" or "Paniolo"), and Hawaiian Telcom, Inc., a Hawaii corporation ("Buyer").

## R E C I T A L S:

**WHEREAS**, Debtor owns and operates a submerged marine fiber and terrestrial fiber telecommunications cable network that connects the five principal islands in the State of Hawaii (the "Business").

**WHEREAS**, on November 13, 2018, certain creditors of Debtor filed an involuntary petition for relief against Debtor under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Hawaii (the "Bankruptcy Court"), which case is being administered under Case No. 19-013139 (RJF) (the "Bankruptcy Case").

**WHEREAS**, on January 30, 2019, the Bankruptcy Court entered an Order for Relief against Debtor in the Bankruptcy Case.

**WHEREAS**, on February 11, 2019, the Bankruptcy Court appointed Seller as chapter 11 trustee for Debtor's bankruptcy estate (the "Estate").

**WHEREAS**, the Estate is the owner of the Purchased Assets (hereinafter defined).

**WHEREAS**, Buyer desires to purchase the Purchased Assets from Seller, and Seller desires to sell the Purchased Assets to Buyer, in consideration of the receipt of the Purchase Price (hereinafter defined) in the manner and subject to the terms and conditions set forth herein and in accordance with the Bankruptcy Code, including sections 363 and 365 thereof.

**WHEREAS**, the transactions contemplated herein shall be consummated pursuant to the terms and conditions of this Agreement and a Sale Order (hereinafter defined) to be entered by the Bankruptcy Court.

**NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, in reliance upon the mutual covenants and agreements hereinafter set forth and subject to the terms and conditions herein contained, the parties hereto agree as follows:

1

## ARTICLE I
## DEFINITIONS

**Section 1.1  Definitions**.  The following terms shall have the following meanings in this Agreement:

"A.1 Assets" shall mean the Debtor's Assets identified as part of Schedule A.1 as described in Schedule 2.1(a).

"A.2 Assets" shall have the Debtor's Assets identified as part of Scheduled A.2 as described in Schedule 2.1(a).

"Acquisition Proposal" shall have the meaning ascribed to such term in Section 5.2(b).

"Affiliate" shall, with respect to any Person, mean any other Person that controls, is controlled by or is under common control with the former, including all affiliates as that term is defined in 11 U.S.C. §101.

"Agreement" shall mean this Asset Purchase Agreement, and each Exhibit and Schedule hereto.

"Antitrust Agency" shall have the meaning ascribed to such term in Section 6.1(a).

"Antitrust Investigation" shall have the meaning ascribed to such term in Section 6.1(a).

"Assigned Claims" shall mean the Debtor's right, title and interest, if any, in claims, causes of action, warranty claims, insurance claims, or claims against third parties, or any proceeds or amounts receivable in connection therewith, whether sounding in contract, tort, equity or otherwise, to pursue recovery or equitable relief in connection with use of the Debtor Assets prior to the Closing, or for damages to the Debtor Assets.

"Assignable Contracts" shall mean the Contracts of Debtor relating to the Business that are identified on Schedule 1.1(a).

"Assigned Permits" shall mean the Debtor's interest, if any, in the Permits relating to the Business that are identified on Schedule 1.1(b), including, for the avoidance of doubt, the Entitlements.

"Assigned Rights" shall mean any of Debtor's rights granted by third parties, including without limitation any and all rights, licenses, vendor consents, rights-of-way, easements, wayleaves, colocations, leases and other approvals, that are necessary for the lawful ownership of the Purchased Assets or other lawful conduct of the Business as currently conducted, including, without limitation, those identified on Schedule 1.1(c).

"Assignment and Assumption Agreement" shall have the meaning ascribed to such term in Section 2.3(b).

"Assumed Liabilities" shall have the meaning ascribed to such term in Section 2.1(c).

"Bankruptcy Case" shall have the meaning ascribed to such term in the recitals hereof.

"Bankruptcy Code" shall have the meaning ascribed to such term in the recitals hereof.

"Bankruptcy Court" shall have the meaning ascribed to such term in the recitals hereof.

"Burdensome Condition" means any Remedy Action or Remedy Actions that, individually or in the aggregate (taken as a whole), would be reasonably likely to have a material adverse effect on Buyer and its Affiliates.

"Business" shall have the meaning ascribed to such term in the recitals hereof.

"Business Day" shall mean any day of the year other than (i) any Saturday or Sunday or (ii) any other day on which banks located in the State of Hawaii generally are closed for business other than the retail depository business.

"Buyer" shall have the meaning ascribed to such term in the first paragraph of this Agreement.

"Buyer Disclosure Schedule" shall have the meaning ascribed to such term in the introductory clause to Article IV.

"CAFP" means the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Section established by Executive Order 13913 (previously known as Team Telecom), and any of its member and advisor agencies, or a grouping thereof, acting in their CAFP capacities.

"Cash Payment" shall have the meaning ascribed to such term in Section 2.2.

"Cash Offset Amount(s)" shall mean any Repair Expenses arising out of or relating to a break in the Submarine Cable.

"CFIUS" means the Committee on Foreign Investment in the United States or any member agency thereof designated to act on behalf of CFIUS.

"CFIUS Clearance" means that any review or investigation by CFIUS under Section 721 of the transactions contemplated by this Agreement shall have been concluded and one of the following has occurred:  (a) written notice has been received by Buyer and Seller (or their respective counsel) from CFIUS stating that the review or investigation of the transactions contemplated by this Agreement pursuant to Section 721 has been concluded and that CFIUS has made a determination that the transactions contemplated by this Agreement do not present any unresolved national security concerns, (b) CFIUS shall have concluded that the transactions contemplated by this Agreement are not subject to review under Section 721; or (c) the President of the United States shall not have acted pursuant to Section 721 to suspend or prohibit the consummation of the transactions contemplated by this Agreement and the applicable period of time for the President to take such action shall have expired.

"Claim" shall mean a right to (i) a payment, whether or not such right is reduced to

judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured or (ii) an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, secured or unsecured.

"Closing" shall have the meaning ascribed to such term in Section 2.7.

"Closing Date" shall have the meaning ascribed to such term in Section 2.7.

"Closing Documents" shall mean, collectively, the documents delivered by Seller pursuant to Section 2.3 and the documents delivered by Buyer pursuant to Section 2.4.

"Code" shall mean the United States Internal Revenue Code of 1986, as amended. All references to the Code, U.S. Treasury Regulations or other governmental pronouncements shall be deemed to include references to any applicable successor Regulations or amending pronouncement.

"Contracts" shall mean any agreements, contracts, commitments, understandings, binding arrangements, unexpired leases of real and personal property, licenses, purchase orders and all other legally binding arrangements, whether written or oral.

"Consent" shall mean any consent, approval, authorization, qualification, waiver or notification of a Governmental Authority that is necessary to be obtained prior to the consummation of the transactions contemplated by this Agreement in order to properly effectuate such transactions.

"Court" shall mean any court, federal, state, United States territorial or local, or arbitration tribunal.

"Cure Costs" shall have the meaning ascribed to such term in Section 2.1(d)(ii).

"Debtor" shall have the meaning ascribed to such term in the first paragraph of this Agreement.

"Debtor Assets" shall mean the assets that are identified on Schedule 2.1(a), including the A.1 Assets and the A.2 Assets.

"Designated Contracts" shall mean those Assignable Contracts that are designated, pursuant to a written notice delivered by Buyer to Seller at least five (5) Business Days prior to the Closing Date, for assignment to Buyer at Closing.

"Effective Time" shall mean 12:01 a.m. (United States Central time) on the Closing Date.

"Entitlements" shall have the meaning ascribed to such term in Schedule 1.1(b).

"Escrow Agent" shall have the meaning ascribed to such term in Section 2.5(a).

"Escrow Agreement" shall have the meaning ascribed to such term in Section 2.5(a).

"Escrow Amount" shall have the meaning ascribed to such term in Section 2.5(a).

4

"Escrow Property" shall mean the Escrow Amount and any interest, income and earnings thereon.

"Estate" shall have the meaning ascribed to such term in the recitals hereof.

"Execution Date" shall have the meaning set forth in the preamble of this Agreement.

"FCC" shall mean the United States Federal Communications Commission.

"FCC Consent" shall mean the consent by the FCC to the assignment of the FCC Permit in connection with the consummation of the transactions contemplated hereby.

"FCC Permit" the Submarine Cable Landing License SCL-LIC-20070223-00003 issued by the FCC to Debtor.

"Final Order" shall mean an order of the Bankruptcy Court or other Court of competent jurisdiction (a) as to which no appeal, notice of appeal or motion for rehearing or new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon, (b) as to which the time for instituting an appeal or motion for rehearing or new trial shall have expired and (c) as to which no stay is in effect; provided, however, that (x) no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order; and (y) the Sale Order shall fail to be a Final Order if, and only if, a timely filed appeal, motion for rehearing or motion for new trial challenges the Bankruptcy Court's conclusion that Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code.

"Financing" shall have the meaning ascribed to such term in Section 2.2.

"Financing Documents" shall mean the Credit Agreement and Security Agreement, each substantially in the form attached hereto as Exhibit F and Exhibit G, respectively.

"Financing Offset Amount(s)" shall mean any Repair Expenses, Routine Maintenance Expenses or other amounts owed to Buyer under Article VIII hereof, but excluding any Cash Offset Amounts.

"Governmental Authority" shall mean any foreign, federal, state, county, municipal, United States territorial, local or other governmental department, authority, regulatory or administrative agency, body, authority, entity, commission, unit, subdivision or governmental authority, including Courts.

"HSBC" shall mean HSBC Securities (USA), Inc.

"HSR Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"Incidental Rights" shall mean any and all rights of Debtor of any kind which are incidental to or arise out of the lawful ownership of any of the Purchased Assets, including, but not limited

5

to, the Assigned Rights and Assigned Permits.

"Knowledge" shall mean, with respect to Buyer, the actual knowledge of the directors and executive officers of such party. "Knowledge" shall mean, with respect to Seller, the actual knowledge of the Seller.

"Law" shall mean (a) all laws, statutes and ordinances of the United States, any foreign country, any domestic or foreign state or territory, or any political subdivision thereof, including all decisions of Courts having the effect of law in each such jurisdiction, and (b) all Regulations.

"Liens" shall mean any mortgage, pledge, hypothecation, assignment, deposit arrangement, lien (statutory, judicial or otherwise), security interest or other charge or encumbrance, any financing lease having substantially the same economic effect as any of the foregoing, any assignment of the right to receive income, any other type of preferential arrangement, or any right-of-way, easement, encroachment or encumbrance of any kind.

"Material Adverse Effect" shall mean any change, fact, circumstance, occurrence, event, effect or condition that, individually or in the aggregate with all other changes, facts, circumstances, occurrences, events, effects or conditions, directly or indirectly, results in, or would reasonably be expected to result in, a material adverse effect on (a) the ability of Seller to consummate the sale of the Purchased Assets or (b) the ability of Buyer to operate the Business, taken as a whole, from and after the Closing.

"North American Zone Maintenance Authority Agreement" shall mean that certain multi-party agreement entered into by SIC on April 1, 2012, as amended on April 1, 2013, January 1, 2016 and January 1, 2019, and subsequently assigned to the Trustee.

"Offset Amount(s)" shall mean the Cash Offset Amount and Financing Offset Amount.

"Offset Claim" shall mean any claim for Offset Costs.

"Offset Costs" shall have the meaning ascribed to such term in Section 8.1.

"Outside Date" shall have the meaning ascribed to such term in Section 7.1(a)(iii).

"Permitted Liens" shall mean the following: (a) the agreements or conditions imposed on the issuance of land use permits, zoning, business licenses, use permits or other entitlements of various types issued by any Governmental Authority and necessary or beneficial to the continued use and occupancy of the Purchased Assets in connection with the Business; (b) zoning Regulations and restrictive covenants and easements of record that do not materially affect, impair or interfere with any property affected thereby or the use of the Purchased Assets; and (c) public utility easements of record, in customary form, to serve the Purchased Assets.

"Permits" shall mean all permits, approvals, franchises, licenses or other rights granted by any Governmental Authority and necessary for the lawful ownership of the assets of Debtor, or other lawful conduct of the Business as currently conducted.

"Person" shall mean an individual, partnership, limited liability company, corporation,

6

U.S. Bankruptcy Court - Hawaii   #18-00808   Dkt # 313-14   Filed 04/30/20   Page 91 of 58
U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 1-1   Filed 04/04/22   Page 91 of 183

joint stock company, trust, estate, joint venture, association or unincorporated organization, Governmental Authority or any other form of business or professional entity.

"Purchased Assets" shall mean, collectively, the Debtor Assets, the Assigned Claims and the Designated Contracts.

"Purchase Price" shall have the meaning ascribed to such term in Section 2.2.

"Real Property" shall mean all buildings, structures, improvements and fixtures, together with all rights of way, easements, privileges, and other appurtenances pertaining or belonging thereto, in which Seller has any interest, whether pursuant to a fee simple interest, leasehold interest, license, or any other agreement.

"Regulation" shall mean any rule or regulation of any Governmental Authority having the effect of law.

"Remedy Action" shall mean (i) proposing, negotiating, committing to and effecting, by consent decree, hold separate order, or otherwise, the sale, divestiture or disposition of businesses, product lines, assets or operations of Buyer or any of its Affiliates, (ii) conducting Buyer and its Affiliates' businesses in a specified manner, or proposing and agreeing or permitting to conduct any of such businesses in a specified manner, including by agreeing to undertakings required by a Governmental Entity that Buyer or any of its Affiliates will take, or refrain from taking, any action, including committing the Buyer or any of its Affiliates to invest specific dollar amounts in specific geographic markets, and (iii) otherwise taking or committing to take actions that after the Effective Time would limit Buyer or any of its Affiliates' ability to retain one or more of the businesses, product lines, assets or operations of the Buyer or any of its Affiliates, in each case, to the extent necessary to obtain any such clearance, resolve any such objections or avoid or eliminate any such impediments.

"Repair Expenses" means any amount paid or payable to third-parties or to Buyer, for labor, materials, replacements, or repairs to, any component of the Purchased Assets, including, for the avoidance of doubt, any Pre-existing Infrastructure Repair (as defined under the Services Agreement).

"Routine Maintenance Expenses" means any amount paid or payable to Buyer for labor related to the performance of routine maintenance activities on the Purchased Assets, as outlined in Schedule A of the Services Agreement.

"Sale Order" shall mean an order of the Bankruptcy Court that is acceptable to Seller and Buyer that authorizes the transactions contemplated hereunder, including authority to convey the Purchased Assets to Buyer pursuant to Sections 363 and 365 of the Bankruptcy Code and that contains a finding of fact that Buyer is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code, substantially in the form of Exhibit A attached hereto.

"Section 721" means Section 721 of the Defense Production Act of 1950, codified as amended at 50 U.S.C. § 4565 (including provisions of the Foreign Investment Risk Review Modernization Act of 2018), and all rules and regulations thereunder, including those codified at 31 C.F.R. Parts 800 through 802.

7

"Seller" shall have the meaning ascribed to such term in the first paragraph of this Agreement.

"Seller Disclosure Schedule" shall have the meaning ascribed to such term in the introductory clause to Article III.

"Services Agreement" shall mean that certain Operational Support and Sales Services Agreement with respect to the Purchased Assets, to be entered into by Seller and Buyer following entry of the Sale Order (as defined herein).

"Settlement Agreement" shall have the meaning ascribed to such term in Schedule 1.1(a).

"SIC" shall have the meaning ascribed to such term in Schedule 1.1(a).

"Submarine Cable" shall have the meaning set forth in the Services Agreement.

"Subsidiary" shall mean any Person of which another specified Person owns directly or indirectly at least a majority of the outstanding capital stock (or other securities) entitled to vote generally or otherwise having the power to elect a majority of the board of directors (or similar governing body) of such Person.

"Superior Proposal" shall have the meaning ascribed to such term in Section 5.2(c).

"Taxes" shall mean all income taxes and all other taxes, charges, imposts, tariffs, fees, levies or other similar assessments or liabilities, including income taxes, ad valorem taxes, excise taxes, withholding taxes or other taxes of or with respect to gross receipts, premiums, real property, personal property, windfall profits, sales, use, transfers, licensing, employment, payroll and franchises imposed by or under any Law; and such terms shall include any interest, fines, penalties, assessments or additions to tax resulting from, attributable to or incurred in connection with any such tax or any contest or dispute thereof.

"Tax Return" shall mean all returns, declarations, reports, estimates, information returns and statements required to be filed by or with respect to Debtor in respect of Taxes, including federal, state, United States territorial, local or foreign Income Tax returns filed on a consolidated, combined or unitary basis.

"Transaction Documents" shall mean this Agreement, the Services Agreement, the Closing Documents and any other agreements or documents the execution of which are contemplated by this Agreement.

**Section 1.2  Rules of Construction.**

(a)    The inclusion of any information in the Seller Disclosure Schedule shall not be deemed an admission or acknowledgment, in and of itself and solely by virtue of the inclusion therein, that such information is required to be listed therein or that such information is material to Debtor, the Estate or the Business. The headings, if any, of the individual sections of the Seller Disclosure Schedule are inserted for convenience only and shall not be deemed to constitute a part thereof or a part of this Agreement. The Seller Disclosure Schedule is arranged in sections merely

8

for convenience, and the disclosure of an item in one section of the Seller Disclosure Schedule as an exception to a particular representation or warranty shall be deemed adequately disclosed as an exception with respect to all other representations or warranties to the extent that the relevance of such item to such representations or warranties is reasonably apparent on the face of such item, notwithstanding the presence or absence of an appropriate section of the Seller Disclosure Schedule with respect to such other representations or warranties or an appropriate cross reference thereto. The specification of any dollar amount in the representations and warranties or otherwise in this Agreement or in the Seller Disclosure Schedule is not intended and shall not be deemed to be an admission or acknowledgment of the materiality of such amounts or items, nor shall the same be used in any dispute or controversy between the parties to determine whether any obligation, item or matter (whether or not described herein or included in any schedule) is or is not material for purposes of this Agreement.

(b)      Each of the parties hereto acknowledges that it has been represented by independent counsel of its choice throughout all negotiations that have preceded the execution of this Agreement and that it has executed the same with consent and upon the advice of such independent counsel. Each party and its counsel cooperated in the drafting and preparation of this Agreement and the documents referred to herein, and any and all drafts relating thereto shall be deemed the work product of the parties and may not be construed against any party by reason of its preparation. Accordingly, any rule of law or any legal decision that would require interpretation of any ambiguities in this Agreement against any party that drafts it is of no application and is hereby expressly waived.

(c)      All references in this Agreement to Exhibits, Schedules, Articles, Sections, subsections and other subdivisions refer to the corresponding Exhibits, Schedules, Articles, Sections, subsections and other subdivisions of this Agreement unless expressly provided otherwise. Titles appearing at the beginning of any Articles, Sections, subsections or other subdivisions of this Agreement are for convenience only, do not constitute any part of such Articles, Sections, subsections or other subdivisions, and shall be disregarded in construing the language contained therein. The words "*this Agreement*," "*herein*," "*hereby*," "*hereunder*" and "*hereof*" and words of similar import, refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. The words "*this Section*," "*this subsection*" and words of similar import refer only to the Sections or subsections hereof in which such words occur. The word "*including*" (in its various forms) means "*including, without limitation*." Pronouns in masculine, feminine or neuter genders shall be construed to state and include any other gender and words, terms and titles (including terms defined herein) in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires. Unless the context otherwise requires, all defined terms contained herein shall include the singular and plural and the conjunctive and disjunctive forms of such defined terms. Any reference to "$" or "dollars" means the currency of the United States of America.

**ARTICLE II**
**PURCHASE AND SALE OF THE PURCHASED ASSETS**

**Section 2.1  Purchase and Sale of the Purchased Assets; Assumption of Liabilities**.

(a)  Purchase and Sale of Purchased Assets.  Upon the terms and subject to the conditions of this Agreement, at the Closing, Seller shall sell to Buyer, and Buyer shall purchase from Seller, all of the Estate's right, title and interest in and to the Purchased Assets and Incidental Rights, free and clear of all Claims and all Liens other than Permitted Liens, in accordance with Sections 363 and 365 of the Bankruptcy Code and the Sale Order.

(b)  Excluded Assets.  The Purchased Assets shall not include the following properties and assets of the Estate, except to the extent expressly included in the Purchased Assets (collectively, the "Excluded Assets"):

(i)  All cash and cash equivalents and all marketable securities;

(ii)  All deposits, withholdings, prepayments, credits and refunds of Seller or the Estate not related to the Business;

(iii)  All Claims, causes of action, choses in action, rights of recovery, rights of set off and rights of recoupment relating to the Excluded Assets, and except with respect to the Assigned Claims, all rights and powers of a trustee and debtor-in-possession against any Person whatsoever, including all avoidance powers granted to Seller under the Bankruptcy Code and all causes of action and remedies granted pursuant to Sections 502, 510, 541, 544, 545, 547 through 551 and 553 of the Bankruptcy Code, except with respect to the Purchased Assets in each case;

(iv)  That certain judgment in favor of Seller entered by the Bankruptcy Court in Adversary Proceeding No. 19-90022, *Katzenstein, Trustee, v. Sandwich Isles Communications, Inc.*;

(v)  All capital stock or other equity interest of the Debtor;

(vi)  The assets listed on Schedule 2.1(b)(vi);

(vii)  The articles of organization, seals, minute books, and stock transfer books of the Debtor; and

(viii)  All rights that accrue to Seller under this Agreement.

(c)  Assumption of Liabilities.  Upon the terms and subject to the conditions of this Agreement and the Sale Order, at the Closing, Buyer shall assume, and Buyer shall thereafter pay, perform and discharge when due or payable, only the following liabilities and obligations (collectively, the "Assumed Liabilities"):

(i)  the liabilities and obligations under the Incidental Rights accruing from and after the Closing;

(ii)     all other liabilities and obligations relating to or arising from the ownership of the Purchased Assets after the Closing.

(d)     <u>Assumption of the Assigned Claims, Designated Contracts, Assigned Permits and Assigned Rights</u>.  The Sale Order shall provide for the assignment to Buyer of the Assigned Claims, Designated Contracts, Assigned Permits and Assigned Rights, effective upon the Closing, on the following terms and conditions:

(i)     On the Closing Date, Seller shall assign to Buyer, the Assigned Claims, Designated Contracts, Assigned Permits and Assigned Rights.  Seller shall provide timely and proper written notice of the motion to approve the sale filed with the Bankruptcy Court to all counterparties to the Assignable Contracts and any applicable Incidental Rights.  The Assignable Contracts shall also be identified by the date of the Assignable Contract and the other party or parties to the Assignable Contract set forth on the <u>Schedule 1.1(a)</u> and included on an exhibit attached to the sale motion for authority to assume, as applicable, and assign such Assignable Contracts. Similarly, the Assigned Rights shall also be identified by the date of the Assigned Right and the other party or parties to the Assigned Right set forth on the <u>Schedule 1.1(c)</u>, and included on an exhibit attached to the sale motion for authority to assume, as applicable, and assign such Assigned Rights.

(ii)     Seller shall be responsible for the payment of any and all liabilities and obligations of Seller or the Estate for all cure, compensation and reinstatement costs or expenses of or relating to the assumption and assignment of the Designated Contracts under Section 365 of the Bankruptcy Code (the "<u>Cure Costs</u>") as determined by the Bankruptcy Court.

(iii)     With respect to any Contract or Incidental Right not specifically identified on <u>Schedule 1.1(a)</u> or <u>Schedule 1.1(c)</u>, and provided such Contract or Incidental Right has not been rejected by Seller pursuant to Section 365 of the Bankruptcy Code, upon reasonable written notice(s) from Buyer, Seller shall, at Buyer's sole cost and expense, including Buyer's payment of any and all liabilities and obligations of the Seller for all cure, compensation and reinstatement costs or expenses relating to the assumption and assignment of each such Contract and Incidental Right, take all actions reasonably necessary to assume and assign to Buyer pursuant to Section 365 of the Bankruptcy Code any Contract(s) or Incidental Right(s) set forth in Buyer's notice(s).  Seller acknowledges and agrees that Seller shall provide Buyer with reasonable advance notice of any motion(s) to reject any Contract. Notwithstanding anything in this Agreement to the contrary, on the date any Contract or Incidental Right is assumed and assigned to Buyer pursuant to this <u>Section 2.1(d)(iii)</u>, such Contract or Incidental Right shall be deemed an Assignable Contract or Assigned Right, as applicable, for all purposes under this Agreement. No increase in Purchase Price shall be made for the inclusion of any additional Contract or Incidental Right assigned hereunder.

(e)     <u>Excluded Liabilities</u>.  Notwithstanding any other provision hereof or any Schedule or Exhibit hereto and regardless of any disclosure to Buyer, other than the Assumed Liabilities and liabilities under the Financing, Buyer shall not assume or be obligated or be responsible to pay, perform, satisfy or otherwise discharge any Liabilities whatsoever (collectively, the "<u>Excluded Liabilities</u>").  For clarity, the Excluded Liabilities shall specifically include any Liens in or to any Purchased Assets or proceeds therefrom.

11

**Section 2.2  Purchase Price**. The purchase price (the "Purchase Price") payable by Buyer to Seller in consideration for the sale of the Purchased Assets and Incidental Rights shall be (i) in consideration of only the A.2 Assets and any Incidental Rights related thereto, $500,000 cash; plus (ii) in consideration of all other Purchased Assets and Incidental Rights, (a) $24,500,000.00 cash, less the Cash Offset Amount, if any (collectively (i) and (ii)(a), the "Cash Payment") plus (b) $25,000,000.00 in financing on the terms set forth on Exhibit F, less (c) the Financing Offset Amount (the "Financing") plus (d) the assumption of the Assumed Liabilities. Payment of the Cash Payment shall be net of any Taxes Buyer shall be required under applicable Law to deduct or withhold from the Cash Payment. Buyer shall make such deductions and withholdings and shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Law.

**Section 2.3  Deliveries by Seller**. At the Closing, Seller shall deliver to Buyer, the following:

(a)  Duly executed bills of sale for the assets, including a separate bill of sale for the A.2 Assets, to be conveyed to Buyer substantially in the form of Exhibit C hereto (each, a "Bill of Sale");

(b)  The duly executed assignment and assumption agreement providing for the assignment and assumption of the Assigned Claims, Designated Contracts, Assigned Permits and Assigned Rights in substantially the form of Exhibit B hereto ("Assignment and Assumption Agreement");

(c)  The Financing Documents;

(d)  The certificate of Seller referred to in Section 6.2 hereof; and

(e)  Such other documents as Buyer may reasonably request to effect the purchase and sale of the Purchased Assets and Incidental Rights and the assumption of the Assumed Liabilities as contemplated hereby.

**Section 2.4  Deliveries by Buyer**. At the Closing, Buyer shall deliver to Seller the following:

(a)  The Cash Payment, less the Escrow Amount and less any amounts owed to Buyer under the Services Agreement, in immediately available funds, pursuant to written wiring instructions delivered by Seller to Buyer a reasonable time prior to the Closing;

(b)  The Financing Documents;

(c)  The certificate of Buyer referred to in Section 6.3 hereof;

(d)  The duly executed Assignment and Assumption Agreement; and

(e)  Such other documents as Seller may reasonably request to effect the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities as contemplated hereby.

**Section 2.5  Escrow Agreement for Earnest Money.**

(a)     Prior to entry of the Sale Order, Buyer, Seller and PNC Bank, N.A., a national association, as escrow agent (the "Escrow Agent"), shall execute an escrow agreement in substantially the form attached hereto as Exhibit E (the "Escrow Agreement") pursuant to which Buyer will deposit five million dollars ($5,000,000) as earnest money into an escrow account to be governed by the terms of the Escrow Agreement and this Agreement.  At the Closing Date, the amount in escrow ("Escrow Amount") shall be paid to Seller as part of the Purchase Price in accordance with the Escrow Agreement and this Agreement.

(b)     If, prior to the Closing, Buyer should breach this Agreement in a manner that gives rise to a termination right pursuant to Section 7.1(a)(vi) on the part of Seller, then Seller shall have the right to terminate this Agreement pursuant to Section 7.1(a)(vi) and to recover damages for a breach of contract. The Escrow Agent shall hold the Escrow Amount pending either a final judicial determination of the amount of such damages payable to Seller or a settlement between the parties regarding the amount of such damage; provided that the Seller's sole and exclusive remedy shall be (i) a claim for damages against the escrow account in an amount not to exceed $2,500,000 and, in addition, (ii) Buyer, as Service Provider under the Services Agreement shall promptly waive and release all rights to payment for accrued and unpaid Fees (as such term is defined in the Services Agreement) owing by Trustee to Service Provider thereunder. The Escrow Agent shall pay Seller such damages from the escrow account specified in Section 2.5(a) and any funds remaining in the escrow account after Seller has collected such damages in full shall be then paid to Buyer.  For the avoidance of doubt, notwithstanding Buyer's release of such rights to payment under the Services Agreement, Service Provider shall remain obligated to fulfill all its duties thereunder, including without limitation, indemnification of the Trustee.

(c)     In the event the parties fail to close this transaction due to a termination of this Agreement pursuant to Section 7.1(a)(i), (a)(ii), (a)(iii), (a)(v), or (a)(vii) then the Escrow Agent shall return the Escrow Amount to Buyer as promptly as possible after the termination of this Agreement in accordance with the notice and other provisions of the Escrow Agreement.

(d)     In the event the parties fail to close this transaction due to a termination of this Agreement pursuant to Section 7.1(a)(iv), then Seller shall be entitled to damages in the amount of $3,700,000.00.  The Escrow Agent shall pay Seller such damages from the escrow account specified in Section 2.5(a) and any funds remaining in the escrow account after Seller has collected such damages in full shall be then paid to Buyer, provided that in the event Seller does not collect funds from the escrow account in an amount sufficient to pay such damages in full, Buyer shall pay Seller an amount equal to any such unpaid damages.

**Section 2.6  Payment of Purchase Price; Allocation of Purchase Price.**

(a)     At the Closing, Buyer and Seller shall deliver a joint written notice to the Escrow Agent directing the Escrow Agent to pay to Seller, by wire transfer of immediately available funds to an account or accounts designated by Seller, the Escrow Amount.

13

(b)      At the Closing, Buyer shall deliver to Seller, pursuant to Section 2.4(a), the Cash Payment (plus any fees owed by Buyer to the Escrow Agent under the Escrow Agreement), less the Escrow Amount.

(c)      At the Closing, Buyer shall execute and deliver the Financing Documents as provided therein, with the proceeds delivered to the Seller payable toward the Purchase Price.

(d)      For purposes of Section 1060 of the Code, Buyer and Seller hereby allocate the Purchase Price among the Purchased Assets and Assumed Liabilities pursuant to the allocation provisions set forth on Exhibit D hereto.

**Section 2.7  Closing**. The closing of the transactions contemplated hereby (the "Closing") shall take place remotely via the exchange of documents and signatures (or such other location or teleconference as mutually agreed upon by the parties hereto) on the second Business Day after the satisfaction of all conditions in Article VI other than those that by their nature are to be satisfied by deliveries by the parties at the Closing. The actual date on which the Closing takes place is referred to herein as the "Closing Date." The Closing shall be deemed to be effective as of the Effective Time.

**Section 2.8  AS IS, WHERE IS NATURE OF SALE**. BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, SELLER, THE ESTATE AND DEBTOR MAKE NO (AND SELLER, THE ESTATE AND DEBTOR EXPRESSLY DISCLAIM AND NEGATE ANY) REPRESENTATIONS OR WARRANTIES OF ANY KIND, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER WHATSOEVER, INCLUDING WITH RESPECT TO THE SALE OF THE PURCHASED ASSETS, INCLUDING ANY EXPRESS OR IMPLIED WARRANTY UNDER SECTION 8-108 OF THE UNIFORM COMMERCIAL CODE, OR WITH RESPECT TO ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE MERCHANTABILITY, QUALITY, QUANTITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE BUSINESS, DEBTOR, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE BUSINESS, DEBTOR, THE PURCHASED ASSETS AND THE ASSUMED LIABILITIES AS BUYER HAS DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS PURCHASE OF THE PURCHASED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH HEREIN, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS, INVESTIGATIONS AND EVALUATIONS. ACCORDINGLY, SUBJECT TO THE FOREGOING AND TO BUYER'S RIGHTS UNDER THIS AGREEMENT AND SELLER'S OBLIGATIONS HEREUNDER, AND EXCEPT AS OTHERWISE PROVIDED FOR IN THIS AGREEMENT, BUYER WILL PURCHASE THE PURCHASED ASSETS AND ASSUME THE ASSUMED LIABILITIES AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS" AND WITHOUT RECOURSE AGAINST SELLER, THE ESTATE OR DEBTOR.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as otherwise disclosed to Buyer in a schedule attached hereto and made a part hereof (the "Seller Disclosure Schedule"), Seller represents and warrants to Buyer as of the date hereof and as of the Closing Date as follows:

**Section 3.1 Authority; Execution and Delivery**. Seller is the duly appointed chapter 11 bankruptcy trustee for the Estate. Subject to approval and entry of the Sale Order by the Bankruptcy Court, Seller has the requisite power and authority to enter into the Transaction Documents and to consummate the transactions contemplated thereby. This Agreement has been, and each of the Transaction Documents shall be, duly executed and delivered by Seller. Subject to the entry and effectiveness of the Sale Order, this Agreement constitutes, and each of the Transaction Documents shall constitute, a legal, valid and binding obligation of Seller on behalf of the Estate, enforceable against Seller on behalf of the Estate in accordance with its terms and conditions, except that the enforcement hereof and thereof may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar Laws now or hereafter in effect relating to creditor's rights generally, (ii) applicable Laws governing assignment or transfer of the FCC Permit, and (iii) general principles of equity (regardless of whether enforceability is considered in a proceeding at law or in equity).

**Section 3.2 Non-Contravention; Approvals and Consents**. The execution and delivery of the Transaction Documents and the consummation of the transactions contemplated thereby by Seller on behalf of the Estate will not conflict with, or result in any violation of, or default (with or without notice or lapse of time, or both), to the knowledge of Seller, under the provisions of any agreement entered into by the Seller.

**Section 3.3 Title to the Purchased Assets; Exclusive Ownership and Right to Use**. At the Closing, Seller will transfer to Buyer all of the Estate's right, title and interest to the Purchased Assets and Incidental Rights, free and clear of all Claims and all Liens (other than Permitted Liens), in accordance with Section 363 and 365 of the Bankruptcy Code and as provided by the Sale Order. Except as otherwise provided by the Sale Order or as set forth in any Designated Agreement, at the Closing, Buyer will not be subject to any lease, sublease, indefeasible right of use, or right to use or occupy the Purchased Assets in favor of any third party.

**Section 3.4 No Subsidiaries**. Debtor has no Subsidiaries.

**Section 3.5 Seller's Brokerage Agreements**. Except as set forth on Seller Disclosure Schedule 3.5, Seller has not engaged any Person as an investment banker, broker, finder or financial advisor and who would be entitled to any fee or commission in connection with the transactions contemplated by this Agreement and no such Person is entitled to any such fee or commissions from Debtor as a result of any action taken by Seller.

**Section 3.6 Assignable Contracts, Assigned Claims, Assigned Permits and Assigned Rights**. Other than in connection with the DIP Financing, neither Seller nor the Estate has assigned, transferred, pledged or otherwise conveyed its rights under any of the Assigned Claims,

15

Assignable Contracts, Assigned Permits or Assigned Rights. Any pledge or encumbrance arising under the DIP Financing will be released at Closing.

Section 3.7 **Real Property.** Except for any portion of the Purchased Assets or Incidental Rights which may constitute Real Property as used in this Agreement, Debtor has no interest in any Real Property.

Section 3.8 **Antitrust.** Seller has determined that no premerger notifications are required under the HSR Act.

Section 3.9 **Settlement Agreement Matters.** Seller has executed and delivered to Buyer true, complete and correct copies of all of the "Definitive Documentation" (as that term is defined in the Settlement Agreement).

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Except as otherwise disclosed to Seller in a schedule attached hereto and made a part hereof (the "Buyer Disclosure Schedule"), Buyer represents and warrants to Seller as follows:

Section 4.1 **Organization and Good Standing.** Buyer is validly existing and in good standing under the Laws of the State of Delaware.

Section 4.2 **Authorization of Agreement; Execution and Delivery.** Buyer has all requisite power and authority to enter into the Transaction Documents and to consummate the transactions contemplated thereby. The execution and delivery by Buyer of the Transaction Documents and the consummation of the transactions contemplated thereby have been duly and validly authorized by all requisite action on the part of Buyer. This Agreement has been, and each of the Transaction Documents shall be, duly executed and delivered by Buyer. This Agreement constitutes, and each of the Transaction Documents shall constitute, a legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, except that the enforcement hereof and thereof may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws now or hereafter in effect relating to creditors' rights generally, (ii) applicable Laws governing assignment or transfer of the FCC Permit, and (iii) general principles of equity (regardless of whether enforceability is considered in a proceeding at law or in equity).

Section 4.3 **Non-Contravention; Approvals and Consents.** The execution and delivery of the Transaction Documents and the consummation of the transactions contemplated thereby by Buyer will not conflict with, or result in any violation of, or default (with or without notice or lapse of time, or both) under (i) any provision of the certificate of incorporation or bylaws (or any similar organizational documents) of Buyer, (ii) the provisions of any agreement to which Buyer or any of its Affiliates is a party or (iii) applicable Law. Prior to the consummation of the transactions contemplated by this Agreement, no consent, approval, order or authorization of, or registration, declaration or filing with, notice to, or permit from, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of any of the Transaction

16

Documents by Buyer or the consummation by Buyer of the transactions contemplated thereby, except for (1) the FCC Consent, and (2) the entry by the Bankruptcy Court of the Sale Order.

Section 4.4 **Financial Ability**. Buyer has sufficient funds available to pay the Cash Payment, assume and perform the Assumed Liabilities, consummate the transactions contemplated hereby and by the other Transaction Documents, and pay all fees and expenses related thereto. Other than with respect to the Financing, Buyer acknowledges that its obligations under this Agreement and the other Transaction Documents are not subject to any conditions regarding its ability to obtain financing for the transactions contemplated by this Agreement and the other Transaction Documents.

Section 4.5 **Buyer's Brokerage Agreements**. Except as set forth on Buyer Disclosure Schedule 4.5, none of Buyer or any of its Affiliates have engaged any Person as an investment banker, broker, finder or financial advisor and who would be entitled to any fee or commission in connection with the transactions contemplated by this Agreement and no such Person is entitled to any such fee or commissions from Buyer or any of its Affiliates. Buyer or its Affiliates are exclusively responsible for the full payment and satisfaction of all fees or commissions associated with any such engagement by Buyer or its Affiliates set forth on Buyer Disclosure Schedule 4.5.

Section 4.6 **No Affiliates of Debtor**. Except as set forth on Buyer Disclosure Schedule 4.6, no current or former equity holder, director or officer (or similar executive level Person) of Debtor is affiliated with Buyer in any capacity, including but not limited to, an Affiliation in a capacity such as a holder of any equity interest in Buyer (and any of Buyer's non-public Affiliates), or an officer, director, employee, consultant, agent, member, partner or other representative of Buyer or any of its Affiliates. In addition, except as set forth on Buyer Disclosure Schedule 4.6, no current or former Affiliate of Debtor possesses the authority to, in any way, exercise effective control, including voting control, over Buyer or any of its non-public Affiliates.

Section 4.7 **Adequate Assurances Regarding Assignable Contracts**. Buyer is and will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assignable Contracts.

Section 4.8 **CFIUS**. Buyer has determined that the filing of a voluntary notice or declaration with CFIUS for CFIUS Clearance is neither required nor necessary under Section 721.

Section 4.9 **Antitrust**. Buyer has determined that no premerger notifications are required under the HSR Act.

### ARTICLE V
### COVENANTS

Section 5.1 **Conduct of the Business**. During the period from the date hereof until the Closing Date, Seller covenants that (except as may be expressly permitted or required by this Agreement, consented to in writing by Buyer, which consent shall not be unreasonably withheld, conditioned or delayed, or as required by the applicable provisions of the Bankruptcy Code or any orders of the Bankruptcy Court), Seller shall cause Debtor, to (i) maintain the Business in the ordinary course consistent with prudent business practices of an owner and operator of telecommunications infrastructure assets, including but not limited to, performing manufacturer

recommended maintenance activities as needed, and maintaining the North American Zone Maintenance Authority Agreement in good standing, and compliance with <u>Section 5.2</u>, (ii) not sell or dispose of any of the Purchased Assets and not create any Lien with respect to the Purchased Assets, (iii) continue all activities required pursuant to the terms of the Assigned Permits, including the payment of any fees due thereunder, (iv) not modify or amend any Assignable Contract or waive any right under any Assignable Contract, (v) pay, on a current basis, all liabilities under the Assignable Contracts, (vi) not terminate or amend any Assigned Permits, (vii) not terminate or amend any Assigned Rights, (viii) not cause to increase or accelerate any of the Assumed Liabilities, (ix) continue in force all policies of insurance on the Purchased Assets, including, for the avoidance of doubt, insurance required under the Services Agreement, and (x) not commit or agree, whether in writing or otherwise, to take any action prohibited by this <u>Section 5.1</u>. Notwithstanding the foregoing, Seller shall not be in breach of this Section 5.1 if its purported breach hereof is due to a breach by Buyer of a related obligation of Buyer under the Services Agreement.

**Section 5.2     Risk of Loss; Duty to Repair.**  Seller shall bear all risk of loss with respect to the Business and the Purchased Assets prior to Closing.  Seller shall be responsible for Repair Expenses and Routine Maintenance Expenses, and Buyer shall be entitled to recover any such expenses either as Cash Offset Amounts or Financing Offset Amounts in accordance with this Agreement.

**Section 5.3     No Solicitation of Other Bids.**

(a)     Seller and HSBC shall not, and shall not authorize or permit any of their respective representatives to, directly or indirectly, (i) encourage, solicit, initiate, facilitate or continue inquiries regarding an Acquisition Proposal; (ii) enter into discussions or negotiations with, or provide any information to, any Person concerning a possible Acquisition Proposal; or (iii) enter into any agreements or other instruments (whether or not binding) regarding an Acquisition Proposal except in accordance with <u>Section 5.3(c)</u>.  HSBC agrees that (i) it shall not assign or transfer its interest as a creditor to the Estate, or any rights in connection therewith, prior to either the Closing or termination of this Agreement, and (ii) it shall not exercise any right to credit bid in connection with the Bankruptcy Case.

(b)     Except as may be required by <u>Section 5.3(c)</u>, Seller shall immediately cease and cause to be terminated all existing discussions or negotiations with any Persons conducted heretofore with respect to, or that could lead to, an Acquisition Proposal. For purposes hereof, "<u>Acquisition Proposal</u>" shall mean any inquiry, proposal or offer from any Person (other than Buyer or any of its Affiliates) concerning the purchase of the Purchased Assets or any other matter that is within the scope of this Agreement.

(c)     In addition to the other obligations under this <u>Section 5.3</u>, Seller shall promptly (and in any event within two (2) Business Days after receipt thereof by Seller) advise Buyer orally and in writing of any Acquisition Proposal, any request for information with respect to any Acquisition Proposal, or any inquiry with respect to or which could reasonably be expected to result in an Acquisition Proposal, the material terms and conditions of such request, Acquisition Proposal or inquiry, and the identity of the Person making the same. Notwithstanding anything to the contrary in this Agreement, in the event that, prior to the Bankruptcy Court's approval of the

Sale Order, Seller or HSBC receives an unsolicited bona fide written Acquisition Proposal that: (a) either (i) was not obtained or made as a direct or indirect result of a breach of (or in violation of) this Agreement or (ii) was received from a party which had previously submitted a bid to the Trustee or HSBC; and (b) is on terms and conditions that the Seller or HSBC determines in good faith and taking into account its fiduciary obligations, and following consultation with its outside legal counsel and outside financial advisors, if any, are more favorable, from a financial point of view, to the Estate, than the terms of this Agreement, and (c) provides for payment to Buyer of a fee of Three Million Seven Hundred Thousand Dollars ($3,700,000) (such proposal a "Superior Proposal"), and the Seller is required to consider such Superior Proposal in order to comply with its fiduciary obligations. Seller shall (i) within 48 hours of receipt, provide Buyer with a copy of any Superior Proposal, and (ii) shall provide Buyer with an opportunity to amend this Agreement to provide for at least equivalent financial terms to those included in the Superior Proposal. Seller and Buyer agree to negotiate in good faith in respect of any such amendment, and in the event that Buyer and Seller agree to amend this Agreement as provided above within five (5) Business Days of Buyer's receipt of the Superior Proposal, Seller shall not accept the Superior Proposal.

(d)     Notwithstanding anything to the contrary in this Section 5.3, nothing herein shall require Seller or the Estate to take any action or to refrain from taking any action in connection with this Section 5.3, to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law.

(e)     Seller agrees that the rights and remedies for noncompliance with this Section 5.3 shall include having such provision specifically enforced by the Bankruptcy Court, it being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury to Buyer and that money damages would not provide an adequate remedy to Buyer.

**Section 5.4     Pre-Closing Access.**

(a)     From the date of this Agreement until the Closing Date, Seller shall use commercially reasonable efforts, to the extent permitted under applicable Law, to give to Buyer and its representatives reasonable access, during normal business hours and upon reasonable notice, to the Estate's properties, books and records relating to the Business and to the Estate's properties, books and records relating to the Purchased Assets (including the Assignable Contracts, the Assigned Rights and the Assigned Permits) and the Assumed Liabilities.

(b)     Seller shall permit Buyer to review all Assignable Contracts to facilitate Buyer's assumption of such contracts at Closing.

(c)     Without limiting the obligations under Section 5.4(e) hereof, Seller shall use commercially reasonable efforts to provide Buyer with reasonable access, during normal business hours and upon reasonable notice, to enter and inspect all physical plants, central offices, or any other facility or infrastructure used in connection with the Business.

(d)     Nothing contained in this Section 5.4 shall obligate Seller or the Estate to (i) breach any duty of confidentiality owed to any Person whether such duty arises contractually, statutorily or otherwise or (ii) waive any attorney/client, work product or similar privilege.

(e)     Seller agrees to cooperate, and when applicable, coordinate with SIC, to provide Buyer with access sufficient for Buyer to perform each of its obligations under the Services Agreement from and after the entry of the Sale Order.

**Section 5.5  Notification.**

(a)     Prior to the Closing, Seller shall notify Buyer, and Buyer shall notify Seller, of any litigation, arbitration, appeal or administrative proceeding pending, or, to its Knowledge, threatened against Seller, the Estate, Debtor or Buyer, as the case may be, that challenges the transactions contemplated hereby.

(b)     Seller shall give prompt written notice to Buyer of (i) the occurrence of any event of which it becomes aware that has caused or that would be likely to cause any representation or warranty of Seller contained in this Agreement to be untrue or inaccurate in any material respect at any time from the date hereof to the Closing and (ii) the failure of Seller to comply with or satisfy in any material respect any covenant or agreement to be complied with by it hereunder.

(c)     Buyer shall give prompt written notice to Seller of (i) the occurrence of any event of which it becomes aware that has caused or that would be likely to cause any representation or warranty of Buyer contained in this Agreement to be untrue or inaccurate in any material respect at any time from the date hereof to the Closing and (ii) the failure of Buyer to comply with or satisfy in any material respect any covenant or agreement to be complied with by it hereunder.

**Section 5.6  Additional Agreements.** Subject to the terms and conditions of this Agreement, each of the parties hereto will use commercially reasonable efforts to do, or cause to be taken all action and to do, or cause to be done, all things necessary, proper or advisable under applicable Law to consummate and make effective the transactions contemplated by this Agreement, including, the fulfillment of the conditions set forth in Article VI to the extent that the fulfillment of such is within the control of such party.

**Section 5.7  Investigation and Agreement by Buyer.** Buyer acknowledges and agrees that it has made its own inquiry and investigation into, and, based thereon, has formed an independent judgment concerning the Purchased Assets, the Assumed Liabilities, the Business and operations of Debtor, the information contained in the Confidential Information Memorandum prepared by Seller and dated February 14, 2020 and other information about the business strategies of Debtor. Buyer has also conducted its own independent review of all orders of, and all motions, pleadings, and other submissions to, the Bankruptcy Court in connection with the Bankruptcy Case.

**Section 5.8  Permits or Consents of Governmental Authorities.**

(a)     Within ten (10) Business Days after the date that the Sale Order is entered by the Bankruptcy Court, the parties hereto shall prepare and file, or cause to be prepared and filed, applications seeking any applicable Permits or Consents of any Governmental Authority (including the FCC) required under Section 6.1(b). Each party shall provide the other party with all information required for any applications, notifications, or other filings to be made pursuant to any applicable Law in connection with the transaction contemplated by this Agreement. In

20

addition, the parties hereto shall reasonably cooperate to make any notice filings required in connection with this matter on a timely basis.

(b)     Buyer shall bear all filing fees in connection with the preparation and prosecution of any applications, notifications or other filings related to a Permit or Consent of a Governmental Authority. Subject to the terms and conditions of this Agreement, each of the parties hereto shall use its commercially reasonable efforts to assist and cooperate with each other to prepare and prosecute any required applications, notifications or other filings related to a Permit or Consent of a Governmental Authority (including, but not limited to, the FCC) in good faith and with due diligence before the applicable Governmental Authorities and in connection therewith shall take such actions as may be reasonably necessary or reasonably required in connection with any application (or other type of filing document) to the applicable Governmental Authorities, including responding as promptly as practicable to any requests of the FCC for information and furnishing to any applicable Governmental Authorities any documents, materials or other information requested by such Governmental Authority in order to obtain any applicable Permit or Consent of a Governmental Authority as expeditiously as practicable, provided that neither party shall have an obligation to share with the other any confidential business information including to the extent such information is requested by a Governmental Authority. In addition, to the extent practicable, the parties hereto shall use commercially reasonable efforts to (i) promptly notify each other of any communication to that party from any Governmental Authority with respect to a Permit or Consent of a Governmental Authority, (ii) permit a representative of the other party reasonably acceptable to the first party to attend and participate in meetings (telephonic or otherwise) with any Governmental Authority and (iii) permit the other party to review in advance, as reasonable, any proposed written communication to any Governmental Authority (provided that each party may designate certain information communications to the government as "Outside Counsel Only") and consider in good faith all reasonable additions, deletions or changes suggested in connection with any submissions to any Governmental Authority, provided that Buyer shall determine the timing and strategy and be solely responsible for the final content of any substantive or oral communications with any applicable Governmental Authority. No party hereto shall knowingly take, or fail to take, any action if the intent or reasonably anticipated consequence of such action or failure to act is, or would be, to cause any Governmental Authority (including, but not limited to, the FCC) not to grant a Permit or Consent or materially delay the granting of any such Permit or Consent.

(c)     In the event that CFIUS should request the filing of a notice or declaration pursuant to Section 721 for CFIUS Clearance, Buyer shall bear all costs and expenses associated with any such filings and otherwise the provision of subparagraph (b) shall apply.

(d)     In the event that a Governmental Authority should initiate an Antitrust Investigation, Buyer shall bear all costs and expenses associated with any such filings and otherwise the provision of subparagraph (b) shall apply.

**Section 5.9 Injunctions.** Prior to the Closing, if any Governmental Authority issues or otherwise promulgates any injunction, stay, decree or similar order that prohibits the consummation of any of the transactions contemplated hereby, the parties, at Buyer's sole cost and expense, shall use commercially reasonable efforts to have such injunction dissolved or otherwise

eliminated as promptly as possible and, prior to or after the Closing, to pursue the underlying litigation diligently and in good faith.

**Section 5.10 <u>Adequate Assurances Regarding Designated Contracts and Assigned Rights</u>**. With respect to each Designated Contract and Assigned Right, to the extent required by the Bankruptcy Court, Seller or the counterparty to such Designated Contract or Assigned Right, Buyer shall provide the Bankruptcy Court, Seller or such counterparty, as the case may be, adequate assurance of the future performance of such Designated Contract or Assigned Right by Buyer. To the extent that Buyer's performance of any such Designated Contract or Assigned Right shall require the cooperation or performance of the Seller, including, without limitation, delivery of any additional instruments or filings by Seller in order to effectuate the complete assignment of any Designated Contract or Assigned Right, Seller covenants to provide such cooperation or performance; provided, however, that nothing in this <u>Section 5.9</u> shall (a) require Seller or the Estate to make any expenditure or incur any obligation on its own or on Buyer's behalf (unless Buyer agrees to promptly reimburse Seller and the Estate for such expenditure or Buyer agrees to fully indemnify Seller and the Estate for such obligation) or (b) prohibit Seller or the Estate from ceasing operations or winding up its affairs following the Closing.

**Section 5.11 <u>Cure of Defaults</u>**. Seller shall, on or prior to the Closing, pay all Cure Costs and otherwise cure any and all defaults under the Designated Contracts that are required to be cured under the Sale Order so that such Designated Contracts may be assumed by Seller and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code.

**Section 5.12 <u>Bankruptcy Covenants</u>**. From and after the date hereof, Seller and/or Buyer, in each case as indicated below, covenant and agree as follows:

(a) Seller and Buyer each shall act promptly, diligently and in good faith, and use their respective best efforts, in pursuing entry of the Sale Order, and otherwise effectuating and consummating the transactions contemplated herein, including the sale of the Purchased Assets to Buyer, under the terms and conditions of this Agreement, in each case, as soon as practicable, but in any case within the applicable timeframes contemplated by this Agreement, including promptly, diligently and in good faith, and using their respective best efforts in (i) preparing and filing appropriate supporting papers, (ii) furnishing available supporting testimony or other evidence, (iii) contesting any applicable objections, (iv) responding to any applicable discovery requests and (v) contesting any applicable appeals or related relief.

(b) In the event an appeal is taken or a stay pending appeal is granted from the Sale Order, Seller shall immediately notify Buyer of such appeal or stay order and shall promptly provide to Buyer a copy of the related notice of appeal or order of stay. Seller shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such orders.

(c) From and after the date hereof, Seller shall not take any action that is intended to or does result in, or fail to take any action the intent of which failure to act would or does result in, the reversal, voiding, modification or staying of the Sale Order.

(d)     Seller shall: (i) file the required notice of a sale hearing with the Bankruptcy Court within one (1) day of the date of this Agreement, and (ii) request that a sale hearing occur in the Bankruptcy Court not less than twenty one (21) days of filing such notice.

**Section 5.13 Migration of Capacity; Clearance of Paniolo Network**. Upon the completion of the Network Inventory (as defined in the Service Agreement) Seller and Buyer shall, subject to and in accordance with the terms and conditions of the Services Agreement, migrate existing SIC capacity and services onto the fibers designated for SIC, and Buyer and Seller shall jointly cooperate to ensure that no third parties other than SIC, Buyer or users who have contracted for capacity pursuant to the Services Agreement are utilizing capacity or services on the Paniolo Network, which cooperation may include, without limitation, the negotiation and execution of additional Designated Contracts acceptable to Seller and Buyer.

## ARTICLE VI
## CONDITIONS TO THE CLOSING

**Section 6.1 Conditions to Obligations of Each Party**. The obligations of each party to this Agreement to effect the transactions contemplated hereby to occur on the Closing Date shall be subject to the satisfaction or, to the extent permitted by applicable Law, waiver of each of the following conditions:

(a)     No temporary restraining order, preliminary or permanent injunction, stay or other order issued by any Governmental Authority preventing the consummation of the transactions contemplated hereby to occur at the Closing Date shall be in effect, and (i) neither the Federal Trade Commission, Department of Justice, nor any state Attorney General (each an "Antitrust Agency") has opened an antitrust-related investigation, proceeding, or inquiry ("Antitrust Investigation") relating to the transactions contemplated hereby, or (ii) any Antitrust Agency that has opened any Antitrust Investigation has notified the parties that such Antitrust Investigation has been closed;

(b)     FCC Consent shall have been obtained by Buyer and Seller and shall not contain any terms, conditions, liabilities, obligations, commitments or sanctions, or any structural or remedial actions, that constitute, individually or in the aggregate, a Burdensome Condition;

(c)     In the event that the parties are required to file any notice or declaration with CFIUS pursuant to Section 5.8(c) of this Agreement, the parties shall have received CFIUS Clearance; and

(d)     The Bankruptcy Court shall have approved this Agreement and the transactions contemplated hereby by entry of the Sale Order and the Sale Order shall have become a Final Order.

**Section 6.2 Conditions to Obligation of Buyer**. The obligation of Buyer to effect the transactions contemplated hereby to occur at the Closing Date and to fund on the Closing Date shall be subject to the satisfaction or, to the extent permitted by applicable Law, waiver of each of the following conditions:

(a)      Each of the representations and warranties of Seller set forth in this Agreement shall be true and correct in all material respects on the Closing Date as though made on and as of the Closing Date, and Buyer shall have received a certificate signed by Seller to such effect;

(b)      Seller shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing Date, and Buyer shall have received a certificate signed by the Seller to such effect;

(c)      Seller shall have paid all Cure Costs and cured any defaults under the Designated Contracts;

(d)      Intentionally omitted;

(e)      Seller shall have delivered all entitlement documents and as-built drawings which are in Seller's possession;

(f)      The Designated Contracts and FCC Permit shall be in full force and effect with no defaults thereunder and shall not be subject to any further appeal by or before any Governmental Authority;

(g)      Seller shall have delivered to Buyer the Closing Documents referred to in <u>Section 2.3</u>; and

(h)      Since the date of this Agreement, there shall not have occurred a Material Adverse Effect.

**Section 6.3  Conditions to Obligation of Seller.** The obligation of Seller to effect the transactions contemplated hereby to occur at the Closing Date shall be subject to the satisfaction or, to the extent permitted by applicable Law, waiver of each of the following conditions:

(a)      Each of the representations and warranties of Buyer set forth in this Agreement shall be true and correct in all material respects on the Closing Date as though made on and as of the Closing Date, and Seller shall have received a certificate signed on behalf of Buyer by an officer of Buyer to such effect;

(b)      Buyer shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing Date, and Seller shall have received a certificate signed on behalf of Buyer by an officer of Buyer to such effect;

(c)      Buyer shall have delivered to Seller the Closing Documents referred to in Section 2.4;

(d)      Buyer shall have delivered the Cash Payment (plus any fees owed by Buyer to the Escrow Agent under the Escrow Agreement) less the Escrow Amount; and

(e)      Buyer shall have delivered its written notice to the Escrow Agent, pursuant to Section 2.6(a), directing the Escrow Agent to deliver to Seller the Escrow Amount and the Escrow Agent shall have delivered the Escrow Amount to Seller.

## ARTICLE VII
## TERMINATION

**Section 7.1  Termination.**

(a)     This Agreement may be terminated at any time prior to the Closing:

(i)     by mutual consent of Buyer and Seller;

(ii)     by either Buyer or Seller if the Bankruptcy Court has not entered the Sale Order within thirty (30) days of the Execution Date; provided, however, that this right to terminate this Agreement shall not be available to a party whose breach of this Agreement has been the cause of, or resulted in, the Sale Order not being entered or before such date;

(iii)     by either Buyer or Seller if the Closing shall not have occurred within two hundred ten (210) days of the FCC issuing public notice of this Agreement and the transactions contemplated herein and hereby (the "Outside Date"); provided, however, that this right to terminate this Agreement shall not be available to a party whose breach of this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before the Outside Date;

(iv)     by either Buyer or Seller if a Governmental Authority shall have issued an order, decree, or ruling or taken any other action, in each case permanently restraining, enjoining, or otherwise prohibiting the transactions contemplated by this Agreement, and such order, decree, ruling, or other action shall have become a Final Order;

(v)     by Buyer, if it is not then in material breach of this Agreement, if Seller has breached or failed to perform any of its representations, warranties, covenants or agreements contained in this Agreement, which breach or failure to perform (i) would cause one or more of the conditions set forth in Section 6.2 not to be satisfied and (ii) cannot be cured or, if curable, is not cured within thirty (30) days, or two days prior to the Outside Date, whichever is earlier, after written notice of such breach or failure to perform is given to Seller by Buyer; and

(vi)     by Seller, if Seller is not then in material breach of this Agreement, if Buyer has breached or failed to perform any of its representations, warranties, covenants or agreements contained in this Agreement, which breach or failure to perform (i) would cause one or more of the conditions set forth in Section 6.3 not to be satisfied and (ii) cannot be cured or, if curable, is not cured within thirty (30) days, or two days prior to the Outside Date, whichever is earlier, after written notice of such breach or failure to perform is given to Buyer by Seller; and

(vii)     by Buyer, in the event of a Material Adverse Effect.

(b)     Notwithstanding the provisions of paragraph (a), if any of the conditions to Buyer's obligation to close are not satisfied, Buyer has the right to waive the unsatisfied conditions and proceed with the Closing, without prejudice to any rights Buyer may have with respect to any breach of representation, warranty or covenant by Seller.

Section 7.2 **Effect of Termination**. Upon termination of this Agreement pursuant to Section 7.1, the undertakings of the parties set forth herein shall forthwith be of no further force and effect; provided, however, that this Section 7.2 and Sections 9.2 (Public Announcements), 9.4 (Expenses), 9.5 (Notices), 9.6 (Confidentiality), 9.7 (Entire Agreement; Amendment; Waiver), 9.8 (Severability), 9.9 (Successors and Assigns; Third Party Beneficiaries), 9.10 (Governing Law), 9.11 (Captions), 9.15 (No Director or Affiliate Liability), and 9.16 (No Personal Liability), and the obligations thereunder and the rights and remedies for any breaches of this Agreement occurring prior to such termination, in each case, shall survive any such termination. In the event of termination, all amounts owed to Buyer under the Services Agreement or this Agreement shall be paid by Seller, and Seller shall agree to Buyer's request to the Bankruptcy Court for an administrative claim under the Bankruptcy Code with respect to such amounts.

Section 7.3 **Survival**. The representations and warranties of Seller and Buyer set forth in this Agreement, the other Transaction Documents, and any certificate delivered in connection with this Agreement or any of the other Transaction Documents shall not survive the Closing. The covenants and other agreements of Seller and Buyer set forth in this Agreement and in the other Transaction Documents shall survive the Closing until fully performed.

## ARTICLE VIII
## OFFSET AMOUNTS

Section 8.1 **Costs Relating to the Purchased Assets**. Subject to the terms, conditions and limitations of this Article VIII, Buyer shall be able to include in the Offset Amounts any costs arising from or in connection with its performance of the Services Agreement or items for which Seller is responsible hereunder or under the Services Agreement (such costs, or cost estimates for such items are collectively referred to herein as the "Offset Costs").

Section 8.2 **Limitations**. Notwithstanding anything to the contrary set forth in this Agreement, Buyer's sole recourse with respect to any Offset Costs shall be to offset such costs against the Purchase Price in accordance with Section 2.2, provided that in the event this Agreement is terminated in accordance with Article VII hereof, Seller shall promptly reimburse such Offset Costs actually paid by Buyer, or the parties shall instruct the Escrow Agent to distribute such amount to Buyer from portion of the Escrow Amount that would otherwise be retained by Seller under Section 2.5.

Section 8.3 **Claim Procedures**. Buyer shall promptly provide written notice of any Offset Claim upon discovery of any matter for which it is entitled to payment hereunder, with such notice to contain the information set forth in the following sentence. The Offset Claim shall specify in reasonable detail the amount of the Offset Costs, if known, and contain a reference to this Article VIII. Failure to provide an Offset Claim shall not release the Seller from any obligations hereunder except to the extent Seller is materially prejudiced by such failure and shall not relieve Seller from obligations under this Article VIII. If the Seller does not notify the Buyer that it disputes such claim within fifteen (15) days following receipt of the Offset Claim, the claim specified therein shall be deemed an obligation of the Seller hereunder (subject to the limitations set forth in this Article VIII, as applicable). Buyer will reasonably cooperate and assist the Seller in determining the validity of any claim for payment by the Buyer and in otherwise resolving such matters. Such assistance and cooperation will include providing reasonable access, during normal business hours

26

and upon reasonable advance notice, to and copies of information, records and documents relating to such matters, providing access, during normal business hours and upon reasonable advance notice, to employees to assist in the investigation, defense and resolution of such matters.

**ARTICLE IX**
**MISCELLANEOUS**

**Section 9.1  Post-Closing Access**. Buyer shall preserve the financial records and other books and records, if any, relating to the Purchased Assets and Assumed Liabilities for a period of three years from the Closing Date. During such three-year period (as may be extended), Buyer shall keep such financial records and other books and records reasonably accessible and not destroy or dispose of such materials without the prior written consent of Debtor, and will permit Seller, Debtor and their respective authorized representatives reasonable access thereto, including making any copies at the Estate's expense. Such records may be sought under this Section 9.1 for any reasonable purpose, including, without limitation, to the extent reasonably required in connection with the administration of the Bankruptcy Case or the audit, accounting, tax, litigation, United States federal or securities disclosure under other applicable Law or other similar needs of Seller, the Estate or Debtor. In the event that any Tax Return becomes the subject of any audit or investigation, Buyer shall provide access to such financial data and other books and records as may be necessary to enable Seller, the Estate or Debtor to defend any such audit or investigation. The access shall be pursuant to this Section 9.1 and shall include access to any computerized information systems that contain the books and records referred hereto. Seller and Debtor shall promptly reimburse, or cause the Estate to reimburse, Buyer for Buyer's reasonable out-of-pocket expenses associated with requests made by Seller or Debtor under this Section 9.1, but no other charges shall be payable by Seller, the Estate or Debtor to Buyer in connection with such requests.

**Section 9.2  Public Announcements**. Prior to the entry of the Sale Order by the Bankruptcy Court, neither party will issue any press release or other public announcement with respect to this Agreement or the transactions contemplated hereby without the prior written approval of the other party, except as may be required by such party or its Affiliate under applicable Law or stock exchange rules or Regulations or as may be mutually agreed in advance in writing.

**Section 9.3  Further Assurances**. From and after the date of this Agreement, each party shall execute and deliver such instruments, documents, or other writings as the other party may reasonably request in order to confirm and carry out and to effectuate fully the intent and purposes of this Agreement.  For the avoidance of doubt, if, notwithstanding any of the provisions of this Agreement or the Sale Order, Buyer is unable to use or enjoy any rights incidental to the ownership of the Purchased Assets, including the Incidental Rights, the parties shall cooperate, as may be required following the closing of the Estate and the Bankruptcy Case, to ensure that Buyer shall be able to enjoy such rights.

**Section 9.4  Expenses**. Except as otherwise expressly provided in this Agreement, all costs and expenses incurred by the parties hereto in connection with the consummation of the transactions contemplated hereby shall be borne solely and entirely by the party that has incurred such expenses. In the event of a dispute between or among the parties in connection with this Agreement and the transactions contemplated hereby, each of the parties hereto hereby agrees that

the prevailing party shall be entitled to reimbursement by the other party or parties of reasonable expenses, including legal expenses, incurred in connection with any related action or proceeding. For the avoidance of doubt, any cost and expense associated with any filing required to provide public notice of the release of Liens with respect to Debtor shall be borne by the Seller.

**Section 9.5 Notices.**

(a)    All notices, requests, consents, waivers and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been given (i) if transmitted by facsimile, upon written confirmation of delivery, (ii) if personally delivered, upon delivery or refusal of delivery, (iii) if mailed by registered or certified United States mail, return receipt requested, postage prepaid, upon delivery or refusal of delivery, or (iv) if sent by an overnight delivery service nationally recognized in the United States, upon delivery or refusal of delivery. All notices, consents, waivers or other communications required or permitted to be given hereunder shall be addressed to the respective party to whom such notice, consent, waiver or other communication relates at the following addresses:

Notices to Seller:

Michael Katzenstein, Trustee,
Bankruptcy Estate of Paniolo Cable Company,
LLC c/o FTI Consulting, Inc.
Three Times Square, 9th Floor
New York, New York 10036
Fax: (212) 841-9350

with a copy to:

Goodsill Anderson Quinn & Stifel LLP
999 Bishop Street, Suite 1600
Honolulu, Hawaii 96813
Attention: Jonathan C. Bolton
Fax: (808) 547-5880

Notices to Buyer:

Hawaiian Telcom
c/o Cincinnati Bell Inc.
221 E. Fourth Street
Attention:  Mark Fahner
Fax: (513) 721-7358

with copies to:

Hawaiian Telcom
c/o Cincinnati Bell Inc.
221 E. Fourth Street

28

Attention: Christopher J. Wilson, General Counsel
Fax: (513) 721-7358

and

Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Attention: Andrew M. Ray, Esq.
Fax: (202) 373-6001

(b)       Either party may at any time change its address for notice from time to time by giving notice to the other party in accordance with this Section 9.5.

**Section 9.6  Confidentiality**. Buyer and Seller each hereby affirms its respective obligations under the non-disclosure agreement, dated September 27, 2019, by and between Cincinnati Bell Inc. and Ducera Partners LLC and its affiliates in its capacity as an advisor to the Seller regarding the confidentiality of all information designated as such therein.

**Section 9.7  Entire Agreement; Amendment; Waiver**. This Agreement and the Exhibits and Schedules attached hereto constitute the entire understanding among the parties with respect to the subject matter hereof and supersede all other understandings and negotiations with respect thereto. This Agreement may be amended only in a writing signed by Seller and Buyer. Any provision of this Agreement may be waived only in a writing signed by the party to be charged with such waiver. No course of dealing among the parties shall be effective to amend or waive any provision of this Agreement.

**Section 9.8  Severability**. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced under applicable Law, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated herein are not affected in any manner adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated herein are consummated as originally contemplated to the fullest extent possible.

**Section 9.9  Successors and Assigns; Third Party Beneficiaries**. Nothing expressed or referred to in this Agreement is intended to or shall be construed to give or to confer upon any Person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its terms and provisions are for the sole and exclusive benefit of the parties to this Agreement and their permitted successors and assigns. For the avoidance of doubt, notwithstanding the foregoing, the parties hereto agree and acknowledge that Sections 9.15 and 9.16 are intended to benefit such Persons that are set forth and are the subject of such Sections and, accordingly, such Persons shall be third party beneficiaries of this Agreement. In addition, the Persons that are set forth and are the subject of Sections 9.15 and 9.16 shall be entitled to enforce such Sections and pursue any

29

legal or equitable right, remedy, or claim under or with respect to such Sections in the event of a breach of such Sections by any party hereto.

### Section 9.10   Governing Law.

(a)      This Agreement shall be construed in accordance with and governed by the internal laws of the State of New York (without reference to its rules as to conflicts of law). For so long as Debtor is subject to the jurisdiction of the Bankruptcy Court, all parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, including matters arising in connection with the Assignable Contracts, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After Debtor is no longer subject to the jurisdiction of the Bankruptcy Court, the parties hereto hereby irrevocably submit to the non-exclusive jurisdiction of any federal court sitting in the State of New York with respect to any action or proceeding arising out of or relating to this Agreement.

(b)      Each of the parties hereby waives trial by jury in any claim, action, suit, arbitration, inquiry, proceeding or investigation to which such party is a party involving, directly or indirectly, any matter in any way arising out of, related to or in connection with the transactions contemplated in this Agreement.

### Section 9.11   Captions. The captions in this Agreement are for purposes of reference only and shall not limit or otherwise affect the interpretation hereof.

### Section 9.12   Counterparts. This Agreement may be executed in one or more counterparts, each of which will be deemed an original and all of which together will constitute one and the same instrument. Counterparts may be delivered via electronic mail (including pdf, facsimile transmission or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

### Section 9.13   Enforcement of Agreement. Subject to the restrictions contained herein, the parties hereto agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with its specific terms or was otherwise breached. It is accordingly agreed that the parties shall be entitled to injunctive relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof (i) during the Bankruptcy Case, in the sole and exclusive jurisdiction of the Bankruptcy Court and (ii) upon the closing, dismissal or conversion of the Bankruptcy Case, in any state or federal court in the State of New York, this being in addition to any other remedy to which they are entitled at law or in equity.

### Section 9.14   Time of Essence; Specified Dates. Time is of the essence for this Agreement and in the performance of the obligations and covenants to be performed or satisfied by the parties. Wherever a date specified in this Agreement falls on a day other than a Business Day, the date shall be extended to the next succeeding Business Day.

### Section 9.15   No Director or Affiliate Liability. Except with respect to obligations of Seller provided in this Agreement or any of the Transaction Documents, neither any direct or

30

indirect holder of equity interests in Debtor, nor any past, present or future director, officer, employee, agent or Affiliate of Debtor or of any such holder, shall have any liability or obligation of any nature whatsoever in connection with or under this Agreement or any of the Transaction Documents, and Buyer hereby waives and releases all claims of any such liability or obligation.

Section 9.16 **No Personal Liability**. Notwithstanding anything in this Agreement or any other Transaction Document to the contrary, Buyer acknowledges and agrees that (i) Seller is acting hereunder solely in his capacity as the Bankruptcy Court appointed chapter 11 trustee of the Estate in the Bankruptcy Case and that Seller shall not have any personal liability to Buyer and Buyer shall not have any recourse against Seller, in his individual capacity; and (ii) the Buyer's sole recourse (if any) shall be against the Estate.

Section 9.17 **No Successor Liability**. Except where expressly prohibited under law or otherwise expressly ordered by the Bankruptcy Court, upon the Closing, to the fullest extent permitted by Law, Buyer shall not be deemed to (a) be the successor of the Seller, (b) have, de facto or otherwise, merged with or into the Seller, (c) be a mere continuation or substantial continuation of the Seller or the enterprise(s) of the Seller, or (d) be liable for any acts or omissions of the Seller other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, Buyer shall not be liable for any claims against the Seller or any of its predecessors or Affiliates, and except as provided in the Agreement, Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business or any obligations of the Seller arising on or prior to the Closing Date, including liabilities on account of any Taxes arising, accruing or payable under, out of, in connection with or in any way relating to the operation of the Business on or prior to the Closing Date.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the duly authorized officer of each party has executed this Agreement as an instrument under seal effective as of the date first set forth above.

SELLER:

_____

**MICHAEL KATZENSTEIN**, solely in his capacity as chapter 11 trustee of the bankruptcy estate of Paniolo Cable Company, LLC

BUYER:

**HAWAIIAN TELCOM, INC.**

By:_____

Name: Leigh Fox

Title:   Chief Executive Officer

IN WITNESS WHEREOF, the duly authorized officer of each party has executed this Agreement as an instrument under seal effective as of the date first set forth above.

SELLER:

MICHAEL KATZENSTEIN, solely in his capacity as chapter 11 trustee of the bankruptcy estate of Paniolo Cable Company, LLC

BUYER:

HAWAIIAN TELCOM, INC.

By:

_____

Name:

_____

Title:

_____

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be signed in its corporate name by its duly authorized officer, all as of the date first above written, solely to acknowledge its obligations pursuant to Section 5.3(a) of this Agreement.

**HSBC SECURITIES (USA), INC.**

By:     /s/ Thomas Curran
Name: Thomas Curran
Title:  Managing Director

# EXHIBIT "H"

EXECUTION VERSION

## OPERATIONAL SUPPORT AND SALES SERVICES AGREEMENT

This Operational Support and Sales Services Agreement (this "Agreement") is entered into as of November 30, 2020, but effective only as of the Effective Date (as defined below), by and between Michael Katzenstein, Chapter 11 Trustee for the Bankruptcy Estate of Paniolo Cable Company, LLC, a Delaware limited liability company ("Trustee") and Hawaiian Telcom, Inc., a Hawaii corporation ("HT" or "Service Provider"). The Trustee and HT are each referred to as a "Party" and are collectively referred to as the "Parties".

### RECITALS:

A.     WHEREAS, the Parties have entered into that certain Asset Purchase Agreement dated November 30, 2020 ("APA") pursuant to which the Trustee will sell to HT, and HT will buy from the Trustee, the Purchased Assets as defined in the APA (referred to herein as "the Paniolo Network") that are currently owned by Paniolo Cable Company, LLC ("Debtor"), which transaction ("Proposed Transaction") requires the prior consent of the Federal Communications Commission ("FCC Consent");

B.     WHEREAS, Service Provider is a provider of telecommunications services, with experience in operating and maintaining telecommunications networks, including submarine cables;

C.     WHEREAS, prior to receiving FCC Consent, the Trustee wishes to secure from Service Provider, and Service Provider wishes to provide to the Trustee, certain operational support and sales services in connection with the Trustee's operation of the Paniolo Network;

NOW THEREFORE, in consideration of the mutual promises set forth below and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

### ARTICLE 1
### DEFINITIONS

1.1.     "Affiliate" means any entity that now or in the future, directly or indirectly controls, is controlled with or by, or is under common control with a Party.  For purposes of the foregoing, "control" means the ownership, directly or indirectly, of fifty percent (50%) or more of the voting power to elect directors (or the equivalent thereof, *i.e.,* limited liability company members or managers) of such entity, or such lesser percentage interest if coupled with the power to direct the management of such entity.

1.2.     "Agreement" is defined in the Preamble.

1.3.     "APA" is defined in Recital A.

1.4.     "Bankruptcy Event" means any proceeding (other than the Paniolo Bankruptcy Proceeding) instituted by a Party voluntarily or involuntarily commenced against any Party (and such proceeding is not dismissed or permanently stayed within thirty (30) days): (a) seeking an

order for relief with respect to such Party under any bankruptcy, insolvency, reorganizations or similar law, including the Bankruptcy Code; (b) seeking to appoint a receiver, trustee, custodian, or other similar official for such Party or for any or all of a Party's assets or property; or (c) making an assignment for the benefit of that Party's creditors.

1.5.    "Business Day" means any official working day other than a legal or bank holiday in the State of New York.  Unless otherwise specifically indicated as a "Business Day" the word "days" as used in this Agreement means calendar days.

1.6.    "Capacity" means a designated unit of available network bandwidth including, but not limited to, TDM, Ethernet or optical networking services that the Paniolo Network equipment is capable of providing without incremental capital investment, between Demarcation Points within the Paniolo Network.

1.7.    "Capacity Contracts" means agreements for the provision of Capacity and related services pursuant to terms and conditions agreed to between the Service Provider and a Customer and approved by the Trustee.  For the avoidance of doubt, the Trustee is expressly prohibited from entering into any Capacity Contracts without the prior approval of the Service Provider.

1.8.    "Claims" is defined in Section 6.2.

1.9.    "Confidential Information" means information disclosed by one Party to the other Party under this Agreement that is marked as confidential or would normally under the circumstances be considered the confidential information of the disclosing Party.  Confidential Information does not include information that the recipient already knew, that becomes public through no fault of the recipient, that was independently developed by the recipient, or that was rightfully given to the recipient by another Party.

1.10.    "Customer" means a potential customer that is introduced by Service Provider or Service Provider Affiliate to Trustee and that enters a Capacity Contract with Trustee for Capacity on the Paniolo Network.

1.11.    "Debtor" is defined in Recital A.

1.12.    "Default" is defined in Section 10.

1.13.    "Effective Date" means the latter of:  (a) the date on which this Agreement is fully executed; and (b) the date on which it is approved by the Presiding Judge in the Paniolo Bankruptcy Proceeding.

1.14.    "FCC Consent" is defined in Recital A.

1.15.    "Fiber Strand" means a single strand of fiber on the Paniolo Network.

1.16.    "Force Majeure Event" is defined in Article 11.

1.17.    "HT" is defined in the preamble and includes its successors and permitted assigns.

2

U.S. Bankruptcy Court - Hawaii   #19-00212   Dkt # 313-4   Filed 01/30/20   Page 13 of 53
U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 1-1   Filed 04/04/22   Page 122 of 183

1.18.  "Indemnified Parties" is defined in Section 6.1.

1.19.  "Indemnifying Party" is defined in Section 6.1.

1.20.  "Intellectual Property" means any and all intellectual property (and rights thereto, whether registered or unregistered) and including, technology, patents, rights to inventions, trademarks, service marks, registered designs, copyrights and related rights, database rights, design rights, domain names, trade dress and other intellectual property, and all registrations, applications for registrations, continuations, continuations-in-part, divisional applications, renewals or extensions of, and rights to claim priority from, those rights, and any similar right recognized from time to time in any jurisdiction, together with all rights of action in relation to the infringement of any of the above.

1.21.  "Law" means any national, regional, state or local law, statute, rule, regulation, code, ordinance, administrative ruling, judgment, decree, order or directive of any jurisdiction applicable to this Agreement.

1.22.  "Leased SIC Fiber" means the Paniolo Network Fiber Pairs, leased to SIC by Paniolo pursuant to Section 3.1 and Schedule 1 of the Master Relationship Agreement (as defined below).

1.23.  "Master Relationship Agreement" means that certain Master Relationship Agreement, dated as of March 6, 2020, by and between Sandwich Isles Communications and Debtor.

1.24.  "Network Inventory" is defined in Section 3.5.

1.25.  "Network Inventory Cap" is defined in Schedule B.

1.26.  "Network Inventory Fees" means the fees payable to Service Provider for provision of the Network Inventory as set forth in Section D of Schedule A attached hereto, excluding Service Provider Expenses.

1.27.  "Network Migration Cap" is defined in Schedule B.

1.28.  "Network Migrations Fees" means the fees payable to Service Provider for the provision of Network Migration Services as set forth in Section B of Schedule A attached hereto, excluding Service Provider Expenses.

1.29.  "Network Migration Services" is defined in Section 3.6.

1.30.  "Network Operations Support Fees" means the fees payable to Service Provider for provision of the Network Operations Support Services as set forth in Section A of Schedule A attached hereto, excluding Service Provider Expenses.

1.31.  "Network Operations Support Services" is defined in Section 3.1.

1.32.  "NOC" is defined in Section 3.1.

3

1.33.   "North American Zone Maintenance Authority Agreement" or "NAZ Agreement" means that certain multi-party agreement entered into by Sandwich Isles Communications on April 1, 2012, as amended on January 1, 2019, and subsequently assumed by the Trustee.

1.34.   "On-site Technical Support Fees" means the fees payable to Service Provider for provision of the Network Operations Support Services as set forth in Section B of Schedule A attached hereto, excluding Service Provider Expenses.

1.35.   "On-site Technical Support Services" is defined in Section 3.2.

1.36.   "On-site Technical Support Services Cap" is defined in Schedule B.

1.37.   "Paniolo Bankruptcy Proceeding" means *In re Paniolo Cable Company, LLC, Debtor*, Case No. 18-01319 in the United States Bankruptcy Court for the District of Hawaii.

1.38.   "Paniolo Network" is defined in Recital A.

1.39.   "Party" refers to each of the Trustee and Service Provider, and their respective permitted successors and assigns.

1.40.   "Pre-existing Infrastructure Repair" is defined in Section 3.2(b).

1.41.   "Pre-existing Infrastructure Repair Estimate" is defined in Section 3.2(b).

1.42.   "Pre-existing Infrastructure Repair Cap" is defined in Section 3.2(b).

1.43.   "Proposed Transaction" is defined in Recital A.

1.44.   "Sales Agent Services" is defined in Section 3.4.

1.45.   "Sales Agent Fees" means the fees payable to Service Provider for the provision of Sales Agent Services as set forth in Section E of Schedule A attached hereto.

1.46.   "Sandwich Isles Communications" means Sandwich Isles Communications, Inc., a Hawaii corporation, and its successors and permitted assigns.

1.47.   "Service Provider Expenses" means all of Service Provider's non-labor expenses, such as vehicle costs, tools, business insurance, and other expenses.

1.48.   "Settlement Agreement" means that certain Rule 9019 Settlement Agreement entered into by SIC and Debtor on March 3, 2020.

1.49.   "SIC" mean Sandwich Isles Communications and its Affiliates.

1.50.   "Submarine Cable" mean the fiber-optic cable extending underwater between the beach manholes for those cable segments connecting Kauai to Oahu, Oahu to Molokai, Molokai to Maui, and Maui to Hawaii.

4

1.51.   "Submarine Cable Repair Expenses" mean the expenses payable to third-parties to repair the Submarine Cable pursuant to Sections 3.3 and Schedule A.

1.52.   "Submarine Cable Storage Agreement" means that certain Agreement for the Storage of Spare Plant for the Paniolo Cable System, dated October 22, 2008, by and between Transoceanic Cable Ship Company, Inc. and its successors and assigns, and Sandwich Isles Communications.

1.53.   "Submarine Cable Support Services" is defined in Section 3.3.

1.54.   "Submarine Cable Support Fees" means the fees payable to Service Provider for the provision of Submarine Cable Support Services as set forth in Section C of Schedule A attached hereto, excluding Service Provider Expenses.

1.55.   "Taxes" means any and all applicable federal, state, local, and foreign sales, use, excise, utility, gross receipts, value added, and other taxes, tax-like charges and other assessments and surcharges imposed on a Party.

1.56.   "Term" is defined in Section 2.1.

1.57.   "Transport Services" means DS1, DS3, OC3, OC12, and OC48 circuits provided to Sandwich Isles Communications in connection with the Leased SIC Fiber, pursuant to Section 3.1 of the Master Relationship Agreement.

1.58.   "Trustee" is defined in the Preamble.

## ARTICLE 2
## TERM

2.1.   Term.   This Agreement is effective as of the Effective Date and shall remain in force until terminated pursuant to Section 2.2 ("Term").

2.2.   Termination.   This Agreement may be terminated by either Party upon the Default of the other Party and will terminate automatically (a) upon the closing of the Proposed Transaction or (b) upon termination pursuant to Section 7.1 of the Asset Purchase Agreement.

2.3.   Effect of Termination.   Termination of this Agreement shall not affect the rights or obligations of either Party that have accrued before the date of termination or expiration, and all terms that by their nature should survive expiration or termination of this Agreement shall remain in effect.

## ARTICLE 3
## OPERATIONAL SUPPORT AND SALES SERVICES

3.1.   Network Operations Support Services.

(a)   Subject to the terms, conditions, and restrictions of this Agreement, Service Provider shall provide operational support services, including network operational center ("NOC")

services, network monitoring and management services, provisioning and configuration services, facility security services, and customer support services, as detailed on Schedule A ("Network Operations Support Services"). Service Provider may provide such Network Operations Support Services through Affiliates or third-party subcontractors; provided, however that Service Provider shall remain responsible for performance hereunder.

(b)   The Trustee shall use commercially reasonable efforts to provide Service Provider with electronic and physical access to the Paniolo Network facilities and equipment from the parties who are currently managing the Paniolo Network, including but not limited to, consultants to the Trustee and SIC, as well as all physical plants, central offices, or any other facility or infrastructure used in connection with the Paniolo Network (which shall include enforcing the provisions of the Settlement Agreement).

3.2.   On-site Technical Support Services. Subject to the terms, conditions, and restrictions of this Agreement, Service Provider shall provide routine on-site technical support services requiring and involving the dispatch of a qualified technician, including site access and escort services, network equipment troubleshooting services, and fiber splicing and repair services, and other routine maintenance as necessary and as detailed in Schedule A ("On-site Technical Support Services"). Service Provider may provide such On-site Technical Support Services through Affiliates or third-party subcontractors; provided, however that Service Provider shall remain responsible for performance hereunder.

3.3.   Submarine Cable Support Services.   Subject to the terms, conditions, and restrictions of this Agreement, Service Provider shall provide submarine cable support services as necessary and detailed in Schedule A, including the coordination and facilitation of any required submarine cable repairs using the NAZ Agreement and the inventory of spare cable held under the Submarine Cable Storage Agreement ("Submarine Cable Support Services"). For the avoidance of doubt, the Trustee shall be responsible for all Submarine Cable Repair Expenses, including any and all repairs arising out of pre-existing conditions of the Submarine Cable(s), as outlined under Article V of the APA.

3.4.   Sales Agent Services.   Subject to the terms, conditions, and restrictions of this Agreement, and as set forth in Schedule A, Service Provider is authorized to market Capacity on Trustee's behalf through such reasonable means, as appropriate, including advertising, participation in trade shows, and responses to inquiries ("Sales Agent Services"). Service Provider shall have the right to designate any agreement signed by Trustee as an Assigned Contract under Section 2.1(d)(iv) of the APA.

3.5.   Network Inventory.   Subject to the terms, conditions, and restrictions of this Agreement and the scope and responsibilities as set forth in Schedule A, the Service Provider shall document the utilization of Paniolo Network fiber and conduits and prepare an inventory of provisioned circuits in use on the Paniolo Network ("Network Inventory"). The Parties agree that an accurate Network Inventory is required to provide the Network Operations Support Services, Submarine Cable Support Services, On-site Technical Support Services, and Sales Agent Support Services. The Parties further acknowledge and agree that the Network Inventory is necessary for the timely and proper grooming and migration of SIC's consumption of network assets to align with the Settlement Agreement and Master Relationship Agreement between the Trustee and SIC.

6

Trustee shall use commercially reasonable efforts (which shall include enforcing the terms of the Settlement Agreement) in support of Service Provider's preparation of the Network Inventory.

      3.6.    Network Migration Services.

      (a)    Subject to the terms, conditions, and restrictions of this Agreement, and using information provided by the Trustee and the Network Inventory prepared by the Service Provider under this Agreement, the Service Provider shall perform the migration of existing Fiber Strands and network circuits consumed by SIC onto the Leased SIC Fiber and Transport Services in connection with the SIC Fiber in accordance with the provisions of the Settlement Agreement and Master Relationship Agreement. The Service Provider will develop a network plan, engineering designs, applicable work orders, circuit designs, network inventory, and implementation plan or method of procedure, to complete the migration. Work shall be performed in accordance with industry best practices in maintenance windows coordinated by the Service Provider, acting on behalf of the Trustee. In the event SIC does not have the equipment necessary to interface with the Leased SIC Fiber and related Transport Services, Service Provider and Trustee shall cooperate to determine an appropriate migration scope to achieve the necessary interface, prior to the closing of the Proposed Transaction.

      (b)    Network Migration Services Fees shall be billed to the Trustee on a time and material basis using the labor rates set forth on Schedule A, and payable as set forth in Schedule B hereof.

      3.7.    Assigned Claims. Pursuant to the Asset Purchase Agreement, Trustee agreed to assign to Buyer all Assigned Claims (as defined in the Asset Purchase Agreement). During the term hereof, Service Provider shall have the right, on behalf of Trustee, to pursue such Assigned Claims, and Trustee shall reasonably cooperate with Service Provider in Service Provider's pursuit of such Assigned Claims.

      3.8.    Communications.  Service Provider shall ensure that all communications to Customers, including marketing and sales materials or statements, clearly identify Trustee as the provider of Capacity. No Customer communication shall state or imply that Service Provider owns or controls the Paniolo Network.

      3.9.    Other Services. Service Provider will provide other services requested by Trustee from time to time as agreed upon by the Parties.

      3.10.    Performance Standard. In addition to any specific performance standards set forth in Schedule A, Service Provider shall perform all Services in a professional manner consistent with industry standards and best practices.

      3.11.    Service Provider Expenses. Service Provider is solely responsible for all Service Provider Expenses.

      3.12.    Facilities and Personnel. Services Provider represents that it has and shall maintain adequate facilities, resources, and personnel to perform its obligations hereunder.

7

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 313-4   Filed 04/30/20   Page 13 of 59
U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 1-1   Filed 04/04/22   Page 127 of 183

3.13.   Records. Service Provider shall keep reasonable books and records of all Services provided under this Agreement and shall make such books and records available to Trustee upon reasonable notice and during normal business hours.

3.14.   Network Access; Information Access.  Trustee shall use commercially reasonable efforts provide Service Provider with access to the Paniolo Network and any information relating to the Paniolo Network as reasonably requested by and necessary for Service Provider to provide Services hereunder. Service Provider shall not be liable for any impairment in service caused by its not receiving information or access as required hereunder.

3.15.   No Transfer of Control. Nothing in this Agreement is intended to transfer *de facto* or *de jure* control (as those terms are construed by the U.S. Federal Communications Commission) of the Paniolo Network. Service Provider acknowledges and agrees that it provides all Services hereunder at the direction of the Trustee, and that the Trustee shall retain ownership and control of the Paniolo Network until consummation of the Proposed Transaction.

3.16.   Relationship.  The relationship between Trustee and Service Provider established by this Agreement is that of independent contractors, and nothing herein shall be construed as creating a relationship of employer and employee, partners, joint venturers, franchisor and franchisee, co-owners, or contractor and subcontractor.

## ARTICLE 4
## FEES; TAXES

4.1.   Service Fees.  In exchange for providing services, Trustee shall pay Service Provider the fees in US dollars, excluding applicable taxes, as detailed in Schedule A.

4.2.   Invoicing.  Service Provider shall invoice Trustee upon the Effective Date and at one (1) month intervals thereafter throughout the Term unless otherwise indicated in Schedule B herein.

4.3.   Payment Terms.  Payment shall be made for the services as detailed in Schedule B.

4.4.   Taxes.  From and after the Effective Date, each Party is responsible, as required under applicable Law, for identifying and paying all Taxes (and any penalties, interest, and other additions thereto) that are imposed on that Party upon or with respect to the transactions and payments under this Agreement.  The Parties shall cooperate to minimize adverse tax consequences.

## ARTICLE 5
## LIMITED WARRANTY; LIMITATION OF LIABILITY; EQUITABLE REMEDIES

5.1.   LIMITED WARRANTY.  EXCEPT AS SET FORTH ELSEWHERE IN THIS AGREEMENT, NEITHER PARTY MAKES ANY WARRANTIES, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, WITH RESPECT TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING ANY WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

8

5.2.    Limitation on Liability.  Subject to Section 5.3, no Party shall be liable under this Agreement, whether in contract, tort (including negligence and strict liability) or otherwise for any special, indirect, punitive, reliance, or consequential damages (whether or not such losses were within the contemplation of the Parties) suffered or incurred by the other Party.

5.3.    Limitation on Liability Not Applicable.  Nothing in this Agreement shall exclude or limit any Party's liability:

(a)    For death or personal injury resulting from the negligence or willful misconduct of a Party or their servants, other agents or employees;

(b)    For fraud and/or fraudulent misrepresentation;

(c)    For misuse of Confidential Information;

(d)    Under Article 7 (Indemnification);

(e)    For payment of sums properly due and owing to the other in the course of normal performance; or

(f)    For matters which cannot be excluded under applicable Law.

5.4.    Subject to Section 5.2 and Section 5.3, each Party's maximum liability under or in connection with this Agreement shall be limited to direct damages proven.

5.5.    The Parties acknowledge and agree that a breach or threatened breach of a material term or condition of this Agreement may cause the non-breaching Party irreparable harm, and accordingly such Party shall be entitled to seek equitable relief.

## ARTICLE 6
## INDEMNIFICATION

6.1.    Each Party (as "Indemnifying Party") shall indemnify, defend and hold harmless the other Party, its employees, officers, directors, members, subcontractors and agents (the "Indemnified Parties") as provided herein.

6.2.    Trustee shall indemnify Service Provider Indemnified Parties from and against all third-party liability, loss, cost, damage, expense, or cause of action of any nature whatsoever (including the infringement of any third-party Intellectual Property, environmental damages, property damage, and personal injury (including death), together with expenses (including reasonable attorneys' fees and court costs through appeal) (collectively, "Claims"), arising from Trustee's gross negligence or willful misconduct in connection with performance by Trustee of its obligations (or breach thereof).

6.3.    Service Provider shall indemnify Trustee Indemnified Parties from and against all Claims (including, for the avoidance of doubt, Customer Claims), arising from Service Provider's performance of its obligations (or breach thereof) hereunder or from Service Provider's statements,

9

representations, assumption of obligations, or other communications or commitments made by Service Provider to a Customer without the approval of Trustee.

6.4.    In connection with the indemnification provided pursuant to this Article 6, the Indemnified Party shall:  (a) promptly notify the Indemnifying Party in writing of any Claim and grant the Indemnifying Party control of the defense and all related settlement negotiations; and (b) cooperate with the Indemnifying Party, at its expense, in defending or settling such Claim; provided that if any settlement results in any ongoing liability to, or prejudices or detrimentally impacts the Indemnified Party, and such obligation, liability, prejudice, or impact can reasonably be expected to be material, then such settlement shall require the Indemnified Party's written consent.  In connection with any Claim, the Indemnified Party may have its own counsel in attendance at all public interactions and substantive negotiations at its own cost and expense.

## ARTICLE 7
## INSURANCE

7.1    During the Term, each Party, at its sole costs and expense, will obtain and maintain with financially reputable insurers that are licensed to do business in all jurisdictions where any work is performed and that hold a current rating of not less than A-, (according to A.M. Best), not less than the following insurance coverages, which may be satisfied through a combination of primary and excess (umbrella policies):

(a)    Workers' Compensation, as provided for under any Worker's compensation or similar Law in the jurisdiction where any work is performed with an Employer's Liability limit of not less than $500,000 for each incident;

(b)    Commercial General Liability, including coverage for Contractual Liability and Products/Completed Operations Liability, with a limit of not less than $1,000,000 per occurrence for bodily injury, personal injury and property damage liability;

(c)    "All Risk" Property Insurance covering not less than the full replacement cost of a Party's personal property while on the other Party's site;

(d)    Business Auto Insurance covering the ownership, maintenance or use of any owned, non-owned or hired automobile with a limit of not less than $1,000,000 combined single limit per accident for bodily injury and property damage liability;

(e)    "All Risk or Special Form" Property Insurance covering not less than the full replacement cost of a Party's property including business interruption; and

(f)    Umbrella form excess liability insurance with limits of not less than $5,000,000.

7.2    Each insurance policy, except Workers' Compensation and Property Insurance, will include each Party as an additional insured and loss payee for their acts or omissions under the Agreement.

10

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 313-4   Filed 01/30/20   Page 59 of 59
U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 1-1   Filed 04/04/22   Page 130 of 183

7.3     Each insurance policy shall contain a waiver of subrogation in favor of the other Party.

7.4     Each insurance policy shall be endorsed to give the other Party at least thirty (30) calendar days' prior written notice of cancellation.

7.5     Each Party's insurance will be primary for their own acts or omissions.

7.6     Nothing contained herein limits either Party's liability to the other Party to the limits of insurance certified or carried.

7.7     Each Party shall provide proof of insurance either in the form of a Certificate of Insurance (ACORD form 25 or equivalent).  Such proof shall be provided within fifteen (15) calendar days of the Effective Date, and again within fifteen (15) calendar days of the renewal or replacement of each policy.

## ARTICLE 8
## NOTICES

All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by a reputable overnight courier service, by facsimile or registered or certified mail (postage prepaid, return receipt requested) to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Article 9).  Deliveries made after normal business hours or on a non-Business Day shall be deemed delivered on the next Business Day.

| | |
|---|---|
| If to the Trustee: | Michael Katzenstein, Trustee<br>Bankruptcy Estate of Paniolo Cable Company, LLC<br>c/o FTI Consulting, Inc.<br>Three Times Square, 9th Floor<br>New York, New York 10036 |
| With a copy to: | Goodsill Anderson Quinn & Stifel LLP<br>999 Bishop Street, Suite 1600<br>Honolulu, Hawaii 96813<br>Attn: Johnathan C. Bolton |
| If to Service Provider: | Cincinnati Bell Inc.<br>221 East Fourth Street<br>Cincinnati, Ohio 45202<br>Attn: Mark J. Fahner |
| With a copy to: | Morgan Lewis & Bockius LLP<br>1111 Pennsylvania Avenue, N.W.<br>Washington, DC 20004<br>Attn: Andrew M. Ray |

A Party may change its address and point of contact by notifying the other Party in writing in accordance with this Article.

## ARTICLE 9
## CONFIDENTIALITY

9.1.    Each Party shall preserve the other Party's Confidential Information provided to it hereunder with the same degree of care in protecting its own Confidential Information, but in no event less than a reasonable standard of care shall be used. A Party shall not disclose the other Party's Confidential Information without the prior written consent of the disclosing Party, except that each Party may disclosure the other Party's Confidential Information to its employees with a need to know for purposes of performance and to its professional advisors; provided that such employees and professional advisors are under an obligation of confidentiality consistent with this Section 9.1. A receiving Party may also disclose certain Confidential Information of the disclosing Party, without violating the obligations of this Agreement, to the extent such disclosure is required by a valid order of a court or other governmental body having jurisdiction, *provided that* the receiving Party provides the disclosing Party with reasonable prior written notice of such disclosure (if legal to do so) and, if requested by the disclosing Party, assists such Party in obtaining a protective order preventing or limiting the disclosure and/or requiring that the Confidential Information so disclosed be used only for the purposes for which the law or regulation requires, or for which the order was issued.

(a)    Nothing herein shall be construed as granting any right or license under any Intellectual Property now or hereafter owned, licensed or controlled by a Party to the other Party.

(b)    The receiving Party shall not, without first obtaining written consent of the disclosing Party, use any service mark, logo, trademark, trade name, or other Intellectual Property of the disclosing Party or refer to the other Party in any promotional activity except as authorized in this Agreement. For the avoidance of doubt, a breach of this provision shall be a material breach of this Agreement, entitling the non-breaching Party to exercise all rights available under this Agreement or applicable Law. Notwithstanding the foregoing, Service Provider shall have a license to use the trade names and trademarks of the Trustee in order to perform its rights and duties hereunder.

9.2.    The provisions of this Article 10 shall survive expiration or other termination of this Agreement.

## ARTICLE 10
## DEFAULT

10.1.    A "Default" shall be deemed to have occurred under this Agreement if a Party:

(a)    violates any applicable Law with respect to its rights and obligations under this Agreement;

(b)    fails to perform any of its material obligations under this Agreement or the APA; or

(c)   undergoes a Bankruptcy Event.

10.2.   In the event of any Default hereunder, the non-Defaulting Party may terminate this Agreement upon written notice to the Defaulting Party; provided, however, that the non-Defaulting party must first provide the Defaulting Party with a default notice specifying in reasonable detail the nature of such breach, and such breach shall have continued without cure for a period of thirty (30) days after the Defaulting Party's receipt of such written notice of breach. For the avoidance of doubt, a Party's failure to make any payment that has not been disputed in good faith in writing within thirty (30) days of receiving a notice of payment due or an invoice, when due hereunder, shall be deemed a material breach of this Agreement.

10.3.   The non-Defaulting Party may (subject to Article 6) pursue any legal remedies it may have under this Agreement, applicable Law, or principles of equity.

10.4.   A waiver by either Party at any time of any of its rights as to anything herein contained shall not be deemed to be a waiver of any breach of covenant or other matter subsequently occurring.

## ARTICLE 11
## FORCE MAJEURE

Solely with respect to the matters governed by this Agreement, and without effecting any other agreements between the Parties, in no event shall a Party have any claim or right against the other for any failure of performance (other than a failure to pay any amount due) due to causes beyond its control (a "Force Majeure Event") including:  acts of God, fire, explosion, vandalism, adverse weather conditions, flood or other similar occurrences; any change in Law; national emergencies; pandemic; insurrections; riots; wars; terrorism; strikes, lock-outs, work stoppages, or other labor difficulties (other than those of a Party's own workforce); or any other cause or circumstance, whether of a similar or dissimilar nature to the foregoing, beyond the reasonable control of the affected Party.

## ARTICLE 12
## GOVERNING LAW; DISPUTE RESOLUTION

12.1.   This Agreement is governed by the laws of the State of New York, without regard to conflict of laws principles.

12.2.   The Parties will attempt to resolve any dispute arising out of this Agreement promptly through discussions between authorized senior representatives with the power to resolve the dispute. All negotiations conducted by such representatives shall be confidential and shall be treated as compromise and settlement negotiations for purposes of federal and state rules and regulations. If the disputing Parties fail to resolve such dispute within thirty (30) days of the non-disputing Party's receipt of the written notice, either such Party may initiate legal action as set forth below.

12.3.   Failing resolution of a dispute in accordance with Section 12.2 above and notwithstanding anything to the contrary contained in this Agreement, the Parties hereby irrevocably agree that any disputes arising out of this Agreement shall be adjudicated in the Paniolo

13

Bankruptcy Proceeding, and each Party hereby agrees to the personal and exclusive jurisdiction of such court.  The prevailing Party in any litigation shall be entitled to its costs and reasonable attorneys' fees.

## ARTICLE 13
## REPRESENTATIONS, WARRANTIES AND FURTHER OBLIGATIONS

13.1.  Each Party represents and warrants that as of the Effective Date:

(a)  it has the full right and authority to enter into, execute, deliver and perform its obligations under this Agreement;

(b)  this Agreement constitutes a legal, valid and binding obligation enforceable against such Party in accordance with its terms, subject to bankruptcy, insolvency, creditors' rights and general equitable principles; and

(c)  its execution of and performance under this Agreement does not violate any applicable existing regulations, rules, statutes or court orders of any local, state or federal government agency, court or body.

13.2.  During the Term, each Party shall secure and maintain all necessary permits, licenses, and other authorizations required to perform its obligations and enjoy its rights as provided under this Agreement.

13.3.  During the Term, each Party shall comply with all applicable Laws including the U.S. Foreign Corrupt Practices Act of 1977, all export control regulations, and the rules and regulations of the Federal Communications Commission.

## ARTICLE 14
## GENERAL PROVISIONS

14.1.  Binding Agreement.  This Agreement shall be binding upon and inure solely to the benefit of the Parties and their respective permitted successors and assigns.

14.2.  Waiver. A Party may (a) extend the time for the performance of any of the obligations or other acts of any other Party, (b) waive any inaccuracies in the representations and warranties of any other Party contained herein or in any document delivered or made available by the other Party pursuant hereto or (c) waive compliance with any of the agreements of the other Party or conditions to such Party's obligations contained herein.  Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the Party to be bound thereby.  Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement.  The failure of a Party to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

14.3.  Assignment.  Neither Party may assign this Agreement without the prior written consent of the other Party.  Any purported assignment in contravention of this Section 14.3 shall be void.

14.4.   Interpretation.  In this Agreement, except to the extent otherwise provided or that the context otherwise requires:

(a)   the headings in this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(b)   whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

(c)   the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms, all tenses, and both noun and verb forms, as context dictates; and

(d)   when calculating the period of time before which, within which or following which any act is to be done or any step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded, and if the last day of such period is not a Business Day, the period shall end on the immediately following Business Day.

14.5.   Joint Participation. The Parties have participated jointly in the negotiation and drafting of this Agreement and each has been represented by counsel of its choosing and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

14.6.   Entire Agreement. This Agreement, together with the Asset Purchase Agreement, constitutes the entire and final agreement and understanding between the Parties with respect to the subject matter hereof and supersedes all prior agreement relating to the subject matter hereof, which are of no further force or effect.

14.7.   Amendment.  This Agreement may not be amended or modified except by an instrument in writing signed by both Parties.

14.8.   Invalidity.  If any term, obligation or other provision of this Agreement is invalid, illegal or incapable of being enforced due to any applicable Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect for so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to either of the Parties.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated by this Agreement are consummated as originally contemplated to the greatest extent.

14.9.   Third Party Beneficiaries. Except as otherwise expressly provided, nothing in this Agreement expressly or impliedly provided any third party with any remedy, claim, liability, reimbursement, cause of action or other right or privilege.

14.10.  <u>Further Actions</u>.  The Parties agree to provide such additional information and take such additional action, including the execution of and delivery of further agreements, instruments, and other documents, as may be reasonably necessary to carry out the purposes of this Agreement.

14.11.  <u>Counterparts and Electronic Signatures</u>.  This Agreement may be executed and delivered (including by facsimile or other means of electronic transmission, such as by electronic mail in "pdf" form) in counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one-and-the-same agreement.

*[The rest of this page is left intentionally blank]*

16

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 313-4   Filed 11/30/20   Page 56 of 58
U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 1-1   Filed 04/04/22   Page 156 of 183

In witness whereof, and intending to be legally bound hereby, the Parties have executed this Agreement as of the dates identified below.

MICHAEL KATZENSTEIN, CHAPTER 11 TRUSTEE FOR THE BANKRUPTCY ESTATE OF PANIOLO CABLE COMPANY, LLC

By: _____

Title: _____

Date: _____

HAWAIIAN TELCOM, INC.

By: _____

Title: Leigh Fox
Date: Chief Executive Officer

In witness whereof, and intending to be legally bound hereby, the Parties have executed this Agreement as of the dates identified below.

MICHAEL     KATZENSTEIN,     CHAPTER     11
TRUSTEE FOR THE BANKRUPTCY ESTATE OF
PANIOLO CABLE COMPANY, LLC

By: _____

Title: _____

Date: _____


HAWAIIAN TELCOM, INC.

By: _____

Title: _____

Date: _____

DB1/ 116844838.9

19

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 313-4  Filed 11/30/20  Page 58 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 1-1  Filed 04/04/22  Page 138 of 183

STATE OF HAWAIʻI
DEPARTMENT OF HAWAIIAN HOME LANDS

January 18, 2022

**Electronically Filed**
**FIRST CIRCUIT**
**1CCV-22-0000321**
**18-MAR-2022**
**05:07 PM**
**Dkt. 8 EXH**

To:         Chairman and Members, Hawaiian Homes Commission

From:       Cedric Duarte, ICRO

Subject:    For Information Only – Update on issues related to Telecommunications
            and Broadband services on Hawaiian Home Lands

RECOMMENDED ACTION

None. For information only.

Discussion

This informational briefing is to update the Hawaiian Homes Commission (HHC) on
the status of the Department of Hawaiian Home Lands (DHHL) issues related to
Telecommunications and Broadband services on Hawaiian Home Lands.

PURPOSE


BACKGROUND

DHHL has informed its lessees, tenants, and permittees that under Federal law they may
obtain broadband telecommunications services from any provider of their choice.

For many years, Sandwich Isle Communications, Inc. (SIC) was the exclusive provider of
broadband telecommunications services under DHHL License No. 372 (License 372)
which was issued to SIC's parent company, Waimana Enterprises, Inc. on May 9, 1995.

On June 30, 2017, the Federal Communications Commission (FCC) adopted a
Memorandum Opinion and Order determining that all exclusivity claims arising from
License 372 are preempted by Federal law and are therefore unenforceable.

Subsequently, on August 31, 2021, Hawaiian Telcom (HT) completed the purchase of
inter-island submarine and middle-mile terrestrial fiber infrastructure assets from the
bankruptcy estate of the Paniolo Cable Company, a firm previously within the Waimana
Enterprises, Inc family of companies.

HT's purchase of the bankrupt Paniolo Cable Company assets did not include any
previously negotiated commercial agreements with SIC. Use of the inter-island submarine

- 1 -

**EXHIBIT G**

ITEM NO. C-3

and middle-mile system by SIC to provide broadband telecommunications services to Hawaiian Home Lands will end on March 31, 2022, unless a new agreement can be reached.

The FCC's 2017 Order, combined with HT's purchase of telecommunications assets on DHHL lands, means that DHHL lessees, tenants, and permittees now have more options for broadband telecommunications services.  In addition, a new conduit use agreement between SIC and Charter Communications, which does business as Spectrum in Hawai'i, will also open additional services.

Current SIC customers may choose to continue their current service or select services from other providers, including Hawaiian Telcom, Spectrum, or other carriers who can provide broadband telecommunications services.

DHHL will receive at least $90 million from the Infrastructure Investment and Jobs Act to provide high-speed internet access to the Native Hawaiian community. In 2021, the Department received the last of five neighbor islands licenses from the FCC to access the 2.5 GHz band spectrum for the development of wireless broadband networks. Details on the Department's expansion plan for broadband services are anticipated for late 2022.



DAVID Y. IGE
GOVERNOR
STATE OF HAWAII

JOSH GREEN
LT. GOVERNOR
STATE OF HAWAII

WILLIAM J. AILA, JR.
CHAIRMAN
HAWAIIAN HOMES COMMISSION

TYLER I. GOMES
DEPUTY TO THE CHAIRMAN

## STATE OF HAWAII
## DEPARTMENT OF HAWAIIAN HOME LANDS
P. O. BOX 1879
HONOLULU, HAWAII 96805

January 14, 2022

Name
Address
City, State, Zip code

Dear Lessee:

Subject:     Broadband Services Update on Hawaiian Home Lands

This letter is to inform you that in accordance with a Federal Communications Commission (FCC) Memorandum Opinion and Order adopted on June 30, 2017, the Department of Hawaiian Home Lands (DHHL), will no longer enforce the exclusivity provision of DHHL License Agreement No. 372, issued to Waimana Enterprises, Inc. on May 9, 1995.

Waimana Enterprises, Inc. is Sandwich Isle Communications, Inc.'s (Sandwich Isles) parent company from who you mave have telephone and internet services.

In the past, DHHL lessees were prevented from obtaining telecommunications services from any other carrier besides Sandwich Isles. As a result of the lifting of the former exclusivity provision, lessees on Hawaiian Home Lands are now able to choose who to receive these services from.

Current Sandwich Isles customers may choose to continue to use their existing service or may select services from other provides, including Hawaiian Telcom, Spectrum, or other carriers who can bring service to your lot. It is important to note that some service providers may not be able to provide all services immediately.

Please feel free to call (808) 620-9500 should you have additional questions or concerns.

Aloha,

William J. Ailā, Jr.
Chair, Hawaiian Homes Commission

cc:



DAVID Y. IGE
GOVERNOR
STATE OF HAWAII

JOSH GREEN
LT. GOVERNOR
STATE OF HAWAII

WILLIAM J. AILA, JR
CHAIRMAN
HAWAIIAN HOMES COMMISSION

TYLER I. GOMES
DEPUTY TO THE CHAIRMAN

**STATE OF HAWAII**
**DEPARTMENT OF HAWAIIAN HOME LANDS**
P. O. BOX 1879
HONOLULU, HAWAII  96805

January 14, 2022

Name
Address
City, State, Zip code

Dear Lessee:

Subject:       Broadband Services Update on Hawaiian Home Lands

This letter is to inform you that in accordance with a Federal Communications Commission (FCC) Memorandum Opinion and Order adopted on June 30, 2017, the Department of Hawaiian Home Lands (DHHL), will no longer enforce the exclusivity provision of DHHL License Agreement No. 372, issued to Waimana Enterprises, Inc. on May 9, 1995.

Waimana Enterprises, Inc. is Sandwich Isle Communications, Inc.'s (Sandwich Isles) parent company from whom many of you have telephone and internet services.

In the past, DHHL General Lessees and Permittees were prevented from obtaining telecommunications services from any other carrier besides Sandwich Isles. As a result of the lifting of the former exclusivity provision, tenants on Hawaiian Home Lands are now able to choose who to receive these services from and would not be in violation of their Lease, License, or Right-Of-Entry agreement.

Current Sandwich Isles customers may choose to continue to use their existing service or may select services from other provides, including Hawaiian Telcom, Spectrum, or other carriers who can bring service to your business. It is important to note that some service providers may not be able to provide all services immediately.

Please feel free to call (808) 620-9500 should you have additional questions or concerns.

Aloha,

William J. Ailā, Jr.
Chair, Hawaiian Homes Commission

cc:

CADES SCHUTTE
A Limited Liability Law Partnership
C. MICHAEL HEIHRE          1307
THEODORE D. C. YOUNG     5735
TRISHA H.S.T. AKAGI       10186
1000 Bishop Street, Suite 1200
Honolulu, HI 96813-4212
Telephone: (808) 521-9200
Facsimile: (808) 521-9210
Email: mheihre@cades.com
        tyoung@cades.com
        takagi@cades.com

MORGAN, LEWIS & BOCKIUS LLP
ANDREW J. GALLO (admitted *pro hac vice*)
One Federal Street
Boston, MA 02110-1726
Telephone: +1 (617) 951-8117
Email: andrew.gallo@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
ANDREW M. RAY (admitted *pro hac vice*)
1111 Pennsylvania Avenue, NW
Washington DC 20004
Telephone: +1 (202) 373-6585
Email: andrew.ray@morganlewis.com

Attorneys for Defendant
HAWAIIAN TELCOM, INC.

**Electronically Filed**
**FIRST CIRCUIT**
**1CCV-22-0000321**
**18-MAR-2022**
**05:07 PM**
**Dkt. 9 EXH**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re: | Case No. 18-01319 (RJF) |
| PANIOLO CABLE COMPANY, LLC, | Chapter 11 |
| Debtor. | |

## EXHIBIT H

SANDWICH ISLES
COMMUNICATIONS, INC.,

           Plaintiff,

vs.

MICHAEL KATZENSTEIN, AS
CHAPTER 11 TRUSTEE;
HAWAIIAN TELCOM INC.,

           Defendants.

Adversary No. 21-90017

DEFENDANT HAWAIIAN TELCOM,
INC.'S **MOTION FOR SUMMARY
JUDGMENT**; MEMORANDUM IN
SUPPORT OF MOTION; CERTIFICATE
OF SERVICE

HEARING:
Date:    January 14, 2022
Time:    10:00 a.m.
Judge:  Honorable Robert J. Faris

## HAWAIIAN TELCOM, INC.'S
## MOTION FOR SUMMARY JUDGMENT

      Defendant Hawaiian Telcom, Inc. ("HTI"), by and through its counsel, respectfully moves this Court for summary judgment as to all claims asserted against HTI in Plaintiff Sandwich Isles Communications, Inc.'s ("SIC" or "Plaintiff") Complaint [Dkt. 477], filed herein on October 12, 2021 (the "Complaint").

      In its Complaint, SIC seeks to enforce the following four agreements (collectively, the "SIC Agreements"):

    (1)    Rule 9019 Settlement Agreement (Post-Judgment) (the "Settlement Agreement") by and between the Chapter 11 Trustee, Michael Katzenstein (the "Trustee"), the Paniolo Creditors, Waimana Enterprises, Inc., SIC and the SIC Affiliates, approved by this Court on June 4, 2020, *see* Concurrently-filed Concise Statement of Facts ("CSF") ¶ 1;

(2)     Master Relationship Agreement ("<u>MRA</u>") by and between SIC and Paniolo Cable Company, LLC ("<u>Paniolo</u>" or "<u>Debtor</u>"), *see* CSF ¶ 4;

(3)     SIC Lease by and between SIC and Paniolo, which was included as Schedule 1 to the MRA, *see* CSF ¶ 5; and

(4)     Assets IRU by and between SIC and Paniolo, which was included as Schedule 2 to the MRA , *see* CSF ¶ 6.

HTI is not a party to any of the SIC Agreements, nor have any of the SIC Agreements been assigned by the Trustee to HTI. HTI did not otherwise assume or agree to be bound by the terms of those agreements. It thus "goes without saying that [the SIC Agreements] cannot bind [HTI,] a nonparty." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002). Accordingly, SIC's claims to enforce the SIC Agreements and for breach of those same agreements, as against HTI, fail as a matter of law.

This Motion is made pursuant to Rule 56 of the Federal Rules of Civil Procedure, as made applicable to this case by Rule 7056 of the Federal Rules of Bankruptcy Procedure and LBR 7056-1, and is supported by the attached memorandum in support, the separately filed concise statement of undisputed material facts and the attached declaration, as well as the pleadings and records on file herein.

DATED:  Honolulu, Hawaii, November 16, 2021.

**CADES SCHUTTE**
**A Limited Liability Law Partnership**

/s/  *Trisha H.S.T. Akagi* _____
C. MICHAEL HEIHRE
THEODORE D. C. YOUNG
TRISHA H.S.T. AKAGI

and

**MORGAN, LEWIS & BOCKIUS LLP**
ANDREW J. GALLO
ANDREW M. RAY

Attorneys for Defendant
HAWAIIAN TELCOM, INC.

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re | CASE NO. 18-01319 |
| | (Chapter 11) |
| PANIOLO CABLE COMPANY, LLC, | |
| Debtor. | |
| | |
| SANDWICH ISLES | Adversary No. 21-90017 |
| COMMUNICATIONS, INC., | |
| Plaintiff, | **MEMORANDUM IN SUPPORT OF MOTION** |
| vs. | |
| MICHAEL KATZENSTEIN, AS CHAPTER 11 TRUSTEE; HAWAIIAN TELCOM INC., | |
| Defendants. | |

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ........................................................................1

II.   RELEVANT FACTUAL BACKGROUND ...................................2

    A.   Paniolo's bankruptcy and the Trustee's acquisition of certain
       SIC assets ..........................................................................2

    B.   SIC enters into the SIC Agreements .......................................2

    C.   HTI purchases substantially all of the Debtor's assets but chose
       not to designate any of the SIC Agreements. ...........................3

III.   LEGAL STANDARD ..............................................................4

IV.   ARGUMENT ..........................................................................5

    A.   Count I (declaratory judgment) fails as a matter of law. ....................6

    B.   Count II (specific performance) fails as a matter of law.....................8

       1.   Specific performance is not an independent claim. ..................8

       2.   SIC cannot maintain a claim against HTI for breach of
          the SIC Agreements. ..................................................9

       3.   SIC could not maintain a claim against HTI for breach of
          the SIC Agreements even if HTI was an agent of the
          Trustee...................................................................9

    C.   Count III (damages) fails as a matter of law. ...................................11

V.   CONCLUSION.......................................................................12

-i-

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. Unione Mediterranea Di Sicurta*,
  364 F.3d 646 (5th Cir. 2004) .................................................................6

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).................................................................................5

*In re Barboza*,
  545 F.3d 702 (9th Cir. 2008) ..................................................................5

*Baskin v. EC Paia LLC*,
  Civil No. 20-00216 WRP, 2020 WL 9762819 (D. Haw. Aug. 31,
  2020) ........................................................................................................8

*Broussard v. Univ. of Cal. at Berkeley*,
  192 F.3d 1252 (9th Cir. 1999) ................................................................4

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).................................................................................4

*Dairy Rd. Partners v. Maui Gas Ventures, LLC*,
  Civ. No. 16-00611DKW-KJM, 2018 WL 1244147 (D. Haw. Mar.
  9, 2018) ....................................................................................................9

*In re Dehon, Inc.*,
  352 B.R. 546 (Bankr. D. Mass. 2006) ....................................................7

*Double C Entmt., Inc. v. Palace Theatre Operating Grp., LLC*,
  Civil Action No. 3:11-CV-98-CRS, 2011 WL 5903606 (W.D. Ky.
  Nov. 25, 2011) .......................................................................................11

*E.E.O.C. v. Waffle House, Inc.*,
  534 U.S. 279 (2002)............................................................................6, 8

*In re Family Snacks, Inc.*,
  257 B.R. 884 (B.A.P. 8th Cir. 2001) ......................................................7

*JMB Mfg., Inc. v. Child Craft, LLC,*
   799 F.3d 780 (7th Cir. 2015) ............................................................10

*Laeroc Waikiki Parkside, LLC v. K.S.K. (Oahu) Ltd. P'ship,*
   115 Hawai'i 201, 166 P.3d 961 (2007)............................................10

*Matsushita Elec. Indus. Co. v. Zenith Radio,*
   475 U.S. 574 (1986)............................................................................5

*RSMCFH, LLC v. FareHarbor Holdings, LLC,*
   361 F. Supp. 3d 981 (D. Haw. 2019)..................................................9

*Soremekun v. Thrifty Payless, Inc.,*
   509 F.3d 978 (9th Cir. 2007) ..............................................................4

*Stanley v. Univ. of S. Calif.,*
   178 F.3d 1069 (9th Cir. 1999) ..........................................................11

*In re Thane Int'l, Inc.,*
   586 B.R. 540 (Bankr. D. Del. 2018)...................................................7

*Vandiver Food Stores, Inc. v. Insurance Co. of N. Am.,*
   909 F. Supp. 618 (E.D. Ark. 1995)...................................................10

*Villiarimo v. Aloha Island Air, Inc.,*
   281 F.3d 1054 (9th Cir. 2002) ............................................................5

*Walz v. Todd & Honeywell, Inc.,*
   195 A.D.2d 455 (N.Y. App. Div. 1993) ...........................................10

**Other Authorities**

Fed. R. Civ. P. 56(a)................................................................................4

## MEMORANDUM IN SUPPORT OF MOTION

### I.      INTRODUCTION

Defendant Hawaiian Telcom, Inc. ("HTI") respectfully moves this Court for summary judgment as to all claims asserted against HTI in Plaintiff Sandwich Isles Communications, Inc.'s ("SIC" or "Plaintiff") Complaint [Dkt. 477], filed herein on October 12, 2021 (the "Complaint").  In its Complaint, SIC seeks to enforce, and damages for the alleged breaches of, the following four agreements (collectively, the "SIC Agreements"):

(1)     Rule 9019 Settlement Agreement (Post-Judgment) (the "Settlement Agreement") by and between the Chapter 11 Trustee, Michael Katzenstein (the "Trustee"), the Paniolo Creditors,[1] Waimana Enterprises, Inc., SIC and the SIC Affiliates,[2] approved by this Court on June 4, 2020, *see* Concurrently-filed Concise Statement of Facts ("CSF") ¶ 1;

(2)     Master Relationship Agreement ("MRA") by and between SIC and Paniolo Cable Company, LLC ("Paniolo" or "Debtor"), *see* CSF ¶ 4;

(3)     SIC Lease by and between SIC and Paniolo, which was included as Schedule 1 to the MRA, *see* CSF ¶ 5; and

(4)     Assets IRU by and between SIC and Paniolo, which was included as Schedule 2 to the MRA, *see* CSF ¶ 6.

---

[1] The "Paniolo Creditors" consist of HSBC Securities (USA) Inc., Sunrise Partnership Limited Partnership and Deutsche Bank Trust Company Americas. *See* CSF ¶ 2.

[2] The "SIC Affiliates" include Clearcom, Inc. Pa Makani LLC and Hoʻopaʻa Insurance Corp.  *See* CSF ¶ 3.

Fatal to SIC's claims against HTI is the fact that HTI is not a party to any of the SIC Agreements nor did HTI assume or otherwise agree to be bound by the terms of any of those agreements.  CSF ¶¶ 1-6.  Thus, as against HTI, SIC's claims to enforce and for breaches of the SIC Agreements fail as a matter of law.

## II.    RELEVANT FACTUAL BACKGROUND

### A.    Paniolo's bankruptcy and the Trustee's acquisition of certain SIC assets

On January 30, 2019, the Court entered its Order for Relief in an Involuntary Case and appointed the Trustee.  CSF ¶ 7.

On or about February 4, 2020, the U.S. Marshal for the District of Hawaii levied upon certain real and personal property assets of SIC (the "A.2 Assets") pursuant to a *Writ of Execution to the United States Marshal* issued by this Court in the related adversary proceeding of *Michael Katzenstein v. Sandwich Isles Communications, Inc.* (Adv. Pro. 19-90022) (the "AP").  *See* CSF ¶ 8.  On March 6, 2020, the United States Marshal conducted a sale of the A.2 Property via public auction (the "Execution Sale").  *See* CSF ¶ 9.  Shortly thereafter, on March 16, 2020, the Court entered its order ratifying, approving, and confirming the sale of the A.2 Property to the Debtor, as the highest auction bidder.  *See* CSF ¶ 10.

### B.    SIC enters into the SIC Agreements

On June 4, 2020, the Court entered its Order Granting Michael Katzenstein, as Chapter 11 Trustee's Motion to Approve Settlement Agreement Pursuant to

Federal Rule of Bankruptcy Procedure 9019.  CSF ¶ 11.  The order approved the Settlement Agreement by and between the Trustee, the Paniolo Creditors, Waimana Enterprises, Inc., SIC, and the SIC Affiliates.  CSF ¶ 12.

In connection with the Settlement Agreement, SIC and the Trustee entered into the MRA.  CSF ¶ 13.  Schedule 1 to the MRA is the SIC Lease by and between the Trustee as Lessor and SIC as Lessee.  CSF ¶ 4.  Schedule 2 to the MRA is the Assets IRU, also by and between the Trustee and SIC.  CSF ¶ 5.

### C.   HTI purchases substantially all of the Debtor's assets but chose not to designate any of the SIC Agreements.

On November 30, 2020, the Trustee filed his Motion for Entry of an Order (A) Authorizing and Approving the Sale of the Debtor's Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (B) Approving the Asset Purchase Agreement, (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection With the Sale, (D) Approving the Operational Support and Sales Services Agreement, (E) Approving a Break-Up Fee and Expense Reimbursement, and (F) Granting Related Relief (the "Sale Motion").  CSF ¶ 14.  On December 28, 2020, the Court entered its order approving the Sale Motion (the "Sale Order").  CSF ¶ 15.

The Sale Order authorized and approved the sale of substantially all of Debtor's assets pursuant to the Asset Purchase Agreement ("APA"), which was attached to the Sale Order as Exhibit A.  CSF ¶ 16.  Schedule 1.1(a) of the APA

identified "Assignable Contracts," certain contracts of the Debtor that HTI, as the purchaser, could elect to assume but had no obligation to do so. *See* CSF ¶¶ 18. Included in the list of Assignable Contracts were the SIC Agreements. *See* CSF ¶ 19.

On August 31, 2021, the sale authorized by the Sale Order (the "Sale") closed after the Federal Communications Commission approved the transaction. *See* CSF ¶ 20. At Closing, HTI did not include any of the SIC Agreements as Designated Contracts to be assumed by HTI. *See* CSF ¶ 21.

## III.   LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999). A "party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as

to the material facts [and] come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (quotations omitted). The "mere allegations or denials of [the party's] pleading" are not enough. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

An issue is "'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. For an inference to be reasonable, there must be "sufficient probative evidence to permit a finding in favor of the opposing party based on more than mere speculation, conjecture, or fantasy." *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 n.10 (9th Cir. 2002).

## IV.   **ARGUMENT**

In its Complaint, SIC seeks to enforce the SIC Agreements against HTI, *see* Compl. ¶¶ 46, 49, as well as damages for the Trustee's alleged breaches of the SIC Agreements, *see id.* ¶¶ 53-54. Since HTI is neither a party to the SIC Agreements

nor did HTI agree to be bound by the SIC Agreements, all of SIC's claims against HTI fail as a matter of law.

**A.    Count I (declaratory judgment) fails as a matter of law.**

In Count I of the Complaint, SIC seeks "a declaratory judgment finding and declaring that the Settlement Agreement, Master Relationship Agreement, Lease and Indefeasible Right to Use remain enforceable and in full force and effect against defendant Hawaiian Telcom."  Compl. ¶ 46.  However, "[i]t goes without saying that a contract cannot bind a nonparty." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002); *see also Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 652 (5th Cir. 2004) ("Under general principles of contract law, it is axiomatic that courts cannot bind a non-party to a contract, because that party never agreed to the terms set forth therein." (quotation marks and citation omitted)).  It is indisputable that HTI is not a party to any of the SIC Agreements. *See* CSF ¶¶ 1-6.

Nor did HTI become a party to the SIC Agreements through assignment.  To the contrary, the APA specifically provided that the SIC Agreements were solely "Assignable Contracts" which means they were contracts that could have been assigned by the Trustee to HTI at HTI's sole election.  *See* CSF ¶ 18.  HTI, however, did not elect to designate any of the SIC Agreements as agreements to be assigned by the Trustee to HTI. *See* CSF ¶ 21.

To the extent that SIC argues that the SIC Agreements were implicitly assumed and assigned to HTI by virtue of the post-closing services purportedly rendered by SIC, bankruptcy law is clear that there are no implied assumptions of executory contracts.  *See, e.g.*, *In re Family Snacks, Inc.*, 257 B.R. 884, 904 (B.A.P. 8th Cir. 2001) ("Implied assumption has no place in the law of executory contracts.  Indeed, Section 365(d) presumes nonassumption by inaction, except in certain specified cases, such as nonresidential real property leases."); *In re Dehon, Inc.*, 352 B.R. 546, 560 (Bankr. D. Mass. 2006) (stating that "[i]t is well-established that the doctrine of 'implied assumption' has little, if any merit" and listing cases holding that an executory contract cannot be implicitly assumed). This is true even where the non-debtor party to an executory contract continues to perform under the contract.  *See In re Dehon, Inc.*, 352 B.R. at 560 ("Even where the non-debtor party to a contract continues to provide services under the contract and the debtor continues to accept the benefits of such performance, the contract will not be considered to have been assumed absent an order of  the court approving the assumption."); *In re Thane Int'l, Inc.*, 586 B.R. 540, 547 (Bankr. D. Del. 2018) (rejecting the argument that the purchaser impliedly assumed or was assigned an executory contract because it allegedly "enjoyed the benefits" of the contract post-closing; assumption and assignment cannot be done informally).

Accordingly, notwithstanding SIC's allegations that it and/or the Trustee intended that the purchaser of the Transferred Assets would be bound by one or more of the SIC Agreements, *see, e.g.*, Compl. ¶¶ 13, 15, no such obligation is found anywhere in the Sale Order or APA.[3] *See* CSF ¶ 22.

As a non-party to the SIC Agreements, HTI cannot be bound by the terms of those agreements and Count I, accordingly, fails as a matter of law. *See, e.g., Waffle House, Inc.*, 534 U.S. at 294 (finding that EEOC, a non-party to the subject contract, was not bound by the arbitration clause in that contract).

**B.    Count II (specific performance) fails as a matter of law.**

1.    Specific performance is not an independent claim.

Count II likewise fails as a matter of law. In Count II, SIC seeks "specific performance, enforcing the [SIC Agreements] against the defendants." Compl. ¶ 49. However, "specific performance is an equitable remedy in a breach of contract action and not an independent claim." *Baskin v. EC Paia LLC*, Civil No. 20-00216 WRP, 2020 WL 9762819, at *2 (D. Haw. Aug. 31, 2020). For that reason alone, summary judgment should be granted in HTI's favor as to Count II. *See id.* (dismissing with prejudice claim for specific performance).

---

[3] Having failed to raise this issue prior to entry of the Sale Order, SIC "is deemed to have consented to the Sale under the terms of the APA[.]" Sale Order ¶ 2 (p. 27).

2.    SIC cannot maintain a claim against HTI for breach of the SIC Agreements.

Even if Count II could be construed as a claim for breach of the SIC Agreements, it would still fail as a matter of law.  Under Hawaii law, to prevail on a breach of contract claim, a party must prove "(1) the contract at issue; (2) the parties to the contract; (3) whether plaintiff performed under the contract; (4) the particular provision of the contract allegedly violated by defendants; and (5) when and how defendants allegedly breached the contract."  *RSMCFH, LLC v. FareHarbor Holdings, LLC*, 361 F. Supp. 3d 981, 991 (D. Haw. 2019) (quotation marks and citation omitted).  However, as discussed *supra*, the SIC Agreements cannot be enforced against HTI since HTI is not a party to any of the SIC Agreements, nor were any of the SIC Agreements assigned to HTI as part of the Sale.  *See supra* Section IV.A.  Therefore, SIC cannot maintain a claim against HTI for breach of the SIC Agreements.  *Cf. Dairy Rd. Partners v. Maui Gas Ventures, LLC*, Civ. No. 16-00611DKW-KJM, 2018 WL 1244147, at *17 (D. Haw. Mar. 9, 2018) (noting that "specific performance is by definition limited to the enforcement of contract duties" and dismissing claim for specific performance where there was no enforceable contract).

3.    SIC could not maintain a claim against HTI for breach of the SIC Agreements even if HTI was an agent of the Trustee.

SIC alleges that HTI is an agent of the Trustee.  *See, e.g.*, Compl. ¶ 43.

Setting aside the lack of evidence regarding the scope of HTI's purported agency, any claim against HTI, as the purported agent of the Trustee, for breach of the SIC Agreements would still fail because HTI is not a party to the SIC Agreements.

"It is well settled that when an agent acts on behalf of a disclosed principal, the agent will not be personally liable for a breach of the contract unless there is clear and explicit evidence of the agent's intention to be bound[.]" *Walz v. Todd & Honeywell, Inc.*, 195 A.D.2d 455, 455 (N.Y. App. Div. 1993) (citation omitted); *see also JMB Mfg., Inc. v. Child Craft, LLC*, 799 F.3d 780, 786 (7th Cir. 2015) ("Under Indiana law, an agent acting within the scope of his authority is not personally liable in carrying out a contractual obligation of the principal."); *Vandiver Food Stores, Inc. v. Insurance Co. of N. Am.*, 909 F. Supp. 618, 625 (E.D. Ark. 1995) ("[A]n agent for a disclosed principal cannot be liable for a breach of contract by its disclosed principal to which it is not a party."); *accord Laeroc Waikiki Parkside, LLC v. K.S.K. (Oahu) Ltd. P'ship*, 115 Hawai'i 201, 214, 166 P.3d 961, 974 (2007) ("[T]he only way that an agent making a contract on behalf of a disclosed principal would become a party to the agreement would be if the agent manifests an intent to become a party . . . ."). This is true even where the breach was a result of the agent's wrongful conduct. *See Vandiver Food Stores, Inc.*, 909 F. Supp. at 625 ("[A]n agent acting within the scope of its authority, is not liable *ex contractu* for the breach of the contract between its disclosed principal

and a third party, even when the breach was a result of its own wrongful conduct[.]"(citing *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800, 808 (2d Cir. 1971)).

Here, there is no evidence that HTI intended to be bound by any of the SIC Agreements.  To the contrary, HTI chose not to become a party to, or otherwise be bound by, the SIC Agreements when it decided not to accept assignment of any of the SIC Agreements as part of the Sale.  *See* CSF ¶ 21.  Therefore, even assuming, for sake of argument, that HTI was acting as the Trustee's agent with respect to the SIC Agreements, SIC still would not be able to maintain a claim against HTI for breach of the SIC Agreements.  *See, e.g., Stanley v. Univ. of S. Calif.*, 178 F.3d 1069, 1078 (9th Cir. 1999) ("[W]e conclude that the district court was correct to grant summary judgment for Garrett on the contract claims, because he acted merely as USC's agent and was not a party to the contract."); *Double C Entertainment, Inc. v. Palace Theatre Operating Group, LLC*, Civil Action No. 3:11-CV-98-CRS, 2011 WL 5903606, at *2 (W.D. Ky. Nov. 25, 2011) (dismissing breach of contract claims against agent and noting that agent was not a party to the subject contract).

## C.    Count III (damages) fails as a matter of law.

Count III (damages) fails for the same reasons as Count II.  In Count III of the Complaint, SIC seeks monetary damages for the Trustee's alleged breaches of

the MRA.  *See* Compl. ¶¶ 50-54.  As discussed *supra*, the MRA is not enforceable

against HTI, *see supra* Section IV.A, and, as such, HTI cannot be held liable for

the Trustee's alleged breach of the MRA, *see supra* Section IV.B.  Therefore,

Count III which seeks monetary damages for the Trustee's alleged breaches of the

MRA, as against HTI, fails as a matter of law.

## V.   **CONCLUSION**

SIC's claims against HTI to enforce and for breach of the SIC Agreements

fail as a matter of law.  HTI respectfully requests that the Court grant the Motion in

its entirety.

DATED:  Honolulu, Hawaii, November 16, 2021.

> **CADES SCHUTTE**
> **A Limited Liability Law Partnership**
>
> /s/  *Trisha H.S.T. Akagi*
> C. MICHAEL HEIHRE
> THEODORE D. C. YOUNG
> TRISHA H.S.T. AKAGI
>
> and
>
> **MORGAN, LEWIS & BOCKIUS LLP**
> ANDREW J. GALLO
> ANDREW M. RAY
>
> Attorneys for Defendant
> HAWAIIAN TELCOM, INC.

CADES SCHUTTE
A Limited Liability Law Partnership
C. MICHAEL HEIHRE          1307
THEODORE D. C. YOUNG     5735
TRISHA H.S.T. AKAGI        10186
1000 Bishop Street, Suite 1200
Honolulu, HI  96813-4212
Telephone:  (808) 521-9200
Facsimile:   (808) 521-9210
Email:  mheihre@cades.com
            tyoung@cades.com
            takagi@cades.com

MORGAN, LEWIS & BOCKIUS LLP
ANDREW J. GALLO (admitted *pro hac vice*)
One Federal Street
Boston, MA 02110-1726
Telephone:  +1 (617) 951-8117
Email:  andrew.gallo@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
ANDREW M. RAY (admitted *pro hac vice*)
1111 Pennsylvania Avenue, NW
Washington DC 20004
Telephone:  +1 (202) 373-6585
Email:  andrew.ray@morganlewis.com

Attorneys for Defendant
HAWAIIAN TELCOM, INC.

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re | CASE NO. 18-01319 (Chapter 11) |
| PANIOLO CABLE COMPANY, LLC, | |
| Debtor. | |

SANDWICH ISLES
COMMUNICATIONS, INC.,

              Plaintiff,

      vs.

MICHAEL KATZENSTEIN, AS
CHAPTER 11 TRUSTEE;
HAWAIIAN TELCOM INC.,

              Defendants.

Adversary No. 21-90017

Judge:  Honorable Robert J. Faris

## CERTIFICATE OF SERVICE

     I HEREBY CERTIFY that on this date, true and correct copy of the

foregoing document was duly served on the following parties via CM/ECF, or

U.S. Postal Service, as indicated below:

### Via CM/ECF

Lex R. Smith on behalf of Plaintiff SANDWICH ISLES COMMUNICATIONS, INC.
lsmith@ksglaw.com, jkeane@ksglaw.com;myw@ksglaw.com

Jonathan C. Bolton on behalf of Defendant MICHAEL KATZENSTEIN
jbolton@goodsill.com, pbabbit@goodsill.com

### VIA U.S. Postal Service

Maria Y. Wang
on behalf of Plaintiff SANDWICH ISLES COMMUNICATIONS, INC.
Kobayashi Sugita & Goda, LLP
999 Bishop Street, 26th Floor
Honolulu, HI 96813

DATED:  Honolulu, Hawaii, November 16, 2021.

**CADES SCHUTTE**
**A Limited Liability Law Partnership**

/s/ *Trisha H.S.T. Akagi*
C. MICHAEL HEIHRE
THEODORE D. C. YOUNG
TRISHA H.S.T. AKAGI

and

**MORGAN, LEWIS & BOCKIUS LLP**
ANDREW J. GALLO
ANDREW M. RAY

Attorneys for Defendant
HAWAIIAN TELCOM, INC.

Before the
**Federal Communications Commission**
Washington, D.C. 20554

**Electronically Filed
FIRST CIRCUIT
1CCV-22-0000321
18-MAR-2022
05:07 PM
Dkt. 10 EXH**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Connect America Fund | ) | WC Docket No. 10-90 |
| | ) | |
| Sandwich Isles Communications, Inc. | ) | |
| | ) | |
| Petition for Waiver of the Definition of "Study | ) | CC Docket No. 96-45 |
| Area" Contained in Part 36, Appendix-Glossary | ) | |
| and Sections 36.611 and 69.2(hh) of the | ) | |
| Commission's Rules | ) | |

**MEMORANDUM OPINION AND ORDER**

Adopted: **June 30, 2017**                                    Released: **July 3, 2017**

By the Commission: Commissioner Clyburn issuing a statement.

1.      Congress has directed that if a State or local legal requirement effectively prohibits competitors from providing telecommunication service, we *must* override that requirement. Today, we carry out that mandate to remove barriers to entry and ensure the benefits of competition by preempting an exclusive license that effectively bars telecommunications competition on the Hawaiian home lands. Specifically, in this Memorandum Opinion and Order, we find that an exclusive license to "build, construct, repair, maintain, and operate" a network to provide telecommunications services that was granted by the State of Hawaii, Department of Hawaiian Home Lands (DHHL or Department) to Waimana Enterprises, Inc. (Waimana) and then assigned to its subsidiary, Sandwich Isles Communications, Inc. (Sandwich Isles) (hereinafter Exclusive License),[1] violates Section 253(a) of the Communications Act, as amended (the Act).[2] Because we find that the Exclusive License is not subject to the exceptions in Section 253(b) or (c),[3] we preempt enforcement of its exclusivity provision pursuant to Section 253(d) of the Act.[4]

**I.      BACKGROUND**

2.      DHHL is responsible for managing the Hawaiian home lands for the benefit of native Hawaiians under the Hawaiian Homes Commission Act of 1920, as amended (HHCA).[5] Thousands of families reside on the Hawaiian home lands, which are comprised of approximately 203,000 acres of

---

[1] State of Hawaii, Department of Hawaiian Home Lands License Agreement No. 372, at 2 (May 9, 1995) (Exclusive License), attached as Exhibit One to Sandwich Isles Reply Comments, WC Docket No. 10-90, WT Docket No. 10-208 (filed Feb. 24, 2012) (Sandwich Isles Feb. 24, 2012 Reply Comments).

[2] 47 U.S.C. § 253(a).

[3] *Id.* § 253(b), (c).

[4] *Id.* § 253(d).

[5] Letter from Jobie M.K. Masagatani, Chairman, Hawaiian Homes Commission, on behalf of the Department of Hawaiian Home Lands, State of Hawaii, to Ajit Pai, Chairman, FCC, WC Docket No. 10-90, CC Docket No. 96-45, at 1 (filed Feb. 3, 2017) (DHHL Letter).

State land.[6]  Pursuant to the HHCA, DHHL has authority over access to and uses of the Hawaiian home lands,[7] including authority "'to grant licenses as easements for . . . telephone lines.'"[8]  However, DHHL "does not have regulatory authority over telecommunications carriers.'"[9]  In 1995, "DHHL granted an 'exclusive' license 'in perpetuity' to Waimana Enterprises, Inc., the parent company of Sandwich Isles, to provide telecommunications services to the Hawaiian home lands."[10]  Specifically, the Exclusive License grants Waimana and its legal successors and assigns "the exclusive right and privilege to build, construct, repair, maintain, and operate a broad band [sic] telecommunications network including poles, overhead and/or underground lines, appliances, microwave and/or other types of equipment over, across, under and throughout all lands under the administration and jurisdiction of [DHHL] . . . ."[11]  The terms of the Exclusive License provide that "broad band [sic] telecommunication services" includes, among other services, "intrastate and interstate telephone services."[12]  In 1996, DHHL granted a partial assignment of the Exclusive License to Sandwich Isles.[13]

3.      In December 2016, following an investigation by the Universal Service Administrative Company, the Commission concluded that Sandwich Isles improperly received payments of more than $27 million in universal service high-cost support through repeated violations of the Commission's rules.[14]  In light of the Commission's findings, the Commission directed the Wireline Competition Bureau (Bureau) to seek comment on whether the Commission should terminate a previously granted study area

---

[6] Comments of Hawaiian Telcom, Inc., WC Docket No. 10-90, CC Docket No. 96-45 (filed Feb. 20, 2017) (Hawaiian Telcom Comments), Attachment, Opposition of Hawaiian Telcom, Inc. to Petition for Expedited Study Area Waiver, CC Docket No. 96-45, at 4 (filed Mar. 4, 2013).

[7] DHHL Letter at 2, n.2.

[8] Hawaiian Telcom Comments, Attachment, at 18 (quoting HHCA § 207(c)(1)).

[9] DHHL Letter at 2, n.2.

[10] *Id.* at 2.

[11] Exclusive License at 2.

[12] *Id.* at 1.

[13] DHHL Letter at 2; *see also* Sandwich Isles Feb. 24, 2012 Reply Comments at 5-6 (explaining that the Exclusive License "was subsequently assigned in part to [Sandwich Isles], a wholly-owned subsidiary of Waimana, for purposes of the wireline voice requirements of the License").

[14] *See generally Sandwich Isles Communications, Inc.*, Order, WC Docket No. 10-90, 31 FCC Rcd 12999 (2016) (*Sandwich Isles Improper Payments Order*).  The Commission also proposed a forfeiture of more than $49 million on Sandwich Isles, Waimana, and its controlling owner, Albert Hee, for apparent violations of the Commission's rules by, among other things, submitting and falsely certifying inaccurate data contained in cost studies from 2002 to 2013 that were used to calculate high-cost support. *See generally Waimana Communications, Inc., Waimana Enterprises, Inc., Albert S.N. Hee*, Notice of Apparently Liability for Forfeiture and Order, File No. EB-IHD-15-00019603, 31 FCC Rcd 12947 (2016) (*Sandwich Isles NAL or NAL*).  In the *NAL*, the Commission ordered Sandwich Isles to submit a report explaining why the Commission should not initiate proceedings against Sandwich Isles to revoke its Commission authorizations, including but not limited to, its Section 214 authorizations. *Id.* at 12974, para. 84.  The Commission also directed the Bureau to issue a Public Notice seeking comment from interested stakeholders on this issue. *Id.*; *see also Wireline Competition Bureau Seeks Comment on Initiating Proceedings to Revoke Sandwich Isles Communications, Inc.'s Commission Authorizations*, Public Notice, WC Docket No. 16-405, DA 17-168 (2017).  Sandwich Isles submitted its response to the *NAL* on February 3, 2017. *See* Sandwich Isles Communications, Inc.'s Comments and Response to Notice of Apparent Liability and Forfeiture Order, WC Docket No. 10-90 (filed Feb. 3, 2017).

boundary waiver providing Sandwich Isles the status of an incumbent local exchange carrier for purposes of receiving high-cost support, and thereby render Sandwich Isles ineligible to receive such support.[15]

4.       In response to the Bureau's Public Notice,[16] on February 3, 2017, DHHL filed a letter requesting guidance on whether the terms of the Exclusive License granted to Waimana and partially assigned to Sandwich Isles[17] "may implicate Section 253(a) . . . and act as a potential barrier to entry by another provider capable of reasonably utilizing [universal service] support" to provide service to the Hawaiian home lands.[18]  On February 6, 2017, the Bureau issued a Public Notice seeking comment on DHHL's request for guidance.[19]  In response, Hawaiian Telcom argues that the Exclusive License violates Section 253(a)[20] and Crown Castle contends that any interpretation of the Exclusive License to exclude the provision of CMRS by entities other than Sandwich Isles would violate Section 253(a).[21]  In their reply comments, Waimana and Sandwich Isles contend that the Exclusive License does not violate Section 253(a).[22]

5.       Section 253(a) provides that:

No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.[23]

6.       Section 253(b) creates an exception to Section 253(a), providing that:

Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.[24]

---

[15] *Sandwich Isles Improper Payments Order*, 31 FCC Rcd at 13016-17, para. 58.  This order does not resolve any issues related to Sandwich Isles' study area waiver or potential revocation of Sandwich Isles' Commission authorizations.

[16] *Wireline Competition Bureau Seeks Comment on the 2005 Waiver That Allows Sandwich Isles to Be Treated as an Incumbent Local Exchange Carrier for Purposes of Receiving High-Cost Universal Service Support*, Public Notice, WC Docket No. 10-90, CC Docket No. 96-45, 31 FCC Rcd 13326 (Dec. 20, 2016).

[17] *See* DHHL Letter at 2 ("Pursuant to a partial assignment of that license in January 1996, Sandwich Isles provides telecommunications services to the home lands.").

[18] *Id.* at 2.

[19] *Wireline Competition Bureau Seeks Comment on the Department of Hawaiian Home Lands' Request for Guidance on Whether Sandwich Isles, Inc.'s Exclusive License to Serve the Hawaiian Home Lands Conflicts with Section 253(a) of the Communications Act*, Public Notice, WC Docket. No. 10-90, CC Docket. No. 96-45, 32 FCC Rcd 1117 (Feb. 6, 2017) (*Section 253 Public Notice*).

[20] *See generally* Hawaiian Telcom Comments.

[21] *See* Comments of Crown Castle USA Inc., WC Docket No. 10-90, CC Docket No. 96-45, at 2 (filed Feb. 20, 2017) (Crown Castle Comments).

[22] *See generally* Reply Comments of Sandwich Isles Communications, Inc., WC Docket No. 10-90, CC Docket No. 96-45 (filed Mar. 9, 2017) (Sandwich Reply Comments); Reply of Waimana Enterprises Inc., WC Docket No. 10-90, CC Docket No. 96-45 (filed Feb 27, 2017) (Waimana Reply Comments); *see also* Letter from Albert Hee, Founder, Waimana Enterprises Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 10-90, CC Docket No. 96-45 (filed Feb. 27, 2017) (Hee Reply Comments).

[23] 47 U.S.C. § 253(a).

[24] *Id.* § 253(b).

7.     Section 253(c) also preserves State authority, saying that:

Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed.[25]

8.     Section 253(d) requires the Commission to preempt the enforcement of State or local requirements that are contrary to Sections 253(a) or (b) "to the extent necessary to correct such violation or inconsistency."[26]

## II.    DISCUSSION

9.     The Exclusive License violates Section 253(a) because it constitutes a State legal requirement that prohibits or has the effect of prohibiting the ability of any entity other than Sandwich Isles to provide intrastate or interstate telecommunications services. Because the Exclusive License does not satisfy the exceptions in Section 253(b) or (c), we are required to preempt enforcement of its exclusivity provision pursuant to Section 253(d).

### A.    Section 253(a) Analysis

10.     *Section 253(a) Applies.*  Despite Waimana's and Sandwich Isles' arguments to the contrary, we find that the Exclusive License falls within the scope of Section 253(a). First, Waimana argues that Section 253(a) does not apply because the "DHHL is not the State,"[27] but rather an entity akin to a tribal government that has sovereignty over the Hawaiian home lands.[28] We disagree and find that the DHHL is a "State" agency to which Section 253(a) applies. As the Ninth Circuit and the Hawaii Supreme Court have explained, the Hawaiian home lands are managed by State officials.[29] Indeed, in rejecting Waimana's argument that the Hawaiian home lands are not "state lands" for purposes of a Hawaii environmental statute, the Hawaii Supreme Court found that while "the State has assumed a trust obligation regarding Hawaiian home lands and must manage and dispose of these lands in a manner consistent with its fiduciary duty to the beneficiaries," Waimana had "overlook[ed] the significant role of the State in relation to these lands."[30] Specifically, "both legal title and management responsibilities over the land are still in the hands of the State."[31] And DHHL, the State agency that has those management responsibilities, was established pursuant to Section 202 of the HHCA,[32] which is State law.[33] Further,

---

[25] *Id.* § 253(c).

[26] *Id.* § 253(d).

[27] Waimana Reply Comments at 11.

[28] *Id.* at 8-9, 11-12; *see also* Sandwich Isles Reply Comments at 3. We note that the Commission has previously declined to act under Section 253 "to preempt Native American power over tribal lands." *AB Fillins*, Memorandum Opinion and Order, 12 FCC Rcd 11755, para. 18 (1997).

[29] *See Kepo'o v. Watson*, 952 P.2d 379, 385-87 (Haw. 1998); *see also Keaukaha-Panaewa Community Ass'n v. Hawaiian Homes Comm'n*, 588 F.2d 1216, 1226-27 (9th Cir. 1978) (explaining that upon admission of Hawaii into the Union, the "United States conveyed its interest in the home lands . . . to the state and these lands are now administered by state officials").

[30] *Kepo'o*, 952 P.2d at 385.

[31] *Id.*; *see also id.* at 386-87 (holding that the "Hawaiian home lands are certainly unique 'state lands,' with special duties attached to them, but they are 'state lands' nevertheless").

[32] HHCA § 202(a).

[33] *See Kepo'o*, 952 P.2d at 386-87 (Hawaii 1998) (holding that while the HHCA was originally enacted by Congress, it was subsequently adopted as part of the Hawaii constitution as a condition of statehood, and is therefore "a matter of state constitutional law and does not constitute federal law") (citing *Keaukaha-Panaewa Community Ass'n*, 588 F.2d at 1226-27). In fact, although Waimana and Sandwich suggest that the Commission cannot preempt here

(continued....)

4

DHHL is headed by an executive board (the Hawaiian Homes Commission) whose members are appointed by the Governor with the advice and consent of the State Senate.[34]  It is therefore not surprising that the Exclusive License expressly states that it was granted by the "*State of Hawaii*, Department of Hawaiian Home Lands,"[35] and that it was granted pursuant to DHHL's authority under the HHCA as well as the "State of Hawaii . . . Administrative Rules."[36]  In fact, Waimana concedes that DHHL is a State agency[37] and Sandwich Isles has repeatedly made the same statement in filings with the Commission.[38]

    11.    Moreover, DHHL's own statements in this proceeding belie Waimana's claim that DHHL has sovereignty over the Hawaiian home lands.  For instance, although it is a form of authority that a sovereign would typically possess, DHHL expressly states that it "does not have regulatory authority over telecommunications carriers" on the Hawaiian home lands.[39]  Additionally, as one commenter explains, while DHHL has statutory control over access to the Hawaiian home lands, no provision of the HHCA authorizes DHHL to establish a telecommunications monopoly on those lands.[40]

    12.    Further, we disagree with Waimana and Sandwich Isles' argument that DHHL is analogous to a sovereign tribal government.  It is true that Section 54.5 of the Commission's rules includes the Hawaiian home lands within the definition of "Tribal lands."[41]  That rule defines "Tribal lands" to include the Hawaiian home lands "[f]or purposes of high-cost support."[42]  But the existence of the rule does not mean that DHHL is akin to a sovereign Tribal government to which Section 253(a) does not apply.  Indeed, as the Commission has previously noted, "we do not have the same government-to-government relationship with Hawaiian Home Lands as we do with Tribal lands."[43]

    13.    We also find—and neither Waimana nor Sandwich Isles disputes—that the Exclusive License is a "legal requirement" under Section 253(a).  In the *Minnesota Order*, the Commission found

(Continued from previous page) ————————————————————————
because the HHCA is longstanding federal law (*see* Waimana Reply Comments at 12; Sandwich Isles Reply Comments at 4), Sandwich Isles itself has previously acknowledged that the HHCA is considered State law.  *See* Sandwich Isles Communications, Inc. Petition for Waiver, CC Docket No. 96-45, n.21 (filed Dec. 27, 2004).

[34] *See* HHCA § 202(a) (citing Haw. Rev. Stat. § 26-34).

[35] Exclusive License at 1 (emphasis added).

[36] *See id.* (citing HHCA § 207(c)(1) and Haw. Admin. Rules §§ 10-4-21, 10-4-22).

[37] Waimana Reply Comments at 8; *id.*, Exhibit F, at 1 (attaching letter from "the Department of Hawaiian Home Lands *of the State of Hawaii*") (emphasis added); *see also id.* at 12 (arguing that the Exclusive License does not violate Section 253(a) because that provision "does not prohibit *state and local governments*, as landowners, from . . . . bargaining with the land rights they own") (emphasis added).

[38] *See, e.g.*, Letter from Janeen Olds, CEO and President, Sandwich Isles Communications, Inc. to Marlene H. Dortch, Secretary, FCC, WC Docket No. 10-90, at 4 (filed Mar. 6, 2014) ("DHHL is a State agency . . . ."); *id.* at 1 ("[Sandwich Isles] provides these services through an exclusive license granted by the Department of Hawaiian Home Lands (DHHL), the managing state agency of HHL, to provide all telecommunications within HHL."); Sandwich Isles Communications, Inc. Petition for Waiver, CC Docket No. 96-45, at v (filed Dec. 27, 2004) ("Sandwich Isles' parent received a license to serve the entire Hawaiian Home Lands . . . from the Department of Hawaiian Home Lands, the state agency administering the trust lands.").

[39] DHHL Letter at 2.

[40] Hawaiian Telcom Comments, Attachment, at 17-18.

[41] Waimana Reply Comments at 8-9; Sandwich Isles Reply Comments at 3-4.

[42] 47 CFR § 54.5.

[43] *Improving Communications Services for Native Nations*, Notice of Inquiry, 26 FCC Rcd 2672, n.2 (2011); *see also Procedures for Reestablishing a Formal Government-to-Government Relationship with the Native Hawaiian Community*, 80 Fed. Reg. 59113, 59116-17 (Oct. 1, 2015) ("[T]he Federal Government does not maintain a formal government-to-government relationship with the Native Hawaiian community as an organized, sovereign entity.").

5

that a contract entered into by the State that granted one entity exclusive access to its freeway rights-of-way for the development of telecommunications transmission capacity created a "legal requirement" under Section 253(a) because it "legally [bound] the State to deny other entities permits for access to these freeway rights-of-way."[44]  The Commission held that it "will look at the effect of the state or local government's action to determine whether [S]ection 253 is applicable," and it found that the agreement had "the potential to adversely affect competitors that do not have similar access" to the freeway rights-of-way.[45]  Similarly, here, the Exclusive License is a contractual agreement[46] entered into by the State that grants one entity "the exclusive right . . . to build, construct, repair, maintain and operate a . . . . telecommunications network"[47] on the Hawaiian home lands.  It thus legally binds the State to deny other competitors the right to do the same, and it consequently adversely affects those competitors.  Specifically, entities other than Sandwich Isles cannot build or operate network facilities to reach and provide telecommunications services to the residents living on the more than 200,000 acres of land that comprise the Hawaiian home lands.  For these reasons, we find that the Exclusive License creates a "legal requirement" to which Section 253(a) applies.  Such a conclusion is entirely consistent with congressional intent.  As the Commission has previously explained, the "fact that Congress included the term 'other legal requirements' within the scope of section 253(a) recognizes that State and local barriers to entry could come from sources other than statutes and regulations," and interpreting the term "legal requirement" broadly best fulfills Congress' desire to ensure that States and localities do not impede the development of competition.[48]

14.     Additionally, we are not persuaded by Waimana's argument that Section 253(a) is inapplicable where it would affect the State's ability to "deal[] with its real estate interests . . . as it sees fit," such as by granting access to "rights-of-way over land that it owns."[49]  In fact, the Commission applied Section 253(a) to just such an instance in the *Minnesota Order*.  There, Minnesota had granted one entity exclusive physical access to State-owned land (*i.e.*, State freeway rights-of-way) in exchange for the development of telecommunications transmission capacity.[50]  The Commission held that Section 253(a) applied because the agreement at issue had the potential to adversely affect competitors that lacked similar access.[51]  As the Commission emphasized there, the relevant inquiry in determining whether Section 253(a) applies is the legal requirement's "effect on the provision of telecommunications service," not how the requirement could be characterized or "the purported subject matter" of the requirement.[52]  Thus, contrary to Waimana's assertion, the fact that the State was "bargaining with the land" that it owns[53] when granting the Exclusive License does not render Section 253(a) inapplicable here.

---

[44] *Petition of the State of Minnesota for a Declaratory Ruling Regarding the Effect of Section 253 on an Agreement to Install Fiber Optic Wholesale Transport Capacity in State Freeway Rights-of-Way*, Memorandum Opinion and Order, 14 FCC Rcd 21697, 21707, para. 17 (1999) (*Minnesota Order*).

[45] *Id.* at 21707, para. 19.  The Commission thus found the situation at hand to be "very different from a traditional government procurement of telecommunications facilities or services" to which Section 253 would not apply. *Id.*

[46] The Exclusive License is a contract in which DHHL granted Waimana the exclusive right to build, maintain, and operate a telecommunications network on the Hawaiian home lands "in consideration of the services to be provided by [Waimana]," including the construction and installation of telecommunications infrastructure on DHHL's lands at Waimana's cost. *See* Exclusive License at 1-2.

[47] *Id.* at 2.

[48] *Minnesota Order*, 14 FCC Rcd at 21707, para. 18.

[49] Waimana Reply Comments at 11-12.

[50] *See generally Minnesota Order*.

[51] *Id.* at 21708, para. 19.

[52] *Id.* at 21705-06, 21707, paras. 14-15, 19.

[53] Waimana Reply Comments at 12.

6

15.    *The Exclusive License Violates Section 253(a).*  Having found that the Exclusive License falls within the scope of Section 253(a), we conclude that it prohibits or has the effect of prohibiting the ability of entities other than Waimana and Sandwich Isles from providing telecommunications services in contravention of the statute.[54]  Sandwich Isles argues that the Exclusive License does not violate Section 253(a) because it grants exclusivity only as to the construction of telecommunications "infrastructure" and therefore does not preclude competitors from providing "service" to the Hawaiian home lands.[55]  We reject this argument.  DHHL itself characterizes the Exclusive License as granting the exclusive right "to provide telecommunications *services* to the Hawaiian home lands"[56] (although it is not clear that DHHL has such authority).  More importantly, for purposes of Section 253(a), it is a legal requirement's "effect on the provision of telecommunications service that is critical, not whether [the requirement] could be characterized as dealing with infrastructure development."[57]

16.    The legal requirement at issue in this proceeding grants one entity the "exclusive" right "to build, construct, repair, maintain and operate a . . . telecommunications network" for the purpose of providing service to the residents of the Hawaiian home lands and therefore prohibits other entities from doing so.[58]  The Exclusive License thus represents exactly the type of prohibition on entry that Section 253(a) was intended to prevent.[59]  As the Commission has held, "[S]ection 253(a), at the very least, proscribes State and local legal requirements that prohibit all but one entity from providing telecommunications services in a particular State or locality."[60]  And the State's action here, "granting an exclusive license to [an entity], appears fundamentally inconsistent with the primary goal of the Telecommunications Act of 1996, to replace exclusivity with competition."[61]

17.    Waimana argues that the Exclusive License does not violate Section 253(a) because several other carriers have been authorized to provide telecommunications services on the Hawaiian home lands, including by operating cellular towers on those lands.[62]  However, this fact does not render the Exclusive License lawful.  On its face, the Exclusive License binds DHHL to prohibit the construction or

---

[54] 47 U.S.C. § 253(a).

[55] Sandwich Isles Reply Comments at 2-3.

[56] DHHL Letter at 2 (emphasis added).

[57] *Minnesota Order*, 14 FCC Rcd at 21705, para. 14; *see also Public Utility Commission of Texas et al. Petitions for Declaratory Ruling and/or Preemption of Certain Provisions of the Texas Public Utility Regulatory Act of 1995*, Memorandum Opinion and Order, 13 FCC Rcd 3460, 3480, para. 41 (1997) (*Texas Order*) (concluding that the mandate under Section 253 "requires us to preempt not only express restrictions on entry, but also restrictions that indirectly produce that result").

[58] *See, e.g., Minnesota Order*, 14 FCC Rcd at 21708, para. 21 (finding that a State requirement that prevents other facilities-based providers from providing telecommunications services would contravene Section 253(a)) (citing *Texas Order*, 13 FCC Rcd at 3496-97, paras. 74-75).

[59] *See, e.g., N.J. Payphone Ass'n v. Town of West New York*, 299 F.3d 235, 242 (3d Cir. 2002) (holding that exclusive area-wide franchise to provide payphones in public rights-of-way is a "deliberate creation of scarcity" in violation of 253(a)); *id.* at 247 (explaining that a requirement that permits a government entity to "choose one service provider . . . to the exclusion of all others based on criteria determined by it rather than the market" violates Section 253(a)); *Classic Telephone, Inc., Petition for Preemption, Declaratory Ruling and Injunctive Relief*, Memorandum Opinion and Order, 11 FCC Rcd 13082, 13096, paras. 26-27 (1996) (*Classic Telephone*) (concluding that city's decision not to grant a local franchise to a second telecommunications carrier in order to prevent competition violates Section 253); *New England Public Communications Council, Petition for Preemption Pursuant to Section 253*, Memorandum Opinion and Order, 11 FCC Rcd 19713, 19721, para. 18 (1996) (*New England Order*) (preempting state commission decision precluding independent payphone providers from offering services).

[60] *Classic Telephone*, 11 FCC Rcd at 13095, para. 25.

[61] *Minnesota Order*, 14 FCC Rcd at 21700, para. 3.

[62] Waimana Reply Comments at 13-14; *see also* Hee Reply Comments at 1.

operation of a telecommunications network by any entity other than Sandwich Isles for the provision of telecommunications services on the Hawaiian home lands. And selective enforcement of the Exclusive License does not obviate its effect of prohibiting competition. Indeed, the record demonstrates that the Exclusive License has the effect of prohibiting the ability of an entity to continue to provide telecommunications services to the Hawaiian home lands. Specifically, Crown Castle states that when it notified DHHL of its intention to extend the term of its non-exclusive license to operate a cellular tower on the Hawaiian home lands, "DHHL notified Crown Castle of [DHHL's] contract with Sandwich Isles" giving exclusive rights with respect to DHHL properties.[63] As a result, Crown Castle has been unable to extend its license to operate the tower, which is used to provide CMRS on the Hawaiian home lands.[64]

18.     Waimana also suggests that the Exclusive License does not prohibit competition because other telecommunications carriers could lease access to elements of Sandwich Isles' network.[65] The Exclusive License, however, prohibits any other entity from even "operat[ing] a . . . telecommunications network" on the Hawaiian home lands.[66] In any event, under Commission precedent, Section 253(a) bars State or local requirements that prevent competitors from "utiliz[ing] their own facilities to provide service."[67]

**B.     Section 253(b) Analysis**

19.     We conclude that the Exclusive License is not protected by Section 253(b). That provision preserves from preemption certain State or local requirements that are "competitively neutral" and "necessary" to achieve the public interest objectives enumerated therein, even if the requirements violate Section 253(a).[68]

20.     Consistent with Commission precedent, we find that the Exclusive License is not competitively neutral. The "proper inquiry" under Section 253(b) is "whether the effect of the [State or local legal requirement] will be competitively neutral."[69] In the *New England Order* and *Texas Order*, the Commission found that the State legal requirements at issue were not competitively neutral because they singled out a class of entities and imposed a disadvantage on them that significantly affected or even eliminated their ability to compete in the provision of certain telecommunications services.[70] Similarly, in the *Minnesota Order*, the Commission concluded that the agreement at issue was not competitively neutral because it granted a single entity exclusive physical access to valuable freeway rights-of-way for a period of ten years with an option to renew for another ten years and thereby disadvantaged facilities-based competitors.[71] Likewise, here, the Exclusive License expressly grants a single entity the exclusive right, in perpetuity, to construct and operate a telecommunications network on the Hawaiian home lands and thus effectively prohibits the provision of telecommunications services by competitors.

21.     Our conclusion that the Exclusive License is not competitively neutral is dispositive on the question of whether the Section 253(b) exception applies. Even if that were not the case, however, we find no basis for concluding that the Exclusive License is "necessary" to advance universal service or any of the other public interest objectives listed in Section 253(b). The burden of proving that the State or

---

[63] Crown Castle Comments at 2.

[64] *Id.*

[65] Waimana Reply Comments at 15-16; *see also* Hee Reply Comments at 1.

[66] Exclusive License at 2.

[67] *Texas Order*, 14 FCC Rcd at 21708, para. 21.

[68] 47 U.S.C. § 253(b); *see also Minnesota Order*, 14 FCC Rcd at 21724, para. 50.

[69] *Minnesota Order*, 14 FCC Rcd at 21724-25, para. 51.

[70] *See New England Order*, 11 FCC Rcd at 19721-22, para. 20; *Texas Order*, 13 FCC Rcd at 3500, para. 82.

[71] *Minnesota Order*, 14 FCC Rcd at 21725, para. 52.

local requirement comes within the exceptions of Section 253 falls on the party claiming that the exemption applies.[72]  Here, Sandwich Isles asserts that the public interest objectives in Section 253(b) "are exactly the basis on which the [Exclusive License] was based."[73]  However, Sandwich Isles does not elaborate on or provide any support for this claim, let alone demonstrate that the Exclusive License is "necessary" to achieve those public interest objectives.[74]  And Waimana does not even reference Section 253(b) in its reply comments.

C.    **Section 253(c) Analysis**

22.    Waimana suggests that the Exclusive License is protected from preemption under Section 253(c).[75]  That provision states that "[n]othing in this section affects the authority of the State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government."[76]  However, Waimana fails to demonstrate how or why the Exclusive License constitutes "manage[ment of] rights-of-way" by DHHL.  Instead, Waimana merely quotes language from a federal district court case regarding the purpose of Section 253(c).[77]  In fact, the district court there expressly distinguished the exclusive franchise to operate payphones on city sidewalks at issue in that case with a "restriction[] on the building of networks through the rights of way to serve the broader community,"[78] which is precisely the type of restriction at issue here.

23.    While the Act does not define "manage[ment of] rights-of-way," the Commission has previously recognized in the context of Section 253(c) that "[l]ocal governments must be allowed to perform the range of vital tasks necessary to preserve the physical integrity of streets and highways, to control the orderly flow of vehicles and pedestrians, [and] to manage gas, water, cable . . . and telephone facilities that crisscross the streets and public rights-of-way."[79]  The Commission in turn has described the "types of activities that fall within the sphere of appropriate rights-of-way management" as including "coordination of construction schedules, determination of insurance, bonding and indemnity requirements, establishment and enforcement of building codes, and keeping track of various systems using the rights-of-way to prevent interference between them."[80]  By contrast, here, the Exclusive License does much more than simply enable DHHL to engage in these or similar types of activities.  Rather, as discussed above, the Exclusive License grants one entity the exclusive right to "operate a . . . telecommunications network" for the provision of telecommunication services on the Hawaiian home lands,[81] and it thus has the effect of precluding any other entity from providing telecommunications services to the residents of those lands.  Finding that such a restriction falls within Section 253(c) would

---

[72] *Id.* at 21704, n.26.

[73] Sandwich Isles Reply Comments at 4-5.

[74] *Id.* at 4.

[75] Waimana Reply Comments at 12.

[76] 47 U.S.C. § 253(c).

[77] *See* Waimana Reply Comments at 12 (quoting *Telebeam Telecomms. Corp. v. City of New York*, 194 F.Supp.3d 178, 188 (E.D.N.Y. 2016)).

[78] *Telebeam Telecomms.*, 194 F.Supp.3d at 188.

[79] *TCI Cablevision of Oakland County, Inc.*, Memorandum Opinion and Order, 12 FCC Rcd 21396, 21441, para. 103 (1997).

[80] *Id.*; *see also Minnesota Order*, 14 FCC Rcd at 21729, n.129.

[81] Exclusive License at 2.

9

Federal Communications Commission                                    FCC 17-85

allow the rights-of-way management exception to "swallow whole the broad congressional preemption"[82] under Section 253(a) and render that statutory provision meaningless.

24.     Moreover, even assuming that the Exclusive License constituted rights-of-way management, such management must be "competitively neutral" and "nondiscriminatory" to receive protection under Section 253(c).[83] Again, "the burden of proving that a statute, regulation, or legal requirement comes within the exemptions found in [S]ections 253(b) and (c) falls on the party claiming that exception applies."[84] Here, however, Waimana does not even acknowledge that a State's rights-of-way management must be both "competitively neutral" and "nondiscriminatory" under Section 253(c), let alone demonstrate that the Exclusive License meets these two requirements.

**D.     Preemption Under Section 253(d)**

25.     Because the Exclusive License violates Section 253(a) and is not saved by the exceptions in Section 253(b) or (c), we are required to preempt enforcement of its exclusivity provision under Section 253(d).[85] That statutory provision requires the Commission to "preempt the enforcement" of "a State or local legal requirement that violates Section 253(a) or 253(b) "to the extent necessary to correct such violation or inconsistency."[86] We therefore preempt enforcement of the exclusivity provision of the Exclusive License[87] because it has the effect of prohibiting the ability of any entity other than Sandwich Isles to provide telecommunications services on the Hawaiian home lands. We note that the Exclusive License also contains a provision which states that "[a]fter LICENSEE activates the existing and/or new telecommunications infrastructure, [DHHL] agrees not to allow any other telecommunications provider to use any remaining telecommunications infrastructure to continue to provide or initiate service on [DHHL's] lands."[88] We also find it necessary to preempt enforcement of this provision to the extent that it acts as a restatement or extension of the exclusivity provision.

**E.     Waimana's and Sandwich Isles' Remaining Arguments**

26.     None of Waimana's remaining arguments alter our conclusion that we must preempt enforcement of the exclusivity provision of the Exclusive License. First, the fact that a State legal requirement prohibiting competition in the provision of telecommunications services may have benefitted the State or some of its residents[89] does not render it lawful.[90] Second, Waimana argues that the Exclusive License "was required by the Rural Utilities Service ('RUS') as a condition" of obtaining an RUS loan.[91] Waimana, however, fails to cite any support for this claim. Nor are we aware of any RUS requirement

---

[82] *City of Auburn v. Qwest Corp.*, 260 F.3d 1160, 1180 (9th Cir. 2001), *overruled on other grounds by Sprint Telephony PCS, L.P. v. County of San Diego*, 543 F.3d 571 (9th Cir. 2008) (en banc).

[83] 47 U.S.C. § 253(c); *see also Minnesota Order*, 14 FCC Rcd at 21729, para. 61.

[84] *Minnesota Order*, 14 FCC Rcd at 21704, n.26.

[85] 47 U.S.C. § 253(d).

[86] *Id.*

[87] *See* Exclusive License at 2 (granting "[Waimana], and its legal successors and assigns, the exclusive right and privilege to build, construct, repair, maintain, and operate a broad band [*sic*] telecommunications network including poles, overhead and/or underground lines, appliances, microwave and/or types of equipment over, across, under and throughout all lands under the administration and jurisdiction of [DHHL]").

[88] *Id.* at 3.

[89] Waimana Reply Comments at 9-10.

[90] *See Minnesota Order*, 14 FCC Rcd at 21716, para. 35 (finding that the State's "extraction of benefits in exchange for exclusive physical access to rights-of-way is fundamentally inconsistent with the 1996 Act, which endeavors to replace exclusive monopoly rights with open competition").

[91] Waimana Reply Comments at 10; *see also* Hee Reply Comments at 1.

10

that an entity obtain an exclusive license from the State in order to receive financing. And even if RUS imposed such a condition, Waimana makes no showing as to why a condition imposed by RUS could act to effectively preempt or nullify Section 253 of the Act. Third, the Commission's knowledge of the Exclusive License's existence prior to DHHL's request for guidance[92] is irrelevant to the Section 253 analysis. The Commission has never examined the issue of whether the Exclusive License comports with Section 253(a),[93] let alone "signed off on" or "approved" it as Waimana asserts.[94]

27.     Finally, we reject Sandwich Isles' claims of "procedural irregularities" in this proceeding.[95] In particular, Sandwich Isles complains that the issue of whether the Exclusive License conflicts with Section 253(a) was not raised in either the *Sandwich Isles Improper Payments Order* or *Sandwich Isles NAL* issued in December 2016.[96] The Commission did not receive DHHL's request for guidance on this issue,[97] however, until after those items were released and there is no procedural bar to taking action at this time pursuant to Section 253(a). We also disagree with Sandwich Isles' contention that the Public Notice seeking comment on DHHL's request was framed in a manner that would not result in examination of all of the relevant issues.[98] The language used in the Public Notice does not presume a violation but instead asks "whether [the Exclusive License] conflicts with Section 253(a)."[99] In response to the Public Notice, the Commission has received comments highlighting factors relevant to this inquiry, suggesting that the notice provided therein was sufficient. And as this Order makes clear, we have carefully considered whether the Exclusive License falls within the scope of Section 253(a), whether it violates Section 253(a), and whether it is protected from preemption by Section 253(b) or (c), and we find that we are obligated to preempt enforcement of the exclusivity provision in the Exclusive License under Section 253(d).

---

[92] Waimana Reply Comments at 11-12.

[93] In a 2005 order granting Sandwich Isles a study area waiver, the Wireline Competition Bureau declined to address Hawaiian Telcom's argument that the Exclusive License may pose a barrier to entry in violation of Section 253 on the basis that the issue was "better addressed in the context of a [S]ection 253 proceeding." *Sandwich Isles Communications, Inc., Petition for Waiver of the Definition of "Study Area" Contained in Part 36, Appendix-Glossary and Sections 36.611 and 69.2(hh) of the Commission's Rules*, Order, 20 FCC Rcd 8999, para. 23 (WCB 2005).

[94] Waimana Reply Comments at 11.

[95] Sandwich Isles Reply Comments at 1-2. Among other issues, Sandwich Isles complains that the Commission did not address its request to extend the deadline for reply comments on the *Section 253 Public Notice* from February 27, 2017 to March 10, 2017. Sandwich Isles Reply Comments at 2; *see also* Sandwich Isles Request for Extension of Time, WC Docket No. 10-90, CC Docket No. 96-45, at 1 (filed Feb. 23, 2017). In any event, Sandwich Isles filed reply comments on March 9, 2017, and we consider those reply comments herein. Therefore, we deem Sandwich Isles' argument moot.

[96] Sandwich Isles Reply Comments at 1.

[97] *See generally* DHHL Letter.

[98] Sandwich Isles Reply Comments at 1, 4-5.

[99] *Section 253 Public Notice* at 1.

### III.    ORDERING CLAUSES

28.     Accordingly, IT IS ORDERED, pursuant to Section 253 of the Communications Act of 1934, as amended, 47 U.S.C. § 253, that the enforcement of the exclusivity provision in the Exclusive License IS PREEMPTED.

29.     IT IS FURTHER ORDERED that this Order and the obligations set forth herein ARE EFFECTIVE upon release of this Order.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

12

Federal Communications Commission                              FCC 17-85

## STATEMENT OF COMMISSIONER MIGNON L. CLYBURN

Re:    *Connect America Fund et al.*, WC Docket No. 10-90 et al.

This Order highlights the importance of—and the Commission's commitment to—removing barriers to competitive entry. It preempts the Department of Hawaiian Home Lands' grant of an exclusive license to Waimana Enterprises, the parent company of Sandwich Isles. I am hopeful that our limited preemption will result in better service for consumers living on the Hawaiian Home Lands.

It also highlights the importance of section 253 of the Communications Act in enabling competition. And how useless it will likely be in a broadband-only world, if the Commission's majority moves forward with its plan to reclassify broadband as an information service. Breaking down barriers to infrastructure deployment without Title II is about as effective demolishing a wall by staring at it. Without a Title II telecommunications service at issue, today's Order would not have been possible.

13


**Waimana**
**Enterprises Inc.**

Electronically Filed
FIRST CIRCUIT
1CCV-22-0000321
18-MAR-2022
05:07 PM
Dkt. 11 EXH

*SENT VIA USPS CERTIFIED MAIL*

February 10, 2022

Mr. Scott K Barber
CEO Hawaiian Telcom
1177 Bishop Street
Honolulu, Hawaii 96813

Aloha Mr. Barber,

Waimana Enterprises, Inc. was granted License No. 372 by the Hawaiian Homes Commission in the 1990's. License 372 grants easements and rights-of-ways to insure telecommunications service on Hawaiian Home Lands. Hawaiian Home Lands are held in trust for the benefit of native Hawaiians as part of the Hawaii State Constitution. Hawaiian Telcom purchased several facilities located on land Waimana owns under License 372. The previous owner of these facilities, Paniolo Trustee, had negotiated an access agreement to use License 372 for these facilities. An access agreement was necessary because the United States Bankruptcy Court's authority does not extend to Hawaiian Home Lands. Hawaiian Telcom also has been granted Licenses on Hawaiian Home Lands for other facilities.

When Hawaiian Telcom purchased the Paniolo facilities on August 31, 2021, it did not purchase the access agreement. The Bankruptcy Court recently granted Hawaiian Telcom's motion to clarify its purchase, which confirmed that the purchase did not include the access agreement. Apparently, the access agreement was not purchased because it specified; "SIC (Sandwich Isles Communications) shall, and hereby does, grant to Paniolo (Trustee) the full benefit and use of the DHHL License for the IRU Term provided <u>Paniolo does not exercise its rights under such grant to impair service to HHL (Hawaiian Home Lands).</u>" Hawaiian Telcom immediately threatened to cut off service to HHL by September 30, 2021. Thankfully, it did not but is now threatening to cut off service on March 31, 2022.

Waimana, through its subsidiary SIC, has been trying to negotiate an access agreement with Hawaiian Telcom via Ms. Ellen Robinson. However, she refuses to address all issues; therefore, Hawaiian Telcom has been operating these facilities without an access agreement. In turn, Waimana has sent an invoice for using its land since August 31, 2021 based on the fair market value. The invoice does not include the cost of repairing Waimana's gates surrounding its property that has been damaged by Hawaiian Telcom employees.

EXHIBIT J

Mr. Scott K Barber
2/10/2022
Page 2

It is apparent Hawaiian Telcom intends to continue to use Waimana's property without authority, to continue to damage our gates and cut off service to HHL. Therefore, Waimana demands Hawaiian Telcom immediately pay the invoice for past access and either negotiate an access agreement OR remove its facilities from Waimana's property <u>within 30 days</u> from the date of this letter.

Waimana's intent from the onset of License 372 was that it be used to benefit HHL, and has done so by building state-of-the-art telecommunications infrastructure for homesteaders at no cost to them. The access agreement negotiated with the Paniolo Trustee would have continued to provide service to Homesteaders. It was our hope to continue that spirit of service with your company by taking all issues—access to the facilities on Waimana property and continued transport—to the negotiation table.

Mahalo,

Wendy Hee,
President
Waimana Enterprises, Inc.

Cc via email:
    William Aila
    Lex Smith
    Kevin Herring



**Hawaiian Telcom**
HAWAII'S TECHNOLOGY LEADER

Electronically Filed
FIRST CIRCUIT
1CCV-22-0000321
11-MAR-2022
05:07 PM
Dkt. 12 EXH

Ellen Robinson
Director, Carrier Sales

1177 Bishop Street
Honolulu, HI 96813
Ellen.Robinson@hawaiiantel.com
808-546-6143

March 11, 2022

Wendy Hee
President
Waimana Enterprises, Inc.
P.O. Box 893128
Mililani, Hawaii 96789

Dear Ms. Hee:

We received your February 10, 2022 letter and invoices from Waimana Enterprises, Inc. ("Waimana"), totaling $6,263,591.65 for "License 372 Access Fee" and other unidentified expenses Waimana claims are attributable to Hawaiian Telcom's use of Waimana's "License 372." As you know, however, any claims to exclusivity Waimana may have once had under License 372 have been rendered unenforceable under the Federal Communications Commission's Memorandum Opinion and Order dated July 3, 2017 (the "Preemption Order"). In a letter to your attorney, the Department of Hawaiian Homelands ("DHHL") similarly confirmed and clarified in writing that License 372 does not give Waimana or Sandwich Isles Communications, Inc. ("SIC") any rights to limit or restrict Hawaiian Telcom's access to and use of the Paniolo assets located on DHHL lands. And, as you are further aware, consistent with the provisions of the FCC's Preemption Order, DHHL has in fact granted Hawaiian Telcom its own independent right of entry agreement for the Paniolo premises. Hawaiian Telcom's right of entry is not dependent on Waimana's remaining interests in the 372 License, and it certainly does not require or condition Hawaiian Telcom's independent use and enjoyment of the Paniolo premises on the payment of any rent, access fee, or other tribute to Waimana.

Furthermore, Waimana and SIC's repeated assertions that Hawaiian Telcom's purchase of the Paniolo assets did not include access rights are similarly false. Those rights were indeed transferred to Hawaiian Telcom through the Bankruptcy Court's sale order. Therefore, consistent with above, Hawaiian Telcom is not required to negotiate an agreement with Waimana to access premises for which it already has been granted access.

Finally, demands made by SIC regarding access to or use of Paniolo assets have nothing to do with SIC's continuing breach and failure to pay Hawaiian Telcom under existing contracts ($1,527,585.38 outstanding as of February 16, 2022). Such contracts and services provided thereunder are wholly unrelated to Hawaiian Telcom's 2021 acquisition of the Paniolo network,

EXHIBIT K

some of which contracts have been in place since 1997, 2011 and 2014, with SIC's defaults dating back to August 2020.

Hawaiian Telcom still remains hopeful that SIC and its affiliates will come to the table and negotiate new commercial arrangements for use of the Paniolo network. Should you have any questions or wish to discuss contract negotiations or payment, please contact me at ellen.robinson@hawaiiantel.com or (808) 546-6143.

Sincerely,

Ellen Robinson
Director, Carrier Sales
Hawaiian Telcom

cc: (VIA EMAIL)
Al Hee, SIC;
Breanne Kahalewai, SIC;
Department of Hawaiian Home Lands;
Hawai'i Public Utilities Commission;
Division of Consumer Advocacy, Department of Commerce and Consumer Affairs;
Department of Justice;
Rural Utilities Service; and
Federal Communications Commission

| **STATE OF HAWAI'I** CIRCUIT COURT OF THE FIRST CIRCUIT | **SUMMONS** TO ANSWER CIVIL COMPLAINT | CASE NUMBER |
|---|---|---|

| PLAINTIFF                                                    VS. | DEFENDANT(S) | |
|---|---|---|
| WAIMANA ENTERPRISES INC. and SANDWICH ISLES COMMUNICATIONS INC., | HAWAIIAN TELCOM INC., | **Electronically Filed FIRST CIRCUIT 1CCV-22-0000321 18-MAR-2022 05:07 PM Dkt. 13 CMPS** |

PLAINTIFF'S NAME & ADDRESS, TEL. NO.

| | |
|---|---|
| LEX R. SMITH 3485 | WILLIAM MEHEULA 2277 |
| First Hawaiian Center | Pacific Guardian Center, Makai Tower |
| 999 Bishop Street, Suite 2600 | 733 Bishop Street, Suite 2900 |
| Honolulu, Hawaii  96813 | Honolulu, Hawaii 96813 |
| Telephone:  (808) 535-5700 | Telephone: (808) 628-7535 |
| Facsimile:  (808) 535-5799 | Facsimile: (808) 533-2467 |

**TO THE ABOVE-NAMED DEFENDANT(S)**

You are hereby summoned and required to file with the court and serve upon

Lex R. Smith and William Meheula III

_____ ,

plaintiff's attorney, whose address is stated above, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the date of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**THIS SUMMONS SHALL NOT BE PERSONALLY DELIVERED BETWEEN 10:00 P.M. AND 6:00 A.M. ON PREMISES NOT OPEN TO THE GENERAL PUBLIC, UNLESS A JUDGE OF THE ABOVE-ENTITLED COURT PERMITS, IN WRITING ON THIS SUMMONS, PERSONAL DELIVERY DURING THOSE HOURS.**

**A FAILURE TO OBEY THIS SUMMONS MAY RESULT IN AN ENTRY OF DEFAULT AND DEFAULT JUDGMENT AGAINST THE DISOBEYING PERSON OR PARTY.**

| The original document is filed in the Judiciary's electronic case management system which is accessible via eCourt Kokua at: http://www.courts.state.hi.us | **Effective Date of 28-Oct-2019 Signed by: /s/ Patsy Nakamoto Clerk, 1st Circuit, State of Hawai'i** |  |
|---|---|---|

|  | In accordance with the Americans with Disabilities Act, and other applicable state and federal laws, if you require a reasonable accommodation for a disability, please contact the ADA Coordinator at the Circuit Court Administration Office on OAHU- Phone No. 808-539-4400, TTY 808-539-4853, FAX 539-4402, at least ten (10) working days prior to your hearing or appointment date. |
|---|---|

# PRINTABLE CASE VIEW

**Generated: 4-APR-2022 01:04 PM**

**Search Criteria: Case ID or Citation Number: 1CCV-22-0000321**

**1 record(s) total**

| | | |
|---|---|---|
| **Case ID:** 1CCV-22-0000321 - Waimana v. Hawaii Telcom<br>**Type:** CV - Circuit Court Civil<br>**Status:** ACTIVE - Active Case<br>**Last Updated:** 04-Apr-2022 | **Filing Date:** FRIDAY, MARCH 18, 2022<br>**Court:** FIRST CIRCUIT<br>**Location:** PUNCHBOWL | |

**Related Cases**

No related cases were found.

**Case Parties**

| Seq # | Assoc | End Date | Type | ID | Name / Aliases |
|---|---|---|---|---|---|
| 1 | Meheula, William K. | | Plaintiff | @4932880 | Waimana Enterprises Inc. |
| 2 | Smith, Lex R. | | Plaintiff | @4932881 | Sandwich Isles Communications Inc. |
| 3 | | | Defendant | @4932882 | Hawaiian Telcom Inc. |
| 4 | Sandwich Isles Communications Inc. | | Attorney | A3485 | Smith, Lex R. |
| 5 | Waimana Enterprises Inc. | | Attorney | A2277 | Meheula, William K. |
| 6 | | | Other | D1C14 | First Circuit Court 14th Division |

**Bail / Bond Information**

No Bails were found.

**Events**

| Event | Parties | Date | Time | Room | Location | Judge | Appearance Disposition |
|---|---|---|---|---|---|---|---|
| Scheduling Conference | | 06/13/2022 | 15:00:00 | First Circuit 14th Division | PUNCHBOWL | Chang , Gary | |

**Dockets**

| Docket # | Date | Docket | Document Name | Parties | Filing Party |
|---|---|---|---|---|---|
| 1 | 03/18/2022 | Complaint and Summons<br>EFile Document upload of type<br>Complaint and Summons | Complaint; Exhibits A - K; Summons | Sandwich Isles Communications Inc. - Plaintiff<br>Waimana Enterprises Inc. - Plaintiff | Meheula, William K., Smith, Lex R. |
| 2 | 03/18/2022 | Exhibit<br>EFile Document upload of type Exhibit | Exhibit A | Waimana Enterprises Inc. - Plaintiff<br>Sandwich Isles Communications Inc. - Plaintiff | Smith, Lex R., Meheula, William K. |
| 3 | 03/18/2022 | Exhibit<br>EFile Document upload of type Exhibit | Exhibit B | Waimana Enterprises Inc. - Plaintiff<br>Sandwich Isles Communications Inc. - Plaintiff | Smith, Lex R., Meheula, William K. |
| 4 | 03/18/2022 | Exhibit<br>EFile Document upload of type Exhibit | Exhibit C | Waimana Enterprises Inc. - Plaintiff<br>Sandwich Isles Communications Inc. - Plaintiff | Meheula, William K., Smith, Lex R. |
| 5 | 03/18/2022 | Exhibit<br>EFile Document upload of type Exhibit | Exhibit D | Waimana Enterprises Inc. - Plaintiff<br>Sandwich Isles Communications Inc. - Plaintiff | Smith, Lex R., Meheula, William K. |
| 6 | 03/18/2022 | Exhibit<br>EFile Document upload of type Exhibit | Exhibit E | Waimana Enterprises Inc. - Plaintiff<br>Sandwich Isles Communications Inc. - Plaintiff | Meheula, William K., Smith, Lex R. |
| 7 | 03/18/2022 | Exhibit<br>EFile Document upload of type Exhibit | Exhibit F | Waimana Enterprises Inc. - Plaintiff<br>Sandwich Isles Communications Inc. - Plaintiff | Smith, Lex R., Meheula, William K. |
| 8 | 03/18/2022 | Exhibit<br>EFile Document upload of type Exhibit | Exhibit G | Waimana Enterprises Inc. - Plaintiff<br>Sandwich Isles Communications Inc. - Plaintiff | Meheula, William K., Smith, Lex R. |
| 9 | 03/18/2022 | Exhibit<br>EFile Document upload of type Exhibit | Exhibit H | Waimana Enterprises Inc. - Plaintiff<br>Sandwich Isles Communications Inc. - Plaintiff | Meheula, William K., Smith, Lex R. |

| 10 | 03/18/2022 | Exhibit<br>EFile Document upload of type Exhibit | Exhibit I | Waimana Enterprises Inc. - Plaintiff<br>Sandwich Isles Communications Inc. - Plaintiff | Meheula, William K., Smith, Lex R. |
| 11 | 03/18/2022 | Exhibit<br>EFile Document upload of type Exhibit | Exhibit J | Waimana Enterprises Inc. - Plaintiff<br>Sandwich Isles Communications Inc. - Plaintiff | Meheula, William K., Smith, Lex R. |
| 12 | 03/18/2022 | Exhibit<br>EFile Document upload of type Exhibit | Exhibit K | Waimana Enterprises Inc. - Plaintiff<br>Sandwich Isles Communications Inc. - Plaintiff | Smith, Lex R., Meheula, William K. |
| 13 | 03/18/2022 | Complaint and Summons<br>EFile Document upload of type Complaint and Summons | Summmons | Waimana Enterprises Inc. - Plaintiff<br>Sandwich Isles Communications Inc. - Plaintiff | Smith, Lex R., Meheula, William K. |
| 14 | 03/18/2022 | Civil Information Sheet<br>EFile Document upload of type Civil Information Sheet | Civil Information Sheet | Waimana Enterprises Inc. - Plaintiff<br>Sandwich Isles Communications Inc. - Plaintiff | Meheula, William K., Smith, Lex R. |
| 15 | 03/18/2022 | Demand for Jury Trial<br>EFile Document upload of type Demand for Jury Trial | Demand for Jury Trial | Waimana Enterprises Inc. - Plaintiff<br>Sandwich Isles Communications Inc. - Plaintiff | Meheula, William K., Smith, Lex R. |
| 17 | 03/18/2022 | Payment Due to Court | | Lex R Smith - Attorney | |
| 19 | 03/18/2022 | Payment<br>Payment by Credit Card-Civil in the amount of $515.00 by Smith, Lex R. | | Lex R Smith - Attorney | |
| 20 | 03/18/2022 | New Case Assignment<br>CASE ASSIGNED TO THE 14TH DIVISION, HONORABLE GARY W.B. CHANG, JUDGE PRESIDING | | Waimana Enterprises Inc. - Plaintiff<br>Sandwich Isles Communications Inc. - Plaintiff<br>Hawaiian Telcom Inc. - Defendant<br>First Circuit Court 14th Division - Other | FILED BY COURT, COURT |
| 22 | 03/23/2022 | Service-Return/Acknowledgement<br>EFile Document upload of type Service-Return/Acknowledgement | Return and Acknowledgment of Service (Hawaiian Telcom Inc.) | Sandwich Isles Communications Inc. - Plaintiff<br>Hawaiian Telcom Inc. - Defendant | Meheula, William K., Smith, Lex R. |

| 24 | 04/01/2022 | Request for Scheduling Conf EFile Document upload of type Request for Scheduling Conf | Notice of Request for Scheduling Conference; [Proposed] Order Setting Scheduling Conference | Sandwich Isles Communications Inc. - Plaintiff   Waimana Enterprises Inc. - Plaintiff | Meheula, William K., Smith, Lex R. |
| 26 | 04/04/2022 | Order Set Sched Conference | ORDER SETTING SCHEDULING CONFERENCE; ZOOM VIDEO INSTRUCTIONS (6/13/2022 at 3pm) | Waimana Enterprises Inc. - Plaintiff   Sandwich Isles Communications Inc. - Plaintiff   Hawaiian Telcom Inc. - Defendant | Meheula, William K., Smith, Lex R. |
| 28 | 04/04/2022 | Notice of Court Date | | All Case Parties | |

## ADVERSARY PROCEEDING COVER SHEET
(Instructions on Reverse)

**ADVERSARY PROCEEDING NO.**

| PLAINTIFF(S) | DEFENDANT(S) |
|---|---|
| WAIMANA ENTERPRISES INC. and SANDWICH ISLES COMMUNICATIONS INC. | HAWAIIAN TELCOM, INC. |

| ATTORNEY(S) (Firm Name, Address, Telephone No.) | ATTORNEY(S) (If Known) |
|---|---|
| LEX R. SMITH, ESQ. \| Kobayashi Sugita & Goda \| 999 Bishop St., Ste. 2600, Honolulu, HI 96813<br><br>WILLIAM K. MEHEULA, III, ESQ. \| Sullivan Meheula Lee, LLLP 733 Bishop St., Ste. 2900, Honolulu, HI 96813 | TED N. PETTIT, ESQ.<br>DAVID G. BRITTIN, ESQ.<br>CASE LOMBARDI & PETTIT<br>737 Bishop St., #2600, Honolulu, Hawaii 96813<br>Ph: 808-547-5400 \| Fax: 808-523-1888 ⊞ |

| PARTY (Check One Box Only) | | PARTY (Check One Box Only) | |
|---|---|---|---|
| ☐ Debtor   ☐ U.S. Trustee | | ☐ Debtor   ☐ U.S. Trustee | |
| ☐ Creditor   ☐ Trustee   ☑ Other | | ☐ Creditor   ☐ Trustee   ☑ Other | |

**CAUSE OF ACTION** (Write a brief statement of cause of action, including all U.S. statutes involved.)

---

### NATURE OF SUIT

(Number up to 5 boxes with the lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

*Note: Only a complaint including an objection to discharge under 11 U.S.C. § 727 will defer the clerk's entry of the debtor's discharge in bankruptcy.*
*A complaint to determine the dischargeability of a debt under 11 U.S.C. § 523 does not affect the entry of a discharge with respect to other debts.*

| | |
|---|---|
| **FRBP 7001(1) – Recovery of Money/Property**<br>☐ 11 – Recovery of money/property - § 542 turnover of property<br>☐ 12 – Recovery of money/property - § 547 preference<br>☐ 13 – Recovery of money/property - § 548 fraudulent transfer<br>☐ 14 – Recovery of money/property – other | **FRBP 7001(6) – Dischargeability (continued)**<br>☐ 61 – Dischargeability - § 523(a)(5), domestic support<br>☐ 68 – Dischargeability - § 523(a)(6), willful and malicious injury<br>☐ 63 – Dischargeability - § 523(a)(8), student loan<br>☐ 64 – Dischargeability - § 523 (a)(15), divorce or separation obligation (other than domestic support)<br>☐ 65 – Dischargeability – other |
| **FRBP 7001(2) – Validity, Priority or Extent of Lien**<br>☐ 21 – Validity, priority or extent of lien or other interest in property | |
| **FRBP 7001(3) – Approval of Sale of Property**<br>☐ 31 – Approval of sale of property of estate and of a co-owner - § 363(h) | **FRBP 7001(7) – Injunctive Relief**<br>☑ 71 – Injunctive relief – imposition of stay<br>☐ 72 – Injunctive relief – other |
| **FRBP 7001(4) – Objection/Revocation of Discharge**<br>☐ 41 – Objection/revocation of discharge - § 727(c), (d), (e) | **FRBP 7001(8) – Subordination of Claim or Interest**<br>☐ 81- Subordination of claim or interest |
| **FRBP 7001(5) – Revocation of Confirmation**<br>☐ 51 – Revocation of confirmation | **FRBP 7001(9) – Declaratory Judgment**<br>☑ 91 – Declaratory judgment |
| **FRBP 7001(6) – Dischargeability**<br>☐ 66 – Dischargeability - § 523(a)(1), (14), (14A) priority tax claims<br>☐ 62 – Dischargeability - § 523(a)(2), false pretenses, false representation, actual fraud<br>☐ 67 – Dischargeability - § 523(a)(4), fraud as fiduciary, embezzlement, larceny<br>**(continued next column)** | **FRBP 7001(10) – Determination of Removed Action**<br>☑ 01 – Determination of removed claim or cause<br><br>**Other**<br>☐ SS-SIPA Case – 15 U.S.C. §§ 78aaa et seq.<br>☐ 02 – Other (e.g.,other actions that would have been brought in state court if unrelated to bankruptcy case) |
| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
| ☐ Check if a jury trial is demanded in complaint | Demand: $ |

**Other Relief Sought:**

Adjudication of rights and remedies of Defendant Hawaiian Telcom Inc, as purchaser, with respect to the 363 Sale Order [ECF 336], the Order Confirming Amended Plan of Liquidation [ECF 606], the Order Granting in Part and Denying in Part Hawaiian Telcom's Motion to Enforce Sale Order [ECF 537], [ECF 559], and related orders a ⊞

B1040 (Form 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br><br>PANIOLO CABLE COMPANY, LLC | BANKRUPTCY CASE NO.<br><br>CASE NO. 18-01319 | |
| DISTRICT IN WHICH CASE IS PENDING<br><br>Hawaii | DIVISION OFFICE<br><br>Honolulu | NAME OF JUDGE<br><br>Judge Robert J. Faris |

| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
|---|---|---|
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY PROCEEDING IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | PRINT NAME OF ATTORNEY (OR PLAINTIFF) | |
| DATE | | |

### INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet. When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs and Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

SULLIVAN MEHEULA LEE
A Limited Liability Law Partnership

WILLIAM MEHEULA          (2277)
D. KAENA HOROWITZ        (9836)
Pacific Guardian Center, Makai Tower
733 Bishop Street, Suite 2900
Honolulu, Hawaiʻi  96813
Telephone:  (808) 599-9555
Facsimile:  (808) 533-2467
Email: meheula@smlhawaii.com; kaena@smlhawaii.com

Attorneys for Plaintiff
WAIMANA ENTERPRISES INC.

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| In re<br><br>PANIOLO CABLE COMPANY, LLC,<br><br>             Debtor.<br>_____<br><br>WAIMANA ENTERPRISES INC. and<br>SANDWICH ISLES<br>COMMUNICATIONS INC.,<br><br>             Plaintiffs,<br><br>    v.<br><br>HAWAIIAN TELCOM INC.,<br><br>             Defendant.<br>_____ | Case No. 18-01319<br>(Chapter 11)<br><br>PLAINTIFF WAIMANA<br>ENTERPRISES INC.'S MOTION TO<br>REMAND CASE TO STATE COURT,<br>OR IN THE ALTERNATIVE, FOR<br>ABSTENTION; MEMORANDUM IN<br>SUPPORT OF MOTION<br><br>HEARING:<br>Date:  June 3, 2022<br>Time:  10:00 a.m.<br>Judge:  The Honorable Robert J. Faris<br><br>Adversary Proceeding No. 22-90008 |

PLAINTIFF WAIMANA ENTERPRISES INC.'S MOTION TO REMAND CASE
TO STATE COURT, OR IN THE ALTERNATIVE, FOR ABSTENTION

 Plaintiff WAIMANA ENTERPRISES INC. ("**Waimana**"), by and through

its undersigned counsel, hereby moves this Honorable Court for an order

remanding this action to the Circuit Court of the First Circuit, State of Hawaiʻi.

 This Motion is made pursuant to Federal Rules of Bankruptcy Procedure

9013, and is based on the supporting memorandum filed simultaneously herewith.

 DATED:  Honolulu, Hawaiʻi, April 27, 2022.


     /s/ William Meheula
     WILLIAM MEHEULA
     D. KAENA HOROWITZ

     Attorneys for Plaintiff
     WAIMANA ENTERPRISES INC.

2

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| In re | Case No. 18-01319 |
| | (Chapter 11) |
| PANIOLO CABLE COMPANY, LLC, | |
| | MEMORANDUM IN SUPPORT OF |
| Debtor. | MOTION |
| | |
| WAIMANA ENTERPRISES INC. and SANDWICH ISLES COMMUNICATIONS INC., | Adversary Proceeding No. 22-90008 |
| | |
| Plaintiffs, | |
| | |
| v. | |
| | |
| HAWAIIAN TELCOM INC., | |
| | |
| Defendant. | |

MEMORANDUM IN SUPPORT OF MOTION

<u>MEMORANDUM IN SUPPORT OF MOTION</u>

This action should be remanded to the Circuit Court, where it was filed.  The debtor, Paniolo Cable Company Inc., is not a party to this case.

The Court lacks jurisdiction over any of the claims contained in the Complaint.

Moreover, even if there were any conceivable basis for the Court to assert jurisdiction, the Court should exercise its discretion to abstain.  The debtor has already sold substantially all of its assets.  This case involves conduct of the parties that took place after the debtor sold substantially all of his assets.  This lawsuit makes no claims against the debtor.  No claim alleged in the lawsuit can conceivably have any effect on the debtor.  There is simply no basis for the claims in the Complaint to be before this Court.

## I.    **<u>BACKGROUND</u>**

The Paniolo Bankruptcy Trustee (the "**Trustee**") sued Sandwich Isles Communications Inc. ("**SIC**") for unpaid rent under a lease.  The Trustee received a money judgment against SIC and, under Haw. Rev. Stat. Chapter 651, the U.S. Marshal levied and executed on certain specified assets of SIC's.  The levy and execution was quite specific: identifying the exact generator(s) and manhole(s) that were levied and executed upon.  The Trustee made it very clear he was not levying

nor executing on all of SIC's assets.  Because the judgment was not against Waimana **no assets** of Waimana were executed upon.

Waimana is the Licensee under License 372, issued by the State of Hawaiʻi Department of Hawaiian Home Lands ("DHHL").  Waimana partially assigned License 372 for voice only to SIC.  The Trustee did **not** levy nor execute on Waimana's interest in License 372.

Following the execution sale, SIC has continued to own, occupy, and use – to provide service to the native Hawaiians residing on the Hawaiian Home Lands ("HHL") – the assets that the Marshal did not levy nor execute on.  This continued for over eight (8) months while Hawaiian Telcom, Inc. ("**HAWTEL**") was managing the assets.  During that period, neither HAWTEL nor the Trustee made any claim to the SIC assets that were not identified on Exhibit A2, the list of assets the Trustee executed on.

Following the closing of the Trustee's sale to HAWTEL of the Trustee's assets – including both the facilities that were originally Paniolo's and the facilities that were acquired in the execution sale of SIC's assets – HAWTEL began claiming ownership of many assets that were never executed upon.  Included among those assets were the real estate interests that were not executed upon. HAWTEL began excluding SIC from the premises, going so far as to cut SIC's locks, in order to deny SIC access to its own premises.

2

SIC sought to negotiate a resolution, but HAWTEL insisted they had the right to unilaterally dictate to SIC, and HAWTEL therefore refused to engage in discussions therewith.

After months of unsuccessfully urging HAWTEL to negotiate and/or discuss, Waimana and SIC sued, in Hawai'i State Circuit Court, for the following relief:

1.    Issuance of a judgment evicting HAWTEL's structures and facilities from the land licensed to Waimana and SIC pursuant to Department of Hawaiian Home Lands License 372;

2.    Issuance of a Writ of Possession in favor of Waimana and SIC and HAWTEL to remove Hawaiian Tel from the lands covered by Waimana's and SIC's License 372;

3.    For a temporary restraining order, preliminary and permanent injunctions enjoining Hawaiian Telcom from occupying the property licensed to Waimana and SIC and prohibiting Hawaiian Tel from damaging Waimana's and SIC's facilities located on the Licensed Property and last mile facilities on HHL.

4.    For damages in an amount to be determined at trial.

5.    For treble damages in an amount be determined at trial.

6.    For punitive damages in an amount to be determined at trial.

7.    For plaintiffs' reasonable costs and attorneys' fees incurred herein.

8.    For such other and further relief as the Court deems just.

3

## II.  **THERE IS NO BANKRUPTCY JURISDICTION**

This action was improperly removed, and should be remanded, because Waimana's and SIC's state court lawsuit does **not** involve the bankruptcy Court's jurisdiction.  The removal was filed pursuant to 28 U.S.C. § 1452, which provides:

(a)  A party may remove any claim or cause of action in a civil action … **if such district court has jurisdiction of such claim or cause of action under section 1334 of this title**.

(b)  **The court to which such claim or cause of action is removed may remand such claim or cause of action on any equitable ground**. An order entered under this subsection remanding a claim or cause of action, or a decision to not remand, is not reviewable by appeal or otherwise by the court of appeals under section 158(d), 1291, or 1292 of this title or by the Supreme Court of the United States under section 1254 of this title.

Id (emphasis added).  Neither prong exists here.

Under 28 U.S.C. § 1334, bankruptcy jurisdiction exists in cases "arising under title 11, or arising in or related to cases under title 11."  The dispute between HAWTEL and Waimana and SIC clearly does **not** arise under Title 11 and does **not** arise in a Title 11 case.  A case "'arises under' the Bankruptcy Code if its existence depends on a substantive provision of bankruptcy law, that is, if it involves a cause of action created or determined by a statutory provision of the Bankruptcy Code."  In re Ray, 624 F.3d 1124, 1131 (9th Cir. 2010).  A case "'arises in' a case under the Bankruptcy Code if it is an administrative matter unique to the bankruptcy process that has no independent existence outside of

4

bankruptcy and could not be brought in another forum, but whose cause of action is not expressly rooted in the Bankruptcy Code." Id.; see Schultze v. Chandler, 765 F.3d 945, 948 (9th Cir. 2014).  Obviously, this case which involves rights (or the lack of rights) in the Hawaiian Home Lands **neither** "arise[s] in" **nor** "arise[s] under" the Bankruptcy Code.

The claims in this case also are not "related to" the Paniolo Title 11 bankruptcy case.

> The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of the proceeding **could conceivably have any effect on the estate being administered in bankruptcy**. [citations omitted]. Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

In re Fietz, 852 F.2d 455, 457 (9th Cir. 1988) quoting Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir.1984).

The outcome of the present case has **no** conceivable impact on the Paniolo estate.  The only issues that will be decided in this case are whether HAWTEL will make tens of millions of dollars from the use of the HHL for free, or whether HAWTEL will be required to pay for the use of the land rights that has already been licensed to Waimana and SIC.   Thus, there is no conceivable impact on the Paniolo estate.

5

In the first place, HAWTEL does not even dispute that they have no rights to the land underlying the "A1 assets" as the facilities were owned by Paniolo at the time the Trustee was appointed.   Paniolo's only land rights for the A1 assets came from the Joint Use Agreement ("**JUA**") between SIC and Paniolo.  The Trustee terminated the JUA and replaced it with the Master Relationship Agreement ("**MRA**") and its schedules, which HAWTEL admits it did **not** assume and is entitled to **no** benefits from.  HAWTEL does not even offer any reasoning why or how they could have any land rights underlying the facilities that were all along owned by Paniolo.

With respect to former SIC-assets that the Marshal levied and executed upon, the record is clear (and HAWTEL does not deny) that the Marshal did **not** levy upon, nor sell, SIC's interest in License 372; and did **not** levy upon nor sell the metes and bounds easements which are recorded addenda to License 372. Nevertheless, HAWTEL relies on Exhibit A2's references an amorphous "right of access" as if such a right exists separate and apart from License 372 and its addenda, which have not been executed upon.  It does not.

The Trustee understood that he did not have the right to access the Central Offices and other facilities and therefore negotiated the MRA with SIC.

HAWTEL elected not to assume the MRA because they expected to get a better deal from DHHL.   Now that HAWTEL has realized DHHL has only

6

granted them a "month to month" permit and it is entirely unclear (i) whether
HAWTEL will receive a License; (ii) whether the Hawaiian Homes Commission
Act allows the issuance of a license to a non-beneficiary company for the same
property already licensed to a Native Hawaiian beneficiary company; and (iii) what
a new license will cost them if the Hawaiian Homes Commission grants one,
HAWTEL is back before this Court trying to get something it did chose not to buy
from the Trustee.

But the reality is, that whatever rights HAWTEL got, or didn't get, from the
DHHL's revocable permit, is outside this Court's jurisdiction.  This case should be
remanded for decision before the appropriate court.

## III.   <u>EVEN IF THERE WERE JURISDICTION, THE COURT SHOULD ABSTAIN.</u>

Even if there were bankruptcy jurisdiction to hear this dispute, which there is
not, the Court should remand the case on equitable grounds.  Under 28 U.S.C. §
1452(b) the bankruptcy court is authorized to remand any removed case or claim
"on any equitable ground."  The "any equitable ground" standard is very broad and
is based on the sound discretion of the bankruptcy judge.

The Ninth Circuit applies a fourteen factor test, the "Cedar Funding factors,"
for determining whether equitable grounds support remand: (1) the effect on the
efficient administration of the estate; (2) the extent to which state-law issues
predominate; (3) the lack of novelty or difficulty of applicable law; (4) the

7

presence of related state-court proceedings; (5) the lack of jurisdictional bases for

removal other than section 1334(b); (6) the remoteness to the main bankruptcy

case; (7) the absence of any core proceeding; (8) the inapplicability of severing

claims; (9) the burden on the federal docket; (10) the likelihood of forum shopping;

(11) the right to a jury trial; (12) the presence of non-debtor parties; (13) comity;

and (14) the possible prejudice to the plaintiff. In re Cedar Funding, Inc., 419 B.R.

807, 820 (9th Cir. B.A.P. 2009).  Applying this test to this case clearly indicates

that the case should be remanded:

      This action will have no effect on the administration of bankruptcy

proceedings.  It is remote from any bankruptcy proceeding—the debtor is not a

party; the debtor has already sold substantially all of its assets—and this action

does not present any bankruptcy issues.

      State law issues predominate.  The rights of Waimana under its license

authorized by the Hawaiian Homes Commission are predominant.  Indeed, there

are no "bankruptcy law" issues at all presented by this case.

      The law under the Hawaiian Homes Commission Act is clearly something

that State courts have expertise on, and the Bankrkuptcy Court does not.  This

factor as well supports abstention and remand.

      While there are no state court proceedings, there are ongoing proceedings

before the Hawaiian Homes Commission on whether or not Hawaiian Telcom will

8

receive a license.  Indeed, it is the reluctance of the Hawaiian Homes Commission to grant Hawaiian Telcom a license, that caused Hawaiian Telcom to ask the Bankruptcy Court to grant Hawaiian Telcom free use of SIC's license.  The interplay with the ongoing proceedings before the Hawaiian Homes Commission weighs in favor of the court abstaining and remanding this case to be addressed in State Court.

There are no jurisdictional bases for removal other than 28 U.S.C. 1334(b). The case presents no issue of federal law.  The parties are all citizens of the state of Hawai'i.

This case is entirely remote from the main bankruptcy case.  This is a dispute between non-debtor, Waimana, and non-debtor Hawaiian Tel about future use of Hawaiian Home Lands.  It has nothing to do with the bankruptcy estate.

Hawaiian Telcom has clearly engaged in forum shopping.  When the Trustee first announced the sale to Hawaiian Telcom, the Trustee and the Department of Hawaiian Home Lands each filed statements in the bankruptcy case confirming that Hawaiian Telcom would have to obtain a new license:  "DHHL will need grant a new license to Hawaiian Telcom, Inc."  Now that they are not happy with the progress of seeking a new license, they return to this Court to try to get a better result.

9

The fact that a plaintiff seeks a jury trial—which will prevent the bankruptcy court from hearing the case—demonstrates that no judicial efficiency will be achieved by removal, and that equity supports a remand.  "Courts have granted equitable remand solely on the basis of a party's entitlement to a jury trial when that party's action was not a 'core proceeding.' " <u>Fed. Home Loan Bank of Seattle v. Barclays Capital, Inc</u>., No. C10–0139 RSM, 2010 WL 3662345, at *7 (W.D. Wash. Sept. 1, 2010).

All of the parties are nondebtors.  Comity with the state courts should be recognized here.

Indeed, all of the factors weigh in favor of remand with the possible exceptions of "burden on the federal docket", "risk of severing of the plaintiffs' claims" and prejudice to plaintiff, each of which is neutral.

Consequently, this matter should be properly remanded to the appropriate court.

DATED:  Honolulu, Hawai'i, April 27, 2022.

/s/ William Meheula
WILLIAM MEHEULA
D. KAENA HOROWITZ

Attorneys for Plaintiff
WAIMANA ENTERPRISES INC.

10

**File a Motion:**

22-90008 Waimana Enterprises Inc et al v. Hawaiian Telcom Inc.

| | | |
|---|---|---|
| Type: ap | Office: 1 (Honolulu) | Judge: rjf |
| Lead Case: 1-18-bk-1319 | Case Flag: TRANSIN, JuryTrial | |

### United States Bankruptcy Court

### District of Hawaii

Notice of Electronic Filing

The following transaction was received from William K. Meheula entered on 4/27/2022 at 1:38 PM HST and filed on 4/27/2022

**Case Name:**          Waimana Enterprises Inc et al v. Hawaiian Telcom Inc.

**Case Number:**      22-90008

**Document Number:** 10

**Docket Text:**
Motion for Remand *(MOTION TO REMAND CASE TO STATE COURT, OR IN THE ALTERNATIVE, FOR ABSTENTION)*. Filed by William K. Meheula III on behalf of Waimana Enterprises Inc. (Meheula, William)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** 2022-04-27 Motion to Remand_Final.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1018307671 [Date=4/27/2022] [FileNumber=4381002-0
] [3c34a64d919ec23adcd9b068413a43ffc072ea47525ce7be686510c2e18771e1823
a9bd8c344177cdef305baa694e43daebb9f46214f3c82f26df2069a1d891c]]

### 22-90008 Notice will be electronically mailed to:

William K. Meheula, III on behalf of Plaintiff Waimana Enterprises Inc
meheula@smlhawaii.com, sandi@smlhawaii.com

Ted N. Pettit on behalf of Defendant Hawaiian Telcom Inc.
tnp@caselombardi.com, mav@caselombardi.com;elm@caselombardi;paa@caselombardi.com

Lex R. Smith on behalf of Plaintiff Sandwich Isles Communications, Inc.
lsmith@ksglaw.com, jkeane@ksglaw.com;myw@ksglaw.com

### 22-90008 Notice will not be electronically mailed to:

1883747v1

KOBAYASHI SUGITA & GODA, LLP
LEX R. SMITH          3485-0
MARIA Y. WANG         8842-0
999 Bishop Street, 26th Floor
Honolulu, Hawaii 96813
Tel:  808-535-5700
Fax:  808-535-5799
lrs@ksglaw.com; myw@ksglaw.com

Attorneys for
SANDWICH ISLES COMMUNICATIONS, INC.

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| In re: | ) | Case No. 18-01319 (RJF) |
| | ) | (Chapter 11) |
| PANIOLO CABLE COMPANY, LLC, | ) | |
| | ) | SANDWICH ISLES |
| | ) | COMMUNICATIONS, INC.'S |
| Debtor. | ) | STATEMENT OF OBJECTIONS TO |
| | ) | THE FINAL RELIEF REQUESTED |
| | ) | BY HAWAIIAN TELCOM [Dkt. 637]; |
| | ) | EXHIBIT A2 |
| | ) | |
| | ) | Final Hearing: |
| | ) | Date:  May 16, 2022 |
| | ) | Time:  2:00 p.m. |
| | ) | Judge: Hon Robert J. Faris |

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

<u>Ahia v. Department of Transp.</u>,
  69 Haw. 538, 555, 751 P.2d 81, 91 (1988) ........................................................ 23

<u>Butner v. United States</u>,
  440 U.S. 48 (1979) ........................................................................................ 16, 29

<u>Keaukaha II</u>,
  739 F.2d at 1472 .................................................................................................. 23

In re: <u>Maunakea</u>
  448 B.R. 252 (D. Haw. 2011) ....................................................................... 16, 25

<u>*Ogden* v. *Saunders*</u>,
  <u>12 Wheat. 213</u> ..................................................................................................... 16

<u>Price v. Akaka (Akaka I)</u>,
  928 F.2d 824, 826 n. 1 (9th Cir. 1990) (emphasis added), cert.
  denied, 502 U.S. 967, 112 S.Ct. 436, 116 L.Ed.2d 455 (1991) ......................... 23

<u>Price v. Akaka ( Akaka II)</u>,
  3 F.3d 1220 (9th Cir. 1993), cert. denied ........................................................... 23

<u>Price v. State of Hawaii</u>,
  764 F.2d 623 (9th Cir. 1985) .............................................................................. 23

<u>Raleigh v Illinois Dep't of Revenue</u>,
  530 US 15, 120 S.Ct 1951, 147 L.Ed.2d 13 (2000) ..................................... 26, 29

<u>*Stellwagen* v. *Clum*</u>,
  <u>245 U.S. 605</u> ................................................................................................ 16, 27

<u>*Sturges* v. *Crowninshield*</u>,
  <u>4 Wheat. 122</u> ...................................................................................................... 16

<u>In re U.S. Airways Group, Inc.</u>,
  303 B.R. 784 (Bankr. E.D. Va. 2003) ........................................................... 27, 29

In re US Airways Group Inc.,
  287 B.R. 643 (E.D. Va. 2002) .................................................................. 26, 27

**State Cases**

Aged Hawaiians v Hawaiian Homes Commission
  78 Haw 192. 891 P.2d 279 (Haw 1995) ....................................................... 21, 23

Ahia v. Department of Transportation
  69 Haw. 538, 544, 751 P.2d 81, 86 (Haw. 1988) ..................................... *passim*

Ahuna v. Department of Hawaiian Home Lands,
  64 Haw. 327, 640 P.2d 1161 (1982) ....................................................... *passim*

Ditto v. McCurdy,
  102 Haw. 518, 78 P.3d 331 (2003) ................................................................ 37

Everett v. Bolles,
  6 Haw. 153 (1875) ........................................................................................ 38

Keahole Defense Coalition v. BLNR,
  110 HAW. 433 (Haw. 2006) ........................................................................... 27

Nelson v Hawaiian Homes Commission,
  127 Haw 185 (Haw 2012) ...................................................... 19, 21, 22, 25

**State Statutes**

Admission Act § 4 ........................................................................................... 23

Civil Code § 1022 ........................................................................................... 38

Communications Act of 1934 ............................................................................ 3

Haw. Rev. Stat. 101-4 ..................................................................................... 12

Hawaii Revised Statutes Chapter 171 ........................................................... 9, 21

Hawaii's Constitution in the Admissions Act ................................................. 17

Hawaiian Homelands Commission Act § 207(c)(1)(A) ...................................... 26

Hawaiian Homelands Commission Act §208 ............................................... 5, 16

Hawaiian Homes Commission Act ....................................................... *passim*

Hawaiian Homes Commission Act, § 204(2)...................................... *passim*

Hawaiian Homes Commission Act §207(a).......................................... 9

Hawaiian Homes Commission Act §207(c)(1) ..................................... 9

**Rules**

Haw. R. App. P. 13.............................................................................. 40

Haw. R. App. P. 602-5(a)(2) ............................................................... 40

Hawai'i Administrative Rules § 10-4-21 ............................................. 26

**Regulations**

Stand. Comm. Rep. No. 56.................................................................. 13

**Constitutional Provisions**

Federal Constitution, Article I, § 8..................................................... 16

Hawaii Const., Article XII, § 2 ........................................................... 23

**Other Authorities**

H.R. 13500.......................................................................................... 18

H.R. Report 839 April 15, 1920 ......................................................... 19

H.R. Report No. 839 April 15, 1920 ................................................... 21

Hawaiian Homes Commission Act §208 ............................................... 5

## TABLE OF CONTENTS

Page(s)

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 4

HAWTEL'S USE OF A1 AND A2 ASSETS ON HAWAIIAN HOMELANDS
    ARE DEFINED BY THE HAWAIIAN HOMES COMMISSION ACT AND
    LICENSE 372 ................................................................................................ 8

THE COURT LACKS AUTHORITY TO GIVE HAWAIIAN HOME LANDS TO
    HAWAIIAN TELCOM ................................................................................ 15

AN IMPORTANT PART OF THE REHABILITATION PURPOSE OF THE
    HAWAIIAN HOMES COMMISSION ACT INCLUDES THE USE OF HHL
    BY ITS BENEFICIARIES FOR BUSINESS ............................................... 20

THE DEPARTMENT OF HAWAIIAN HOME LANDS' SUPPORT MUST BE
    CONSTITUTIONAL AND IN ACCORDANCE WITH THEIR FIDUCIARY
    DUTY AS TRUSTEES OF THE HAWAIIAN HOMES COMMISSION ACT21

THE COURT LACKS AUTHORITY TO TRANSFER HAWAIIAN HOME
    LANDS TO HAWAIIAN TELCOM "FREE AND CLEAR OF
    ENCUMBRANCES" CREATED BY THE HAWAIIAN HOMES
    COMMISSION ............................................................................................. 25

THE COURT LACKS AUTHORITY TO AUTHORIZE HAWAIIAN TELCOM
    TO DENY SIC ITS RIGHT TO ACCESS, AT NO COST, HAWAIIAN HOME
    LANDS TO WHICH SIC HOLDS A VALID AND ENFORCEABLE
    LICENSE ...................................................................................................... 28

THE COURT LACKS AUTHORITY TO AUTHORIZE HAWAIIAN TELCOM
    TO DENY WAIMANA AND CLEARCOM THE RIGHT TO ACCESS,
    WITHOUT COST, HAWAIIAN HOME LANDS TO WHICH THEY HOLD A
    VALID AND ENFORCEABLE LICENSE ................................................... 30

DECISIONS AND ORDERS REGARDING THE ADMINISTRATION OF
    HAWAIIAN HOME LANDS MUST BE BASED ON THE PRESENT AND
    NOT SPECULATE ON WHAT MAY HAPPEN IN THE FUTURE .............. 31

THERE IS NO RATIONALE FOR THE COURT TO AWARD HAWTEL ANY
INTEREST IN THE LAND UNDERLYING THE A1 ASSETS (THE ASSETS
THAT WERE OWNED BY PANIOLO, NOT SIC, AT THE TIME THE
TRUSTEE TOOK POSSESSION OF THEM)................................................. 33

THE TRUSTEE DID NOT ACQUIRE, AND THEREFORE COULD NOT HAVE
TRANSFERRED TO HAWTEL, THE LAND RIGHTS UNDER THE A2
BUILDINGS ...................................................................................... 35

A.  THE TRUSTEE AND SIC KNEW AND AGREED THE RIGHTS TO
HHL WERE NOT TRANSFERRED.................................................... 35

B.  THE MARSHAL HIMSELF KNEW AND TESTIFIED THAT HE
LEVIED ON NO REAL PROPERTY INTERESTS OTHER THAN THE
MILILANI PROPERTY ................................................................... 36

C.  SIC'S RIGHTS TO ACCESS THE BUILDINGS ARE REFLECTED IN
ADDENDA TO LICENSE 372, METES AND BOUNDS DESCRIPTIONS
ATTACHED TO EASEMENTS RECORDED IN THE BUREAU OF
CONVEYANCES.  THE EASEMENTS ARE NOT IDENTIFIED ON
EXHIBIT A2; THEY WERE NOT LEVIED UPON; THEY WERE NOT
AUCTIONED; AND THEY WERE NOT CONVEYED BY THE MARSHAL.
THEY ARE STILL OWNED BY THE LICENSEE ......................................... 38

THE COURT SHOULD CERTIFY TO THE HAWAII SUPREME COURT THE
QUESTIONS OF THE CONSTITUTIONALITY OF THE COURT TAKING
HAWAIIAN HOME LANDS LICENSED TO A NATIVE HAWAIIAN
BUSINESSPERSON IN A COLLECTION CASE WHERE THE LICENSE WAS
NOT PLEDGED AS COLLATERAL .................................................... 40

CONCLUSION .................................................................................. 41

**SANDWICH ISLES COMMUNICATIONS, INC.'S
STATEMENT OF OBJECTIONS TO THE FINAL RELIEF REQUESTED
BY HAWAIIAN TELCOM [Dkt. 637]**

## INTRODUCTION

Service to most areas of the Hawaiian Home Lands ("HHL") is ONLY

provided by wireline.  The overwhelming majority of HHL is located in remote

areas on the neighbor islands, not Oahu, so wireless service is virtually non-

existent or very poor.  Waimana Enterprises Inc. ("Waimana") continues to insure

each homesteader has access to wireline service to these areas where no one else

will.  Sandwich Isles Communications Inc. ("SIC") and Clearcom Inc.

("ClearCom") do so because of the commitment both made in accepting the partial

assignments of License 372.  The Hawaiian Homes Commission ("HHC")

approved issuing License 372 because Hawaiian Telephone would not honor its

obligation as the only telephone company in Hawaii to provide service throughout

HHL and the Hawaii Public Utilities Commission would not enforce Hawaiian

Telephone's Carrier of Public Convenience and Necessity.  Waimana is obligated

to provide telecommunications service to ALL HHL in PERPETUITY.  SIC

provides voice services. ClearCom, an affiliate public utility, and Spectrum

provide internet services.  These services are provided through infrastructure on

HHL that SIC, ClearCom and Waimana own and Spectrum leases.  Hawaiian

Telcom ("HAWTEL"), the Court and the Department of Hawaiian Homelands

1

("DHHL") would let service to Hawaiian homesteaders die because their interests are elsewhere.   None of this is the bankruptcy court's issue.   Whether these parties' efforts to cut service to HHL, and revert to the status quo of thirty years ago when Hawaiian homesteaders only received inferior or no service is not an issue that the bankruptcy court should be deciding.   SIC continues to, and will always, object to all efforts to deprive Hawaiians of the rights to which they are entitled.   This is the reason for everything SIC has done and will continue to do in this case.[1]

The Court is familiar with the financial pressures that have been brought to bear on SIC.  These pressures are similar to what HAWTEL faced when it was in Bankruptcy for years.  The differences are:  the political establishment and this Court didn't allow service to their customers to drop by the; (i) dismantling of HAWTEL's network; (ii) sell-off of the profitable pieces; (iii) killing the unprofitable ones; and, (iv) emergence from bankruptcy under new ownership. Despite the financial pressures on SIC, SIC continues to provide service to HHL. No one else has even offered to replace SIC in providing service to all of HHL, especially in the remote areas (literally for years, the United States Rural Utilities

---

[1] It is unfortunate that Hawaiians must time and again take actions such as chaining themselves to Hilo Airport gates (once HHL), occupying HHL on the road to Mauna Kea or filing the numerous lawsuits because of DHHL's and HHC's refusal to fulfill their fiduciary responsibility.

Service has had a judgment lien and writ of execution against SIC's assets that the Trustee did not execute against, yet there has been no sale because all of the players in this case, including shamefully the DHHL, except SIC are only too happy to ignore the needs of native Hawaiians,  In fact, the Paniolo Trustee ("Paniolo" or "Trustee") only executed on, and only wanted, certain SIC assets which could serve non-HHL areas.  Termination of service violates the Communications Act of 1934[2] (as amended) for which the United States made loans to SIC.  Service on Oahu will likely be restored by other carriers, but Hawaiian homesteaders in the remote areas of the neighbor islands will suffer the greatest because no other carrier wants to serve them.

The threat to take away License 372 (and SIC's interest in the HHL derived from License 372), in whole or in part, is especially a threat to service to the homesteaders living in the remote areas of HHL. Those areas are not profitable, but are part of SIC's mission to serve all HHL.  Without License 372, SIC will be deprived of its ability to serve.  The Trustee made a deal in the Master Relationship Agreement ("MRA") to get the land rights associated with SIC's license in exchange for SIC's free use of less than 10% of Paniolo's assets needed to continue service on HHL.  The Trustee knew he needed SIC to provide those land

---

[2] The United States has been issuing loans to meet in part the Congressional mandate that all Citizens receive a universal level of communications.

rights voluntarily so the buyer could keep operating the Paniolo Network on HHL, but use it to profitably serve the general public, i.e. non-homesteaders.  HAWTEL chose not to assume the MRA because it was confident it could get a new license within a few months from DHHL.  We are only here before this Court because DHHL was unable to deliver on the promise of a new license to HAWTEL.  It is important to note that had HAWTEL assumed the MRA, these post sale court proceedings would not be occurring.

Fortunately, the law precludes transfer of License 372, or any interest in HHL, to HAWTEL or any other non-native-owned company.  The Trustee understood this, the United States understands this and DHHL should understand this.  The remedy sought by HAWTEL would violate the Hawaii State Constitution.  At a minimum, the Court should certify this important question of Hawaiian rights to the Hawaii Supreme Court, as it should not be made by a bankruptcy judge.

**BACKGROUND**

The Adversary Proceeding against SIC was initiated by Paniolo filing an Adversary Complaint.  The same claims in the Adversary Proceeding could have been filed in State Circuit Court as they were all governed entirely by Hawaii law. They were only before the Bankruptcy Court because the debtor was suing to collect amounts owed to it.  Although filed in Bankruptcy Court, the adversary

proceeding was governed entirely by Hawaii law.  There was no Federal

Bankruptcy law involved in the adjudication of the claims in the Adversary

Proceeding; nor was there anything but the applicable sections of Hawaii's

Constitution and laws covering levy and execution of the judgment involving

HHL[3].  Nevertheless, Hawaii's Constitution is applicable to both Hawaii's law and

the Federal Bankruptcy Code, and therefore prevents the Court's inclination to

dispose of HHL.

    In 2020, the Trustee and the DHHL both filed statements in this Court

confirming that HAWTEL was going to have to obtain a new license for the

facilities it had purchased on HHL.  The new license would be issued in

accordance with the Hawaiian Homes Commission Act ("Act").   DHHL

represented it expected the new license to take several months.

> DHHL further clarifies that the new license to the Buyer is **subject to
> approval by the Hawaiian Homes Commission**. DHHL anticipates
> that the negotiation and approval process for Buyer to acquire a new
> license will take several months

Dkt 341, page 5

    DHHL's statement to the Court alerted all parties that any license the HHC

may approve would meet their fiduciary duties as trustees for the Act.   In the

sixteen months since that representation was made (and in the 8 months since the

---

[3] See §208 of the Act.

sale to HAWTEL closed) no new license was issued. The HHC cannot issue a license to HAWTEL without violating the Act as long as License 372 is valid or SIC agrees. So, HAWTEL now asks this Court to solve its problem, by giving HAWTEL what it knew it didn't get from the 363 sale because the Trustee never acquired it: SIC's interest in License 372. Because the Court's order approving the sale is not a flexible bucket into which HAWTEL can add anything they subsequently want (even if they have DHHL's support), the motion should be denied.

On December 17, 2019, in the Adversary Proceeding, the Court entered a money judgment in favor of the Trustee and against SIC in the amount of $256,000,000[4]. Dkt #28 in the Adversary Proceeding. On January 6, 2020 a Writ of Execution to the U.S. Marshal was issued. Dkt #32. That writ contained absolutely no description of any kind of what property was to be levied upon, nor executed upon. On January 21, 2020 SIC moved to quash the writ of execution.

After he was served with SIC's motion pointing out that the judgment creditor has to specify what is to be levied upon and what is to be executed upon, the Trustee filed a "Notice of Execution" which attached Exhibit A2. Dkt. 36. At the hearing on SIC's motion to quash, the Court ruled that Exhibit A2 sufficiently

---

[4] Public utilities always carry large capital debt. Hawaiian Telcom's lenders wrote off $400m (over half of the capital debt) to keep Hawaiian Telcom operating.

identified the assets to be levied upon and that bidders could seek more

information from the judgment creditor to the extent they needed it.  This list may

have been sufficient if some of the assets were not on HHL and therefore subject to

the Act.  The sale to the Trustee took place on March 6, 2020 with no further detail

regarding the contents of Exhibit A2.  A copy of the Notice of Execution that the

Court ruled was adequate is attached hereto as Exhibit "1."

On the night before the execution sale was conducted, the Trustee and SIC

entered a Rule 9019 Settlement Agreement that was later approved by the Court

together with the MRA and its attached schedules.

The Rule 9019 Settlement Agreement expressly says it was being entered:

> with the objective of restructuring the business and financial affairs of
> Paniolo Cable Company, LLC ("Paniolo Cable") and addressing the
> rights under the judgment granted the Paniolo Trustee against SIC

> Dkt. 271 Page 1 Recital A

The Rule 9019 Settlement Agreement expressly says Paniolo Trustee and

SIC terminated the Joint Use Agreement ("JUA") and replaced it with the MRA.

> The Parties agree that **replacement of the SIC Lease and of the JUA
> as set forth in the Master Relationship Agreement** and provided
> herein, and a sale of substantially all of Paniolo Cable's assets free
> and clear of all liens and encumbrances (the "Paniolo 363 Sale") are
> in their best interests and that of their constituencies

> ...

> For the avoidance of doubt, the Master Relationship Agreement and
> the Schedule A.2 IRU **shall replace the JUA and the SIC lease**

Dkt 271 Page 2 Recital G and Page 3 Definition of Master Relationship Agreement

The Rule 9019 Settlement Agreement and the MRA were submitted to, (Dkt 249, 251, 252, 253) and approved by, the Court.  Dkt 271.  They expressly confirm that DHHL License 372 issued to Waimana Enterprises Inc. and partially assigned to SIC was not transferred to the Trustee, and hence could not have been transferred to HAWTEL[5]:

> "SIC hereby agrees to assign, transfer, or convey to Paniolo all Entitlements (**other than the DHHL License**) … For the avoidance of doubt, the Parties acknowledge and agree that **DHHL License will not be assigned by SIC to Paniolo**, but that SIC shall, and hereby does, grant to Paniolo the full benefit and use of the DHHL License for the IRU Term **provided Paniolo does not exercise its rights under such grant to impair service to HHL**"

Dkt 253; Dkt 668 Exhibit B Schedule 2 Assets IRU page 2 Section 2.3.

The intent of the Trustee, the intent of SIC, and the intent of the Court is thus absolutely clear.  SIC's interest in License 372 was not transferred to the Trustee and the Trustee therefore could not transfer it to HAWTEL.

## HAWTEL'S USE OF A1 AND A2 ASSETS ON HAWAIIAN HOME LANDS ARE DEFINED BY THE HAWAIIAN HOMES COMMISSION ACT AND LICENSE 372

---

[5] Hawaii's Constitution does not provide for the transfer of License 372.  The transfer HHL from a beneficiary to a non-beneficiary violates the spirit and intent of the Act.

The purpose of the Act is to provide a land base to be used to rehabilitate native Hawaiians.  The Act accomplishes this by providing for native Hawaiians to use and occupy HHL.  Exceptions are made to allow non-native Hawaiians to use HHL, provided their use of HHL quantifiably benefits native Hawaiians or DHHL.  It would be inconceivable for a non-beneficiary to use HHL to diminish existing benefits to native Hawaiians and still comply with the Act.

License 372 was issued in accordance with §207(c)(1) of the Act.  In issuing License 372, preference was given to a native Hawaiian organization in accordance with the Act, §204(2).

> "(2) ...In the management of any retained available lands not required for leasing under section §207(a), the department may dispose of those lands or any improvements thereon to the public, including native Hawaiians on the same terms, conditions, restrictions, and uses applicable to the disposition of public lands as provided in chapter 171, Hawaii Revised Statutes; provided that the department may not sell such lands in fee simple except as authorized in section 205 of this Act, provided further that the department is expressly authorized to negotiate, prior to negotiations with the general public, the disposition of Hawaiian home lands or any improvement thereon **to a native Hawaiian, or organization or associations owned or controlled by native Hawaiians**, for commercial, industrial or other business purposes in accordance with the procedures set forth in chapter 171, Hawaii Revised Statues."

The JUA allowed Paniolo Cable Company LLC, (owned by a non-native Hawaiian company at its inception[6]) to locate portions of its cable and equipment

---

[6] Waybill LLC, the non-native Hawaiian owner of Paniolo Cable Co. LLC., subsequently sold its interest to a native Hawaiian organization.  The sale did not change any of the contractual obligations including the mortgage to Deutsch Bank or the JUA.

necessary to operate the Paniolo Network on HHL that SIC obtained under License 372. The JUA did not transfer use or occupancy of HHL to a non-native Hawaiian company and the entire Paniolo cable would be leased to SIC which can only serve HHL[7]. The JUA, which applied to the A1 assets, was replaced by the MRA which also did not transfer occupancy or use of HHL to the Trustee (a non-beneficiary) and conditioned the use of the Paniolo assets on HHL to not "impair service to HHL," therefore did not violate the Act. The MRA applied to both the A1 and A2 assets. The Trustee and SIC agreed to remove SIC's license from the A1 and A2 assets as part of the 9019 Settlement Agreement. The MRA enabled the Trustee to sell the A1 and A2 assets to either a beneficiary or non-beneficiary company, and still be in compliance with the Act in part because HHL could not be used to impair service.[8]

The Trustee did not want the use of the A1 and A2 assets on HHL to be limited to just voice or the other obligations specified in SIC's License. The Trustee believed the MRA allowed the buyer to use those assets without being restricted to voice, and the other obligations of SIC's license[9] while continuing to

---

[7] The Hawaii Public Utilities Commission authorized SIC to only serve HHL.
[8] A native Hawaiian buyer would also be unable to use the assets on HHL in a way that diminishes HHL
[9] SIC's dispute of this is moot since HAWTEL refused the MRA when it purchased the assets.

locate those assets on HHL[10].  The settlement agreement and MRA separated the

ownership of the A1 and A2 assets from the provisions of the Act requiring native

Hawaiian ownership because SIC's license remained with a native Hawaiian

beneficiary and the assets on HHL could not be used "to impair service to HHL".[11]

The court approved the 9019 settlement agreement which included the MRA

in any sale of the A1 and A2 assets.  The inclusion of the MRA allowed the

Trustee to sell the A1 and A2 assets on HHL to either a native Hawaiian or non-

native Hawaiian buyer because there was no transfer of HHL.  HAWTEL elected

**not** to accept the MRA.  It purchased the A1 and A2 assets without the JUA,

without the MRA and therefore without any right to use or keep its assets on HHL.

HAWTEL is not a native Hawaiian organization.  The Act does not contain

provisions for the transfer of HHL from a native Hawaiian beneficiary company to

a non-native Hawaiian company.  Nor does the Act have any provision for the

transfer of a valid license issued to a native Hawaiian beneficiary.  HAWTEL

purchased the A1 and A2 assets.  The Act provides HAWTEL with two remedies;

---

[10] SIC never disputed the A1 and A2 assets could remain on HHL because the MRA did not transfer use or occupancy of HHL away from SIC.

[11] The Act only applies to the occupancy and use of HHL and the improvements built on HHL.

(1) negotiate a new agreement to separate the use of the assets on HHL from SIC's license; or (2) move their assets off of HHL[12].

This case is distinguished from <u>Ahia v Department of Transportation</u> 69 Haw 538, 544, 751 P.2d 81, 86 (Haw 1988).  In <u>Ahia</u>, the court considered a challenge to DHHL issuing a new lease to the Hawaii Department of Transportation to build a boat ramp at South Point.  Ahia, a native Hawaiian beneficiary had been trying to obtain that land for years.  In holding the requirements of the Act were met, the court relied on 204(2) and said;

> "The paragraph is by no means esoteric.  Still, an application of its provisions demands more than a cursory reading.  For the language of the paragraph is meaningful only when read in conjunction with other provisions of the Act …"

> 69 Haw. at 544.

In reaching its decision, the court dismissed the argument that 204(2) required DHHL "to give preference to native Hawaiians in the disposition of the lease."

> "If the decision had been to lease the land in question "for commercial, industrial, or other business purposes," the second proviso in the second paragraph of section 204(2) which authorizes such preferential treatment would have applied.  But we would not characterize the construction and maintenance of a boat-launching facility by a government agency as a "commercial, industrial, or other business" activity'

---

[12] If this situation occurred on other than HHL or Federal lands, Haw. Rev. Stat. 101-4 allows HAWTEL to petition the Hawaii Public Utilities Commission to condemn the property so HAWTEL could purchase it.  The Act precludes that from occurring on HHL.

69 Haw. at 550.

The court continued pointing out: (1) the 65 year lease is to a government agency

not a commercial company; (2) DHHL's need for funds: (3) the rent being paid

was four times the market rate; and, (4) the lease would assist in DHHL's

homesteading efforts.

> "The Department of Hawaiian Home Lands "was established by the Act to provide a means to rehabilitate its beneficiaries through a series of projects[.]" Stand. Comm. Rep. No. 56, in 1978 Proceedings, at 631. Unfortunately the department "was given very little financial assistance to perfect its mandate[,]" and "must lease [some available lands] in order to generate revenues to support its administrative and operating budget." Id. Here, 4.3 acres of the 11,000 acre tract of unimproved lands were leased to a government agency to "enhance a Homesteading Program at South Point" the department hopes to establish.

> 69 Haw. at 550.

 In the dissenting opinion, Justices Padgett and Hayashi took issue with the court's

finding that the boat ramp was for a public not a commercial use and its

interpretation of §204(2);

> "The Department of Hawaiian Home Lands is not, however, an ordinary government agency. As we said in Ahuna v. Department of Hawaiian Home Lands, 64 Haw. 327, 640 P.2d 1161 (1982):

>> In dealing with eligible native Hawaiians collectively or individually, appellant must adhere to high fiduciary duties normally owed by a trustee to its beneficiaries.
>> Id. at 338, 640 P.2d 1161.

> ...

> Moreover, there is nothing in the record to indicate that
> the appellees ever gave any consideration to attempting
> to find a lessee who was a native Hawaiian, or an
> organization controlled by native Hawaiians, or that
> granting of a lease, equivalent to General Lease No. 213,
> to such a lessee could not have served the purposes of the
> trust equally as well as granting a lease to the Department
> of Transportation (DOT).
> Discount

69 Haw at 553-556, 751 P.2d at 91-92.

Ahia involved a lease being issued for the first time to a government agency whose use purported to greatly improve HHL.  The Court  discounted §204(2), citing DHHL's need for money and  its proposed enhanced Homesteading Project at South Point as actions fulfilling other sections of the Act.

HAWTEL's motion differs from Ahia: (1) it attempts to transfer an existing license issued to a naïve Hawaiian company, for which there are no provisions in the Act; (2) DHHL's need for money will be satisfied by the proposed $600M appropriation from the Legislature; (3) License 372 is providing real service to native Hawaiian beneficiaries while in Ahia, the benefit was to a speculative Homesteading Program (which has not occurred).

Unlike in Ahia there is already a license issued to a native Hawaiian beneficiary which has; (4) provided $450M in infrastructure that would have otherwise been a DHHL expense; enhanced DHHL's homesteading initiatives over the last 25 years and will continue to do so in perpetuity.

Granting HAWTEL's motion will: (5) negatively affect property rights of other native Hawaiian businesses who have also been assigned portions of the License 372; (6) eliminate the benefit of modern telecommunications for all native Hawaiians on HHL in perpetuity; (7) greatly diminish other native Hawaiian beneficiary companies' (with property rights in License 372) ability to obtain financing to continue upgrading the telecommunications network on HHL; (8) diminish potential to rehabilitate native Hawaiians via business opportunities; and, (9) violate the non-alienation restriction in the Act.

The reasons for upholding the lease of HHL to a government agency in <u>Ahia</u> are not present in HAWTEL's motion.  HAWTEL's motion will diminish existing and future benefits to native Hawaiians.  HAWTEL's motion violates the Act and cannot be justified.

## THE COURT LACKS AUTHORITY TO GIVE HAWAIIAN HOME LANDS TO HAWAIIAN TELCOM

It would be a violation of the Hawaii Constitution for this Honorable Court to transfer to HAWTEL use and occupancy of HHL.  No Court can do it.  The application of Hawaii Statutes in bankruptcy cases must be done in a way that does not violate the Act which is part of Hawaii's Constitution[13].  "Congress has

---

[13] The application of the Federal Bankruptcy Code allowing the residential lease to be included in the valuation of the debtor's estate is limited by the provisions of the Act which requires the transfer of that lease to another native

generally left the determination of property rights in the assets of a bankrupt's estate to state law[14]." Butner v. United States, 440 U.S. 48, 54 (1979)

The Act was legislated by the U.S. Congress in the 1920s, and incorporated into the Hawaii State Constitution at the time of Statehood.  The Act's §208 restricts what can be done with HHL.  Subject to certain exceptions, not applicable here, §208 of the Act (that is, of the State Constitution) provides that HHL: **"shall not … be subject to attachment, levy, or sale upon court process."**  Congress recognized the importance of the courts in the Act and defined the court's role[15].

---

Hawaiian.  See In re: Maunakea 448 B.R. 252 (D. Haw. 2011); Septimo v Farmer CV 11-00315 DAE-KSC (D. Haw. 2012)

[14]Butner v. United States, 440 U.S. 48, 55 n.9 (1979) (""The Federal Constitution, Article I, § 8, gives Congress the power to establish uniform laws on the subject of bankruptcy throughout the United States. In view of this grant of authority to the Congress it has been settled from an early date that state laws to the extent that they conflict with the laws of Congress, enacted under its constitutional authority, on the subject of bankruptcies are suspended. While this is true, state laws are thus suspended only to the extent of actual conflict with the system provided by the Bankruptcy Act of Congress. *Sturges* v. *Crowninshield*, 4 Wheat. 122; *Ogden* v. *Saunders*, 12 Wheat. 213. "**Notwithstanding this requirement as to uniformity the bankruptcy acts of Congress may recognize the laws of the State in certain particulars, although such recognition may lead to different results in different States. For example, the Bankruptcy Act recognizes and enforces the laws of the States affecting dower, exemptions, the validity of mortgages, priorities of payment and the like. Such recognition in the application of state laws does not affect the constitutionality of the Bankruptcy Act, although in these particulars the operation of the act is not alike in all the States.**" [emphasis added]  *Stellwagen* v. *Clum*, 245 U.S. 605, 613. ")

[15] The courts have recognized that state laws may result in the application of a Federal law having different results in each State. See. n.2. Congress required the

That role is to insure HHL are kept in the use and occupancy of native Hawaiian beneficiaries.  License 372 is a grant of HHL by DHHL and approved by the HHC. There are no rights to HHL without License 372.  The Trustee understood this and clearly agreed in the court-approved MRA that the **"DHHL License will not be assigned by SIC to Paniolo."**

The License grants use and occupancy of certain parcels of HHL to Waimana which it partially assigned to SIC.  Without the License SIC has no legal interest in HHL.  Obtaining those parcels of HHL requires the Trustee to execute on License 372, which the Trustee deliberately did not do because it is impermissible under the Act, and which the Trustee confirmed in the MRA that he did not do.  Had the Trustee executed on License 372, he would have violated the Act.  HAWTEL is asking this Court to violate the State Constitution by alienating HHL.

> Reverend Akaiko Akana testifying in support of the bill which would become the Hawaiian Homes Commission Act; "The bill, containing a plan to lease the select lands to the Hawaiians instead of giving them in fee simple, provides for a permanent security of the land against any disposition by sale and against mortgage, pledge, or otherwise hold for the benefit of any other person except a native Hawaiian. ... that these lands can not [sic] be ***alienated***, and that those [native Hawaiians] who take tracts be financed in order that their holdings may be made profitable ... Mr. Kalanianaole [Delegate to Congress]; To retard this great decrease of my people, it is

---

Act be made a part of Hawaii's Constitution in the Admissions Act. This insured the Act would continue to have the significance of a Federal law requiring the Act be considered in the application of all Federal and State laws.

provided in this bill that certain lands be set apart for the use of the [native] Hawaiians in order to insure their rehabilitation, that these lands can not [sic] be ***alienated***, and that those who take tracts be financed in order that their holdings may be made profitable ..." Hawaiian Homes Commission Act; emphasis added.

Hearings before the Committee on Territories, US Senate Sixty-Six Congress on H.R. 13500, December 14, 1920. Pg. 48-49, 70-71.

A debate of the **alienation** clause between Chairman New, Senator Smoot and Mr. McClellan, an opponent of the bill, provides the following testimony: Mr. MClellan; "... Hawaiians have been steadily leaving their lands for over 50 years ... which they already own ... [for] the lure of town life..." Chairman New; "What disposition has been made of these lands ..." Mr. McClellan: "they naturally tend to be bought by the adjoining owners." Senator Smoot; "This is how it is, Senator, they have little kuleanas... Those kuleanas have been purchased by the cane people ..." Chairman New; "I asked that question in order that I might determine whether the Hawaiian has quit the lands from actual choice or whether he has been induced to sell by the white man ...without a realization on his part of the real value of what he was giving up, the way it has been with the Indian in this country." Mr. McClellan; "The Delegate [Kalanianaole] intimated yesterday, Mr. Chairman, "...if someone had had the foresight at the time of the Great Mahele to have provided that all those kuleanas should be conveyed, with the right of occupation and without the power of ***alienation***, it would be a great boon to the Hawaiians." Mr. McClellan; "It is perfectly well know, Mr. Chairman ... that Hawaiians, by their lack of provisions for the future, which has not been instilled in them like it has been in the Anglo-Saxon, will sometimes mortgage a home to give a luau ..."

Id. December 24, 1920. Emphasis added. Id. pg. 105, 106.

License 372 is issued to a native Hawaiian beneficiary. The HHL obtained as a result of License 372 cannot be alienated and given to HAWTEL, a non-beneficiary.

> "Your committee is, however, of the opinion that (1) the Hawaiian must be placed upon the land in order to insure his rehabilitation; (2)

**alienation** of such land must, not only in the immediate future but also for many years to come, be made impossible; ..." [emphasis added]

H.R. Report 839 April 15, 1920 pg. 7. License 372 fulfills the Act and Hawaii Constitution.

Congress intended that HHL be kept for the use and occupancy of native Hawaiian beneficiaries. To interpret this to mean that as long as HHL is not sold in fee renders the Act meaningless. That would allow a disposition of HHL to be fashioned in a manner that a non-native Hawaiian could use and occupy HHL as long as it remains HHL. Congressional approval was required to amend the Act to allow the transfer of a residential lease from a native Hawaiian beneficiary who had defaulted on the mortgage to his home. In that instance the lease must be transferred to another native Hawaiian beneficiary. There is nothing in the Act to **transfer** the use and occupancy of HHL for other than residential use. The Act limits the non-residential uses of HHL by non-native Hawaiians in scope and term after it is offered to a native Hawaiian beneficiary and then only as an original disposition. See Ahia; Nelson v Hawaiian Homes Commission, 127 Haw 185 (Haw 2012).

HAWTEL and DHHL are asking this Court to violate the expressed intent of the Act and take away HHL that a native Hawaiian corporation has a valid license to, and give use and occupancy to a foreign-owned corporation. Such an action is unconstitutional and cannot be done.

**AN IMPORTANT PART OF THE REHABILITIATION PURPOSE OF THE HAWAIIAN HOMES COMMISSION ACT INCLUDES THE USE OF HHL BY ITS BENEFICIARIES FOR BUSINESS.**

There exists misinformation that the rehabilitation of native Hawaiians under the Act includes only homesteading.  Congress believed it was important to rehabilitate an indigenous people to provide the opportunity to become fully participating United States Citizens.  This opportunity includes business.

> Mr. McClellan: "Mr. Chairman, I have only one main proposition to lay down before this committee … Congress legislating for Hawaii, ought to proceed on the basis and principle of America first … This measure purports to be an attempt to do a thing which has never been accomplished in the history of the world, viz, to materially reconstruct and reinstate a primitive people who are dying out as a separate people.  It has never been achieved; and if Congress expects that they can reverse the whole course of history throughout the centuries they certainly have a large proposition on their hands and ought to consider the means by which they will bring it about pretty carefully." Id. December 14, 1920 at 85.  Mr. McClellan: "In every position where they are directed they are excellent workers; but you can put it down that when you go over the entire Territory you do not find one Hawaiian running any sort of ***business*** of his own.  You have indisputable proof there that there is an inherent lack of that particular facility.  Senator Smoot "There is no doubt about it that the ***business*** qualifications of the Hawaiian are not developed.  Mr. McClellan: Something was said here by Mr. Akana [Rev. Akaiko Akana] about the Hawaiians not having the opportunity…The Hawaiian has the difficulty of his own particular qualifications.  He has certain splendid elements of strength.  He has certain pathetic elements of weakness.  The problem is, of course, how to coordinate that with the civilization in which he lives.  Senator Smoot:  I do feel that if we can do anything to rehabilitate the Hawaiian people, and put them on the lands and allow them to make a living there … it will be a mighty good thing."

Id. December 24, 1920 at 109, 110, 112.

> "The Hawaiians are not ***business*** men and have shown themselves
> unable to meet competitive conditions unaided."

H.R. Report No. 839 April 15, 1920, pg. 6.

Congress in passing the Act not only included business but also a preferential

treatment for native Hawaiians using HHL for business purposes.  The applicable

§204(2) reads:

> "… provided further that the department is expressly authorized to negotiate,
> **prior to negotiations with the general public, the disposition of
> Hawaiian home lands or any improvement thereon** *to a native Hawaiian,
> or organization or associations owned or controlled by native Hawaiians,*
> **for** *__commercial industrial or other business purposes__*, in accordance with
> the procedures set forth in chapter 171, Hawaii revised Statutes." [emphasis
> added]


**THE DEPARTMENT OF HAWAIIAN HOME LANDS' SUPPORT MUST
BE CONSTITUTIONAL AND IN ACCORDANCE WITH THEIR
FIDUCIARY DUTY AS TRUSTEES OF THE HAWAIIAN HOMES
COMMISSION ACT.**

The fact that DHHL is supporting this unconstitutional action is no surprise,

given the many violations of the Act and the trust fiduciary duty the HHC has been

caught supporting in the past.  See. Aged Hawaiians v Hawaiian Homes

Commission 78 Haw 192. 891 P.2d 279 (Haw 1995); Ahuna v Department of

Hawaiian Home Lands 64 Haw 327. 640 P.2d 1161 (Haw 1982); Nelson v

Hawaiian Homes Commission 127 Haw 185. 277 P.3d 279 (Haw 2012); Kalima v

State of Hawaii, Civil No. 99-4771-12.  In Nelson: the Hawaii Supreme Court

stated:

> Instead of obtaining necessary funds from the Legislature, **the Hawaiian Homes Commission and the Department of Hawaiian Home Lands have continued to offer commercial leases to non-Hawaiian entities in order to raise revenue. This removal of Hawaiian Home Lands from use by beneficiaries of the Hawaiian Home Lands Trust, and the failure to seek sufficient funds[,] are breaches of the State Constitution and the trust**.

    127 Haw. at 190, 277 P.3d at 284.

Yet this action to offer commercial leases to non-Hawaiians is exactly what DHHL

is urging this Court to do despite Hawaii's Legislature pending appropriation of

$600M and the settlement of $328M in Kalima v State of Hawaii, Civil No. 99-

4771-12.  DHHL is ignoring the court's decision in Nelson and continues to use

the "need to raise money" as an excuse to violate their trust responsibilities in

administering the Act and Hawaii's Constitution.  They urge this court to take

HHL away from a trust beneficiary who is using HHL to serve native Hawaiians

exclusively, and give them to a foreign-owned company who is at this moment

threatening to cutoff service to those same native Hawaiians, while using HHL to

make tens of millions in profits annually serving non-Hawaiians.

    DHHL and the HHC have an enforceable trust responsibility to native

Hawaiian beneficiaries.

> "Congress' role in the formation of a compact between the United States and a State is at least as great as Congress' role in approving a compact between

two States.  In addition, federal law is "an essential element" of a suit that charges a violation of a compact incorporating "the spirit of the Hawaiian Homes Commission Act looking to the continuance of the Hawaiian homes projects." Hawaii Const., art. XII, § 2; art. XII, § 4; art. XVI, § 7; see Keaukaha II, 739 F.2d at 1472.

Price v. State of Hawaii, 764 F.2d 623, 629 (9th Cir. 1985)

A federal-state compact, like an interstate compact, is enforceable as a matter of federal law because it derives its powers from Congress and can be amended or repealed only with the consent of Congress.  Although the management and disposition of Hawaiian home lands has been turned over to the State in § 4 of the Admission Act, "Congress enacted . . . a federal public trust, which by its nature **creates a federally enforceable right for its beneficiaries to maintain an action against the trustee in breach of the trust**." Aged Hawaiians v. Hawaiian Homes Commn., 78 Haw. 192, 205-6, 891 P.2d 279, 292-3 (1995) citing Price v. Akaka ( Akaka II), 3 F.3d 1220, 1225 (9th Cir. 1993), cert. denied,_____ U.S. ____, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994); see also Price v. State of Hawaii, 764 F.2d at 629; Keaukaha II, 739 F.2d at 1471-72; Ahia v. Department of Transp., 69 Haw. 538, 555, 751 P.2d 81, 91 (1988). Furthermore, as the Ninth Circuit has stated, the "`compact' between [Hawaii] and the United States strictly limits the manner in which [Hawaii] may manage the homelands [.]" Price v. Akaka (Akaka I), 928 F.2d 824, 826 n. 1 (9th Cir. 1990) (emphasis added), cert. denied, 502 U.S. 967, 112 S.Ct. 436, 116 L.Ed.2d 455 (1991); accord Akaka II, 3 F.3d at 1222 n. 2.

Aged Hawaiians v. Hawaiian Homes Comm'n, 78 Haw. 192, 205-6, 891 P.2d 279, 292-3 (1995)

The trust responsibility extends to dealings with beneficiaries collectively or

individually.  Ahuna v DHHL 64 Haw. 327, 640 P.22d 1161 (1982) involved

DHHL's duties as trustee of HHL.

"We conclude from this history that the Hawaiian Homes Commission, which oversees the Department, is the specific state entity obliged to implement the fiduciary duty under the HHCA on behalf of eligible native Hawaiians. In dealing with eligible native Hawaiians collectively or

individually, appellant must adhere to high fiduciary duties normally owed by a trustee to its beneficiaries…. <u>One specific trust duty is the obligation to administer the trust solely in the interest of the beneficiary.</u> A second fundamental trust obligation is to use reasonable skill and care to make trust property productive …Given these two basic duties of a trustee, we now impose them on the Hawaiian Homes Commission, the individual commissioners, and the Department to determine whether there has been a breach of fiduciary duties." [emphasis added]

<u>Ahuna</u> at 338, 340

Waimana was originally owned by a single native Hawaiian beneficiary. It is now owned and controlled by three native Hawaiian beneficiaries, and continues to benefit all native Hawaiian beneficiaries currently and who will live on HHL in perpetuity.

The HHC and DHHL are violating their fiduciary duties in their support of HAWTEL's motion. The Court in <u>Ahuna</u> found, "As to the question of the trustees considering the interests of third parties, or non-beneficiaries, we think it impermissibly weighed the interests of certain third parties…" at 340. The Court should take judicial notice of the recently announced $328M settlement for previous breaches of its fiduciary duty in <u>Kalima v State of Hawaii</u>, Civil No. 99-4771-12. The Court must disregard DHHL's support urging the Court to take an unconstitutional action. The Court lacks authority to violate the Hawaii Constitution, and DHHL's support will not change that.

**THE COURT LACKS AUTHORITY TO TRANSFER HAWAIIAN HOME LANDS TO HAWAIIAN TELCOM "FREE AND CLEAR OF**

## ENCUMBRANCES" CREATED BY THE HAWAIIAN HOMES COMMISSION

Nelson v Hawaiian Homes Commission 127 Haw 185 (Haw 2012), confirms that any use of HHL, by lease, license or revocable permit, must conform to the Act.  License 372 fulfills the Hawaii State Constitution by giving use and occupancy of HHL to a native Hawaiian-owned company for commercial/business purposes.  Its encumbrances fulfill the Act by requiring the, "construction, operation and maintenance" of telecommunications infrastructure throughout HHL in perpetuity regardless of the cost thereby making HHL now and in the future more valuable.  License 372 fulfills the Act by improving the living conditions of native Hawaiians by making it possible for them to get medical, cultural, education and social benefits from their homesteads.

In contrast, any transfer to HAWTEL without SIC's agreement violates the Act and Hawaii's Constitution.   HAWTEL is not a native Hawaiian beneficiary of the Act.[16]  HAWTEL's assets are on HHL that was obtained by License 372. HAWTEL has not assumed License 372's obligation to build, operate and maintain telecommunications infrastructure throughout HHL in perpetuity.  HAWTEL would not improve the living conditions of native Hawaiians.  Instead HAWTEL, within hours after closing its purchase from the Trustee, threatened to use its

---

[16] The transfer of a residential home on HHL requires the transfer of encumbrances on the use and occupancy of those HHL under and surrounding the home.  This is accomplished by transferring it to another native Hawaiian Beneficiary.  See. In re: Manuakea 448 B.R. 252 (D. Haw 2011)

facilities on HHL to deny service to native Hawaiians thus devaluing HHL and lowering the standard of living.  Hawaii's Constitution requires the usage of HHL for the benefit of native Hawaiians.  This requirement cannot be extinguished even under Bankruptcy Law, "Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code." <u>Raleigh v Illinois Dep't of Revenue</u>, 530 US 15, 20, 120 S.Ct 1951, 147 L.Ed.2d 13 (2000).

Courts have recognized many times that "[a]n unexpired lease is fundamentally an asset coupled with a liability." <u>In re US Airways Group Inc</u>., 287 B.R. 643, 645 (E.D. Va. 2002).  The same is also true of an unexpired license when that license grants the same benefits of a lease, conditioned on performance of extensive duties on the part of the Licensee.[17]  One cannot take the benefits of the

---

[17] [Waimana] is a native Hawaiian corporation, recognized by DHHL, whose business endeavors inherently concern the welfare and betterment of native Hawaiians. Between 1994 and 1995, [Waimana] negotiated an agreement with DHHL to provide telecommunication services to all DHHL properties throughout the State of Hawaii. ROA:2949-2957. Appellee DHHL issued the license pursuant to §207(c)(1)(A) of the Hawaiian Homelands Commission Act and [Hawai`i Administrative Rules (HAR)] § 10-4-21. ROA:2949. In the lease, DHHL ("Leasor") stated that the Leasor "believes and intends that the issuance of this Exclusive Benefit LICENSE will also fulfill the purpose of advancing the rehabilitation and the welfare of native Hawaiians." ROA:2950. This exclusive statutory license extends to the DHHL 153-acre parcel which abuts the northeastern corner of HELCO's present Keahole power plant site. Id. The adjacent DHHL parcel will be made available to [Waimana] to provide telecommunication services under its lease. ROA:2949. [Waimana] has both a statutory entitlement

license (use and occupancy of HHL) without also being tasked with the burdens: "to obtain the benefit, the trustee or debtor in possession must perform all the obligations." Id. In US Airways, the issue was the bankruptcy court's ability to use its equitable powers to ignore an Act of Congress. ("The distinction here is that the court is not simply valuing a contingent future loss. Rather, Congress, by statute, has expressly given the PBGC a *present* right to recover an amount determined in accordance with the valuation regulation."). In re U.S. Airways Group, Inc., 303 B.R. 784, 793 (Bankr. E.D. Va. 2003). Here Congress enacted the Act which limited the use of HHL and required the Act be part of Hawaii's Constitution. HAWTEL's counsel's repeated statements that HAWTEL owns the land licensed to SIC "free and clear of all encumbrances as bankruptcy courts do,[18]" should be an outrage to DHHL and the Court. They reflect a foreign owned company's extreme lack of respect for the Hawaiian Home Lands Trust and Hawaii's Constitution. It is unconstitutional and cannot be sustained.

---

and obligation to provide these services to all DHHL land, including DHHL-held at Keahole. Keahole Defense Coalition v BLNR 110 HAW. 433 (Haw. 2006)
[18] "Notwithstanding this requirement as to uniformity of the bankruptcy acts of Congress may recognize the laws of the State in certain particulars, although such recognition may lead to different results in different States. For example, the Bankruptcy Act recognizes and enforces the laws of the States affecting dower, exemptions, the validity of mortgages, priorities of payment and the like. Such recognition in the application of state laws does not affect the constitutionality of the Bankruptcy Act, although in these particulars the operation of the act is not alike in all the States." Stellwagen v. Clum, 245 U.S. 605, 613. "

**THE COURT LACKS AUTHORITY TO AUTHORIZE HAWAIIAN
TELCOM TO DENY SIC ITS RIGHT TO ACCESS, AT NO COST,
HAWAIIAN HOME LANDS TO WHICH SIC HOLDS A VALID AND
ENFORCEABLE LICENSE**

When DHHL and the Trustee filed their papers in this Court asserting that

SIC's license is "in default" SIC immediately demanded a contested case hearing

from the DHHL.   DHHL promptly confirmed that SIC's license remains fully

enforceable and in good standing.  Dkt 668 Exhibit C.  When HAWTEL elected

not to accept the MRA as part of its purchase, HAWTEL's ONLY conceivable

claim to SIC's license lies in A2.  The inclusion of SIC's license in the list of A2

assets was contested as part of SIC's Motion to Quash the A2 list.[19]  The Trustee

knew its unilateral inclusion of SIC's license in A2 would violate the Act if the

buyer was non-native Hawaiian, so sought and received SIC's agreement to allow

its use in the MRA, "[the] DHHL License will not be assigned by SIC to Paniolo".

HAWTEL is not a native Hawaiian company so its claim to the benefits of SIC's

license in A2 is tenuous at best.  However, any claim to the use and occupancy of

SIC's property derived from License 372, must include all of the obligations and

limitations of SIC's partially assigned license.  These obligations affect the

property rights of native Hawaiian beneficiary companies other than SIC.  A

---

[19] The courts order would not have violated the Act if the buyer was a native
Hawaiian beneficiary.

default on the obligations of SIC's partially assigned license results in all holders of License 372 losing the property and their improvements: "[it] is simply not a correct reading of Raleigh to say that non-bankruptcy law determines only the abstract validity of the claim—that is, whether the debtor has some liability to the creditor—as divorced from [in this case] the amount [effect] of the claim." U.S. Airways at 793.

HAWTEL's motion seeks a ruling from this Court negating SIC's interest in License 372.  DHHL confirmation of its validity directly contradicts DHHL's efforts to have this court give HAWTEL the 372 property.  DHHL will be in violation of the Act if it gave the use and occupancy of HHL currently held by a beneficiary with a valid license to a non-beneficiary.  DHHL is therefore asking this court to authorize the transfer, hoping this court can use non-existent special equitable bankruptcy powers. "Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." Butner v. United States, 440 U.S. 48 (1979). The federal interest is continued service under the Communications Act.  DHHL is an interested party whose interests should be to uphold the Act.  Doing otherwise violates Hawaii's Constitution.  HAWTEL seeks the Court's endorsement to use and occupy HHL under SIC's license.  It threatens to cut off service to the HHL

and deny SIC access to the land licensed to it.  The transfer of the use and occupancy allows HAWTEL to charge the Licensee for access to the Licensee's lands and if the Licensee doesn't pay whatever HAWTEL demands, HAWTEL will exclude the Licensee, denying its ability to fulfill the obligations of License 372,[20] leading to a violation of SIC's license.  Ultimately, however, the transfer of the use and occupancy of HHL from a beneficiary to a non-beneficiary violates Hawaii's Constitution.

**THE COURT LACKS AUTHORITY TO AUTHORIZE HAWAIIAN TELCOM TO DENY WAIMANA AND CLEARCOM THE RIGHT TO ACCESS, WITHOUT COST, HAWAIIAN HOME LANDS TO WHICH THEY HOLD A VALID AND ENFORCEABLE LICENSE**

SIC is not the only party that holds rights under License 372.  Waimana, Clearcom, Inc. and Pa Makani all have equipment on lands licensed to them under License 372 which each uses to provide service.  There are no judgments against Waimana, ClearCom and PaMakani which would give jurisdiction to this court.  A non-beneficiary controlling the access and use of HHL currently licensed to a native Hawaiian beneficiary company violates the Act and Hawaii's Constitution. None of these companies are debtors to the Trustee.  The Court has not issued a judgment against any of these companies.  The Court has no jurisdiction or

---

[20] HAWTEL currently charges SIC a fee for escorted access under HAWTEL's alleged "security protocols."

authority to take anything from these companies.  The Court has no basis to deny

them the right to access the lands licensed to them, without interference or

harassment from HAWTEL

## DECISIONS AND ORDERS REGARDING THE ADMINISTRATION OF HAWAIIAN HOME LANDS MUST BE BASED ON THE PRESENT AND NOT SPECULATE ON WHAT MAY HAPPEN IN THE FUTURE

In Ahuna v DHHL 64 Haw 327 (Haw 1982) the court confirmed Circuit

Judge Kubota's decision and found DHHL and the HHC breached their fiduciary

duty.  The case involved DHHL not complying with a part of Judge Kubota's order

to give a lease for a 10 acre parcel to Mr. Beck, a native Hawaiian beneficiary.

DHHL defended its decision because four years after the decision, DHHL

approved Hawaii County plans to extend a road which the 10 acre parcel would

interfere with.  "Finally, Judge Kubota found the proposed highway as yet in the

planning stage without a definite timetable for construction.  We concur in his

finding that the Extension was a "highly speculative proposition." Ahuna at 343.

DHHL and HHC must base their decisions on the present, and not speculate

on what may happen in the future.  Presently, under License 372 all homesteaders

are guaranteed telecommunication service no matter where they live.  DHHL has

convinced HHC that transferring HHL to HAWTEl fulfills its trust responsibility.

They have speculated that HHL residents will receive greater benefits if HAWTEL

was given land currently held by SIC under License 372.  However, HAWTEL has

already shown that benefits would diminish, as it has historically refused to

provide service to homesteaders in the most remote areas, where SIC has already

proven it will build the infrastructure and provide service.  HAWTEL has already

shown that it is unwilling to use the assets it purchased on HHL to benefit

homesteaders by refusing the MRA, which would have given enough Paniolo

assets (which the RUS has confirmed are critical to continued service to HHL) to

provide telecommunication service to homesteaders for free.  DHHL's support of

HAWTEL is based on unfounded speculation of greater benefit to homesteaders.

The standards for DHHL's fiduciary duties as trustee is established in Ahuna, and

DHHL's support of HAWTEL's motion does not meet the standards of its duties as

fiduciary trustee of the Act[21].

The court must make its decision based on what is before it and not

speculate on what may happen after the decision.   There is nothing speculative

about the fact that granting HAWTEL's motion to transfer HHL from a native

Hawaiian beneficiary to a foreign owned company violates the Act and Hawaii's

Constitution.

---

[21] DHHL's fiduciary responsibility is to Hawaiian Homelands trust beneficiaries.
"One specific trust duty is the obligation to administer the trust solely in the
interest of the beneficiary."  Ahuna v. Department of Hawaiian Home Lands, 64
Haw. 327, 338, 340. 640 P.2d 1161, 1168 (1982) holding that DHHL assumed the
obligation to implement the state's fiduciary duty under the HHCA on behalf of
eligible native Hawaiians.

**THERE IS NO RATIONALE FOR THE COURT TO AWARD HAWTEL ANY INTEREST IN THE LAND UNDERLYING THE A1 ASSETS (THE ASSETS THAT WERE OWNED BY PANIOLO, NOT SIC, AT THE TIME THE TRUSTEE TOOK POSSESSION OF THEM.)**

Paniolo owned certain assets and facilities on HHL at the time the Trustee was appointed.   Paniolo's right to have Paniolo-owned facilities on HHL came exclusively from the JUA, which, by agreement between the Trustee and SIC, was terminated and replaced by the MRA.   Nothing ever granted the Paniolo Trustee the land rights under the originally-Paniolo owned assets.

The Trustee certainly did not acquire the rights to the land under the originally-Paniolo owned assets in the execution sale of SIC's assets.   Exhibit A2 very expressly limits the rights it describes to the A2 assets:  i.e. the assets specifically identified on Exhibit A2.

| Anahola Central Office | Central Office located in Anahola, Hawaii, including access rights to the land on which **the central office** resides |
| Nanakuli Terminal Building | Terminal building located in Nanakuli, Hawaii including access rights to the land on which **the terminal building** resides |
| Waimanalo Terminal Building | Terminal building located in Waimanalo, Hawaii including access rights to the land on which **the terminal building** resides. |
| Kalamaula Terminal Building | Terminal building located in Kalamaula, Hawaii including access rights to the land on which **the terminal building** resides |
| Waiehu Central Office | Central Office located in Waiehu, Hawaii including access rights to the land on which **the central office** resides |
| Laiopua Central Office | Central Office located in Laiopua, Hawaii including access rights to the land on which **the central office** resides. |
| Hilo Central | Central Office located in Hilo, Hawaii including access |

| Office | rights to the land on which **the central office** resides. |
|---|---|
| Licenses | All licenses necessary to build, construct, repair, maintain and operate the **Schedule A.2 assets**, including without limitation SIC's interest in License Agreement No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands.<br><br>All existing and pending entitlements (including without limitation, SIC's interests in memoranda of agreement, easements, leases, license agreements, letters of approval, special area management permits, rights of way or rights of interest, necessary to build, construct, repair, maintain and operate **the Schedule A.2 assets** |

SIC disagrees with HAWTEL's claim, and the Court's inclination, that the execution sale of the A2 assets gave the Trustee and HAWTEL the rights to the HHL underlying and surrounding the A2 assets[22]. As is discussed elsewhere in this brief, such a claim violates the Hawaii Constitution and Hawaii law on levy and execution. But no conceivable reading of Exhibit A2 could include land rights under assets which are **not** A2 assets because they were never owned by Paniolo. The Trustee did not own, and could not have transferred to HAWTEL any interest in the lands underlying the A1 assets that were owned by Paniolo when the Trustee

---

[22] SIC disagreement with HAWTEL's claim and this Court's inclination extends to any assets not listed on A2..

was appointed.[23]   Paniolo's only right came from the JUA, which was terminated, and from the MRA which HAWTEL did not assume.

## THE TRUSTEE DID NOT ACQUIRE, AND THEREFORE COULD NOT HAVE TRANSFERRED TO HAWTEL, THE LAND RIGHTS UNDER THE A2 BUILDINGS

The various arguments offered by HAWTEL for their claim to ownership of HHL under the A2 assets are unsupportable and should be rejected by this Court. As is discussed earlier, transferring HHL to HAWTEL violates the Hawaii Constitution.  In addition, reliance on A2 is misplaced for each of the following reasons.

### A.  THE TRUSTEE AND SIC KNEW AND AGREED THE RIGHTS TO HHL WERE NOT TRANSFERRED

The MRA, which was executed by the Trustee and SIC, and approved by the Court **after the execution sale had taken place** clearly and unambiguously confirmed that the Trustee did not acquire License 372.

> "SIC hereby agrees to assign, transfer, or convey to Paniolo all Entitlements (**other than the DHHL License**) … For the avoidance of doubt, the Parties acknowledge and agree **that DHHL License will not be assigned by SIC to Paniolo** …

---

[23] The Trustee knew this and negotiated the MRA to cover both the A1 and A2 assets.

Obviously the Trustee recognized that the execution sale did not give him the land interests in the HHL.   And, of course, the Trustee could not sell what he did not own.   HAWTEL's motion is an attempt to have the Court give them rights which should properly be attained through a license.

B.  THE MARSHAL HIMSELF KNEW AND TESTIFIED THAT HE LEVIED ON NO REAL PROPERTY INTERESTS OTHER THAN THE MILILANI PROPERTY

The deposition testimony of the Marshal makes it quite clear that he levied on one piece of real property, the Mililani property.   This is not a "red herring." SIC's only rights to any of HHL come from License 372 and its addenda which specifically describe, by metes and bounds, the easements granted.   If HAWTEL claims the land rights granted by License 372 and its addenda were levied upon, how was that done?   The fact is it was not done, as the Marshal testified[24].

Again, the intent as exhibited by actions of the parties is critical here.   The Trustee's conduct confirms he knew he did not have the land rights: and he negotiated for those rights.   The Marshal's testimony confirms he knew he wasn't executing on land rights.

Levy is an indispensable part of the execution process:

---

[24] In his deposition, (Dkt 668 Exhibit H, page 10, lines 13-16) the Marshall testified:
Q  Now, you've told us what was done with respect to the Sandwich Isles Real Estate
A One piece of real estate

> A levy of a writ of execution consists of the acts by
> which an officer sets apart and appropriates, for the
> purpose of satisfying the command of the writ of
> execution, a part or the whole of the judgment debtor's
> property

Ditto v. McCurdy, 102 Haw. 518, 522, 78 P.3d 331, 335 (2003).

"[A]n essential ingredient of a levy [is] that the property levied upon be taken in the possession, care or guardianship of the officer." Id., quoting Everett v. Bolles, 6 Haw. 153, 154 (1875). "The purpose of the return is to establish of record that the officer has performed the official acts essential to an effective levy." Id. Here, as he has already testified under oath, the Marshal levied on exactly one interest in real estate: the property at Mililani which was not sold to HAWTEL. He did not because he could not levy on HHL[25] derived from SIC's interest in License 372; he did not because he could not levy on any of the recorded addenda to License 372 that give metes and bounds descriptions of certain easements[26]. None of them was levied, nor executed, upon. It is not a "red herring" that the rights to lands under and surrounding buildings are real estate interests. This is why they are described in metes and bounds and recorded in the bureau of conveyances. They were never levied upon and there was no execution sale of them.

---

[25] The Act provides that HHL: **"shall not … be subject to attachment, levy, or sale."**
[26] Id.

It has been the law of Hawaii since at least 1875, that without a proper levy in accordance with the statute there can be no execution sale:

> Section 1022 of the Civil Code reads as follows: "Every levy by an officer, in pursuance of a writ of execution issued by any Court, or justice, shall be made by taking the property levied upon into his possession, care and guardianship, and in his option, by removal of the same to some place of security. The officer shall make an inventory of the property levied upon."

> It is an essential ingredient of a levy that the property levied upon be taken into the possession, care or guardianship of the officer. He must have the property in his power and control. In this case the property of the defendant was not taken into the possession, care or guardianship of the officer. The Marshal did not designate any of the goods or merchandise of the defendant as taken into his possession. He did not leave a keeper in charge, nor make an inventory, or exercise any act of possession or guardianship over the property… The reason of this requirement is obvious: **"It should be known to others who may take posterior executions, or who may deal with the debtor, what property is affected by the lien and what is not**."

Everett v. Bolles, 6 Haw. 153 (1875).  In Everett, the court held that because of the defective levy, there was no proper execution.  The same is true here.  There is no way it could have been known to anyone that other interests in real property had been executed upon:  even the Marshal himself didn't know it!

C. SIC'S RIGHTS TO ACCESS THE BUILDINGS ARE REFLECTED IN ADDENDA TO LICENSE 372, METES AND BOUNDS DESCRIPTIONS ATTACHED TO EASEMENTS RECORDED IN THE BUREAU OF CONVEYANCES.  THE EASEMENTS ARE NOT IDENTIFIED ON EXHIBIT A2; THEY WERE NOT LEVIED UPON; THEY WERE NOT AUCTIONED; AND THEY WERE NOT CONVEYED BY THE MARSHAL.  THEY ARE STILL OWNED BY THE LICENSEE

The Marshal knew how to execute on land rights.  He even did it in this case with respect to the one real estate interest that was the subject of the execution sale. He recorded the writ of execution with the Tax Map Key and Transfer Certificate of Title of the property being levied upon.   Nothing even comparable was done with respect to License 372 or its addenda.  They were not levied upon and were not executed upon.

If the Court is relying on Exhibit A2's description of "access rights to the land on which the central office resides", where do these interests in HHL come from?   Did the Marshal grant the Trustee an easement over HHL.   SIC's rights in HHL come only from License 372 and its addenda.   If those were not properly executed upon then the Trustee and HAWTEL have no rights to the lands.

Addenda to License 372 are recorded in the Bureau of Conveyances and describe in metes and bounds the real property they cover.  Putting aside for the moment, whether they can even be levied upon separate from License 372, the Marshal confirmed he did not levy on them.  The Trustee knew he did not have them, as he, subsequent to the execution, signed agreements saying he did not have them.  Exhibit A2 does not identify them.  It is certainly not a "red herring" to say that the Court should acknowledge that these are interests in Hawaiian Home Lands; and that they were neither levied upon nor executed upon by the Marshal.

**THE COURT SHOULD CERTIFY TO THE HAWAII SUPREME COURT THE QUESTIONS OF THE CONSTITUTIONALITY OF THE COURT TAKING HAWAIIAN HOME LANDS LICENSED TO A NATIVE HAWAIIAN BUSINESSPERSON IN A COLLECTION CASE WHERE THE LICENSE WAS NOT PLEDGED AS COLLATERAL**

Hawaii law (Haw. R. App. P. 13 and Haw. R. App. P. 602-5(a)(2) authorize this Court to certify to the Hawaii Supreme Court questions of controlling law. The issue of alienation to a foreign-owned corporation of HHL, licensed to a native Hawaiian Trust Beneficiary, is a case of first impression that should be answered by the Hawaii Supreme Court rather than the Bankruptcy Court.

This Court has recognized that the bankruptcy court "constitute[s] a unit of the district court" and it is therefore appropriate for the bankruptcy court to certify questions of controlling law to the Hawaii Supreme Court.   SIC submits that this is an important issue of native Hawaiian rights and it should be decided by the Hawaii Supreme Court rather than the bankruptcy court.

It has taken 100 years, the death of many native Hawaiian beneficiaries before they could obtain the benefits of the Act and countless decades of litigation to finally recognize the State, DHHL and the HHC have been breaching its trust fiduciary duty in administering the Act.  This year the legislature is on track to appropriate $600M and the State has settled a class action breach of trust for $328M.  Rehabilitation under the Act includes native Hawaiian beneficiaries using HHL for business as well as homesteads.  It would be a great injustice for it to take

another 10 years of appeals and the insolvency of the only native Hawaiian owned utility to determine if the Court's inclination is constitutional.[27]

## CONCLUSION

HAWTEL's motion asks this Court to interpret its previous order.  This Court's interpretation will have no effect on the Paniolo bankruptcy estate.  If this Court is inclined to make its interpretation in opposite of the Act, Hawaii's Constitution and settled law, the Court should certify the constitutional question to the Hawaii Supreme Court before making its decision.

Dated:  Honolulu, Hawaii May 2, 2022.

/s/ Lex R. Smith
LEX R. SMITH
MARIA Y. WANG

Attorneys for Defendant
SANDWICH ISLES
COMMUNICATIONS, INC.

---

[27]. During the course of this case the Court has questioned the motives of SIC and its founder, Al Hee.  Mr. Hee has always been passionate about Hawaiians fully participating in society by using the business opportunities afforded all U.S. Citizens.  He firmly believes that Hawaiians will never be full citizens until they are represented in all aspects of society including business.  He has first-hand knowledge in the taking of his family's and other Hawaiians' Kuleana lands because of the Hawaiians' lack of business skills..  As Congress' committee reports (included in this brief) attest, this weakness led Congress to include the alienation and business clauses in the Act.  His determination for Hawaiians to improve themselves through business should not be misconstrued as anything else.

GOODSILL ANDERSON QUINN & STIFEL
A LIMITED LIABILITY LAW PARTNERSHIP LLP

JOHNATHAN C. BOLTON      9650-0
   jbolton@goodsill.com
CHRISTOPHER P. ST. SURE   10001-0
   cstsure@goodsill.com
First Hawaiian Center
999 Bishop Street, Suite 1600
Honolulu, Hawaii 96813
Telephone: (808) 547-5600
Facsimile: (808) 547-5880

Attorneys for Chapter 11 Trustee
MICHAEL KATZENSTEIN

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re: | Case No. 18-01319 (RJF) |
| PANIOLO CABLE COMPANY, LLC, | (Chapter 11) |
| Debtor. | |
| MICHAEL KATZENSTEIN, as CHAPTER 11 TRUSTEE, | Adversary No. 19-90022 |
| Plaintiff, | NOTICE OF EXECUTION |
| v. | |
| SANDWICH ISLES COMMUNICATIONS, INC., | |
| Defendant. | |

**NOTICE OF EXECUTION**

EXHIBIT A2

Notice is hereby given that pursuant to law and by virtue of a *Writ of Execution to the United States Marshal*, issued out of the above-entitled Court in the above-entitled case, the U.S. Marshal for the District of Hawaii, did levy upon certain real and personal property assets of Defendant/Judgment Debtor SANDWICH ISLES COMMUNICATIONS, INC., in and to the real and personal property described in Exhibit "A", attached hereto.

DATED:  Honolulu, Hawaiʻi, ~~January~~ February 4, 2020.

CHARLES L. GOODWIN
United States Marshal
District of Hawaiʻi

By: _____

Deputy U.S. Marshal

2

EXHIBIT "A"

## Real Property

*Oahu-Mililani*

PINE SPUR:

All of those certain parcel(s) of land situate at Waipio, Waikele, Waikakalaua, Ulu, Auiole Poopalupalu, Hopenui, Kahuaiki, Hanuhanu, Kanupoo, Kapakahi and Ewa, District of Ewa, City and County of Honolulu, State of Hawaii, described as follows:

| LOT | AREA | MAP |
|-----|------|-----|
| 1-A-1 | 1.083 acres | 18 |
| 1-A-2 | 0.032 acre | 18 |
| 1-A-3 | 0.083 acre | 18 |
| 1-A-4 | 0.431 acre | 18 |
| 8-A-1 | 0.245 acre | 20 |
| 8-A-2 | 17.863 acres | 20 |
| 8-A-3 | 0.902 acre | 20 |
| 8-A-4 | 3.191 acres | 20 |
| 8-A-5 | 0.084 acre | 20 |
| 8-A-6 | 0.014 acre | 20 |
| 8-A-7 | 0.396 acre | 20 |
| 8-A-8 | 20.694 acres | 20 |
| 8-A-9 | 1.250 acres | 20 |
| 8-A-10 | 0.014 acre | 20 |
| 8-A-11 | 0.457 acre | 20 |
| 8-A-12 | 13.807 acres | 20 |
| 8-A-13-A | 1.603 acres | 52 |
| 540 | 58.560 acres | 68 |
| 541 | 0.278 acre | 68 |
| 542 | 28.304 acres | 68 |
| 5399-A | 2.718 acres | 687 |
| 5400-A | 0.043 acre | 687 |
| 5401-A | 5.185 acres | 687 and |
| 5402-A | 5.605 acres | 687 |

as shown on the aforementioned Maps, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii with Land Court Application No. 1000 of John Ii Estate, Limited;

TOGETHER WITH AND SUBJECT TO THE FOLLOWING:

As to Lot 1-A-2:     Together with access to a public highway, namely, Kamehameha Highway, by means of Lot 1-A-1 as shown on Map 18 of said Land Court Application No. 1000, as set forth by Land Court Order No. 9104, filed July 11, 1949.

As to Lot 8-A-4:       Together with access to a public highway, namely, Kamehameha Highway, by means of Lots 8-A-5, 8-A-6, 8-A-7, 8-A-10, 8-A-11 and 8-A-15 as shown on Map 20 of said Land Court Application No. 1000, as set forth by Land Court Order No. 9106, filed July 11, 1949.

As to Lot 541:       Together with access to a public highway over Lot 540 as shown on Map 68 of said Land Court Application No. 1000, as set forth by Land Court Order No. 15154, filed January 30, 1957.

As to Lot 542:       Together with access to a public highway over Lots 540 and 541 as shown on Map 68 of said Land Court Application No. 1000, as set forth by Land Court Order No. 15154, filed January 30, 1957.

As to Lot 5399-A:       Together with access to a public road over Lots 8-A-5, 8-A-6 and 8-A-7 as shown on Map 20, and Lot 5400-A as shown on Map 687, of said Land Court Application No. 1000, as set forth by Land Court Order No. 85547, filed July 31, 1987.

As to Lot 5400-A:       Together with access to a public road over Lots 8-A-5, 8-A-6 and 8-A-7 as shown on Map 20 of said Land Court Application No. 1 000, as set forth by Land Court Order No. 85547, filed July 31, 1987.

As to Lot 5401-A:       Together with access to a public road over Lots 8-A-5, 8-A-6 and 8-A-7 as shown on Map 20, and Lot 5400-A as shown on Map 687, of said Land Court Application No. 1000, as set forth by Land Court Order No. 85547, filed July 31, 1987.

As to Lot 5402-A:       Together with access to a public road over Lots 1-A-1 and 1-A-4 as shown on Map 18 of said Land Court Application No. 1000, as set forth by Land Court Order No. 85547, filed July 31, 1987.

Being land(s) described in Transfer Certificate of Title No. 600,112 issued to SANDWICH ISLES COMMUNICATIONS, INC., a Hawaii corporation.

## Schedule A.2 Assets

*Kaua'i*

| Assets | Description |
|---|---|
| Terrestrial Structure | 3625 Feet of Subduct extending from near the Kekaha beach manhole to the Kekaha terminal building. |
| Anahola Central Office | Central Office located in Anahola, Hawaii, including access rights to the land on which the central office resides. |
| HVAC System | Included with the Anahola Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Anahola Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Anahola Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Anahola Central Office providing structure for fiber and other cables to be brought and terminated within the central office. |
| Cable Rack and Frame Structure | Internal support structure within the Anahola Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Anahola Central Office. |
| Fujitsu 4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the Schedule A.2 equipment function within the network. |
| Terrestrial Structure | 41 Miles of Subduct extending from the Kekaha terminal building towards the Anahola Central Office.  Unknown Manholes. |
| Fiber Cable | 41 Miles of Fiber extending from the Kekaha terminal building towards the Anahola Central Office. |

*Oahu – Nanakuli*

| Assets | Description |
|---|---|
| Terrestrial Structure | 9200 Feet of Subduct extending from near the Nanakuli terminal building to Farrington Highway where it meets the Paniolo Cable Network Terrestrial Structure. Unknown number of manholes. |
| Nanakuli Terminal Building | Terminal building located in Nanakuli, Hawaii including access rights to the land on which the terminal building resides. |
| HVAC System | Included with the Nanakuli Terminal Building is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Nanakuli Terminal Building. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Nanakuli Terminal Building. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Nanakuli Terminal Building providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Nanakuli Terminal Building providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Nanakuli Terminal Building. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-192/OC-48. Includes all cards installed in the system, software, and spares |
| Fujitsu 7200 | Wave Division Platform and transmitter platform for fiber terminations that works with the Fujitsu 4500/4300 to provide optical services. |
| Fujitsu 9500 | Dense Wave Division Platform and transmitter platform for fiber terminations. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.1 and Schedule A.2 equipment function within the network. |

*Oahu – Waimanalo*

| Assets | Description |
|---|---|
| Terrestrial Structure | 2160 Feet of Subduct extending from near the Waimanalo terminal building to the manhole near Kalanianaole Highway where it meets the Paniolo Terrestrial structure. 1 Manhole. |
| Waimanalo Terminal Building | Terminal building located in Waimanalo, Hawaii including access rights to the land on which the terminal building resides. |
| HVAC System | Included with the Waimanalo Terminal Building is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Waimanalo Terminal Building. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Waimanalo Terminal Building. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Waimanalo Terminal Building providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Waimanalo Terminal Building providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Waimanalo Terminal Building. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-192/OC-48. Includes all cards installed in the system, software, and spares. |
| Fujitsu 7200 | Wave Division Platform and transmitter platform for fiber terminations that works with the Fujitsu 4500/4300 to provide optical services. |
| Fujitsu 9500 | Dense Wave Division Platform and transmitter platform for fiber terminations. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.2 equipment function within the network. |

*Molokai – Kalamaula*

| Assets | Description |
|---|---|
| Terrestrial Structure | 1000 Feet of Subduct extending from near the Kalamaula terminal building to Kamehameha V Highway where it meets the Paniolo Cable Network Terrestrial Structure. |
| Kalamaula Terminal Building | Terminal building located in Kalamaula, Hawaii including access rights to the land on which the terminal building resides. |
| HVAC System | Included with the Kalamaula Terminal Building is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Kalamaula Terminal Building. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Kalamaula Terminal Building. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Kalamaula Terminal Building providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Kalamaula Terminal Building providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Kalamaula Terminal Building. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-192/OC-48. Includes all cards installed in the system, software, and spares. Paniolo seeks to have the Fujitsu 4500/4300 system in Kalamaula (if additional to the already identified Paniolo system). |
| Fujitsu 7200 | Wave Division Platform and transmitter platform for fiber terminations that works with the Fujitsu 4500/4300 to provide optical services. Paniolo seeks to have the Fujitsu 7200 systems in Kalamaula (if additional to the already identified Paniolo system). |
| Fujitsu 9500 | Dense Wave Division Platform and transmitter platform for fiber terminations. Paniolo seeks to have the Fujitsu 9500 system in Kalamaula (if not included as a Schedule A.1 asset). |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.2 equipment function within the network. |

*Molokai – Hoolehua*

| Assets | Description |
|---|---|
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure at Hoolehua. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within Hoolehua. |
| Terrestrial Structure | 7 Miles of Subduct extending from the Kalamaula terminal building towards the Hoolehua Airport DLC and Hoolehua East DLC locations.  Unknown Manholes. |
| Fiber Cable | 7 Miles of Fiber extending from the Kalamaula terminal building towards the Hoolehua Airport DLC and Hoolehua East DLC locations. |

*Maui*

| Assets | Description |
|---|---|
| Terrestrial Structure | 13,800 Feet of Subduct extending from near the Puunene terminal building to Kuihelani Highway where it meets the Paniolo Terrestrial Structure. Unknown Manholes. |
| Waiehu Central Office | Central Office located in Waiehu, Hawaii including access rights to the land on which the central office resides. |
| HVAC System | Included with the Waiehu Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Waiehu Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Waiehu Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Waiehu Central Office providing structure for fiber and other cables to be brought and terminated within the central office. |
| Cable Rack and Frame Structure | Internal support structure within the Waiehu Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Waiehu Central Office. |
| Fujitsu 4300/4100 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.2 equipment function within the network. |
| Terrestrial Structure | 1.7 Miles of Subduct extending from the Puunene terminal building near Kuihelani Highway towards the Waiehu central office. Unknown Manholes. |
| Fiber Cable | 4.3 Miles of Fiber extending from the Puunene terminal building towards the Waiehu central office. |
| Terrestrial Structure | 1.1 Miles of Subduct extending from Pakalani to Kahikinui. Unknown Manholes. |
| Fiber Cable | 1.1 Miles of Fiber extending from Pakalani to Kahikinui. |

*Hawaii – Laiopua*

| Assets | Description |
|---|---|
| Terrestrial Structure | 73,600 Feet of Subduct extending from near the Puukapu terminal building to Kawaihae-Mahukona Road where it meets the Paniolo Terrestrial Structure. Unknown Manholes. |
| Laiopua Central Office | Central Office located in Laiopua, Hawaii including access rights to the land on which the central office resides. |
| HVAC System | Included with the Laiopua Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Laiopua Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Laiopua Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Laiopua Central Office providing structure for fiber and other cables to be brought and terminated within the central office. |
| Cable Rack and Frame Structure | Internal support structure within the Laiopua Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Laiopua Central Office. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.2 equipment function within the network. |
| Terrestrial Structure | 32.6 Miles of Subduct extending from the Puukapu terminal building near Kawaihae-Mahukona Road where it meets the Paniolo Terrestrial Structure towards the Laiopua central office. Unknown Manholes. |
| Fiber Cable | 46.5 Miles of Fiber extending from the Puukapu terminal building towards the Laiopua central office. |

*Hawaii – Hilo*

| Assets | Description |
|---|---|
| Hilo Central Office | Central Office located in Hilo, Hawaii including access rights to the land on which the central office resides. |
| HVAC System | Included with the Hilo Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Hilo Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Hilo Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Hilo Central Office providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Hilo Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Hilo Central Office. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. Paniolo seeks to have the Fujitsu 4500/4300 systems both in Puukapu (if additional to the already identified Paniolo system) and Hilo. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.1 and Schedule A.2 equipment function within the network. |
| Terrestrial Structure | 8.7 Miles of Subduct extending from the Hilo central office towards the Waiakea Area and Akolea Area.  Unknown Manholes. |
| Fiber Cable | 8.7 Miles of Fiber extending from the Hilo central office towards the  Waiakea Area and Akolea Area.  Unknown Manholes. |

*Other Related Assets*

| Assets | Description |
|--------|-------------|
| Information and Records | -Financial statements (reviewed/audited, to the extent available) and detail of operational costs for the facilities<br>-Asset listing of all infrastructure and equipment indicated in Schedule A.2 (Asset Register including websites, URLs, IP Addresses, etc.)<br>-All contracts associated with the network and maintenance of the network<br>-Wet and dry maintenance records and maintenance agreements<br>-Engineering drawings including "as built" and engineering specifications attached to schedule of spend to date<br>-All inspection reports of the network (wet, dry, facilities, batteries, generators, Etc.)<br>-Operating agreements for the monitoring and maintenance of the network<br>-Existing agreements and related materials for leasing capacity to third parties<br>-Detailed logical and physical inventory of the network linked to the asset list by item – to the extent this information is maintained in Operating Systems, provide the information in this form as requested below<br>-Inventory of all electronics equipment used to provide circuits in the Paniolo Cable Network System including assignment information for specific assets to the provision of specific circuits including card assignment, fiber cross-connects, fiber assignments, and other related information<br>-All maintenance records for the HVAC, batteries, rectifiers, and backup generator equipment located at terminal buildings and central offices identified in Schedule A.2<br>-All notices, citations or reports received from government agencies in relation to the Paniolo assets indicated in Schedule A.2<br>-All deeds to real property, plus all title insurance polities and title search results<br>-All land user permits and certificates of compliance with land use permits<br>-List of major suppliers, with copies of supply and support agreements<br>-Provide all third party agreements that are utilized to provide maintenance to the Schedule A.2 assets including SONET equipment, patch panel equipment, terrestrial fiber, marine fiber, power equipment, grounds maintenance, etc. |

| Operating Systems | -Software and all related hardware and data associated with the circuit inventory, monitoring, and maintenance of the Schedule A.1 and Schedule A.2 assets<br>-IT system vendors and maintenance agreements<br>-Location of the network assets and to the extent available provide geocoded locations of manhole access to fiber infrastructure, and map data of your files in a standard GIS format showing the location of all fiber infrastructure |
|---|---|
| Access Keys | -All keys for access to the 10 terminal buildings and central offices identified in Schedule A.1 and Schedule A.2 including keys to any fences on the perimeter of the terminal buildings |
| Licenses | -All licenses necessary to build, construct, repair, maintain and operate the Schedule A.2 assets, including without limitation SIC's interest in License Agreement No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands.<br>-All existing and pending entitlements (including without limitation, SIC's interests in memoranda of agreement, easements, leases, license agreements, letters of approval, special area management permits, rights of way or rights of interest, necessary to build, construct, repair, maintain and operate the Schedule A.2 assets. |

**Date Signed:**
**May 18, 2022**



SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>PANIOLO CABLE COMPANY, LLC,<br><br>              Debtor. | Case No. 18-01319<br>Chapter 11 |
| WAIMANA ENTERPRISES INC. and SANDWICH ISLES COMMUNICATIONS INC.<br><br>              Plaintiffs,<br><br>   v.<br><br>HAWAIIAN TELCOM INC.,<br><br>              Defendant. | Adv. Pro. No. 22-90008<br><br>Dkt. 6, 13, 15, 18 |

## <u>TENTATIVE RULING ON MOTION TO DISMISS</u>

Waimana Enterprises Inc. ("Waimana") and Sandwich Isles Communications Inc. ("SIC") filed a complaint against Hawaiian Telcom, Inc. ("HTI") in the Circuit Court of the First Circuit, State of Hawaii. Waimana and SIC allege three causes of action: trespass, willful damaging of property, and engagement in unfair methods of competition. HTI removed the case to this court and moves to dismiss the complaint on the grounds that this court's orders bar the claims. Subject to oral argument and further reflection, I am inclined to grant HTI's motion to dismiss.

## I.    Background Facts

In 1995, the Department of Hawaiian Home Lands ("DHHL") granted a license – License Agreement No. 372 ("License 372") – to Waimana to provide telecommunications on Hawaiian Home Lands. Shortly thereafter, Waimana partially assigned License 372 to SIC. The assignment describes the assigned portion as "those certain rights, title and interest necessary to provide IntraLata and Intrastate telecommunication services" under License 372.[1]

---

[1] Waimana and SIC have argued that this assignment was limited to

2

Paniolo Cable Company, LLC ("Paniolo") is an affiliate of Waimana and SIC that owned and operated an undersea cable system that connected to SIC's terrestrial telecommunications system. Creditors forced Paniolo into chapter 11 bankruptcy proceedings, and Michael Katzenstein was appointed as the chapter 11 trustee.

This court entered judgment in favor of the trustee and against SIC for more than $256 million. The trustee enforced the judgment by causing the U.S. Marshal to levy upon and sell certain SIC assets listed in Schedule A.2 to the Certificate of Execution for the Marshal Sale. The trustee was the successful bidder at the execution sale. The court confirmed the Marshal's sale by an order entered on March 16, 2020. No one appealed from that order, and the time to do so has long since expired.

The trustee entered into an Asset Purchase Agreement ("APA") with Hawaiian Telcom, Inc. ("HTI"). The trustee agreed to sell to HTI substantially all of Paniolo's assets (the "A.1 Assets") and the SIC assets

---

"voice-only" services. While the partial assignment is limited to local and intrastate service, it covers all "telecommunications" services and is not limited to voice.

3

that the trustee bought at the Marshal's sale (the "A.2 Assets"). The description of the A.2 Assets in the APA is identical in substance to the description of assets in the order confirming the Marshal's sale.

The court approved the APA and the sale transaction on December 28, 2020. No one appealed from that order, and the time to do so has long since expired.

I have recently entered interim and final orders barring SIC and its affiliates from interfering with HTI's use of the purchased assets.

## II.    Jurisdiction

The bankruptcy court has jurisdiction over these proceedings through its authority to interpret and enforce its own prior orders.[2] The enforcement and interpretation of orders issued in core proceedings are also core proceedings.[3]

## III.   Legal Standard

To survive a rule 12(b)(6) motion to dismiss, a complaint must

---

[2] *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009).
[3] *See, e.g., In re Allegheny Health Educ. & Rsch. Found.*, 383 F.3d 169, 176 (3d Cir. 2004).

4

articulate "enough facts to state a claim to relief that is plausible on its fact."[4] The court may dismiss a complaint under rule 12(b)(6) when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory.[5]

## IV.   Discussion

Waimana and SIC have alleged three causes of action – trespass, willful damaging of property, and engaging in unfair methods of competition. All of these claims rest on the proposition that HTI did not acquire any interest in License 372 and that its conduct is inconsistent with Waimana's and SIC's continued ownership of License 372.  I am inclined to rule that my prior orders confirming the Marshal's sale and approving the HTI sale foreclose this contention as a matter of law.

The assets that HTI bought include the following facilities:

| | |
|---|---|
| 1. | Anahola [Kauai] Central Office |
| 2. | Kekaha [Kauai] Terminal Building |
| 3. | Nanakuli [Oahu] Terminal Building |
| 4. | Waimanalo [Oahu] Terminal Building |
| 5. | Kalamaula [Molokai] Terminal Building |

---

[4] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)

[5] *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019).

| | |
|---|---|
| 6. | Puunene [Maui] Terminal Building |
| 7. | Waiehu [Maui] Central Office |
| 8. | Puukapu [Hawaii] Terminal Building |
| 9. | Laiopua [Hawaii] Central Office |
| 10. | Hilo [Hawaii] Central Office |

These facilities are on property covered by License 372.

As set forth in Schedule 2.1(a) to the APA, HTI also bought "access rights to the land on which the [central offices and terminal buildings] reside[]," ancillary assets necessary for security of the locations, and "[a]ll keys for access to the 10 terminal buildings and central offices identified in Schedule A.1 and Schedule A.2 including keys to any fences on the perimeter of the terminal buildings and central offices."

Schedule 1.1(b) additionally provides that among the Permits transferred from the debtor to HTI were "[a]ll easements, rights-of-way, and other property and real estate access rights granted to SIC in connection with and pertaining to the assets listed in Schedule 2.1(a)," i.e., the A.2 assets that the trustee bought at the Marshal's sale.

I am inclined to hold, as I have held before, that by virtue of the sale orders, HTI acquired all of Paniolo's and SIC's rights to the described

6

assets, including SIC's rights as a partial assignee of License 372. It is

significant that DHHL, the licensor under License 372 and the agency

responsible for the Hawaiian Home Lands, agrees with this conclusion.[6]

In effect, Waimana and its affiliates contend that the sale orders were

incorrect. For example, they argue that HTI cannot own Hawaiian Home

Lands because it is not a Native Hawaiian organization. But those orders

are now final, and I am not inclined to change them, particularly in view of

HTI's reliance on those orders.

Waimana points out that it was not a judgment debtor so the trustee

could not have executed upon its property rights. It further claims that HTI

---

[6] In DHHL's words, "As HT correctly points out in the Motion, to the
extent that SIC held any rights in the Transferred Assets, or the premises
on which the Transferred Assets are located, those rights were definitely
extinguished and terminated by the Marshal Sale and the 363 Sale. SIC has
no existing rights under License Agreement No. 372 that would permit it to
contravene this Court's prior order and interfere with HT's access to, and
operation of, the Transferred Assets. DHHL has previously informed SIC
that License 372 does not afford Waimana Enterprises, Inc. or SIC any
rights to limit or restrict HT's access to and use of the Transferred Assets
which are located on DHHL lands." Department of Hawaiian Home
Lands' Position Statement Regarding Motion by Hawaiian Telcom, Inc. for
Interim and Final Relief Enforcing the Court's Sale Order, ECF 669 at 9 in
the main bankruptcy case, Case No. 18-01319.

7

is "usurping" Waimana's rights under License 372. But the order

approving the HTI explicitly held that the "Transferred Assets [including

the A.2 Assets] constitute property of [Paniolo's] estate and title thereto is

vested in [Paniolo's] estate . . . ."[7] (.) I am inclined to hold that Waimana's

claim that it has an interest in the A.2 Assets comes too late.

Because the plaintiffs' three causes of action rely on the proposition

that HTI did not acquire any interest in License 372, and because my prior

final orders preclude that proposition, I am inclined to hold that the

complaint does not state a cognizable claim. I am further inclined to hold

that the plaintiffs could not avoid the effect of my prior orders by alleging

additional facts, and that allowing amendment of the complaint therefore

would be futile. Accordingly, I am inclined to grant HTI's motion to

dismiss without leave to amend.

**END OF TENTATIVE RULING**

---

[7] ECF 366 at 26 in Case No. 18-01319. Waimana has argued that the Marshal
did not sell any real estate to the Trustee, but Waimana has agreed that the
transferred assets include "real estate" needed "for a stand-alone
commercial operation and use of the Paniolo Cable System." ECF 271 at 8
in Case No. 18-01319.

8