D.C. No. 1:22-cv-00441-JAO-KJM

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

_____

In Re:  PANIOLO CABLE COMPANY, LLC,

Debtor.

WAIMANA ENTERPRISES INC.,

Appellant,

v.

HAWAIIAN TELCOM, INC., et al.,

Appellees.

_____

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

NO. HI-22-01180

HON. ROBERT J. FARIS

**APPENDIX**

WILLIAM MEHEULA          2277
MEHEULA LAW, LLLC
Three Waterfront Plaza, Suite 499
500 Ala Moana Boulevard
Honolulu, Hawaii 96813
Telephone No.: (808) 599-9554
Email:  bill@meheulalaw.com

Attorney for Appellant
WAIMANA ENTERPRISES INC.;
PA MAKANA LLC; and
CLEARCOM, INC

# TABLE OF CONTENTS

Volume 1

2021/10/18 (Dkt. 480, at 1-5) Sandwich Isles Communications Inc's Memorandum In Opposition to Motion of Hawaiian Telcom, Inc. to Enforce Sale Order [Dkt. 459] ........................................................................1-22

2022/04/04 (Adv. No. 22-90008 Dkt. 1) Defendant Hawaiian Telcom Inc.'s Notice of Removal of State Court Action to Bankruptcy Court ..................23-226

2022/04/27 (Dkt. 10) Plaintiff Waimana Enterprises Inc.'s Motion to Remand Case to State Court, or in the Alternative, for Abstention ..................227-240

2022-05-02 (Dkt. 713) Sandwich Isles Communications, Inc.'s Statement of Objections to the Final Relief Requested by Hawaiian Telcom [Dkt. 637] ..241-301

2022/05/18 (Adversary Proceeding No. 22-90008, Dkt. 22) Tentative Ruling on Motion to Dismiss ....................................................302-309

Volume 2

2022/05/27 (Dkt. 28) First Amended Complaint ...........................1-288

2022/05/31 (Dkt. 31) Order Granting Motion by Hawaiian Telcom, Inc. to Dismiss the Complaint in its Entirety, or in the Alternative, to Stay the Adversary Proceeding, Filed April 11, 2022. And Granting Plaintiffs Leave to Amend Complaint ..............................................................289-292

2022/06/10 (Dkt. 35) Motion by Hawaiian Telcom, Inc. to Dismiss the First Amended Complaint in its Entirety ....................................293-348

2022/07/01 (Dkt. 40) Plaintiffs' Memorandum in Opposition to Motion by Hawaiian Telcom, Inc. to Dismiss the First Amended Complaint it its Entirety, Filed June 10, 2022 [Dkt. 35] ..........................................349-365

2022/07/08 (Dkt. 47) Reply in Support of Motion by Hawaiian Telcom, Inc. to Dismiss the First Amended Complaint in its Entirety ....................366-388

2022/08/18 (Dkt. 67) Order Granting Motion By Hawaiian Telcom, Inc. To Dismiss The First Amended Complaint In Its Entirety ........................................389-392

2022/08/22 (Dkt. 70) Order Denying Plaintiff Waimana Enterprises Inc.'s Motion to Remand Case to State Court, or in the Alternative, for Abstenion ..............393-397

2022/08/30 (Dkt. 77) Notice of Appeal and Statement of Election ................398-405

SULLIVAN MEHEULA LEE
A Limited Liability Law Partnership

WILLIAM MEHEULA          (2277)
D. KAENA HOROWITZ        (9836)
Pacific Guardian Center, Makai Tower
733 Bishop Street, Suite 2900
Honolulu, Hawai'i  96813
Telephone:  (808) 599-9555
Facsimile:  (808) 533-2467
Email: meheula@smlhawaii.com; kaena@smlhawaii.com

Attorneys for Plaintiff
WAIMANA ENTERPRISES INC.,
PA MAKANI LLC, AND
CLEARCOM, INC.

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| In re | Case No. 18-01319 (Chapter 11) |
| PANIOLO CABLE COMPANY, LLC, | |
| Debtor. | |
| _____ | Adversary Proceeding No. 22-90008 |
| WAIMANA ENTERPRISES INC., PA MAKANI LLC, CLEARCOM, INC., | FIRST AMENDED COMPLAINT; EXHIBITS A-P |
| Plaintiffs, | |
| v. | |
| HAWAIIAN TELCOM, INC., | |
| Defendant. | |

<u>FIRST AMENDED COMPLAINT</u>

Plaintiffs Waimana Enterprises Incorporated ("**Waimana**"), Pa Makani LLC

("**Pa Makani**") and Clearcom, Inc. ("**Clearcom**") for their First Amended

Complaint against Defendant Hawaiian Tel Inc. ("**HTI**") allege and aver as

follows.

1.     Waimana is the primary owner and holder of License 372 that

requires Waimana to provide all infrastructure necessary to provide modern

telecommunications services on Hawaiian Home Lands ("**HHL**"), no matter how

remote their residence may be.  License 372 was issued to a native Hawaiian

corporation in 1995 and the term is in perpetuity.  Many of its customers do not

have electricity or water and one family lives in a tent.  License 372 mandates that

no matter how expensive the infrastructure may be in order to provide such

service, Waimana's monthly charge to the customer will be no more than is

charged for comparable service in the adjacent non-HHL areas.   The provisions of

License 372 are the reason the residents of the HHL have modern

telecommunication service today, including in many cases fiber-optic cable to their

homes.  It is essential to sustaining, expanding and upgrading non-voice

telecommunications service to the HHL residents in the future that the

requirements of License 372 be continued.

2.    Plaintiff Waimana is a corporation organized and existing under the laws of the State of Hawaiʻi.

3.    Plaintiff Pa Makani is a limited liability company organized and existing under the laws of the State of Hawaiʻi.

4.    Plaintiff Clearcom is a corporation organized and existing under the laws of the State of Hawaiʻi.

5.    Defendant HTI is a corporation organized under the laws of the State of Hawaiʻi.

6.    Former Plaintiff but now non-party Sandwich Isles Communications, Inc. ("**SIC**") is a corporation organized and existing under the laws of the State of Hawaiʻi.

7.    Section 207(c)(1)(A) of the Hawaiian Homes Commission Act ("**HHCA**") states: "The department is authorized to grant licenses as easements for railroads, telephone lines, electric power and light lines, gas mains, and the like." Emphasis added.

8.    Section 204(2) of the HHCA states "In the management of any retain available lands … the department is expressly authorized to negotiate, prior to negotiations with the general public, the disposition of Hawaiian home lands or any improvement thereon to a native Hawaiian, or organization or associations

owned or controlled by native Hawaiians, for commercial, industrial or other business purposes …"

9.     Plaintiffs are native Hawaiian organizations as noted in License 372 and the Partial Assignments.

10.     Section 206 of the HHCA states:

"OTHER OFFICERS NOT TO CONTROL HAWAIIAN HOME LANDS; EXCEPTIONS.  The powers and duties of the governor … in respect to the lands of the State, shall not extend to lands having the status of Hawaiian home lands, except as specifically provided in this title."

11.     The Hawaii Public Utilities Commission ("**PUC**") is a division of the Governor's administration and therefore has no authority on HHL.

12.     Waimana is the owner and holder of License No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands ("**DHHL**") pursuant to authorization from the HHC (hereinafter "**License 372**").  A true copy of License 372 is attached hereto as **Exhibit "A"** and incorporated herein by this reference.

13.     License 372 granted Waimana a right to provide "telecommunication services of all types" to HHL, see Exhibit A at 1:

Licensor determines that the LICENSE established herein is essential in order to provide broad band telecommunication services of all types (including but not limited to local, intrastate, interstate and international telephone; video on demand interactive communication; cable television; medical and educational links; and electronic data transmission) to LICENSOR'S lands in a timely manner;

4

The added underscored words identify the type and area of telecommunication services assigned to SIC in the Partial Assignment of License, discussed below. The right to provide all other types of telecommunication services were retained by Waimana.

14.    Under HHCA 207(c)(1), License 372 is an interest in real property issued to Waimana pursuant to HHCA 207(c)(1) and Hawaii Administrative Rules 10-4-21 and 22.

15.    By instrument dated January 15, 1996, Waimana partially assigned License 372 to SIC (the "**SIC Partial Assignment**").  A true copy of the Partial Assignment is attached hereto as **Exhibit "B."**  By instrument dated October 6, 2008, the HHC consented to the Partial Assignment.  A true copy of the Consent is attached hereto as **Exhibit "C"**.

16.    The SIC Partial Assignment is expressly limited to "***IntraLata and Intrastate telecommunication services***", which means "limited to local, intrastate, interstate and international telephone" on HHL ("**voice only service**").  Consistent with that voice only service limitation and area of service limitation, SIC was granted a Certificate of Authority from the Hawaii Public Utilities Commission to provide voice only services on HHL.

5

17.     Waimana caused other subsidiaries including Clearcom, Inc. and Pa Makani LLC to provide other telecommunications services (internet, wireless etc.) both on and off HHL.

18.      By instrument dated December 30, 2011, Waimana partially assigned License 372 to Pa Makani (the "**Pa Makani Partial Assignment**"), which granted "those certain rights, title and interest necessary to provide "***wireless communications services of all types***" under License 372.  DHHL consented to the Pa Makani Partial Assignment.  A true copy of the Partial Assignment is attached hereto as **Exhibit "D",**

19.     By instrument dated May 29, 2014, Waimana partially assigned License 372 to Clearcom (the "**Clearcom Partial Assignment**"), which granted "those certain rights, title and interest necessary to provide "***broadband communications services of all types***" under License 372.  DHHL consented to the Clearcom Partial Assignment.  A true copy of the Partial Assignment is attached hereto as **Exhibit "E",**

20.     License 372 in relevant part also provides:

LICENSOR believes and intends that the issuance of this Exclusive "Benefit" LICENSE will also fulfill the purpose of advancing the rehabilitation and welfare of native Hawaiians.

NOW THEREFORE, LICENSOR, in consideration of the services to be provided by LICENSEE [Waimana], and the terms, conditions and covenants herein contained on the part of LICENSEE to be kept, observed and performed, hereby grants and issues to LICENSEE, and its legal

6

successors and assigns, the [1] <u>exclusive right and privilege to build, construct, repair, maintain and operate a broad band telecommunications network including poles, overhead and/or underground lines, appliances, microwave and/or other types of equipment over, across, under and throughout all lands under the administration and jurisdiction of LICENSOR,</u> and its legal successors and assigns, including the right to trim and keep trimmed any vegetation, shrubbery, bushes or trees in the way of its lines and appurtenances, and [2] <u>including also the right of entry upon the Easement and adjoining land of LICENSOR for the construction, maintenance, operation and removal of LICENSEE'S line and appurtenances over, across and under the LICENSE area.</u>[1]

TO HAVE AND TO HOLD the same unto LICENSEE, its legal successors and assigns, <u>in perpetuity</u>, commencing on May 1, 1995, unless sooner terminated as hereinafter provided,

4.     <u>ACCESS TO TELECOMMUNICATIONS INFRASTRUCTURE.</u>  LICENSEE shall make available to LICENSOR the use of all available telecommunications equipment and services then under LICENSEE'S control at LICENSEE'S cost.  LICENSOR'S use under this paragraph shall be limited to emergency, public and official purposes only.

5.     <u>LEVEL OF TELECOMMUNICATION SERVICES</u>. LICENSEE shall provide at a minimum the same level of telecommunication service being provided in adjacent areas not subject to this LICENSE.  LICENSEE shall use its best effort to provide a higher level of telecommunication service than that being provided in adjacent areas not subject to this LICENSE.  LICENSEE shall not provide a lower level of service than that level being provided in adjacent areas not subject to the LICENSE unless LICENSOR shall agree in writing.

---

[1] Section [1] is the exclusive right to provide telecommunications services throughout HHL that the FCC Order preempted by its Memorandum Opinion and Order dated 7/3/17, where the FCC Order removed the exclusivity aspect of the service right on HHL.  ("**License 372 Service Right**").

Section [2] is the License exclusive easement granted by DHHL to Waimana in License 372 for certain areas of HHL, i.e. "the <u>easement area and adjoining land of LICENSOR for the construction, maintenance, operation and removal of LICENSEE'S line and appurtenances over, across and under the LICENSE area.</u>" ("**License 372 Easement**").

7

6.    COST OF TELECOMMUNICATIONS SERVICES. LICENSEE shall provide to the beneficiaries of LICENSOR living in areas subject to this LICENSE, telecommunications services at a cost less than or equal to the cost for comparable services being provided in adjacent areas not subject to this LICENSE.  LICENSEE shall not charge beneficiaries living in the LICENSE area more for telecommunication services than being charged in adjacent areas not subject to this LICENSE unless LICENSOR consents in writing.

7.    JOB TRAINING/EDUCATION. LICENSEE agrees to expend an amount equal to at least one-half percent (1/2%) of LICENSEE'S annual net profit for job training and/or educational opportunities for beneficiaries of LICENSOR each year.  For purposes of demonstrating compliance with this paragraph, LICENSEE agrees to allow LICENSOR access to LICENSEE'S financial statement, provided, that all material and information will be kept strictly confidential.

8.    EMPLOYMENT.  LICENSEE agrees to offer employment opportunities to qualified beneficiaries of LICENSOR.

9.    CAPITAL EXPENDITURES/CONTRACTS. LICENSEE agrees to utilize qualified companies controlled or owned by beneficiaries of LICENSOR provided such beneficiary company is qualified to perform the terms of the contract and such beneficiary company's bid price is not more than 5% higher than the lowest bid from an equally qualified non-beneficiary company.

19.    BREACH.  If LICENSEE shall substantially fail to observe or perform any of the conditions herein contained and on its part to be observed or performed and such failure or lack of substantial compliance shall continue for sixty (60) days after the receipt by certified mail or written notice of such failure to the address of LICENSEE, or if LICENSEE shall abandon the premises, then and in any such event LICENSOR may, at its option, cancel this LICENSE Agreement and, thereupon, take immediate possession of the premises, allowing LICENSEE reasonable time to remove

8

its property therefrom, without prejudice to any remedy or right of action that LICENSOR may have against LICENSEE.[2]

21.     Pursuant to License 372, SIC developed telecommunications facilities, including Central Offices, warehouses and security fencing and underground conduits to beneficiary lessee residences on License 372 Easement. SIC used those facilities for the provision of voice only services only on HHL. Plaintiffs developed other telecommunications facilities on HHL.

22.     Paniolo Cable Company Inc. ("**Paniolo**") developed and leased to SIC, certain telecommunication facilities (undersea and underground cables and switches) outside of HHL which connected various HHL parcels on each Hawaiian island except Lanai.  Paniolo's facilities were connected to and housed in existing facilities on License 372 Easement, pursuant to SIC's joint use agreement with Paniolo.  All of Paniolo's facilities were leased to SIC at a time when Paniolo was a third-party mainland undersea cable company not owned or controlled by Waimana nor any affiliate of Waimana.  Paniolo had no interest in any HHL, as the License 372 Easement was licensed to Waimana pursuant to its rights under License 372.  The assets owned by Paniolo and leased to SIC including the assets on the License 372 Easement are hereinafter referred to as the "**Paniolo Assets**."

---

[2] Although DHHL initially sent Waimana and SIC a notice of violation in March 2020 that notice was effectively withdrawn by DHHL in January 2021 when Waimana and SIC requested a contested case hearing, and since then, DHHL has not sent Plaintiffs any such notice of breach.

9

23.     In 2018, an involuntary bankruptcy petition was filed against Paniolo and in 2019, the U.S. Bankruptcy Court appointed Michael Katzenstein to serve as the Trustee in Bankruptcy for Paniolo ("**Katzenstein**").

24.     Because SIC was delinquent in its rent payments to Paniolo, in 2019, Katzenstein sued SIC and obtained a money judgment against SIC for the amount of unpaid rent that SIC owed to Paniolo.

25.     With the money judgment, on February 4, 2020, Katzenstein filed a Notice of Execution in Case No. 19-90022 (Dkt 36), which is attached hereto as **Exhibit "M,"** that identified levied SIC property described in Exhibit "A" as **Real Property**, which is real property in Mililani on Oahu, and **Schedule A-2 Assets**, (collectively, "**SIC Property**").

26.     Schedule A-2 at the end of the section entitled "Licenses" stated:

 -All licenses necessary to build, construct, repair, maintain and operate the Schedule A.2 assets, including without limitation SIC's interest in License Agreement No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands.

-All existing and pending entitlements (including without limitation, SIC's interests in memoranda of agreement, easements, leases, license agreements, letters of approval, special area management permits, rights of way or rights of interest, necessary to build, construct, repair, maintain and operate the Schedule A.2 assets.

Emphasis added.

27.     On March 6, 2020, pursuant to the Writ of Execution, the Trustee at a public auction purchased the SIC Property.

10

28.     By the Rule 9019 Settlement Agreement effective as of March 6,

2020, and approved and entered by the Bankruptcy Court on June 4, 2020, attached

hereto as **Exhibit "L,"** the Court approved the Rule 9019 Settlement Agreement

between Trustee, Paniolo Creditors, SIC, and SIC Affiliates (Waimana, Pa Makani

and Clearcom), which referenced, adopted and approved the Master Relationship

Agreement ("**MRA**"), a copy of the MRA is attached hereto as **Exhibit "F."**

29.     Schedule 2, section 2.3 of the MRA states:

**2.3. Entitlements.** The Parties acknowledge and agree that: (a) that certain
Department of Hawaiian Home Lands License Agreement No. 372 ("DHHL
License"), together with (b) the easements, leases, license agreements, letters
of approval, special area management permits, rights of way or rights of
entry granted to SIC or an SIC Affiliate and identified on Exhibit B hereto
(the "Entitlements") are necessary for the operation and maintenance of the
Paniolo Network (or were necessary for the construction of the Paniolo
Network). <u>SIC hereby agrees to assign, transfer, or convey to Paniolo all
Entitlements **(other than the DHHL License)** that may by their terms be so
assigned or transferred and to the extent such assignment, transfer, or
conveyance would not, in Paniolo's reasonable judgment, adversely affect
service in the Hawaiian Home Lands.</u> <u>To the extent any Entitlement may
not, by its terms, be so assigned or transferred, SIC shall (i) sublease or
sublicense (as applicable) the Entitlement to Paniolo; or (ii) grant to Paniolo
the broadest possible right to use the Entitlement.</u> For the avoidance of
doubt, <u>the Parties acknowledge and agree that **DHHL License will not be
assigned by SIC to Paniolo**, but that SIC shall, and hereby does, grant to
Paniolo the full benefit and use of the DHHL License for the IRU Term
provided Paniolo does not exercise its rights under such grant to impair
service to HHL.</u>

Emphasis added.

30.     Thus, regardless of whether the MRA was assumed by HTI, the SIC

Property did not include and the Trustee did not obtain "<u>SIC's interest in License</u>

11

Agreement No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands" listed in Schedule A-2 as the Trustee acknowledged that he did not obtain an assignment of SIC's interest in License 372 despite the wording in Schedule A-2.

31.     In addition, the Trustee and HTI clearly did not obtain any portion of Waimana's interest in License 372 that was not assigned to SIC in the Partial Assignment, which includes Plaintiffs' right to provide (post FCC Order non-exclusive) telecommunications services other than voice only service on HHL including Pa Makani's Partial Assignment and Clearcom's Partial Assignment, and Plaintiffs' License 372 Easement areas that Plaintiffs developed on HHL.

32.     On November 30, 2020, without Waimana, Pa Makani, Clearcom or SIC's knowledge or concurrence, the Trustee and HTI entered into the Asset Purchase Agreement dated ("**APA**"), a true copy of which is attached hereto as **Exhibit "G"** where Katzenstein agreed to sell SIC Property as limited by the MRA and Rule 9010 Settlement Agreement (together with Paniolo's Assets) to HTI.

33.     On December 16, 2020, Ryan K. P. Kanakaole, Esq., the Deputy Attorney General representing DHHL filed papers in the Bankruptcy Court, a copy of which is attached hereto as **Exhibit "O,"** confirming that, "The Buyer [HTI] will need to acquire a new license for the use of DHHL lands."   The same message was confirmed by HHC Chairman William Aila, in emails dated January

12

6, 2021, to alhee@waimana.com that states that License 372 has not been cancelled, and: "The License remains valid.  DHHL informed the Court that any purchaser of the assets would require a license from DHHL."  And by DHHL's filing on August 19, 2021 (Dkt 432), a copy of which is attached hereto as **Exhibit "P,"** DHHL reconfirmed that HTI needs a new license to build, construct, repair, maintain and operate on HHL.

34.     Moreover, even if HTI obtains a new license from DHHL, such easement cannot be in the same areas already granted to Plaintiffs under License 372 as that would constitute a breach of License 372 and breach of fiduciary duties by DHHL.  In addition, even if for purposes of argument the Trustee obtained "SIC's interest in License Agreement No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands" listed in Schedule A-2 despite the Rule 9019 Settlement Agreement and the MRA (the determination of which involves discovery and questions of fact and a State Court determination of the scope of and rights under License 372), that does not eliminate Plaintiffs' License 372 Easement and right to provide non-voice telecommunications services on HHL.

35.     DHHL's 8/19/21 filing also disclosed the Limited Right-of Entry to HTI, which violates Plaintiffs' License 372 rights.[3]  See, Plaintiffs lawsuit in First

---

[3] In section 13 of the Limited Right-of Entry, HTI refused to defend and indemnity DHHL for any claim brought by Waimana.

13

Circuit Court against DHHL for breach of License 372 and related claims, in Civil No. 1CCV-22-0000617, a copy of which without exhibits is attached hereto as **Exhibit "N."**

36.    On August 31, 2021, the APA sale to HTI closed.

37.    HTI had the opportunity to assume from Katzenstein all of the benefits of MRA including the defined Entitlements but decided not to assume it.

38.    At the time HTI made its choice not to assume this agreement with SIC, HTI knew that it was buying facilities located on Plaintiffs' License 372 Easement.

39.    HTI's failure to assume this agreement was not inadvertent.  HTI has repeatedly emphasized that its decision not to assume the agreement that allowed Katzenstein to use the License 372 Easement was deliberate and intentional.   For example, in HTI's motion filed in the U.S. Bankruptcy Court on November 16, 2021, attached hereto as **Exhibit "H,"** HTI asserted that the agreements giving Paniolo the right to use License 372:

> were solely "Assignable Contracts" which means they were contracts that could have been assigned by the Trustee to HTI at HTI's sole election. … **HTI, however, did not elect to designate any of the SIC Agreements as agreements to be assigned by the Trustee to HTI**

Id. at 14 (emphasis added).

14

40.     In addition, although Plaintiffs were parties to the 9019 Settlement Agreement approved by Order dated June 4, 2020 (Dkt 271), because HTI did not assume the MRA and Settlement Agreement, HTI cannot enforce Plaintiffs' commitments made therein including their agreement to provide access to the Transferred Assets and Equipment and HTI cannot bind Plaintiffs to commitments made therein as the settlement agreement included the representation that Plaintiffs entering into the settlement agreement was consideration for the Trustee entering into the MRA and committing that any assignor would be bound by the MRA.

41.     Thus, HTI is a trespasser on Plaintiffs' License 372 Easement.

42.     On and after August 31, 2021, HTI had no right to locate the assets it had purchased on the Plaintiffs' License 372 Easement.  HTI does not have a license allowing its assets to be on Plaintiffs' License 372 Easement.

43.     Plaintiffs are not aware whether DHHL has granted HTI any right to provide telecommunications services on HHL, and if DHHL is contemplating doing so, DHHL would breach fiduciary duties to its beneficiaries if that license does not include the same strict obligations that Waimana assumed in License 372 including paragraphs 6-9 of License 372 and if allowed use of the same easement areas licensed to Plaintiffs who are native Hawaiian entities.

44.     HTI may argue that the Federal Communications Commission ("FCC") order dated July 3, 2017 ("**FCC Order**"), attached hereto as **Exhibit "I,"**

15

requires DHHL to provide access to the License 372 Easement on the grounds that the FCC Order prohibits DHHL from granting an exclusive license to only one company to provide telecommunications services on HHL, i.e. the License 372 Service Right.  However, the order does not require Plaintiffs to share use of their License 372 Easement areas.  The FCC Order only preempts the portion of the License that:

> grants one entity the "exclusive" right "to build, construct, repair, maintain and operate a . . . telecommunications network" for the purpose of providing service to the residents of the Hawaiian home lands and therefore prohibits other entities from doing so.

Id. at Page 7, Paragraph 16

45.     Under the severability provision of the License 372 at paragraph 22, while the exclusive License 372 Service Right may have been invalidated by the FCC Order, the order did not invalidate, and FCC does not have jurisdiction to invalidate Plaintiffs' License 372 Easement or its non-exclusive License 372 Service Rights.  Plaintiffs require exclusive possession to perform its telecommunications obligations required under License 372.  Thus, Plaintiffs' right to exclusive possession of their License 372 Easement areas survived the FCC Order, as did their rights and obligations to provide telecommunications services to HHL.  An internal DHHL memo to the HHC dated January 18, 2022, a copy of which is attached hereto as **Exhibit "J",** states "DHHL has informed its lessees,

16

tenants, and permittees that under Federal law they may obtain broadband telecommunications services from any provider of their choice"; confirming that the FCC Order dealt with License 372 Service Right.

46.     Plaintiffs own numerous improvements on the License 372 Easement that were not obtained by Katzenstein and thus were **not** purchased by HTI and are still owned, maintained and used by Plaintiffs to provide service to their HHL customers.  HTI's destructive actions are interfering with Plaintiffs.   HTI is using Plaintiffs' License 372 Easement and non-exclusive post FCC Order License 372 Service Right for non-voice only telecommunications services on HHL without authorization or paying for such use.

47.     HTI's letter March 11, 2022 asserting their rights under the FCC Order and Limited Right of Entry attached hereto as **Exhibit "K,"** only proves that HTI is wrongly using Plaintiffs' License 372 Service Rights and Plaintiffs' License 372 Easement areas.

## COUNT I - TRESPASS

48.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 45 hereinabove.

49.     HTI is a trespasser preventing Plaintiffs from exclusive unimpeded use and occupancy of their License 372 Easement areas to serve HHL lessees.

50.     HTI has no license, nor any other legal right, to occupy Plaintiffs' License 372 Easement.

51.     Plaintiffs are entitled to: (a) an injunction barring HTI from access to their License 372 Easement, and/or a similar judgment for possession of their License 372 Easement areas  and an order evicting of HTI from their License 372 Easement areas and an order to remove any property of HTI located thereon, (b) damages for wrongfully using Plaintiffs' License 372 Easement areas in violation of Plaintiff's rights under License 372 including damages for use of the License 372 Easement and disgorgement of HTI profits; and (c) punitive damages.

COUNT II – CONVERSION

52.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 49 hereinabove.

53.     HTI has willfully used and damaged Plaintiffs' License 372 Easement areas and property located on thereon, which constitutes conversion.

54.     HTI has also willfully used without Plaintiffs' authorization their License 372 Service Right for all telecommunications services on HHL except voice only services granted to Plaintiffs as native Hawaiian organizations under Section 204(2) of the HHCA, which constitutes conversion.

55.     Plaintiffs are entitled to judgment for damages in an amount to be proved at trial for: (a) the property damage caused by HTI's tortious actions in

18

deliberately, repeatedly damaging Plaintiffs' property; (b) lost profits and compensation for use of the License 372 Easement areas and License 372 Service Rights; (c) disgorgement of HTI profits for use of Plaintiffs' License 372 Easement areas and License 372 Service Rights; and (c) punitive damages.

COUNT III – UNFAIR COMPETITION

56.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 52 hereinabove.

57.    HTI is a competitor with Plaintiffs in the telecommunications business.

58.    HTI engaged in unfair methods of competition by usurping Plaintiffs License 372 Easements and their License 372 Service Rights without compensation, and destroying relations with their DHHL and HHL customers.

59.    HTI's above-described conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

60.    HTI's conduct negatively affects competition and harms fair competition as provided for in the Telecommunications Act of 1996 by impeding Plaintiffs' operations on HHL.

61.    Plaintiffs have been damaged in its business and property by HTI's unfair methods of competition in an amount to be proven at trial.

19

## COUNT IV – INTENTIONAL INTERFERENCE OF CONTRACT

62.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 58 hereinabove.

63.     The elements of tortious interference with contractual relations include:

> 1) a contract between the plaintiff and a third party; 2) the defendant's knowledge of the contract; 3) the defendant's intentional inducement of the third party to breach the contract; 4) the absence of justification on the defendant's part ; 5) the subsequent breach of the contract by the third party; and 6) damages to the plaintiff. It is of the essence in an action for wrongful interference with contractual relationships that the plaintiff suffer damages as a consequence of the defendant's conduct, and these damages cannot be speculative or conjectural losses.

Ace Quality Farm Prods., Ltd. Liab. Co. v. Hahn, 136 Hawai'i 373, 362 P.3d 806 (App. 2015).

64.     Here, 1) Plaintiffs have License 372 agreements with DHHL; 2) HTI knew of them; 3) HTI intentionally enticed, encouraged and induced DHHL to breach these agreements with Plaintiffs; 4) For numerous reasons HTI had no justification for doing so, including but not limited to rejecting the MRA and 9019 Settlement Agreement and over reaching by using Plaintiffs' License 372 rights that clearly were never transferred to HTI, particularly for data (non-voice) telecommunications; 5) encouraged and induced DHHL to breach its obligations to Plaintiffs under License 372 by entering into the Limited Right-of Entry, making

20

filings in this Court and potentially negotiating a new license with HTI that violate

Plaintiffs rights under License 372 and Partial Assignments to Pa Makani and

Clearcom; and 6) which damaged Plaintiffs' business on HHL.

COUNT V – DECLARATORY RELEIF

65.    Plaintiffs incorporate by reference the allegations contained in

paragraphs 1 through 61 hereinabove.

66.    Plaintiffs are entitled to a declaratory relief determination that by

entering into the Rule 9019 Settlement Agreement and MRA that were approved

by Order dated June 4, 2020 (Dkt 271), attached hereto as **Exhibit "L,"** even

though HTI did not assume these agreements, (a) the Trustee nonetheless did not

obtain "SIC's interest in License Agreement No. 372 issued by the State of Hawaii

Department of Hawaiian Home Lands" listed in Schedule A-2 as the Trustee

acknowledged in Schedule 2, section 2.3 of the MRA that SIC did not assign its

interests in License 372, which Plaintiffs have an interest in because they use SIC's

excess capacity to provided non-voice telecommunications services; and (b)

although Plaintiffs were parties to the 9019 Settlement Agreement, because HTI

also refused to assume the MRA, HTI cannot enforce Plaintiffs' commitments

made in the settlement agreement including the agreement to provide access to the

Transferred Assets and Equipment as it would be unfair to continue to bind

Plaintiffs to those commitments as Trustee's agreement to enter into the MRA and

21

including the commitment that any "purchaser or assignee approved by the Court shall be bound by the terms of the" MRA, was consideration for Plaintiffs entering into the settlement agreement.

67.    Plaintiffs are entitled to a declaratory relief determination that the SIC Partial Assignment only provided SIC with the right to provide voice only service on HHL and no other telecommunications services throughout Hawaii, including wireless that was assigned to Pa Makani and broadband that was assigned to Clearcom.

68.    Plaintiffs are entitled to a declaratory relief determination that the SIC Partial Assignment did not include Plaintiffs' License 372 Easement areas.

WHEREFORE, Plaintiffs prays the Court grant the following relief:

1.    Issuance of a judgment for eviction against HTI, evicting HTI from Plaintiffs License 372 Easement areas and to remove its property therefrom;

2.    Issuance of a Writ of Possession in favor of Plaintiffs and against HTI directing the sheriff to remove HTI from the lands covered by Plaintiffs' License 372 Easement areas;

3.    For a temporary restraining order and preliminary and permanent injunctions enjoining HTI from occupying the Plaintiffs' License 372 Easement areas and prohibiting HTI from damaging Plaintiffs' facilities and property located on HHL.

22

4.      For damages in an amount to be determined at trial.

5.      For treble damages in an amount be determined at trial.

6.      For punitive damages in an amount to be determined at trial.

7.      Declaratory relief set forth in Count V.

8.      For plaintiffs' reasonable costs and attorneys' fees incurred herein.

9.      For such other and further relief as the Court deems just.

DATED:  Honolulu, Hawai'i, May 27, 2022.

/s/ William Meheula
WILLIAM MEHEULA
D. KAENA HOROWITZ

Attorneys for Plaintiff
WAIMANA ENTERPRISES INC.,
PA MAKANI LLC, and CLEARCOM, INC.

23

# EXHIBIT A

THE ORIGINAL OF THIS DOCUMENT
RECORDED AS FOLLOWS
STATE OF HAWAII

BUREAU OF CONVEYANCE

DATE MAY 1 2 1995   32ᵗ

DOCUMENT NO. 95-064

## STATE OF HAWAII

## DEPARTMENT OF HAWAIIAN HOME LANDS

### LICENSE AGREEMENT NO. 312

THIS LICENSE made and entered into this ___9th___ day of ___May___, 19_95_, by and between the State of Hawaii, DEPARTMENT OF HAWAIIAN HOME LANDS, whose place of business is 335 Merchant Street, Honolulu, Hawaii 96813, and whose mailing address is P. O. Box 1879, Honolulu, Hawaii 96805, hereinafter referred to as "LICENSOR," and WAIMANA ENTERPRISES, INCORPORATED, a native Hawaiian corporation (Federal I.D. No. 99-0263871), whose principal place of business and mailing address is 1001 Bishop Street, Pauahi Tower, Suite 1520, Honolulu, Hawaii 96813, hereinafter referred to as "LICENSEE."

### W I T N E S S E T H   T H A T:

LICENSOR, pursuant to the authority granted to it by Section 207(C)(1)(A), HHCA, is authorized to grant licenses as easements for railroads, telephone lines, electric power and light lines, gas mains and the like;

LICENSOR, pursuant to the provisions under Section 10-4-22, Title 10, State of Hawaii, Department of Hawaiian Home Lands, Administrative Rules 1981, as amended (DHHL Administrative Rules), may grant licenses for public purposes for any length of term subject to reverter to LICENSOR upon termination or abandonment, on such terms and conditions as may be prudently and reasonably set by the LICENSOR;

LICENSOR, pursuant to the provisions under Section 10-4-21, DHHL Administrative Rules, may allow the rental for licenses to be nominal should the use benefit LICENSOR or its native Hawaiians beneficiaries;

LICENSOR determines that the LICENSE established herein is essential in order to provide broad band telecommunication services of all types (including but not limited to local, intrastate, interstate and international telephone; video on demand; interactive communication; cable television; medical and educational links; and electronic data transmission) to LICENSOR'S lands in a timely manner;

FURTHER, LICENSOR determines that the issuance of this LICENSE established herein is essential for LICENSEE to obtain necessary funds needed to construct and operate the necessary telecommunications infrastructure;

## EXHIBIT A

LICENSOR believes and intends that the issuance of this Exclusive "Benefit" LICENSE will also fulfill the purpose of advancing the rehabilitation and the welfare of native Hawaiians.

NOW THEREFORE, LICENSOR, in consideration of the services to be provided by LICENSEE, and the terms, conditions and covenants herein contained on the part of LICENSEE to be kept, observed and performed, hereby grants and issues to LICENSEE, and its legal successors and assigns, the exclusive right and privilege to build, construct, repair, maintain and operate a broad band telecommunications network including poles, overhead and/or underground lines, appliances, microwave and/or other types of equipment over, across, under and throughout all lands under the administration and jurisdiction of LICENSOR, and its legal successors and assigns, including the right to trim and keep trimmed any vegetation, shrubbery, bushes or trees in the way of its lines and appurtenances, and including also the right of entry upon the easement area and adjoining land of LICENSOR for the construction, maintenance, operation and removal of LICENSEE'S line and appurtenances over, across and under the LICENSE area.

TO HAVE AND TO HOLD the same unto LICENSEE, its legal successors and assigns, in perpetuity, commencing on May 1, 1995, unless sooner terminated as hereinafter provided, LICENSOR agreeing and LICENSEE understanding that the nominal rental of ONE AND NO/100 DOLLARS ($1.00) for the entire term is waived.

AND LICENSEE hereby covenants with LICENSOR, each for itself and not for the other that:

1.  INITIAL DEMONSTRATION PERIOD.  BOTH PARTIES agree to allow LICENSEE an initial period of not more than FIVE (5) YEARS in which LICENSEE shall demonstrate satisfactory performance of the applicable terms and conditions contained in this License.  LICENSEE shall demonstrate financial capability to complete the initial project within ONE (1) YEAR from date of the LICENSE.  Financial capability may be demonstrated by providing a bond, letter of credit, corporate guarantee, bank loan commitment letter, loan approval from a government agency or other similar instrument in the amount of the telecommunications construction.  When LICENSEE has demonstrated its ability to fund, install and operate the telecommunications network for the selected project, the remaining provisions, terms and conditions of this LICENSE shall automatically take effect.  No other action shall be required from either party.

2.  NEW CONSTRUCTION TELECOMMUNICATION INFRASTRUCTURE COSTS.  LICENSEE agrees to construct and install all telecommunications infrastructure on LICENSOR'S lands at LICENSEE'S cost for all new construction to include but not limited to residential, agricultural, pastoral, commercial

and/or industrial subdivisions developed after January 1, 1996 in the LICENSE area at LICENSEE'S cost. In the alternative, LICENSEE at its option, may choose to reimburse LICENSOR for all costs to install telecommunications infrastructure provided the telecommunications infrastructure is installed to LICENSEE'S specifications.

3. **EXISTING TELECOMMUNICATIONS INFRASTRUCTURE.** LICENSOR agrees to sell and LICENSEE agrees to purchase at LICENSOR'S cost and/or install telecommunications infrastructure on LICENSOR'S land at LICENSEE'S cost including but not limited to all existing residential, agricultural, pastoral, commercial and/or industrial subdivisions. If the existing infrastructure is not owned by the LICENSOR, LICENSEE shall have the option, to be exercised in LICENSEE'S sole discretion, to either purchase or install new telecommunications infrastructure. After LICENSEE activates the existing and/or new telecommunications infrastructure, LICENSOR agrees not to allow any other telecommunications provider to use any remaining telecommunications infrastructure to continue to provide or initiate service on LICENSOR'S lands.

4. **ACCESS TO TELECOMMUNICATIONS INFRASTRUCTURE.** LICENSEE shall make available to LICENSOR the use of all available telecommunications equipment and services then under LICENSEE'S control at LICENSEE'S cost. LICENSOR'S use under this paragraph shall be limited to emergency, public and official purposes only.

5. **LEVEL OF TELECOMMUNICATION SERVICES.** LICENSEE shall provide at a minimum the same level of telecommunication service being provided in adjacent areas not subject to this LICENSE. LICENSEE shall use its best effort to provide a higher level of telecommunication service than that being provided in adjacent areas not subject to this LICENSE. LICENSEE shall not provide a lower level of service than that level being provided in adjacent areas not subject to the LICENSE unless LICENSOR shall agree in writing.

6. **COST OF TELECOMMUNICATIONS SERVICES.** LICENSEE shall provide to the beneficiaries of LICENSOR living in areas subject to this LICENSE, telecommunications services at a cost less than or equal to the cost for comparable services being provided in adjacent areas not subject to this LICENSE. LICENSEE shall not charge beneficiaries living in the LICENSE area more for telecommunication services than being charged in adjacent areas not subject to this LICENSE unless LICENSOR consents in writing.

7. **JOB TRAINING/EDUCATION.** LICENSEE agrees to expend an amount equal to at least one-half percent (1/2%) of LICENSEE'S annual net profit for job training and/or educational

opportunities for beneficiaries of LICENSOR each year.  For purposes of demonstrating compliance with this paragraph, LICENSEE agrees to allow LICENSOR access to LICENSEE'S financial statement, provided, that all material and information will be kept strictly confidential.

8.  EMPLOYMENT.  LICENSEE agrees to offer employment opportunities to qualified beneficiaries of LICENSOR.

9.  CAPITAL EXPENDITURES/CONTRACTS.  LICENSEE agrees to utilize qualified companies controlled or owned by beneficiaries of LICENSOR provided such beneficiary company is qualified to perform the terms of the contract and such beneficiary company's bid price is not more than 5% higher than the lowest bid from an equally qualified non-beneficiary company.

10.  TAXES.  During the term of this LICENSE, LICENSEE shall pay when due, all real property taxes and any other assessments, including all charges for utility services, which shall, during the term of this LICENSE, be lawfully charged, assessed, imposed, or become due and payable upon or on account of the licensed premises and the improvements now on or hereafter erected thereon.

11.  DUE CARE AND DILIGENCE.  LICENSEE shall use due care and diligence in the operation and maintenance of the premises and shall keep the grounds and improvements in good and safe condition and repair.

12.  INDEMNITY.  LICENSEE shall, to the extent permitted by law, indemnify and hold harmless, LICENSOR, from any and all claims and demands against LICENSOR for any loss or damage or injury or death to persons or property resulting from, or in any way connected with, the condition or use of the premises covered by this LICENSE not caused by the negligence of LICENSOR, their agents, servants or employees acting within the scope of their employment, and from and against all damages, costs, counsel fees, or liabilities incurred or brought thereon.

13.  ASSIGNMENTS.  Except as expressly provided in this LICENSE, this LICENSE is not transferable.  At no time during the term of this LICENSE, shall LICENSEE assign, mortgage or pledge its interest in this LICENSE or its interest in the improvements now or hereafter erected on the premises without the prior written consent of LICENSOR, which consent will not be withheld unreasonably.

14.  CONDEMNATION.  If at any time the premises across which this LICENSE extends, or any part thereof, shall be condemned or taken for any public project by a governmental authority, LICENSEE shall have the right to claim and recover from the condemning authority, but not from LICENSOR, such

compensation as is payable for the LICENSE and LICENSEE'S improvements, if any, used in connection with this LICENSE, which shall be payable to LICENSEE as its interests appear.

15. ABANDONMENT. In the event the easement area hereby granted shall be abandoned or shall remain unused for a continuous period of one year, all rights granted hereunder shall terminate, and LICENSEE will remove its equipment and improvements and restore the land as nearly as is reasonably possible to the condition existing immediately prior to the signing of this License. Failure of LICENSEE to remove its equipment and improvements and to restore the land within 90 days after notification to do so from LICENSOR by certified mail at LICENSEE'S last known address, will constitute a breach of this LICENSE and LICENSOR may thereafter remove LICENSEE'S equipment and improvements and restore the land to a condition similar to that existing immediately prior to the signing of this LICENSE and LICENSEE will reimburse LICENSOR for all reasonable costs in connection with the removal and restoration.

16. RELOCATION. If LICENSOR determines that the continued exercise of the easement rights granted herein constitutes an undue interference with a subdivision or other development of the land over which the granted easement crosses, LICENSOR shall have the right to terminate the easement granted to the extent necessary to eliminate such interference; provided, that it shall grant to LICENSEE without payment of any monetary consideration, a substitute easement of similar width within the reasonable vicinity to permit LICENSEE to effect relocation of any facility or portion thereof, installed, placed or constructed on the easement area at LICENSEE'S own cost and expense, which substitute easement shall be subject to the same terms and conditions as this LICENSE contains.

17. CONSTRUCTION OF IMPROVEMENTS. LICENSEE shall undertake no construction until LICENSOR has reviewed and approved the plans. All buildings or structures or other major improvements of whatever kind that LICENSEE constructs or erects on the premises shall remain the property of LICENSEE and LICENSEE shall have the right, prior to termination of this LICENSE, or within such additional period as LICENSOR in its reasonable discretion may allow, to remove its property from the premises; provided that in the event LICENSEE shall fail to so remove such property within thirty (30) days after written notice to remove, LICENSOR may at its option retain the property or remove the same and charge the cost of removal and storage, if any, to LICENSEE.

18. MAINTENANCE OF PREMISES. During the term of this LICENSE, LICENSEE shall repair and maintain all improvements heretofore and hereafter erected upon the premises, including all glass, water and gas plumbing, electrical wiring, and all

other fixtures in or on the premises with all necessary reparations and amendments whatsoever; shall keep the premises and all improvements thereon in a strictly clean and sanitary condition, and shall comply with all laws, ordinances, rules and regulations of the Federal, State, County or municipal governments that are applicable to the premises and improvements; and shall allow LICENSOR or its agents, at all reasonable times, free access to the premises for the purpose of examining the same or determining whether the conditions herein are being fully observed and performed, and shall make good at its own cost and expense all defects within sixty (60) days after receipt of written notice by certified mail to the last known address of LICENSEE.

19. **BREACH.**  If LICENSEE shall substantially fail to observe or perform any of the conditions herein contained and on its part to be observed or performed and such failure or lack of substantial compliance shall continue for sixty (60) days after the receipt by certified mail or written notice of such failure to the address of LICENSEE, or if LICENSEE shall abandon the premises, then and in any such event LICENSOR may, at its option, cancel this LICENSE Agreement and, thereupon, take immediate possession of the premises, allowing LICENSEE reasonable time to remove its property therefrom, without prejudice to any remedy or right of action that LICENSOR may have against LICENSEE.

20. **RIGHT OF ENTRY.**  LICENSOR and its duly authorized representatives shall have the right to enter the Premises at all times for the purposes of conducting its own inspection and to ensure that LICENSEE is in compliance with the provisions of this LICENSE.

21. **WAIVER.**  That notwithstanding any provision contained herein to the contrary, wherever applicable, LICENSOR may for good cause shown, extend the time for compliance and/or waive any of the terms, conditions and covenants contained herein that LICENSEE, must observe and perform.

22. **SEVERABILITY.**  Whenever possible each provision of this LICENSE shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this LICENSE should be prohibited or invalidated under applicable law or for any other reason whatsoever, such provision shall not invalidate any other portion of this License.

23. **DEFINITION.**  The word "premises", when it appears herein, includes and shall be deemed to include the lands described above and improvements whenever and wherever erected or placed thereon.

24. <u>SINGULAR/PLURAL.</u>  The singular or plural depends on its appropriate use.

25. <u>AGREEMENT.</u>  This agreement shall be binding upon and inure to the benefit of the parties hereto and their respective legal successors and assigns.

IN WITNESS WHEREOF, the parties hereto have caused these presents to be duly executed the day and year first above written.

Approved by the HHC
at its meeting held on
December 20, 1994


Approved as to form:


<u>Deputy Attorney General</u>
<u>State of Hawaii</u>

State of Hawaii
DEPARTMENT OF HAWAIIAN HOME LANDS

By _____
<u>Kali Watson, Chairman</u>
<u>Hawaiian Homes Commission</u>

                    LICENSOR


WAIMANA ENTERPRISES, INC.
  a Hawaii corporation

By _____
<u>Albert S.N. Hee, President</u>

                    LICENSEE

STATE OF HAWAII          )
                              ) ss
CITY AND COUNTY OF HONOLULU  )

        On this _9th_ day of ___May___, 19 95 ,
before me personally appeared Albert S.N. Hee, to me personally
known, who, being by me duly sworn, did say that he is the
President of Waimana Enterprises, Inc., a Hawaii corporation,
and that the instrument was signed on behalf of the corporation
and he acknowledged the instrument to be the free act and deed
of the corporation.

                           Notary Public, State of Hawaii
                           My commission expires: 12/27/95

# EXHIBIT B

## PARTIAL ASSIGNMENT OF LICENSE

FOR VALUE RECEIVED, WAIMANA ENTERPRISES, INC. (Assignor) hereby assigns, transfers and sets over to SANDWICH ISLES COMMUNICATIONS, INC. (Assignee) those certain rights, title and interest necessary to provide IntraLata and Intrastate telecommunication services in and to the following described License:

License Agreement No. 372, dated May 9, 1995, between the Hawaiian Home Lands and Waimana Enterprises, Inc., recorded in the Bureau of Conveyances, State of Hawaii as Document No. 95-064099.

The Assignor warrants and represents that said License is in full force and effect and is fully assignable.

The Assignee hereby assumes and agrees to perform all the obligations of the Assignor under the License and guarantees to hold the Assignor harmless from any claim or demand made thereunder.

Signed under seal this 15th day of January, 1996.

Albert S.N. Hee, President
Assignor

Albert S.N. Hee, President
Assignee

STATE OF HAWAII          )
                         ) SS.
COUNTY OF HONOLULU       )

On this 15th day of January, 1996, before me personally appeared Albert S.N. Hee, being first duly sworn, deposes and says that he is the President of Sandwich Isles Communications, Inc. and Waimana Enterprises, Inc. to me known to be the person who executed the foregoing instrument and acknowledged that he executed the same as his free act and deed.

Witness my hand and seal.

Robin Kanalahu

My commission expires: 3/24/99

EXHIBIT B

# EXHIBIT C

# STATE OF HAWAII

## DEPARTMENT OF HAWAIIAN HOME LANDS

### CONSENT TO PARTIAL ASSIGNMENT OF LICENSE AGREEMENT NO. 372

**KNOW ALL MEN BY THESE PRESENTS**:

The **STATE OF HAWAII**, by its Hawaiian Homes Commission, is the "Licensor" named in that certain License Agreement No. 372, dated May 9, 1995, in favor of Waimana Enterprises, Incorporated, a native Hawaiian corporation ("Licensee"), recorded in the Bureau of Conveyances, State of Hawaii as Document No. 95-064099.

**WHEREAS THE LICENSOR DOES HEREBY CONSENT** to that certain Partial Assignment of License, dated January 15, 1996, by and between Licensee, as Assignor, and Sandwich Isles Communications, Inc., a Hawaii corporation, as Assignee, with respect to those certain rights, title and interest necessary to provide IntraLata and Intrastate telecommunication services in and to the License Agreement, upon the following conditions:

(1)    This consent shall not authorize, nor deemed to authorize, any further or other assignment of the License Agreement;

(2)    This consent shall not be deemed nor construed to be a waiver of any of the terms, covenants or provisions of said License Agreement; all rights of Licensor under said License Agreement being hereby reserved;

(3)    Should there be any conflict between the terms of said License Agreement and the terms of said Partial Assignment of License, the former shall control, and nothing herein shall be construed as being a waiver of any of the terms, covenants, conditions, or provisions of said License Agreement;

(4)    All rights of the Licensor or against the Licensee under the License Agreement are reserved; and

(5)    All other conditions upon which the approval of this consent was made subject to by the board of the Hawaiian Homes Commission on May 21, 1996.

**WHEREAS**, the Hawaiian Homes Commission unanimously approved said Partial Assignment of License at its meeting on May 21, 1996, and this consent shall be effective as of said date.

# EXHIBIT C



**IN WITNESS WHEREOF**, the **STATE OF HAWAII**, by its Hawaiian Homes Commission, has executed these presents this _____ 6th _____ day of _____ October _____, 2008.

Approved by the Hawaiian Homes
Commission on May 21, 1996

STATE OF HAWAII
**DEPARTMENT OF HAWAIIAN HOME LANDS**

By _____
Micah A. Kane, Chairman
Hawaiian Homes Commission

APPROVED AS TO FORM:

Deputy Attorney General
State of Hawaii

2

STATE OF HAWAII            )
                           ) ss:
CITY AND COUNTY OF HONOLULU )

On this 6th day of October, 2008, before me appeared MICAH A. KANE, to me personally known, who, being by me duly sworn, did say that he is the Chairman of the Hawaiian Homes Commission and the person who executed the foregoing instrument and acknowledged to me that he executed the same freely and voluntarily for the use and purposes therein set forth.

_____
Notary Public, State of Hawaii

**ABIGAIL L. TUBERA**
_____
Print Name of Notary Public

My commission expires:___11/11/08___

Doc. Date:____10/6/08_____   # Pages:__3__
Notary Name:___Abigail L. Tubera____   First Circuit
Doc. Description: Consent to Partial Assignment
to LA 372 - Waimana Enterprises, Inc.

_____   10/6/08
Notary Signature        Date

3

# EXHIBIT D

**PARTIAL ASSIGNMENT OF LICENSE**

FOR VALUE RECEIVED, WAIMANA ENTERPRISES, INC., a native Hawaiian corporation (Assignor) hereby assigns, transfers and sets over to PA MAKANI LLC dba SANDWICH ISLES WIRELESS, a Hawaii limited liability company (Assignee) those certain rights, title and interest necessary to provide wireless communications services of all types, including but not limited to the construction and operation of all necessary wireless communications infrastructure, in and to the following described License:

License Agreement No. 372, dated May 9, 1995, between the Hawaiian Home Lands and Waimana Enterprises, Inc., recorded in the Bureau of Conveyances, State of Hawaii as Document No. 95-064099.

The Assignor warrants and represents that said License is in full force and effect and is fully assignable.

The Assignee hereby assumes and agrees to perform all the obligations of the Assignor under the License and guarantees to hold the Assignor harmless from any claim or demand made thereunder.

Such partial assignment shall be effective December 30, 2011.

WAIMANA ENTERPRISES, INC., a native Hawaiian corporation

Albert S.N. Hee
Its President

"Assignor"

PA MAKANI LLC, a Hawaii limited liability company
By WAIMANA ENTERPRISES, INC., a native Hawaiian corporation
Its Manager

Albert S.N. Hee
Its President

"Assignee"

1
# EXHIBIT D

STATE OF HAWAII  )
) SS.
COUNTY OF HONOLULU  )

On this 9th day of January 2012, in the First Circuit, State of Hawaii, before me personally appeared Albert S.N. Hee to me known, who being by me duly sworn, did say that he is the President of Waimana Enterprises, Inc., a native Hawaiian corporation, and that said instrument identified was signed on behalf of said corporation by authority of its Board of Directors, and he acknowledged such instrument to be the free act and deed of the corporation.

The foregoing instrument is dated December 30, 2011 and contained 2 pages at the time of this acknowledgement/certification.



Name of Notary:  Joycelynn P.S. Costa
Notary Public, State of Hawaii
My commission expires: FEB 0 1 2012

STATE OF HAWAII  )
) SS.
COUNTY OF HONOLULU  )

On this 9th day of January 2012, in the First Circuit, State of Hawaii, before me personally appeared Albert S.N. Hee ("Officer"), to me personally known, who being by me duly sworn, did say that he is the President of Waimana Enterprises Incorporated, a Hawaii corporation (the "Manager"), the Manager of Pa Makani LLC, a Hawaii limited liability company which is Manager-Managed (the "LLC"); that said instrument was executed by said Officer in the name and on behalf of said Manager by authority of its Board of Directors; that said instrument was executed by said Manager in the name and on behalf of said LLC by authority of its members; and said Officer acknowledged that he executed said instrument as the free act and deed as such officer of the Manager, as the free act and deed as the Manager of said LLC, and as the free act and deed of said LLC.

The foregoing instrument is dated December 30, 2011 and contained 2 pages at the time of this acknowledgement/certification.



Name of Notary:  Joycelynn P.S. Costa
Notary Public, State of Hawaii
My commission expires:  FEB 0 1 2012

2



Doc. Date: DEC 3 0 2011 # Pages: 2 + certification
Name: Joycelynn P.S. Costa    First Circuit
Doc. Description: __Partial__
__Assignment of License__
                                JAN 0 9 2012
Signature     NOTARY CERTIFICATION     Date



Doc. Date: DEC 3 0 2011 # Pages: 2 + certification
Name: Joycelynn P.S. Costa    First Circuit
Doc. Description: __Partial__
__Assignment of License__
                                JAN 0 9 2012
Signature     NOTARY CERTIFICATION     Date

# EXHIBIT E

## PARTIAL ASSIGNMENT OF LICENSE

FOR VALUE RECEIVED, WAIMANA ENTERPRISES, INC., a native Hawaiian corporation (Assignor) hereby assigns, transfers and sets over to CLEARCOM, INC. dba SANDWICH ISLES BROADBAND, a Hawaii corporation (Assignee) those certain rights, title and interest necessary to provide broadband services of all types, including but not limited to the construction and operation of all necessary broadband infrastructure, in and to the following described License:

License Agreement No. 372, dated May 9, 1995, between the Hawaiian Home
Lands and Waimana Enterprises, Inc., recorded in the Bureau of Conveyances,
State of Hawaii as Document No. 95-064099.

The Assignor warrants and represents that said License is in full force and effect and is fully assignable.

The Assignee hereby assumes and agrees to perform all the obligations of the Assignor under the License and guarantees to hold the Assignor harmless from any claim or demand made thereunder.

Such partial assignment shall be effective May 29, 2014 .

WAIMANA ENTERPRISES, INC., a native Hawaiian
corporation

Albert S.N. Hee
Its President

"Assignor"

CLEARCOM, INC., a native Hawaiian corporation

Albert S.N. Hee
Its President

"Assignee"

1

# EXHIBIT E

STATE OF HAWAII                    )
                                  ) SS.
COUNTY OF HONOLULU                 )

On this 29th day of May, 2014, in the First Circuit, State of Hawaii, before me personally appeared Albert S.N. Hee to me known, who being by me duly sworn, did say that he is the President of Waimana Enterprises, Inc., a native Hawaiian corporation, and that said instrument identified was signed on behalf of said corporation by authority of its Board of Directors, and he acknowledged such instrument to be the free act and deed of the corporation.

This Partial Assignment of License is dated May 29, 2014 and contained 2 pages at the time of this acknowledgement/certification.



Name of Notary: Joycelynn P.S. Costa
Notary Public, State of Hawaii
My commission expires: 2/1/2016

STATE OF HAWAII                    )
                                  ) SS.
COUNTY OF HONOLULU                 )

On this 29th day of May, 2014, in the First Circuit, State of Hawaii, before me personally appeared Albert S.N. Hee to me known, who being by me duly sworn, did say that he is the President of Clearcom, Inc., a native Hawaiian corporation, and that said instrument identified was signed on behalf of said corporation by authority of its Board of Directors, and he acknowledged such instrument to be the free act and deed of the corporation.

This Partial Assignment of License is dated May 29, 2014 and contained 2 pages at the time of this acknowledgement/certification.



Name of Notary: Joycelynn P.S. Costa
Notary Public, State of Hawaii
My commission expires: 2/1/2016

2

# EXHIBIT F

**EXECUTION VERSION**

## MASTER RELATIONSHIP AGREEMENT

This Master Relationship Agreement (this "MRA" and, together with all Schedules and Exhibits hereto, the "Agreement") is entered into as of March 6, 2020, by and between Sandwich Isles Communications, Inc., a Hawaii corporation ("SIC") and Paniolo Cable Company, LLC, a Delaware corporation ("Paniolo"). SIC and Paniolo are each referred to as a "Party" and are collectively referred to as the "Parties".

**RECITALS:**

A.     WHEREAS, Paniolo owns and operates a submarine cable system and related terrestrial assets ("the Paniolo System") connecting certain islands in Hawaii;

B.     WHEREAS, SIC owns and operates certain facilities and provides telecommunications services in the Hawaiian Home Lands;

C.     WHEREAS, in connection with that certain Adversary Proceeding No. 19-90022, *Katzenstein Trustee v. Sandwich Isles Communications, Inc.* (the "Adversary") pending in *In re Paniolo Cable Company, LLC*, Debtor, Case No. 18-01319 (RJF), in the United States Bankruptcy Court for the District of Hawaii (the "Paniolo Bankruptcy Proceeding"), the Parties have entered into that certain Rule 9019 Settlement Agreement ("Settlement Agreement") in order to restructure their business and financial affairs;

D.     WHEREAS, the Settlement Agreement sets forth the Parties' agreement, in general terms, with respect to:  (a) the grant by SIC to Paniolo of an indefeasible right to access, occupy, and use certain assets for the purpose of operating and maintaining the Paniolo System (which assets, together with the Paniolo System, are referred to as the "Paniolo Network");  and  (b) the assignment, transfer, conveyance, sublease, sublicense or grant of the indefeasible right of use by SIC to Paniolo of certain easements, leases, licenses, permits and rights of way necessary to operate and maintain the Paniolo Network;  (c) the lease by Paniolo to SIC of fiber pairs on the Paniolo Network for the sole purpose of providing retail telecommunications service in the Hawaiian Homelands;  (d) the lease by Paniolo to SIC of collocation space and conduit access necessary to use such fiber pairs;  (e) the lease by Paniolo to SIC of certain transport services utilizing existing Fujitsu transport assets in the Paniolo Network; and (f) the provision of related operations and maintenance services and power by one Party to the other;

E.     WHEREAS, the Parties desire to enter into this Agreement to more specifically memorialize the terms of the Settlement Agreement;

F.     Accordingly, in consideration of the mutual promises set forth below and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

# EXHIBIT F

99754430.1

EXECUTION VERSION

# ARTICLE 1
## DEFINITIONS

1.1.   "Adversary" is defined in Recital C.

1.2.   "Affiliate" means any entity that now or in the future, directly or indirectly controls, is controlled with or by, or is under common control with a Party.  For purposes of the foregoing, "control" means the ownership, directly or indirectly, of fifty percent (50%) or more of the voting power to elect directors (or the equivalent thereof, *i.e.,* limited liability company members or managers) of such entity, or such lesser percentage interest if coupled with the power to direct the management of such entity.

1.3.   "Agreement" is defined in the Preamble.

1.4.   "Assets IRU" is defined in Section 3.2 and Schedule 2.

1.5.   "Bankruptcy Event" means any proceeding instituted by a Party voluntarily or involuntarily commenced against any Party (and such proceeding is not dismissed or permanently stayed within thirty (30) days): (a) seeking an order for relief with respect to such Party under any bankruptcy, insolvency, reorganizations or similar law, including the Bankruptcy Code; (b) seeking to appoint a receiver, trustee, custodian, or other similar official for such Party or for any or all of a Party's assets or property; or (c) making an assignment for the benefit of that Party's creditors.  For the avoidance of doubt, "Bankruptcy Event" shall not include the pending Paniolo Bankruptcy Proceeding with respect to Paniolo.

1.6.   "Business Day" means any official working day other than a legal or bank holiday in the State of Hawaii.  Unless otherwise specifically indicated as a "Business Day" the word "days" as used in the Agreement means calendar days.

1.7.   "Charges" means the fees and charges set out in the Agreement or a Schedule and may include recurring and non-recurring charges.

1.8.   "Claims" is defined in Section 7.1.

1.9.   "Collocation Space" means the space leased by Paniolo to SIC for the purposes of installing and operating equipment for the provision of retail telecommunications services pursuant to Section 3.1 and Schedule 1, as more particularly defined in that Schedule and Exhibit C thereto.

1.10.   "Conduits" means the conduits and ducts to which Paniolo grants SIC access to and use of pursuant to Section 3.1 and Schedule 1, as more particularly defined in that Schedule.

1.11.   "Confidential Information" means information disclosed by one Party to the other Party under this Agreement that is marked as confidential or would normally under the circumstances be considered the confidential information of the disclosing Party.  Confidential Information does not include information that the recipient already knew, that becomes public through no fault of the recipient, that was independently developed by the recipient, or that was rightfully given to the recipient by another Party under no confidentiality obligation.

99754430.1

EXECUTION VERSION

1.12.   "Default" is defined in Section 11.

1.13.   "Dispute" is defined in Section 13.1.

1.14.   "Effective Date" means the latter of: (a) the date on which this Agreement is fully executed; and (b) the date on which it is approved by the Presiding Judge in the Paniolo Bankruptcy Proceeding.

1.15.   "Entitlements" means the various easements, leases, licenses, license agreements, letters of approval, special area management permits, rights of way or rights of entry assigned, transferred, sublicensed, or subleased by SIC to Paniolo  (or to which SIC grants Paniolo an indefeasible beneficial right of use) pursuant to Section 3.2 and Schedule 2, as more particularly defined in that Schedule.

1.16.   "Fiber Pair" means two dark fibers used to transmit and receive optical signals on the Paniolo System.

1.17.   "Force Majeure Event" is defined in Article 12.

1.18.   "Indemnified Parties" is defined in Section 7.1.

1.19.   "Indemnifying Party" is defined in Section 7.1.

1.20.   "Intellectual Property" means any and all intellectual property (and rights thereto, whether registered or unregistered) and including, but not limited to, technology, patents, rights to inventions, trademarks, service marks, registered designs, copyrights and related rights, database rights, design rights, domain names, trade dress and other intellectual property, and all registrations, applications for registrations, continuations, continuations-in-part, divisional applications, renewals or extensions of, and rights to claim priority from, those rights, and any similar right recognized from time to time in any jurisdiction, together with all rights of action in relation to the infringement of any of the above.

1.21.   "IRU Assets" means the assets subject to the Assets IRU granted to Paniolo by SIC pursuant to Section 3.2 and Schedule 2, as more particularly defined in that Schedule.

1.22.   "Law" means any national, regional, state or local law, statute, rule, regulation, code, ordinance, administrative ruling, judgment, decree, order or directive of any jurisdiction applicable to this Agreement.

1.23.   "Leased Fiber" means the Paniolo Network Fiber Pairs leased to SIC by Paniolo pursuant to Section 3.1 and Schedule 1, as more particularly defined in that Schedule.

1.24.   "MRA" means the main body of this Agreement.

1.25.   "O&M Services" means the operations and maintenance services provided by one Party to another pursuant to this Agreement, and includes "Assets O&M Services" (O&M Services provided by SIC with respect to the IRU Assets) and "Leased Fiber and Transport Services O&M

**EXECUTION VERSION**

Services (O&M Services provided by Paniolo with respect to the Leased Fiber), all such O&M Services to be provided on commercially reasonable terms and conditions.

1.26.   "Paniolo" means Paniolo Cable Company, LLC, and its permitted successors and assigns.

1.27.   "Paniolo Bankruptcy Proceeding" is defined in Recital C.

1.28.   "Paniolo Equipment" means any equipment owned or leased, or to which Paniolo has an indefeasible right of use (other than the IRU Assets), that Paniolo uses to operate the Paniolo Network.

1.29.   "Paniolo Network" is defined in Recital D.

1.30.   "Paniolo System" is defined in Recital A.

1.31.   "Party" refers to each of SIC and Paniolo, and their respective permitted successors and assigns.

1.32.   "Released Claims" is defined in Section 3.2.

1.33.   "SIC" means Sandwich Isles Communications, Inc. and its permitted successors and assigns.

1.34.   "Settlement Agreement" is defined in Recital C.

1.35.   "SIC Equipment" means any equipment installed by or on behalf of SIC and/or its Affiliates in the Collocation Space or Conduits for the purpose of using the Leased Fiber as permitted under this Agreement, including any electronic or optronic equipment.  For the avoidance of doubt, "SIC Equipment" does not include any IRU Assets.

1.36.   "SIC Lease" is defined in Section 3.1.

1.37.   "Specifications" means the technical and performance specifications applicable to the Leased Fiber, as more particularly identified in Section 2.2 of Schedule 1 and Exhibit A thereof.

1.38.   "Taxes" means any and all applicable federal, state, local, and foreign sales, use, excise, utility, gross receipts, value added, and other taxes, tax-like charges and other assessments and surcharges imposed on a Party.

1.39.   "Term" is defined in Section 2.1.

1.40.   "Transport Services" means DS1, DS3, OC3, OC12, and OC48 circuits provided by Paniolo leveraging the Paniolo Network Fujitsu equipment existing in the Paniolo Network central offices (*i.e.,* those offices where the Paniolo Network Fiber Pairs interconnect).

99754430.1

4

## ARTICLE 2
## TERM

2.1.     Term.  This MRA is effective as of the Effective Date and shall remain in force until all Schedules hereto have terminated ("Term").

2.2.     Termination of Schedules.  Any Schedule may be terminated by the written agreement of both Parties.  In addition, any Schedule other than Schedule 2 may be terminated by a Party in the event the other Party is in Default.  For the avoidance of doubt, the Parties expressly agree that Schedule 2 is irrevocable and non-terminable.  SIC's remedies for a Paniolo Default with respect to Schedule 2 shall be damages at law, or equitable remedies pursuant to Section 6.

2.3.     Effect of Termination.  Termination of this Agreement or a Schedule shall not affect the rights or obligations of either Party that have arisen before the date of termination or expiration.

## ARTICLE 3
## SCHEDULED SERVICES AND RIGHTS OF USE

3.1.     SIC Lease.  In consideration for the Assets IRU, Paniolo shall lease to SIC, and SIC shall lease from Paniolo, the Leased Fiber for the sole purpose of providing retail telecommunications services in the Hawaiian Home Lands (the "SIC Lease").  The SIC Lease is subject to the terms and conditions more particularly set forth in Schedule 1, attached hereto and incorporated herein by reference.  To facilitate SIC's use of the Leased Fiber, Paniolo shall also: (a) lease to SIC, and SIC shall lease from Paniolo, the Collocation Space to use the Leased Fiber as well as space on related fiber patch panels to connect to the Leased Fiber as well as Collocation Space for other SIC Equipment occupying the Paniolo Network central office space; (b) lease to SIC, and SIC shall lease from Paniolo, Conduits used by SIC for connectivity to the Hawaiian Home Lands as of the Effective Date; (c) lease to SIC, and SIC shall lease from Paniolo, the Transport Services in connection with the Leased Fiber as of the Effective Date; and (d)  provide to SIC Fiber O&M Services and power, subject to the terms and conditions more particularly set forth in Schedule 1.  Nominal Charges shall apply to (a) the Leased Fiber and related Transport Services leased to SIC as of the Effective Date, and (b) Collocation Space and Conduits occupied by SIC and its Affiliates as of the date of this Agreement (but in the case of such Collocation Space and Conduits, only for the period beginning with the Effective Date and ending at midnight December 31, 2020).  For the avoidance of doubt, such Nominal Charges shall not apply to (a) any Fiber Pairs and related Transport Services other than the Leased Fiber leased to SIC as of the Effective Date and Transport Services related to such Leased Fiber, (b) any Collocation Space or Conduits for any time after December 31, 2020; or (c) O&M Services and power; instead market rates shall be charged to SIC therefor.

3.2.     Paniolo Assets IRU.  In consideration for the nominal Charges for Leased Fiber, Collocation Space,  Conduits and Transport Services provided for in the SIC Lease, and the release of certain claims identified in the Settlement Agreement ("Released Claims"), SIC shall grant to Paniolo, and Paniolo shall purchase from SIC, an indefeasible right to use the IRU Assets ("Assets IRU") on the terms and conditions more particularly set forth in Schedule 2, attached hereto and incorporated herein by reference.  To facilitate Paniolo's use of the IRU Assets, SIC shall also: (a) assign, transfer, convey, sublease, sublicense or grant an indefeasible right to the beneficial use of

99754430.1

5

the Entitlements to Paniolo; and (b) provide Assets O&M Services and power to Paniolo, also on the terms and conditions as may be agreed upon by the Parties pursuant to Schedule 2.

3.3.   Additional Services. The Parties may, from time to time, agree on additional services to be provided by one Party to the other. Any such services shall be set forth in a Schedule, which Schedule shall be attached hereto and incorporated herein by reference.

3.4.   No Additional Rights; No Liens. Nothing in this Agreement shall grant to either Party any rights in and to the real and personal property of the other Party, except as expressly provided herein. Each Party shall indemnify and hold the other Party harmless from, and shall keep the other Party's personal and real property free and clear of and from, all mechanics' and materialmen's liens and claims of liens, and all other liabilities, liens, claims and demands of any kind (other than any pre-existing, perfected liens and security interests of the United States Rural Utilities Services, if any). If any such lien is filed on account of a Party at any time against the other Party's real or personal property, such Party shall cause such lien to be discharged of record within ten (10) days after the filing thereof. For purposes of this Section 3.4, Paniolo's real and personal property includes the IRU Assets.

**ARTICLE 4**
**CHARGES AND INVOICING**

4.1.   Charges. All Charges shall be identified in the relevant Schedules. The Parties acknowledge and agree that the Charges for Leased Fiber and Transport Services as of the Effective Date are nominal, as such Charges reflect the offset of the value of the IRU Assets and value of the Released Claims.

4.2.   Invoicing and Payment. Charges shall be invoiced and paid pursuant to the terms set forth in the relevant Schedule. Invoices shall be delivered to the Parties at the following physical and electronic addresses:

| If to Paniolo: | Paniolo Cable Company, LLC<br>Attention: Michael Katzenstein, Chapter 11 Trustee<br>Three Times Square, 9th Floor<br>New York, NY 10036 |
|---|---|
| If to SIC: | Sandwich Isles Communications, Inc.<br>77-808 Kamechameha Highway<br>Mililani, Hawaii 96789<br>Attention: Breanne Kahalewai |

4.3.   No Other Offset. Except as expressly provided in Section 4.1 or in a Schedule, neither Party shall have any rights of offset or deduction.

4.4.   Disputes.  Either Party may dispute an invoice by providing notice to the other Party within sixty (60) days of receipt of the disputed invoice, which notice provides sufficient explanation of the nature of the dispute.  The Parties will cooperate in good faith to resolve any such disputes within a sixty (60) day period after the disputing Party provides notice. Neither Party shall be entitled to withhold any disputed amount pending resolution of a dispute.  Upon resolution of a dispute, the non-prevailing Party shall promptly credit any amount determined to be owed, if any, to the other Party's account.  In the event the Parties are unable to resolve a billing dispute, the billing dispute will be deemed a "Dispute" as defined in and subject to Article 13.

4.5.   Late Payments; Interest.  In the event a Party fails to make any payment owed hereunder when due, such Party shall pay interest on the unpaid amount at the rate of one and one-half percent (1.5%) per month or the highest rate permitted by law, whichever is lower, until such sum is paid in full.

## ARTICLE 5
## TAXES

5.1.   From and after the Effective Date, each Party is responsible, as required under applicable Law, for identifying and paying all Taxes (and any penalties, interest, and other additions thereto) that are imposed on that Party upon or with respect to the transactions and payments under this Agreement.   The Parties shall cooperate to minimize adverse tax consequences.

(a)   An invoicing Party may charge, and the invoiced Party will pay (1) applicable national, state or local sales or use Taxes or value added Taxes that the invoicing Party is legally obligated to charge and (2) applicable regulatory Taxes that the invoicing Party is legally permitted to charge, including the Universal Service Fund surcharge.  The invoiced Party may provide the invoicing Party with an exemption certificate or equivalent information acceptable to the relevant taxing authority, in which case the invoicing Party will not charge or collect the Taxes covered by that certificate.  All invoiced Taxes must be identified as a separate line upon an invoice.

(b)   From and after the Effective Date, Paniolo shall be solely responsible for any real or personal property Taxes, if any, relating in any way to the IRU Assets.

## ARTICLE 6
## LIMITED WARRANTY; LIMITATION OF LIABILITY; EQUITABLE REMEDIES

6.1.   LIMITED WARRANTY.  EXCEPT AS SET FORTH ELSEWHERE IN THIS AGREEMENT, NEITHER PARTY MAKES ANY WARRANTIES, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, WITH RESPECT TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO ANY WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

6.2.   Limitation on Liability.  Subject to Section 6.3, no Party shall be liable under this Agreement, whether in contract, tort (including, but not limited to, negligence and strict liability)

99754430.1

or otherwise for any special, indirect, punitive, reliance, or consequential damages (whether or not such losses were within the contemplation of the Parties) suffered or incurred by the other Party.

6.3.     <u>Limitation on Liability Not Applicable.</u>  Nothing in this Agreement shall exclude or limit any Party's liability:

(a)     For death or personal injury resulting from the negligence or willful misconduct of a Party or their servants, agents or employees;

(b)     For fraud and/or fraudulent misrepresentation;

(c)     For misuse of Confidential Information;

(d)     Under Article 7 (Indemnification);

(e)     For payment of sum property due and owing to the other in the course of normal performance; or

(f)     For matters which cannot be excluded under applicable Law.

6.4.     Subject to Section 6.2 and Section 6.3, each Party's maximum liability under or in connection with this Agreement shall be limited to direct damages proven.

6.5.     The Parties acknowledge and agree that a breach or threatened breach of a material term or condition of this Agreement, may cause the non-breaching Party irreparable harm, and accordingly such Party shall be entitled to seek equitable relief.

**ARTICLE 7**
**INDEMNIFICATION**

7.1.     Each Party (as "<u>Indemnifying Party</u>") shall indemnify, defend and hold harmless the other Party, its employees, officers, directors, members, subcontractors and agents (the "<u>Indemnified Parties</u>") from and against all third-party liability, loss, cost, damage, expense, or claim, demand, allegation, cause of action (or threat thereof) of any nature whatsoever (including the infringement of any third-party Intellectual Property, environmental damages, property damage, and personal injury (including death) to the Paniolo Indemnitees), together with expenses (including reasonable attorneys' fees and court costs through appeal) (collectively, "<u>Claims</u>"), arising from Indemnifying Party's negligence or willful misconduct in connection with performance by Indemnifying Party of its obligations (or breach thereof) or the exercise by Indemnifying Party of its rights under this Agreement.

7.2.     In connection with the indemnification provided pursuant to this <u>Article 7</u>, the Indemnified Party shall:  (a) promptly notify the Indemnifying Party in writing of any Claim and grant the Indemnifying Party control of the defense and all related settlement negotiations;  and (b) cooperate with the Indemnifying Party, at its expense, in defending or settling such Claim; <u>provided</u> that if any settlement results in any ongoing liability to, or prejudices or detrimentally impacts the Indemnified Party, and such obligation, liability, prejudice, or impact can reasonably be expected to be material, then such settlement shall require the Indemnified Party's written

99754430.1

8

EXECUTION VERSION

consent.  In connection with any Claim, the Indemnified Party may have its own counsel in attendance at all public interactions and substantive negotiations at its own cost and expense.

## ARTICLE 8
## INSURANCE

8.1.    During the Term, each Party, at its sole costs and expense, will obtain and maintain with financially reputable insurers that are licensed to do business in all jurisdictions where any work is performed and that hold a current rating of not less than A-, (according to A.M. Best), not less than the following insurance coverages, which may be satisfied through a combination of primary and excess (umbrella) policies:

(a)    Workers' Compensation, as provided for under any Worker's Compensation or similar Law in the jurisdiction where any work is performed with an Employer's Liability limit of not less than $500,000 for each incident;

(b)    Commercial General Liability, including coverage for Contractual Liability and Products/Completed Operations Liability, with a limit of not less than $1,000,000 per occurrence for bodily injury, personal injury and property damage liability;

(c)    "All Risk" Property Insurance covering not less than the full replacement cost of a Party's personal property while on the other Party's site;

(d)    Business Auto Insurance covering the ownership, maintenance or use of any owned, non-owned or hired automobile with a limit of not less than $1,000,000 combined single limit per accident for bodily injury and property damage liability;

(e)    "All Risk or Special Form" Property Insurance covering not less than the full replacement cost of a Party's property including business interruption; and

(f)    Umbrella form excess liability insurance with limits of not less than $5,000,000.

8.2.    Each insurance policy, except Workers' Compensation and Property Insurance, will include each Party as an additional insured for their acts or omissions under the Agreement.

8.3.    Each insurance policy shall contain a waiver of subrogation in favor of the other Party.

8.4.    Each insurance policy shall be endorsed to give the other Party at least thirty (30) calendar days' prior written notice of cancellation.

8.5.    Each Party's insurance will be primary for their own acts or omissions.

8.6.    Nothing contained herein limits either Party's liability to the other Party to the limits of insurance certified or carried.

8.7.    Each Party shall provide proof of insurance either in the form of a Certificate of Insurance (ACORD form 25 or equivalent).  Such proof shall be provided within fifteen (15) calendar days of the Effective Date, and again within fifteen (15) calendar days of the renewal or replacement of each policy.

**ARTICLE 9**
**NOTICES**

All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by a reputable overnight courier service, by facsimile or registered or certified mail (postage prepaid, return receipt requested), or by email (under normal service conditions, with confirmation of receipt) to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Article 9).

| If to Paniolo: | Paniolo Cable Company, LLC<br>Attention:  Michael  Katzenstein,  Chapter  11 Trustee<br><br>-with a copy to-<br><br>Goodsill Anderson Quinn & Stifel<br>A Limited Liability Law Partnership<br>999 Bishop Street, Suite 1600<br>Honolulu, Hawaii 96813<br>Attention:  Johnathan C. Bolton |
|---|---|
| If to SIC: | Sandwich Isles Communications, Inc.<br>77-808 Kamechameha Highway<br>Mililani, Hawaii 96789<br>Attention:  Breanne Kahalewai<br><br>-with a copy to-<br><br>Kobayashi Sugita & Goda, LLP<br>999 Bishop Street, 26th Floor<br>Honolulu, HI 96813<br>Attention: Lex R. Smith |

A Party may change its address and point of contact by notifying the other Party in writing in accordance with this Article.

99754430.1

10

## ARTICLE 10
## CONFIDENTIALITY

10.1.   Each Party shall preserve the other Party's Confidential Information provided to it hereunder with the same degree of care in protecting its own Confidential Information, but in no event less than a reasonable standard of care shall be used.  A Party shall not disclosure the other Party's Confidential Information without the prior written consent of the disclosing Party. Notwithstanding the foregoing, the receiving Party may disclose certain Confidential Information of the disclosing Party, without violating the obligations of this Agreement, to the extent such disclosure is required by a valid order of a court or other governmental body having jurisdiction, *provided that* the receiving Party provides the disclosing Party with reasonable prior written notice of such disclosure (if legal to do so) and, if requested by the disclosing Party, assists such Party in obtaining a protective order preventing or limiting the disclosure and/or requiring that the Confidential Information so disclosed be used only for the purposes for which the law or regulation requires, or for which the order was issued.

(a)   Nothing herein shall be construed as granting any right or license under any Intellectual Property now or hereafter owned, licensed or controlled by a Party to the other Party.

(b)   The receiving Party shall not, without first obtaining written consent of the disclosing Party, use any service mark, logo, trademark, trade name, or other Intellectual Property of the disclosing Party or refer to the other Party in any promotional activity.  For the avoidance of doubt, a breach of this provision shall be a material breach of this Agreement, entitling the non-breaching Party to exercise all rights available under this Agreement or applicable Law.

10.2.   The provisions of this Article 10 shall survive expiration or other termination of this Agreement.

## ARTICLE 11
## DEFAULT

11.1.   A Default shall be deemed to have occurred under this Agreement (including any Schedule hereto) if a Party:

(a)   fails to timely pay any amount due under this Agreement, which failure is not remedied within ten (10) days from receipt of notice thereof;

(b)   violates any applicable Law with respect to its rights and obligations under this Agreement and such violation(s) are not remedied within thirty (30) days after written notice thereof;

(c)   fails to perform any of its material obligations (other than the timely payment of amounts due, which is subject to the 10-day cure period identified above) under this Agreement, and such non-performance is not remedied within thirty (30) days after notice thereof; or

(d)   undergoes a Bankruptcy Event.

99754430.1

11

**EXECUTION VERSION**

11.2.   In the event of any Default hereunder, the non-Defaulting Party may (subject to Article 6) pursue any legal remedies it may have under this Agreement, applicable Law, or principles of equity, including specific performance.

11.3.   A waiver by either Party at any time of any of its rights as to anything herein contained shall not be deemed to be a waiver of any breach of covenant or other matter subsequently occurring.

**ARTICLE 12**
**FORCE MAJEURE**

In no event shall a Party have any claim or right against the other for any failure of performance (other than a failure to pay) due to causes beyond its control (a "Force Majeure Event") including:  acts of God, fire, explosion, vandalism, cable or fiber cut not due to a Party's negligence, adverse weather conditions, flood or other similar occurrences; any change in Law; national emergencies; pandemic; insurrections; riots; wars; terrorism; strikes, lock-outs, work stoppages, or other labor difficulties (other than those of a Party's own workforce); or any other cause or circumstance, whether of a similar or dissimilar nature to the foregoing, beyond the reasonable control of the affected Party.

**ARTICLE 13**
**GOVERNING LAW; DISPUTE RESOLUTION**

13.1.   The Agreement is governed by the laws of the State of Hawaii, without regard to conflict of laws principles.

13.2.   The Parties will attempt to resolve any dispute arising out of this Agreement promptly through discussions at the operational level.  In the event that a resolution is not achieved, the disputing Party shall provide the other Party with written notice of the same and the Parties shall attempt to resolve such dispute between the respective vice presidents of operations (or equivalent position with the power to resolve the dispute) of the disputing Parties.  All negotiations conducted by such officers shall be confidential and shall be treated as compromise and settlement negotiations for purposes of federal and state rules and regulations.  If the disputing Parties fail to resolve such dispute within thirty (30) days of the non-disputing Party's receipt of the written notice, either such Party may initiate legal action as set forth below.

(a)   Failing resolution of a dispute in accordance with Section 13.2 above and notwithstanding anything to the contrary contained in this Agreement, the Parties hereby irrevocably agree that any legal action, suit or proceeding with respect to any matter under or arising out of or in any way connected with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding shall be brought in the courts of the State of Hawaii, and each Party hereby agrees to the personal and exclusive jurisdiction of such courts.  The prevailing Party in any litigation shall be entitled to its costs and reasonable attorneys' fees.

99754430 1

12

## ARTICLE 14
## REPRESENTATIONS, WARRANTIES AND ACKNOWLEDGMENTS

14.1.   Each Party represents and warrants that:

(a)   it has the full right and authority to enter into, execute, deliver and perform its obligations under this Agreement;

(b)   this Agreement constitutes a legal, valid and binding obligation enforceable against such Party in accordance with its terms, subject to bankruptcy, insolvency, creditors' rights and general equitable principles; and

(c)   its execution of and performance under this Agreement does not violate any applicable existing regulations, rules, statutes or court orders of any local, state or federal government agency, court or body.

14.2.   During the Term, each Party shall secure and maintain all necessary permits, licenses, and other authorizations required to perform its obligations and enjoy its rights as provided under this Agreement.

14.3.   During the Term, each Party shall comply with all applicable Laws including the U.S. Foreign Corrupt Practices Act of 1977, all export control regulations, and the rules and regulations of the Federal Communications Commission.

## ARTICLE 15
## RELOCATION

Either Party may relocate any physical component or asset to which it has legal title that is the subject of this Agreement:  (a) due to a court order or the requirements of governmental authorities (including but not limited to condemnation) or third parties with the right to require any such change;  (b) due to adverse changes in environmental conditions;  (c) in the event of destruction or damage thereto;  (d) to allow the installation of additional cables, facilities or equipment;  or (e) due to operational requirements.  Any such changes shall be at the relocating Party's sole cost and expense (subject to the last sentence hereof), except in the event that the need for same has been caused by the acts or omissions of the other Party, its agents or contractors, in which case such other Party shall be solely responsible for the entire cost and expense thereof. Notwithstanding the foregoing reference to legal title:  (i) Paniolo shall have the right to relocate the IRU Assets for any reason specified in this Article 15; provided, however, that any voluntary relocation shall not adversely affect (in Paniolo's commercially reasonable judgment) SIC's ability to provide service in the Hawaiian Home Lands; and (ii) SIC shall have the right to relocate IRU Assets only if such relocation arises pursuant to subsection (a), and in such instance Paniolo shall have the right to approve any relocation site, which approval shall not be unreasonably withheld, conditioned, or delayed.  A Party shall reimburse the relocating Party for its pro rata shares of any costs and expenses relating to any changes made pursuant to subsections (a), (b), and (c) above (based on its respective percentage interest in the use of the relocated asset(s)) to the extent the relocating Party is not otherwise reimbursed by reason of insurance, condemnation award, or otherwise.

99754430.1

·
**EXECUTION VERSION**

## ARTICLE 16
## GENERAL PROVISIONS

16.1.   Binding Agreement.  This Agreement shall be binding upon and inure solely to the benefit of the Parties and their respective permitted successors and assigns, and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

16.2.   Waiver. A Party may (a) extend the time for the performance of any of the obligations or other acts of any other Party, (b) waive any inaccuracies in the representations and warranties of any other Party contained herein or in any document delivered or made available by the other Party pursuant hereto or (c) waive compliance with any of the agreements of the other Party or conditions to such Party's obligations contained herein.  Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the Party to be bound thereby.  Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement.  The failure of a Party to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

16.3.   Assignment.   Paniolo may assign this Agreement, or any of its rights and corresponding  obligations hereunder, for any reason upon prior notice to SIC.  SIC may not assign this Agreement without the prior written consent of Paniolo (such consent not to be unreasonably withheld, conditioned, or delayed), except as provided in this Section 16.3.  SIC may transfer or assign this Agreement to any entity providing retail telecommunication services to the Hawaiian Home Lands.  SIC may sublease rights under the Lease, as long as all restrictions on use contained herein fully apply to the sublessee.   Any purported assignment or sublease in contravention of this Section 16.3 shall be void.

16.4.   Interpretation.  In this Agreement, except to the extent otherwise provided or that the context otherwise requires:

(a)   when a reference is made in this Agreement to an Article, Section, Schedule, or Exhibit, such reference is to an Article or Section of, or a Schedule to, the MRA, Schedule or Exhibit where referenced unless otherwise indicated;

(b)   the headings in this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(c)   whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

(d)   the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms, all tenses, and both noun and verb forms, as context dictates; and

(e)   when calculating the period of time before which, within which or following which any act is to be done or any step taken pursuant to this Agreement, the date that is the

99754430.1

14

EXECUTION VERSION

reference date in calculating such period shall be excluded, and if the last day of such period is not a business day, the period shall end on the immediately following business day.

16.5.    <u>Joint Participation.</u> The Parties have participated jointly in the negotiation and drafting of this Agreement and each has been represented by counsel of its choosing and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

16.6.    <u>Performance Standard.</u>  The Parties shall perform all actions, activities, consents, approvals and other undertakings in this Agreement in a reasonable and timely manner, and each expressly acknowledges and understands that time is of the essence in the performance of obligations required to be performed by a date expressly specified herein.  Except as specifically set forth herein, for the purpose of this Agreement the standards and practices of performance within the telecommunications industry in the relevant market shall be the measure of a Party's performance.

16.7.    <u>Entire Agreement.</u> This Agreement (inclusive of all Schedules and Exhibits) constitutes the entire and final agreement and understanding between the Parties with respect to the subject matter hereof and supersedes all prior agreement relating to the subject matter hereof, which are of no further force or effect.

16.8.    <u>Amendment.</u>  This Agreement may not be amended or modified except (a) by an instrument in writing signed by, or on behalf of, SIC and Paniolo or (b) by a waiver in accordance with <u>Section 16.2.</u>

16.9.    <u>Relationship.</u> The relationship between Paniolo and SIC shall not be that of partners, agents, or joint venturers, and nothing contained in this Agreement shall be deemed to constitute a partnership or agency agreement between them for any purposes, including federal income tax purposes.  Paniolo and SIC, in performing any of their obligations hereunder, shall be independent contractors or independent parties and shall discharge their contractual obligations at their own risk subject, however, to the terms and conditions hereof.

16.10.    <u>Invalidity.</u>  If any term, obligation or other provision of this Agreement is invalid, illegal or incapable of being enforced by any applicable Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect for so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to either of the Parties.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated by this Agreement are consummated as originally contemplated to the greatest extent

16.11.    <u>Priority.</u>  In the event of an inconsistency between the terms of the MRA and any Schedule, the terms of the Schedule will prevail with respect to the specific subject matter thereof. In all other respects, this MRA shall prevail.

99754430.1

15

EXECUTION VERSION

16.12.  Further Actions.  The Parties agree to provide such additional information and take such additional action, including the execution of and delivery of further agreements, instruments, and other documents, as may be reasonably necessary to carry out the purposes of the Agreement.

16.13.  Counterparts and Electronic Signatures.  This Agreement may be executed and delivered (including by facsimile or other means of electronic transmission, such as by electronic mail in "pdf" form) in counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one-and-the-same agreement.

In witness whereof, and intending to be legally bound hereby, the Parties have executed this Agreement as of the dates identified below.

SANDWICH ISLES COMMUNICATIONS, INC.

By: _____

Title: _Present_____

Date: _4/15/2020_____


PANIOLO CABLE COMPANY, LLC

By: _____

Title: _Chapter 11 Trustee_____

Date: _4/17/20_____

**EXECUTION VERSION**

## SCHEDULES AND EXHIBITS

**Schedule 1:**    SIC Lease

Exhibit A:    Leased Fiber Specifications and Service Levels

Exhibit B:    Collocation Space

Exhibit C:    Conduits

Exhibit D:    Leased Fiber O&M Services

**Schedule 2:**    Assets IRU

Exhibit A:    IRU Assets

Exhibit B:    Entitlements

Exhibit C:    Assets O&M Services

**Schedule 3:**    [Reserved]

**Schedule 4:**    [Reserved]

99754430.1

EXECUTION VERSION

## SCHEDULE 1

## SIC LEASE

This SIC Lease is entered into as of March 6, 2020 by and between Sandwich Isles Communications, Inc., a Hawaii corporation ("SIC") and Paniolo Cable Company, LLC, a Delaware corporation ("Paniolo"), and sets forth the specific terms and conditions applicable to Paniolo's lease to SIC, and SIC's lease from Paniolo, of Leased Fiber, Transport Services, Collocation Space, and Conduits pursuant to that certain Master Relationship Agreement to which this Schedule 1 (SIC Lease) is attached.  Capitalized terms used herein have the meanings assigned to them in the MRA or in the Section where first introduced.

## ARTICLE 1
## TERM AND TERMINATION

1.1.    Term.  Except as set forth in Section 3.5 below, this SIC Lease is effective as of the Effective Date and shall remain in force until terminated as provided in Section 2.2 below (the "Lease Term").

1.2.    Termination by Paniolo.  Paniolo may terminate this SIC Lease either:  (a) upon an SIC Default; or (b) in its sole discretion in the event Paniolo decides to decommission the Paniolo System.

1.3.    Termination by SIC.  SIC may terminate this SIC Lease for any reason.

1.4.    Automatic Termination.  This SIC Lease will terminate immediately and without further action or notice by Paniolo in the event SIC purports to assign, transfer, or sublease any of its interest in the Leased Fiber (including the sale of any wholesale capacity), except as permitted pursuant to Section 2.5.

1.5.    Mutual Termination. The Parties may terminate this SIC Lease upon mutual written agreement.

1.6.    Effect of Termination.  In the event of termination, the following provisions shall apply:

(a)    SIC shall within sixty (60) days disconnect and remove all SIC Equipment installed in the Collocation Space and Conduits, leaving the Collocation Space and Conduits in the same condition (wear and tear excepted) as existed on the Effective Date.  In the event it fails to do so, Paniolo shall have the right to remove and store all such SIC Equipment, at SIC's sole cost and expense, or sell such SIC Equipment and retain the proceeds.

(b)    If termination is pursuant to Section 1.2(b), Paniolo may, but is not obligated to, transfer ownership of the Paniolo System, including all associated liabilities, to SIC upon commercially reasonable terms, in which case subsection (a) shall not apply.

(c)    For the avoidance of doubt, the Parties acknowledge and agree that any termination of this SIC Lease shall have no effect on the Assets IRU, nor on any Charges due thereunder, if any, except as expressly provided in Schedule 2.

## ARTICLE 2
## SIC LEASE; LEASED FIBER; COLLOCATION; CONDUITS

2.1.    <u>SIC Lease; Leased Fiber.</u>  Paniolo hereby leases to SIC, and SIC leases from Paniolo Fiber Pairs on the Paniolo Network (the "<u>Leased Fiber</u>") as specified in Exhibit A denoted by a quantity of Fiber Pairs (which shall initially be two (2) Fiber Pairs) throughout the Paniolo Network effective as of the Effective Date.  The number of Fiber Pairs that comprise the Leased Fiber may be adjusted from time to time by the written agreement of the Parties, which agreement shall set forth the particular, commercially reasonable terms and conditions applicable to such additional Fiber Pairs.  The Parties acknowledge and agree that the Nominal Charges and other commercial terms applicable to the Leased Fiber leased to SIC as of the Effective Date shall not automatically apply to additional Fiber Pairs unless otherwise stated.  The number of Fiber Pairs that comprise the Leased Fiber shall not be less than two (2) and shall in all cases be limited to the number of Fiber Pairs necessary for SIC to provide retail telecommunications services in the Hawaiian Home Lands.

2.2.    <u>Fiber Specifications.</u>  The Parties acknowledge and agree that the Leased Fiber has been tested and meets the technical and performance specifications set forth at Exhibit A hereto ("Specifications").

2.3.    <u>SIC Lease; Transport Services.</u>  Paniolo hereby leases to SIC, and SIC leases from Paniolo Transport Services on the Paniolo Network as provided as of the Effective Date, which Transport Services are identified on Exhibit A by circuit type and transmission speed (DS1, DS3, OC3, OC12, or OC48) and demarcation points (*i.e.,* the Paniolo offices between which the Transport Services are provided).  The quantity of circuits that comprise Transport Services may be adjusted from time to time by the written agreement of the Parties, which agreement shall set forth the particular, commercially reasonable terms and conditions applicable to such additional Transport Services.  The Parties acknowledge and agree that the Nominal Charges applicable to Transport Services shall not automatically apply to additional Transport Services.  In all cases, the quantity of circuits that comprise the Transport Services shall not exceed the number necessary for SIC to provide retail telecommunications services in the Hawaiian Home Lands.  Paniolo shall be responsible for the cost, if any, of reconfiguring current SIC traffic onto the Leased Fiber; provided further that Paniolo shall have the sole discretion to determine how and when such reconfiguration shall be implemented.

2.4.    <u>Applicability of Nominal Charges.</u>  For the avoidance of doubt, Paniolo and SIC agree that Nominal Charges shall apply only to the following:  (a) for the entire term of this Lease: (i) SIC's use of the Leased Fiber leased as of the Effective Date; (b) Transport Services in connection with SIC's use of the Leased Fiber leased as of the Effective Date; and (b) for the period beginning on the Effective Date and ending December 31, 2020, SIC's use of Collocation

99754430.1

- 2 -

Space and Conduits used by SIC and Affiliates as of the Effective Date. All other charges shall be at market rates.

2.5.     Restricted Use. SIC may only use the Leased Fiber, Transport Services, Collocation Space, and Conduits to provide retail telecommunications services in the Hawaiian Home Lands in compliance with all applicable Laws. SIC may sublease, assign, transfer, or convey any interest in and to the Leased Fiber upon prior notice to Paniolo. The Parties acknowledge and agree that the use restriction set forth in this Section 2.4 shall apply to any such assignment or sublease.

2.6.     Collocation Space. Paniolo hereby leases to SIC, and SIC hereby leases from Paniolo, the Collocation Space (including allocated power) depicted and described on Exhibit B. SIC shall have access to the Collocation Space 24 hours a day, 7 days a week, subject to Section 2.8. The Collocation Space is delivered "AS IS", and SIC agrees that SIC's act of occupying and using the Collocation Space shall be an acknowledgement that such Collocation Space is in good condition.

(a)     Types of Collocation Space. Collocation Space shall consist of cageless space in the central office that will be shared with Paniolo and other third-party collocators. Collocation Space will be made available in Relay Rack increments. "Relay Rack" is defined as the space necessary to place the framing material to mount telecommunications equipment into a lineup of telecommunications equipment. Relay Rack increments will be provided in two types: (a) Cabinetized Relay Racks such as SIC is presently utilizing for its Alcatel/Lucent 5ESS equipment that includes sufficient width and depth in the lineup to contain the telecommunications equipment in a secure cabinet; and (b) Non-Cabinetized Relay Racks that are typically 19-inch wide spaces where the telecommunications equipment is placed but without additional space needed for providing a secure cabinet around the telecommunications equipment. Charges for these two types of Relay Racks will be separately identified.

(b)     DC Power. Paniolo will provide DC Power (48 Volt) to the Relay Racks that is protected by both battery backup and generator backup in the event of a longer term commercial AC outage. The rental rates for Cabinetized Relay Racks and Non-Cabinetized Relay Racks will be inclusive of the average cost for DC Power usage.

2.7.     Conduits. Paniolo hereby leases to SIC, and SIC hereby leases from Paniolo, the Conduits identified on Exhibit C during the Lease Term. SIC shall have access to the Conduits 24 hours a day, 7 days a week, subject to Section 2.8. The Conduits shall be delivered "AS IS", and SIC agrees that SIC's act of occupying and using the Conduits shall be an acknowledgement that such Conduits are in good condition.

2.8.     Security. SIC's access to and use of Collocation Space and Conduits shall at all times be subject to Paniolo's security policies and procedures, as updated from time to time in Paniolo's sole discretion.

2.9.     Additional SIC Equipment. The Parties acknowledge and agree that SIC may replace existing SIC Equipment or install additional SIC Equipment in SIC's Collocation Space subject to Paniolo's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

99754430.1

- 3 -

## ARTICLE 3
## LEASED FIBER AND TRANSPORT SERVICES O&M SERVICES; ADDITIONAL SERVICES

3.1.    <u>Paniolo System Maintenance.</u>  Paniolo shall maintain the Paniolo System in a manner which will permit SIC's use of the Leased Fiber, Transport Services, Collocation, and Conduit as permitted under this Schedule 1.  Paniolo shall maintain all components of the Paniolo System in accordance with manufacturers' specifications, and shall maintain the Leased Fiber, Transport Services, Collocation, and Conduit in accordance with the Specifications.

3.2.    <u>Leased Fiber and Transport Services O&M Services.</u>  Paniolo shall provide the Leased Fiber and Transport Services O&M Services identified on Exhibit D, which O&M Services will initially cover O&M Services related to the central office buildings, DC power equipment (batteries, rectifiers, backup generator, and related control equipment, security equipment, grounds maintenance, Fiber monitoring and maintenance, Transport Services monitoring and maintenance, and other services. Except as set forth herein, SIC will be solely responsible for providing and paying for any and all maintenance for all SIC Equipment used in connection with the operation of the Leased Fiber and Transport Services, none of which is included in the Leased Fiber and Transport Services O&M services to be provided hereunder.

3.3.    <u>Subcontracting.</u> Paniolo may subcontract any of the Leased Fiber and Transport Services O&M Services provided that Paniolo shall require the subcontractor(s) to perform in accordance with the requirements and procedures identified on Exhibit D.  The use of any such subcontractor shall not relieve Paniolo of any of its obligations hereunder.

3.4.    <u>Additional Services.</u>  SIC may order additional services from Paniolo from time to time, including additional operations and maintenance services and interconnection services.  Any such additional services shall be on commercially reasonable terms and conditions no less favorable than the terms and conditions offered to third parties.

3.5    <u>Effective Date of Leased Fiber and Transport Services O&M Services.</u>  Paniolo's obligations to provide Leased Fiber and Transport Services O&M Services pursuant to Section 3.3 will be effective as of the date a sale of under Section 363 of the Bankruptcy Code of all or substantially all of Paniolo's assets that comprise Paniolo Network is consummated and approved by the Bankruptcy Court. The Parties acknowledge and agree that all maintenance and repair obligations with respect to Leased Fiber and Transport Services shall continue to be performed by SIC until such date.

## ARTICLE 4
## ACCEPTABLE USE; MANDATORY MONITORING

4.1.    <u>Acceptable Use.</u>  SIC's access to and use of the Leased Fiber, Transport Services, Collocation Space, Conduits and SIC Equipment associated therewith shall fully comply with Paniolo's security policies and procedures and further shall not:  (a) interrupt, interfere with, or impair service over the Paniolo Network;  (b) interrupt, interfere with, or impair Paniolo's customers' use of the Paniolo Network; (c) except as required by applicable Law, impair the privacy of any communications transmitted over the Leased Fiber;  or (d) cause damage or create

hazards to the Paniolo Network, Paniolo personnel, Paniolo's customers, their interconnecting companies, or the general public.

4.2.   Suspension.  In the event that Paniolo has a reasonable belief that SIC is in breach of Section 4.1, in addition to any other remedy it may have, Paniolo may suspend SIC's right to access and use the Leased Fiber.  Any such suspension shall be lifted as soon as Paniolo, acting reasonably, determines that the event giving rise to the suspension has been cured.

4.3.   Mandatory Monitoring.  Paniolo represents and warrants that it will not capture, modify, or intercept the contents of any data destined or sourced from the Leased Fiber, with the exception of control traffic used for operational engineering, unless Paniolo deems it reasonably necessary to protect the security or operation of the Paniolo Network or as required by Law ("Mandatory Monitoring"). In such case, Paniolo must immediately notify SIC of any Mandatory Monitoring (if lawful to do so), and must cease such Mandatory Monitoring as soon as possible and lawful to do so.

**ARTICLE 5**
**CHARGES AND INVOICING**

5.1.   Charges.  The Charges for the Leased Fiber, Transport Services, Collocation, Conduit, and Transport Services O&M Services shall be set out in Exhibit E.  Paniolo reserves the right to modify the Charges annually with the exception of the nominal Charges established as of the Effective Date for existing Fiber Pairs comprising Leased Fiber and Transport Services.  All such Charges shall be commercially reasonable.

5.2.   Invoicing; Payment.  Paniolo shall invoice SIC on the Effective Date for the first quarter's Charges.  Thereafter, Paniolo shall invoice SIC monthly in advance of each successive quarter during the Lease Term.  All Charges for additional services shall be separately invoiced at the time the service is performed.  All invoices are due within thirty (30) days of receipt.

**ARTICLE 6**
**FURTHER ACTIONS**

The Parties agree to provide such additional information and take such additional action, including the execution of and delivery of further agreements, instruments, and other documents, as may be reasonably necessary to carry out the purposes of the Agreement and this Schedule 1.

In witness whereof, and intending to be legally bound hereby, the Parties have executed this SIC Lease as of the dates identified below.

99754430.1

SANDWICH ISLES COMMUNICATIONS, INC.

By: _____

Title: _____Presicent_____

Date: _____4/15/20_____


PANIOLO CABLE COMPANY, LLC

By: _____

Title: ___Chapter 11 Trustee___

Date: _____4/17/20_____

U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-6   Filed  05/27/22   Page 24 of 50

# EXHIBIT A

## LEASED FIBER SPECIFICATIONS AND SERVICE LEVELS

### Demarcation Points

| Demarcation A | Demarcation Z | Strands | Notes |
|---|---|---|---|
| Anahola | Kekaha | 4 | |
| Lateral (Anahola-Kekaha) | Lihue (Verizon) | 4 | Lateral from Anahola-Kekaha Cable to Lihue Only |
| Lateral (Anahola-Kekaha) | Hanapepe | 4 | Lateral from Anahola-Kekaha Cable to Lihue Only |
| Kakaha | Nanakuli | 4 | |
| Waimanalo | Kalamaula | 4 | |
| Kalamaula | Hoolehua Airport DLC | 4 | |
| Lateral (Kalamaula-Hoolehua Airport DLC) | Hoolehua East DLC | 4 | Lateral from Kalamaula-Hoolehua Airport DLC Cable to Hoolehua East DLC Only |
| Kalamaula | Puunene | 4 | |
| Puunene | Waiehu | 4 | |
| Puunene | Puukapu | 4 | |
| Puukapu | Laiopua CO | 4 | |
| Hilo | DLC Locations | 4 | Need to Be Identified |

### Technical Performance Specifications

1. Sandwich Isles, by using the fiber provided in Demarcation Points Table indicated above, warrants that the fiber meets the technical specifications necessary for Sandwich Isles to provide the services needed.

2. Paniolo warrants that the minimum capacity for the fiber will be 10 Gigabits per second.

### Service Level Commitments

1. For the terrestrial network, Paniolo will respond to a fiber outage within 24 hours with a crew sufficient to provide a temporary repair to the affected fiber.

2.   For the marine network, Paniolo will respond commensurate with the capabilities of the marine contractor (Global Marine) to make resources available to provide a temporary repair to the affected fiber.

## EXHIBIT B

## COLLOCATION SPACE

| Node | Island | Cabinets | Relay Racks |
|------|--------|----------|-------------|
| Anahola Central Office | Kauai | 9 | 6 |
| Kekaha Terminal Building | Kauai | 0 | 6 |
| Nanakuli Terminal Building | Oahu | 0 | 10 |
| Waimanalo Terminal Building | Oahu | 11 | 5 |
| Kalamaula Terminal Building | Molokai | 13 | 7 |
| Puunene Terminal Building | Maui | 0 | 7 |
| Waiehu Central Office | Maui | 9 | 6 |
| Puukapu Terminal Building | Hawaii | 0 | 7 |
| Laiopua Central Office | Hawaii | 11 | 5 |
| Hilo Central Office | Hawaii | 11 | 5 |

## EXHIBIT C

## CONDUITS

Conduits require either receiving documentation as requested on an inventory of assets from the Marshal Sale or from discussion with Sandwich Isles.  The Conduits that must be identified are those that are utilized to reach Hawaiian Home Lands (HHL) locations.

99754430.1

**EXHIBIT D**

**LEASED FIBER O&M SERVICES**

1.  The services provided under Exhibit D are limited to Lease Fiber Services which are for specific strands on fiber cables owned and operated by Paniolo.

2.  Operations and Maintenance Services for the fiber cable will be commensurate with those that Paniolo provides for its own use of the remaining strands in the fiber cable.  Sandwich Isles will receive the same Operations and Maintenance Services as it provides for the remainder of the cable containing the fibers.

3.  Under a failure or impairment on Sandwich Isles strands, Paniolo will provide patch or repair services to the Sandwich Isles strands in conformance with the intervals indicated in Exhibit A.

4.  To the extent that the failure or impairment relates to only the Sandwich Isles fiber strand, the issue will be diagnosed at the equipment level and repair and maintenance to the fiber strand will be provided within the intervals indicated in Exhibit A.

99754430.1

**EXHIBIT E**

**CHARGES**

1.  Existing Leased Fiber Services are provided at a nominal charge for the fibers indicated in Exhibit A.  Additional fibers will be provided at the then-current market rate.

2.  Existing Conduit is provided at a nominal charge for the Conduit indicated in Exhibit C.  Additional Conduit will be provided at the then-current market rate.

3.  The following charges for Collocation are inclusive of average power usage as well as space as indicated below:

    a.  Cabinetized Relay Racks:  $900.00 per Month

    b.  Non-Cabinetized Relay Racks:  $600.00 per Month

99754430.1

EXECUTION VERSION

## SCHEDULE 2

## ASSETS IRU

This Assets IRU is entered into as of March 6, 2020 by and between Sandwich Isles Communications, Inc., a Hawaii corporation ("SIC"), and Paniolo Cable Company, LLC, a Delaware corporation ("Paniolo"), and sets forth the specific terms and conditions applicable to the grant by SIC to Paniolo, and the purchase by Paniolo from SIC, of an indefeasible right to use the IRU Assets, and the assignment, conveyance, transfer, sublease, or sublicense by SIC to Paniolo of the Entitlements pursuant to that certain Master Relationship Agreement to which this Schedule 2 (Assets IRU) is attached.  Capitalized terms used herein have the meanings assigned to them in the MRA or in the Section where first introduced.

## ARTICLE 1
## TERM AND TERMINATION

1.1.    Term.  This Assets IRU is effective as of the Effective Date and shall remain in force until terminated as provided in Sections 1.2 through 1.4 below (the "IRU Term").

1.2.    Termination by Paniolo.  Paniolo may terminate this Assets IRU upon an SIC Default.

1.3.    Automatic Termination.  This Assets IRU shall terminate automatically upon the decommissioning of the Paniolo System.

1.4.    Mutual Termination.  The Parties may terminate this SIC Lease upon mutual written agreement.

1.5.    Effect of Termination.  In the event of termination, Paniolo shall cease all use of the IRU Assets and shall within sixty (60) days disconnect and remove all Paniolo Equipment installed in or connected to the IRU Assets, leaving the IRU Assets in the same condition (normal wear and tear excepted) as existed on the Effective Date.  In the event it fails to do so, SIC shall have the right to remove and store all such Paniolo Equipment, at Paniolo's sole cost and expense or to sell such Paniolo Equipment and retain the proceeds.

## ARTICLE 2
## IRU ASSETS; ENTITLEMENTS

2.1.    Grant of Assets IRU; IRU Assets.  SIC hereby grants to Paniolo, and Paniolo purchases from SIC, as of the Effective Date, an exclusive, indefeasible right of use to the IRU Assets, as more particularly identified on Exhibit A hereto.

2.2.    Purchase Option.  At any time during the IRU Term, Paniolo shall have the right to purchase any or all of the IRU Assets from SIC.  Should Paniolo exercise this right, the Parties shall negotiate in good faith to agree upon a purchase price and to prepare and execute a bill of sale and to execute all other necessary documents that will be required to transfer legal title to the

purchased IRU Assets, including, but not limited to, the assignment, transfer, or conveyance of any Entitlements.  In the event the Parties are not able to agree upon a purchase price, the purchase price shall be determined by an appraisal process in which each Party selects a neutral, qualified appraiser with knowledge of the type of assets subject to the transaction to conduct an appraisal, and the purchase price shall be the average of the two appraisals.

2.3.    Entitlements.  The Parties acknowledge and agree that: (a) that certain Department of Hawaiian Home Lands License Agreement No. 372 ("DHHL License"), together with (b) the easements, leases, license agreements, letters of approval, special area management permits, rights of way or rights of entry granted to SIC or an SIC Affiliate and identified on Exhibit B hereto (the "Entitlements") are necessary for the operation and maintenance of the Paniolo Network (or were necessary for the construction of the Paniolo Network).  SIC hereby agrees to assign, transfer, or convey to Paniolo all Entitlements (other than the DHHL License) that may by their terms be so assigned or transferred and to the extent such assignment, transfer, or conveyance would not, in Paniolo's reasonable judgment, adversely affect service in the Hawaiian Home Lands.  To the extent any Entitlement may not, by its terms, be so assigned or transferred, SIC shall (i) sublease or sublicense (as applicable) the Entitlement to Paniolo; or (ii) grant to Paniolo the broadest possible right to use the Entitlement. For the avoidance of doubt, the Parties acknowledge and agree that DHHL License will not be assigned by SIC to Paniolo, but that SIC shall, and hereby does, grant to Paniolo the full benefit and use of the DHHL License for the IRU Term provided Paniolo does not exercise its rights under such grant to impair service to HHL.

2.4.    SIC Compliance.  During the IRU Term, SIC shall fully comply with the terms, covenants, and conditions of all Entitlements not transferred or conveyed by SIC to Paniolo pursuant to section 2.3, including the payment of any fees due thereunder, and take such additional actions as may be necessary to maintain the Entitlements in full force and effect.

2.5.    Paniolo Compliance.  Paniolo shall assume all rights and obligations under any Entitlement assigned, transferred, or conveyed by SIC to Paniolo hereunder, and shall fully comply with all terms, covenants, and conditions thereof, including the payment of any fees or charges due thereunder. Paniolo shall also comply with the terms, covenants, and conditions applicable to any Entitlement to which it has acquires a leasehold-, license-, or IRU-interest or other right.

2.6.    Security.  Paniolo shall have the right to establish and implement security policies and procedures to protect the IRU Assets and the Paniolo Network.  To the extent SIC retains any rights to or beneficial use of the Entitlements (pursuant to the SIC Lease or otherwise), SIC shall comply with all such security policies and procedures.  Paniolo shall have the right to update such policies and procedures from time to time, in its sole discretion.

### ARTICLE 3
### BANKRUPTCY EVENTS

SIC represents, warrants and covenants that for all purposes, including without limitation those of Section 541(d) of the Bankruptcy Code: (a) Paniolo shall hold an equitable interest in the IRU Assets for the IRU Term; (b) SIC retains only legal title to the IRU Assets and not any equitable interest;  and (c) Paniolo has exclusive possession, use and control over, and is for all purposes the equitable owner of, the IRU Assets during the IRU Term.  SIC agrees and

99679422.3

- 2 -

acknowledges that, from the Effective Date, it has no right to use the IRU Assets (except as otherwise leased to SIC pursuant to the SIC Lease). For the avoidance of doubt, any rights of Paniolo to the IRU Assets are not intended to be a revocable license or a lease, but rather to provide the broadest possible legal rights to Paniolo over such IRU Assets consistent with this Agreement. The Parties acknowledge that in the event of an SIC Bankruptcy Event, Paniolo shall be deemed to have acquired and completed, in advance of any petition or proceeding and on an indefeasible basis, a beneficial ownership in such IRU Assets. The Parties further acknowledge that: (a) obtaining such beneficial interest or IRU is intended to be non-executory in nature; (b) Paniolo shall have full and unfettered rights of access to the IRU Assets; and (c) denying Paniolo access to the IRU Assets under such circumstances would render Paniolo's rights hereunder nugatory. Such rights to access and use the IRU Assets will run for the remainder of the IRU Term.

## ARTICLE 4
## ASSETS O&M; ADDITIONAL SERVICES

4.1.     Assets O&M Services. In the event Paniolo and SIC determine that SIC shall provide Assets O&M Services, such services shall be identified on Exhibit D and attached hereto. For the purposes of Assets O&M Services, these services may cover O&M Services related to the central office buildings, DC power equipment (batteries, rectifiers, backup generator, and related control equipment, security equipment, grounds maintenance, Fiber monitoring and maintenance, Transport Services monitoring and maintenance, and other services. SIC shall provide such Assets O&M Services (if any) for successive one (1) year terms, which may be terminated by Paniolo pursuant to Section 4.5 or by either Party by providing written notice to the other Party sixty (60) days prior to the expiration of the then-current term. For the avoidance of doubt, the term of any Assets O&M Services shall automatically terminate without further notice or action if this IRU is terminated pursuant to Section 1.

4.2.     Subcontracting. SIC may subcontract any of the Assets O&M Services provided that SIC shall require the subcontractor(s) to perform in accordance with the requirements and procedures identified on Exhibit D. The use of any such subcontractor shall not relieve SIC of any of its obligations hereunder.

4.3.     Additional Services. Paniolo may order additional services from SIC from time to time, interconnection services. Any such additional services shall be on commercially reasonable terms and conditions no less favorable than the terms and conditions offered to third parties, and shall be set forth on an updated Exhibit D.

4.4.     Other Service Providers. Paniolo has the right, in its sole discretion, to hire any third party to perform any operations or maintenance services with respect to the IRU Assets.

4.5.     SIC Breach. In the event of an SIC breach relating to the performance or non-performance of Assets O&M Services, which breach is not cured within thirty (30) days of notice thereof, Paniolo may, without further notice, terminate SIC's provision of such O&M Services, without any further obligation.

## ARTICLE 5
## CHARGES AND INVOICING

5.1.    <u>Charges for IRU Assets.</u>  There shall be no Charges for the IRU Assets, it being acknowledged and agreed that the Released Claims and nominal Leased Fiber Charges are the consideration for the IRU Assets.

5.2.    <u>Assets O&M Charges.</u>  The Charges for the Assets O&M shall be [$•] per quarter.

5.3.    <u>Charges for Entitlements.</u>  The Charges for the Entitlements shall be [$•] per quarter.  The Parties acknowledge and agree that these Charges are a pass-through of fees and charges payable by SIC pursuant to the terms of the Entitlements, without any mark-up.  In the event such fees and charges increase, the Charges due hereunder will correspondingly increase, unless such increase arises out of an act or omission by SIC.

5.4.    <u>Invoicing; Payment.</u>  SIC shall invoice Paniolo on the Effective Date for the first quarter's Charges.  Thereafter, SIC shall invoice Paniolo thirty (30) days in advance of each successive quarter during the IRU Term.  All Charges for additional services shall be separately invoiced at the time the service is performed.  All invoices are due within thirty (30) days of receipt.

## ARTICLE 6
## FURTHER ACTIONS

The Parties agree to provide such additional information and take such additional action, including the execution of and delivery of further agreements, instruments, and other documents, as may be reasonably necessary to carry out the purposes of the Agreement and this Schedule 2.


In witness whereof, and intending to be legally bound hereby, the Parties have executed this Assets IRU as of the dates identified below.


SANDWICH ISLES COMMUNICATIONS, INC.

By: _____

Title: _President_____

Date: _4/15/20_____

99754430.1

- 4 -

PANIOLO CABLE COMPANY, LLC

By: _____

Title: _Chapter 11 Trustee_____

Date: _4/17/20_____

99679422.3

- 5 -

**EXHIBIT A**

**IRU ASSETS**

**Schedule  A.2 Assets**

*Kaua'i*

| Assets | Description |
|---|---|
| Terrestrial Structure | 3625 Feet of Subduct extending from near the Kekaha beach manhole to the Kekaha terminal building. |
| Anahola Central Office | Central Office located in Anahola, Hawaii, including access rights to the land on which the central office resides. |
| HVAC System | Included with the Anahola Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Anahola Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Anahola Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Anahola Central Office providing structure for fiber and other cables to be brought and terminated within the central office. |
| Cable Rack and Frame Structure | Internal support structure within the Anahola Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Anahola Central Office. |
| Fujitsu 4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the Schedule A.2 equipment function within the network. |
| Terrestrial Structure | 41 Miles of Subduct extending from the Kekaha terminal building towards the Anahola Central Office. Unknown  Manholes. |

99679422.3

**6**

| Fiber Cable | 41 Miles of Fiber extending from the Kekaha terminal building towards the Anahola Central Office. |
| --- | --- |

99679422.3

**7**

*Oahu-Nanakuli*

| Assets | Description |
|---|---|
| Terrestrial Structure | 9200 Feet of Subduct extending from near the Nanakuli terminal building to Farrington Highway where it meets the Paniolo Cable Network Terrestrial Structure. Unknown number of manholes. |
| Nanakuli Terminal Building | Terminal building located in Nanakuli, Hawaii including access rights to the land on which the terminal building resides. |
| HVAC System | Included with the Nanakuli Terminal Building is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Nanakuli Terminal Building. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Nanakuli Terminal Building. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Nanakuli Terminal Building providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Nanakuli Terminal Building providing for cable infrastructure between equipment and frames or equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Nanakuli Terminal Building. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC- 192/0C-48. Includes all cards installed in the system, software, and spares |
| Fujitsu 7200 | Wave Division Platform and transmitter platform for fiber terminations that works with the Fujitsu 4500/4300 to provide optical services. |
| Fujitsu 9500 | Dense Wave Division Platform and transmitter platform for fiber terminations. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.1 and Schedule A.2 equipment function within the network. |

*Oahu - Waimanalo*

| Assets | Description |
|---|---|
| Terrestrial Structure | 2160 Feet of Subduct extending from near the Waimanalo terminal building o the manhole near Kalanianaole Highway where it meets the Paniolo Terrestrial structure. 1 Manhole. |
| Waimanalo Terminal Building | Terminal building located in Waimanalo, Hawaii including access rights to the land on which the terminal building resides. |
| HVAC System | Included with the Waimanalo Terminal Building is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Waimanalo Terminal Building. |
| DC Power nfrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Waimanalo Terminal Building. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Waimanalo Terminal Building providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Waimanalo Terminal Buildingproviding for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Waimanalo Terminal Building. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DSl to OC-192/OC-48. Includes all cards installed in the system, software, and spares. |
| Fujitsu 7200 | Wave Division Platform and transmitter platform for fiber terminations that works with the Fujitsu 4500/4300 to provide optical services. |
| Fujitsu 9500 | Dense Wave Division Platform and transmitter platform for fiber terminations. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.2 equipment function within the network. |

*Molokai - Kalamaula*

| Assets | Description |
|---|---|
| Terrestrial Structure | 1000 Feet of Subduct extending from near the Kalamaula terminal building to Kamehameha V Highway where it meets the Paniolo Cable Network Terrestrial Structure. |
| Kalamaula Terminal Building | Terminal building located 'in Kalamaula, Hawaii including access rights to the land on which the terminal building resides. |
| HVAC System | Included with the Kalamaula Terminal Building is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Kalamaula Terminal Building. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Kalamaula Terminal Building. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Kalamaula Terminal Building providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Kalamaula Terminal Building providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Kalamaula Terminal Building. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-192/OC-48. Includes all cards installed in the system, software, and spares. Paniolo seeks to have the Fujitsu 4500/4300 system in Kalamaula (if additional to he already identified Paniolo system). |
| Fujitsu 7200 | Wave Division Platform and transmitter platform for fiber terminations that works with the Fujitsu 4500/4300 to provide optical services. Paniolo seeks to have the Fujitsu 7200 systems in Kalamaula (if additional to the already identified Paniolo system). |
| Fujitsu 9500 | Dense Wave Division Platform and transmitter platform for fiber terminations. Paniolo seeks to have the Fujitsu 9500 system in Kalamaula (if not included as a Schedule A.1 asset). |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.2 equipment function within the network. |

*Molokai - Hoolehua*

| Assets | Description |
|---|---|
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure at Hoolehua. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within Hoolehua. |
| Terrestrial Structure | 7 Miles of Subduct extending from the Kalamaula terminal building towards the Hoolehua Airport DLC and Hoolehua East DLC locations. Unknown Manholes. |
| Fiber Cable | 7 Miles of Fiber extending from the Kalamaula terminal building towards the Hoolehua Airport DLC and Hoolehua East DLC locations. |

*Maui*

| Assets | Description |
|---|---|
| Terrestrial Structure | 13,800 Feet of Subduct extending from near the Puunene terminal building to Kuihelani Highway where it meets the Paniolo Terrestrial Structure. [Unknown Manholes. |
| Waiehu Central Office | Central Office located in Waiehu, Hawaii including access rights to the land on which the central office resides. |
| HVAC System | Included with the Waiehu Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Waiehu Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Waiehu Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Waiehu Central Office providing structure for fiber and other cables to be brought and terminated within the central office. |
| Cable Rack and Frame Structure | Internal support structure within the Waiehu Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Waiehu Central Office. |
| Fujitsu 4300/4100 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes .11 cards installed in the system, software, and spares. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.2 equipment function within the network. . |
| Terrestrial Structure | 1.7 Miles of Subduct extending from the Puunene terminal building near Kuihelani Highway towards the Waiehu central office. Unknown Manholes. |
| Fiber Cable | 4.3 Miles of Fiber extending from the Puunene terminal building towards he Waiehu central office. |
| Terrestrial Structure | 1.1 Miles of Subduct extending from Pakalani to Kahikinui. Unknown Manholes. |
| Fiber Cable | 1.1 Miles of Fiber extending from Pakalani to Kahikinui. |

*Hawaii - Laiopua*

| Assets | Description |
|---|---|
| Terrestrial Structure | 73,600 Feet of Subduct extending from near the Puukapu terminal building to Kawaihae-Mahukona Road where it meets the Paniolo Terrestrial Structure. Unknown Manholes. |
| Laiopua Central Office | Central Office located in Laiopua, Hawaii including access rights to the land on which the central office resides. |
| HVAC System | Included with the Laiopua Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Laiopua Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Laiopua Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Laiopua Central Office providing structure for fiber and other cables to lbe brought and terminated within the central office. |
| Cable Rack and Frame Structure | Internal support structure within the Laiopua Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Laiopua Central Office. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.2 equipment function within the network. |
| Terrestrial Structure | 32.6 Miles of Subduct extending from the Puukapu terminal building near Kawaihae-Mahukona Road where it meets the Paniolo Terrestrial Structure towards the Laiopua central office. Unknown Manholes. |
| Fiber Cable | 46.5 Miles of Fiber extending from the Puukapu terminal building towards he Laiopua central office. |

*Hawaii - Hilo*

| Assets | Description |
|---|---|
| Hilo Central Office | Central Office located in Hilo, Hawaii including access rights to the land on which the central office resides. |
| HVAC System | Included with the Hilo Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Hilo Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers Utilized to convert AC to DC power and provide backup in the event of a power failure within the Hilo Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Hilo Central Office providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Hilo Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Hilo Central Office. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. Paniolo seeks to have the Fujitsu 4500/4300 systems both in Puukapu (if additional to the already identified Paniolo system) and Hilo. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.1 and Schedule A.2 equipment function within the network. |
| Terrestrial Structure | 8.7 Miles of Subduct extending from the Hilo central office towards the Waiakea Area and Akolea Area. Unknown Manholes. |
| Fiber Cable | 8.7 Miles of Fiber extending from the Hilo central office towards the Waiakea Area and Akolea Area. Unknown Manholes. |

*Other Related Assets*

| Assets | Description |
|---|---|
| Information and Records | -Financial statements (reviewed/audited, to the extent available) and detail of operational costs for the facilities<br>-Asset listing of all infrastructure and equipment indicated in Schedule A.2 (Asset Register including websites, URLs, IP Addresses, etc.)<br>-All contracts associated with the network and maintenance of the network<br>-Wet and dry maintenance records and maintenance agreements<br>-Engineering drawings including "as built" and engineering specifications attached to schedule of spend to date<br>-All inspection reports of the network (wet, dry, facilities, batteries, generators, Etc.)<br>-Operating agreements for the monitoring and maintenance of the network<br>-Existing agreements and related materials for leasing capacity to third parties<br>-Detailed logical and physical inventory of the network linked to the asset list by item - to the extent this information is maintained in Operating Systems, provide the information in this form as requested below<br>-Inventory of all electronics equipment used to provide circuits in the Paniolo Cable Network System including assignment information for specific assets to the provision of specific circuits including card assignment, fiber cross-connects, fiber assignments, and other related information<br>-All maintenance records for the HVAC, batteries, rectifiers, and backup generator equipment located at terminal buildings and central offices identified in Schedule A.2<br>-All notices, citations or reports received from government agencies in relation to the Paniolo assets indicated in Schedule A.2<br>-All deeds to real property, plus all title insurance policies and title search results<br>-All land user permits and certificates of compliance with land use permits<br>-List of major suppliers, with copies of supply and support agreements<br>-Provide all third party agreements that are utilized to provide maintenance to the Schedule A.2 assets including SONET equipment, patch panel equipment, terrestrial fiber, marine fiber, power equipment, grounds maintenance, etc. |

| | |
|---|---|
| Operating Systems | -Software and all related hardware and data associated with the circuit inventory, monitoring, and maintenance of the Schedule A.1 and Schedule A.2 assets<br>-IT system vendors and maintenance agreements<br>-Location of the network assets and to the extent available provide geocoded locations of manhole access to fiber infrastructure, and map data of your files in a standard GIS format showing the location of all fiber infrastructure |
| Access Keys | -All keys for access to the 10 terminal buildings and central offices identified in Schedule A.1 and Schedule A.2 including keys to any fences on the perimeter of the terminal buildings and central offices |
| Licenses | -All licenses necessary to build, construct, repair, maintain and operate the Schedule A.2 assets, including without limitation SIC's interest in License Agreement No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands.<br>-All existing and pending entitlements (including without limitation, SIC's interests in memoranda of agreement, easements, leases, license agreements, letters of approval, special area management permits, rights of way or rights of interest, necessary to build, construct, repair, maintain and operate the Schedule A.2 assets. |

**EXHIBIT B**

**ENTITLEMENTS**

**EXISTING ENTITLEMENTS**

<u>Federal</u>

1.      Finding of No Significant Impact, January 2006 -- Rural Utilities Branch

2.      Section 10 of the River and Harbor Act, October 11, 2006 -- Dept. of Army

3.      Cable Landing License, June 2, 2004 -- Federal Communications Commission

4.      Section 106 of the National Historic Preservation Act.  Individual Memorandum of Agreements have been executed between SIC, USDA Rural Utilities Service (RUS), and SHPD in compliance with Section 106. These agreements govern the archaeological and cultural monitoring during construction of the project (see nos. 17, 20, 26, 29 and 39 below).

<u>State</u>

5.      Final Environmental Assessment/Finding of No Significant Impact, June 8, 2004 -- DLNR

6.      Hawaii Coastal Zone Management (CZM) Program Federal Consistency, June 14, 2006 -- Dept. of Business, Economic Development & Tourism (DBEDT), Office of Planning

7.      Conservation District Use Permit (all sites except Sandy Beach) ST 05-3176, July 16, 2004 -- Dept. of Land and Natural Resources (DLNR), Office of Conservation and Coastal Lands

     7.1.      Extension to Conservation District Use Permit (all sites except Sandy Beach), ST 05-3176, June 23, 2005 - DLNR, Office of Conservation and Coastal Lands.

8.      Conservation District Use Permit (Sandy Beach), OA-3360, August 2, 2006 -- DLNR, Office of Conservation and Coastal Lands

9.      DLNR Right-of-Entry Permit to Sandwich Isles Communications, Inc. to Enter Upon State-Owned Lands, June 25, 2007

10.     Dept. of Health, Notice of General Permit Coverage (NPDES) permits have been completed for each of the terrestrial routes to the landing sites and for the landing sites:

- Notice of General Permit Coverage (NGPC) Hanamaulu to Kekaha Fiber Optics Ductline Project, September 12, 2002 (File No. HI R10B320)

- Termination of Notice of General Permit Coverage (NGPC) Hanamaulu to Kekaha Fiber Optics Ductline Project, August 8, 2006 (File No. HI R10B320)

- Notice of General Permit Coverage (NGPC) Nanakuli to Kili Drive Fiber Optics Ductline Project, March 30, 2005 (File No. HI R10C084)

- Notice of General Permit Coverage (NGPC) Kalanianaole to Waimanalo Fiber Optics Ductline Project, March 29, 2005 (File No. HI R10C127)

- Letter dated June 5, 2006, re Compliance with Conditions 9.b., c., e., f., g., and h. of the Notice of General Permit Coverage (NGPC) Kalanianaole to Waimanalo Fiber Optics Ductline Project Phase 6 (File No. HI R10C127)

- Authorization to Discharge Under the National Pollutant Discharge Elimination System (NPDES) Kalanianaole to Waimanalo Fiber Optics Ductline Project, June 9, 2006 (Permit No. HI S000061)

- Notice of General Permit Coverage (NGPC) Kalamaula to Alii Fish Pond Fiber Optics Ductline Project, December 3, 2004 (File No. HI R10B984)

- Notice of General Permit Coverage (NGPC) Puunene to Makena Fiber Optics Ductline Project, March 29, 2005 (File No. HI R10C133)

- Notice of General Permit Coverage (NGPC) Honokowai to Waiko Road Fiber Optics Ductline Project, March 30, 2005 (File No. HI R10C132)

- Notice of General Permit Coverage (NGPC) Kawaihae to Upolu Fiber Optics Ductline Project, November 23, 2004 (File No. HI R10B890)

- Notice of General Permit Coverage (NGPC) Sandwich Isles Communications, Inc. Submarine Fiber-Optic Cable Network Lahaina and Kula, Maui, Hawaii, July 20, 2007 (File No. HI R10C888)

- Notice of General Permit Coverage (NGPC) Sandwich Isles Communications, Inc. Submarine Fiber-Optic Cable Network Waiane and Honolulu, Oahu, Hawaii, July 23, 2007 (File No. HI R10C880)

11. Finding of No Significant Impact (FONSI) for Kauai terrestrial segments, June 23, 2001, Department of Transportation (DOT)

12. Finding of No Significant Impact (FONSI) for Oahu terrestrial segments, June 23, 2001, DOT

13. Finding of No Significant Impact (FONSI) for Maui County (Maui and Molokai) terrestrial segments, August 8, 2001, DOT

14. Finding of No Significant Impact (FONSI) for Hawaii County terrestrial segments, June 23, 2001, DOT

Kauai

15. Special Management Area (SMA) exemption letter, June 30, 2004 – County of Kauai Planning Dept.

16. Hanamaulu to Kekaha Fiber Optic Duct Line (Akiohala Road (Kekaha)) Conditional Letter – Dated 9/19/02 and Executed 9/24/02 and construction plan approval.

17. Memorandum of Agreement (MOA) between USDA, RUS, Hawaii SHPO, and SIC regarding SIC's Kauai Fiber Optic Duct Lines Project - Dated October 10, 2001

<u>Oahu</u>

18.     SMA (2004/SMA-67) and SSV (2004/SV-18), Makaha (Kili Drive) December 13, 2004 – City & County of Honolulu, Dept. of Planning and Permitting

19.     Nanakuli to Kili Drive Fiber Optic Duct Line (Kili Drive (Makaha)) Conditional Letter – Dated 6/23/05 and Executed 6/28/05 and construction plan approval

20.     MOA regarding SIC's Oahu Rural Fiber Optic Duct Lines Project - Dated October 10, 2001

21.     SMA (2004/SMA-58), Sandy Beach Park, December 27, 2004 – City & County of Honolulu, Dept. of Planning and Permitting

22.     Kalanianaole to Waimanalo Fiber Optic Duct Line (Sandy Beach to Waimanalo) Conditional Letter – Dated 11/28/06 and Executed 12/6/06 and construction plan approval

23.     SSV (2004/SV-17), November 30, 2004 – City & County of Honolulu, Dept. of Planning and Permitting

<u>Molokai</u>

24.     SMA exemption letter for Onealii landing site, Molokai, December 10, 2004 – County of Maui, Dept. of Planning

25.     Kalamaula to Alii Fish Pond (Onealii Homestead (Kalamaula)) Conditional Letter – Dated 10/20/04 and Executed 11/1/04 and construction plan approval

26.     MOA regarding SIC's Molokai Rural Fiber Optics Duct Lines Project - Dated October 10, 2001

<u>Maui</u>

27.     SMA (SM2 2004/0075) and Shoreline Setback Approval (SSA 2004/0016), Poolenalena Park, July 22, 2004 – County of Maui, Dept. of Planning

        27.1.   Extension to SMA (SM2 2004/0075) and SSA (SSA 2004/0016), Poolenalena Park, February 1, 2005 – County of Maui, Dept. of Planning

        27.2.   Extension to SMA (SM2 2004/0075) and SSA (SSA 2004/0016), Poolenalena Park, February 8, 2006 – County of Maui, Dept. of Planning

28.     Puunene to Makena Fiber Optic Duct Line (Poolenalena Park (Makena) Conditional Letter – Dated 3/5/07 and Executed 3/7/07 and construction plan approval

29.     First Amended MOA between USDA, RUS, Hawaii HPO, and SIC with Concurrence by the Maui/Lanai Islands Burial Counsel – Dated April 2004

30.     DLNR right of entry for archaeological site work at Poolenalena landing site:

        •   Right of Entry Permit dated January 8, 2003, issued by DLNR (Ref. PSF 02OD-417)

- Right of Entry Permit dated January 23, 2004, issued by DLNR (Ref. PSF 02OD-417)

- Extension of Right of Entry Permit dated March 9, 2007, issued by DLNR (Ref. PSF 02OD-417)

31.    SMA (SM2 2004/0074) and SSA (SSA 2004/0015), Wahikuli, July 22, 2004 – County of Maui Dept. of Planning

    31.1.    Extension of SMA (SM2 2004/0074) and SSA (SSA 2004/0015), Wahikuli, February 1, 2005 – County of Maui Dept. of Planning

    31.2.    Extension of SMA (SM2 2004/0074) and SSA (SSA 2004/0015), Wahikuli, February 8, 2006 – County of Maui Dept. of Planning

32.    Honokowai to Waiko Fiber Optic Duct Line (Wahikuli (Lahaina)) Conditional Letter – Dated 3/23/07 and Executed 3/27/07 and construction plan approval

33.    Decision and Order and Findings of Fact and Conclusions of Law each dated June 6, 2007 (Docket No. 07-NR-VN-14, V-462) issed by State Department of Health (noise variance for nighttime work obtained with Henkels & McCoy as contractor along Wahikuli route; HDD only)

34.    State DLNR, Division of Boating and Ocean Recreation (DOBOR) letter of no objection to laying of Undersea fiber optic within the Kaanapali Water

35.    Maui County Dept. of Parks and Recreation letters of no objection to submarine fiber optic cable at Poolenalena Beach Park and Wahikuli Wayside Park dated Feb. 13, 2007

36.    Maui County Dept. of Parks and Recreation letter of no objection to relocated alignment of submarine fiber optic cable at Poolenalena Beach Park dated Feb. 23, 2007


Hawaii

37.    SMA Permit No. 152, April 13, 2004 – County of Hawaii, Planning Dept.

    37.1.    Extension to SMA Permit No. 152, July 14, 2005 – County of Hawaii, Planning Dept.

    37.2.    Extension of SMA Permit No. 152, June 27, 2007 – County of Hawaii, Planning Dept.

38.    Kawaihae to Maluokalani (Kaewa Place (Kawaihae)) Conditional Letter – Dated 6/23/05 and Executed 7/13/05 and construction plan approval

39.    MOA regarding SIC's Hawaii Rural Fiber Optic Duct Lines Project – Dated October 10, 2001

DHHL

40.    Construction Plan Approval by Dept. of Hawaiian Home Lands (DHHL) pursuant to License Agreement No. 372 for (i) temporary construction site for Kekaha landing site, (ii) Molokai landing at Onealii, and (iii) construction on DHHL lands at Kaewa, Kawaihae

**PENDING ENTITLEMENTS**

<u>State</u>

1.      Extension to CDUP, ST 05-3176 for all marine landing sites, except Sandy Beach (approved by Board of Land and Natural Resources on July 27, 2007; awaiting extension letter from DLNR)

2.      Extension to CDUP, ST 04-3360, for Sandy Beach landing site (approved by Board of Land and Natural Resources on July 27, 2007; awaiting extension letter from DLNR)

3.      SDOT conditional letters and approval of plans for landing sites

<u>Kauai</u>

4.      Amendment to State Governor's Executive Order No. 3346 to County for Park Purposes for Kekaha

5.      Easement for Kekaha Landing Site. Dept. of Land and Natural Resources (DLNR) to process after completion with construction (DLNR approved easements June 22, 2007)

<u>Oahu</u>

6.      City & County Easement for use of City Parks (Sandy Beach and Makaha landing sites)

<u>Molokai</u>

7.   DHHL easement for Molokai landing at Onealii

<u>Maui</u>

8.      Amendment to State Governor's Executive Order No. 3346 to County for Park Purposes for Poolenalena

9.      Easement for Poolenalena Landing Site. Dept. of Land and Natural Resources (DLNR) to process after completion with construction (DLNR approved easements June 22, 2007)

10.     County of Maui Parks Department approval of plans for Wahikuli

11.     Archaeological inventory survey of the proposed area to be bored at Poolenalena

12.     Easement from County of Maui for marine fiber running under Wahikuli Wayside Park (to be obtained after completion of construction)

<u>Hawaii</u>

13.     DHHL easement for use of DHHL lands at Kaewa, Kawaihae

**EXHIBIT C**

**ASSETS O&M SERVICES**

1.    Periodic maintenance within keeping with the particular asset category in question will be performed.

2.    Regular testing of the backup generator and battery systems will be performed. To the extent that issues are found with these components, remediation will be performed in keeping with normal industry practice.

3.    Routine monitoring and maintenance of electronic assets will be performed as consistent with manufacturer guidelines and industry standard practice. To the extent that issues are found with the electronic assets, remediation will be performed in keeping with normal industry practice.

4.    Maintenance of the grounds will be performed in keeping with the requirements given the state of vegetation growth and in accordance with the requirements of the leaseholder for the land (if applicable).

5.    Routine maintenance of the building will be performed including roof, facia, and environmental systems in keeping with normal industry practice. To the extent that issues are found with the building or environmental systems, remediation will be performed in keeping with normal industry practice.

# EXHIBIT G

Execution Version

ASSET PURCHASE AGREEMENT

by and between

MICHAEL KATZENSTEIN, as Seller

solely in his capacity as chapter 11 trustee for

the bankruptcy estate of

PANIOLO CABLE COMPANY, LLC, as Debtor

and HAWAIIAN TELCOM, INC., as Buyer

dated

November 30, 2020

# EXHIBIT G

**TABLE OF CONTENTS**

Page

ARTICLE I     DEFINITIONS ............................................................................ 1

    Section 1.1     Definitions.................................................................. 1

    Section 1.2     Rules of Construction ................................................ 7

ARTICLE II     PURCHASE AND SALE OF THE PURCHASED ASSETS ........... 8

    Section 2.1     Purchase and Sale of the Purchased Assets; Assumption of Liabilities ................................................................ 8

    Section 2.2     Purchase Price ............................................................ 11

    Section 2.3     Deliveries by Seller.................................................... 11

    Section 2.4     Deliveries by Buyer ................................................... 12

    Section 2.5     Escrow Agreement for Earnest Money....................... 12

    Section 2.6     Payment of Purchase Price; Delivery of Closing Documents; Allocation of Purchase Price................................. 13

    Section 2.7     Closing ...................................................................... 13

    Section 2.8     As is, Where is Nature of Sale ................................. 13

ARTICLE III     REPRESENTATIONS AND WARRANTIES OF SELLER ........... 14

    Section 3.1     Authority; Execution and Delivery........................... 14

    Section 3.2     Non-Contravention; Approvals and Consents ........... 14

    Section 3.3     Title to the Purchased Assets .................................... 15

    Section 3.4     No Subsidiaries.......................................................... 15

    Section 3.5     Seller's Brokerage Agreements ................................. 15

    Section 3.6     Litigation.................................................................... 15

    Section 3.7     Assignable Contracts, Assigned Claims, Assigned Permits, and Assigned Rights ......................................................... 15

    Section 3.8     Real Estate ................................................................. 16

ARTICLE IV     REPRESENTATIONS AND WARRANTIES OF BUYER ........... 16

    Section 4.1     Organization and Good Standing............................... 16

    Section 4.2     Authorization of Agreement; Execution and Delivery ........... 16

    Section 4.3     Non-Contravention; Approvals and Consents ........... 16

    Section 4.4     Financial Ability ....................................................... 16

    Section 4.5     Buyer's Brokerage Agreements................................. 17

    Section 4.6     No Affiliates of Debtor .............................................. 17

-i-

## TABLE OF CONTENTS
(continued)

Page

Section 4.7    Adequate Assurances Regarding Assignable Contracts and Assigned Rights ........................................................................... 17

ARTICLE V    COVENANTS .................................................................... 17

Section 5.1    Conduct of the Business .................................................. 17

Section 5.2    Risk of Loss; Duty to Repair ........................................ 17

Section 5.3    No Solicitation ................................................................ 17

Section 5.4    Pre-Closing Access ........................................................ 17

Section 5.5    Notification ...................................................................... 18

Section 5.6    Additional Agreements .................................................. 18

Section 5.7    Investigation and Agreement by Buyer ........................ 18

Section 5.8    Permits or Consents of Governmental Authorities ...... 19

Section 5.9    Injunctions ...................................................................... 20

Section 5.10   Adequate Assurances Regarding Assignable Contracts and Assigned Rights ............................................................... 20

Section 5.11   Cure of Defaults ............................................................ 20

Section 5.12   Bankruptcy Covenants .................................................. 20

Section 5.13   Migration of Capacity .................................................... 20

ARTICLE VI    CONDITIONS TO THE CLOSING ........................................ 21

Section 6.1    Conditions to Obligations of Each Party ...................... 21

Section 6.2    Conditions to Obligation of Buyer ................................ 21

Section 6.3    Conditions to Obligation of Seller ................................ 22

ARTICLE VII   TERMINATION .................................................................... 23

Section 7.1    Termination ...................................................................... 23

Section 7.2    Effect of Termination ...................................................... 24

Section 7.3    Survival ............................................................................ 24

ARTICLE VIII  OFFSET AMOUNTS ............................................................ 24

Section 8.1    Costs Relating to the Purchased Assets ........................ 24

Section 8.2    Limitations ...................................................................... 24

Section 8.3    Claim Procedures ............................................................ 24

-ii-

**TABLE OF CONTENTS**
(continued)

Page

ARTICLE IX   MISCELLANEOUS ............................................................................ 24

    Section 9.1    Post-Closing Access ........................................................ 24

    Section 9.2    Public Announcements .................................................... 24

    Section 9.3    Further Assurances ......................................................... 25

    Section 9.4    Expenses ......................................................................... 25

    Section 9.5    Notices ........................................................................... 25

    Section 9.6    Confidentiality ............................................................... 26

    Section 9.7    Entire Agreement; Amendment; Waiver ......................... 26

    Section 9.8    Severability ................................................................... 26

    Section 9.9    Successors and Assigns; Third Party Beneficiaries ................ 27

    Section 9.10    Governing Law .............................................................. 27

    Section 9.11    Captions ......................................................................... 27

    Section 9.12    Counterparts ................................................................... 27

    Section 9.13    Enforcement of Agreement ............................................ 27

    Section 9.14    Time of Essence; Specified Dates .................................. 28

    Section 9.15    No Director or Affiliate Liability ................................... 28

    Section 9.16    No Personal Liability ..................................................... 28

    Section 9.17    No Successor Liability .................................................... 28

<u>EXHIBITS</u>

| EXHIBIT A | - | Form of Sale Order |
|---|---|---|
| EXHIBIT B | - | Form of Assignment and Assumption Agreement |
| EXHIBIT C | - | Form of Bill of Sale |
| EXHIBIT D | - | Allocation of Purchase Price |
| EXHIBIT E | - | Form of Escrow Agreement |
| EXHIBIT F | - | Form of Credit Agreement |
| EXHIBIT G | - | Form of Security Agreement |
| EXHIBIT H | - | Form of Operational Support and Sales Services Agreement |

<u>SCHEDULES</u>

| 1.1(a) | - | ASSIGNABLE CONTRACTS |
|---|---|---|
| 1.1(b) | - | ASSIGNED PERMITS |
| 1.1(c) | - | ASSIGNED RIGHTS |

2.1(a)   -   DEBTOR ASSETS

SELLER DISCLOSURE SCHEDULE

3.3(a)   -   TITLE TO PURCHASED ASSETS
3.5      -   SELLER'S BROKERAGE AGREEMENTS

BUYER DISCLOSURE SCHEDULE

4.5      -   BUYER'S BROKERAGE AGREEMENTS
4.6      -   NO AFFILIATES OF DEBTOR

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of November 30, 2020 (the "Execution Date"), by and between Michael Katzenstein, solely in his capacity as chapter 11 trustee ("Seller") for the bankruptcy estate of Paniolo Cable Company, LLC, a limited liability company organized under the laws of the State of Delaware ("Debtor" or "Paniolo"), and Hawaiian Telcom, Inc., a Hawaii corporation ("Buyer").

## R E C I T A L S:

**WHEREAS**, Debtor owns and operates a submerged marine fiber and terrestrial fiber telecommunications cable network that connects the five principal islands in the State of Hawaii (the "Business").

**WHEREAS**, on November 13, 2018, certain creditors of Debtor filed an involuntary petition for relief against Debtor under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Hawaii (the "Bankruptcy Court"), which case is being administered under Case No. 19-013139 (RJF) (the "Bankruptcy Case").

**WHEREAS**, on January 30, 2019, the Bankruptcy Court entered an Order for Relief against Debtor in the Bankruptcy Case.

**WHEREAS**, on February 11, 2019, the Bankruptcy Court appointed Seller as chapter 11 trustee for Debtor's bankruptcy estate (the "Estate").

**WHEREAS**, the Estate is the owner of the Purchased Assets (hereinafter defined).

**WHEREAS**, Buyer desires to purchase the Purchased Assets from Seller, and Seller desires to sell the Purchased Assets to Buyer, in consideration of the receipt of the Purchase Price (hereinafter defined) in the manner and subject to the terms and conditions set forth herein and in accordance with the Bankruptcy Code, including sections 363 and 365 thereof.

**WHEREAS**, the transactions contemplated herein shall be consummated pursuant to the terms and conditions of this Agreement and a Sale Order (hereinafter defined) to be entered by the Bankruptcy Court.

**NOW, THEREFORE,** in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, in reliance upon the mutual covenants and agreements hereinafter set forth and subject to the terms and conditions herein contained, the parties hereto agree as follows:

1

## ARTICLE I
## DEFINITIONS

**Section 1.1** <u>Definitions.</u>  The following terms shall have the following meanings in this Agreement:

"<u>A.1 Assets</u>" shall mean the Debtor's Assets identified as part of Schedule A.1 as described in <u>Schedule 2.1(a).</u>

"<u>A.2 Assets</u>" shall have the Debtor's Assets identified as part of Scheduled A.2 as described in <u>Schedule 2.1(a).</u>

"<u>Acquisition Proposal</u>" shall have the meaning ascribed to such term in <u>Section 5.2(b).</u>

"<u>Affiliate</u>" shall, with respect to any Person, mean any other Person that controls, is controlled by or is under common control with the former, including all affiliates as that term is defined in 11 U.S.C. §101.

"<u>Agreement</u>" shall mean this Asset Purchase Agreement, and each Exhibit and Schedule hereto.

"<u>Antitrust Agency</u>" shall have the meaning ascribed to such term in <u>Section 6.1(a).</u>

"<u>Antitrust Investigation</u>" shall have the meaning ascribed to such term in <u>Section 6.1(a).</u>

"<u>Assigned Claims</u>" shall mean the Debtor's right, title and interest, if any, in claims, causes of action, warranty claims, insurance claims, or claims against third parties, or any proceeds or amounts receivable in connection therewith, whether sounding in contract, tort, equity or otherwise, to pursue recovery or equitable relief in connection with use of the Debtor Assets prior to the Closing, or for damages to the Debtor Assets.

"<u>Assignable Contracts</u>" shall mean the Contracts of Debtor relating to the Business that are identified on <u>Schedule 1.1(a).</u>

"<u>Assigned Permits</u>" shall mean the Debtor's interest, if any, in the Permits relating to the Business that are identified on <u>Schedule 1.1(b)</u>, including, for the avoidance of doubt, the Entitlements.

"<u>Assigned Rights</u>" shall mean any of Debtor's rights granted by third parties, including without limitation any and all rights, licenses, vendor consents, rights-of-way, easements, wayleaves, colocations, leases and other approvals, that are necessary for the lawful ownership of the Purchased Assets or other lawful conduct of the Business as currently conducted, including, without limitation, those identified on <u>Schedule 1.1(c).</u>

"<u>Assignment and Assumption Agreement</u>" shall have the meaning ascribed to such term in <u>Section 2.3(b).</u>

"<u>Assumed Liabilities</u>" shall have the meaning ascribed to such term in <u>Section 2.1(c).</u>

2

"Bankruptcy Case" shall have the meaning ascribed to such term in the recitals hereof.

"Bankruptcy Code" shall have the meaning ascribed to such term in the recitals hereof.

"Bankruptcy Court" shall have the meaning ascribed to such term in the recitals hereof.

"Burdensome Condition" means any Remedy Action or Remedy Actions that, individually or in the aggregate (taken as a whole), would be reasonably likely to have a material adverse effect on Buyer and its Affiliates.

"Business" shall have the meaning ascribed to such term in the recitals hereof.

"Business Day" shall mean any day of the year other than (i) any Saturday or Sunday or (ii) any other day on which banks located in the State of Hawaii generally are closed for business other than the retail depository business.

"Buyer" shall have the meaning ascribed to such term in the first paragraph of this Agreement.

"Buyer Disclosure Schedule" shall have the meaning ascribed to such term in the introductory clause to Article IV.

"CAFP" means the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Section established by Executive Order 13913 (previously known as Team Telecom), and any of its member and advisor agencies, or a grouping thereof, acting in their CAFP capacities.

"Cash Payment" shall have the meaning ascribed to such term in Section 2.2.

"Cash Offset Amount(s)" shall mean any Repair Expenses arising out of or relating to a break in the Submarine Cable.

"CFIUS" means the Committee on Foreign Investment in the United States or any member agency thereof designated to act on behalf of CFIUS.

"CFIUS Clearance" means that any review or investigation by CFIUS under Section 721 of the transactions contemplated by this Agreement shall have been concluded and one of the following has occurred: (a) written notice has been received by Buyer and Seller (or their respective counsel) from CFIUS stating that the review or investigation of the transactions contemplated by this Agreement pursuant to Section 721 has been concluded and that CFIUS has made a determination that the transactions contemplated by this Agreement do not present any unresolved national security concerns, (b) CFIUS shall have concluded that the transactions contemplated by this Agreement are not subject to review under Section 721; or (c) the President of the United States shall not have acted pursuant to Section 721 to suspend or prohibit the consummation of the transactions contemplated by this Agreement and the applicable period of time for the President to take such action shall have expired.

"Claim" shall mean a right to (i) a payment, whether or not such right is reduced to

judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured or (ii) an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, secured or unsecured.

"Closing" shall have the meaning ascribed to such term in Section 2.7.

"Closing Date" shall have the meaning ascribed to such term in Section 2.7.

"Closing Documents" shall mean, collectively, the documents delivered by Seller pursuant to Section 2.3 and the documents delivered by Buyer pursuant to Section 2.4.

"Code" shall mean the United States Internal Revenue Code of 1986, as amended. All references to the Code, U.S. Treasury Regulations or other governmental pronouncements shall be deemed to include references to any applicable successor Regulations or amending pronouncement.

"Contracts" shall mean any agreements, contracts, commitments, understandings, binding arrangements, unexpired leases of real and personal property, licenses, purchase orders and all other legally binding arrangements, whether written or oral.

"Consent" shall mean any consent, approval, authorization, qualification, waiver or notification of a Governmental Authority that is necessary to be obtained prior to the consummation of the transactions contemplated by this Agreement in order to properly effectuate such transactions.

"Court" shall mean any court, federal, state, United States territorial or local, or arbitration tribunal.

"Cure Costs" shall have the meaning ascribed to such term in Section 2.1(d)(ii).

"Debtor" shall have the meaning ascribed to such term in the first paragraph of this Agreement.

"Debtor Assets" shall mean the assets that are identified on Schedule 2.1(a), including the A.1 Assets and the A.2 Assets.

"Designated Contracts" shall mean those Assignable Contracts that are designated, pursuant to a written notice delivered by Buyer to Seller at least five (5) Business Days prior to the Closing Date, for assignment to Buyer at Closing.

"Effective Time" shall mean 12:01 a.m. (United States Central time) on the Closing Date.

"Entitlements" shall have the meaning ascribed to such term in Schedule 1.1(b).

"Escrow Agent" shall have the meaning ascribed to such term in Section 2.5(a).

"Escrow Agreement" shall have the meaning ascribed to such term in Section 2.5(a).

"Escrow Amount" shall have the meaning ascribed to such term in Section 2.5(a).

4

"Escrow Property" shall mean the Escrow Amount and any interest, income and earnings thereon.

"Estate" shall have the meaning ascribed to such term in the recitals hereof.

"Execution Date" shall have the meaning set forth in the preamble of this Agreement.

"FCC" shall mean the United States Federal Communications Commission.

"FCC Consent" shall mean the consent by the FCC to the assignment of the FCC Permit in connection with the consummation of the transactions contemplated hereby.

"FCC Permit" the Submarine Cable Landing License SCL-LIC-20070223-00003 issued by the FCC to Debtor.

"Final Order" shall mean an order of the Bankruptcy Court or other Court of competent jurisdiction (a) as to which no appeal, notice of appeal or motion for rehearing or new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon, (b) as to which the time for instituting an appeal or motion for rehearing or new trial shall have expired and (c) as to which no stay is in effect; provided, however, that (x) no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order; and (y) the Sale Order shall fail to be a Final Order if, and only if, a timely filed appeal, motion for rehearing or motion for new trial challenges the Bankruptcy Court's conclusion that Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code.

"Financing" shall have the meaning ascribed to such term in Section 2.2.

"Financing Documents" shall mean the Credit Agreement and Security Agreement, each substantially in the form attached hereto as Exhibit F and Exhibit G, respectively.

"Financing Offset Amount(s)" shall mean any Repair Expenses, Routine Maintenance Expenses or other amounts owed to Buyer under Article VIII hereof, but excluding any Cash Offset Amounts.

"Governmental Authority" shall mean any foreign, federal, state, county, municipal, United States territorial, local or other governmental department, authority, regulatory or administrative agency, body, authority, entity, commission, unit, subdivision or governmental authority, including Courts.

"HSBC" shall mean HSBC Securities (USA), Inc.

"HSR Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"Incidental Rights" shall mean any and all rights of Debtor of any kind which are incidental to or arise out of the lawful ownership of any of the Purchased Assets, including, but not limited

5

to, the Assigned Rights and Assigned Permits.

"Knowledge" shall mean, with respect to Buyer, the actual knowledge of the directors and executive officers of such party. "Knowledge" shall mean, with respect to Seller, the actual knowledge of the Seller.

"Law" shall mean (a) all laws, statutes and ordinances of the United States, any foreign country, any domestic or foreign state or territory, or any political subdivision thereof, including all decisions of Courts having the effect of law in each such jurisdiction, and (b) all Regulations.

"Liens" shall mean any mortgage, pledge, hypothecation, assignment, deposit arrangement, lien (statutory, judicial or otherwise), security interest or other charge or encumbrance, any financing lease having substantially the same economic effect as any of the foregoing, any assignment of the right to receive income, any other type of preferential arrangement, or any right-of-way, easement, encroachment or encumbrance of any kind.

"Material Adverse Effect" shall mean any change, fact, circumstance, occurrence, event, effect or condition that, individually or in the aggregate with all other changes, facts, circumstances, occurrences, events, effects or conditions, directly or indirectly, results in, or would reasonably be expected to result in, a material adverse effect on (a) the ability of Seller to consummate the sale of the Purchased Assets or (b) the ability of Buyer to operate the Business, taken as a whole, from and after the Closing.

"North American Zone Maintenance Authority Agreement" shall mean that certain multi-party agreement entered into by SIC on April 1, 2012, as amended on April 1, 2013, January 1, 2016 and January 1, 2019, and subsequently assigned to the Trustee.

"Offset Amount(s)" shall mean the Cash Offset Amount and Financing Offset Amount.

"Offset Claim" shall mean any claim for Offset Costs.

"Offset Costs" shall have the meaning ascribed to such term in Section 8.1.

"Outside Date" shall have the meaning ascribed to such term in Section 7.1(a)(iii).

"Permitted Liens" shall mean the following: (a) the agreements or conditions imposed on the issuance of land use permits, zoning, business licenses, use permits or other entitlements of various types issued by any Governmental Authority and necessary or beneficial to the continued use and occupancy of the Purchased Assets in connection with the Business; (b) zoning Regulations and restrictive covenants and easements of record that do not materially affect, impair or interfere with any property affected thereby or the use of the Purchased Assets; and (c) public utility easements of record, in customary form, to serve the Purchased Assets.

"Permits" shall mean all permits, approvals, franchises, licenses or other rights granted by any Governmental Authority and necessary for the lawful ownership of the assets of Debtor, or other lawful conduct of the Business as currently conducted.

"Person" shall mean an individual, partnership, limited liability company, corporation,

6

U.S. Bankruptcy Court - Hawaii.  #18-01319.  Dkt # 313-4   Filed. 11/30/20   Page 11 of 58
U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-7   Filed  05/27/22   Page 12 of 59

joint stock company, trust, estate, joint venture, association or unincorporated organization, Governmental Authority or any other form of business or professional entity.

"Purchased Assets" shall mean, collectively, the Debtor Assets, the Assigned Claims and the Designated Contracts.

"Purchase Price" shall have the meaning ascribed to such term in Section 2.2.

"Real Property" shall mean all buildings, structures, improvements and fixtures, together with all rights of way, easements, privileges, and other appurtenances pertaining or belonging thereto, in which Seller has any interest, whether pursuant to a fee simple interest, leasehold interest, license, or any other agreement.

"Regulation" shall mean any rule or regulation of any Governmental Authority having the effect of law.

"Remedy Action" shall mean (i) proposing, negotiating, committing to and effecting, by consent decree, hold separate order, or otherwise, the sale, divestiture or disposition of businesses, product lines, assets or operations of Buyer or any of its Affiliates, (ii) conducting Buyer and its Affiliates' businesses in a specified manner, or proposing and agreeing or permitting to conduct any of such businesses in a specified manner, including by agreeing to undertakings required by a Governmental Entity that Buyer or any of its Affiliates will take, or refrain from taking, any action, including committing the Buyer or any of its Affiliates to invest specific dollar amounts in specific geographic markets, and (iii) otherwise taking or committing to take actions that after the Effective Time would limit Buyer or any of its Affiliates' ability to retain one or more of the businesses, product lines, assets or operations of the Buyer or any of its Affiliates, in each case, to the extent necessary to obtain any such clearance, resolve any such objections or avoid or eliminate any such impediments.

"Repair Expenses" means any amount paid or payable to third-parties or to Buyer, for labor, materials, replacements, or repairs to, any component of the Purchased Assets, including, for the avoidance of doubt, any Pre-existing Infrastructure Repair (as defined under the Services Agreement).

"Routine Maintenance Expenses" means any amount paid or payable to Buyer for labor related to the performance of routine maintenance activities on the Purchased Assets, as outlined in Schedule A of the Services Agreement.

"Sale Order" shall mean an order of the Bankruptcy Court that is acceptable to Seller and Buyer that authorizes the transactions contemplated hereunder, including authority to convey the Purchased Assets to Buyer pursuant to Sections 363 and 365 of the Bankruptcy Code and that contains a finding of fact that Buyer is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code, substantially in the form of Exhibit A attached hereto.

"Section 721" means Section 721 of the Defense Production Act of 1950, codified as amended at 50 U.S.C. § 4565 (including provisions of the Foreign Investment Risk Review Modernization Act of 2018), and all rules and regulations thereunder, including those codified at 31 C.F.R. Parts 800 through 802.

"Seller" shall have the meaning ascribed to such term in the first paragraph of this Agreement.

"Seller Disclosure Schedule" shall have the meaning ascribed to such term in the introductory clause to Article III.

"Services Agreement" shall mean that certain Operational Support and Sales Services Agreement with respect to the Purchased Assets, to be entered into by Seller and Buyer following entry of the Sale Order (as defined herein).

"Settlement Agreement" shall have the meaning ascribed to such term in Schedule 1.1(a).

"SIC" shall have the meaning ascribed to such term in Schedule 1.1(a).

"Submarine Cable" shall have the meaning set forth in the Services Agreement.

"Subsidiary" shall mean any Person of which another specified Person owns directly or indirectly at least a majority of the outstanding capital stock (or other securities) entitled to vote generally or otherwise having the power to elect a majority of the board of directors (or similar governing body) of such Person.

"Superior Proposal" shall have the meaning ascribed to such term in Section 5.2(c).

"Taxes" shall mean all income taxes and all other taxes, charges, imposts, tariffs, fees, levies or other similar assessments or liabilities, including income taxes, ad valorem taxes, excise taxes, withholding taxes or other taxes of or with respect to gross receipts, premiums, real property, personal property, windfall profits, sales, use, transfers, licensing, employment, payroll and franchises imposed by or under any Law; and such terms shall include any interest, fines, penalties, assessments or additions to tax resulting from, attributable to or incurred in connection with any such tax or any contest or dispute thereof.

"Tax Return" shall mean all returns, declarations, reports, estimates, information returns and statements required to be filed by or with respect to Debtor in respect of Taxes, including federal, state, United States territorial, local or foreign Income Tax returns filed on a consolidated, combined or unitary basis.

"Transaction Documents" shall mean this Agreement, the Services Agreement, the Closing Documents and any other agreements or documents the execution of which are contemplated by this Agreement.

### Section 1.2  Rules of Construction.

(a)      The inclusion of any information in the Seller Disclosure Schedule shall not be deemed an admission or acknowledgment, in and of itself and solely by virtue of the inclusion therein, that such information is required to be listed therein or that such information is material to Debtor, the Estate or the Business. The headings, if any, of the individual sections of the Seller Disclosure Schedule are inserted for convenience only and shall not be deemed to constitute a part thereof or a part of this Agreement. The Seller Disclosure Schedule is arranged in sections merely

8

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 313-4   Filed 11/30/20   Page 13 of 58
U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-7   Filed 05/27/22   Page 14 of 59

for convenience, and the disclosure of an item in one section of the Seller Disclosure Schedule as an exception to a particular representation or warranty shall be deemed adequately disclosed as an exception with respect to all other representations or warranties to the extent that the relevance of such item to such representations or warranties is reasonably apparent on the face of such item, notwithstanding the presence or absence of an appropriate section of the Seller Disclosure Schedule with respect to such other representations or warranties or an appropriate cross reference thereto. The specification of any dollar amount in the representations and warranties or otherwise in this Agreement or in the Seller Disclosure Schedule is not intended and shall not be deemed to be an admission or acknowledgment of the materiality of such amounts or items, nor shall the same be used in any dispute or controversy between the parties to determine whether any obligation, item or matter (whether or not described herein or included in any schedule) is or is not material for purposes of this Agreement.

(b)     Each of the parties hereto acknowledges that it has been represented by independent counsel of its choice throughout all negotiations that have preceded the execution of this Agreement and that it has executed the same with consent and upon the advice of such independent counsel. Each party and its counsel cooperated in the drafting and preparation of this Agreement and the documents referred to herein, and any and all drafts relating thereto shall be deemed the work product of the parties and may not be construed against any party by reason of its preparation. Accordingly, any rule of law or any legal decision that would require interpretation of any ambiguities in this Agreement against any party that drafts it is of no application and is hereby expressly waived.

(c)     All references in this Agreement to Exhibits, Schedules, Articles, Sections, subsections and other subdivisions refer to the corresponding Exhibits, Schedules, Articles, Sections, subsections and other subdivisions of this Agreement unless expressly provided otherwise. Titles appearing at the beginning of any Articles, Sections, subsections or other subdivisions of this Agreement are for convenience only, do not constitute any part of such Articles, Sections, subsections or other subdivisions, and shall be disregarded in construing the language contained therein. The words "*this Agreement,*" "*herein,*" "*hereby,*" "*hereunder*" and "*hereof*" and words of similar import, refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. The words "*this Section,*" "*this subsection*" and words of similar import refer only to the Sections or subsections hereof in which such words occur. The word "*including*" (in its various forms) means "*including, without limitation.*" Pronouns in masculine, feminine or neuter genders shall be construed to state and include any other gender and words, terms and titles (including terms defined herein) in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires. Unless the context otherwise requires, all defined terms contained herein shall include the singular and plural and the conjunctive and disjunctive forms of such defined terms. Any reference to "$" or "dollars" means the currency of the United States of America.

9

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 313-4  Filed 11/30/20  Page 14 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7  Filed 05/27/22  Page 15 of 59

## ARTICLE II
## PURCHASE AND SALE OF THE PURCHASED ASSETS

**Section 2.1** **Purchase and Sale of the Purchased Assets; Assumption of Liabilities**.

(a)     Purchase and Sale of Purchased Assets.   Upon the terms and subject to the conditions of this Agreement, at the Closing, Seller shall sell to Buyer, and Buyer shall purchase from Seller, all of the Estate's right, title and interest in and to the Purchased Assets and Incidental Rights, free and clear of all Claims and all Liens other than Permitted Liens, in accordance with Sections 363 and 365 of the Bankruptcy Code and the Sale Order.

(b)     Excluded Assets.  The Purchased Assets shall not include the following properties and assets of the Estate, except to the extent expressly included in the Purchased Assets (collectively, the "Excluded Assets"):

(i)     All cash and cash equivalents and all marketable securities;

(ii)     All deposits, withholdings, prepayments, credits and refunds of Seller or the Estate not related to the Business;

(iii)     All Claims, causes of action, choses in action, rights of recovery, rights of set off and rights of recoupment relating to the Excluded Assets, and except with respect to the Assigned Claims, all rights and powers of a trustee and debtor-in-possession against any Person whatsoever, including all avoidance powers granted to Seller under the Bankruptcy Code and all causes of action and remedies granted pursuant to Sections 502, 510, 541, 544, 545, 547 through 551 and 553 of the Bankruptcy Code, except with respect to the Purchased Assets in each case;

(iv)     That certain judgment in favor of Seller entered by the Bankruptcy Court in Adversary Proceeding No. 19-90022, *Katzenstein, Trustee, v. Sandwich Isles Communications, Inc.;*

(v)     All capital stock or other equity interest of the Debtor;

(vi)     The assets listed on Schedule 2.1(b)(vi);

(vii)     The articles of organization, seals, minute books, and stock transfer books of the Debtor; and

(viii)     All rights that accrue to Seller under this Agreement.

(c)     Assumption of Liabilities.   Upon the terms and subject to the conditions of this Agreement and the Sale Order, at the Closing, Buyer shall assume, and Buyer shall thereafter pay, perform and discharge when due or payable, only the following liabilities and obligations (collectively, the "Assumed Liabilities"):

(i)     the liabilities and obligations under the Incidental Rights accruing from and after the Closing;

10

(ii)     all other liabilities and obligations relating to or arising from the ownership of the Purchased Assets after the Closing.

(d)     Assumption of the Assigned Claims, Designated Contracts, Assigned Permits and Assigned Rights.   The Sale Order shall provide for the assignment to Buyer of the Assigned Claims, Designated Contracts, Assigned Permits and Assigned Rights, effective upon the Closing, on the following terms and conditions:

(i)     On the Closing Date, Seller shall assign to Buyer, the Assigned Claims, Designated Contracts, Assigned Permits and Assigned Rights.  Seller shall provide timely and proper written notice of the motion to approve the sale filed with the Bankruptcy Court to all counterparties to the Assignable Contracts and any applicable Incidental Rights.  The Assignable Contracts shall also be identified by the date of the Assignable Contract and the other party or parties to the Assignable Contract set forth on the Schedule 1.1(a) and included on an exhibit attached to the sale motion for authority to assume, as applicable, and assign such Assignable Contracts. Similarly, the Assigned Rights shall also be identified by the date of the Assigned Right and the other party or parties to the Assigned Right set forth on the Schedule 1.1(c), and included on an exhibit attached to the sale motion for authority to assume, as applicable, and assign such Assigned Rights.

(ii)     Seller shall be responsible for the payment of any and all liabilities and obligations of Seller or the Estate for all cure, compensation and reinstatement costs or expenses of or relating to the assumption and assignment of the Designated Contracts under Section 365 of the Bankruptcy Code (the "Cure Costs") as determined by the Bankruptcy Court.

(iii)     With respect to any Contract or Incidental Right not specifically identified on Schedule 1.1(a) or Schedule 1.1(c), and provided such Contract or Incidental Right has not been rejected by Seller pursuant to Section 365 of the Bankruptcy Code, upon reasonable written notice(s) from Buyer, Seller shall, at Buyer's sole cost and expense, including Buyer's payment of any and all liabilities and obligations of the Seller for all cure, compensation and reinstatement costs or expenses relating to the assumption and assignment of each such Contract and Incidental Right, take all actions reasonably necessary to assume and assign to Buyer pursuant to Section 365 of the Bankruptcy Code any Contract(s) or Incidental Right(s) set forth in Buyer's notice(s). Seller acknowledges and agrees that Seller shall provide Buyer with reasonable advance notice of any motion(s) to reject any Contract. Notwithstanding anything in this Agreement to the contrary, on the date any Contract or Incidental Right is assumed and assigned to Buyer pursuant to this Section 2.1(d)(iii), such Contract or Incidental Right shall be deemed an Assignable Contract or Assigned Right, as applicable, for all purposes under this Agreement. No increase in Purchase Price shall be made for the inclusion of any additional Contract or Incidental Right assigned hereunder.

(e)     Excluded Liabilities.  Notwithstanding any other provision hereof or any Schedule or Exhibit hereto and regardless of any disclosure to Buyer, other than the Assumed Liabilities and liabilities under the Financing, Buyer shall not assume or be obligated or be responsible to pay, perform, satisfy or otherwise discharge any Liabilities whatsoever (collectively, the "Excluded Liabilities").  For clarity, the Excluded Liabilities shall specifically include any Liens in or to any Purchased Assets or proceeds therefrom.

11

**Section 2.2  Purchase Price.** The purchase price (the "Purchase Price") payable by Buyer to Seller in consideration for the sale of the Purchased Assets and Incidental Rights shall be (i) in consideration of only the A.2 Assets and any Incidental Rights related thereto, $500,000 cash; plus (ii) in consideration of all other Purchased Assets and Incidental Rights, (a) $24,500,000.00 cash, less the Cash Offset Amount, if any (collectively (i) and (ii)(a), the "Cash Payment") plus (b) $25,000,000.00 in financing on the terms set forth on Exhibit F, less (c) the Financing Offset Amount (the "Financing") plus (d) the assumption of the Assumed Liabilities. Payment of the Cash Payment shall be net of any Taxes Buyer shall be required under applicable Law to deduct or withhold from the Cash Payment.  Buyer shall make such deductions and withholdings and shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Law.

**Section 2.3  Deliveries by Seller.** At the Closing, Seller shall deliver to Buyer, the following:

(a)      Duly executed bills of sale for the assets, including a separate bill of sale for the A.2 Assets, to be conveyed to Buyer substantially in the form of Exhibit C hereto (each, a "Bill of Sale");

(b)      The duly executed assignment and assumption agreement providing for the assignment and assumption of the Assigned Claims, Designated Contracts, Assigned Permits and Assigned Rights in substantially the form of Exhibit B hereto ("Assignment and Assumption Agreement");

(c)      The Financing Documents;

(d)      The certificate of Seller referred to in Section 6.2 hereof; and

(e)      Such other documents as Buyer may reasonably request to effect the purchase and sale of the Purchased Assets and Incidental Rights and the assumption of the Assumed Liabilities as contemplated hereby.

**Section 2.4  Deliveries by Buyer.** At the Closing, Buyer shall deliver to Seller the following:

(a)      The Cash Payment, less the Escrow Amount and less any amounts owed to Buyer under the Services Agreement, in immediately available funds, pursuant to written wiring instructions delivered by Seller to Buyer a reasonable time prior to the Closing;

(b)      The Financing Documents;

(c)      The certificate of Buyer referred to in Section 6.3 hereof;

(d)      The duly executed Assignment and Assumption Agreement; and

(e)      Such other documents as Seller may reasonably request to effect the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities as contemplated hereby.

12

### Section 2.5 **Escrow Agreement for Earnest Money**.

(a)     Prior to entry of the Sale Order, Buyer, Seller and PNC Bank, N.A., a national association, as escrow agent (the "Escrow Agent"), shall execute an escrow agreement in substantially the form attached hereto as Exhibit E (the "Escrow Agreement") pursuant to which Buyer will deposit five million dollars ($5,000,000) as earnest money into an escrow account to be governed by the terms of the Escrow Agreement and this Agreement. At the Closing Date, the amount in escrow ("Escrow Amount") shall be paid to Seller as part of the Purchase Price in accordance with the Escrow Agreement and this Agreement.

(b)     If, prior to the Closing, Buyer should breach this Agreement in a manner that gives rise to a termination right pursuant to Section 7.1(a)(vi) on the part of Seller, then Seller shall have the right to terminate this Agreement pursuant to Section 7.1(a)(vi) and to recover damages for a breach of contract. The Escrow Agent shall hold the Escrow Amount pending either a final judicial determination of the amount of such damages payable to Seller or a settlement between the parties regarding the amount of such damage; provided that the Seller's sole and exclusive remedy shall be (i) a claim for damages against the escrow account in an amount not to exceed $2,500,000 and, in addition, (ii) Buyer, as Service Provider under the Services Agreement shall promptly waive and release all rights to payment for accrued and unpaid Fees (as such term is defined in the Services Agreement) owing by Trustee to Service Provider thereunder. The Escrow Agent shall pay Seller such damages from the escrow account specified in Section 2.5(a) and any funds remaining in the escrow account after Seller has collected such damages in full shall be then paid to Buyer. For the avoidance of doubt, notwithstanding Buyer's release of such rights to payment under the Services Agreement, Service Provider shall remain obligated to fulfill all its duties thereunder, including without limitation, indemnification of the Trustee.

(c)     In the event the parties fail to close this transaction due to a termination of this Agreement pursuant to Section 7.1(a)(i), (a)(ii), (a)(iii), (a)(v), or (a)(vii) then the Escrow Agent shall return the Escrow Amount to Buyer as promptly as possible after the termination of this Agreement in accordance with the notice and other provisions of the Escrow Agreement.

(d)     In the event the parties fail to close this transaction due to a termination of this Agreement pursuant to Section 7.1(a)(iv), then Seller shall be entitled to damages in the amount of $3,700,000.00.  The Escrow Agent shall pay Seller such damages from the escrow account specified in Section 2.5(a) and any funds remaining in the escrow account after Seller has collected such damages in full shall be then paid to Buyer, provided that in the event Seller does not collect funds from the escrow account in an amount sufficient to pay such damages in full, Buyer shall pay Seller an amount equal to any such unpaid damages.

### Section 2.6 **Payment of Purchase Price; Allocation of Purchase Price**.

(a)     At the Closing, Buyer and Seller shall deliver a joint written notice to the Escrow Agent directing the Escrow Agent to pay to Seller, by wire transfer of immediately available funds to an account or accounts designated by Seller, the Escrow Amount.

13

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 313-4  Filed  11/30/20  Page 18 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7  Filed  05/27/22  Page 19 of 59

(b)      At the Closing, Buyer shall deliver to Seller, pursuant to Section 2.4(a), the Cash Payment (plus any fees owed by Buyer to the Escrow Agent under the Escrow Agreement), less the Escrow Amount.

(c)      At the Closing, Buyer shall execute and deliver the Financing Documents as provided therein, with the proceeds delivered to the Seller payable toward the Purchase Price.

(d)      For purposes of Section 1060 of the Code, Buyer and Seller hereby allocate the Purchase Price among the Purchased Assets and Assumed Liabilities pursuant to the allocation provisions set forth on Exhibit D hereto.

Section 2.7   **Closing.** The closing of the transactions contemplated hereby (the "Closing") shall take place remotely via the exchange of documents and signatures (or such other location or teleconference as mutually agreed upon by the parties hereto) on the second Business Day after the satisfaction of all conditions in Article VI other than those that by their nature are to be satisfied by deliveries by the parties at the Closing. The actual date on which the Closing takes place is referred to herein as the "Closing Date." The Closing shall be deemed to be effective as of the Effective Time.

Section 2.8   **AS IS, WHERE IS NATURE OF SALE.** BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, SELLER, THE ESTATE AND DEBTOR MAKE NO (AND SELLER, THE ESTATE AND DEBTOR EXPRESSLY DISCLAIM AND NEGATE ANY) REPRESENTATIONS OR WARRANTIES OF ANY KIND, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER WHATSOEVER, INCLUDING WITH RESPECT TO THE SALE OF THE PURCHASED ASSETS, INCLUDING ANY EXPRESS OR IMPLIED WARRANTY UNDER SECTION 8-108 OF THE UNIFORM COMMERCIAL CODE, OR WITH RESPECT TO ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE MERCHANTABILITY, QUALITY, QUANTITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE BUSINESS, DEBTOR, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE BUSINESS, DEBTOR, THE PURCHASED ASSETS AND THE ASSUMED LIABILITIES AS BUYER HAS DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS PURCHASE OF THE PURCHASED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH HEREIN, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS, INVESTIGATIONS AND EVALUATIONS. ACCORDINGLY, SUBJECT TO THE FOREGOING AND TO BUYER'S RIGHTS UNDER THIS AGREEMENT AND SELLER'S OBLIGATIONS HEREUNDER, AND EXCEPT AS OTHERWISE PROVIDED FOR IN THIS AGREEMENT, BUYER WILL PURCHASE THE PURCHASED ASSETS AND ASSUME THE ASSUMED LIABILITIES AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS" AND WITHOUT RECOURSE AGAINST SELLER, THE ESTATE OR DEBTOR.

14

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 313-4   Filed 11/30/20   Page 19 of 58
U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-7   Filed 05/27/22   Page 20 of 59

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as otherwise disclosed to Buyer in a schedule attached hereto and made a part hereof (the "Seller Disclosure Schedule"), Seller represents and warrants to Buyer as of the date hereof and as of the Closing Date as follows:

**Section 3.1  Authority; Execution and Delivery.**  Seller is the duly appointed chapter 11 bankruptcy trustee for the Estate. Subject to approval and entry of the Sale Order by the Bankruptcy Court, Seller has the requisite power and authority to enter into the Transaction Documents and to consummate the transactions contemplated thereby. This Agreement has been, and each of the Transaction Documents shall be, duly executed and delivered by Seller. Subject to the entry and effectiveness of the Sale Order, this Agreement constitutes, and each of the Transaction Documents shall constitute, a legal, valid and binding obligation of Seller on behalf of the Estate, enforceable against Seller on behalf of the Estate in accordance with its terms and conditions, except that the enforcement hereof and thereof may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar Laws now or hereafter in effect relating to creditor's rights generally, (ii) applicable Laws governing assignment or transfer of the FCC Permit, and (iii) general principles of equity (regardless of whether enforceability is considered in a proceeding at law or in equity).

**Section 3.2  Non-Contravention; Approvals and Consents.**  The execution and delivery of the Transaction Documents and the consummation of the transactions contemplated thereby by Seller on behalf of the Estate will not conflict with, or result in any violation of, or default (with or without notice or lapse of time, or both), to the knowledge of Seller, under the provisions of any agreement entered into by the Seller.

**Section 3.3  Title to the Purchased Assets; Exclusive Ownership and Right to Use.**  At the Closing, Seller will transfer to Buyer all of the Estate's right, title and interest to the Purchased Assets and Incidental Rights, free and clear of all Claims and all Liens (other than Permitted Liens), in accordance with Section 363 and 365 of the Bankruptcy Code and as provided by the Sale Order. Except as otherwise provided by the Sale Order or as set forth in any Designated Agreement, at the Closing, Buyer will not be subject to any lease, sublease, indefeasible right of use, or right to use or occupy the Purchased Assets in favor of any third party.

**Section 3.4  No Subsidiaries.**  Debtor has no Subsidiaries.

**Section 3.5  Seller's Brokerage Agreements.**  Except as set forth on Seller Disclosure Schedule 3.5, Seller has not engaged any Person as an investment banker, broker, finder or financial advisor and who would be entitled to any fee or commission in connection with the transactions contemplated by this Agreement and no such Person is entitled to any such fee or commissions from Debtor as a result of any action taken by Seller.

**Section 3.6  Assignable Contracts, Assigned Claims, Assigned Permits and Assigned Rights.**  Other than in connection with the DIP Financing, neither Seller nor the Estate has assigned, transferred, pledged or otherwise conveyed its rights under any of the Assigned Claims,

15

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 313-4  Filed 11/30/20  Page 20 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7  Filed 05/27/22  Page 21 of 59

Assignable Contracts, Assigned Permits or Assigned Rights. Any pledge or encumbrance arising under the DIP Financing will be released at Closing.

**Section 3.7  Real Property.** Except for any portion of the Purchased Assets or Incidental Rights which may constitute Real Property as used in this Agreement, Debtor has no interest in any Real Property.

**Section 3.8  Antitrust.** Seller has determined that no premerger notifications are required under the HSR Act.

**Section 3.9  Settlement Agreement Matters.** Seller has executed and delivered to Buyer true, complete and correct copies of all of the "Definitive Documentation" (as that term is defined in the Settlement Agreement).

### ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF BUYER

Except as otherwise disclosed to Seller in a schedule attached hereto and made a part hereof (the "Buyer Disclosure Schedule"), Buyer represents and warrants to Seller as follows:

**Section 4.1  Organization and Good Standing.** Buyer is validly existing and in good standing under the Laws of the State of Delaware.

**Section 4.2  Authorization of Agreement; Execution and Delivery.** Buyer has all requisite power and authority to enter into the Transaction Documents and to consummate the transactions contemplated thereby. The execution and delivery by Buyer of the Transaction Documents and the consummation of the transactions contemplated thereby have been duly and validly authorized by all requisite action on the part of Buyer. This Agreement has been, and each of the Transaction Documents shall be, duly executed and delivered by Buyer. This Agreement constitutes, and each of the Transaction Documents shall constitute, a legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, except that the enforcement hereof and thereof may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws now or hereafter in effect relating to creditors' rights generally, (ii) applicable Laws governing assignment or transfer of the FCC Permit, and (iii) general principles of equity (regardless of whether enforceability is considered in a proceeding at law or in equity).

**Section 4.3  Non-Contravention; Approvals and Consents.** The execution and delivery of the Transaction Documents and the consummation of the transactions contemplated thereby by Buyer will not conflict with, or result in any violation of, or default (with or without notice or lapse of time, or both) under (i) any provision of the certificate of incorporation or bylaws (or any similar organizational documents) of Buyer, (ii) the provisions of any agreement to which Buyer or any of its Affiliates is a party or (iii) applicable Law. Prior to the consummation of the transactions contemplated by this Agreement, no consent, approval, order or authorization of, or registration, declaration or filing with, notice to, or permit from, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of any of the Transaction

16

Documents by Buyer or the consummation by Buyer of the transactions contemplated thereby, except for (1) the FCC Consent, and (2) the entry by the Bankruptcy Court of the Sale Order.

Section 4.4 **Financial Ability.** Buyer has sufficient funds available to pay the Cash Payment, assume and perform the Assumed Liabilities, consummate the transactions contemplated hereby and by the other Transaction Documents, and pay all fees and expenses related thereto. Other than with respect to the Financing, Buyer acknowledges that its obligations under this Agreement and the other Transaction Documents are not subject to any conditions regarding its ability to obtain financing for the transactions contemplated by this Agreement and the other Transaction Documents.

Section 4.5 **Buyer's Brokerage Agreements.** Except as set forth on Buyer Disclosure Schedule 4.5, none of Buyer or any of its Affiliates have engaged any Person as an investment banker, broker, finder or financial advisor and who would be entitled to any fee or commission in connection with the transactions contemplated by this Agreement and no such Person is entitled to any such fee or commissions from Buyer or any of its Affiliates. Buyer or its Affiliates are exclusively responsible for the full payment and satisfaction of all fees or commissions associated with any such engagement by Buyer or its Affiliates set forth on Buyer Disclosure Schedule 4.5.

Section 4.6 **No Affiliates of Debtor.** Except as set forth on Buyer Disclosure Schedule 4.6, no current or former equity holder, director or officer (or similar executive level Person) of Debtor is affiliated with Buyer in any capacity, including but not limited to, an Affiliation in a capacity such as a holder of any equity interest in Buyer (and any of Buyer's non-public Affiliates), or an officer, director, employee, consultant, agent, member, partner or other representative of Buyer or any of its Affiliates. In addition, except as set forth on Buyer Disclosure Schedule 4.6, no current or former Affiliate of Debtor possesses the authority to, in any way, exercise effective control, including voting control, over Buyer or any of its non-public Affiliates.

Section 4.7 **Adequate Assurances Regarding Assignable Contracts.** Buyer is and will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assignable Contracts.

Section 4.8 **CFIUS.** Buyer has determined that the filing of a voluntary notice or declaration with CFIUS for CFIUS Clearance is neither required nor necessary under Section 721.

Section 4.9 **Antitrust.** Buyer has determined that no premerger notifications are required under the HSR Act.

### ARTICLE V
### COVENANTS

Section 5.1 **Conduct of the Business.** During the period from the date hereof until the Closing Date, Seller covenants that (except as may be expressly permitted or required by this Agreement, consented to in writing by Buyer, which consent shall not be unreasonably withheld, conditioned or delayed, or as required by the applicable provisions of the Bankruptcy Code or any orders of the Bankruptcy Court), Seller shall cause Debtor, to (i) maintain the Business in the ordinary course consistent with prudent business practices of an owner and operator of telecommunications infrastructure assets, including but not limited to, performing manufacturer

17

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 313-4   Filed 11/30/20   Page 22 of 58
U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-7   Filed 05/27/22   Page 23 of 59

recommended maintenance activities as needed, and maintaining the North American Zone Maintenance Authority Agreement in good standing, and compliance with <u>Section 5.2</u>, (ii) not sell or dispose of any of the Purchased Assets and not create any Lien with respect to the Purchased Assets, (iii) continue all activities required pursuant to the terms of the Assigned Permits, including the payment of any fees due thereunder, (iv) not modify or amend any Assignable Contract or waive any right under any Assignable Contract, (v) pay, on a current basis, all liabilities under the Assignable Contracts, (vi) not terminate or amend any Assigned Permits, (vii) not terminate or amend any Assigned Rights, (viii) not cause to increase or accelerate any of the Assumed Liabilities, (ix) continue in force all policies of insurance on the Purchased Assets, including, for the avoidance of doubt, insurance required under the Services Agreement, and (x) not commit or agree, whether in writing or otherwise, to take any action prohibited by this <u>Section 5.1</u>. Notwithstanding the foregoing, Seller shall not be in breach of this Section 5.1 if its purported breach hereof is due to a breach by Buyer of a related obligation of Buyer under the Services Agreement.

**Section 5.2    Risk of Loss; Duty to Repair.** Seller shall bear all risk of loss with respect to the Business and the Purchased Assets prior to Closing. Seller shall be responsible for Repair Expenses and Routine Maintenance Expenses, and Buyer shall be entitled to recover any such expenses either as Cash Offset Amounts or Financing Offset Amounts in accordance with this Agreement.

### Section 5.3    No Solicitation of Other Bids.

(a)    Seller and HSBC shall not, and shall not authorize or permit any of their respective representatives to, directly or indirectly, (i) encourage, solicit, initiate, facilitate or continue inquiries regarding an Acquisition Proposal; (ii) enter into discussions or negotiations with, or provide any information to, any Person concerning a possible Acquisition Proposal; or (iii) enter into any agreements or other instruments (whether or not binding) regarding an Acquisition Proposal except in accordance with <u>Section 5.3(c)</u>. HSBC agrees that (i) it shall not assign or transfer its interest as a creditor to the Estate, or any rights in connection therewith, prior to either the Closing or termination of this Agreement, and (ii) it shall not exercise any right to credit bid in connection with the Bankruptcy Case.

(b)    Except as may be required by <u>Section 5.3(c)</u>, Seller shall immediately cease and cause to be terminated all existing discussions or negotiations with any Persons conducted heretofore with respect to, or that could lead to, an Acquisition Proposal. For purposes hereof, "<u>Acquisition Proposal</u>" shall mean any inquiry, proposal or offer from any Person (other than Buyer or any of its Affiliates) concerning the purchase of the Purchased Assets or any other matter that is within the scope of this Agreement.

(c)    In addition to the other obligations under this <u>Section 5.3</u>, Seller shall promptly (and in any event within two (2) Business Days after receipt thereof by Seller) advise Buyer orally and in writing of any Acquisition Proposal, any request for information with respect to any Acquisition Proposal, or any inquiry with respect to or which could reasonably be expected to result in an Acquisition Proposal, the material terms and conditions of such request, Acquisition Proposal or inquiry, and the identity of the Person making the same. Notwithstanding anything to the contrary in this Agreement, in the event that, prior to the Bankruptcy Court's approval of the

18

U.S. Bankruptcy Court - Hawaii  #18-91318  Dkt # 313-4  Filed  11/30/20  Page 23 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7  Filed  05/27/22  Page 24 of 59

Sale Order, Seller or HSBC receives an unsolicited bona fide written Acquisition Proposal that: (a) either (i) was not obtained or made as a direct or indirect result of a breach of (or in violation of) this Agreement or (ii) was received from a party which had previously submitted a bid to the Trustee or HSBC; and (b) is on terms and conditions that the Seller or HSBC determines in good faith and taking into account its fiduciary obligations, and following consultation with its outside legal counsel and outside financial advisors, if any, are more favorable, from a financial point of view, to the Estate, than the terms of this Agreement, and (c) provides for payment to Buyer of a fee of Three Million Seven Hundred Thousand Dollars ($3,700,000) (such proposal a "Superior Proposal"), and the Seller is required to consider such Superior Proposal in order to comply with its fiduciary obligations, Seller shall (i) within 48 hours of receipt, provide Buyer with a copy of any Superior Proposal, and (ii) shall provide Buyer with an opportunity to amend this Agreement to provide for at least equivalent financial terms to those included in the Superior Proposal. Seller and Buyer agree to negotiate in good faith in respect of any such amendment, and in the event that Buyer and Seller agree to amend this Agreement as provided above within five (5) Business Days of Buyer's receipt of the Superior Proposal, Seller shall not accept the Superior Proposal.

(d)     Notwithstanding anything to the contrary in this Section 5.3, nothing herein shall require Seller or the Estate to take any action or to refrain from taking any action in connection with this Section 5.3, to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law.

(e)     Seller agrees that the rights and remedies for noncompliance with this Section 5.3 shall include having such provision specifically enforced by the Bankruptcy Court, it being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury to Buyer and that money damages would not provide an adequate remedy to Buyer.

### Section 5.4    Pre-Closing Access.

(a)     From the date of this Agreement until the Closing Date, Seller shall use commercially reasonable efforts, to the extent permitted under applicable Law, to give to Buyer and its representatives reasonable access, during normal business hours and upon reasonable notice, to the Estate's properties, books and records relating to the Business and to the Estate's properties, books and records relating to the Purchased Assets (including the Assignable Contracts, the Assigned Rights and the Assigned Permits) and the Assumed Liabilities.

(b)     Seller shall permit Buyer to review all Assignable Contracts to facilitate Buyer's assumption of such contracts at Closing.

(c)     Without limiting the obligations under Section 5.4(e) hereof, Seller shall use commercially reasonable efforts to provide Buyer with reasonable access, during normal business hours and upon reasonable notice, to enter and inspect all physical plants, central offices, or any other facility or infrastructure used in connection with the Business.

(d)     Nothing contained in this Section 5.4 shall obligate Seller or the Estate to (i) breach any duty of confidentiality owed to any Person whether such duty arises contractually, statutorily or otherwise or (ii) waive any attorney/client, work product or similar privilege.

19

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 313-4   Filed 11/30/20   Page 24 of 58
U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-7   Filed 05/27/22   Page 25 of 59

(e)     Seller agrees to cooperate, and when applicable, coordinate with SIC, to provide Buyer with access sufficient for Buyer to perform each of its obligations under the Services Agreement from and after the entry of the Sale Order.

**Section 5.5  Notification.**

(a)     Prior to the Closing, Seller shall notify Buyer, and Buyer shall notify Seller, of any litigation, arbitration, appeal or administrative proceeding pending, or, to its Knowledge, threatened against Seller, the Estate, Debtor or Buyer, as the case may be, that challenges the transactions contemplated hereby.

(b)     Seller shall give prompt written notice to Buyer of (i) the occurrence of any event of which it becomes aware that has caused or that would be likely to cause any representation or warranty of Seller contained in this Agreement to be untrue or inaccurate in any material respect at any time from the date hereof to the Closing and (ii) the failure of Seller to comply with or satisfy in any material respect any covenant or agreement to be complied with by it hereunder.

(c)     Buyer shall give prompt written notice to Seller of (i) the occurrence of any event of which it becomes aware that has caused or that would be likely to cause any representation or warranty of Buyer contained in this Agreement to be untrue or inaccurate in any material respect at any time from the date hereof to the Closing and (ii) the failure of Buyer to comply with or satisfy in any material respect any covenant or agreement to be complied with by it hereunder.

**Section 5.6  Additional Agreements.** Subject to the terms and conditions of this Agreement, each of the parties hereto will use commercially reasonable efforts to do, or cause to be taken all action and to do, or cause to be done, all things necessary, proper or advisable under applicable Law to consummate and make effective the transactions contemplated by this Agreement, including, the fulfillment of the conditions set forth in Article VI to the extent that the fulfillment of such is within the control of such party.

**Section 5.7  Investigation and Agreement by Buyer.** Buyer acknowledges and agrees that it has made its own inquiry and investigation into, and, based thereon, has formed an independent judgment concerning the Purchased Assets, the Assumed Liabilities, the Business and operations of Debtor, the information contained in the Confidential Information Memorandum prepared by Seller and dated February 14, 2020 and other information about the business strategies of Debtor. Buyer has also conducted its own independent review of all orders of, and all motions, pleadings, and other submissions to, the Bankruptcy Court in connection with the Bankruptcy Case.

**Section 5.8  Permits or Consents of Governmental Authorities.**

(a)     Within ten (10) Business Days after the date that the Sale Order is entered by the Bankruptcy Court, the parties hereto shall prepare and file, or cause to be prepared and filed, applications seeking any applicable Permits or Consents of any Governmental Authority (including the FCC) required under Section 6.1(b). Each party shall provide the other party with all information required for any applications, notifications, or other filings to be made pursuant to any applicable Law in connection with the transaction contemplated by this Agreement. In

20

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 313-4  Filed 11/30/20  Page 25 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7  Filed 05/27/22  Page 26 of 59

addition, the parties hereto shall reasonably cooperate to make any notice filings required in connection with this matter on a timely basis.

(b)     Buyer shall bear all filing fees in connection with the preparation and prosecution of any applications, notifications or other filings related to a Permit or Consent of a Governmental Authority. Subject to the terms and conditions of this Agreement, each of the parties hereto shall use its commercially reasonable efforts to assist and cooperate with each other to prepare and prosecute any required applications, notifications or other filings related to a Permit or Consent of a Governmental Authority (including, but not limited to, the FCC) in good faith and with due diligence before the applicable Governmental Authorities and in connection therewith shall take such actions as may be reasonably necessary or reasonably required in connection with any application (or other type of filing document) to the applicable Governmental Authorities, including responding as promptly as practicable to any requests of the FCC  for information and furnishing to any applicable Governmental Authorities any documents, materials or other information requested by such Governmental Authority in order to obtain any applicable Permit or Consent of a Governmental Authority as expeditiously as practicable, provided that neither party shall have an obligation to share with the other any confidential business information including to the extent such information is requested by a Governmental Authority. In addition, to the extent practicable, the parties hereto shall use commercially reasonable efforts to (i) promptly notify each other of any communication to that party from any Governmental Authority with respect to a Permit or Consent of a Governmental Authority, (ii) permit a representative of the other party reasonably acceptable to the first party to attend and participate in meetings (telephonic or otherwise) with any Governmental Authority and (iii) permit the other party to review in advance, as reasonable, any proposed written communication to any Governmental Authority (provided that each party may designate certain information communications to the government as "Outside Counsel Only") and consider in good faith all reasonable additions, deletions or changes suggested in connection with any submissions to any Governmental Authority, provided that Buyer shall determine the timing and strategy and be solely responsible for the final content of any substantive or oral communications with any applicable Governmental Authority. No party hereto shall knowingly take, or fail to take, any action if the intent or reasonably anticipated consequence of such action or failure to act is, or would be, to cause any Governmental Authority (including, but not limited to, the FCC) not to grant a Permit or Consent or materially delay the granting of any such Permit or Consent.

(c)     In the event that CFIUS should request the filing of a notice or declaration pursuant to Section 721 for CFIUS Clearance, Buyer shall bear all costs and expenses associated with any such filings and otherwise the provision of subparagraph (b) shall apply.

(d)     In the event that a Governmental Authority should initiate an Antitrust Investigation, Buyer shall bear all costs and expenses associated with any such filings and otherwise the provision of subparagraph (b) shall apply.

**Section 5.9  Injunctions.** Prior to the Closing, if any Governmental Authority issues or otherwise promulgates any injunction, stay, decree or similar order that prohibits the consummation of any of the transactions contemplated hereby, the parties, at Buyer's sole cost and expense, shall use commercially reasonable efforts to have such injunction dissolved or otherwise

21

U.S. Bankruptcy Court - Hawaii  #18-01018  Dkt # 313-4  Filed 11/30/20  Page 26 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7  Filed 05/27/22  Page 27 of 59

eliminated as promptly as possible and, prior to or after the Closing, to pursue the underlying litigation diligently and in good faith.

Section 5.10 **Adequate Assurances Regarding Designated Contracts and Assigned Rights**. With respect to each Designated Contract and Assigned Right, to the extent required by the Bankruptcy Court, Seller or the counterparty to such Designated Contract or Assigned Right, Buyer shall provide the Bankruptcy Court, Seller or such counterparty, as the case may be, adequate assurance of the future performance of such Designated Contract or Assigned Right by Buyer. To the extent that Buyer's performance of any such Designated Contract or Assigned Right shall require the cooperation or performance of the Seller, including, without limitation, delivery of any additional instruments or filings by Seller in order to effectuate the complete assignment of any Designated Contract or Assigned Right, Seller covenants to provide such cooperation or performance; provided, however, that nothing in this Section 5.9 shall (a) require Seller or the Estate to make any expenditure or incur any obligation on its own or on Buyer's behalf (unless Buyer agrees to promptly reimburse Seller and the Estate for such expenditure or Buyer agrees to fully indemnify Seller and the Estate for such obligation) or (b) prohibit Seller or the Estate from ceasing operations or winding up its affairs following the Closing.

Section 5.11 **Cure of Defaults**. Seller shall, on or prior to the Closing, pay all Cure Costs and otherwise cure any and all defaults under the Designated Contracts that are required to be cured under the Sale Order so that such Designated Contracts may be assumed by Seller and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code.

Section 5.12 **Bankruptcy Covenants**. From and after the date hereof, Seller and/or Buyer, in each case as indicated below, covenant and agree as follows:

(a)     Seller and Buyer each shall act promptly, diligently and in good faith, and use their respective best efforts, in pursuing entry of the Sale Order, and otherwise effectuating and consummating the transactions contemplated herein, including the sale of the Purchased Assets to Buyer, under the terms and conditions of this Agreement, in each case, as soon as practicable, but in any case within the applicable timeframes contemplated by this Agreement, including promptly, diligently and in good faith, and using their respective best efforts in (i) preparing and filing appropriate supporting papers, (ii) furnishing available supporting testimony or other evidence, (iii) contesting any applicable objections, (iv) responding to any applicable discovery requests and (v) contesting any applicable appeals or related relief.

(b)     In the event an appeal is taken or a stay pending appeal is granted from the Sale Order, Seller shall immediately notify Buyer of such appeal or stay order and shall promptly provide to Buyer a copy of the related notice of appeal or order of stay. Seller shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such orders.

(c)     From and after the date hereof, Seller shall not take any action that is intended to or does result in, or fail to take any action the intent of which failure to act would or does result in, the reversal, voiding, modification or staying of the Sale Order.

22

U.S. Bankruptcy Court - Hawaii  #18-90008  Dkt # 313-4  Filed 11/30/20  Page 27 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7  Filed 05/27/22  Page 28 of 59

(d)     Seller shall: (i) file the required notice of a sale hearing with the Bankruptcy Court within one (1) day of the date of this Agreement, and (ii) request that a sale hearing occur in the Bankruptcy Court not less than twenty one (21) days of filing such notice.

**Section 5.13  Migration of Capacity; Clearance of Paniolo Network.** Upon the completion of the Network Inventory (as defined in the Service Agreement) Seller and Buyer shall, subject to and in accordance with the terms and conditions of the Services Agreement, migrate existing SIC capacity and services onto the fibers designated for SIC, and Buyer and Seller shall jointly cooperate to ensure that no third parties other than SIC, Buyer or users who have contracted for capacity pursuant to the Services Agreement are utilizing capacity or services on the Paniolo Network, which cooperation may include, without limitation, the negotiation and execution of additional Designated Contracts acceptable to Seller and Buyer.

### ARTICLE VI
### CONDITIONS TO THE CLOSING

**Section 6.1  Conditions to Obligations of Each Party.** The obligations of each party to this Agreement to effect the transactions contemplated hereby to occur on the Closing Date shall be subject to the satisfaction or, to the extent permitted by applicable Law, waiver of each of the following conditions:

(a)     No temporary restraining order, preliminary or permanent injunction, stay or other order issued by any Governmental Authority preventing the consummation of the transactions contemplated hereby to occur at the Closing Date shall be in effect, and (i) neither the Federal Trade Commission, Department of Justice, nor any state Attorney General (each an "Antitrust Agency") has opened an antitrust-related investigation, proceeding, or inquiry ("Antitrust Investigation") relating to the transactions contemplated hereby, or (ii) any Antitrust Agency that has opened any Antitrust Investigation has notified the parties that such Antitrust Investigation has been closed;

(b)     FCC Consent shall have been obtained by Buyer and Seller and shall not contain any terms, conditions, liabilities, obligations, commitments or sanctions, or any structural or remedial actions, that constitute, individually or in the aggregate, a Burdensome Condition;

(c)     In the event that the parties are required to file any notice or declaration with CFIUS pursuant to Section 5.8(c) of this Agreement, the parties shall have received CFIUS Clearance; and

(d)     The Bankruptcy Court shall have approved this Agreement and the transactions contemplated hereby by entry of the Sale Order and the Sale Order shall have become a Final Order.

**Section 6.2  Conditions to Obligation of Buyer.** The obligation of Buyer to effect the transactions contemplated hereby to occur at the Closing Date and to fund on the Closing Date shall be subject to the satisfaction or, to the extent permitted by applicable Law, waiver of each of the following conditions:

23

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 313-4   Filed 11/30/20   Page 28 of 58
U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-7   Filed 05/27/22   Page 29 of 59

(a)   Each of the representations and warranties of Seller set forth in this Agreement shall be true and correct in all material respects on the Closing Date as though made on and as of the Closing Date, and Buyer shall have received a certificate signed by Seller to such effect;

(b)   Seller shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing Date, and Buyer shall have received a certificate signed by the Seller to such effect;

(c)   Seller shall have paid all Cure Costs and cured any defaults under the Designated Contracts;

(d)   Intentionally omitted;

(e)   Seller shall have delivered all entitlement documents and as-built drawings which are in Seller's possession;

(f)   The Designated Contracts and FCC Permit shall be in full force and effect with no defaults thereunder and shall not be subject to any further appeal by or before any Governmental Authority;

(g)   Seller shall have delivered to Buyer the Closing Documents referred to in <u>Section 2.3</u>; and

(h)   Since the date of this Agreement, there shall not have occurred a Material Adverse Effect.

**Section 6.3 <u>Conditions to Obligation of Seller</u>.** The obligation of Seller to effect the transactions contemplated hereby to occur at the Closing Date shall be subject to the satisfaction or, to the extent permitted by applicable Law, waiver of each of the following conditions:

(a)   Each of the representations and warranties of Buyer set forth in this Agreement shall be true and correct in all material respects on the Closing Date as though made on and as of the Closing Date, and Seller shall have received a certificate signed on behalf of Buyer by an officer of Buyer to such effect;

(b)   Buyer shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing Date, and Seller shall have received a certificate signed on behalf of Buyer by an officer of Buyer to such effect;

(c)   Buyer shall have delivered to Seller the Closing Documents referred to in <u>Section 2.4</u>;

(d)   Buyer shall have delivered the Cash Payment (plus any fees owed by Buyer to the Escrow Agent under the Escrow Agreement) less the Escrow Amount; and

(e)   Buyer shall have delivered its written notice to the Escrow Agent, pursuant to <u>Section 2.6(a)</u>, directing the Escrow Agent to deliver to Seller the Escrow Amount and the Escrow Agent shall have delivered the Escrow Amount to Seller.

24

**ARTICLE VII**
**TERMINATION**

**Section 7.1  Termination.**

(a)      This Agreement may be terminated at any time prior to the Closing:

(i)      by mutual consent of Buyer and Seller:

(ii)      by either Buyer or Seller if the Bankruptcy Court has not entered the Sale Order within thirty (30) days of the Execution Date; provided, however, that this right to terminate this Agreement shall not be available to a party whose breach of this Agreement has been the cause of, or resulted in, the Sale Order not being entered or before such date;

(iii)      by either Buyer or Seller if the Closing shall not have occurred within two hundred ten (210) days of the FCC issuing public notice of this Agreement and the transactions contemplated herein and hereby (the "Outside Date"); provided, however, that this right to terminate this Agreement shall not be available to a party whose breach of this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before the Outside Date;

(iv)      by either Buyer or Seller if a Governmental Authority shall have issued an order, decree, or ruling or taken any other action, in each case permanently restraining, enjoining, or otherwise prohibiting the transactions contemplated by this Agreement, and such order, decree, ruling, or other action shall have become a Final Order;

(v)      by Buyer, if it is not then in material breach of this Agreement, if Seller has breached or failed to perform any of its representations, warranties, covenants or agreements contained in this Agreement, which breach or failure to perform (i) would cause one or more of the conditions set forth in Section 6.2 not to be satisfied and (ii) cannot be cured or, if curable, is not cured within thirty (30) days, or two days prior to the Outside Date, whichever is earlier, after written notice of such breach or failure to perform is given to Seller by Buyer; and

(vi)      by Seller, if Seller is not then in material breach of this Agreement, if Buyer has breached or failed to perform any of its representations, warranties, covenants or agreements contained in this Agreement, which breach or failure to perform (i) would cause one or more of the conditions set forth in Section 6.3 not to be satisfied and (ii) cannot be cured or, if curable, is not cured within thirty (30) days, or two days prior to the Outside Date, whichever is earlier, after written notice of such breach or failure to perform is given to Buyer by Seller; and

(vii)      by Buyer, in the event of a Material Adverse Effect.

(b)      Notwithstanding the provisions of paragraph (a), if any of the conditions to Buyer's obligation to close are not satisfied, Buyer has the right to waive the unsatisfied conditions and proceed with the Closing, without prejudice to any rights Buyer may have with respect to any breach of representation, warranty or covenant by Seller.

25

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 313-4   Filed 11/30/20   Page 30 of 58
U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-7   Filed 05/27/22   Page 31 of 59

Section 7.2 **Effect of Termination**. Upon termination of this Agreement pursuant to Section 7.1, the undertakings of the parties set forth herein shall forthwith be of no further force and effect; provided, however, that this Section 7.2 and Sections 9.2 (Public Announcements), 9.4 (Expenses), 9.5 (Notices), 9.6 (Confidentiality), 9.7 (Entire Agreement; Amendment; Waiver), 9.8 (Severability), 9.9 (Successors and Assigns; Third Party Beneficiaries), 9.10 (Governing Law), 9.11 (Captions), 9.15 (No Director or Affiliate Liability), and 9.16 (No Personal Liability), and the obligations thereunder and the rights and remedies for any breaches of this Agreement occurring prior to such termination, in each case, shall survive any such termination. In the event of termination, all amounts owed to Buyer under the Services Agreement or this Agreement shall be paid by Seller, and Seller shall agree to Buyer's request to the Bankruptcy Court for an administrative claim under the Bankruptcy Code with respect to such amounts.

Section 7.3 **Survival**. The representations and warranties of Seller and Buyer set forth in this Agreement, the other Transaction Documents, and any certificate delivered in connection with this Agreement or any of the other Transaction Documents shall not survive the Closing. The covenants and other agreements of Seller and Buyer set forth in this Agreement and in the other Transaction Documents shall survive the Closing until fully performed.

**ARTICLE VIII**
**OFFSET AMOUNTS**

Section 8.1 **Costs Relating to the Purchased Assets**. Subject to the terms, conditions and limitations of this Article VIII, Buyer shall be able to include in the Offset Amounts any costs arising from or in connection with its performance of the Services Agreement or items for which Seller is responsible hereunder or under the Services Agreement (such costs, or cost estimates for such items are collectively referred to herein as the "Offset Costs").

Section 8.2 **Limitations**. Notwithstanding anything to the contrary set forth in this Agreement, Buyer's sole recourse with respect to any Offset Costs shall be to offset such costs against the Purchase Price in accordance with Section 2.2, provided that in the event this Agreement is terminated in accordance with Article VII hereof, Seller shall promptly reimburse such Offset Costs actually paid by Buyer, or the parties shall instruct the Escrow Agent to distribute such amount to Buyer from portion of the Escrow Amount that would otherwise be retained by Seller under Section 2.5.

Section 8.3 **Claim Procedures**. Buyer shall promptly provide written notice of any Offset Claim upon discovery of any matter for which it is entitled to payment hereunder, with such notice to contain the information set forth in the following sentence. The Offset Claim shall specify in reasonable detail the amount of the Offset Costs, if known, and contain a reference to this Article VIII. Failure to provide an Offset Claim shall not release the Seller from any obligations hereunder except to the extent Seller is materially prejudiced by such failure and shall not relieve Seller from obligations under this Article VIII. If the Seller does not notify the Buyer that it disputes such claim within fifteen (15) days following receipt of the Offset Claim, the claim specified therein shall be deemed an obligation of the Seller hereunder (subject to the limitations set forth in this Article VIII, as applicable). Buyer will reasonably cooperate and assist the Seller in determining the validity of any claim for payment by the Buyer and in otherwise resolving such matters. Such assistance and cooperation will include providing reasonable access, during normal business hours

and upon reasonable advance notice, to and copies of information, records and documents relating to such matters, providing access, during normal business hours and upon reasonable advance notice, to employees to assist in the investigation, defense and resolution of such matters.

## ARTICLE IX
## MISCELLANEOUS

**Section 9.1  Post-Closing Access.** Buyer shall preserve the financial records and other books and records, if any, relating to the Purchased Assets and Assumed Liabilities for a period of three years from the Closing Date. During such three-year period (as may be extended), Buyer shall keep such financial records and other books and records reasonably accessible and not destroy or dispose of such materials without the prior written consent of Debtor, and will permit Seller, Debtor and their respective authorized representatives reasonable access thereto, including making any copies at the Estate's expense. Such records may be sought under this Section 9.1 for any reasonable purpose, including, without limitation, to the extent reasonably required in connection with the administration of the Bankruptcy Case or the audit, accounting, tax, litigation, United States federal or securities disclosure under other applicable Law or other similar needs of Seller, the Estate or Debtor. In the event that any Tax Return becomes the subject of any audit or investigation, Buyer shall provide access to such financial data and other books and records as may be necessary to enable Seller, the Estate or Debtor to defend any such audit or investigation. The access shall be pursuant to this Section 9.1 and shall include access to any computerized information systems that contain the books and records referred hereto. Seller and Debtor shall promptly reimburse, or cause the Estate to reimburse, Buyer for Buyer's reasonable out-of-pocket expenses associated with requests made by Seller or Debtor under this Section 9.1, but no other charges shall be payable by Seller, the Estate or Debtor to Buyer in connection with such requests.

**Section 9.2  Public Announcements.** Prior to the entry of the Sale Order by the Bankruptcy Court, neither party will issue any press release or other public announcement with respect to this Agreement or the transactions contemplated hereby without the prior written approval of the other party, except as may be required by such party or its Affiliate under applicable Law or stock exchange rules or Regulations or as may be mutually agreed in advance in writing.

**Section 9.3  Further Assurances.** From and after the date of this Agreement, each party shall execute and deliver such instruments, documents, or other writings as the other party may reasonably request in order to confirm and carry out and to effectuate fully the intent and purposes of this Agreement. For the avoidance of doubt, if, notwithstanding any of the provisions of this Agreement or the Sale Order, Buyer is unable to use or enjoy any rights incidental to the ownership of the Purchased Assets, including the Incidental Rights, the parties shall cooperate, as may be required following the closing of the Estate and the Bankruptcy Case, to ensure that Buyer shall be able to enjoy such rights.

**Section 9.4  Expenses.** Except as otherwise expressly provided in this Agreement, all costs and expenses incurred by the parties hereto in connection with the consummation of the transactions contemplated hereby shall be borne solely and entirely by the party that has incurred such expenses. In the event of a dispute between or among the parties in connection with this Agreement and the transactions contemplated hereby, each of the parties hereto hereby agrees that

27

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 313-4  Filed  11/30/20  Page 32 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7  Filed  05/27/22  Page 33 of 59

the prevailing party shall be entitled to reimbursement by the other party or parties of reasonable expenses, including legal expenses, incurred in connection with any related action or proceeding. For the avoidance of doubt, any cost and expense associated with any filing required to provide public notice of the release of Liens with respect to Debtor shall be borne by the Seller.

### Section 9.5 Notices.

(a)     All notices, requests, consents, waivers and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been given (i) if transmitted by facsimile, upon written confirmation of delivery, (ii) if personally delivered, upon delivery or refusal of delivery, (iii) if mailed by registered or certified United States mail, return receipt requested, postage prepaid, upon delivery or refusal of delivery, or (iv) if sent by an overnight delivery service nationally recognized in the United States, upon delivery or refusal of delivery. All notices, consents, waivers or other communications required or permitted to be given hereunder shall be addressed to the respective party to whom such notice, consent, waiver or other communication relates at the following addresses:

Notices to Seller:

Michael Katzenstein, Trustee,
Bankruptcy Estate of Paniolo Cable Company,
LLC c/o FTI Consulting, Inc.
Three Times Square, 9th Floor
New York, New York 10036
Fax: (212) 841-9350

with a copy to:

Goodsill Anderson Quinn & Stifel LLP
999 Bishop Street, Suite 1600
Honolulu, Hawaii 96813
Attention: Jonathan C. Bolton
Fax: (808) 547-5880

Notices to Buyer:

Hawaiian Telcom
c/o Cincinnati Bell Inc.
221 E. Fourth Street
Attention: Mark Fahner
Fax: (513) 721-7358

with copies to:

Hawaiian Telcom
c/o Cincinnati Bell Inc.
221 E. Fourth Street

Attention:  Christopher J. Wilson, General Counsel
Fax: (513) 721-7358

and

Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Attention:  Andrew M. Ray, Esq.
Fax: (202) 373-6001

(b)     Either party may at any time change its address for notice from time to time by giving notice to the other party in accordance with this Section 9.5.

**Section 9.6  Confidentiality.** Buyer and Seller each hereby affirms its respective obligations under the non-disclosure agreement, dated September 27, 2019, by and between Cincinnati Bell Inc. and Ducera Partners LLC and its affiliates in its capacity as an advisor to the Seller regarding the confidentiality of all information designated as such therein.

**Section 9.7  Entire Agreement; Amendment; Waiver.** This Agreement and the Exhibits and Schedules attached hereto constitute the entire understanding among the parties with respect to the subject matter hereof and supersede all other understandings and negotiations with respect thereto. This Agreement may be amended only in a writing signed by Seller and Buyer.  Any provision of this Agreement may be waived only in a writing signed by the party to be charged with such waiver. No course of dealing among the parties shall be effective to amend or waive any provision of this Agreement.

**Section 9.8  Severability.** If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced under applicable Law, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated herein are not affected in any manner adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated herein are consummated as originally contemplated to the fullest extent possible.

**Section 9.9  Successors and Assigns; Third Party Beneficiaries.** Nothing expressed or referred to in this Agreement is intended to or shall be construed to give or to confer upon any Person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its terms and provisions are for the sole and exclusive benefit of the parties to this Agreement and their permitted successors and assigns.  For the avoidance of doubt, notwithstanding the foregoing, the parties hereto agree and acknowledge that Sections 9.15 and 9.16 are intended to benefit such Persons that are set forth and are the subject of such Sections and, accordingly, such Persons shall be third party beneficiaries of this Agreement. In addition, the Persons that are set forth and are the subject of Sections 9.15 and 9.16 shall be entitled to enforce such Sections and pursue any

legal or equitable right, remedy, or claim under or with respect to such Sections in the event of a breach of such Sections by any party hereto.

Section 9.10  **Governing Law.**

(a)      This Agreement shall be construed in accordance with and governed by the internal laws of the State of New York (without reference to its rules as to conflicts of law). For so long as Debtor is subject to the jurisdiction of the Bankruptcy Court, all parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, including matters arising in connection with the Assignable Contracts, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After Debtor is no longer subject to the jurisdiction of the Bankruptcy Court, the parties hereto hereby irrevocably submit to the non-exclusive jurisdiction of any federal court sitting in the State of New York with respect to any action or proceeding arising out of or relating to this Agreement.

(b)      Each of the parties hereby waives trial by jury in any claim, action, suit, arbitration, inquiry, proceeding or investigation to which such party is a party involving, directly or indirectly, any matter in any way arising out of, related to or in connection with the transactions contemplated in this Agreement.

Section 9.11  **Captions**. The captions in this Agreement are for purposes of reference only and shall not limit or otherwise affect the interpretation hereof.

Section 9.12  **Counterparts.** This Agreement may be executed in one or more counterparts, each of which will be deemed an original and all of which together will constitute one and the same instrument. Counterparts may be delivered via electronic mail (including pdf, facsimile transmission or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

Section 9.13  **Enforcement of Agreement.** Subject to the restrictions contained herein, the parties hereto agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with its specific terms or was otherwise breached. It is accordingly agreed that the parties shall be entitled to injunctive relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof (i) during the Bankruptcy Case, in the sole and exclusive jurisdiction of the Bankruptcy Court and (ii) upon the closing, dismissal or conversion of the Bankruptcy Case, in any state or federal court in the State of New York, this being in addition to any other remedy to which they are entitled at law or in equity.

Section 9.14  **Time of Essence; Specified Dates.** Time is of the essence for this Agreement and in the performance of the obligations and covenants to be performed or satisfied by the parties. Wherever a date specified in this Agreement falls on a day other than a Business Day, the date shall be extended to the next succeeding Business Day.

Section 9.15  **No Director or Affiliate Liability.** Except with respect to obligations of Seller provided in this Agreement or any of the Transaction Documents, neither any direct or

30

indirect holder of equity interests in Debtor, nor any past, present or future director, officer, employee, agent or Affiliate of Debtor or of any such holder, shall have any liability or obligation of any nature whatsoever in connection with or under this Agreement or any of the Transaction Documents, and Buyer hereby waives and releases all claims of any such liability or obligation.

Section 9.16 **No Personal Liability**. Notwithstanding anything in this Agreement or any other Transaction Document to the contrary, Buyer acknowledges and agrees that (i) Seller is acting hereunder solely in his capacity as the Bankruptcy Court appointed chapter 11 trustee of the Estate in the Bankruptcy Case and that Seller shall not have any personal liability to Buyer and Buyer shall not have any recourse against Seller, in his individual capacity; and (ii) the Buyer's sole recourse (if any) shall be against the Estate.

Section 9.17 **No Successor Liability**. Except where expressly prohibited under law or otherwise expressly ordered by the Bankruptcy Court, upon the Closing, to the fullest extent permitted by Law, Buyer shall not be deemed to (a) be the successor of the Seller, (b) have, de facto or otherwise, merged with or into the Seller, (c) be a mere continuation or substantial continuation of the Seller or the enterprise(s) of the Seller, or (d) be liable for any acts or omissions of the Seller other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, Buyer shall not be liable for any claims against the Seller or any of its predecessors or Affiliates, and except as provided in the Agreement, Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business or any obligations of the Seller arising on or prior to the Closing Date, including liabilities on account of any Taxes arising, accruing or payable under, out of, in connection with or in any way relating to the operation of the Business on or prior to the Closing Date.

[SIGNATURE PAGE FOLLOWS]

31

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 313-4   Filed 11/30/20   Page 36 of 58
U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-7   Filed 05/27/22   Page 37 of 59

IN WITNESS WHEREOF, the duly authorized officer of each party has executed this Agreement as an instrument under seal effective as of the date first set forth above.

**SELLER:**

_____

**MICHAEL KATZENSTEIN**, solely in his capacity as chapter 11 trustee of the bankruptcy estate of Paniolo Cable Company, LLC

**BUYER:**

**HAWAIIAN TELCOM, INC.**

By:_____

Name: Leigh Fox

Title:   Chief Executive Officer

IN WITNESS WHEREOF, the duly authorized officer of each party has executed this Agreement as an instrument under seal effective as of the date first set forth above.

**SELLER:**

MICHAEL KATZENSTEIN, solely in his capacity as chapter 11 trustee of the bankruptcy estate of Paniolo Cable Company, LLC

**BUYER:**

**HAWAIIAN TELCOM, INC.**

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be signed in its corporate name by its duly authorized officer, all as of the date first above written, solely to acknowledge its obligations pursuant to Section 5.3(a) of this Agreement.

**HSBC SECURITIES (USA), INC.**

By:     /s/ Thomas Curran

Name:  Thomas Curran

Title:   Managing Director

# EXHIBIT "H"

**EXECUTION VERSION**

## OPERATIONAL SUPPORT AND SALES SERVICES AGREEMENT

This Operational Support and Sales Services Agreement (this "Agreement") is entered into as of November 30, 2020, but effective only as of the Effective Date (as defined below), by and between Michael Katzenstein, Chapter 11 Trustee for the Bankruptcy Estate of Paniolo Cable Company, LLC, a Delaware limited liability company ("Trustee") and Hawaiian Telcom, Inc., a Hawaii corporation ("HT" or "Service Provider"). The Trustee and HT are each referred to as a "Party" and are collectively referred to as the "Parties".

### RECITALS:

A.    WHEREAS, the Parties have entered into that certain Asset Purchase Agreement dated November 30, 2020 ("APA") pursuant to which the Trustee will sell to HT, and HT will buy from the Trustee, the Purchased Assets as defined in the APA (referred to herein as "the Paniolo Network") that are currently owned by Paniolo Cable Company, LLC ("Debtor"), which transaction ("Proposed Transaction") requires the prior consent of the Federal Communications Commission ("FCC Consent");

B.    WHEREAS, Service Provider is a provider of telecommunications services, with experience in operating and maintaining telecommunications networks, including submarine cables;

C.    WHEREAS, prior to receiving FCC Consent, the Trustee wishes to secure from Service Provider, and Service Provider wishes to provide to the Trustee, certain operational support and sales services in connection with the Trustee's operation of the Paniolo Network;

NOW THEREFORE, in consideration of the mutual promises set forth below and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

### ARTICLE 1
### DEFINITIONS

1.1.    "Affiliate" means any entity that now or in the future, directly or indirectly controls, is controlled with or by, or is under common control with a Party. For purposes of the foregoing, "control" means the ownership, directly or indirectly, of fifty percent (50%) or more of the voting power to elect directors (or the equivalent thereof, *i.e.*, limited liability company members or managers) of such entity, or such lesser percentage interest if coupled with the power to direct the management of such entity.

1.2.    "Agreement" is defined in the Preamble.

1.3.    "APA" is defined in Recital A.

1.4.    "Bankruptcy Event" means any proceeding (other than the Paniolo Bankruptcy Proceeding) instituted by a Party voluntarily or involuntarily commenced against any Party (and such proceeding is not dismissed or permanently stayed within thirty (30) days): (a) seeking an

order for relief with respect to such Party under any bankruptcy, insolvency, reorganizations or similar law, including the Bankruptcy Code; (b) seeking to appoint a receiver, trustee, custodian, or other similar official for such Party or for any or all of a Party's assets or property; or (c) making an assignment for the benefit of that Party's creditors.

1.5.  "Business Day" means any official working day other than a legal or bank holiday in the State of New York.  Unless otherwise specifically indicated as a "Business Day" the word "days" as used in this Agreement means calendar days.

1.6.  "Capacity" means a designated unit of available network bandwidth including, but not limited to, TDM, Ethernet or optical networking services that the Paniolo Network equipment is capable of providing without incremental capital investment, between Demarcation Points within the Paniolo Network.

1.7.  "Capacity Contracts" means agreements for the provision of Capacity and related services pursuant to terms and conditions agreed to between the Service Provider and a Customer and approved by the Trustee.  For the avoidance of doubt, the Trustee is expressly prohibited from entering into any Capacity Contracts without the prior approval of the Service Provider.

1.8.  "Claims" is defined in Section 6.2.

1.9.  "Confidential Information" means information disclosed by one Party to the other Party under this Agreement that is marked as confidential or would normally under the circumstances be considered the confidential information of the disclosing Party.  Confidential Information does not include information that the recipient already knew, that becomes public through no fault of the recipient, that was independently developed by the recipient, or that was rightfully given to the recipient by another Party.

1.10.  "Customer" means a potential customer that is introduced by Service Provider or Service Provider Affiliate to Trustee and that enters a Capacity Contract with Trustee for Capacity on the Paniolo Network.

1.11.  "Debtor" is defined in Recital A.

1.12.  "Default" is defined in Section 10.

1.13.  "Effective Date" means the latter of:  (a) the date on which this Agreement is fully executed; and (b) the date on which it is approved by the Presiding Judge in the Paniolo Bankruptcy Proceeding.

1.14.  "FCC Consent" is defined in Recital A.

1.15.  "Fiber Strand" means a single strand of fiber on the Paniolo Network.

1.16.  "Force Majeure Event" is defined in Article 11.

1.17.  "HT" is defined in the preamble and includes its successors and permitted assigns.

1.18.   "Indemnified Parties" is defined in Section 6.1.

1.19.   "Indemnifying Party" is defined in Section 6.1.

1.20.   "Intellectual Property" means any and all intellectual property (and rights thereto, whether registered or unregistered) and including, technology, patents, rights to inventions, trademarks, service marks, registered designs, copyrights and related rights, database rights, design rights, domain names, trade dress and other intellectual property, and all registrations, applications for registrations, continuations, continuations-in-part, divisional applications, renewals or extensions of, and rights to claim priority from, those rights, and any similar right recognized from time to time in any jurisdiction, together with all rights of action in relation to the infringement of any of the above.

1.21.   "Law" means any national, regional, state or local law, statute, rule, regulation, code, ordinance, administrative ruling, judgment, decree, order or directive of any jurisdiction applicable to this Agreement.

1.22.   "Leased SIC Fiber" means the Paniolo Network Fiber Pairs, leased to SIC by Paniolo pursuant to Section 3.1 and Schedule 1 of the Master Relationship Agreement (as defined below).

1.23.   "Master Relationship Agreement" means that certain Master Relationship Agreement, dated as of March 6, 2020, by and between Sandwich Isles Communications and Debtor.

1.24.   "Network Inventory" is defined in Section 3.5.

1.25.   "Network Inventory Cap" is defined in Schedule B.

1.26.   "Network Inventory Fees" means the fees payable to Service Provider for provision of the Network Inventory as set forth in Section D of Schedule A attached hereto, excluding Service Provider Expenses.

1.27.   "Network Migration Cap" is defined in Schedule B.

1.28.   "Network Migrations Fees" means the fees payable to Service Provider for the provision of Network Migration Services as set forth in Section B of Schedule A attached hereto, excluding Service Provider Expenses.

1.29.   "Network Migration Services" is defined in Section 3.6.

1.30.   "Network Operations Support Fees" means the fees payable to Service Provider for provision of the Network Operations Support Services as set forth in Section A of Schedule A attached hereto, excluding Service Provider Expenses.

1.31.   "Network Operations Support Services" is defined in Section 3.1.

1.32.   "NOC" is defined in Section 3.1.

3

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 313-4   Filed 11/30/20   Page 43 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7   Filed 05/27/22   Page 44 of 59

1.33.   "North American Zone Maintenance Authority Agreement" or "NAZ Agreement" means that certain multi-party agreement entered into by Sandwich Isles Communications on April 1, 2012, as amended on January 1, 2019, and subsequently assumed by the Trustee.

1.34.   "On-site Technical Support Fees" means the fees payable to Service Provider for provision of the Network Operations Support Services as set forth in Section B of Schedule A attached hereto, excluding Service Provider Expenses.

1.35.   "On-site Technical Support Services" is defined in Section 3.2.

1.36.   "On-site Technical Support Services Cap" is defined in Schedule B.

1.37.   "Paniolo Bankruptcy Proceeding" means *In re Paniolo Cable Company, LLC*, Debtor, Case No. 18-01319 in the United States Bankruptcy Court for the District of Hawaii.

1.38.   "Paniolo Network" is defined in Recital A.

1.39.   "Party" refers to each of the Trustee and Service Provider, and their respective permitted successors and assigns.

1.40.   "Pre-existing Infrastructure Repair" is defined in Section 3.2(b).

1.41.   "Pre-existing Infrastructure Repair Estimate" is defined in Section 3.2(b).

1.42.   "Pre-existing Infrastructure Repair Cap" is defined in Section 3.2(b).

1.43.   "Proposed Transaction" is defined in Recital A.

1.44.   "Sales Agent Services" is defined in Section 3.4.

1.45.   "Sales Agent Fees" means the fees payable to Service Provider for the provision of Sales Agent Services as set forth in Section E of Schedule A attached hereto.

1.46.   "Sandwich Isles Communications" means Sandwich Isles Communications, Inc., a Hawaii corporation, and its successors and permitted assigns.

1.47.   "Service Provider Expenses" means all of Service Provider's non-labor expenses, such as vehicle costs, tools, business insurance, and other expenses.

1.48.   "Settlement Agreement" means that certain Rule 9019 Settlement Agreement entered into by SIC and Debtor on March 3, 2020.

1.49.   "SIC" mean Sandwich Isles Communications and its Affiliates.

1.50.   "Submarine Cable" mean the fiber-optic cable extending underwater between the beach manholes for those cable segments connecting Kauai to Oahu, Oahu to Molokai, Molokai to Maui, and Maui to Hawaii.

4

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 313-4   Filed 11/30/20   Page 44 of 58
U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-7   Filed 05/27/22   Page 45 of 59

1.51.   "Submarine Cable Repair Expenses" mean the expenses payable to third-parties to repair the Submarine Cable pursuant to Sections 3.3 and Schedule A.

1.52.   "Submarine Cable Storage Agreement" means that certain Agreement for the Storage of Spare Plant for the Paniolo Cable System, dated October 22, 2008, by and between Transoceanic Cable Ship Company, Inc. and its successors and assigns, and Sandwich Isles Communications.

1.53.   "Submarine Cable Support Services" is defined in Section 3.3.

1.54.   "Submarine Cable Support Fees" means the fees payable to Service Provider for the provision of Submarine Cable Support Services as set forth in Section C of Schedule A attached hereto, excluding Service Provider Expenses.

1.55.   "Taxes" means any and all applicable federal, state, local, and foreign sales, use, excise, utility, gross receipts, value added, and other taxes, tax-like charges and other assessments and surcharges imposed on a Party.

1.56.   "Term" is defined in Section 2.1.

1.57.   "Transport Services" means DS1, DS3, OC3, OC12, and OC48 circuits provided to Sandwich Isles Communications in connection with the Leased SIC Fiber, pursuant to Section 3.1 of the Master Relationship Agreement.

1.58.   "Trustee" is defined in the Preamble.

## ARTICLE 2
## TERM

2.1.   Term.   This Agreement is effective as of the Effective Date and shall remain in force until terminated pursuant to Section 2.2 ("Term").

2.2.   Termination.   This Agreement may be terminated by either Party upon the Default of the other Party and will terminate automatically (a) upon the closing of the Proposed Transaction or (b) upon termination pursuant to Section 7.1 of the Asset Purchase Agreement.

2.3.   Effect of Termination.   Termination of this Agreement shall not affect the rights or obligations of either Party that have accrued before the date of termination or expiration, and all terms that by their nature should survive expiration or termination of this Agreement shall remain in effect.

## ARTICLE 3
## OPERATIONAL SUPPORT AND SALES SERVICES

3.1.   Network Operations Support Services.

(a)   Subject to the terms, conditions, and restrictions of this Agreement, Service Provider shall provide operational support services, including network operational center ("NOC")

5

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 313-4  Filed 11/30/20  Page 45 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7  Filed 05/27/22  Page 46 of 59

services, network monitoring and management services, provisioning and configuration services, facility security services, and customer support services, as detailed on Schedule A ("Network Operations Support Services"). Service Provider may provide such Network Operations Support Services through Affiliates or third-party subcontractors; provided, however that Service Provider shall remain responsible for performance hereunder.

(b)   The Trustee shall use commercially reasonable efforts to provide Service Provider with electronic and physical access to the Paniolo Network facilities and equipment from the parties who are currently managing the Paniolo Network, including but not limited to, consultants to the Trustee and SIC, as well as all physical plants, central offices, or any other facility or infrastructure used in connection with the Paniolo Network (which shall include enforcing the provisions of the Settlement Agreement).

3.2.   On-site Technical Support Services. Subject to the terms, conditions, and restrictions of this Agreement, Service Provider shall provide routine on-site technical support services requiring and involving the dispatch of a qualified technician, including site access and escort services, network equipment troubleshooting services, and fiber splicing and repair services, and other routine maintenance as necessary and as detailed in Schedule A ("On-site Technical Support Services"). Service Provider may provide such On-site Technical Support Services through Affiliates or third-party subcontractors; provided, however that Service Provider shall remain responsible for performance hereunder.

3.3.   Submarine Cable Support Services. Subject to the terms, conditions, and restrictions of this Agreement, Service Provider shall provide submarine cable support services as necessary and detailed in Schedule A, including the coordination and facilitation of any required submarine cable repairs using the NAZ Agreement and the inventory of spare cable held under the Submarine Cable Storage Agreement ("Submarine Cable Support Services"). For the avoidance of doubt, the Trustee shall be responsible for all Submarine Cable Repair Expenses, including any and all repairs arising out of pre-existing conditions of the Submarine Cable(s), as outlined under Article V of the APA.

3.4.   Sales Agent Services. Subject to the terms, conditions, and restrictions of this Agreement, and as set forth in Schedule A, Service Provider is authorized to market Capacity on Trustee's behalf through such reasonable means, as appropriate, including advertising, participation in trade shows, and responses to inquiries ("Sales Agent Services"). Service Provider shall have the right to designate any agreement signed by Trustee as an Assigned Contract under Section 2.1(d)(iv) of the APA.

3.5.   Network Inventory. Subject to the terms, conditions, and restrictions of this Agreement and the scope and responsibilities as set forth in Schedule A, the Service Provider shall document the utilization of Paniolo Network fiber and conduits and prepare an inventory of provisioned circuits in use on the Paniolo Network ("Network Inventory"). The Parties agree that an accurate Network Inventory is required to provide the Network Operations Support Services, Submarine Cable Support Services, On-site Technical Support Services, and Sales Agent Support Services. The Parties further acknowledge and agree that the Network Inventory is necessary for the timely and proper grooming and migration of SIC's consumption of network assets to align with the Settlement Agreement and Master Relationship Agreement between the Trustee and SIC.

6

Trustee shall use commercially reasonable efforts (which shall include enforcing the terms of the Settlement Agreement) in support of Service Provider's preparation of the Network Inventory.

    3.6.    <u>Network Migration Services.</u>

    (a)    Subject to the terms, conditions, and restrictions of this Agreement, and using information provided by the Trustee and the Network Inventory prepared by the Service Provider under this Agreement, the Service Provider shall perform the migration of existing Fiber Strands and network circuits consumed by SIC onto the Leased SIC Fiber and Transport Services in connection with the SIC Fiber in accordance with the provisions of the Settlement Agreement and Master Relationship Agreement. The Service Provider will develop a network plan, engineering designs, applicable work orders, circuit designs, network inventory, and implementation plan or method of procedure, to complete the migration. Work shall be performed in accordance with industry best practices in maintenance windows coordinated by the Service Provider, acting on behalf of the Trustee. In the event SIC does not have the equipment necessary to interface with the Leased SIC Fiber and related Transport Services, Service Provider and Trustee shall cooperate to determine an appropriate migration scope to achieve the necessary interface, prior to the closing of the Proposed Transaction.

    (b)    Network Migration Services Fees shall be billed to the Trustee on a time and material basis using the labor rates set forth on Schedule A, and payable as set forth in Schedule B hereof.

    3.7.    <u>Assigned Claims.</u> Pursuant to the Asset Purchase Agreement, Trustee agreed to assign to Buyer all Assigned Claims (as defined in the Asset Purchase Agreement). During the term hereof, Service Provider shall have the right, on behalf of Trustee, to pursue such Assigned Claims, and Trustee shall reasonably cooperate with Service Provider in Service Provider's pursuit of such Assigned Claims.

    3.8.    <u>Communications.</u>    Service Provider shall ensure that all communications to Customers, including marketing and sales materials or statements, clearly identify Trustee as the provider of Capacity. No Customer communication shall state or imply that Service Provider owns or controls the Paniolo Network.

    3.9.    <u>Other Services.</u> Service Provider will provide other services requested by Trustee from time to time as agreed upon by the Parties.

    3.10.    <u>Performance Standard.</u> In addition to any specific performance standards set forth in Schedule A, Service Provider shall perform all Services in a professional manner consistent with industry standards and best practices.

    3.11.    <u>Service Provider Expenses.</u> Service Provider is solely responsible for all Service Provider Expenses.

    3.12.    <u>Facilities and Personnel.</u> Services Provider represents that it has and shall maintain adequate facilities, resources, and personnel to perform its obligations hereunder.

7

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 313-4   Filed 11/30/20   Page 47 of 58
U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-7   Filed 05/27/22   Page 48 of 59

3.13.   Records. Service Provider shall keep reasonable books and records of all Services provided under this Agreement and shall make such books and records available to Trustee upon reasonable notice and during normal business hours.

3.14.   Network Access: Information Access. Trustee shall use commercially reasonable efforts provide Service Provider with access to the Paniolo Network and any information relating to the Paniolo Network as reasonably requested by and necessary for Service Provider to provide Services hereunder. Service Provider shall not be liable for any impairment in service caused by its not receiving information or access as required hereunder.

3.15.   No Transfer of Control. Nothing in this Agreement is intended to transfer *de facto* or *de jure* control (as those terms are construed by the U.S. Federal Communications Commission) of the Paniolo Network. Service Provider acknowledges and agrees that it provides all Services hereunder at the direction of the Trustee, and that the Trustee shall retain ownership and control of the Paniolo Network until consummation of the Proposed Transaction.

3.16.   Relationship. The relationship between Trustee and Service Provider established by this Agreement is that of independent contractors, and nothing herein shall be construed as creating a relationship of employer and employee, partners, joint venturers, franchisor and franchisee, co-owners, or contractor and subcontractor.

## ARTICLE 4
## FEES; TAXES

4.1.   Service Fees. In exchange for providing services, Trustee shall pay Service Provider the fees in US dollars, excluding applicable taxes, as detailed in Schedule A.

4.2.   Invoicing. Service Provider shall invoice Trustee upon the Effective Date and at one (1) month intervals thereafter throughout the Term unless otherwise indicated in Schedule B herein.

4.3.   Payment Terms. Payment shall be made for the services as detailed in Schedule B.

4.4.   Taxes. From and after the Effective Date, each Party is responsible, as required under applicable Law, for identifying and paying all Taxes (and any penalties, interest, and other additions thereto) that are imposed on that Party upon or with respect to the transactions and payments under this Agreement.  The Parties shall cooperate to minimize adverse tax consequences.

## ARTICLE 5
## LIMITED WARRANTY; LIMITATION OF LIABILITY; EQUITABLE REMEDIES

5.1.   LIMITED WARRANTY. EXCEPT AS SET FORTH ELSEWHERE IN THIS AGREEMENT, NEITHER PARTY MAKES ANY WARRANTIES, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, WITH RESPECT TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING ANY WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

8

U.S. Bankruptcy Court - Hawaii  #18-01319  Dkt # 313-4  Filed 11/30/20  Page 48 of 58
U.S. Bankruptcy Court - Hawaii  #22-90008  Dkt # 28-7  Filed 05/27/22  Page 49 of 59

5.2.   Limitation on Liability.  Subject to Section 5.3, no Party shall be liable under this Agreement, whether in contract, tort (including negligence and strict liability) or otherwise for any special, indirect, punitive, reliance, or consequential damages (whether or not such losses were within the contemplation of the Parties) suffered or incurred by the other Party.

5.3.   Limitation on Liability Not Applicable.  Nothing in this Agreement shall exclude or limit any Party's liability:

(a)   For death or personal injury resulting from the negligence or willful misconduct of a Party or their servants, other agents or employees;

(b)   For fraud and/or fraudulent misrepresentation;

(c)   For misuse of Confidential Information;

(d)   Under Article 7 (Indemnification);

(e)   For payment of sums properly due and owing to the other in the course of normal performance; or

(f)   For matters which cannot be excluded under applicable Law.

5.4.   Subject to Section 5.2 and Section 5.3, each Party's maximum liability under or in connection with this Agreement shall be limited to direct damages proven.

5.5.   The Parties acknowledge and agree that a breach or threatened breach of a material term or condition of this Agreement may cause the non-breaching Party irreparable harm, and accordingly such Party shall be entitled to seek equitable relief.

## ARTICLE 6
## INDEMNIFICATION

6.1.   Each Party (as "Indemnifying Party") shall indemnify, defend and hold harmless the other Party, its employees, officers, directors, members, subcontractors and agents (the "Indemnified Parties") as provided herein.

6.2.   Trustee shall indemnify Service Provider Indemnified Parties from and against all third-party liability, loss, cost, damage, expense, or cause of action of any nature whatsoever (including the infringement of any third-party Intellectual Property, environmental damages, property damage, and personal injury (including death), together with expenses (including reasonable attorneys' fees and court costs through appeal) (collectively, "Claims"), arising from Trustee's gross negligence or willful misconduct in connection with performance by Trustee of its obligations (or breach thereof).

6.3.   Service Provider shall indemnify Trustee Indemnified Parties from and against all Claims (including, for the avoidance of doubt, Customer Claims), arising from Service Provider's performance of its obligations (or breach thereof) hereunder or from Service Provider's statements,

9

representations, assumption of obligations, or other communications or commitments made by Service Provider to a Customer without the approval of Trustee.

6.4.    In connection with the indemnification provided pursuant to this Article 6, the Indemnified Party shall:  (a) promptly notify the Indemnifying Party in writing of any Claim and grant the Indemnifying Party control of the defense and all related settlement negotiations; and (b) cooperate with the Indemnifying Party, at its expense, in defending or settling such Claim; provided that if any settlement results in any ongoing liability to, or prejudices or detrimentally impacts the Indemnified Party, and such obligation, liability, prejudice, or impact can reasonably be expected to be material, then such settlement shall require the Indemnified Party's written consent.  In connection with any Claim, the Indemnified Party may have its own counsel in attendance at all public interactions and substantive negotiations at its own cost and expense.

## ARTICLE 7
## INSURANCE

7.1    During the Term, each Party, at its sole costs and expense, will obtain and maintain with financially reputable insurers that are licensed to do business in all jurisdictions where any work is performed and that hold a current rating of not less than A-, (according to A.M. Best), not less than the following insurance coverages, which may be satisfied through a combination of primary and excess (umbrella policies):

(a)    Workers' Compensation, as provided for under any Worker's compensation or similar Law in the jurisdiction where any work is performed with an Employer's Liability limit of not less than $500,000 for each incident;

(b)    Commercial General Liability, including coverage for Contractual Liability and Products/Completed Operations Liability, with a limit of not less than $1,000,000 per occurrence for bodily injury, personal injury and property damage liability;

(c)    "All Risk" Property Insurance covering not less than the full replacement cost of a Party's personal property while on the other Party's site;

(d)    Business Auto Insurance covering the ownership, maintenance or use of any owned, non-owned or hired automobile with a limit of not less than $1,000,000 combined single limit per accident for bodily injury and property damage liability;

(e)    "All Risk or Special Form" Property Insurance covering not less than the full replacement cost of a Party's property including business interruption; and

(f)    Umbrella form excess liability insurance with limits of not less than $5,000,000.

7.2    Each insurance policy, except Workers' Compensation and Property Insurance, will include each Party as an additional insured and loss payee for their acts or omissions under the Agreement.

10

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 313-4   Filed 11/30/20   Page 50 of 58
U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-7   Filed 05/27/22   Page 51 of 59

7.3     Each insurance policy shall contain a waiver of subrogation in favor of the other Party.

7.4     Each insurance policy shall be endorsed to give the other Party at least thirty (30) calendar days' prior written notice of cancellation.

7.5     Each Party's insurance will be primary for their own acts or omissions.

7.6     Nothing contained herein limits either Party's liability to the other Party to the limits of insurance certified or carried.

7.7     Each Party shall provide proof of insurance either in the form of a Certificate of Insurance (ACORD form 25 or equivalent).  Such proof shall be provided within fifteen (15) calendar days of the Effective Date, and again within fifteen (15) calendar days of the renewal or replacement of each policy.

## ARTICLE 8
## NOTICES

All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by a reputable overnight courier service, by facsimile or registered or certified mail (postage prepaid, return receipt requested) to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Article 9).  Deliveries made after normal business hours or on a non-Business Day shall be deemed delivered on the next Business Day.

| | |
|---|---|
| If to the Trustee: | Michael Katzenstein, Trustee<br>Bankruptcy Estate of Paniolo Cable Company, LLC<br>c/o FTI Consulting, Inc.<br>Three Times Square, 9th Floor<br>New York, New York 10036 |
| With a copy to: | Goodsill Anderson Quinn & Stifel LLP<br>999 Bishop Street, Suite 1600<br>Honolulu, Hawaii 96813<br>Attn: Johnathan C. Bolton |
| If to Service Provider: | Cincinnati Bell Inc.<br>221 East Fourth Street<br>Cincinnati, Ohio 45202<br>Attn: Mark J. Fahner |
| With a copy to: | Morgan Lewis & Bockius LLP<br>1111 Pennsylvania Avenue, N.W.<br>Washington, DC 20004<br>Attn: Andrew M. Ray |

11

A Party may change its address and point of contact by notifying the other Party in writing in accordance with this Article.

## ARTICLE 9
## CONFIDENTIALITY

9.1.     Each Party shall preserve the other Party's Confidential Information provided to it hereunder with the same degree of care in protecting its own Confidential Information, but in no event less than a reasonable standard of care shall be used.  A Party shall not disclose the other Party's Confidential Information without the prior written consent of the disclosing Party, except that each Party may disclosure the other Party's Confidential Information to its employees with a need to know for purposes of performance and to its professional advisors; provided that such employees and professional advisors are under an obligation of confidentiality consistent with this Section 9.1. A receiving Party may also disclose certain Confidential Information of the disclosing Party, without violating the obligations of this Agreement, to the extent such disclosure is required by a valid order of a court or other governmental body having jurisdiction, *provided that* the receiving Party provides the disclosing Party with reasonable prior written notice of such disclosure (if legal to do so) and, if requested by the disclosing Party, assists such Party in obtaining a protective order preventing or limiting the disclosure and/or requiring that the Confidential Information so disclosed be used only for the purposes for which the law or regulation requires, or for which the order was issued.

(a)     Nothing herein shall be construed as granting any right or license under any Intellectual Property now or hereafter owned, licensed or controlled by a Party to the other Party.

(b)     The receiving Party shall not, without first obtaining written consent of the disclosing Party, use any service mark, logo, trademark, trade name, or other Intellectual Property of the disclosing Party or refer to the other Party in any promotional activity except as authorized in this Agreement.  For the avoidance of doubt, a breach of this provision shall be a material breach of this Agreement, entitling the non-breaching Party to exercise all rights available under this Agreement or applicable Law.  Notwithstanding the foregoing, Service Provider shall have a license to use the trade names and trademarks of the Trustee in order to perform its rights and duties hereunder.

9.2.     The provisions of this Article 10 shall survive expiration or other termination of this Agreement.

## ARTICLE 10
## DEFAULT

10.1.     A "Default" shall be deemed to have occurred under this Agreement if a Party:

(a)     violates any applicable Law with respect to its rights and obligations under this Agreement;

(b)     fails to perform any of its material obligations under this Agreement or the APA; or

12

(c)    undergoes a Bankruptcy Event.

10.2.    In the event of any Default hereunder, the non-Defaulting Party may terminate this Agreement upon written notice to the Defaulting Party; provided, however, that the non-Defaulting party must first provide the Defaulting Party with a default notice specifying in reasonable detail the nature of such breach, and such breach shall have continued without cure for a period of thirty (30) days after the Defaulting Party's receipt of such written notice of breach. For the avoidance of doubt, a Party's failure to make any payment that has not been disputed in good faith in writing within thirty (30) days of receiving a notice of payment due or an invoice, when due hereunder, shall be deemed a material breach of this Agreement.

10.3.    The non-Defaulting Party may (subject to Article 6) pursue any legal remedies it may have under this Agreement, applicable Law, or principles of equity.

10.4.    A waiver by either Party at any time of any of its rights as to anything herein contained shall not be deemed to be a waiver of any breach of covenant or other matter subsequently occurring.

## ARTICLE 11
## FORCE MAJEURE

Solely with respect to the matters governed by this Agreement, and without effecting any other agreements between the Parties, in no event shall a Party have any claim or right against the other for any failure of performance (other than a failure to pay any amount due) due to causes beyond its control (a "Force Majeure Event") including: acts of God, fire, explosion, vandalism, adverse weather conditions, flood or other similar occurrences; any change in Law; national emergencies; pandemic; insurrections; riots; wars; terrorism; strikes, lock-outs, work stoppages, or other labor difficulties (other than those of a Party's own workforce); or any other cause or circumstance, whether of a similar or dissimilar nature to the foregoing, beyond the reasonable control of the affected Party.

## ARTICLE 12
## GOVERNING LAW; DISPUTE RESOLUTION

12.1.    This Agreement is governed by the laws of the State of New York, without regard to conflict of laws principles.

12.2.    The Parties will attempt to resolve any dispute arising out of this Agreement promptly through discussions between authorized senior representatives with the power to resolve the dispute. All negotiations conducted by such representatives shall be confidential and shall be treated as compromise and settlement negotiations for purposes of federal and state rules and regulations. If the disputing Parties fail to resolve such dispute within thirty (30) days of the non-disputing Party's receipt of the written notice, either such Party may initiate legal action as set forth below.

12.3.    Failing resolution of a dispute in accordance with Section 12.2 above and notwithstanding anything to the contrary contained in this Agreement, the Parties hereby irrevocably agree that any disputes arising out of this Agreement shall be adjudicated in the Paniolo

Bankruptcy Proceeding, and each Party hereby agrees to the personal and exclusive jurisdiction of such court. The prevailing Party in any litigation shall be entitled to its costs and reasonable attorneys' fees.

## ARTICLE 13
## REPRESENTATIONS, WARRANTIES AND FURTHER OBLIGATIONS

13.1.   Each Party represents and warrants that as of the Effective Date:

(a)   it has the full right and authority to enter into, execute, deliver and perform its obligations under this Agreement;

(b)   this Agreement constitutes a legal, valid and binding obligation enforceable against such Party in accordance with its terms, subject to bankruptcy, insolvency, creditors' rights and general equitable principles; and

(c)   its execution of and performance under this Agreement does not violate any applicable existing regulations, rules, statutes or court orders of any local, state or federal government agency, court or body.

13.2.   During the Term, each Party shall secure and maintain all necessary permits, licenses, and other authorizations required to perform its obligations and enjoy its rights as provided under this Agreement.

13.3.   During the Term, each Party shall comply with all applicable Laws including the U.S. Foreign Corrupt Practices Act of 1977, all export control regulations, and the rules and regulations of the Federal Communications Commission.

## ARTICLE 14
## GENERAL PROVISIONS

14.1.   Binding Agreement.  This Agreement shall be binding upon and inure solely to the benefit of the Parties and their respective permitted successors and assigns.

14.2.   Waiver.  A Party may (a) extend the time for the performance of any of the obligations or other acts of any other Party, (b) waive any inaccuracies in the representations and warranties of any other Party contained herein or in any document delivered or made available by the other Party pursuant hereto or (c) waive compliance with any of the agreements of the other Party or conditions to such Party's obligations contained herein.  Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the Party to be bound thereby. Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement.  The failure of a Party to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

14.3.   Assignment.  Neither Party may assign this Agreement without the prior written consent of the other Party.  Any purported assignment in contravention of this Section 14.3 shall be void.

14

14.4.   Interpretation.  In this Agreement, except to the extent otherwise provided or that the context otherwise requires:

(a)   the headings in this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(b)   whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

(c)   the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms, all tenses, and both noun and verb forms, as context dictates; and

(d)   when calculating the period of time before which, within which or following which any act is to be done or any step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded, and if the last day of such period is not a Business Day, the period shall end on the immediately following Business Day.

14.5.   Joint Participation.  The Parties have participated jointly in the negotiation and drafting of this Agreement and each has been represented by counsel of its choosing and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

14.6.   Entire Agreement.  This Agreement, together with the Asset Purchase Agreement, constitutes the entire and final agreement and understanding between the Parties with respect to the subject matter hereof and supersedes all prior agreement relating to the subject matter hereof, which are of no further force or effect.

14.7.   Amendment.  This Agreement may not be amended or modified except by an instrument in writing signed by both Parties.

14.8.   Invalidity.  If any term, obligation or other provision of this Agreement is invalid, illegal or incapable of being enforced due to any applicable Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect for so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to either of the Parties.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated by this Agreement are consummated as originally contemplated to the greatest extent.

14.9.   Third Party Beneficiaries.  Except as otherwise expressly provided, nothing in this Agreement expressly or impliedly provided any third party with any remedy, claim, liability, reimbursement, cause of action or other right or privilege.

14.10.  Further Actions.  The Parties agree to provide such additional information and take such additional action, including the execution of and delivery of further agreements, instruments, and other documents, as may be reasonably necessary to carry out the purposes of this Agreement.

14.11.  Counterparts and Electronic Signatures.  This Agreement may be executed and delivered (including by facsimile or other means of electronic transmission, such as by electronic mail in "pdf" form) in counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one-and-the-same agreement.

[*The rest of this page is left intentionally blank*]

16

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 313-4   Filed 11/30/20   Page 56 of 58
U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-7   Filed 05/27/22   Page 57 of 59

In witness whereof, and intending to be legally bound hereby, the Parties have executed this Agreement as of the dates identified below.

MICHAEL   KATZENSTEIN,   CHAPTER   11
TRUSTEE FOR THE BANKRUPTCY ESTATE OF
PANIOLO CABLE COMPANY, LLC

By: _____

Title: _____

Date: _____

HAWAIIAN TELCOM, INC.

By: _____

Title:   Leigh Fox
Date:    Chief Executive Officer

*[Signature page to Operational Support and Sales Services Agreement]*

In witness whereof, and intending to be legally bound hereby, the Parties have executed this Agreement as of the dates identified below.

MICHAEL KATZENSTEIN, CHAPTER 11 TRUSTEE FOR THE BANKRUPTCY ESTATE OF PANIOLO CABLE COMPANY, LLC

By: _____

Title: _____

Date: _____


HAWAIIAN TELCOM, INC.

By: _____

Title: _____

Date: _____

# EXHIBIT H

CADES SCHUTTE
A Limited Liability Law Partnership
C. MICHAEL HEIHRE          1307
THEODORE D. C. YOUNG    5735
TRISHA H.S.T. AKAGI       10186
1000 Bishop Street, Suite 1200
Honolulu, HI  96813-4212
Telephone:  (808) 521-9200
Facsimile:   (808) 521-9210
Email:  mheihre@cades.com
          tyoung@cades.com
          takagi@cades.com

MORGAN, LEWIS & BOCKIUS LLP
ANDREW J. GALLO (admitted *pro hac vice*)
One Federal Street
Boston, MA 02110-1726
Telephone:  +1 (617) 951-8117
Email:  andrew.gallo@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
ANDREW M. RAY (admitted *pro hac vice*)
1111 Pennsylvania Avenue, NW
Washington DC 20004
Telephone:  +1 (202) 373-6585
Email:  andrew.ray@morganlewis.com

Attorneys for Defendant
HAWAIIAN TELCOM, INC.

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>PANIOLO CABLE COMPANY, LLC,<br><br>Debtor. | Case No. 18-01319 (RJF)<br>Chapter 11 |

EXHIBIT H

SANDWICH ISLES
COMMUNICATIONS, INC.,

           Plaintiff,

  vs.

MICHAEL KATZENSTEIN, AS
CHAPTER 11 TRUSTEE;
HAWAIIAN TELCOM INC.,

           Defendants.

Adversary No. 21-90017

DEFENDANT HAWAIIAN TELCOM,
INC.'S **MOTION FOR SUMMARY
JUDGMENT**; MEMORANDUM IN
SUPPORT OF MOTION; CERTIFICATE
OF SERVICE

HEARING:
Date:    January 14, 2022
Time:    10:00 a.m.
Judge:  Honorable Robert J. Faris

## HAWAIIAN TELCOM, INC.'S
## MOTION FOR SUMMARY JUDGMENT

Defendant Hawaiian Telcom, Inc. ("HTI"), by and through its counsel, respectfully moves this Court for summary judgment as to all claims asserted against HTI in Plaintiff Sandwich Isles Communications, Inc.'s ("SIC" or "Plaintiff") Complaint [Dkt. 477], filed herein on October 12, 2021 (the "Complaint").

In its Complaint, SIC seeks to enforce the following four agreements (collectively, the "SIC Agreements"):

(1)    Rule 9019 Settlement Agreement (Post-Judgment) (the "Settlement Agreement") by and between the Chapter 11 Trustee, Michael Katzenstein (the "Trustee"), the Paniolo Creditors, Waimana Enterprises, Inc., SIC and the SIC Affiliates, approved by this Court on June 4, 2020, *see* Concurrently-filed Concise Statement of Facts ("CSF") ¶ 1;

(2)    Master Relationship Agreement ("<u>MRA</u>") by and between SIC and Paniolo Cable Company, LLC ("<u>Paniolo</u>" or "<u>Debtor</u>"), *see* CSF ¶ 4;

(3)    SIC Lease by and between SIC and Paniolo, which was included as Schedule 1 to the MRA, *see* CSF ¶ 5; and

(4)    Assets IRU by and between SIC and Paniolo, which was included as Schedule 2 to the MRA , *see* CSF ¶ 6.

HTI is not a party to any of the SIC Agreements, nor have any of the SIC Agreements been assigned by the Trustee to HTI.  HTI did not otherwise assume or agree to be bound by the terms of those agreements.  It thus "goes without saying that [the SIC Agreements] cannot bind [HTI,] a nonparty." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002).  Accordingly, SIC's claims to enforce the SIC Agreements and for breach of those same agreements, as against HTI, fail as a matter of law.

This Motion is made pursuant to Rule 56 of the Federal Rules of Civil Procedure, as made applicable to this case by Rule 7056 of the Federal Rules of Bankruptcy Procedure and LBR 7056-1, and is supported by the attached memorandum in support, the separately filed concise statement of undisputed material facts and the attached declaration, as well as the pleadings and records on file herein.

DATED:  Honolulu, Hawaii, November 16, 2021.

**CADES SCHUTTE**
**A Limited Liability Law Partnership**

/s/  *Trisha H.S.T. Akagi*
C. MICHAEL HEIHRE
THEODORE D. C. YOUNG
TRISHA H.S.T. AKAGI

and

**MORGAN, LEWIS & BOCKIUS LLP**
ANDREW J. GALLO
ANDREW M. RAY

Attorneys for Defendant
HAWAIIAN TELCOM, INC.

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re | CASE NO. 18-01319 |
| | (Chapter 11) |
| PANIOLO CABLE COMPANY, LLC, | |
| Debtor. | |
| | |
| SANDWICH ISLES | Adversary No. 21-90017 |
| COMMUNICATIONS, INC., | |
| Plaintiff, | **MEMORANDUM IN SUPPORT** |
| | **OF MOTION** |
| vs. | |
| MICHAEL KATZENSTEIN, AS | |
| CHAPTER 11 TRUSTEE; | |
| HAWAIIAN TELCOM INC., | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...........................................................................1

II.  RELEVANT FACTUAL BACKGROUND ...................................2

    A.  Paniolo's bankruptcy and the Trustee's acquisition of certain SIC assets ...................................................................................2

    B.  SIC enters into the SIC Agreements ...................................2

    C.  HTI purchases substantially all of the Debtor's assets but chose not to designate any of the SIC Agreements.......................................3

III.  LEGAL STANDARD ..................................................................4

IV.  ARGUMENT.................................................................................5

    A.  Count I (declaratory judgment) fails as a matter of law. ...................6

    B.  Count II (specific performance) fails as a matter of law.....................8

        1.  Specific performance is not an independent claim. ..................8

        2.  SIC cannot maintain a claim against HTI for breach of the SIC Agreements. ..................................................................9

        3.  SIC could not maintain a claim against HTI for breach of the SIC Agreements even if HTI was an agent of the Trustee.......................................................................................9

    C.  Count III (damages) fails as a matter of law. ...................................11

V.  CONCLUSION.............................................................................12

-i-

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Unione Mediterranea Di Sicurta*,
   364 F.3d 646 (5th Cir. 2004) ................................................................... 6

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................ 5

*In re Barboza*,
   545 F.3d 702 (9th Cir. 2008) .................................................................. 5

*Baskin v. EC Paia LLC*,
   Civil No. 20-00216 WRP, 2020 WL 9762819 (D. Haw. Aug. 31,
   2020) ...................................................................................................... 8

*Broussard v. Univ. of Cal. at Berkeley*,
   192 F.3d 1252 (9th Cir. 1999) ................................................................ 4

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ................................................................................ 4

*Dairy Rd. Partners v. Maui Gas Ventures, LLC*,
   Civ. No. 16-00611DKW-KJM, 2018 WL 1244147 (D. Haw. Mar.
   9, 2018) .................................................................................................. 9

*In re Dehon, Inc.*,
   352 B.R. 546 (Bankr. D. Mass. 2006) ................................................... 7

*Double C Entmt., Inc. v. Palace Theatre Operating Grp., LLC*,
   Civil Action No. 3:11-CV-98-CRS, 2011 WL 5903606 (W.D. Ky.
   Nov. 25, 2011) ..................................................................................... 11

*E.E.O.C. v. Waffle House, Inc.*,
   534 U.S. 279 (2002) ............................................................................ 6, 8

*In re Family Snacks, Inc.*,
   257 B.R. 884 (B.A.P. 8th Cir. 2001) ..................................................... 7

-ii-

*JMB Mfg., Inc. v. Child Craft, LLC*,
   799 F.3d 780 (7th Cir. 2015) ...............................................................10

*Laeroc Waikiki Parkside, LLC v. K.S.K. (Oahu) Ltd. P'ship*,
   115 Hawai'i 201, 166 P.3d 961 (2007)...............................................10

*Matsushita Elec. Indus. Co. v. Zenith Radio*,
   475 U.S. 574 (1986).............................................................................5

*RSMCFH, LLC v. FareHarbor Holdings, LLC*,
   361 F. Supp. 3d 981 (D. Haw. 2019)...................................................9

*Soremekun v. Thrifty Payless, Inc.*,
   509 F.3d 978 (9th Cir. 2007) ...............................................................4

*Stanley v. Univ. of S. Calif.*,
   178 F.3d 1069 (9th Cir. 1999) ...........................................................11

*In re Thane Int'l, Inc.*,
   586 B.R. 540 (Bankr. D. Del. 2018)....................................................7

*Vandiver Food Stores, Inc. v. Insurance Co. of N. Am.*,
   909 F. Supp. 618 (E.D. Ark. 1995).....................................................10

*Villiarimo v. Aloha Island Air, Inc.*,
   281 F.3d 1054 (9th Cir. 2002) .............................................................5

*Walz v. Todd & Honeywell, Inc.*,
   195 A.D.2d 455 (N.Y. App. Div. 1993) .............................................10

**Other Authorities**

Fed. R. Civ. P. 56(a)....................................................................................4

## MEMORANDUM IN SUPPORT OF MOTION

### I.   INTRODUCTION

Defendant Hawaiian Telcom, Inc. ("HTI") respectfully moves this Court for summary judgment as to all claims asserted against HTI in Plaintiff Sandwich Isles Communications, Inc.'s ("SIC" or "Plaintiff") Complaint [Dkt. 477], filed herein on October 12, 2021 (the "Complaint").  In its Complaint, SIC seeks to enforce, and damages for the alleged breaches of, the following four agreements (collectively, the "SIC Agreements"):

> (1)   Rule 9019 Settlement Agreement (Post-Judgment) (the "Settlement Agreement") by and between the Chapter 11 Trustee, Michael Katzenstein (the "Trustee"), the Paniolo Creditors,[1] Waimana Enterprises, Inc., SIC and the SIC Affiliates,[2] approved by this Court on June 4, 2020, *see* Concurrently-filed Concise Statement of Facts ("CSF") ¶ 1;

> (2)   Master Relationship Agreement ("MRA") by and between SIC and Paniolo Cable Company, LLC ("Paniolo" or "Debtor"), *see* CSF ¶ 4;

> (3)   SIC Lease by and between SIC and Paniolo, which was included as Schedule 1 to the MRA, *see* CSF ¶ 5; and

> (4)   Assets IRU by and between SIC and Paniolo, which was included as Schedule 2 to the MRA, *see* CSF ¶ 6.

---

[1]  The "Paniolo Creditors" consist of HSBC Securities (USA) Inc., Sunrise Partnership Limited Partnership and Deutsche Bank Trust Company Americas. *See* CSF ¶ 2.

[2]  The "SIC Affiliates" include Clearcom, Inc. Pa Makani LLC and HoʻOpaʻa Insurance Corp.  *See* CSF ¶ 3.

Fatal to SIC's claims against HTI is the fact that HTI is not a party to any of the SIC Agreements nor did HTI assume or otherwise agree to be bound by the terms of any of those agreements.  CSF ¶¶ 1-6.  Thus, as against HTI, SIC's claims to enforce and for breaches of the SIC Agreements fail as a matter of law.

## II.     RELEVANT FACTUAL BACKGROUND

### A.     Paniolo's bankruptcy and the Trustee's acquisition of certain SIC assets

On January 30, 2019, the Court entered its Order for Relief in an Involuntary Case and appointed the Trustee.  CSF ¶ 7.

On or about February 4, 2020, the U.S. Marshal for the District of Hawaii levied upon certain real and personal property assets of SIC (the "A.2 Assets") pursuant to a *Writ of Execution to the United States Marshal* issued by this Court in the related adversary proceeding of *Michael Katzenstein v. Sandwich Isles Communications, Inc.* (Adv. Pro. 19-90022) (the "AP").  *See* CSF ¶ 8.  On March 6, 2020, the United States Marshal conducted a sale of the A.2 Property via public auction (the "Execution Sale").  *See* CSF ¶ 9.  Shortly thereafter, on March 16, 2020, the Court entered its order ratifying, approving, and confirming the sale of the A.2 Property to the Debtor, as the highest auction bidder.  *See* CSF ¶ 10.

### B.     SIC enters into the SIC Agreements

On June 4, 2020, the Court entered its Order Granting Michael Katzenstein, as Chapter 11 Trustee's Motion to Approve Settlement Agreement Pursuant to

Federal Rule of Bankruptcy Procedure 9019.  CSF ¶ 11.  The order approved the Settlement Agreement by and between the Trustee, the Paniolo Creditors, Waimana Enterprises, Inc., SIC, and the SIC Affiliates.  CSF ¶ 12.

In connection with the Settlement Agreement, SIC and the Trustee entered into the MRA.  CSF ¶ 13.  Schedule 1 to the MRA is the SIC Lease by and between the Trustee as Lessor and SIC as Lessee.  CSF ¶ 4.  Schedule 2 to the MRA is the Assets IRU, also by and between the Trustee and SIC.  CSF ¶ 5.

### C.   HTI purchases substantially all of the Debtor's assets but chose not to designate any of the SIC Agreements.

On November 30, 2020, the Trustee filed his Motion for Entry of an Order (A) Authorizing and Approving the Sale of the Debtor's Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (B) Approving the Asset Purchase Agreement, (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection With the Sale, (D) Approving the Operational Support and Sales Services Agreement, (E) Approving a Break-Up Fee and Expense Reimbursement, and (F) Granting Related Relief (the "Sale Motion").  CSF ¶ 14.  On December 28, 2020, the Court entered its order approving the Sale Motion (the "Sale Order").  CSF ¶ 15.

The Sale Order authorized and approved the sale of substantially all of Debtor's assets pursuant to the Asset Purchase Agreement ("APA"), which was attached to the Sale Order as Exhibit A.  CSF ¶ 16.  Schedule 1.1(a) of the APA

identified "Assignable Contracts," certain contracts of the Debtor that HTI, as the purchaser, could elect to assume but had no obligation to do so. *See* CSF ¶¶ 18. Included in the list of Assignable Contracts were the SIC Agreements. *See* CSF ¶ 19.

On August 31, 2021, the sale authorized by the Sale Order (the "Sale") closed after the Federal Communications Commission approved the transaction. *See* CSF ¶ 20. At Closing, HTI did not include any of the SIC Agreements as Designated Contracts to be assumed by HTI. *See* CSF ¶ 21.

## III.   **LEGAL STANDARD**

Rule 56(a) of the Federal Rules of Civil Procedure mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999). A "party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as

to the material facts [and] come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (quotations omitted). The "mere allegations or denials of [the party's] pleading" are not enough. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

An issue is "'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. For an inference to be reasonable, there must be "sufficient probative evidence to permit a finding in favor of the opposing party based on more than mere speculation, conjecture, or fantasy." *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 n.10 (9th Cir. 2002).

## IV.    ARGUMENT

In its Complaint, SIC seeks to enforce the SIC Agreements against HTI, *see* Compl. ¶¶ 46, 49, as well as damages for the Trustee's alleged breaches of the SIC Agreements, *see id.* ¶¶ 53-54. Since HTI is neither a party to the SIC Agreements

nor did HTI agree to be bound by the SIC Agreements, all of SIC's claims against HTI fail as a matter of law.

## A.   Count I (declaratory judgment) fails as a matter of law.

In Count I of the Complaint, SIC seeks "a declaratory judgment finding and declaring that the Settlement Agreement, Master Relationship Agreement, Lease and Indefeasible Right to Use remain enforceable and in full force and effect against defendant Hawaiian Telcom." Compl. ¶ 46.  However, "[i]t goes without saying that a contract cannot bind a nonparty." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002); *see also Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 652 (5th Cir. 2004) ("Under general principles of contract law, it is axiomatic that courts cannot bind a non-party to a contract, because that party never agreed to the terms set forth therein." (quotation marks and citation omitted)).  It is indisputable that HTI is not a party to any of the SIC Agreements. *See* CSF ¶¶ 1-6.

Nor did HTI become a party to the SIC Agreements through assignment.  To the contrary, the APA specifically provided that the SIC Agreements were solely "Assignable Contracts" which means they were contracts that could have been assigned by the Trustee to HTI at HTI's sole election.  *See* CSF ¶ 18.  HTI, however, did not elect to designate any of the SIC Agreements as agreements to be assigned by the Trustee to HTI. *See* CSF ¶ 21.

To the extent that SIC argues that the SIC Agreements were implicitly assumed and assigned to HTI by virtue of the post-closing services purportedly rendered by SIC, bankruptcy law is clear that there are no implied assumptions of executory contracts. *See, e.g.*, *In re Family Snacks, Inc.*, 257 B.R. 884, 904 (B.A.P. 8th Cir. 2001) ("Implied assumption has no place in the law of executory contracts. Indeed, Section 365(d) presumes nonassumption by inaction, except in certain specified cases, such as nonresidential real property leases."); *In re Dehon, Inc.*, 352 B.R. 546, 560 (Bankr. D. Mass. 2006) (stating that "[i]t is well-established that the doctrine of 'implied assumption' has little, if any merit" and listing cases holding that an executory contract cannot be implicitly assumed). This is true even where the non-debtor party to an executory contract continues to perform under the contract. *See In re Dehon, Inc.*, 352 B.R. at 560 ("Even where the non-debtor party to a contract continues to provide services under the contract and the debtor continues to accept the benefits of such performance, the contract will not be considered to have been assumed absent an order of the court approving the assumption."); *In re Thane Int'l, Inc.,* 586 B.R. 540, 547 (Bankr. D. Del. 2018) (rejecting the argument that the purchaser impliedly assumed or was assigned an executory contract because it allegedly "enjoyed the benefits" of the contract post-closing; assumption and assignment cannot be done informally).

Accordingly, notwithstanding SIC's allegations that it and/or the Trustee intended that the purchaser of the Transferred Assets would be bound by one or more of the SIC Agreements, *see, e.g.*, Compl. ¶¶ 13, 15, no such obligation is found anywhere in the Sale Order or APA.[3]  *See* CSF ¶ 22.

As a non-party to the SIC Agreements, HTI cannot be bound by the terms of those agreements and Count I, accordingly, fails as a matter of law.  *See, e.g., Waffle House, Inc.*, 534 U.S. at 294 (finding that EEOC, a non-party to the subject contract, was not bound by the arbitration clause in that contract).

**B.    Count II (specific performance) fails as a matter of law.**

1.    Specific performance is not an independent claim.

Count II likewise fails as a matter of law.  In Count II, SIC seeks "specific performance, enforcing the [SIC Agreements] against the defendants."  Compl. ¶ 49.  However, "specific performance is an equitable remedy in a breach of contract action and not an independent claim."  *Baskin v. EC Paia LLC*, Civil No. 20-00216 WRP, 2020 WL 9762819, at *2 (D. Haw. Aug. 31, 2020).  For that reason alone, summary judgment should be granted in HTI's favor as to Count II.  *See id.* (dismissing with prejudice claim for specific performance).

---

[3] Having failed to raise this issue prior to entry of the Sale Order, SIC "is deemed to have consented to the Sale under the terms of the APA[.]"  Sale Order ¶ 2 (p. 27).

    2.    **SIC cannot maintain a claim against HTI for breach of the SIC Agreements.**

Even if Count II could be construed as a claim for breach of the SIC Agreements, it would still fail as a matter of law.  Under Hawaii law, to prevail on a breach of contract claim, a party must prove "(1) the contract at issue; (2) the parties to the contract; (3) whether plaintiff performed under the contract; (4) the particular provision of the contract allegedly violated by defendants; and (5) when and how defendants allegedly breached the contract."  *RSMCFH, LLC v. FareHarbor Holdings, LLC*, 361 F. Supp. 3d 981, 991 (D. Haw. 2019) (quotation marks and citation omitted).  However, as discussed *supra*, the SIC Agreements cannot be enforced against HTI since HTI is not a party to any of the SIC Agreements, nor were any of the SIC Agreements assigned to HTI as part of the Sale.  *See supra* Section IV.A.  Therefore, SIC cannot maintain a claim against HTI for breach of the SIC Agreements.  *Cf. Dairy Rd. Partners v. Maui Gas Ventures, LLC*, Civ. No. 16-00611DKW-KJM, 2018 WL 1244147, at *17 (D. Haw. Mar. 9, 2018) (noting that "specific performance is by definition limited to the enforcement of contract duties" and dismissing claim for specific performance where there was no enforceable contract).

    3.    **SIC could not maintain a claim against HTI for breach of the SIC Agreements even if HTI was an agent of the Trustee.**

SIC alleges that HTI is an agent of the Trustee.  *See, e.g.*, Compl. ¶ 43.

Setting aside the lack of evidence regarding the scope of HTI's purported agency, any claim against HTI, as the purported agent of the Trustee, for breach of the SIC Agreements would still fail because HTI is not a party to the SIC Agreements.

"It is well settled that when an agent acts on behalf of a disclosed principal, the agent will not be personally liable for a breach of the contract unless there is clear and explicit evidence of the agent's intention to be bound[.]" *Walz v. Todd & Honeywell, Inc.*, 195 A.D.2d 455, 455 (N.Y. App. Div. 1993) (citation omitted); *see also JMB Mfg., Inc. v. Child Craft, LLC*, 799 F.3d 780, 786 (7th Cir. 2015) ("Under Indiana law, an agent acting within the scope of his authority is not personally liable in carrying out a contractual obligation of the principal."); *Vandiver Food Stores, Inc. v. Insurance Co. of N. Am.*, 909 F. Supp. 618, 625 (E.D. Ark. 1995) ("[A]n agent for a disclosed principal cannot be liable for a breach of contract by its disclosed principal to which it is not a party."); *accord Laeroc Waikiki Parkside, LLC v. K.S.K. (Oahu) Ltd. P'ship*, 115 Hawai'i 201, 214, 166 P.3d 961, 974 (2007) ("[T]he only way that an agent making a contract on behalf of a disclosed principal would become a party to the agreement would be if the agent manifests an intent to become a party . . . ."). This is true even where the breach was a result of the agent's wrongful conduct. *See Vandiver Food Stores, Inc.*, 909 F. Supp. at 625 ("[A]n agent acting within the scope of its authority, is not liable *ex contractu* for the breach of the contract between its disclosed principal

and a third party, even when the breach was a result of its own wrongful conduct[.]"(citing *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800, 808 (2d Cir. 1971)).

Here, there is no evidence that HTI intended to be bound by any of the SIC Agreements. To the contrary, HTI chose not to become a party to, or otherwise be bound by, the SIC Agreements when it decided not to accept assignment of any of the SIC Agreements as part of the Sale. *See* CSF ¶ 21. Therefore, even assuming, for sake of argument, that HTI was acting as the Trustee's agent with respect to the SIC Agreements, SIC still would not be able to maintain a claim against HTI for breach of the SIC Agreements. *See, e.g.*, *Stanley v. Univ. of S. Calif.*, 178 F.3d 1069, 1078 (9th Cir. 1999) ("[W]e conclude that the district court was correct to grant summary judgment for Garrett on the contract claims, because he acted merely as USC's agent and was not a party to the contract."); *Double C Entertainment, Inc. v. Palace Theatre Operating Group, LLC*, Civil Action No. 3:11-CV-98-CRS, 2011 WL 5903606, at *2 (W.D. Ky. Nov. 25, 2011) (dismissing breach of contract claims against agent and noting that agent was not a party to the subject contract).

## C.   Count III (damages) fails as a matter of law.

Count III (damages) fails for the same reasons as Count II. In Count III of the Complaint, SIC seeks monetary damages for the Trustee's alleged breaches of

the MRA.  *See* Compl. ¶¶ 50-54.  As discussed *supra*, the MRA is not enforceable against HTI, *see supra* Section IV.A, and, as such, HTI cannot be held liable for the Trustee's alleged breach of the MRA, *see supra* Section IV.B.  Therefore, Count III which seeks monetary damages for the Trustee's alleged breaches of the MRA, as against HTI, fails as a matter of law.

## V.   CONCLUSION

SIC's claims against HTI to enforce and for breach of the SIC Agreements fail as a matter of law.  HTI respectfully requests that the Court grant the Motion in its entirety.

DATED:  Honolulu, Hawaii, November 16, 2021.

**CADES SCHUTTE**
**A Limited Liability Law Partnership**

/s/  *Trisha H.S.T. Akagi*
C. MICHAEL HEIHRE
THEODORE D. C. YOUNG
TRISHA H.S.T. AKAGI

and

**MORGAN, LEWIS & BOCKIUS LLP**
ANDREW J. GALLO
ANDREW M. RAY

Attorneys for Defendant
HAWAIIAN TELCOM, INC.

CADES SCHUTTE
A Limited Liability Law Partnership
C. MICHAEL HEIHRE        1307
THEODORE D. C. YOUNG    5735
TRISHA H.S.T. AKAGI        10186
1000 Bishop Street, Suite 1200
Honolulu, HI  96813-4212
Telephone:  (808) 521-9200
Facsimile:   (808) 521-9210
Email:  mheihre@cades.com
        tyoung@cades.com
        takagi@cades.com

MORGAN, LEWIS & BOCKIUS LLP
ANDREW J. GALLO (admitted *pro hac vice*)
One Federal Street
Boston, MA 02110-1726
Telephone:  +1 (617) 951-8117
Email:  andrew.gallo@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
ANDREW M. RAY (admitted *pro hac vice*)
1111 Pennsylvania Avenue, NW
Washington DC 20004
Telephone:  +1 (202) 373-6585
Email:  andrew.ray@morganlewis.com

Attorneys for Defendant
HAWAIIAN TELCOM, INC.

### IN THE UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF HAWAII

| In re | CASE NO. 18-01319 |
|---|---|
|  | (Chapter 11) |
| PANIOLO CABLE COMPANY, LLC, |  |
|  |  |
| Debtor. |  |

| SANDWICH ISLES COMMUNICATIONS, INC., | Adversary No. 21-90017 |
|---|---|
| Plaintiff, | |
| vs. | Judge: Honorable Robert J. Faris |
| MICHAEL KATZENSTEIN, AS CHAPTER 11 TRUSTEE; HAWAIIAN TELCOM INC., | |
| Defendants. | |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this date, true and correct copy of the

foregoing document was duly served on the following parties via CM/ECF, or

U.S. Postal Service, as indicated below:

### Via CM/ECF

Lex R. Smith on behalf of Plaintiff SANDWICH ISLES COMMUNICATIONS, INC.
lsmith@ksglaw.com, jkeane@ksglaw.com;myw@ksglaw.com

Jonathan C. Bolton on behalf of Defendant MICHAEL KATZENSTEIN
jbolton@goodsill.com, pbabbit@goodsill.com

### VIA U.S. Postal Service

Maria Y. Wang
on behalf of Plaintiff SANDWICH ISLES COMMUNICATIONS, INC.
Kobayashi Sugita & Goda, LLP
999 Bishop Street, 26th Floor
Honolulu, HI 96813

DATED:  Honolulu, Hawaii, November 16, 2021.

**CADES SCHUTTE**
**A Limited Liability Law Partnership**

/s/  *Trisha H.S.T. Akagi*_____
C. MICHAEL HEIHRE
THEODORE D. C. YOUNG
TRISHA H.S.T. AKAGI

and

**MORGAN, LEWIS & BOCKIUS LLP**
ANDREW J. GALLO
ANDREW M. RAY

Attorneys for Defendant
HAWAIIAN TELCOM, INC.

# EXHIBIT I

Before the
**Federal Communications Commission**
Washington, D.C. 20554

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Connect America Fund | ) | WC Docket No. 10-90 |
| | ) | |
| Sandwich Isles Communications, Inc. | ) | |
| | ) | |
| Petition for Waiver of the Definition of "Study | ) | CC Docket No. 96-45 |
| Area" Contained in Part 36, Appendix-Glossary | ) | |
| and Sections 36.611 and 69.2(hh) of the | ) | |
| Commission's Rules | ) | |

**MEMORANDUM OPINION AND ORDER**

**Adopted: June 30, 2017**                                   **Released: July 3, 2017**

By the Commission: Commissioner Clyburn issuing a statement.

    1.      Congress has directed that if a State or local legal requirement effectively prohibits competitors from providing telecommunication service, we *must* override that requirement.  Today, we carry out that mandate to remove barriers to entry and ensure the benefits of competition by preempting an exclusive license that effectively bars telecommunications competition on the Hawaiian home lands. Specifically, in this Memorandum Opinion and Order, we find that an exclusive license to "build, construct, repair, maintain, and operate" a network to provide telecommunications services that was granted by the State of Hawaii, Department of Hawaiian Home Lands (DHHL or Department) to Waimana Enterprises, Inc. (Waimana) and then assigned to its subsidiary, Sandwich Isles Communications, Inc. (Sandwich Isles) (hereinafter Exclusive License),[1] violates Section 253(a) of the Communications Act, as amended (the Act).[2]  Because we find that the Exclusive License is not subject to the exceptions in Section 253(b) or (c),[3] we preempt enforcement of its exclusivity provision pursuant to Section 253(d) of the Act.[4]

**I.    BACKGROUND**

    2.      DHHL is responsible for managing the Hawaiian home lands for the benefit of native Hawaiians under the Hawaiian Homes Commission Act of 1920, as amended (HHCA).[5]  Thousands of families reside on the Hawaiian home lands, which are comprised of approximately 203,000 acres of

---

[1] State of Hawaii, Department of Hawaiian Home Lands License Agreement No. 372, at 2 (May 9, 1995) (Exclusive License), attached as Exhibit One to Sandwich Isles Reply Comments, WC Docket No. 10-90, WT Docket No. 10-208 (filed Feb. 24, 2012) (Sandwich Isles Feb. 24, 2012 Reply Comments).

[2] 47 U.S.C. § 253(a).

[3] *Id.* § 253(b), (c).

[4] *Id.* § 253(d).

[5] Letter from Jobie M.K. Masagatani, Chairman, Hawaiian Homes Commission, on behalf of the Department of Hawaiian Home Lands, State of Hawaii, to Ajit Pai, Chairman, FCC, WC Docket No. 10-90, CC Docket No. 96-45, at 1 (filed Feb. 3, 2017) (DHHL Letter).

State land.[6]  Pursuant to the HHCA, DHHL has authority over access to and uses of the Hawaiian home lands,[7] including authority "'to grant licenses as easements for . . . telephone lines.'"[8]  However, DHHL "does not have regulatory authority over telecommunications carriers."[9]  In 1995, "DHHL granted an 'exclusive' license 'in perpetuity' to Waimana Enterprises, Inc., the parent company of Sandwich Isles, to provide telecommunications services to the Hawaiian home lands."[10]  Specifically, the Exclusive License grants Waimana and its legal successors and assigns "the exclusive right and privilege to build, construct, repair, maintain, and operate a broad band [sic] telecommunications network including poles, overhead and/or underground lines, appliances, microwave and/or other types of equipment over, across, under and throughout all lands under the administration and jurisdiction of [DHHL] . . . ."[11]  The terms of the Exclusive License provide that "broad band [sic] telecommunication services" includes, among other services, "intrastate and interstate telephone services."[12]  In 1996, DHHL granted a partial assignment of the Exclusive License to Sandwich Isles.[13]

3.        In December 2016, following an investigation by the Universal Service Administrative Company, the Commission concluded that Sandwich Isles improperly received payments of more than $27 million in universal service high-cost support through repeated violations of the Commission's rules.[14]  In light of the Commission's findings, the Commission directed the Wireline Competition Bureau (Bureau) to seek comment on whether the Commission should terminate a previously granted study area

---

[6] Comments of Hawaiian Telcom, Inc., WC Docket No. 10-90, CC Docket No. 96-45 (filed Feb. 20, 2017) (Hawaiian Telcom Comments), Attachment, Opposition of Hawaiian Telcom, Inc. to Petition for Expedited Study Area Waiver, CC Docket No. 96-45, at 4 (filed Mar. 4, 2013).

[7] DHHL Letter at 2, n.2.

[8] Hawaiian Telcom Comments, Attachment, at 18 (quoting HHCA § 207(c)(1)).

[9] DHHL Letter at 2, n.2.

[10] Id. at 2.

[11] Exclusive License at 2.

[12] Id. at 1.

[13] DHHL Letter at 2; see also Sandwich Isles Feb. 24, 2012 Reply Comments at 5-6 (explaining that the Exclusive License "was subsequently assigned in part to [Sandwich Isles], a wholly-owned subsidiary of Waimana, for purposes of the wireline voice requirements of the License").

[14] See generally Sandwich Isles Communications, Inc., Order, WC Docket No. 10-90, 31 FCC Rcd 12999 (2016) (Sandwich Isles Improper Payments Order).  The Commission also proposed a forfeiture of more than $49 million on Sandwich Isles, Waimana, and its controlling owner, Albert Hee, for apparent violations of the Commission's rules by, among other things, submitting and falsely certifying inaccurate data contained in cost studies from 2002 to 2013 that were used to calculate high-cost support.  See generally Sandwich Isles Communications, Inc., Waimana Enterprises, Inc., Albert S.N. Hee, Notice of Apparently Liability for Forfeiture and Order, File No. EB-IHD-15-00019603, 31 FCC Rcd 12947 (2016) (Sandwich Isles NAL or NAL).  In the NAL, the Commission ordered Sandwich Isles to submit a report explaining why the Commission should not initiate proceedings against Sandwich Isles to revoke its Commission authorizations, including but not limited to, its Section 214 authorizations.  Id. at 12974, para. 84.  The Commission also directed the Bureau to issue a Public Notice seeking comment from interested stakeholders on this issue.  Id.; see also Wireline Competition Bureau Seeks Comment on Initiating Proceedings to Revoke Sandwich Isles Communications, Inc.'s Commission Authorizations, Public Notice, WC Docket No. 16-405, DA 17-168 (2017).  Sandwich Isles submitted its response to the NAL on February 3, 2017.  See Sandwich Isles Communications, Inc.'s Comments and Response to Notice of Apparent Liability and Forfeiture Order, WC Docket No. 10-90 (filed Feb. 3, 2017).

2

**Federal Communications Commission**                                    **FCC 17-85**

boundary waiver providing Sandwich Isles the status of an incumbent local exchange carrier for purposes of receiving high-cost support, and thereby render Sandwich Isles ineligible to receive such support.[15]

4.        In response to the Bureau's Public Notice,[16] on February 3, 2017, DHHL filed a letter requesting guidance on whether the terms of the Exclusive License granted to Waimana and partially assigned to Sandwich Isles[17] "may implicate Section 253(a) . . . and act as a potential barrier to entry by another provider capable of reasonably utilizing [universal service] support" to provide service to the Hawaiian home lands.[18]  On February 6, 2017, the Bureau issued a Public Notice seeking comment on DHHL's request for guidance.[19]  In response, Hawaiian Telcom argues that the Exclusive License violates Section 253(a)[20] and Crown Castle contends that any interpretation of the Exclusive License to exclude the provision of CMRS by entities other than Sandwich Isles would violate Section 253(a).[21]  In their reply comments, Waimana and Sandwich Isles contend that the Exclusive License does not violate Section 253(a).[22]

5.        Section 253(a) provides that:

No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.[23]

6.        Section 253(b) creates an exception to Section 253(a), providing that:

Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.[24]

---

[15] *Sandwich Isles Improper Payments Order*, 31 FCC Rcd at 13016-17, para. 58.  This order does not resolve any issues related to Sandwich Isles' study area waiver or potential revocation of Sandwich Isles' Commission authorizations.

[16] *Wireline Competition Bureau Seeks Comment on the 2005 Waiver That Allows Sandwich Isles to Be Treated as an Incumbent Local Exchange Carrier for Purposes of Receiving High-Cost Universal Service Support*, Public Notice, WC Docket No. 10-90, CC Docket No. 96-45, 31 FCC Rcd 13326 (Dec. 20, 2016).

[17] *See* DHHL Letter at 2 ("Pursuant to a partial assignment of that license in January 1996, Sandwich Isles provides telecommunications services to the home lands.").

[18] *Id.* at 2.

[19] *Wireline Competition Bureau Seeks Comment on the Department of Hawaiian Home Lands' Request for Guidance on Whether Sandwich Isles, Inc.'s Exclusive License to Serve the Hawaiian Home Lands Conflicts with Section 253(a) of the Communications Act*, Public Notice, WC Docket. No. 10-90, CC Docket. No. 96-45, 32 FCC Rcd 1117 (Feb. 6, 2017) (*Section 253 Public Notice*).

[20] *See generally* Hawaiian Telcom Comments.

[21] *See* Comments of Crown Castle USA Inc., WC Docket No. 10-90, CC Docket No. 96-45, at 2 (filed Feb. 20, 2017) (Crown Castle Comments).

[22] *See generally* Reply Comments of Sandwich Isles Communications, Inc., WC Docket No. 10-90, CC Docket No. 96-45 (filed Mar. 9, 2017) (Sandwich Reply Comments); Reply of Waimana Enterprises Inc., WC Docket No. 10-90, CC Docket No. 96-45 (filed Feb 27, 2017) (Waimana Reply Comments); *see also* Letter from Albert Hee, Founder, Waimana Enterprises Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 10-90, CC Docket No. 96-45 (filed Feb. 27, 2017) (Hee Reply Comments).

[23] 47 U.S.C. § 253(a).

[24] *Id.* § 253(b).

7.      Section 253(c) also preserves State authority, saying that:

Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed.[25]

8.      Section 253(d) requires the Commission to preempt the enforcement of State or local requirements that are contrary to Sections 253(a) or (b) "to the extent necessary to correct such violation or inconsistency."[26]

## II.    DISCUSSION

9.      The Exclusive License violates Section 253(a) because it constitutes a State legal requirement that prohibits or has the effect of prohibiting the ability of any entity other than Sandwich Isles to provide intrastate or interstate telecommunications services.  Because the Exclusive License does not satisfy the exceptions in Section 253(b) or (c), we are required to preempt enforcement of its exclusivity provision pursuant to Section 253(d).

### A.      Section 253(a) Analysis

10.      *Section 253(a) Applies.*  Despite Waimana's and Sandwich Isles' arguments to the contrary, we find that the Exclusive License falls within the scope of Section 253(a).  First, Waimana argues that Section 253(a) does not apply because the "DHHL is not the State,"[27] but rather an entity akin to a tribal government that has sovereignty over the Hawaiian home lands.[28]  We disagree and find that the DHHL is a "State" agency to which Section 253(a) applies.  As the Ninth Circuit and the Hawaii Supreme Court have explained, the Hawaiian home lands are managed by State officials.[29]  Indeed, in rejecting Waimana's argument that the Hawaiian home lands are not "state lands" for purposes of a Hawaii environmental statute, the Hawaii Supreme Court found that while "the State has assumed a trust obligation regarding Hawaiian home lands and must manage and dispose of these lands in a manner consistent with its fiduciary duty to the beneficiaries," Waimana had "overlook[ed] the significant role of the State in relation to these lands."[30]  Specifically, "both legal title and management responsibilities over the land are still in the hands of the State."[31]  And DHHL, the State agency that has those management responsibilities, was established pursuant to Section 202 of the HHCA,[32] which is State law.[33]  Further,

---

[25] *Id.* § 253(c).

[26] *Id.* § 253(d).

[27] Waimana Reply Comments at 11.

[28] *Id.* at 8-9, 11-12; *see also* Sandwich Isles Reply Comments at 3.  We note that the Commission has previously declined to act under Section 253 "to preempt Native American power over tribal lands." *AB Fillins*, Memorandum Opinion and Order, 12 FCC Rcd 11755, para. 18 (1997).

[29] *See Kepo'o v. Watson*, 952 P.2d 379, 385-87 (Haw. 1998); *see also Keaukaha-Panaewa Community Ass'n v. Hawaiian Homes Comm'n*, 588 F.2d 1216, 1226-27 (9th Cir. 1978) (explaining that upon admission of Hawaii into the Union, the "United States conveyed its interest in the home lands . . . to the state and these lands are now administered by state officials").

[30] *Kepo'o*, 952 P.2d at 385.

[31] *Id.*; *see also id.* at 386-87 (holding that the "Hawaiian home lands are certainly unique 'state lands,' with special duties attached to them, but they are 'state lands' nevertheless").

[32] HHCA § 202(a).

[33] *See Kepo'o*, 952 P.2d at 386-87 (Hawaii 1998) (holding that while the HHCA was originally enacted by Congress, it was subsequently adopted as part of the Hawaii constitution as a condition of statehood, and is therefore "a matter of state constitutional law and does not constitute federal law") (citing *Keaukaha-Panaewa Community Ass'n*, 588 F.2d at 1226-27).  In fact, although Waimana and Sandwich suggest that the Commission cannot preempt here

(continued....)

4

**Federal Communications Commission**          **FCC 17-85**

DHHL is headed by an executive board (the Hawaiian Homes Commission) whose members are appointed by the Governor with the advice and consent of the State Senate.[34]  It is therefore not surprising that the Exclusive License expressly states that it was granted by the "*State of Hawaii*, Department of Hawaiian Home Lands,"[35] and that it was granted pursuant to DHHL's authority under the HHCA as well as the "State of Hawaii . . . Administrative Rules."[36]  In fact, Waimana concedes that DHHL is a State agency[37] and Sandwich Isles has repeatedly made the same statement in filings with the Commission.[38]

11.     Moreover, DHHL's own statements in this proceeding belie Waimana's claim that DHHL has sovereignty over the Hawaiian home lands.  For instance, although it is a form of authority that a sovereign would typically possess, DHHL expressly states that it "does not have regulatory authority over telecommunications carriers" on the Hawaiian home lands.[39]  Additionally, as one commenter explains, while DHHL has statutory control over access to the Hawaiian home lands, no provision of the HHCA authorizes DHHL to establish a telecommunications monopoly on those lands.[40]

12.     Further, we disagree with Waimana and Sandwich Isles' argument that DHHL is analogous to a sovereign tribal government.  It is true that Section 54.5 of the Commission's rules includes the Hawaiian home lands within the definition of "Tribal lands."[41]  That rule defines "Tribal lands" to include the Hawaiian home lands "[f]or purposes of high-cost support."[42]  But the existence of the rule does not mean that DHHL is akin to a sovereign Tribal government to which Section 253(a) does not apply.  Indeed, as the Commission has previously noted, "we do not have the same government-to-government relationship with Hawaiian Home Lands as we do with Tribal lands."[43]

13.     We also find—and neither Waimana nor Sandwich Isles disputes—that the Exclusive License is a "legal requirement" under Section 253(a).  In the *Minnesota Order*, the Commission found

---

(Continued from previous page) ————————————————————
because the HHCA is longstanding federal law (*see* Waimana Reply Comments at 12; Sandwich Isles Reply Comments at 4), Sandwich Isles itself has previously acknowledged that the HHCA is considered State law.  *See* Sandwich Isles Communications, Inc. Petition for Waiver, CC Docket No. 96-45, n.21 (filed Dec. 27, 2004).

[34] *See* HHCA § 202(a) (citing Haw. Rev. Stat. § 26-34).

[35] Exclusive License at 1 (emphasis added).

[36] *See id.* (citing HHCA § 207(c)(1) and Haw. Admin. Rules §§ 10-4-21, 10-4-22).

[37] Waimana Reply Comments at 8; *id.*, Exhibit F, at 1 (attaching letter from "the Department of Hawaiian Home Lands *of the State of Hawaii*") (emphasis added); *see also id.* at 12 (arguing that the Exclusive License does not violate Section 253(a) because that provision "does not prohibit *state and local governments*, as landowners, from . . . bargaining with the land rights they own") (emphasis added).

[38] *See, e.g.*, Letter from Janeen Olds, CEO and President, Sandwich Isles Communications, Inc. to Marlene H. Dortch, Secretary, FCC, WC Docket No. 10-90, at 4 (filed Mar. 6, 2014) ("DHHL is a State agency . . . ."); *id.* at 1 ("[Sandwich Isles] provides these services through an exclusive license granted by the Department of Hawaiian Home Lands (DHHL), the managing state agency of HHL, to provide all telecommunications within HHL."); Sandwich Isles Communications, Inc. Petition for Waiver, CC Docket No. 96-45, at v (filed Dec. 27, 2004) ("Sandwich Isles' parent received a license to serve the entire Hawaiian Home Lands . . . from the Department of Hawaiian Home Lands, the state agency administering the trust lands.").

[39] DHHL Letter at 2.

[40] Hawaiian Telcom Comments, Attachment, at 17-18.

[41] Waimana Reply Comments at 8-9; Sandwich Isles Reply Comments at 3-4.

[42] 47 CFR § 54.5.

[43] *Improving Communications Services for Native Nations*, Notice of Inquiry, 26 FCC Rcd 2672, n.2 (2011); *see also Procedures for Reestablishing a Formal Government-to-Government Relationship with the Native Hawaiian Community*, 80 Fed. Reg. 59113, 59116-17 (Oct. 1, 2015) ("[T]he Federal Government does not maintain a formal government-to-government relationship with the Native Hawaiian community as an organized, sovereign entity.").

that a contract entered into by the State that granted one entity exclusive access to its freeway rights-of-way for the development of telecommunications transmission capacity created a "legal requirement" under Section 253(a) because it "legally [bound] the State to deny other entities permits for access to these freeway rights-of-way."[44]  The Commission held that it "will look at the effect of the state or local government's action to determine whether [S]ection 253 is applicable," and it found that the agreement had "the potential to adversely affect competitors that do not have similar access" to the freeway rights-of-way.[45]  Similarly, here, the Exclusive License is a contractual agreement[46] entered into by the State that grants one entity "the exclusive right . . . to build, construct, repair, maintain and operate a . . . . telecommunications network"[47] on the Hawaiian home lands.  It thus legally binds the State to deny other competitors the right to do the same, and it consequently adversely affects those competitors.  Specifically, entities other than Sandwich Isles cannot build or operate network facilities to reach and provide telecommunications services to the residents living on the more than 200,000 acres of land that comprise the Hawaiian home lands.  For these reasons, we find that the Exclusive License creates a "legal requirement" to which Section 253(a) applies.  Such a conclusion is entirely consistent with congressional intent.  As the Commission has previously explained, the "fact that Congress included the term 'other legal requirements' within the scope of section 253(a) recognizes that State and local barriers to entry could come from sources other than statutes and regulations," and interpreting the term "legal requirement" broadly best fulfills Congress' desire to ensure that States and localities do not impede the development of competition.[48]

14.    Additionally, we are not persuaded by Waimana's argument that Section 253(a) is inapplicable where it would affect the State's ability to "deal[] with its real estate interests . . . as it sees fit," such as by granting access to "rights-of-way over land that it owns."[49]  In fact, the Commission applied Section 253(a) to just such an instance in the *Minnesota Order*.  There, Minnesota had granted one entity exclusive physical access to State-owned land (*i.e.*, State freeway rights-of-way) in exchange for the development of telecommunications transmission capacity.[50]  The Commission held that Section 253(a) applied because the agreement at issue had the potential to adversely affect competitors that lacked similar access.[51]  As the Commission emphasized there, the relevant inquiry in determining whether Section 253(a) applies is the legal requirement's "effect on the provision of telecommunications service," not how the requirement could be characterized or "the purported subject matter" of the requirement.[52]  Thus, contrary to Waimana's assertion, the fact that the State was "bargaining with the land" that it owns[53] when granting the Exclusive License does not render Section 253(a) inapplicable here.

---

[44] *Petition of the State of Minnesota for a Declaratory Ruling Regarding the Effect of Section 253 on an Agreement to Install Fiber Optic Wholesale Transport Capacity in State Freeway Rights-of-Way*, Memorandum Opinion and Order, 14 FCC Rcd 21697, 21707, para. 17 (1999) (*Minnesota Order*).

[45] *Id.* at 21707, para. 19.  The Commission thus found the situation at hand to be "very different from a traditional government procurement of telecommunications facilities or services" to which Section 253 would not apply.  *Id.*

[46] The Exclusive License is a contract in which DHHL granted Waimana the exclusive right to build, maintain, and operate a telecommunications network on the Hawaiian home lands "in consideration of the services to be provided by [Waimana]," including the construction and installation of telecommunications infrastructure on DHHL's lands at Waimana's cost.  *See* Exclusive License at 1-2.

[47] *Id.* at 2.

[48] *Minnesota Order*, 14 FCC Rcd at 21707, para. 18.

[49] Waimana Reply Comments at 11-12.

[50] *See generally Minnesota Order*.

[51] *Id.* at 21708, para. 19.

[52] *Id.* at 21705-06, 21707, paras. 14-15, 19.

[53] Waimana Reply Comments at 12.

15.    *The Exclusive License Violates Section 253(a).*  Having found that the Exclusive License falls within the scope of Section 253(a), we conclude that it prohibits or has the effect of prohibiting the ability of entities other than Waimana and Sandwich Isles from providing telecommunications services in contravention of the statute.[54]  Sandwich Isles argues that the Exclusive License does not violate Section 253(a) because it grants exclusivity only as to the construction of telecommunications "infrastructure" and therefore does not preclude competitors from providing "service" to the Hawaiian home lands.[55]  We reject this argument.  DHHL itself characterizes the Exclusive License as granting the exclusive right "to provide telecommunications *services* to the Hawaiian home lands"[56] (although it is not clear that DHHL has such authority).  More importantly, for purposes of Section 253(a), it is a legal requirement's "effect on the provision of telecommunications service that is critical, not whether [the requirement] could be characterized as dealing with infrastructure development."[57]

16.    The legal requirement at issue in this proceeding grants one entity the "exclusive" right "to build, construct, repair, maintain and operate a . . . telecommunications network" for the purpose of providing service to the residents of the Hawaiian home lands and therefore prohibits other entities from doing so.[58]  The Exclusive License thus represents exactly the type of prohibition on entry that Section 253(a) was intended to prevent.[59]  As the Commission has held, "[S]ection 253(a), at the very least, proscribes State and local legal requirements that prohibit all but one entity from providing telecommunications services in a particular State or locality."[60]  And the State's action here, "granting an exclusive license to [an entity], appears fundamentally inconsistent with the primary goal of the Telecommunications Act of 1996, to replace exclusivity with competition."[61]

17.    Waimana argues that the Exclusive License does not violate Section 253(a) because several other carriers have been authorized to provide telecommunications services on the Hawaiian home lands, including by operating cellular towers on those lands.[62]  However, this fact does not render the Exclusive License lawful.  On its face, the Exclusive License binds DHHL to prohibit the construction or

---

[54] 47 U.S.C. § 253(a).

[55] Sandwich Isles Reply Comments at 2-3.

[56] DHHL Letter at 2 (emphasis added).

[57] *Minnesota Order*, 14 FCC Rcd at 21705, para. 14; *see also Public Utility Commission of Texas et al. Petitions for Declaratory Ruling and/or Preemption of Certain Provisions of the Texas Public Utility Regulatory Act of 1995*, Memorandum Opinion and Order, 13 FCC Rcd 3460, 3480, para. 41 (1997) (*Texas Order*) (concluding that the mandate under Section 253 "requires us to preempt not only express restrictions on entry, but also restrictions that indirectly produce that result").

[58] *See, e.g., Minnesota Order*, 14 FCC Rcd at 21708, para. 21 (finding that a State requirement that prevents other facilities-based providers from providing telecommunications services would contravene Section 253(a)) (citing *Texas Order*, 13 FCC Rcd at 3496-97, paras. 74-75).

[59] *See, e.g., N.J. Payphone Ass'n v. Town of West New York*, 299 F.3d 235, 242 (3d Cir. 2002) (holding that exclusive area-wide franchise to provide payphones in public rights-of-way is a "deliberate creation of scarcity" in violation of 253(a)); *id.* at 247 (explaining that a requirement that permits a government entity to "choose one service provider . . . to the exclusion of all others based on criteria determined by it rather than the market" violates Section 253(a)); *Classic Telephone, Inc., Petition for Preemption, Declaratory Ruling and Injunctive Relief*, Memorandum Opinion and Order, 11 FCC Rcd 13082, 13096, paras. 26-27 (1996) (*Classic Telephone*) (concluding that city's decision not to grant a local franchise to a second telecommunications carrier in order to prevent competition violates Section 253); *New England Public Communications Council, Petition for Preemption Pursuant to Section 253*, Memorandum Opinion and Order, 11 FCC Rcd 19713, 19721, para. 18 (1996) (*New England Order*) (preempting state commission decision precluding independent payphone providers from offering services).

[60] *Classic Telephone*, 11 FCC Rcd at 13095, para. 25.

[61] *Minnesota Order*, 14 FCC Rcd at 21700, para. 3.

[62] Waimana Reply Comments at 13-14; *see also* Hee Reply Comments at 1.

operation of a telecommunications network by any entity other than Sandwich Isles for the provision of telecommunications services on the Hawaiian home lands. And selective enforcement of the Exclusive License does not obviate its effect of prohibiting competition. Indeed, the record demonstrates that the Exclusive License has the effect of prohibiting the ability of an entity to continue to provide telecommunications services to the Hawaiian home lands. Specifically, Crown Castle states that when it notified DHHL of its intention to extend the term of its non-exclusive license to operate a cellular tower on the Hawaiian home lands, "DHHL notified Crown Castle of [DHHL's] contract with Sandwich Isles" giving exclusive rights with respect to DHHL properties.[63] As a result, Crown Castle has been unable to extend its license to operate the tower, which is used to provide CMRS on the Hawaiian home lands.[64]

18.     Waimana also suggests that the Exclusive License does not prohibit competition because other telecommunications carriers could lease access to elements of Sandwich Isles' network.[65] The Exclusive License, however, prohibits any other entity from even "operat[ing] a . . . telecommunications network" on the Hawaiian home lands.[66] In any event, under Commission precedent, Section 253(a) bars State or local requirements that prevent competitors from "utiliz[ing] their own facilities to provide service."[67]

B.     **Section 253(b) Analysis**

19.     We conclude that the Exclusive License is not protected by Section 253(b). That provision preserves from preemption certain State or local requirements that are "competitively neutral" and "necessary" to achieve the public interest objectives enumerated therein, even if the requirements violate Section 253(a).[68]

20.     Consistent with Commission precedent, we find that the Exclusive License is not competitively neutral. The "proper inquiry" under Section 253(b) is "whether the effect of the [State or local legal requirement] will be competitively neutral."[69] In the *New England Order* and *Texas Order*, the Commission found that the State legal requirements at issue were not competitively neutral because they singled out a class of entities and imposed a disadvantage on them that significantly affected or even eliminated their ability to compete in the provision of certain telecommunications services.[70] Similarly, in the *Minnesota Order*, the Commission concluded that the agreement at issue was not competitively neutral because it granted a single entity exclusive physical access to valuable freeway rights-of-way for a period of ten years with an option to renew for another ten years and thereby disadvantaged facilities-based competitors.[71] Likewise, here, the Exclusive License expressly grants a single entity the exclusive right, in perpetuity, to construct and operate a telecommunications network on the Hawaiian home lands and thus effectively prohibits the provision of telecommunications services by competitors.

21.     Our conclusion that the Exclusive License is not competitively neutral is dispositive on the question of whether the Section 253(b) exception applies. Even if that were not the case, however, we find no basis for concluding that the Exclusive License is "necessary" to advance universal service or any of the other public interest objectives listed in Section 253(b). The burden of proving that the State or

---

[63] Crown Castle Comments at 2.

[64] *Id.*

[65] Waimana Reply Comments at 15-16; *see also* Hee Reply Comments at 1.

[66] Exclusive License at 2.

[67] *Texas Order*, 14 FCC Rcd at 21708, para. 21.

[68] 47 U.S.C. § 253(b); *see also Minnesota Order*, 14 FCC Rcd at 21724, para. 50.

[69] *Minnesota Order*, 14 FCC Rcd at 21724-25, para. 51.

[70] *See New England Order*, 11 FCC Rcd at 19721-22, para. 20; *Texas Order*, 13 FCC Rcd at 3500, para. 82.

[71] *Minnesota Order*, 14 FCC Rcd at 21725, para. 52.

8

local requirement comes within the exceptions of Section 253 falls on the party claiming that the exemption applies.[72] Here, Sandwich Isles asserts that the public interest objectives in Section 253(b) "are exactly the basis on which the [Exclusive License] was based."[73] However, Sandwich Isles does not elaborate on or provide any support for this claim, let alone demonstrate that the Exclusive License is "necessary" to achieve those public interest objectives.[74] And Waimana does not even reference Section 253(b) in its reply comments.

**C.      Section 253(c) Analysis**

22.      Waimana suggests that the Exclusive License is protected from preemption under Section 253(c).[75] That provision states that "[n]othing in this section affects the authority of the State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government."[76] However, Waimana fails to demonstrate how or why the Exclusive License constitutes "manage[ment of] rights-of-way" by DHHL. Instead, Waimana merely quotes language from a federal district court case regarding the purpose of Section 253(c).[77] In fact, the district court there expressly distinguished the exclusive franchise to operate payphones on city sidewalks at issue in that case with a "restriction[] on the building of networks through the rights of way to serve the broader community,"[78] which is precisely the type of restriction at issue here.

23.      While the Act does not define "manage[ment of] rights-of-way," the Commission has previously recognized in the context of Section 253(c) that "[l]ocal governments must be allowed to perform the range of vital tasks necessary to preserve the physical integrity of streets and highways, to control the orderly flow of vehicles and pedestrians, [and] to manage gas, water, cable . . . and telephone facilities that crisscross the streets and public rights-of-way."[79] The Commission in turn has described the "types of activities that fall within the sphere of appropriate rights-of-way management" as including "coordination of construction schedules, determination of insurance, bonding and indemnity requirements, establishment and enforcement of building codes, and keeping track of various systems using the rights-of-way to prevent interference between them."[80] By contrast, here, the Exclusive License does much more than simply enable DHHL to engage in these or similar types of activities. Rather, as discussed above, the Exclusive License grants one entity the exclusive right to "operate a . . . telecommunications network" for the provision of telecommunication services on the Hawaiian home lands,[81] and it thus has the effect of precluding any other entity from providing telecommunications services to the residents of those lands. Finding that such a restriction falls within Section 253(c) would

---

[72] *Id.* at 21704, n.26.

[73] Sandwich Isles Reply Comments at 4-5.

[74] *Id.* at 4.

[75] Waimana Reply Comments at 12.

[76] 47 U.S.C. § 253(c).

[77] *See* Waimana Reply Comments at 12 (quoting *Telebeam Telecomms. Corp. v. City of New York*, 194 F.Supp.3d 178, 187 (E.D.N.Y. 2016)).

[78] *Telebeam Telecomms.*, 194 F.Supp.3d at 188.

[79] *TCI Cablevision of Oakland County, Inc.*, Memorandum Opinion and Order, 12 FCC Rcd 21396, 21441, para. 103 (1997).

[80] *Id.*; *see also Minnesota Order*, 14 FCC Rcd at 21729, n.129.

[81] Exclusive License at 2.

allow the rights-of-way management exception to "swallow whole the broad congressional preemption"[82] under Section 253(a) and render that statutory provision meaningless.

24.     Moreover, even assuming that the Exclusive License constituted rights-of-way management, such management must be "competitively neutral" and "nondiscriminatory" to receive protection under Section 253(c).[83]  Again, "the burden of proving that a statute, regulation, or legal requirement comes within the exemptions found in [S]ections 253(b) and (c) falls on the party claiming that exception applies."[84]  Here, however, Waimana does not even acknowledge that a State's rights-of-way management must be both "competitively neutral" and "nondiscriminatory" under Section 253(c), let alone demonstrate that the Exclusive License meets these two requirements.

### D.     Preemption Under Section 253(d)

25.     Because the Exclusive License violates Section 253(a) and is not saved by the exceptions in Section 253(b) or (c), we are required to preempt enforcement of its exclusivity provision under Section 253(d).[85]  That statutory provision requires the Commission to "preempt the enforcement" of "a State or local legal requirement that violates Section 253(a) or 253(b) "to the extent necessary to correct such violation or inconsistency."[86]  We therefore preempt enforcement of the exclusivity provision of the Exclusive License[87] because it has the effect of prohibiting the ability of any entity other than Sandwich Isles to provide telecommunications services on the Hawaiian home lands.  We note that the Exclusive License also contains a provision which states that "[a]fter LICENSEE activates the existing and/or new telecommunications infrastructure, [DHHL] agrees not to allow any other telecommunications provider to use any remaining telecommunications infrastructure to continue to provide or initiate service on [DHHL's] lands."[88]  We also find it necessary to preempt enforcement of this provision to the extent that it acts as a restatement or extension of the exclusivity provision.

### E.     Waimana's and Sandwich Isles' Remaining Arguments

26.     None of Waimana's remaining arguments alter our conclusion that we must preempt enforcement of the exclusivity provision of the Exclusive License.  First, the fact that a State legal requirement prohibiting competition in the provision of telecommunications services may have benefitted the State or some of its residents[89] does not render it lawful.[90]  Second, Waimana argues that the Exclusive License "was required by the Rural Utilities Service ('RUS') as a condition" of obtaining an RUS loan.[91]  Waimana, however, fails to cite any support for this claim.  Nor are we aware of any RUS requirement

---

[82] *City of Auburn v. Qwest Corp.*, 260 F.3d 1160, 1180 (9th Cir. 2001), *overruled on other grounds by Sprint Telephony PCS, L.P. v. County of San Diego*, 543 F.3d 571 (9th Cir. 2008) (en banc).

[83] 47 U.S.C. § 253(c); *see also Minnesota Order*, 14 FCC Rcd at 21729, para. 61.

[84] *Minnesota Order*, 14 FCC Rcd at 21704, n.26.

[85] 47 U.S.C. § 253(d).

[86] *Id.*

[87] *See* Exclusive License at 2 (granting "[Waimana], and its legal successors and assigns, the exclusive right and privilege to build, construct, repair, maintain, and operate a broad band [*sic*] telecommunications network including poles, overhead and/or underground lines, appliances, microwave and/or types of equipment over, across, under and throughout all lands under the administration and jurisdiction of [DHHL]").

[88] *Id.* at 3.

[89] Waimana Reply Comments at 9-10.

[90] *See Minnesota Order*, 14 FCC Rcd at 21716, para. 35 (finding that the State's "extraction of benefits in exchange for exclusive physical access to rights-of-way is fundamentally inconsistent with the 1996 Act, which endeavors to replace exclusive monopoly rights with open competition").

[91] Waimana Reply Comments at 10; *see also* Hee Reply Comments at 1.

that an entity obtain an exclusive license from the State in order to receive financing. And even if RUS imposed such a condition, Waimana makes no showing as to why a condition imposed by RUS could act to effectively preempt or nullify Section 253 of the Act. Third, the Commission's knowledge of the Exclusive License's existence prior to DHHL's request for guidance[92] is irrelevant to the Section 253 analysis. The Commission has never examined the issue of whether the Exclusive License comports with Section 253(a),[93] let alone "signed off on" or "approved" it as Waimana asserts.[94]

27.     Finally, we reject Sandwich Isles' claims of "procedural irregularities" in this proceeding.[95] In particular, Sandwich Isles complains that the issue of whether the Exclusive License conflicts with Section 253(a) was not raised in either the *Sandwich Isles Improper Payments Order* or *Sandwich Isles NAL* issued in December 2016.[96] The Commission did not receive DHHL's request for guidance on this issue,[97] however, until after those items were released and there is no procedural bar to taking action at this time pursuant to Section 253(a). We also disagree with Sandwich Isles' contention that the Public Notice seeking comment on DHHL's request was framed in a manner that would not result in examination of all of the relevant issues.[98] The language used in the Public Notice does not presume a violation but instead asks "whether [the Exclusive License] conflicts with Section 253(a)."[99] In response to the Public Notice, the Commission has received comments highlighting factors relevant to this inquiry, suggesting that the notice provided therein was sufficient. And as this Order makes clear, we have carefully considered whether the Exclusive License falls within the scope of Section 253(a), whether it violates Section 253(a), and whether it is protected from preemption by Section 253(b) or (c), and we find that we are obligated to preempt enforcement of the exclusivity provision in the Exclusive License under Section 253(d).

---

[92] Waimana Reply Comments at 11-12.

[93] In a 2005 order granting Sandwich Isles a study area waiver, the Wireline Competition Bureau declined to address Hawaiian Telcom's argument that the Exclusive License may pose a barrier to entry in violation of Section 253 on the basis that the issue was "better addressed in the context of a [S]ection 253 proceeding." *Sandwich Isles Communications, Inc., Petition for Waiver of the Definition of "Study Area" Contained in Part 36, Appendix-Glossary and Sections 36.611 and 69.2(hh) of the Commission's Rules*, Order, 20 FCC Rcd 8999, para. 23 (WCB 2005).

[94] Waimana Reply Comments at 11.

[95] Sandwich Isles Reply Comments at 1-2. Among other issues, Sandwich Isles complains that the Commission did not address its request to extend the deadline for reply comments on the *Section 253 Public Notice* from February 27, 2017 to March 10, 2017. Sandwich Isles Reply Comments at 2; *see also* Sandwich Isles Request for Extension of Time, WC Docket No. 10-90, CC Docket No. 96-45, at 1 (filed Feb. 23, 2017). In any event, Sandwich Isles filed reply comments on March 9, 2017, and we consider those reply comments herein. Therefore, we deem Sandwich Isles' argument moot.

[96] Sandwich Isles Reply Comments at 1.

[97] *See generally* DHHL Letter.

[98] Sandwich Isles Reply Comments at 1, 4-5.

[99] *Section 253 Public Notice* at 1.

| Federal Communications Commission | FCC 17-85 |
|---|---|

## III. ORDERING CLAUSES

28.     Accordingly, IT IS ORDERED, pursuant to Section 253 of the Communications Act of 1934, as amended, 47 U.S.C. § 253, that the enforcement of the exclusivity provision in the Exclusive License IS PREEMPTED.

29.     IT IS FURTHER ORDERED that this Order and the obligations set forth herein ARE EFFECTIVE upon release of this Order.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

12

## STATEMENT OF COMMISSIONER MIGNON L. CLYBURN

Re:     *Connect America Fund et al.*, WC Docket No. 10-90 et al.

      This Order highlights the importance of—and the Commission's commitment to—removing barriers to competitive entry. It preempts the Department of Hawaiian Home Lands' grant of an exclusive license to Waimana Enterprises, the parent company of Sandwich Isles. I am hopeful that our limited preemption will result in better service for consumers living on the Hawaiian Home Lands.

      It also highlights the importance of section 253 of the Communications Act in enabling competition. And how useless it will likely be in a broadband-only world, if the Commission's majority moves forward with its plan to reclassify broadband as an information service. Breaking down barriers to infrastructure deployment without Title II is about as effective demolishing a wall by staring at it. Without a Title II telecommunications service at issue, today's Order would not have been possible.

U.S. Bankruptcy Court - Hawaii   #22-90008   Dkt # 28-9   Filed  05/27/22   Page 14 of 14

# EXHIBIT J

STATE OF HAWAIʻI
DEPARTMENT OF HAWAIIAN HOME LANDS

January 18, 2022

To:          Chairman and Members, Hawaiian Homes Commission

From:        Cedric Duarte, ICRO

Subject:     For Information Only – Update on issues related to Telecommunications
             and Broadband services on Hawaiian Home Lands

RECOMMENDED ACTION

None.  For information only.

Discussion

This informational briefing is to update the Hawaiian Homes Commission (HHC) on
the status of the Department of Hawaiian Home Lands (DHHL) issues related to
Telecommunications and Broadband services on Hawaiian Home Lands.

PURPOSE

BACKGROUND

DHHL has informed its lessees, tenants, and permittees that under Federal law they may
obtain broadband telecommunications services from any provider of their choice.

For many years, Sandwich Isle Communications, Inc. (SIC) was the exclusive provider of
broadband telecommunications services under DHHL License No. 372 (License 372)
which was issued to SIC's parent company, Waimana Enterprises, Inc. on May 9, 1995.

On June 30, 2017, the Federal Communications Commission (FCC) adopted a
Memorandum Opinion and Order determining that all exclusivity claims arising from
License 372 are preempted by Federal law and are therefore unenforceable.

Subsequently, on August 31, 2021, Hawaiian Telcom (HT) completed the purchase of
inter-island submarine and middle-mile terrestrial fiber infrastructure assets from the
bankruptcy estate of the Paniolo Cable Company, a firm previously within the Waimana
Enterprises, Inc family of companies.

HT's purchase of the bankrupt Paniolo Cable Company assets did not include any
previously negotiated commercial agreements with SIC. Use of the inter-island submarine

- 1 -

ITEM NO. C-3

and middle-mile system by SIC to provide broadband telecommunications services to Hawaiian Home Lands will end on March 31, 2022, unless a new agreement can be reached.

The FCC's 2017 Order, combined with HT's purchase of telecommunications assets on DHHL lands, means that DHHL lessees, tenants, and permittees now have more options for broadband telecommunications services.  In addition, a new conduit use agreement between SIC and Charter Communications, which does business as Spectrum in Hawai'i, will also open additional services.

Current SIC customers may choose to continue their current service or select services from other providers, including Hawaiian Telcom, Spectrum, or other carriers who can provide broadband telecommunications services.

DHHL will receive at least $90 million from the Infrastructure Investment and Jobs Act to provide high-speed internet access to the Native Hawaiian community. In 2021, the Department received the last of five neighbor islands licenses from the FCC to access the 2.5 GHz band spectrum for the development of wireless broadband networks. Details on the Department's expansion plan for broadband services are anticipated for late 2022.

ITEM NO. C-3



DAVID Y. IGE
GOVERNOR
STATE OF HAWAII

JOSH GREEN
LT. GOVERNOR
STATE OF HAWAII

WILLIAM J. AILA, JR
CHAIRMAN
HAWAIIAN HOMES COMMISSION

TYLER I. GOMES
DEPUTY TO THE CHAIRMAN

**STATE OF HAWAII**
**DEPARTMENT OF HAWAIIAN HOME LANDS**
P. O. BOX 1879
HONOLULU, HAWAII  96805

January 14, 2022

Name
Address
City, State, Zip code

Dear Lessee:

Subject:      Broadband Services Update on Hawaiian Home Lands

This letter is to inform you that in accordance with a Federal Communications Commission (FCC) Memorandum Opinion and Order adopted on June 30, 2017, the Department of Hawaiian Home Lands (DHHL), will no longer enforce the exclusivity provision of DHHL License Agreement No. 372, issued to Waimana Enterprises, Inc. on May 9, 1995.

Waimana Enterprises, Inc. is Sandwich Isle Communications, Inc.'s (Sandwich Isles) parent company from who you mave have telephone and internet services.

In the past, DHHL lessees were prevented from obtaining telecommunications services from any other carrier besides Sandwich Isles. As a result of the lifting of the former exclusivity provision, lessees on Hawaiian Home Lands are now able to choose who to receive these services from.

Current Sandwich Isles customers may choose to continue to use their existing service or may select services from other provides, including Hawaiian Telcom, Spectrum, or other carriers who can bring service to your lot. It is important to note that some service providers may not be able to provide all services immediately.

Please feel free to call (808) 620-9500 should you have additional questions or concerns.

Aloha,

William J. Ailā, Jr.
Chair, Hawaiian Homes Commission

cc:

DAVID Y. IGE
GOVERNOR
STATE OF HAWAII

JOSH GREEN
LT. GOVERNOR
STATE OF HAWAII



WILLIAM J. AILA, JR
CHAIRMAN
HAWAIIAN HOMES COMMISSION

TYLER I. GOMES
DEPUTY TO THE CHAIRMAN

## STATE OF HAWAII
## DEPARTMENT OF HAWAIIAN HOME LANDS
P. O. BOX 1879
HONOLULU, HAWAII 96805

January 14, 2022

Name
Address
City, State, Zip code

Dear Lessee:

Subject:     Broadband Services Update on Hawaiian Home Lands

This letter is to inform you that in accordance with a Federal Communications Commission (FCC) Memorandum Opinion and Order adopted on June 30, 2017, the Department of Hawaiian Home Lands (DHHL), will no longer enforce the exclusivity provision of DHHL License Agreement No. 372, issued to Waimana Enterprises, Inc. on May 9, 1995.

Waimana Enterprises, Inc. is Sandwich Isle Communications, Inc.'s (Sandwich Isles) parent company from whom many of you have telephone and internet services.

In the past, DHHL General Lessees and Permittees were prevented from obtaining telecommunications services from any other carrier besides Sandwich Isles. As a result of the lifting of the former exclusivity provision, tenants on Hawaiian Home Lands are now able to choose who to receive these services from and would not be in violation of their Lease, License, or Right-Of-Entry agreement.

Current Sandwich Isles customers may choose to continue to use their existing service or may select services from other provides, including Hawaiian Telcom, Spectrum, or other carriers who can bring service to your business. It is important to note that some service providers may not be able to provide all services immediately.

Please feel free to call (808) 620-9500 should you have additional questions or concerns.

Aloha,

William J. Ailā, Jr.
Chair, Hawaiian Homes Commission

cc:

# EXHIBIT K



**Hawaiian Telcom**
HAWAII'S TECHNOLOGY LEADER

---

**Ellen Robinson**
Director, Carrier Sales

1177 Bishop Street
Honolulu, HI 96813
Ellen.Robinson@hawaiiantel.com
808-546-6143

March 11, 2022

Wendy Hee
President
Waimana Enterprises, Inc.
P.O. Box 893128
Mililani, Hawaii 96789

Dear Ms. Hee:

We received your February 10, 2022 letter and invoices from Waimana Enterprises, Inc. ("Waimana"), totaling $6,263,591.65 for "License 372 Access Fee" and other unidentified expenses Waimana claims are attributable to Hawaiian Telcom's use of Waimana's "License 372." As you know, however, any claims to exclusivity Waimana may have once had under License 372 have been rendered unenforceable under the Federal Communications Commission's Memorandum Opinion and Order dated July 3, 2017 (the "Preemption Order"). In a letter to your attorney, the Department of Hawaiian Homelands ("DHHL") similarly confirmed and clarified in writing that License 372 does not give Waimana or Sandwich Isles Communications, Inc. ("SIC") any rights to limit or restrict Hawaiian Telcom's access to and use of the Paniolo assets located on DHHL lands. And, as you are further aware, consistent with the provisions of the FCC's Preemption Order, DHHL has in fact granted Hawaiian Telcom its own independent right of entry agreement for the Paniolo premises. Hawaiian Telcom's right of entry is not dependent on Waimana's remaining interests in the 372 License, and it certainly does not require or condition Hawaiian Telcom's independent use and enjoyment of the Paniolo premises on the payment of any rent, access fee, or other tribute to Waimana.

Furthermore, Waimana and SIC's repeated assertions that Hawaiian Telcom's purchase of the Paniolo assets did not include access rights are similarly false. Those rights were indeed transferred to Hawaiian Telcom through the Bankruptcy Court's sale order. Therefore, consistent with above, Hawaiian Telcom is not required to negotiate an agreement with Waimana to access premises for which it already has been granted access.

Finally, demands made by SIC regarding access to or use of Paniolo assets have nothing to do with SIC's continuing breach and failure to pay Hawaiian Telcom under existing contracts ($**1,527,585.38** outstanding as of February 16, 2022). Such contracts and services provided thereunder are wholly unrelated to Hawaiian Telcom's 2021 acquisition of the Paniolo network,

EXHIBIT K

U.S. Bankruptcy Court - Hawaii  #22-90008   Dkt # 28-11   Filed  05/27/22   Page 2 of 3

some of which contracts have been in place since 1997, 2011 and 2014, with SIC's defaults dating back to August 2020.

Hawaiian Telcom still remains hopeful that SIC and its affiliates will come to the table and negotiate new commercial arrangements for use of the Paniolo network. Should you have any questions or wish to discuss contract negotiations or payment, please contact me at ellen.robinson@hawaiiantel.com or (808) 546-6143.

Sincerely,

*Ellen Robinson*

Ellen Robinson
Director, Carrier Sales
Hawaiian Telcom


cc: (VIA EMAIL)
Al Hee, SIC;
Breanne Kahalewai, SIC;
Department of Hawaiian Home Lands;
Hawai'i Public Utilities Commission;
Division of Consumer Advocacy, Department of Commerce and Consumer Affairs;
Department of Justice;
Rural Utilities Service; and
Federal Communications Commission

# EXHIBIT L

**Date Signed:**
**June 4, 2020**



SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>PANIOLO CABLE COMPANY, LLC,<br><br>Debtor. | Case No. 18-01319 (RJF)<br>(Chapter 11)<br><br>ORDER GRANTING MICHAEL KATZENSTEIN, AS CHAPTER 11 TRUSTEE'S MOTION TO APPROVE SETTLEMENT AGREEMENT PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019<br><br>Hearing:<br>Date: June 1, 2020<br>Time: 2:00 p.m.<br>Judge: Robert J. Faris |

**ORDER GRANTING MICHAEL KATZENSTEIN, AS CHAPTER 11 TRUSTEE'S MOTION TO APPROVE SETTLEMENT AGREEMENT PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019**

The *Motion to Approve Settlement Agreement Pursuant to Federal Rule of Bankruptcy Procedure 9019* [Dkt. no. 252] (the "Motion") filed by Michael Katztenstein, as Chapter 11 Trustee (the "Trustee") of the Bankruptcy Estate of

EXHIBIT L

7988341.1

PANIOLO CABLE COMPANY, LLC (the "<u>Debtor</u>"), was considered by the Honorable Robert J. Faris, United States Bankruptcy Judge, at 2:00 p.m. on June 1, 2020 (the "<u>Hearing</u>").  Appearances of counsel are noted in the record.

The Court, after finding that due and adequate notice of the Motion having been given, after finding that there were no objections to the Motion; after finding that the *Rule 9019 Settlement Agreement (Post-Judgment)* by and between the Trustee, the Paniolo Creditors,[1] Waimana Enterprises, Inc., Sandwich Isles Communications, Inc. and the SIC Affiliates meets the requirements of *Martin v. Kane (In re A & C Properties.),* 784 F.2d 1377 (9th Cir.) *cert. denied*, 479 U.S. 854 (1986), for the reasons set forth on the record of the Hearing, has decided that the Motion should be GRANTED.

It is therefore ORDERED, ADJUDGED and DECREED that:

1.      The Motion is GRANTED for the reasons set forth therein.

2.      The terms and conditions of the *Rule 9019 Settlement Agreement (Post-Judgment)* are APPROVED.

3.      The Court reserves jurisdiction over the parties to the *Rule 9019 Settlement Agreement (Post-Judgment)* for the purposes of interpretation, implementation and enforcement thereof.

## END OF ORDER

---

[1] Defined terms not defined herein shall have the meanings ascribed to them in the Motion.

Submitted by:

GOODSILL ANDERSON QUINN & STIFEL
A LIMITED LIABILITY LAW PARTNERSHIP LLP

JOHNATHAN C. BOLTON
  jbolton@goodsill.com
CHRISTOPHER P. ST. SURE
  cstsure@goodsill.com
First Hawaiian Center
999 Bishop Street, Suite 1600
Honolulu, Hawaii  96813
Telephone:  (808) 547-5600
Facsimile:  (808) 547-5880

Attorneys for Chapter 11 Trustee
MICHAEL KATZENSTEIN

EXECUTION COPY                                                    REDACTED

**RULE 9019 SETTLEMENT AGREEMENT (POST-JUDGMENT)**

This Rule 9019 Settlement Agreement is entered into, effective as of March 6, 2020 (this "Agreement") by and among:

(i)     The Paniolo Creditors[1] by and through the acknowledgement of Deutsche Bank Trust Company Americas, as Purchasers Agent and Collateral Agent, which is not a Party as such term is defined herein in such capacity (the "Paniolo Creditors");

(ii)    Michael Katzenstein, Chapter 11 Trustee of Paniolo Cable Company, LLC ("Paniolo Trustee");

(iii)   Waimana Enterprises, Inc.[2]("Ownership") and SIC Affiliates (hereinafter defined); and

(iv)    Sandwich Isles Communications, Inc. ("SIC", together with the SIC Affiliates and Ownership, the "SIC Parties");

The Paniolo Creditors, the Paniolo Trustee, Ownership and SIC shall collectively be referred to herein as the "Parties," and each, individually, as a "Party."

RECITALS

A.     The Parties have negotiated in good faith and at arm's length with the objective of restructuring the business and financial affairs of Paniolo Cable Company, LLC ("Paniolo Cable") and addressing the rights under the judgment granted the Paniolo Trustee against SIC in Adversary Proceeding No. 19-90022, *Katzenstein, Trustee, v. Sandwich Isles Communications, Inc.,* pending in *In re Paniolo Cable Company, LLC, Debtor,* Case No. 19-01319 (RJF), in the United States Bankruptcy Court (the "Bankruptcy Court") for the District of Hawaii (the "Judgment").

B.     Ownership directly or indirectly owns or controls 100% of the equity interests of SIC, and certain affiliates of SIC, including Clearcom, Inc. ("Clearcom"), Pa Makani LLC ("Pa Makani") and Ho'Opa'a Insurance Corp. ("Ho'Opa'a," together with Clearcom and Pa Makani,

---

[1] The Paniolo Creditors consist of HSBC Securities (USA) Inc., which holds legal or beneficial ownership of 94.6% ($176.3 million of $186.3 million) of Paniolo Cable Company, LLC Series A secured debt, 100% ($28.8 million) of Paniolo's Series B secured debt and 100% ($643,400) of Paniolo's Series C unsecured debt plus unpaid interest and fees; Sunrise Partnership Limited Partnership, which holds legal or beneficial ownership of 5.4% ($10 million of $186.3 million) of Paniolo Cable Company, LLC Series A secured debt plus unpaid interest and fees; and Deutsche Bank Trust Company Americas, which is owed $61,699 by Paniolo Cable (plus attorneys' fees and costs) in fees and expenses incurred under the Amended and Restated Note Purchase Agreement.

[2] Members of the Hee family and the family trusts own and control ownership of SIC.

EXECUTION COPY

and other affiliates, including Waimana Enterprises, Inc. ("Waimana"), collectively, the "SIC Affiliates").

C.     SIC is party to the SIC Lease and the Joint Use Agreement.[3]

D.     Pursuant to a submarine cable landing license issued by the Federal Communications Commission (the "FCC"), Paniolo Cable owns and, pursuant to the SIC Lease and JUA (each as hereinafter defined) operates a submarine cable system and related terrestrial assets (the "Paniolo System") connecting certain islands in the State of Hawaii.

E.     Pursuant to various licenses from the FCC, the Hawaii Public Utilities Commission, the State of Hawaii Department of Hawaiian Home Lands ("DHHL") and other regulatory agencies (the "Licenses and Entitlements"), SIC and the SIC Affiliates own and operate certain facilities, including an incumbent local exchange carrier, and provide telecommunications (including wireless and broadband) services to subscribers residing on the Hawaiian Home Lands.  Such services are currently dependent upon access to the Paniolo System.  SIC leases access to the Paniolo System from Paniolo Cable via a long-term lease (as hereinafter defined, the "SIC Lease").  In addition, Paniolo Cable and SIC are parties to a Joint Use Agreement (as hereinafter defined, the "JUA") which facilitates SIC's delivery of services to its customers and maintenance and operation of the Paniolo System.

F.     SIC owes the Paniolo Trustee approximately $256 million, plus interest and fees as provided for in the Judgment.

G.     The Parties agree that replacement of the SIC Lease and of the JUA as set forth in the Master Relationship Agreement and provided herein, and a sale of substantially all of Paniolo Cable's assets free and clear of all liens and encumbrances (the "Paniolo 363 Sale") are in their best interests and that of their constituencies.

H.     The Parties agree that certain of the measures set forth herein are subject to necessary approvals by applicable government authorities and the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties to this Agreement hereby agrees as follows:

1.     Additional Definitions.  In addition to the definitions set forth in the Recitals, the following terms shall have the following meanings:

"Bankruptcy Code" means title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Hawaii.

"Definitive Documentation" means the Master Relationship Agreement, and such other documents necessary to consummate the settlement contemplated in this Agreement, each in form and substance satisfactory to the Parties, including each of the following:

---

[3] Capitalized terms shall have the meanings as defined herein unless the context requires otherwise.

EXECUTION COPY

a.     The Master Relationship Agreement, to be approved by the presiding judge in the Paniolo Bankruptcy Case.

b.     All Licenses and such other assets held by SIC and specific Licenses and assets held by SIC Affiliates, including those itemized on Exhibit "3" attached hereto that are necessary to provide telecommunication services in the Hawaiian Home Lands, including but not limited to: (a) the  license to provide telecommunications services to Hawaiian Home Lands between DHHL as licensor and Waimana as licensee, granting certain exclusive rights and privileges relating to a telecommunications network on Hawaiian Home Lands, partial assignments thereof from Waimana to Pa Makani and Clearcom, and (b) any contracts between and among SIC and any of the SIC Affiliates relating to the telecommunication services or Paniolo Cable..

c.     The Assignment of Judgment.

d.     The Schedule A.1 Acknowledgement.

e.     The Schedule A.2 IRU.

f.     [Other]

"Joint Use Agreement" means that certain Joint Use Agreement dated July 19, 2007 by and among Paniolo Cable and SIC.

"Master Relationship Agreement" means that certain Master Relationship Agreement, substantially in the form attached hereto as Exhibit 1, which shall be assumable and assignable under Bankruptcy Code §365.  For the avoidance of doubt, the Master Relationship Agreement and the Schedule A.2 IRU shall replace the JUA and the SIC lease, and shall include (a) a lease to SIC of  a maximum of two (2) fiber pairs on the Paniolo Cable System (the "Initially Leased Fiber") at no cost (other than charges for space and power), (b) an option for SIC to acquire additional capacity on the Paniolo Cable System upon negotiation of fees mutually agreeable to the Paniolo Trustee (or its successors) and SIC (the "Additional Fiber"), (c) granting an Indefeasible Right of Use (IRU) of SIC equipment and property rights (including the Schedule A.2 assets) to the Paniolo Trustee or his designee (and their successors) (the "Schedule A.2 Assets IRU") and provisions to assure SIC of the rights to use the Schedule A.2 Assets as necessary to continue SIC retail telecommunications services to the residents of the Hawaiian Home Lands,[4] and (d) annual rent payments by SIC of not more than $1 per annum,[5] plus reasonable OA&M for the Initially Leased Fiber.  SIC shall have no right to assign or sublease any of its interest in the Initially Leased Fiber except to the Ownership and only for the purposes of providing retail services to end users on Hawaiian Home Lands.  The Initially Leased Fiber shall be used during the term of the Master Relationship Agreement exclusively to provide retail telecommunications services to SIC end-user

---

[4]     For the avoidance of doubt, the Initially Leased Fiber may be used only to provide telecommunication services to end-users (including individuals and commercial businesses) located on Hawaiian Home Lands that do not re-sell access to the Leased Fiber.

[5]     This nominal amount shall only applied to the Initially Leased Fiber.  Charges for space and power and for the Additional Fiber shall be charged to SIC at market rates.

customers, including non-profit organizations, and commercial users (but not resellers) of the Initially Leased Fiber residing on the Hawaiian Home Lands. Any assignment, sublease or use other than to provide retail telecommunications services to SIC end-user customers residing on the Hawaiian Home Lands during the term of the Master Relationship Agreement shall constitute an event of default under the Master Relationship Agreement and shall, with immediate effect, cancel SIC's rights in respect of the Initially Leased Fiber, but in no event shall affect the rights of the Paniolo Trustee (or any of his successors in interest) in the Schedule A.2 Assets IRU.

"Mililani Lease" means the lease or an IRU of the Mililani Property which the Paniolo Trustee shall execute as lessor as grantor to a third party granting such access and non-exclusive possession of the necessary areas of buildings located on the Mililani Property for purposes to conduct operations of the Paniolo cable network. The charge for such use shall be at a rate equal to the pro rata portion of reasonable expenses incurred in the operation of the Paniolo cable network on the Mililani Property. The use of the property shall be limited by any law, zoning or land use classification and to operations relating to Paniolo Cable. The third party's use of the property for any other operations shall be with the consent of the owner of the Mililani Property and subject to charge at market rates. The Mililani Option shall be subject to the Mililani Lease and shall not be terminable by the Optionee or its successors.

"Mililani Property" means the real estate, fixtures and the other property located at 77-808 Kamehameha Highway, Mililani, Hawaii 96789, more specifically described in Transfer Certificate of Title No. 600,112, issued to Sandwich Isles Communications, Inc., a Hawaii corporation, Tax Map Key No. (1) 9-5-2-3.

"Mililani Property Option" means that certain option to purchase granted by Paniolo Trustee to Ownership or its designee ("Optionee") and providing the Optionee with the right to purchase the Mililani Property, as is, where is, subject to the Mililani Lease, and the remaining portion of the Judgment on or prior to May 15, 2020 (the "Option Date") for $2 million cash only (without offset or reduction), Optionee to bear all costs of such purchase. For the avoidance of doubt, the option may only be exercised by delivery of $2 million in cash to the Paniolo Trustee by the Option Date.

"Paniolo 363 Sale" means a sale of all or substantially all of Paniolo Cable's assets free and clear of liens and encumbrances and amendment, assumption and assignment of certain contracts pursuant to Bankruptcy Code sections 363 and 365, and entry into the Mililani Lease, subject to approval by the Bankruptcy Court and all regulatory authorities.

"Person" means any individual, partnership, corporation, limited liability company, association, trust, joint venture, unincorporated organization, governmental unit or other entity.

"Schedule A.1 Acknowledgement" means an acknowledgement executed by SIC acknowledging Paniolo Cable's ownership and, if requested by the Paniolo Trustee, an assignment, transfer and conveyance by SIC, free and clear of the claims and liens of any other person, to the Paniolo Trustee, at no cost, those certain assets listed in Schedule A.1, which are assets currently titled in or owned by Paniolo Cable but in the possession or under the control of SIC.

EXECUTION COPY

"SIC Lease" means that certain Paniolo Cable Network Lease dated July 19, 2007 pursuant to which Paniolo Cable leased Paniolo System capacity to SIC.

"Transferred Equipment and Property Rights" means the equipment and property rights, including those described in Schedule A.2 to Exhibit A attached hereto and those described in the Schedule A.2 Assets IRU, and the Mililani Property, to transferred by SIC in conjunction with the US Marshal Sale, in partial consideration for entering into the Master Relationship Agreement, and generally consisting of all assets spanning from and including the points of presence (central offices) to the subsea cable connections (cable stations), which for the avoidance of doubt includes but is not limited to all buildings currently performing as cable landing stations, central offices, real estate (including easements, rights of way, licenses, the Licenses and Entitlements and the like, as are required for ingress, egress and access) conduits, manholes, handholes, rights of way, easements, fiber optic and telecommunication cables, fiber optic transmission, multiplexing, circuit switching, circuit transport equipment, IP routing & switching equipment, and related supporting assets such as towers, test equipment, power systems, cooling systems, security systems, network management systems, cross connects and cross connect panels, vehicles, trailers and tools, including all relevant manuals, maintenance records, warranties and the like, as to be further specified by the Paniolo Trustee for a stand-alone commercial operation and use of the Paniolo Cable System.

"US Marshal Sale" means the sale of the Transferred Equipment and Property Rights, including such other SIC assets as may be deemed appropriate by the Paniolo Trustee, under that certain Writ of Execution and related writs issued in enforcement of the Judgment.

2.      Several Obligations.  The obligations of the Parties hereunder are several and not joint and no Party hereto shall be responsible for the failure of any other Party hereto to perform its obligations hereunder.

3.      The Parties' Obligations to Close.  Subject to the terms and conditions of this Agreement:

(a)      The Parties agree to use their commercially reasonable efforts to promptly prepare and execute the Definitive Documentation.

(b)      In the event SIC breaches this Agreement, the Paniolo Trustee shall have the right to continue to execute on the Judgment, including without limitation, exercise of any available post-judgment remedies.

(c)      The Parties agree to use their commercially reasonable efforts to effect the assignment of the Transferred Equipment and Property Rights under the terms and conditions set forth in the Master Relationship Agreement, to obtain all necessary and appropriate regulatory and third-party approvals of the transactions, including the Licenses and Entitlements, contemplated in this Agreement, each as promptly as practicable, and to do all things reasonably necessary and appropriate in furtherance thereof.

(d)      The SIC Parties expressly consent to the US Marshal Sale, waiving all objections thereto and agree to facilitate transfer of the Transferred Equipment and

EXECUTION COPY

Property Rights. The SIC Parties expressly consent to the US Marshal Sale, waiving all objections thereto and agree to facilitate transfer of the Transferred Assets and Equipment and Property Rights.  The SIC Parties (1) expressly confirm that all of the A.2 Assets are present in the locations set forth on the list of Schedule A.2 Assets attached to the Notice of Execution filed with the Bankruptcy Court for the purposes of confirming the inventory prepared by the Substitute Custodian, and (2) agree not to object (or cause or encourage any other party to object) to the US Marshal Sale or to entry of orders or to the rights of the Paniolo Trustee to credit bid and hereby waive any right to appeal such orders.

(e)      The SIC Parties expressly agree not to object (or cause or encourage any other party to object) to the US Marshal Sale or to entry of orders or to the rights of the Paniolo Trustee to credit bid and hereby waive any right to appeal such orders.

(f)      Provided that the Paniolo Trustee is the successful bidder for the Mililani Property at the US Marshal Sale, the Paniolo Trustee agrees to promptly file a motion seeking confirmation of such sale and requesting that the Bankruptcy Court determine such sale extinguishes all liens and claims against the Mililani Property inferior to the Paniolo Trustee's judgment lien. Notwithstanding the failure or refusal of the Bankruptcy Court to make such a determination, the terms of the Mililani Property Option shall not be modified except upon written agreement of the Parties.

(g)      The SIC Parties expressly agree and covenant to provide all access to the Transferred Assets and Equipment and to exercise best efforts to cooperate with the Paniolo Trustee in the orderly transfer of such assets to the Paniolo Trustee and in the inspection, due diligence and dissemination of information (including authorizing and directing employees and agents of the SIC Parties to provide information) to facilitate the marketing and sale of assets and assignment of contracts under or related to the Paniolo 363 Sale provided it does cause the SIC Parties to expend any funds.  Failure to honor the consent and fully cooperate with the Paniolo Trustee shall constitute a default under this settlement and the SIC Parties shall forfeit their rights hereunder.

(h)      The Parties agree that, subject to Bankruptcy Court approval, the Paniolo Trustee will conduct a sales process for the Paniolo 363 Sale, including assumption and assignment of executory contracts and nonresidential releases pursuant to orders of the Bankruptcy Court governing procedures and deadlines, of substantially all of Paniolo's assets.  The SIC Parties expressly agree not to object (or cause or encourage any other party to object) to entry of such orders or to the rights of any secured creditor of Paniolo to credit bid and shall waive any rights to appeal such orders. The SIC Parties expressly agree and covenant to provide all access to such assets and to exercise best efforts to cooperate with the purchaser and assignee under Paniolo 363 Sale in the orderly transfer of such assets to such purchaser and assignee. Any purchaser or assignee approved by the Court shall be bound by the terms of the Master Relationship Agreement.

(i)      Ownership and SIC affiliates shall agree not to object or cause to be filed any legal proceedings to the Paniolo 363 Sale.  After consummation of the Paniolo 363 Sale and all orders approving same become final and non-appealable, Ownership and SIC affiliates shall have no further duties hereunder.

EXECUTION COPY

4.     Effectiveness of this Agreement.  The effectiveness of this Agreement, and the respective obligations of a Party under this Agreement, is conditioned upon the receipt of the signature hereto of each of the other Parties.

5.     Amendments.  No amendment, waiver or extension of any term or provision of this Agreement shall be valid unless the same shall be in writing and signed by the Parties.

6.     Termination.  Notwithstanding anything to the contrary set forth herein, unless as otherwise provided in this Agreement, this Agreement and all of the obligations and undertakings of the Parties set forth in this Agreement shall terminate and expire upon the earliest to occur of (a) December 31, 2020; or (b) written agreement among the Parties to terminate this Agreement.

7.     Representations and Warranties.  Each of the Parties represents and warrants to the others that:

(i)     if an entity, it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all requisite corporate, partnership or other power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)     to its knowledge, the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership or other action on its part and the execution, delivery and performance by it of this Agreement do not and shall not (A) violate any provision of law, rule or regulation applicable to it or any of its affiliates or its certificate of incorporation or bylaws or other organizational documents or those of any of its subsidiaries; or (B) conflict with, result in the breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligations to which it or any of its affiliates is a party or under its certificate of incorporation, bylaws or other governing regulations or instruments;

(iii)     except as otherwise expressly provided herein, the execution, delivery and performance by it of this Agreement do not and shall not require any registration or filing with, the consent or approval of notice to, or any other action with respect to, any Federal, state or other governmental authority or regulatory body;

(iv)     this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization or similar laws affecting the rights of creditors generally; and

(v)     it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement.

8.     Representation and Warranty Regarding Third Parties. Except as set forth in Exhibit 2 hereto, the SIC Parties hereby represent and warrant to the other parties that there are no agreements of any nature (including without limitation, grants of Indefeasible Rights of Use (IRUs), wholesale contracts, or commercial agreements) permitting persons or entities other

EXECUTION COPY

than SIC to use capacity on the Paniolo Cable System other than the two pairs of fiber reserved to SIC for the purposes stated herein.

9.    Payment of Expenses.  Except as may be recoverable from the estate after notice and opportunity for hearing and as otherwise provided herein, each Party shall be responsible for its own expenses incurred in connection with this Agreement.

10.    Good Faith.  Each of the Parties agrees to cooperate in good faith with each other to facilitate the performance by the parties of their respective obligations hereunder and the purposes of this Agreement.

11.    Amendments and Modifications.  Except as otherwise expressly provided in this Agreement, this Agreement shall not be amended, modified or supplemented, except in writing signed by the Parties.

12.    No Waiver.  Each of the Parties expressly acknowledges and agrees that, except as expressly provided in this Agreement, nothing in this Agreement is intended to, or does, in any manner waive, limit, impair or restrict the ability of any party to this Agreement to protect and preserve all of its rights, remedies and interests, including, without limitation, with respect to its claims against the Debtors in the event of a termination of this Agreement.

13.    Further Assurances.  Each of the Parties hereby further covenants and agrees to execute and deliver all further documents and agreements and take all further action that may be reasonably necessary or desirable in order to enforce and effectively implement the terms and conditions of this Agreement.

14.    Complete Agreement.   This Agreement constitutes the complete agreement between the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous negotiations, agreements and understandings with respect to the subject matter hereof.  The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the signatories hereto.

15.    Notices.  All notices, requests, demands, claims and other communications hereunder shall be in writing and shall be (a) transmitted by hand delivery, or (b) mailed by first class, registered or certified mail, postage prepaid, or (c) transmitted by overnight courier, or (d) transmitted by telecopy or electronic mail, and in each case:

if to Paniolo Creditors:

Norton Rose Fulbright (US) LLP
2200 Ross Avenue – Suite 3600
Dallas, Texas 75201
Attn. Toby L. Gerber
toby.gerber@nortonrosefulbright.com

-and-

Harris, Wiltshire & Grannis LLP
1919 M Street, N.W., Suite 800
Washington, D.C.  20036-3537 Attn: Kent Bressie

EXECUTION COPY

if to Michael Katzenstein, Chapter 11 Trustee of Paniolo Cable Company, LLC:

>Mr. Michael Katzenstein
>FTI Consulting Inc.
>Three Times Square – Ninth Floor
>New York, NY  10036

>-with a copy to-

>Goodsill Anderson Quinn & Stifel
>A Limited Liability Law Partnership
>1099 Alakea Street, Suite 1800
>Honolulu, Hawaii 96813
>Attn: Johnathan C. Bolton

if to  [Ownership]:

>Mr. Al Hee
>In care of
>Kobayashi Sugita & Goda, LLP
>999 Bishop Street, 26th Floor
>Honolulu, Hawaii  96813
>Attn: Lex R. Smith

>-with a copy to-

>Kobayashi Sugita & Goda, LLP
>999 Bishop Street, 26th Floor
>Honolulu, Hawaii  96813
>Attn: Lex R. Smith

if to Sandwich Isles Communications, Inc.:

>Kobayashi Sugita & Goda, LLP
>999 Bishop Street, 26th Floor
>Honolulu, Hawaii  96813
>Attn: Lex R. Smith

Notices mailed or transmitted in accordance with the foregoing shall be deemed to have been given upon receipt.

16.    Governing Law.  This Agreement shall be governed in all respects by the laws of the State of New York, except to the extent such law is preempted by the Bankruptcy Code.

17.    Jurisdiction.    By its execution and delivery of this Agreement, each of the signatories to this Agreement irrevocably and unconditionally agrees that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the United States Bankruptcy Court for the District of

U.S. Bankruptcy Court - Hawaii  #22-00189  Dkt # 2712  Filed 06/07/22  Page 123 of 168

EXECUTION COPY

Hawaii (the "Bankruptcy Court"). By its execution and delivery of this Agreement, each of the signatories to this Agreement irrevocably accepts and submits itself to the jurisdiction of the Bankruptcy Court, or a court of competent jurisdiction in the State of New York, as applicable under the preceding sentence, with respect to any such action, suit or proceeding.

18.   Consent to Service of Process.   Each of the signatories hereto irrevocably consents to service of process by mail at the address listed with the signature of each such party on the signature pages to this Agreement.  Each of the signatories hereto agrees that its submission to jurisdiction and consent to service of process by mail is made for the express benefit of each of the other signatories hereto.

19.   Specific Performance.  It is understood and agreed by each of the signatories to this Agreement that money damages would not be a sufficient remedy for any breach of this Agreement by any party and each non-breaching party shall be entitled to specific performance, injunction, rescission or other equitable relief as remedy for any such breach.

20.   Headings.  The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

21.   Successors and Assigns.  This Agreement is intended to bind and inure to the benefit of the signatories hereto and their respective successors, permitted assigns, heirs, executors, administrators and representatives.  The agreements, representations and obligations of the undersigned parties under this Agreement are, in all respects, several and not joint.

22.   Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page by facsimile or electronic mail shall be effective as delivery of a manually executed counterpart.

23.   No Third-Party Beneficiaries.  Unless expressly stated in this Agreement, this Agreement shall be solely for the benefit of the signatories hereto, and no other Person or entity shall be a third-party beneficiary hereof.

24.   No Solicitations.   This Agreement is not intended to be, and each signatory hereto acknowledges that it is not, a solicitation of the acceptance or rejection of any plan of reorganization for the Company pursuant to Section 1125 of the Bankruptcy Code.

25.   Consideration.  It is hereby acknowledged by each of the signatories hereto that no consideration (other than the obligations of the other parties under this Agreement) shall be due or paid to the parties for their agreement to support the Plan in accordance with the terms and conditions of this Agreement.

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed and delivered by its duly authorized officers as of the date first written above.

[SIGNATURE PAGES TO FOLLOW]

THE REMAINDER OF THIS PAGE IS BLANK

EXECUTION COPY

PANIOLO CREDITORS

ACKNOWLEDGED BY:
DEUTSCHE BANK TRUST COMPANY
AMERICAS, AS PURCHASERS AGENT AND
COLLATERAL AGENT

By: _____
    Name:    Erika Wershoven
    Title:    Vice President

By: _____
    Name:    Deirdre Lewis
    Title:    Vice President

MICHAEL KATZENSTEIN, CHAPTER 11
TRUSTEE OF PANIOLO CABLE COMPANY, LLC,
DEBTOR

By: _____
    Michael Katzenstein, Chapter 11 Trustee

99528193.3

11

EXECUTION COPY

**PANIOLO CREDITORS**

**ACKNOWLEDGED BY:**
**DEUTSCHE BANK TRUST COMPANY**
**AMERICAS, AS PURCHASERS AGENT AND**
**COLLATERAL AGENT**

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

**MICHAEL KATZENSTEIN, CHAPTER 11**
**TRUSTEE OF PANIOLO CABLE COMPANY,**
**LLC, DEBTOR**

By: _____
      Michael Katzenstein, Chapter 11 Trustee

11

EXECUTION COPY

WAIMANA ENTERPRISES, INC. AND THE SIC
AFFILIATES

By: _____
Name: ALBERT S.N. HEE
Title: AUTHORIZED AGENT

SANDWICH ISLES COMMUNICATIONS, INC.

By: _____
Name: ALBERT S.N. HEE
Title: AUTHORIZED AGENT

ALL ATTACHMENTS
TO THE SETTLEMENT
AGREEMENT HAVE BEEN
FILED UNDER SEAL

H9022 (12/15)

| Information to identify the case: | | |
|---|---|---|
| Debtor 1 | **Paniolo Cable Company, LLC** | United States Bankruptcy Court |
| | Name | District of Hawaii |
| Debtor 2 (Spouse, if filing) | Name | Case number: **18–01319** Chapter: **11** |

## NOTICE OF ENTRY OF ORDER OR JUDGMENT

NOTICE IS GIVEN THAT:

The court entered the following order or judgment on the date below,

**Order Granting Motion to Approve Settlement Agreement Pursuant to Federal Rule of Bankruptcy Procedure 9019 (Related Doc # 252) Date of Entry: 6/4/2020. (JN)**

The order or judgment may be viewed at the Clerk's Office. It may also be viewed online using PACER, the federal judiciary's electronic records system. Information about obtaining and using a PACER account is available at the court website, www.hib.uscourts.gov.

Date:  June 4, 2020

Michael B. Dowling
Clerk

Clerk's Office:
1132 Bishop Street, Suite 250
Honolulu, Hawaii 96813
(808) 522–8100
www.hib.uscourts.gov

# EXHIBIT M

GOODSILL ANDERSON QUINN & STIFEL
A LIMITED LIABILITY LAW PARTNERSHIP LLP

JOHNATHAN C. BOLTON       9650-0
  jbolton@goodsill.com
CHRISTOPHER P. ST. SURE   10001-0
  cstsure@goodsill.com
First Hawaiian Center
999 Bishop Street, Suite 1600
Honolulu, Hawaii 96813
Telephone: (808) 547-5600
Facsimile: (808) 547-5880

Attorneys for Chapter 11 Trustee
MICHAEL KATZENSTEIN

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>PANIOLO CABLE COMPANY, LLC,<br><br>      Debtor. | Case No. 18-01319 (RJF)<br>(Chapter 11) |
| MICHAEL KATZENSTEIN, as<br>CHAPTER 11 TRUSTEE,<br><br>      Plaintiff,<br><br>v.<br><br>SANDWICH ISLES<br>COMMUNICATIONS, INC.,<br><br>      Defendant. | Adversary No. 19-90022<br><br>NOTICE OF EXECUTION |

## NOTICE OF EXECUTION
# EXHIBIT M

Notice is hereby given that pursuant to law and by virtue of a *Writ of Execution to the United States Marshal*, issued out of the above-entitled Court in the above-entitled case, the U.S. Marshal for the District of Hawaii, did levy upon certain real and personal property assets of Defendant/Judgment Debtor SANDWICH ISLES COMMUNICATIONS, INC., in and to the real and personal property described in Exhibit "A", attached hereto.

DATED: Honolulu, Hawaiʻi, ~~January~~ February 4 , 2020.

CHARLES L. GOODWIN
For United States Marshal
District of Hawaiʻi

By: _Will G. Fung couson_
Deputy U.S. Marshal

2

EXHIBIT "A"

### Real Property

*Oahu-Mililani*

PINE SPUR:

All of those certain parcel(s) of land situate at Waipio, Waikele, Waikakalaua, Ulu, Auiole Poopalupalu, Hopenui, Kahuaiki, Hanuhanu, Kanupoo, Kapakahi and Ewa, District of Ewa, City and County of Honolulu, State of Hawaii, described as follows:

| LOT | AREA | MAP |
|-----|------|-----|
| 1-A-1 | 1.083 acres | 18 |
| 1-A-2 | 0.032 acre | 18 |
| 1-A-3 | 0.083 acre | 18 |
| 1-A-4 | 0.431 acre | 18 |
| 8-A-1 | 0.245 acre | 20 |
| 8-A-2 | 17.863 acres | 20 |
| 8-A-3 | 0.902 acre | 20 |
| 8-A-4 | 3.191 acres | 20 |
| 8-A-5 | 0.084 acre | 20 |
| 8-A-6 | 0.014 acre | 20 |
| 8-A-7 | 0.396 acre | 20 |
| 8-A-8 | 20.694 acres | 20 |
| 8-A-9 | 1.250 acres | 20 |
| 8-A-10 | 0.014 acre | 20 |
| 8-A-11 | 0.457 acre | 20 |
| 8-A-12 | 13.807 acres | 20 |
| 8-A-13-A | 1.603 acres | 52 |
| 540 | 58.560 acres | 68 |
| 541 | 0.278 acre | 68 |
| 542 | 28.304 acres | 68 |
| 5399-A | 2.718 acres | 687 |
| 5400-A | 0.043 acre | 687 |
| 5401-A | 5.185 acres | 687 and |
| 5402-A | 5.605 acres | 687 |

as shown on the aforementioned Maps, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii with Land Court Application No. 1000 of John Ii Estate, Limited;

TOGETHER WITH AND SUBJECT TO THE FOLLOWING:

As to Lot 1-A-2:      Together with access to a public highway, namely, Kamehameha Highway, by means of Lot 1-A-1 as shown on Map 18 of said Land Court Application No. 1000, as set forth by Land Court Order No. 9104, filed July 11, 1949.

7864979.1

As to Lot 8-A-4:       Together with access to a public highway, namely, Kamehameha Highway, by means of Lots 8-A-5, 8-A-6, 8-A-7, 8-A-10, 8-A-11 and 8-A-15 as shown on Map 20 of said Land Court Application No. 1000, as set forth by Land Court Order No. 9106, filed July 11, 1949.

As to Lot 541:       Together with access to a public highway over Lot 540 as shown on Map 68 of said Land Court Application No. 1000, as set forth by Land Court Order No. 15154, filed January 30, 1957.

As to Lot 542:       Together with access to a public highway over Lots 540 and 541 as shown on Map 68 of said Land Court Application No. 1000, as set forth by Land Court Order No. 15154, filed January 30, 1957.

As to Lot 5399-A:       Together with access to a public road over Lots 8-A-5, 8-A-6 and 8-A-7 as shown on Map 20, and Lot 5400-A as shown on Map 687, of said Land Court Application No. 1000, as set forth by Land Court Order No. 85547, filed July 31, 1987.

As to Lot 5400-A:       Together with access to a public road over Lots 8-A-5, 8-A-6 and 8-A-7 as shown on Map 20 of said Land Court Application No. 1 000, as set forth by Land Court Order No. 85547, filed July 31, 1987.

As to Lot 5401-A:       Together with access to a public road over Lots 8-A-5, 8-A-6 and 8-A-7 as shown on Map 20, and Lot 5400-A as shown on Map 687, of said Land Court Application No. 1000, as set forth by Land Court Order No. 85547, filed July 31, 1987.

As to Lot 5402-A:       Together with access to a public road over Lots 1-A-1 and 1-A-4 as shown on Map 18 of said Land Court Application No. 1000, as set forth by Land Court Order No. 85547, filed July 31, 1987.

Being land(s) described in Transfer Certificate of Title No. 600,112 issued to SANDWICH ISLES COMMUNICATIONS, INC., a Hawaii corporation.

## Schedule A.2 Assets

*Kaua'i*

| Assets | Description |
|---|---|
| Terrestrial Structure | 3625 Feet of Subduct extending from near the Kekaha beach manhole to the Kekaha terminal building. |
| Anahola Central Office | Central Office located in Anahola, Hawaii, including access rights to the land on which the central office resides. |
| HVAC System | Included with the Anahola Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Anahola Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Anahola Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Anahola Central Office providing structure for fiber and other cables to be brought and terminated within the central office. |
| Cable Rack and Frame Structure | Internal support structure within the Anahola Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Anahola Central Office. |
| Fujitsu 4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the Schedule A.2 equipment function within the network. |
| Terrestrial Structure | 41 Miles of Subduct extending from the Kekaha terminal building towards the Anahola Central Office.  Unknown Manholes. |
| Fiber Cable | 41 Miles of Fiber extending from the Kekaha terminal building towards the Anahola Central Office. |

*Oahu – Nanakuli*

| Assets | Description |
|---|---|
| Terrestrial Structure | 9200 Feet of Subduct extending from near the Nanakuli terminal building to Farrington Highway where it meets the Paniolo Cable Network Terrestrial Structure. Unknown number of manholes. |
| Nanakuli Terminal Building | Terminal building located in Nanakuli, Hawaii including access rights to the land on which the terminal building resides. |
| HVAC System | Included with the Nanakuli Terminal Building is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Nanakuli Terminal Building. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Nanakuli Terminal Building. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Nanakuli Terminal Building providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Nanakuli Terminal Building providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Nanakuli Terminal Building. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-192/OC-48. Includes all cards installed in the system, software, and spares |
| Fujitsu 7200 | Wave Division Platform and transmitter platform for fiber terminations that works with the Fujitsu 4500/4300 to provide optical services. |
| Fujitsu 9500 | Dense Wave Division Platform and transmitter platform for fiber terminations. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.1 and Schedule A.2 equipment function within the network. |

*Oahu – Waimanalo*

| Assets | Description |
|---|---|
| Terrestrial Structure | 2160 Feet of Subduct extending from near the Waimanalo terminal building to the manhole near Kalanianaole Highway where it meets the Paniolo Terrestrial structure. 1 Manhole. |
| Waimanalo Terminal Building | Terminal building located in Waimanalo, Hawaii including access rights to the land on which the terminal building resides. |
| HVAC System | Included with the Waimanalo Terminal Building is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Waimanalo Terminal Building. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Waimanalo Terminal Building. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Waimanalo Terminal Building providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Waimanalo Terminal Building providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Waimanalo Terminal Building. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-192/OC-48. Includes all cards installed in the system, software, and spares. |
| Fujitsu 7200 | Wave Division Platform and transmitter platform for fiber terminations that works with the Fujitsu 4500/4300 to provide optical services. |
| Fujitsu 9500 | Dense Wave Division Platform and transmitter platform for fiber terminations. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.2 equipment function within the network. |

*Molokai – Kalamaula*

| Assets | Description |
|---|---|
| Terrestrial Structure | 1000 Feet of Subduct extending from near the Kalamaula terminal building to Kamehameha V Highway where it meets the Paniolo Cable Network Terrestrial Structure. |
| Kalamaula Terminal Building | Terminal building located in Kalamaula, Hawaii including access rights to the land on which the terminal building resides. |
| HVAC System | Included with the Kalamaula Terminal Building is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Kalamaula Terminal Building. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Kalamaula Terminal Building. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Kalamaula Terminal Building providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Kalamaula Terminal Building providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Kalamaula Terminal Building. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-192/OC-48. Includes all cards installed in the system, software, and spares. Paniolo seeks to have the Fujitsu 4500/4300 system in Kalamaula (if additional to the already identified Paniolo system). |
| Fujitsu 7200 | Wave Division Platform and transmitter platform for fiber terminations that works with the Fujitsu 4500/4300 to provide optical services. Paniolo seeks to have the Fujitsu 7200 systems in Kalamaula (if additional to the already identified Paniolo system). |
| Fujitsu 9500 | Dense Wave Division Platform and transmitter platform for fiber terminations. Paniolo seeks to have the Fujitsu 9500 system in Kalamaula (if not included as a Schedule A.1 asset). |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.2 equipment function within the network. |

*Molokai – Hoolehua*

| Assets | Description |
|---|---|
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure at Hoolehua. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within Hoolehua. |
| Terrestrial Structure | 7 Miles of Subduct extending from the Kalamaula terminal building towards the Hoolehua Airport DLC and Hoolehua East DLC locations.  Unknown Manholes. |
| Fiber Cable | 7 Miles of Fiber extending from the Kalamaula terminal building towards the Hoolehua Airport DLC and Hoolehua East DLC locations. |

*Maui*

| Assets | Description |
|---|---|
| Terrestrial Structure | 13,800 Feet  of Subduct extending from near the Puunene terminal building to Kuihelani Highway where it meets the Paniolo Terrestrial Structure. Unknown Manholes. |
| Waiehu Central Office | Central Office located in Waiehu, Hawaii including access rights to the land on which the central office resides. |
| HVAC System | Included with the Waiehu Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Waiehu Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Waiehu Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Waiehu Central Office providing structure for fiber and other cables to be brought and terminated within the central office. |
| Cable Rack and Frame Structure | Internal support structure within the Waiehu Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Waiehu Central Office. |
| Fujitsu 4300/4100 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. |
| Ancillary Equipment | To the extent not listed above, any  equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.2 equipment function within the network. |
| Terrestrial Structure | 1.7 Miles of Subduct extending from the Puunene terminal building near Kuihelani Highway towards the Waiehu central office. Unknown Manholes. |
| Fiber Cable | 4.3 Miles of Fiber extending from the Puunene terminal building towards the Waiehu central office. |
| Terrestrial Structure | 1.1 Miles of Subduct extending from Pakalani to Kahikinui. Unknown Manholes. |
| Fiber Cable | 1.1 Miles of Fiber extending from Pakalani to Kahikinui. |

*Hawaii – Laiopua*

| Assets | Description |
|---|---|
| Terrestrial Structure | 73,600 Feet of Subduct extending from near the Puukapu terminal building to Kawaihae-Mahukona Road where it meets the Paniolo Terrestrial Structure. Unknown Manholes. |
| Laiopua Central Office | Central Office located in Laiopua, Hawaii including access rights to the land on which the central office resides. |
| HVAC System | Included with the Laiopua Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Laiopua Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Laiopua Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Laiopua Central Office providing structure for fiber and other cables to be brought and terminated within the central office. |
| Cable Rack and Frame Structure | Internal support structure within the Laiopua Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Laiopua Central Office. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.2 equipment function within the network. |
| Terrestrial Structure | 32.6 Miles of Subduct extending from the Puukapu terminal building near Kawaihae-Mahukona Road where it meets the Paniolo Terrestrial Structure towards the Laiopua central office. Unknown Manholes. |
| Fiber Cable | 46.5 Miles of Fiber extending from the Puukapu terminal building towards the Laiopua central office. |

*Hawaii – Hilo*

| Assets | Description |
|---|---|
| Hilo Central Office | Central Office located in Hilo, Hawaii including access rights to the land on which the central office resides. |
| HVAC System | Included with the Hilo Central Office is the HVAC system and all other environmental assets supporting the building. |
| Backup Generator | Diesel generator providing emergency power to the Hilo Central Office. |
| DC Power Infrastructure | Rectifiers, Batteries, Power Distribution Panels (BDFBs), and Controllers utilized to convert AC to DC power and provide backup in the event of a power failure within the Hilo Central Office. |
| Zero Manhole and Entrance Structure | Manhole on property and entrance conduit extending from the manhole into the Hilo Central Office providing structure for fiber and other cables to be brought and terminated within the terminal building. |
| Cable Rack and Frame Structure | Internal support structure within the Hilo Central Office providing for cable infrastructure between equipment and frames for equipment shelves. |
| Fiber Distribution Panel | Fiber distribution panel that provides for the termination of the fiber cables within the Hilo Central Office. |
| Fujitsu 4500/4300 | Multiservice Provisioning Platform delivering a unifying platform for Carrier Ethernet and SONET derived services from DS1 to OC-48. Includes all cards installed in the system, software, and spares. Paniolo seeks to have the Fujitsu 4500/4300 systems both in Puukapu (if additional to the already identified Paniolo system) and Hilo. |
| Ancillary Equipment | To the extent not listed above, any equipment that is necessary for the performance or monitoring of the DC Power, HVAC, Security, fiber or transport infrastructure, or related other equipment needed to make the identified Schedule A.1 and Schedule A.2 equipment function within the network. |
| Terrestrial Structure | 8.7 Miles of Subduct extending from the Hilo central office towards the Waiakea Area and Akolea Area.  Unknown Manholes. |
| Fiber Cable | 8.7 Miles of Fiber extending from the Hilo central office towards the  Waiakea Area and Akolea Area.  Unknown Manholes. |

*Other Related Assets*

| Assets | Description |
|---|---|
| Information and Records | -Financial statements (reviewed/audited, to the extent available) and detail of operational costs for the facilities<br>-Asset listing of all infrastructure and equipment indicated in Schedule A.2 (Asset Register including websites, URLs, IP Addresses, etc.)<br>-All contracts associated with the network and maintenance of the network<br>-Wet and dry maintenance records and maintenance agreements<br>-Engineering drawings including "as built" and engineering specifications attached to schedule of spend to date<br>-All inspection reports of the network (wet, dry, facilities, batteries, generators, Etc.)<br>  -Operating agreements for the monitoring and maintenance of the network<br>  -Existing agreements and related materials for leasing capacity to third parties<br>  -Detailed logical and physical inventory of the network linked to the asset list by item – to the extent this information is maintained in Operating Systems, provide the information in this form as requested below<br>  -Inventory of all electronics equipment used to provide circuits in the Paniolo Cable Network System including assignment information for specific assets to the provision of specific circuits including card assignment, fiber cross-connects, fiber assignments, and other related information<br>  -All maintenance records for the HVAC, batteries, rectifiers, and backup generator equipment located at terminal buildings and central offices identified in Schedule A.2<br>  -All notices, citations or reports received from government agencies in relation to the Paniolo assets indicated in Schedule A.2<br>  -All deeds to real property, plus all title insurance polities and title search results<br>  -All land user permits and certificates of compliance with land use permits<br>  -List of major suppliers, with copies of supply and support agreements<br>-Provide all third party agreements that are utilized to provide maintenance to the Schedule A.2 assets including SONET equipment, patch panel equipment, terrestrial fiber, marine fiber, power equipment, grounds maintenance, etc. |

| Operating Systems | -Software and all related hardware and data associated with the circuit inventory, monitoring, and maintenance of the Schedule A.1 and Schedule A.2 assets<br>-IT system vendors and maintenance agreements<br>-Location of the network assets and to the extent available provide geocoded locations of manhole access to fiber infrastructure, and map data of your files in a standard GIS format showing the location of all fiber infrastructure |
|---|---|
| Access Keys | -All keys for access to the 10 terminal buildings and central offices identified in Schedule A.1 and Schedule A.2 including keys to any fences on the perimeter of the terminal buildings |
| Licenses | -All licenses necessary to build, construct, repair, maintain and operate the Schedule A.2 assets, including without limitation SIC's interest in License Agreement No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands.<br>-All existing and pending entitlements (including without limitation, SIC's interests in memoranda of agreement, easements, leases, license agreements, letters of approval, special area management permits, rights of way or rights of interest, necessary to build, construct, repair, maintain and operate the Schedule A.2 assets. |

# EXHIBIT N

Of Counsel:
SULLIVAN MEHEULA LEE, LLLP

WILLIAM MEHEULA          2277
D. KAENA HOROWITZ       9836
Pacific Guardian Center, Makai Tower
733 Bishop Street, Suite 2900
Honolulu, Hawaii 96813
Telephone:  (808) 628-7535
Facsimile:  (808) 533-2467
Email:  meheula@smlhawaii.com; kaena@smlhawaii.com

Attorneys for Plaintiffs
WAIMANA ENTERPRISES INC.,
PA MAKANI LLC and CLEARCOM, INC.

Electronically Filed
FIRST CIRCUIT
1CCV-22-0000617
27-MAY-2022
11:44 AM
Dkt. 1 CMPS

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAIʻI

| | |
|---|---|
| WAIMANA ENTERPRISES INC., PA MAKANI LLC, and CLEARCOM, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> DEPARTMENT OF HAWAIIAN HOME LANDS, HAWAIIAN HOMES COMMISSION; HAWAIIAN HOMES COMMISSION TRUSTEES WILLIAM J. AILA, JR., PATRICIA KAHANAMOKU-TERUYA, RUSSELL KAUPU, RANDY AWO, PAULINE NAMUʻO, ZACHERY HELM, DENNIS NEVES, MICHAEL KALEIKINI, DAVID B. KAʻAPU, IN THEIR OFFICIAL CAPACITY; <br><br> Defendants. | CIVIL NO. <br> (Other Civil Action) <br><br> COMPLAINT; EXHIBITS "A" – "K"; SUMMONS |

EXHIBIT N

<u>COMPLAINT</u>

Plaintiffs Waimana Enterprises Incorporated ("**Waimana**"), Pa Makani LLC ("**Pa Makani**") and Clearcom, Inc. ("**Clearcom**") for their Complaint against Defendant Department of Hawaiian Home Lands ("**DHHL**"), Hawaiian Homes Commission ("**HHC**"); Hawaiiian Homes Commission Trustees William J. Aila, Jr., Patricia Kahanamoku-Teruya, Russell Kaupu, Randy Awo, Pauline Namu`O, Zachery Helm, Dennis Neves, Michael Kaleikini, David B. Ka`Apu, In Their Official Capacity ("**Trustees**") allege and aver as follows.

1.      Waimana is the primary owner and holder of License 372 that requires Waimana to provide all infrastructure necessary to provide modern telecommunications services on Hawaiian Home Lands ("**HHL**"), no matter how remote their residence may be.  License 372 was issued to a native Hawaiian corporation in 1995 and the term is in perpetuity.  Many of its customers do not have electricity or water and one family lives in a tent.  License 372 mandates that no matter how expensive the infrastructure may be in order to provide such service, Waimana's monthly charge to the customer will be no more than is charged for comparable service in the adjacent non-HHL areas.   The provisions of License 372 are the reason the residents of the HHL have modern telecommunication service today, including in many cases fiber-optic cable to their homes.  It is essential to sustaining, expanding and upgrading non-voice telecommunications service to the HHL residents in the future that the requirements of License 372 be continued.

2.      Plaintiff Waimana is a corporation organized and existing under the laws of the State of Hawai'i.

3.      Plaintiff Pa Makani is a limited liability company organized and existing under the laws of the State of Hawai'i.

2

4.      Plaintiff Clearcom is a corporation organized and existing under the laws of the State of Hawaiʻi.

5.      Defendant DHHL is an agency of the State of Hawaiʻi organized under the Constitution and laws of the State of Hawaiʻi.

6.      Pursuant to section 202, Hawaiian Homes Commission Act ("**HHCA**"), DHHL is headed by Defendant HHC, whose nine Defendant Trustees are appointed by the Governor with the advice and consent of the Senate.  Three of the trustees are residents of the City and County of Honolulu; two are residents of the County of Maui, with one being a resident of the island of Molokaʻi; two are residents of the County of Hawaiʻi, one being a resident of East Hawaiʻi and the other a resident of West Hawaiʻi; one is a resident of the County of Kauaʻi; and the ninth trustee member is the Chairman William A`ila, who is appointed by the Governor from among the members of the Commission.  The Chairman of the Commission serves as the full-time administrator of the DHHL.

7.      HAR §10-2-19 states Duties of commissioners as trustees. As trustees, it shall be the duty of commissioners to:

> (1) Act exclusively in the interest of beneficiaries under the act;
> (2) Hold and protect the trust property for beneficiaries under the act;
> (3) Exercise such care and skill as a person of ordinary prudence would exercise in dealing with one's own property in the management of Hawaiian home lands; and
> (4) Adhere to the terms of the trust as set forth in the act.

8.      Non-party Sandwich Isles Communications, Inc. ("**SIC**") is a native Hawaiian corporation organized and existing under the laws of the State of Hawaiʻi.

9.      Non-party Hawaiian Tel Inc. ("**HTI**") is a corporation organized under the laws of the State of Hawaiʻi.

3

10. Section 207(c)(1)(A) of the HHCA states: "The department is authorized to <u>grant licenses as easements for</u> railroads, <u>telephone lines</u>, electric power and light lines, gas mains, <u>and the like</u>." Emphasis added.

11. Section 204(2) of the HHCA states "In the management of any retain available lands … the department is expressly authorized to negotiate, prior to negotiations with the general public, the disposition of Hawaiian home lands or any improvement thereon to a native Hawaiian, or organization or associations owned or controlled by native Hawaiians, for commercial, industrial or other business purposes …"

12. Plaintiffs are native Hawaiian organizations as noted in License 372 and the Partial Assignments.

13. Section 206 of the HHCA states:

"OTHER OFFICERS NOT TO CONTROL HAWAIIAN HOME LANDS; EXCEPTIONS.  The powers and duties of the governor … in respect to the lands of the State, shall not extend to lands having the status of Hawaiian home lands, except as specifically provided in this title."

14. The Hawaii Public Utilities Commission ("**PUC**") is a division of the Governor's administration and therefore has no authority on HHL.

15. Waimana is the owner and holder of License No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands ("**DHHL**") pursuant to authorization from the HHC (hereinafter "**License 372**").  A true copy of License 372 is attached hereto as **Exhibit "A"** and incorporated herein by this reference.

16. License 372 granted Waimana a right to provide "telecommunication services of all types" to HHL, <u>see</u> Exhibit A at 1:

Licensor determines that the LICENSE established herein is essential in order to provide broad band telecommunication services of all types (including but not limited to <u>local, intrastate, interstate and international telephone</u>; video on demand interactive

4

communication; cable television; medical and educational links; and electronic data transmission) <u>to LICENSOR'S lands</u> in a timely manner;

The added underscored words identify the type and area of telecommunication services assigned to SIC in the Partial Assignment of License, discussed below.  The right to provide all other types of telecommunication services were retained by Waimana.

17.     Under HHCA 207(c)(1), License 372 is an interest in real property issued to Waimana pursuant to HHCA 207(c)(1) and Hawaii Administrative Rules 10-4-21 and 22.

18.     By instrument dated January 15, 1996, Waimana partially assigned License 372 to SIC (the "**SIC Partial Assignment**").  A true copy of the Partial Assignment is attached hereto as **Exhibit "B."**  By instrument dated October 6, 2008, the HHC consented to the Partial Assignment.  A true copy of the Consent is attached hereto as **Exhibit "C"**.

19.     The SIC Partial Assignment is expressly limited to "***IntraLata and Intrastate telecommunication services***", which means "limited to local, intrastate, interstate and international telephone" on HHL ("**voice only service**").  Consistent with that voice only service limitation and area of service limitation, SIC was granted a Certificate of Authority from the Hawaii Public Utilities Commission to provide voice only services on HHL.

20.     Waimana caused other subsidiaries including Plaintiffs Clearcom, Inc. and Pa Makani LLC to provide other telecommunications services (internet, wireless etc.) both on and off HHL.

21.      By instrument dated December 30, 2011, Waimana partially assigned License 372 to Pa Makani (the "**Pa Makani Partial Assignment**"), which granted "those certain rights, title and interest necessary to provide "***wireless communications services of all types***" under License 372.  DHHL consented to the Pa Makani Partial Assignment.  A true copy of the Partial Assignment is attached hereto as **Exhibit "D",**

5

22.     By instrument dated May 29, 2014, Waimana partially assigned License 372 to Clearcom (the "**Clearcom Partial Assignment**"), which granted  "those certain rights, title and interest necessary to provide "***broadband communications services of all types***" under License 372.  DHHL consented to the Clearcom Partial Assignment.  A true copy of the Partial Assignment is attached hereto as **Exhibit "E",**

23.     License 372 in relevant part also provides:

> LICENSOR believes and intends that the issuance of this Exclusive "Benefit" LICENSE will also fulfill the purpose of advancing the rehabilitation and welfare of native Hawaiians.

> NOW THEREFORE, LICENSOR, in consideration of the services to be provided by LICENSEE [Waimana], and the terms, conditions and covenants herein contained on the part of LICENSEE to be kept, observed and performed, hereby grants and issues to LICENSEE, and its legal successors and assigns, the [1] <u>exclusive right and privilege to build, construct, repair, maintain and operate a broad band telecommunications network including poles, overhead and/or underground lines, appliances, microwave and/or other types of equipment over, across, under and throughout all lands under the administration and jurisdiction of LICENSOR</u>, and its legal successors and assigns, including the right to trim and keep trimmed any vegetation, shrubbery, bushes or trees in the way of its lines and appurtenances, and [2] <u>including also the right of entry upon the Easement and adjoining land of LICENSOR for the construction, maintenance, operation and removal of LICENSEE'S line and appurtenances over, across and under the LICENSE area</u>.[1]

TO HAVE AND TO HOLD the same unto LICENSEE, its legal successors and assigns, <u>in perpetuity</u>, commencing on May 1, 1995, unless sooner   terminated as hereinafter provided,

> 4.     <u>ACCESS TO TELECOMMUNICATIONS INFRASTRUCTURE.</u>
> LICENSEE shall make available to LICENSOR the use of all available telecommunications equipment and services then under LICENSEE'S control at LICENSEE'S cost.  LICENSOR'S use under this paragraph shall be limited to emergency, public and official purposes only.

---

[1] Section [1] is the exclusive right to provide telecommunications services throughout HHL that the FCC Order preempted by its Memorandum Opinion and Order dated 7/3/17, where the FCC Order removed the exclusivity aspect of the service right on HHL.  ("**License 372 Service Right**").

Section [2] is the License exclusive easement granted by DHHL to Waimana in License 372 for certain areas of HHL, i.e. "<u>the easement area and adjoining land of LICENSOR for the construction, maintenance, operation and removal of LICENSEE'S line and appurtenances over, across and under the LICENSE area</u>."  ("**License 372 Easement**").

6

5.     LEVEL OF TELECOMMUNICATION SERVICES.  LICENSEE shall provide at a minimum the same level of telecommunication service being provided in adjacent areas not subject to this LICENSE.  LICENSEE shall use its best effort to provide a higher level of telecommunication service than that being provided in adjacent areas not subject to this LICENSE.  LICENSEE shall not provide a lower level of service than that level being provided in adjacent areas not subject to the LICENSE unless LICENSOR shall agree in writing.

6.     COST OF TELECOMMUNICATIONS SERVICES.  LICENSEE shall provide to the beneficiaries of LICENSOR living in areas subject to this LICENSE, telecommunications services at a cost less than or equal to the cost for comparable services being provided in adjacent areas not subject to this LICENSE.  LICENSEE shall not charge beneficiaries living in the LICENSE area more for telecommunication services than being charged in adjacent areas not subject to this LICENSE unless LICENSOR consents in writing.

7.     JOB TRAINING/EDUCATION. LICENSEE agrees to expend an amount equal to at least one-half percent (1/2%) of LICENSEE'S annual net profit for job training and/or educational opportunities for beneficiaries of LICENSOR each year.  For purposes of demonstrating compliance with this paragraph, LICENSEE agrees to allow LICENSOR access to LICENSEE'S financial statement, provided, that all material and information will be kept strictly confidential.

8.     EMPLOYMENT.  LICENSEE agrees to offer employment opportunities to qualified beneficiaries of LICENSOR.

9.     CAPITAL EXPENDITURES/CONTRACTS. LICENSEE agrees to utilize qualified companies controlled or owned by beneficiaries of LICENSOR provided such beneficiary company is qualified to perform the terms of the contract and such beneficiary company's bid price is not more than 5% higher than the lowest bid from an equally qualified non-beneficiary company.

19.     BREACH.  If LICENSEE shall substantially fail to observe or perform any of the conditions herein contained and on its part to be observed or performed and such failure or lack of substantial compliance shall continue for sixty (60) days after the receipt by certified mail or written notice of such failure to the address of LICENSEE, or if LICENSEE shall abandon the premises, then and in any such event LICENSOR may, at its option, cancel this LICENSE Agreement and, thereupon, take immediate possession of the premises, allowing LICENSEE reasonable time to remove its property therefrom, without prejudice to any remedy or right of action that LICENSOR may have against LICENSEE.[2]

---

[2] Although DHHL initially sent Waimana and SIC a notice of violation in March 2020 that notice was effectively withdrawn by DHHL in January 2021 when Waimana and SIC requested a contested case hearing, and since then, DHHL has not sent Plaintiffs any such notice of breach.

24.     Pursuant to License 372, SIC developed telecommunications facilities, including Central Offices, warehouses and security fencing and underground conduits to beneficiary lessee residences on License 372 Easement.  SIC used those facilities for the provision of voice only services.  Plaintiffs developed other telecommunications facilities.

25.     Paniolo Cable Company Inc. ("**Paniolo**") developed and leased to SIC, certain telecommunication facilities (undersea and underground cables and switches) outside of HHL which connected various HHL parcels on each Hawaiian island except Lanai.  Paniolo's facilities were connected to and housed in existing facilities on License 372 Easement, pursuant to SIC's joint use agreement with Paniolo.  All of Paniolo's facilities were leased to SIC at a time when Paniolo was a third-party mainland undersea cable company not owned or controlled by Waimana nor any affiliate of Waimana.  Paniolo had no interest in any HHL, as the License 372 Easement was licensed to Waimana pursuant to its rights under License 372.  The assets owned by Paniolo and leased to SIC including the assets on the License 372 Easement are hereinafter referred to as the "**Paniolo Assets**."

26.     In 2018, an involuntary bankruptcy petition was filed against Paniolo and in 2019, the U.S. Bankruptcy Court appointed Michael Katzenstein to serve as the Trustee in Bankruptcy for Paniolo ("**Katzenstein**").

27.     Because SIC was delinquent in its rent payments to Paniolo, in 2019, Katzenstein sued SIC and obtained a money judgment against SIC for the amount of unpaid rent that SIC owed to Paniolo.

28.     With the money judgment, on February 4, 2020, Katzenstein filed a Notice of Execution in Case No. 19-90022 (Dkt 36), which is attached hereto as **Exhibit "K,"** that

identified levied SIC property described in Exhibit "A" as **Real Property**, which is real property

in Mililani on Oahu, and **Schedule A-2 Assets**, (collectively, "**SIC Property**").

29.     Schedule A-2 at the end of the section entitled "Licenses" stated:

 -All licenses necessary to build, construct, repair, maintain and operate the Schedule A.2
assets, including without limitation SIC's interest in License Agreement No. 372 issued
by the State of Hawaii Department of Hawaiian Home Lands.

-All existing and pending entitlements (including without limitation, SIC's interests in
memoranda of agreement, easements, leases, license agreements, letters of approval,
special area management permits, rights of way or rights of interest, necessary to build,
construct, repair, maintain and operate the Schedule A.2 assets.

Emphasis added.

30.     On March 6, 2020, pursuant to the Writ of Execution, the Trustee at a public

auction purchased the SIC Property.

31.     By Rule 9019 Settlement Agreement effective as of March 6, 2020 31, and

approved and order by the Bankruptcy Court on June 4, 2020, the Court approved the 9019

Settlement Agreement between Trustee, Paniolo Creditors, SIC, and SIC Affiliates (Waimana,

Pa Makani and Clearcom) which referenced, adopted and approved the Master Relationship

Agreement ("**MRA**"), a copy of the MRA is attached hereto as **Exhibit "F."**  Schedule 2, section

2.3 of the MRA states:

**2.3. Entitlements.** The Parties acknowledge and agree that: (a) that certain Department
of Hawaiian Home Lands License Agreement No. 372 ("DHHL License"), together with
(b) the easements, leases, license agreements, letters of approval, special area
management permits, rights of way or rights of entry granted to SIC or an SIC Affiliate
and identified on Exhibit B hereto (the "Entitlements") are necessary for the operation
and maintenance of the Paniolo Network (or were necessary for the construction of the
Paniolo Network). SIC hereby agrees to assign, transfer, or convey to Paniolo all
Entitlements **(other than the DHHL License)** that may by their terms be so assigned or
transferred and to the extent such assignment, transfer, or conveyance would not, in
Paniolo's reasonable judgment, adversely affect service in the Hawaiian Home Lands. To
the extent any Entitlement may not, by its terms, be so assigned or transferred, SIC shall
(i) sublease or sublicense (as applicable) the Entitlement to Paniolo; or (ii) grant to
Paniolo the broadest possible right to use the Entitlement. For the avoidance of doubt, the

9

> <u>Parties acknowledge and agree that **DHHL License will not be assigned by SIC to Paniolo**, but that SIC shall, and hereby does, grant to Paniolo the full benefit and use of the DHHL License for the IRU Term provided Paniolo does not exercise its rights under such grant to impair service to HHL.</u>

Emphasis added.

32.     Thereafter, the 9019 Settlement Agreement and MRA were not assumed by HTI, which raises the issue as to whether the SIC Property transferred to HTI included "<u>SIC's interest in License Agreement No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands</u>" listed in Schedule A-2 as the Trustee acknowledged that he did not obtain an assignment of SIC's interest in License 372 despite the wording in Schedule A-2.

33.     However, regardless how this issue is ultimately decided, the Trustee and HTI clearly did not obtain any portion of Waimana's interest in License 372 that was not assigned to SIC in the Partial Assignment, which is Waimana's right to provide (post FCC Order non-exclusive) telecommunications services other than voice only service on HHL and Plaintiffs' License 372 Easement areas.

34.     On December 16, 2020, Ryan K. P. Kanakaole, Esq., the Deputy Attorney General representing DHHL filed papers in the Bankruptcy Court, a copy of which is attached hereto as **Exhibit "G,"** confirming that, "The Buyer [HTI] will need to acquire a new license for the use of DHHL lands."   The same message was confirmed by HHC Chairman William Aila, in emails dated January 6, 2021, to alhee@waimana.com that states that License 372 has not been cancelled, and: "The License remains valid.  DHHL informed the Court that any purchaser of the assets would require a license from DHHL."  And by DHHL's filing on August 19, 2021 (Dkt 432), a copy of which is attached hereto as **Exhibit "H,"** DHHL reconfirmed that HTI needs a new license to build, construct, repair, maintain and operate on HHL.

10

35.     Moreover, even if HTI obtains a new license from DHHL, such easement cannot be in the same areas already granted to Plaintiffs in License 372 as that would constitute a breach of License 372 by Defendants and breach of fiduciary duty, by Defendants.

36.     DHHL's 8/19/21 filing also disclosed the Limited Right-of Entry granted to HTI, which violates Plaintiffs' License 372 rights.[3]

37.     On August 31, 2021, the APA sale to HTI closed.

38.     Plaintiffs are not aware whether DHHL has granted HTI any right to provide telecommunications services on HHL, and if DHHL is contemplating doing so, DHHL would breach fiduciary duties to its beneficiaries if that license does not include the same strict obligations that Waimana assumed in License 372 including paragraphs 6-9 of License 372.

39.     DHHL would also breach fiduciary duties owed to Plaintiffs if it allowed use of the same easement areas licensed to Plaintiffs who are native Hawaiian corporations and a limited liability company as acknowledged in License 372, the Pa Makani Partial Assignment and the Clearcom Partial Assignment.

40.     DHHL may argue that the Federal Communications Commission ("FCC") order dated July 3, 2017 ("**FCC Order**"), attached hereto as **Exhibit "I,"** allows DHHL to provide access to the License 372 Easement on the grounds that the FCC Order prohibits DHHL from granting an exclusive license to only one company to provide telecommunications services on HHL, i.e. the License 372 Service Right.  However, the order does not require Plaintiffs to share use of their License 372 Easement.  The FCC Order only preempts the portion of the License that:

---

[3] In section 13 of the Limited Right-of-Entry, HTI refused to defend and indemnity DHHL for any claim brought by Waimana.

> grants one entity the "exclusive" right "to build, construct, repair, maintain and operate a . . . telecommunications network" for the purpose of providing service to the residents of the Hawaiian home lands and therefore prohibits other entities from doing so.

Id. at Page 7, Paragraph 16.

41.     DHHL also breached duties owed to Plaintiffs by petitioning the FCC to terminate the exclusive service right in License 372 by effectively withdrawing the rural company exception to Plaintiffs detriment.

42.     Nonetheless, under the severability provision of the License 372 at paragraph 22, while the exclusive aspect of License 372 Service Right may have been invalidated by the FCC Order, the order did not invalidate, and FCC does not have jurisdiction to invalidate Plaintiffs' License 372 Easement or invalidate the non-exclusive License 372 Service Right.  Plaintiffs require exclusive possession to perform their telecommunications obligations required under License 372.  Thus, Plaintiffs' right to exclusive possession of their License 372 Easement areas survived the FCC Order, as did their rights and obligations to provide non-voice telecommunications services on HHL.  An internal DHHL memo to the HHC dated January 18, 2022, a copy of which is attached hereto as **Exhibit "J",** states "DHHL has informed its lessees, tenants, and permittees that under Federal law they may obtain broadband telecommunications services from any provider of their choice"; confirming that the FCC Order dealt with License 372 Service Right.

43.     DHHL also breached duties owed to Plaintiffs by revoking DHHL's issued Eligible Telecommunications Carrier ("**ETC**") certifications that had allowed Plaintiffs to obtain support payments from funds administered by the FCC and transferring DHHL's authority to issue ETC's to the PUC thereby giving up HHCA Section 206 jurisdiction to the detriment of Plaintiffs and other native Hawaiian utility companies.

12

44.    The only area qualified to receive support payments in Hawaii is HHL thus by transferring DHHL's authority to issue ETC's to the PUC, DHHL gave up HHCA Section 206 jurisdiction to the detriment of Plaintiffs and other native Hawaiian companies that are eligible to receive funds for providing services to residents on HHL.

45.    Oceanic Communications, now Charter Communications, has an agreement to provide high speed data (internet) and video (cable TV) to HHL with Clearcom.

46.    Without notice to Plaintiffs, DHHL initiated at least one meeting with Charter to find out if Charter's agreement to use License 372 assets could be used by others to circumvent License 372.

COUNT I – BREACH OF CONTRACT

47.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 46 hereinabove.

48.    The elements of breach of contract are: (1) a contract, (2) the plaintiff's performance or excuse for nonperformance, (3) the defendant's breach, and (4) the resulting damages to plaintiff. 17B C.J.S. Contracts § 830, Westlaw (database updated October 2021). Haw. State Fed. Credit Union v. Kahapea, 150 Hawai'i 155 n.7, 497 P.3d 1103 (App. 2021)

49.    Here, (1) License 372, the Pa Makani Partial Assignment and the Clearcom Partial Assignment are contracts; (2) Plaintiffs have performed under these contracts or their non-performance has been excused; (3) DHHL breached these contract by entering into the Limited Right-of-Entry, allowing HTI to carry non-voice telecommunications, making filings in the Bankruptcy Court, potentially negotiating a new license with HTI that violate Plaintiffs rights under License 372 and Partial Assignments to Pa Makani and Clearcom, causing the FCC Order

13

and terminating Plaintiffs ETC and then transferring ETC jurisdiction for HHL to the PUC; and
(4) said breaches have harmed Plaintiffs in amounts to be determined at trial.

COUNT II – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

50.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1
through 49 hereinabove.

51.    The covenant of good faith and fair dealing is implied in the License 372 and
Partial Assignments to Pa Makani and Clearcom where DHHL is obligated to be faithful to an
agreed common purpose and consistently with the justified expectations of Plaintiffs.  Clark
Realty Corp. v. Henry F. Akona Tr., 142 Hawai'i 486, 421 P.3d 694 (App. 2018).

52.    Here, Plaintiffs entered into License 372 and partial assignments in perpetuity to
provide telecommunications services to HHL beneficiaries based on the promise that the
easements were exclusive to areas they developed and used to provide said services.

53.    DHHL breached this covenant and continue to do so to the detriment of Plaintiffs
and all native Hawaiians in amounts to be determined at trial

COUNT III – BREACH OF FIDUCIARY DUTIES

54.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1
through 53 hereinabove

55.    Defendants owed trust fiduciary duties to Plaintiffs as native Hawaiian
corporations and a limited liability company.

56.    Defendants breach those fiduciary duties by entering into the Limited Right-of
Entry, allowing HTI to carry non-voice telecommunications, making filings in the Bankruptcy
Court noted above, potentially negotiating a new license with HTI, causing the FCC Order and

terminating Plaintiffs ETC and transferring ETC jurisdiction to the PUC, all of which impairs Plaintiffs right and obligation to provide benefits to HHL beneficiaries set forth in License 372.

57.     Said breach caused harm to Plaintiffs and all HHL beneficiaries in amounts to be determined at trial.

COUNT IV – DECLARATORY RELIEF

58.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 57 hereinabove.

59.     Plaintiffs are entitled to a declaratory relief determination that the SIC Partial Assignment only provided SIC with the right to provide voice only service on HHL and no other telecommunications services throughout Hawaii, including wireless that was assigned to Pa Makani and broadband that was assigned to Clearcom.

60.     Plaintiffs are entitled to a declaratory relief determination that the SIC Partial Assignment did not provide to SIC the License 372 Easement areas developed by Waimana, Pa Makani and Clearcom.

WHEREFORE, Plaintiffs prays the Court grant the following relief:

1.     For damages in an amount to be determined at trial.

2.     Declaratory relief set forth in Count IV.

3.     For plaintiffs' reasonable costs and attorneys' fees incurred herein.

4.     For such other and further relief as the Court deems just.

DATED:  Honolulu, Hawai‘i, May 27, 2022.

/s/ William Meheula
WILLIAM MEHEULA
D. KAENA HOROWITZ
Attorneys for Plaintiff
WAIMANA ENTERPRISES INC.,
PA MAKANI LLC, and CLEARCOM, INC.

15

# EXHIBIT O

CLARE E. CONNORS          7936
Attorney General, State of Hawai'i

CRAIG Y. IHA             7919
RYAN K. P. KANAKAOLE     9613

Deputy Attorneys General
Department of the Attorney
 General, State of Hawai'i
425 Queen Street
Honolulu, Hawai'i  96813
Telephone:  (808) 587-2978
Facsimile:   (808) 586-1372
Email:        ryan.kp.kanakaole@hawaii.gov
Attorneys for the Department of Hawaiian Home Lands,
State of Hawai'i

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| In re<br><br>PANIOLO CABLE COMPANY, LLC,<br><br>                     Debtor. | Case No. 18-01319 (RJF)<br>(Chapter 11)<br><br><u>Hearing</u><br>Date:    December 21, 2020<br>Time:   2:00 p.m.<br>Judge:  Hon. Robert J. Faris<br><br>[Related Docket Entry: Dkt. #313] |

**DEPARTMENT OF HAWAIIAN HOME LANDS' STATEMENT OF POSITION ON MICHAEL KATZENSTEIN, AS CHAPTER 11 TRUSTEE'S MOTION FOR ENTRY OF AN ORDER (A) AUTHORIZING AND APPROVING THE SALE OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) APPROVING THE ASSET PURCHASE AGREEMENT, (C) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE, (D) APPROVING THE OPERATIONAL SUPPORT AND SALES SERVICES AGREEMENT, (E) <u>APPROVING A BREAK-UP FEE; AND (F) GRANTING RELATED RELIEF</u>**

## EXHIBIT O

State of Hawaiʻi, Department of Hawaiian Home Lands ("DHHL") submits this Statement of Position Regarding Michael Katzenstein, as Chapter 11 Trustee's Motion for Entry of an Order (A) Authorizing and Approving the Sale of the Debtor's Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (B) Approving the Asset Purchase Agreement, (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale, (D) Approving the Operational Support and Sales Services Agreement, (E) Approving a Break-up Fee, and (F) Granting Related Relief filed on November 30, 2020 ("Motion to Approve Sale").  Dkt. #313.

DHHL controls and manages the lands upon which all buildings, manholes, and other fixtures of the Debtor's Schedule A.2 Assets are located.  *Id.* at 24-25. As noted in the Motion to Approve Sale, these assets are on DHHL's lands pursuant to a license, which is in default; and DHHL will need grant a new license to Hawaiian Telcom, Inc. (the "Buyer").  DHHL offers its comments on this issue below.

## I.  BACKGROUND

In 1920, Congress enacted the Hawaiian Homes Commission Act ("HHCA"), which set aside approximately 203,500 acres of public lands for a homesteading program for native Hawaiians; these lands were given the status of Hawaiian Home Lands.  *Ahuna v. Dept. of Hawaiian Home Land*, 64 Haw. 327, 336-38, 640 P.2d 1161, 1167-68 (1982).  Hawaiian Home Lands were to be under

2

the control of the body then called the Hawaiian Homes Commission.  *Id.*  When

Hawaiʻi entered the Union, the State acquired title to the Hawaiian Home Lands.

*Kepoʻo v. Watson*, 87 Hawaiʻi 91, 97-98, 952 P.2d 379, 385, 86 (1998).  Both legal

title and management responsibilities over Hawaiian Home Lands are in the hands

of the State.  *Id.*  DHHL, led by the Hawaiian Homes Commission, is the state

agency charged with administering Hawaiian Home Lands.  HHCA § 202.

This involuntary Chapter 11 bankruptcy proceeding was initiated on

November 13, 2018 against Paniolo Cable Company, LLC (the "Debtor").  Dkt.

#1.  On January 30, 2019, the Court entered its *Order for Relief* in this matter and

appointed Michael Katzenstein (the "Trustee") as Trustee of Debtor's Bankruptcy

Estate (the "Estate").  Dkt. #48.

An Adversary Proceeding in this matter was opened on June 24, 2019.

*Katzenstein v. Sandwich Isles Communications, Inc.*, Adversary Case No. 19-

90022 ("Adversary Proceeding"), Dkt. #1.

On December 17, 2019, this Court entered a judgment in favor of Trustee

and against Defendant Sandwich Isles Communications, Inc. ("SIC") to recover

from SIC the amount of $256,553,854.00 ("Money Judgment").  Adversary

Proceeding, Dkt. #28.

On January 6, 2020, this Court entered a *Writ of Execution to the United*

*States Marshal* directing the U.S. Marshal to levy upon SIC's property to satisfy

the Money Judgment (the "Writ of Execution").  Adversary Proceeding, Dkt. #32.

On February 4, 2020, a *Certificate of Execution* was entered certifying that the U.S. Marshal executed upon all of the right, title, and interest of, *inter alia*, certain personal property assets of SIC (the "A.2 Assets").  Adversary Proceeding, Dkt. #37 at 2, 6-15.  The inventory of A.2 Assets identifies buildings, manholes, conduits, subducts, and other fixtures located on Hawaiian Home Lands.  *Id.* at 6-15; see also Dkt. #313 at 24-25.  The inventory of A.2 Assets also included SIC's interest in License Agreement No. 372 issued by DHHL to build, construct, repair, and maintain a telecommunications network on Hawaiian Home Lands ("License No. 372").  *See* Adversary Proceeding, Dkt. #37  at 15.

Pursuant to the Writ of Execution, a public auction of SIC's property, including the A.2 Assets, was held on March 6, 2020 (the "Execution Sale"). Adversary Proceeding, Dkt. #65 at 2-3.  The A.2 Assets were sold to the Trustee as the highest bidder at the Execution Sale.  *Id.*

Through the instant motion, the Trustee seeks this Court's approval of the sale of Debtor's Assets, including the A.2 Assets, to the Buyer.

## II.  DHHL'S STATEMENT OF POSITION

DHHL does not object to the Motion to Approve Sale.  However, DHHL submits the following comment:

A. <u>The Buyer will need to acquire a new license for the use of DHHL lands.</u>

DHHL confirms what is noted by the Trustee in the Motion to Approve Sale – that the Buyer will need to acquire a new license for the use of Hawaiian Home

4

Lands upon which certain A.2 Assets are located.  *See* Dkt. #313 at 24-25; Dkt. #313-3 at 11-12.  The new license would authorize the Buyer to build, construct, repair, maintain and operate the A.2 Assets located on Hawaiian Home Lands previously covered by License No. 372, which is default.  DHHL further clarifies that the new license to the Buyer is subject to approval by the Hawaiian Homes Commission.  DHHL anticipates that the negotiation and approval process for Buyer to acquire a new license will take several months.

      DATED:    Honolulu, Hawai'i, December 16, 2020.

                                        CLARE E. CONNORS
                                        Attorney General, State of Hawai'i


                                        /s/ Ryan K. P. Kanakaole
                                        CRAIG Y. IHA
                                        RYAN K. P. KANAKAOLE
                                        Deputy Attorneys General
                                        Attorneys for DHHL

# EXHIBIT P

CLARE E. CONNORS   7936
Attorney General, State of Hawaiʻi
CRAIG Y. IHA            7919
RYAN K. P. KANAKAOLE   9613
Deputy Attorneys General
Department of the Attorney
  General, State of Hawaiʻi
425 Queen Street
Honolulu, Hawaiʻi 96813
Telephone:  (808) 587-2978
Facsimile:  (808) 586-1372
Email:       ryan.kp.kanakaole@hawaii.gov

ASHFORD & WRISTON
A Limited Liability Law Partnership LLP
JAMES K. MEE   2995-0
KEVIN W. HERRING   6722-0
999 Bishop Street
First Hawaiian Center, 14th Floor
Honolulu, Hawaii 96813
Telephone:  (808) 539-0440
Facsimile:  (808) 533-4945
Email:  jmee@awlaw.com

Attorneys for the Department of Hawaiian Home Lands,
State of Hawaiʻi

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| In re | ) Case No. 18-01319 (RJF) |
| | ) (Chapter 11) |
| PANIOLO CABLE COMPANY, LLC | ) |
| | ) <u>Status Conference</u> |
| Debtor. | ) Date:  August 23, 2021 |
| | ) Time:  2:00 p.m. |
| | ) Judge:  Hon. Robert J. Faris |
| | ) |
| | ) [Related Docket Entry:  Dkt. #425] |

## EXHIBIT P

DEPARTMENT OF HAWAIIAN HOME LANDS' RESPONSE
REGARDING MICHAEL KATZENSTEIN, CHAPTER 11 TRUSTEE'S
STATUS REPORT AND REQUEST FOR STATUS CONFERENCE,
<u>FILED HEREIN ON AUGUST 16, 2021 (DKT #425)</u>

State of Hawai'i, Department of Hawaiian Home Lands ("DHHL") submits this response regarding Michael Katzenstein, Chapter 11 Trustee's Status Report and Request for Status Conference ("Status Report"). Dkt. 425.

In the Status Report, the Trustee indicates that disagreements have arisen between the Trustee and Sandwich Isles Communications ("SIC") regarding SIC fulfilling obligations under the Settlement Agreement and the Sale Order. Further, several exhibits were attached to the Status Report which seem to imply that SIC may still claim exclusive control of the Paniolo assets due to DHHL's License 372 originally issued to Waimana Enterprise, Inc.

DHHL is filing this response:

(1) to inform the Court of the present status of negotiations between DHHL and Hawaiian Telcom ("Buyer") regarding issuance of a new license that would permit Buyer's long-term use of DHHL lands to operate the Paniolo system, as well as interim agreements which authorize Buyer to maintain and operate the Paniolo system.

(2)  to inform the Court of DHHL'S belief that SIC's apparent claim of exclusivity under License 372 is not correct.

(3) to express its concern that SIC's incorrect claim of exclusivity may have

an adverse on service to DHHL beneficiaries and others on the Hawaiian Home

Lands.

## I.    BACKGROUND

On May 9, 1995, DHHL entered into a license with Waimana Enterprises,

Inc. for development of broad band telecommunications services on the Home

Lands.  ("License 372").  License 372 stated it was an "exclusive" license.

Subsequently, there were partial assignments of  License 372 to Waimana

affiliates SIC, Pa Makani LLC dba Sandwich Isles Wireless, Clearcom, Inc. dba

Sandwich Isles Broadband, and Debtor.  SIC also entered into a joint use

agreement with Debtor for a portion of the assets covered by License 372.

In 2017, the Federal Communications Commission ("FCC") issued an order

determining that the exclusivity provisions of License 372 violated Section 253(a)

of the Communications Act, 47 U.S.C. § 151 *et seq.*, and were accordingly

preempted and non-enforceable under Section 253(d) of the Act.  *See* Ex. "B"

attached to the Declaration of James K. Mee (the Mee Decl.) (the "FCC Order").

This Chapter 11 proceeding was commenced in 2018.  Subsequently, the

Trustee filed Michael Katzenstein as Chapter 11 Trustee's Motion for Entry of an

Order (A) Authorizing and Approving the Sale of the Debtor's Assets Free and

Clear of All Liens, Claims, Interests, and Encumbrances, (B) Approving the Asset

Purchase Agreement, (C) Approving the Assumption and Assignment of Certain

Executory Contracts and Unexpired Leases in Connection With the Sale, (D)

Approving the Operational Support and Sales Services Agreement, (E) Approving

a Break-Up Fee, and (F) Granting Related Relief ("Motion to Approve Sale").

(Docket #313.)

DHHL filed a Statement of Position  (Docket #341), stating that DHHL did

not object to the sale of the Paniolo assets to Buyer under the terms of the Motion

to Approve Sale.  DHHL further stated that the Buyer would need to enter into a

new license for the use of Hawaiian Home Lands upon which certain of the

Paniolo assets were located, which would authorize Buyer to build, construct,

repair, maintain and operate the assets located on Hawaiian Home Lands.  (Docket

#341 at 4-5.)

## II.    DHHL AND BUYER HAVE ENTERED INTO A RIGHT OF ENTRY AGREEMENT ALLOWING BUYER TO MAINTAIN AND OPERATE THE PANIOLO ASSETS LOCATED ON HAWAIIAN HOME LANDS ON AN INTERIM BASIS, AND ARE IN THE PROCESS OF NEGOTIATING A NEW LONG-TERM LICENSE.

DHHL and Buyer are presently negotiating a new license that would allow

Buyer, on a long-term basis, to maintain and operate the Paniolo assets on the

Hawaiian Home Lands.  As the first step in that process, on July 26, 2021,

DHHL's Chairman issued an initial 30-day Limited Right of Entry that allow

Buyer to engage in due diligence activities prior to acquisition of the assets.  The

Limited Right of Entry is good for a period of thirty days. The issuance of the Limited Right of Entry recited, among other things, that it was in contemplation of the parties entering into negotiations for a new license. The terms of the Limited Right of Entry include, among other things, that DHHL and Buyer contemplated entering into negotiations for a new license. *See* Ex. "B" to Mee Decl., at 2.

Subsequently, at a regular meeting held on August 16, 2021, the Hawaiian Homes Commission approved a longer Right of Entry, to be on a month-to-month basis for a period of up to one year. Mee Decl. at ¶ 5. The final form of that Right of Entry agreement is presently being prepared and should be finalized and executed shortly. Mee Decl. at ¶ 6.

Concurrently, DHHL and Buyer are engaged in negotiations regarding a new long-term license. A proposed form of license was transmitted by counsel for DHHL to counsel for Buyer on August 5, 2021. Mee Decl. at ¶ 7.

Once a form of license is agreed upon by the parties, the proposed license will go through a beneficiary consultation process. Once that process is complete and beneficiary comments have been considered, the Hawaiian Homes Commission will make the final determination whether to approve the license. Mee Decl. at ¶ 8.

## III.   LICENSE 372 IS NOT EXCLUSIVE, AND DOES NOT GIVE SIC EXCLUSIVE RIGHTS IN THE HAWAIIAN HOME LANDS, NOR PRECLUDE DHHL FROM ISSUING ANOTHER LICENSE TO BUYER.

The Exhibits to the Trustee's Status Report include several comments made by SIC which imply that, despite the clear wording and effect of the FCC Order, SIC still claims exclusive rights under License 372, and that DHHL is restricted in some fashion from entering into a new license with Buyer.  For example, SIC states incorrectly that "[t]he assets on Hawaii Home Lands cannot be operated without Sandwich Isles' license."  Letter of May 14, 2021, from SIC to Buyer.  Exhibit "A" to Status Report.  In an email dated June 2, 2021 from Al Hee of SIC to Buyer's consultant Winslow Tanabe, Mr. Hee incorrectly states that "[a]ll DHHL easements are part of the Waimana License which is not transferable."  In another email from Mr. Hee to Mr. Tanabe of July 19, 2021, Mr. Hee incorrectly states that "HT [Buyer] does not own or control the property under the COs it purchased.  HHL does subject to Waimana's license."

The quoted SIC statements are not correct for several reasons, including: first, it is DHHL's understanding that any interest of SIC in the Paniolo assets being acquired by Buyer, including that portion of License 372 which comprises part of the Paniolo assets, has been extinguished by the bankruptcy proceedings; and second, the FCC Order expressly ruled that the exclusivity provisions of License 372 violated Section 253 of the Communications Act, 47 U.S.C. § 151 et

seq., and were accordingly preempted and non-enforceable under Section 253(d) of

the Act.  Exhibit "C" attached hereto.  As stated by the FCC:

> [W]e find that an exclusive license to "build, construct,
> repair, maintain, and operate" a network to provide
> telecommunications services that was granted by the
> State of Hawaii, Department of Hawaiian Home Lands . .
> . to Waimana Enterprises, Inc. . . . and then assigned to
> its subsidiary, Sandwich Isles Communications, Inc. . . .
> violates Section 253 of the Communications Act . . . we
> preempt enforcement of its exclusivity provision
> pursuant to 253(d) of the Act.

Exhibit "C" at 1.

Accordingly, since any rights of SIC under License 372 are not exclusive,

DHHL is fully authorized to enter into the process and issue another license to the

Buyer.

## IV.   SIC SHOULD NOT BE ALLOWED TO DO ANYTHING WHICH MIGHT DISRUPT OR AFFECT THE QUALITY OF SERVICES BEING PROVIDED TO THE HOME LANDS.

The Trustee's Status Report recites a number of areas where SIC is

apparently not cooperating in the transfer of control of the Paniolo network to the

Buyer, which is acting as Servicer of the system prior to Closing of the

transactions.  Also, according to the Status Report, SIC has apparently indicated

that, post-closing, it will attempt to maintain "dead-hand control" via the

provisions of License 372.  The Trustee states that SIC's actions "represent a clear

U.S. Bankruptcy Court Hawaii #22-90008 Dkt # 28-32  Filed 05/27/22  Page 8 of 33

and present danger to the operations, safety and security of the Paniolo Cable Network." (Dkt. 425 at 12-13.)

The present situation as outlined in the Status Report causes great concern for DHHL. Thousands of DHHL beneficiaries as well as others on Hawaiian Home Lands are presently serviced by the SIC system, which is connected to and dependent upon the "middle mile" Paniolo system.

DHHL respectfully requests that the Court make it clear that SIC is not permitted to take any action which jeopardizes the Paniolo network, including failing to cooperate in the prompt and lawful transfer of assets to Buyer, or SIC's provision of services to the Home Lands.

DATED:   Honolulu, Hawai'i, August 19, 2021.

CLARE E. CONNORS
Attorney General, State of Hawaii

CRAIG Y. IHA
RYAN K.P. KANAKAOLE


/s/ Kevin W. Herring
JAMES K. MEE
KEVIN W. HERRING

Attorneys for the Department of
Hawaiian Home Lands, State of Hawai'i

# EXHIBIT "A"

STATE OF HAWAII
DEPARTMENT OF HAWAIIAN HOME LANDS

## LIMITED RIGHT-OF-ENTRY NO. 22-008

This LIMITED RIGHT-OF-ENTRY NO. 22-008 ("LROE"), dated _____ July 26 ,
2021 (*Effective Date*) is made by and between the State of Hawaii, **DEPARTMENT OF
HAWAIIAN HOME LANDS**, whose place of business is 91-5420 Kapolei Parkway, Kapolei,
Hawaii, 96707 (***PERMITTOR***) and **HAWAIIAN TELCOM, INC.**, a Hawaii corporation,
whose address is 1177 Bishop Street, Suite 32, Honolulu, Hawaii 96813, (***PERMITTEE***).

### RECITALS

**WHEREAS**, on November 13, 2018, an involuntary proceeding under Chapter 11 of the
Bankruptcy Code was filed against Paniolo Cable Company, LLC ("Debtor") in the United
States Bankruptcy Court for the District of Hawaii ("Bankruptcy Court"), Case No. 18-01310
(RJF); and

**WHEREAS**, the submarine and terrestrial assets of the Debtor were sold by the Trustee
of the Debtor ("Trustee") to the PERMITTEE, via an Asset Purchase Agreement dated
November 30, 2020 (the "APA"); and

**WHEREAS**, the sale of the assets of the Debtor (collectively the "Assets") under the
terms and conditions of the APA was approved by the Bankruptcy Court by its "Order (A)
Authorizing and Approving the Sale of the Debtor's Assets Free and clear of All Liens, Claims,
Interests, and encumbrances, (B) Approving the Asset Purchase Agreement, (C) Approving the
Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in
Connection with the Sale, (D) Approving the Operational Support and Sales Services
Agreement, (E) Approving a Break-Up Fee, and (F)) Granting Related Relief; Exhibits "A" and
"B"," filed December 28, 2020 ("Sale Order"); and

**WHEREAS**, pursuant to the APA and Sale Order, the Trustee and the PERMITTEE are
presently moving to a closing of the transaction, contingent on receiving certain approvals from
the Federal Communications Commission; and

**WHEREAS**, as a part of the sale, the Trustee and PERMITTEE also entered into an
Amended Operational Support and Sales Agreement dated December 21, 2020 ("Operations
Agreement"), allowing PERMITTEE to maintain and operate the Assets of the Debtor until the
closing of the transaction; and

**WHEREAS**, a portion of the Assets being acquired by the PERMITTEE and presently
being maintained and operated by PERMITTEE are physically located on the lands of the
PERMITTOR;

**WHEREAS**, while ownership is imminent, PERMITTEE has not yet acquired the
Assets and PERMITTEE has requested this LROE to obtain access it needs to inspect and

## EXHIBIT A

assess existing infrastructure and immediately adjoining peripheral areas and complete any other due diligence related to Assets and the sales transaction; and

**WHEREAS,** the "Premises" for this LROE means the portions of PERMITTOR's land currently being used by the PERMITTEE to maintain and operate the Assets under the Operations Agreement and peripheral areas thereto for PERMITTEE's due diligence work, as more specifically described in Exhibit "A" attached hereto; and

**WHEREAS,** based on the best available information, Exhibit "A" attached hereto identifies the portion of the Premises currently being used by the PERMITTEE to maintain and operate the Assets, and after its due diligence, PERMITTEE will inform PERMITTOR if the PERMITTEE believes other additional areas of PERMITTOR's land are being used for such maintenance and operation; and

**WHEREAS,** this LROE is not intended to affect existing rights PERMITTEE has under the Operations Agreement and the Sales Order or will acquire pursuant to the Sales Order, which allow and will allow PERMITTEE to continue to maintain and operate the Assets; and

**WHEREAS,** PERMITTOR and PERMITTEE have agreed to work collaboratively and expediously in a manner consistent with the rights and duties of the PERMITTEE and the rights and duties of the PERMITTOR for the issuance of a new license and

**WHEREAS,** as an interim measure, PERMITTOR is issuing this initial Limited Right of Entry to PERMITTEE (i) in order to allow PERMITTEE to conduct its due diligence investigations, and (ii) in furtherance of negotiations between PERMITTOR and PERMITTEE regarding the issuance of a new License and such other agreement(s) which would memorialize the continued maintenance and operation activities of PERMITTEE up to, and from, the closing of the transaction;

**NOW, THEREFORE, PERMITTOR** hereby grants this limited right of entry upon the following terms and conditions:

1.    **GRANT**. PERMITTOR grants to PERMITTEE, its employees, consultants, contractors, invitees, agents, and representatives (collectively, Permittee's Representatives), a non-exclusive, revocable right to enter the Premises.

2.    **TERM**. This LROE commences on the Effective Date and will continue thereafter for a period of thirty (30) days.

3.    **PERMITTED USE**. PERMITTEE may use the Premises only for conducting its due diligence investigations. PERMITTEE shall not use the Premises for any other purpose(s), except with PERMITTOR'S prior written consent and except for maintenance and operation of the Assets on the Premises as set forth in the Operations Agreement.

4.    **FEES**. PERMITTEE is not required to pay any fees for its use of the Premises, but PERMITTEE will bear its own costs, expenses, and liabilities arising from its use of the Premises.  There is no processing and documentation fee for this LROE.

2

5. **MAINTENANCE, SECURITY**. PERMITTEE shall keep the Premises in a strictly clean and sanitary and orderly condition, and shall not cause, make, permit, or suffer any waste, spoil, nuisance, nor any unlawful, improper, illegal, or offensive use of or on the Premises. PERMITTEE shall be solely responsible for the security of the Premises and all of PERMITTEE'S property kept in or on the Premises.

6. **CONSTRUCTION AND IMPROVEMENTS**. PERMITTEE may not construct, alter, amend, place, or install any improvements or fixtures on the Premises or any improvements thereon except with PERMITTOR'S prior written approval or as permitted by the Operations Agreement.

7. **COMPLIANCE WITH LAWS**. PERMITTEE shall comply with all rules, regulations, ordinances and/or laws of the State of Hawaii and any other municipal and/or Federal Government authority applicable to the Premises and improvements thereon.

8. **LIMITED RIGHT TO ENTER**. Because of the high security nature of the portions of the Premises where the Assets are located, PERMITTOR, its employees, agents, consultants, contractors and representatives, will not have free access to enter such areas of the Premises. As to the balance of the Premises, PERMITTOR, its employees, agents, consultants, contractors and representatives, may at all reasonable times freely access and enter such portion of the Premises for the purpose of, but not limited to, examining the same or for the performance of any public or official duties; provided that PERMITTOR shall not interfere unreasonably with PERMITTEE'S permitted use(s) of the Premises under the Operations Agreement.

9. **NO ASSIGNMENT OR SUBLEASE**. PERMITTEE may not in any manner transfer, assign, mortgage, pledge, sublease, or sublet any rights in or to the Premises, in whole or part, or otherwise hold or agree so to do for the benefit of any other person or persons or organization of any kind.

10. **NO LIENS OR ENCUMBRANCES**. PERMITTEE shall not by any act or omission, directly or indirectly, create, incur, assume, cause, or suffer to exist any liens or encumbrances on or with respect to its interests and rights of use in the Premises. PERMITTEE shall promptly notify PERMITTOR of any such liens and encumbrances and, at its own expense, take such action as may be necessary to immediately and fully discharge or release any such lien or encumbrance.

11. **EXPIRATION**. Upon termination of this LROE, PERMITTEE may continue with its activities under and pursuant to the Operations Agreement, however, will no longer have access to the peripheral areas of the Premises.

1. **INSURANCE**. PERMITTEE shall provide proof of a comprehensive commercial general liability insurance policy of no less than $2,000,000.00 for each occurrence, naming the Department of Hawaiian Home Lands (DHHL) as an additional

3

insured prior to commencement of work and throughout the term of this ROE. The specification of these limits as contained herein shall not be construed in any way to be a limitation on the amount of liability of PERMITTEE for fees, interest or other charges under this ROE.

PERMITTEE shall provide certificate(s) of insurance necessary to evidence compliance with the insurance provisions of this ROE. PERMITTEE shall keep such insurance in effect and the certificate(s) on deposit with PERMITTOR during the entire term of this ROE.

In addition:

a.   Failure of PERMITTEE to provide and keep in force such insurance shall be regarded as material default under this ROE. PERMITTOR shall be entitled to exercise any or all of the remedies provided in this ROE for default of PERMITTEE.

b.   The procuring of such required insurance policies shall not be construed to limit PERMITTEE'S indemnification obligations under this ROE.

c.   PERMITTOR is a self insured State agency. PERMITTEE'S insurance shall be primary. Any insurance maintained by PERMITTOR and/or the State of Hawaii shall apply in excess of, and shall not contribute with, insurance provided by PERMITTEE.

Such insurance policy shall (a) be issued by an insurance company or surety company authorized to do business in the State of Hawaii or approved in writing by the Chairman, Hawaiian Homes Commission; (b) name the State of Hawaii and its DEPARTMENT OF HAWAIIAN HOME LANDS as an insured; (c) provide that the DEPARTMENT OF HAWAIIAN HOME LANDS shall be notified at least thirty (30) days prior to any termination, cancellation or material change in the insurance coverage; and (d) cover all injuries, losses or damages arising from, growing out of or caused by any acts or omissions of PERMITTEE, its officers, agents, employees, invitees or licensees in connection with PERMITTEE'S use or occupancy of the Premises; provided that PERMITEE shall not be required to cover injuries, losses or damages caused by the sole negligence of DEPARTMENT OF HAWAIIAN HOME LANDS or pre-existing conditions.

PERMITTEE shall insure during the term of this ROE the Assets as required by the Operations Agreement.

PERMITTEE shall furnish to PERMITTOR upon the execution of this ROE, certificates showing such insurance policy or policies to be in favor of PERMITTOR and to be in force, and shall furnish like certificates upon each renewal thereof. In the event of loss, damage or destruction, PERMITTOR shall retain from the proceeds of the policies such amounts deemed by it to be necessary to cover the loss, damage or destruction of or to the improvements and the balance of such proceeds, if any, shall be delivered to PERMITTEE.

4

The procuring of this policy shall not release or relieve PERMITTEE of its responsibility under this ROE as set forth herein or limit the amount of its liability under this ROE.
PERMITTEE shall provide proof of liability insurance satisfactory to PERMITTOR within a reasonable time before the Effective Date.

13. **DEFENSE AND INDEMNITY.** PERMITTEE agrees to save, defend, and hold harmless the State of Hawaii, its Department of Hawaiian Home Lands, its officers, employees, and agents from and against all liability, loss, damage, cost, and expenses, including all attorneys' fees and costs, and all claims, suits, demands therefore arising out of or resulting from the acts or omissions of PERMITTEE or PERMITTEE's employees, officers, agents, or subcontractors under this Limited Right of Entry Permit, provided that PERMITTEE's obligations under this paragraph do not apply to any claims, suits, demands, liability, loss, damage, cost and expenses, including attorneys' fees and costs, asserted by Sandwich Isles Communications (SIC), or its related companies or subsidiaries, or any person or entity claiming by or through any of them, for trespass, tortious interference with a business advantage, breach of contract, or similar allegation or any claim arising from or based on any putative exclusive agreement between DHHL and SIC.

14. **HAZARDOUS MATERIAL.** PERMITTEE shall not cause or permit the escape, disposal, or release of any hazardous materials. PERMITTEE shall not allow the storage or use of such materials in any manner not sanctioned by law or by the highest standards prevailing in the industry for the storage and use of such materials, nor allow to be brought onto the premises any such materials except to use in the ordinary course of PERMITTEE'S business, and then only after written notice is given to the PERMITTOR of the identity of such materials and upon PERMITTOR'S consent, which consent may be withheld at the PERMITTOR'S sole and absolute discretion. If any lender or governmental agency shall ever require testing to ascertain whether or not there has been any release of hazardous materials by PERMITTEE, then PERMITTEE shall be responsible for the costs thereof. In addition, PERMITTEE shall execute affidavits, representations and the like from time to time at PERMITTOR'S request concerning PERMITTEE'S best knowledge and belief regarding the presence of hazardous materials on the Premises placed or released by PERMITTEE.

PERMITTEE agrees to indemnify, defend, and hold harmless PERMITTOR, its officers, employees, and agents from and against all liability, loss, damage, cost, and expense, including all attorney's fees, and all claims, suits, and demands therefore, arising out of or resulting from any use or release of hazardous materials on the premises occurring while PERMITTEE is in possession, or elsewhere if caused by PERMITTEE or persons acting under PERMITTEE. These covenants shall survive the expiration or earlier termination of the LROE.

For the purpose of this LROE, the term "hazardous material" as used herein shall include any substance, waste or material designated as hazardous or toxic or radioactive or other similar term by any present or future federal, state or local statutes, regulation or ordinance, such as the Resource Conservation and Recovery Act, as amended, the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, and the Federal Clean Water Act, as amended from time to time, and also including but not limited to petroleum, petroleum based substances, asbestos, polychlorinated-byphenyls ("PCB"),

5

formaldehyde, and also including any substance designated by federal, state or local regulations, now or in the future, as presenting a risk to human health or the environment.

Prior to the termination of the LROE, PERMITTEE may be required to conduct a Level One (1) Hazardous Waste Evaluation and conduct a complete abatement and disposal, if necessary, satisfactory to the standards required by the Federal Environmental Protection Agency, the Department of Health and PERMITTOR.

The foregoing shall not apply to PERMITTEE's routine day-to-day maintenance and operation activities pursuant to the Operations Agreement.

15.    **ENTIRE AGREEMENT**. This LROE contains all of the terms and agreements between the parties relating to the subject matter hereof and supersedes and cancels any and all other conflicting prior agreements, promises, and negotiations between them. Nothing contained herein shall limit any claims by PERMITTOR against PERMITTEE arising under prior agreements, nor limit PERMITTEE'S continuing obligations under prior agreements, including insurance, indemnity, and hazardous waste obligations.  This LROE may be executed in counterparts, each of which shall be deemed an original, but all such counterparts together shall constitute one agreement.

16.    **PERMITTEE REPRESENTATIONS**. PERMITTEE currently uses and occupies the Premises where the Assets are located and is familiar with the quality and condition of such portion of the Premises, has had an opportunity to inspect such portion of the Premises, and to evaluate and determine for itself the suitability of the such Premises for its intended purposes.  As to the entire Premises, PERMITTEE accepts the Premises as-is, where-is, with all faults, defects, and conditions, whether known or unknown.

17.    **SPECIAL CONDITIONS**.

A.    The LROE document shall be subject to other standard terms and conditions of similar documents issued by DHHL and will be subject to the review and approval by the Office of the Attorney General, State of Hawaii; and

B.    This LROE is subject to other terms and conditions that may be deemed prudent by the Chairman of the Hawaiian Homes Commission.

[REMAINDER OF PAGE BLANK -- SIGNATURE PAGE FOLLOWS]

6

IN WITNESS WHEREOF, PERMITTOR and PERMITTEE have caused this LROE to be executed by the duly authorized officers/individuals as of the day and year first above written.

State of Hawaii
DEPARTMENT OF HAWAIIAN HOME LANDS

APPROVED AS TO FORM:

By _____
William J. Aila, Jr., Chairman
Hawaiian Homes Commission

_____
Deputy Attorney General
State of Hawaii

PERMITTOR

HAWAIIAN TELCOM, INC.
a Hawaii corporation

By: _____
Su Hwa Shin Meisenzahl
Its:  President & General Manager

PERMITTEE

7

Exhibit "A"

| Location | Function | TMK / Description |
|---|---|---|
| Anahola (Kauai) | Central Office | (4) 4-18-15 (Parcel 22 and 23) and access easement adjacent |
| Kekaha (Kauai) | Terminal Building / CLS | 7743 Iwipolena Rd, Kekaha, HI 96752 (Parcel ID 120170050000) |
| Nanakuli (Oahu) | Terminal Building / CLS | 8-9-7 Portion 2 (Lot A) |
| Waimanalo (Oahu) | Terminal Building / CLS | 4-1-08: Portion 3 (Lot 55 Waimanalo Resident Lots, Unit 9) |
| Oneili'i (Molokai) | Cable Landing | 2-5-4-6:19 (parcel ID 540060190000) |
| Kalamaula (Molokai) | Terminal Building / CLS | 2nd Div 5-2-09: :Portion 22 and 14 |
| Puunene (Maui) | Terminal Building / CLS | Northwest portion of parcel ID 380080360000 (Near 1350 Mehameha Loop, Kahului, HI 96753) |
| Waiehu (Maui) | Central Office | 2nd Div 3-2-21:14 (Portion of Lot 14 Waiehu Kou Subdivision) |
| Kawaihae (Hawaii) | Cable Landing/Beach MH | 3-6-1-4:20 (Parcel ID 610040200000) |
| Puukapu (Hawaii) | Terminal Building / CLS | 3rd 6-4-04:009 portion (Lot 23 Puukapu Pasture Lots Section I) and land between Puukapu Pasture Lots Section I and Kuhio Village |
| Laiopua (Hawaii) | Central Office | Lot 227 - Villages of Laiopua (Village 3) |
| Hilo (Hawaii) | Central Office | 2-1-025:090 - Portion of Lot 89 Panaewa House & Farm Lots Section 1 |

| Location | Function | TMK / Description |
|---|---|---|
| Near Ka Waihona O Ka Naauao PCS at 89-195 Farrington Hwy | Meet-Me Cabinet for Nanakuli Terminal Bldg | Includes cabinet located on Parcel ID 890010040000 and the area for the lines to connect to the main site. |
| Near Hawaiian Telcom Waimanalo CO at 41-1032 Kalanianaole Hwy | Meet-Me Cabinet for Waimanalo Terminal Bldg | Includes cabinet located on Parcel ID 410210310000 and the area for the lines to connect to the main site. |
| NE of intersection of Kahiwa St and Mauna Loa Hwy | Meet-Me Cabinet for Kalamaula Terminal Bldg | Includes cabinet located on the parcel to be identified and the area for the lines to connect to the main site. |
| Southernmost corner of Parcel ID 320230550000 on Kahekili Hwy just NW of Hoauna St Intersection | Meet-Me Cabinet for Waiehu Central Office | Includes cabinet located on Parcel ID 320230550000 and the area for the lines to connect to the main site. |

2

# EXHIBIT "B"

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Connect America Fund | ) | WC Docket No. 10-90 |
| | ) | |
| Sandwich Isles Communications, Inc. | ) | |
| | ) | |
| Petition for Waiver of the Definition of "Study | ) | CC Docket No. 96-45 |
| Area" Contained in Part 36, Appendix-Glossary | ) | |
| and Sections 36.611 and 69.2(hh) of the | ) | |
| Commission's Rules | ) | |

## MEMORANDUM OPINION AND ORDER

**Adopted: June 30, 2017**                                    **Released:  July 3, 2017**

By the Commission: Commissioner Clyburn issuing a statement.

     1.     Congress has directed that if a State or local legal requirement effectively prohibits competitors from providing telecommunication service, we *must* override that requirement.  Today, we carry out that mandate to remove barriers to entry and ensure the benefits of competition by preempting an exclusive license that effectively bars telecommunications competition on the Hawaiian home lands. Specifically, in this Memorandum Opinion and Order, we find that an exclusive license to "build, construct, repair, maintain, and operate" a network to provide telecommunications services that was granted by the State of Hawaii, Department of Hawaiian Home Lands (DHHL or Department) to Waimana Enterprises, Inc. (Waimana) and then assigned to its subsidiary, Sandwich Isles Communications, Inc. (Sandwich Isles) (hereinafter Exclusive License),[1] violates Section 253(a) of the Communications Act, as amended (the Act).[2]  Because we find that the Exclusive License is not subject to the exceptions in Section 253(b) or (c),[3] we preempt enforcement of its exclusivity provision pursuant to Section 253(d) of the Act.[4]

## I.    BACKGROUND

     2.     DHHL is responsible for managing the Hawaiian home lands for the benefit of native Hawaiians under the Hawaiian Homes Commission Act of 1920, as amended (HHCA).[5]  Thousands of families reside on the Hawaiian home lands, which are comprised of approximately 203,000 acres of

---

[1] State of Hawaii, Department of Hawaiian Home Lands License Agreement No. 372, at 2 (May 9, 1995) (Exclusive License), attached as Exhibit One to Sandwich Isles Reply Comments, WC Docket No. 10-90, WT Docket No. 10-208 (filed Feb. 24, 2012) (Sandwich Isles Feb. 24, 2012 Reply Comments).

[2] 47 U.S.C. § 253(a).

[3] *Id.* § 253(b), (c).

[4] *Id.* § 253(d).

[5] Letter from Jobie M.K. Masagatani, Chairman, Hawaiian Homes Commission, on behalf of the Department of Hawaiian Home Lands, State of Hawaii, to Ajit Pai, Chairman, FCC, WC Docket No. 10-90, CC Docket No. 96-45, at 1 (filed Feb. 3, 2017) (DHHL Letter).

State land.[6]  Pursuant to the HHCA, DHHL has authority over access to and uses of the Hawaiian home lands,[7] including authority "'to grant licenses as easements for . . . telephone lines.'"[8]  However, DHHL "does not have regulatory authority over telecommunications carriers."[9]  In 1995, "DHHL granted an 'exclusive' license 'in perpetuity' to Waimana Enterprises, Inc., the parent company of Sandwich Isles, to provide telecommunications services to the Hawaiian home lands."[10]  Specifically, the Exclusive License grants Waimana and its legal successors and assigns "the exclusive right and privilege to build, construct, repair, maintain, and operate a broad band [sic] telecommunications network including poles, overhead and/or underground lines, appliances, microwave and/or other types of equipment over, across, under and throughout all lands under the administration and jurisdiction of [DHHL] . . . ."[11]  The terms of the Exclusive License provide that "broad band [sic] telecommunication services" includes, among other services, "intrastate and interstate telephone services."[12]  In 1996, DHHL granted a partial assignment of the Exclusive License to Sandwich Isles.[13]

3.      In December 2016, following an investigation by the Universal Service Administrative Company, the Commission concluded that Sandwich Isles improperly received payments of more than $27 million in universal service high-cost support through repeated violations of the Commission's rules.[14]  In light of the Commission's findings, the Commission directed the Wireline Competition Bureau (Bureau) to seek comment on whether the Commission should terminate a previously granted study area

---

[6] Comments of Hawaiian Telcom, Inc., WC Docket No. 10-90, CC Docket No. 96-45 (filed Feb. 20, 2017) (Hawaiian Telcom Comments), Attachment, Opposition of Hawaiian Telcom, Inc. to Petition for Expedited Study Area Waiver, CC Docket No. 96-45, at 4 (filed Mar. 4, 2013).

[7] DHHL Letter at 2, n.2.

[8] Hawaiian Telcom Comments, Attachment, at 18 (quoting HHCA § 207(c)(1)).

[9] DHHL Letter at 2, n.2.

[10] *Id.* at 2.

[11] Exclusive License at 2.

[12] *Id.* at 1.

[13] DHHL Letter at 2; *see also* Sandwich Isles Feb. 24, 2012 Reply Comments at 5-6 (explaining that the Exclusive License "was subsequently assigned in part to [Sandwich Isles], a wholly-owned subsidiary of Waimana, for purposes of the wireline voice requirements of the License").

[14] *See generally Sandwich Isles Communications, Inc.*, Order, WC Docket No. 10-90, 31 FCC Rcd 12999 (2016) (*Sandwich Isles Improper Payments Order*).  The Commission also proposed a forfeiture of more than $49 million on Sandwich Isles, Waimana, and its controlling owner, Albert Hee, for apparent violations of the Commission's rules by, among other things, submitting and falsely certifying inaccurate data contained in cost studies from 2002 to 2013 that were used to calculate high-cost support. *See generally Sandwich Isles Communications, Inc., Waimana Enterprises, Inc., Albert S.N. Hee*, Notice of Apparent Liability for Forfeiture and Order, File No. EB-IHD-15-00019603, 31 FCC Rcd 12947 (2016) (*Sandwich Isles NAL* or *NAL*).  In the *NAL*, the Commission ordered Sandwich Isles to submit a report explaining why the Commission should not initiate proceedings against Sandwich Isles to revoke its Commission authorizations, including but not limited to, its Section 214 authorizations. *Id.* at 12974, para. 84.  The Commission also directed the Bureau to issue a Public Notice seeking comment from interested stakeholders on this issue. *Id.*; *see also Wireline Competition Bureau Seeks Comment on Initiating Proceedings to Revoke Sandwich Isles Communications, Inc.'s Commission Authorizations*, Public Notice, WC Docket No. 16-405, DA 17-168 (2017).  Sandwich Isles submitted its response to the *NAL* on February 3, 2017. *See* Sandwich Isles Communications, Inc.'s Comments and Response to Notice of Apparent Liability and Forfeiture Order, WC Docket No. 10-90 (filed Feb. 3, 2017).

boundary waiver providing Sandwich Isles the status of an incumbent local exchange carrier for purposes of receiving high-cost support, and thereby render Sandwich Isles ineligible to receive such support.[15]

4.       In response to the Bureau's Public Notice,[16] on February 3, 2017, DHHL filed a letter requesting guidance on whether the terms of the Exclusive License granted to Waimana and partially assigned to Sandwich Isles[17] "may implicate Section 253(a) . . . and act as a potential barrier to entry by another provider capable of reasonably utilizing [universal service] support" to provide service to the Hawaiian home lands.[18]  On February 6, 2017, the Bureau issued a Public Notice seeking comment on DHHL's request for guidance.[19]  In response, Hawaiian Telcom argues that the Exclusive License violates Section 253(a)[20] and Crown Castle contends that any interpretation of the Exclusive License to exclude the provision of CMRS by entities other than Sandwich Isles would violate Section 253(a).[21]  In their reply comments, Waimana and Sandwich Isles contend that the Exclusive License does not violate Section 253(a).[22]

5.       Section 253(a) provides that:

No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.[23]

6.       Section 253(b) creates an exception to Section 253(a), providing that:

Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.[24]

---

[15] *Sandwich Isles Improper Payments Order*, 31 FCC Rcd at 13016-17, para. 58.  This order does not resolve any issues related to Sandwich Isles' study area waiver or potential revocation of Sandwich Isles' Commission authorizations.

[16] *Wireline Competition Bureau Seeks Comment on the 2005 Waiver That Allows Sandwich Isles to Be Treated as an Incumbent Local Exchange Carrier for Purposes of Receiving High-Cost Universal Service Support*, Public Notice, WC Docket No. 10-90, CC Docket No. 96-45, 31 FCC Rcd 13326 (Dec. 20, 2016).

[17] *See* DHHL Letter at 2 ("Pursuant to a partial assignment of that license in January 1996, Sandwich Isles provides telecommunications services to the home lands.").

[18] *Id.* at 2.

[19] *Wireline Competition Bureau Seeks Comment on the Department of Hawaiian Home Lands' Request for Guidance on Whether Sandwich Isles, Inc.'s Exclusive License to Serve the Hawaiian Home Lands Conflicts with Section 253(a) of the Communications Act*, Public Notice, WC Docket. No. 10-90, CC Docket. No. 96-45, 32 FCC Rcd 1117 (Feb. 6, 2017) (*Section 253 Public Notice*).

[20] *See generally* Hawaiian Telcom Comments.

[21] *See* Comments of Crown Castle USA Inc., WC Docket No. 10-90, CC Docket No. 96-45, at 2 (filed Feb. 20, 2017) (Crown Castle Comments).

[22] *See generally* Reply Comments of Sandwich Isles Communications, Inc., WC Docket No. 10-90, CC Docket No. 96-45 (filed Mar. 9, 2017) (Sandwich Reply Comments); Reply of Waimana Enterprises Inc., WC Docket No. 10-90, CC Docket No. 96-45 (filed Feb 27, 2017) (Waimana Reply Comments); *see also* Letter from Albert Hee, Founder, Waimana Enterprises Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 10-90, CC Docket No. 96-45 (filed Feb. 27, 2017) (Hee Reply Comments).

[23] 47 U.S.C. § 253(a).

[24] *Id.* § 253(b).

7.      Section 253(c) also preserves State authority, saying that:

Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed.[25]

8.      Section 253(d) requires the Commission to preempt the enforcement of State or local requirements that are contrary to Sections 253(a) or (b) "to the extent necessary to correct such violation or inconsistency."[26]

## II.    DISCUSSION

9.      The Exclusive License violates Section 253(a) because it constitutes a State legal requirement that prohibits or has the effect of prohibiting the ability of any entity other than Sandwich Isles to provide intrastate or interstate telecommunications services. Because the Exclusive License does not satisfy the exceptions in Section 253(b) or (c), we are required to preempt enforcement of its exclusivity provision pursuant to Section 253(d).

### A.    Section 253(a) Analysis

10.      *Section 253(a) Applies.* Despite Waimana's and Sandwich Isles' arguments to the contrary, we find that the Exclusive License falls within the scope of Section 253(a). First, Waimana argues that Section 253(a) does not apply because the "DHHL is not the State,"[27] but rather an entity akin to a tribal government that has sovereignty over the Hawaiian home lands.[28] We disagree and find that the DHHL is a "State" agency to which Section 253(a) applies. As the Ninth Circuit and the Hawaii Supreme Court have explained, the Hawaiian home lands are managed by State officials.[29] Indeed, in rejecting Waimana's argument that the Hawaiian home lands are not "state lands" for purposes of a Hawaii environmental statute, the Hawaii Supreme Court found that while "the State has assumed a trust obligation regarding Hawaiian home lands and must manage and dispose of these lands in a manner consistent with its fiduciary duty to the beneficiaries," Waimana had "overlook[ed] the significant role of the State in relation to these lands."[30] Specifically, "both legal title and management responsibilities over the land are still in the hands of the State."[31] And DHHL, the State agency that has those management responsibilities, was established pursuant to Section 202 of the HHCA,[32] which is State law.[33] Further,

---

[25] *Id.* § 253(c).

[26] *Id.* § 253(d).

[27] Waimana Reply Comments at 11.

[28] *Id.* at 8-9, 11-12; *see also* Sandwich Isles Reply Comments at 3. We note that the Commission has previously declined to act under Section 253 "to preempt Native American power over tribal lands." *AB Fillins*, Memorandum Opinion and Order, 12 FCC Rcd 11755, para. 18 (1997).

[29] *See Kepo'o v. Watson*, 952 P.2d 379, 385-87 (Haw. 1998); *see also Keaukaha-Panaewa Community Ass'n v. Hawaiian Homes Comm'n*, 588 F.2d 1216, 1226-27 (9th Cir. 1978) (explaining that upon admission of Hawaii into the Union, the "United States conveyed its interest in the home lands . . . to the state and these lands are now administered by state officials").

[30] *Kepo'o*, 952 P.2d at 385.

[31] *Id.*; *see also id.* at 386-87 (holding that the "Hawaiian home lands are certainly unique 'state lands,' with special duties attached to them, but they are 'state lands' nevertheless").

[32] HHCA § 202(a).

[33] *See Kepo'o*, 952 P.2d at 386-87 (Hawaii 1998) (holding that while the HHCA was originally enacted by Congress, it was subsequently adopted as part of the Hawaii constitution as a condition of statehood, and is therefore "a matter of state constitutional law and does not constitute federal law") (citing *Keaukaha-Panaewa Community Ass'n*, 588 F.2d at 1226-27). In fact, although Waimana and Sandwich suggest that the Commission cannot preempt here

(continued....)

U.S. Bankruptcy Court - Hawaii   #22-90030069   Dkt # 243-2-63   Filed 06/27/21   Page 254 of 343

DHHL is headed by an executive board (the Hawaiian Homes Commission) whose members are appointed by the Governor with the advice and consent of the State Senate.[34]  It is therefore not surprising that the Exclusive License expressly states that it was granted by the "*State of Hawaii*, Department of Hawaiian Home Lands,"[35] and that it was granted pursuant to DHHL's authority under the HHCA as well as the "State of Hawaii . . . Administrative Rules."[36]  In fact, Waimana concedes that DHHL is a State agency[37] and Sandwich Isles has repeatedly made the same statement in filings with the Commission.[38]

11.     Moreover, DHHL's own statements in this proceeding belie Waimana's claim that DHHL has sovereignty over the Hawaiian home lands.  For instance, although it is a form of authority that a sovereign would typically possess, DHHL expressly states that it "does not have regulatory authority over telecommunications carriers" on the Hawaiian home lands.[39]  Additionally, as one commenter explains, while DHHL has statutory control over access to the Hawaiian home lands, no provision of the HHCA authorizes DHHL to establish a telecommunications monopoly on those lands.[40]

12.     Further, we disagree with Waimana and Sandwich Isles' argument that DHHL is analogous to a sovereign tribal government.  It is true that Section 54.5 of the Commission's rules includes the Hawaiian home lands within the definition of "Tribal lands."[41]  That rule defines "Tribal lands" to include the Hawaiian home lands "[f]or purposes of high-cost support."[42]  But the existence of the rule does not mean that DHHL is akin to a sovereign Tribal government to which Section 253(a) does not apply.  Indeed, as the Commission has previously noted, "we do not have the same government-to-government relationship with Hawaiian Home Lands as we do with Tribal lands."[43]

13.     We also find—and neither Waimana nor Sandwich Isles disputes—that the Exclusive License is a "legal requirement" under Section 253(a).  In the *Minnesota Order*, the Commission found

(Continued from previous page) ————————————————
because the HHCA is longstanding federal law (*see* Waimana Reply Comments at 12; Sandwich Isles Reply Comments at 4), Sandwich Isles itself has previously acknowledged that the HHCA is considered State law.  *See* Sandwich Isles Communications, Inc. Petition for Waiver, CC Docket No. 96-45, n.21 (filed Dec. 27, 2004).

[34] *See* HHCA § 202(a) (citing Haw. Rev. Stat. § 26-34).

[35] Exclusive License at 1 (emphasis added).

[36] *See id.* (citing HHCA § 207(c)(1) and Haw. Admin. Rules §§ 10-4-21, 10-4-22).

[37] Waimana Reply Comments at 8; *id.*, Exhibit F, at 1 (attaching letter from "the Department of Hawaiian Home Lands *of the State of Hawaii*") (emphasis added); *see also id.* at 12 (arguing that the Exclusive License does not violate Section 253(a) because that provision "does not prohibit *state and local governments*, as landowners, from . . . bargaining with the land rights they own") (emphasis added).

[38] *See, e.g.*, Letter from Janeen Olds, CEO and President, Sandwich Isles Communications, Inc. to Marlene H. Dortch, Secretary, FCC, WC Docket No. 10-90, at 4 (filed Mar. 6, 2014) ("DHHL is a State agency . . . ."); *id.* at 1 ("[Sandwich Isles] provides these services through an exclusive license granted by the Department of Hawaiian Home Lands (DHHL), the managing state agency of HHL, to provide all telecommunications within HHL."); Sandwich Isles Communications, Inc. Petition for Waiver, CC Docket No. 96-45, at v (filed Dec. 27, 2004) ("Sandwich Isles' parent received a license to serve the entire Hawaiian Home Lands . . . from the Department of Hawaiian Home Lands, the state agency administering the trust lands.").

[39] DHHL Letter at 2.

[40] Hawaiian Telcom Comments, Attachment, at 17-18.

[41] Waimana Reply Comments at 8-9; Sandwich Isles Reply Comments at 3-4.

[42] 47 CFR § 54.5.

[43] *Improving Communications Services for Native Nations*, Notice of Inquiry, 26 FCC Rcd 2672, n.2 (2011); *see also Procedures for Reestablishing a Formal Government-to-Government Relationship with the Native Hawaiian Community*, 80 Fed. Reg. 59113, 59116-17 (Oct. 1, 2015) ("[T]he Federal Government does not maintain a formal government-to-government relationship with the Native Hawaiian community as an organized, sovereign entity.").

that a contract entered into by the State that granted one entity exclusive access to its freeway rights-of-way for the development of telecommunications transmission capacity created a "legal requirement" under Section 253(a) because it "legally [bound] the State to deny other entities permits for access to these freeway rights-of-way."[44]  The Commission held that it "will look at the effect of the state or local government's action to determine whether [S]ection 253 is applicable," and it found that the agreement had "the potential to adversely affect competitors that do not have similar access" to the freeway rights-of-way.[45]  Similarly, here, the Exclusive License is a contractual agreement[46] entered into by the State that grants one entity "the exclusive right . . . to build, construct, repair, maintain and operate a . . . . telecommunications network"[47] on the Hawaiian home lands.  It thus legally binds the State to deny other competitors the right to do the same, and it consequently adversely affects those competitors.  Specifically, entities other than Sandwich Isles cannot build or operate network facilities to reach and provide telecommunications services to the residents living on the more than 200,000 acres of land that comprise the Hawaiian home lands.  For these reasons, we find that the Exclusive License creates a "legal requirement" to which Section 253(a) applies.  Such a conclusion is entirely consistent with congressional intent.  As the Commission has previously explained, the "fact that Congress included the term 'other legal requirements' within the scope of section 253(a) recognizes that State and local barriers to entry could come from sources other than statutes and regulations," and interpreting the term "legal requirement" broadly best fulfills Congress' desire to ensure that States and localities do not impede the development of competition.[48]

        14.     Additionally, we are not persuaded by Waimana's argument that Section 253(a) is inapplicable where it would affect the State's ability to "deal[] with its real estate interests . . . as it sees fit," such as by granting access to "rights-of-way over land that it owns."[49]  In fact, the Commission applied Section 253(a) to just such an instance in the *Minnesota Order*.  There, Minnesota had granted one entity exclusive physical access to State-owned land (*i.e.*, State freeway rights-of-way) in exchange for the development of telecommunications transmission capacity.[50]  The Commission held that Section 253(a) applied because the agreement at issue had the potential to adversely affect competitors that lacked similar access.[51]  As the Commission emphasized there, the relevant inquiry in determining whether Section 253(a) applies is the legal requirement's "effect on the provision of telecommunications service," not how the requirement could be characterized or "the purported subject matter" of the requirement.[52]  Thus, contrary to Waimana's assertion, the fact that the State was "bargaining with the land" that it owns[53] when granting the Exclusive License does not render Section 253(a) inapplicable here.

---

[44] *Petition of the State of Minnesota for a Declaratory Ruling Regarding the Effect of Section 253 on an Agreement to Install Fiber Optic Wholesale Transport Capacity in State Freeway Rights-of-Way*, Memorandum Opinion and Order, 14 FCC Rcd 21697, 21707, para. 17 (1999) (*Minnesota Order*).

[45] *Id.* at 21707, para. 19.  The Commission thus found the situation at hand to be "very different from a traditional government procurement of telecommunications facilities or services" to which Section 253 would not apply.  *Id.*

[46] The Exclusive License is a contract in which DHHL granted Waimana the exclusive right to build, maintain, and operate a telecommunications network on the Hawaiian home lands "in consideration of the services to be provided by [Waimana]," including the construction and installation of telecommunications infrastructure on DHHL's lands at Waimana's cost.  *See* Exclusive License at 1-2.

[47] *Id.* at 2.

[48] *Minnesota Order*, 14 FCC Rcd at 21707, para. 18.

[49] Waimana Reply Comments at 11-12.

[50] *See generally Minnesota Order*.

[51] *Id.* at 21708, para. 19.

[52] *Id.* at 21705-06, 21707, paras. 14-15, 19.

[53] Waimana Reply Comments at 12.

6

15.     *The Exclusive License Violates Section 253(a).*  Having found that the Exclusive License falls within the scope of Section 253(a), we conclude that it prohibits or has the effect of prohibiting the ability of entities other than Waimana and Sandwich Isles from providing telecommunications services in contravention of the statute.[54]  Sandwich Isles argues that the Exclusive License does not violate Section 253(a) because it grants exclusivity only as to the construction of telecommunications "infrastructure" and therefore does not preclude competitors from providing "service" to the Hawaiian home lands.[55]  We reject this argument.  DHHL itself characterizes the Exclusive License as granting the exclusive right "to provide telecommunications *services* to the Hawaiian home lands"[56] (although it is not clear that DHHL has such authority).  More importantly, for purposes of Section 253(a), it is a legal requirement's "effect on the provision of telecommunications service that is critical, not whether [the requirement] could be characterized as dealing with infrastructure development."[57]

16.     The legal requirement at issue in this proceeding grants one entity the "exclusive" right "to build, construct, repair, maintain and operate a . . . telecommunications network" for the purpose of providing service to the residents of the Hawaiian home lands and therefore prohibits other entities from doing so.[58]  The Exclusive License thus represents exactly the type of prohibition on entry that Section 253(a) was intended to prevent.[59]  As the Commission has held, "[S]ection 253(a), at the very least, proscribes State and local legal requirements that prohibit all but one entity from providing telecommunications services in a particular State or locality."[60]  And the State's action here, "granting an exclusive license to [an entity], appears fundamentally inconsistent with the primary goal of the Telecommunications Act of 1996, to replace exclusivity with competition."[61]

17.     Waimana argues that the Exclusive License does not violate Section 253(a) because several other carriers have been authorized to provide telecommunications services on the Hawaiian home lands, including by operating cellular towers on those lands.[62]  However, this fact does not render the Exclusive License lawful.  On its face, the Exclusive License binds DHHL to prohibit the construction or

---

[54] 47 U.S.C. § 253(a).

[55] Sandwich Isles Reply Comments at 2-3.

[56] DHHL Letter at 2 (emphasis added).

[57] *Minnesota Order*, 14 FCC Rcd at 21705, para. 14; *see also Public Utility Commission of Texas et al. Petitions for Declaratory Ruling and/or Preemption of Certain Provisions of the Texas Public Utility Regulatory Act of 1995*, Memorandum Opinion and Order, 13 FCC Rcd 3460, 3480, para. 41 (1997) (*Texas Order*) (concluding that the mandate under Section 253 "requires us to preempt not only express restrictions on entry, but also restrictions that indirectly produce that result").

[58] *See, e.g., Minnesota Order*, 14 FCC Rcd at 21708, para. 21 (finding that a State requirement that prevents other facilities-based providers from providing telecommunications services would contravene Section 253(a)) (citing *Texas Order*, 13 FCC Rcd at 3496-97, paras. 74-75).

[59] *See, e.g., N.J. Payphone Ass'n v. Town of West New York*, 299 F.3d 235, 242 (3d Cir. 2002) (holding that exclusive area-wide franchise to provide payphones in public rights-of-way is a "deliberate creation of scarcity" in violation of 253(a)); *id.* at 247 (explaining that a requirement that permits a government entity to "choose one service provider . . . to the exclusion of all others based on criteria determined by it rather than the market" violates Section 253(a)); *Classic Telephone, Inc., Petition for Preemption, Declaratory Ruling and Injunctive Relief*, Memorandum Opinion and Order, 11 FCC Rcd 13082, 13096, paras. 26-27 (1996) (*Classic Telephone*) (concluding that city's decision not to grant a local franchise to a second telecommunications carrier in order to prevent competition violates Section 253); *New England Public Communications Council, Petition for Preemption Pursuant to Section 253*, Memorandum Opinion and Order, 11 FCC Rcd 19713, 19721, para. 18 (1996) (*New England Order*) (preempting state commission decision precluding independent payphone providers from offering services).

[60] *Classic Telephone*, 11 FCC Rcd at 13095, para. 25.

[61] *Minnesota Order*, 14 FCC Rcd at 21700, para. 3.

[62] Waimana Reply Comments at 13-14; *see also* Hee Reply Comments at 1.

operation of a telecommunications network by any entity other than Sandwich Isles for the provision of telecommunications services on the Hawaiian home lands. And selective enforcement of the Exclusive License does not obviate its effect of prohibiting competition. Indeed, the record demonstrates that the Exclusive License has the effect of prohibiting the ability of an entity to continue to provide telecommunications services to the Hawaiian home lands. Specifically, Crown Castle states that when it notified DHHL of its intention to extend the term of its non-exclusive license to operate a cellular tower on the Hawaiian home lands, "DHHL notified Crown Castle of [DHHL's] contract with Sandwich Isles" giving exclusive rights with respect to DHHL properties.[63] As a result, Crown Castle has been unable to extend its license to operate the tower, which is used to provide CMRS on the Hawaiian home lands.[64]

18.     Waimana also suggests that the Exclusive License does not prohibit competition because other telecommunications carriers could lease access to elements of Sandwich Isles' network.[65] The Exclusive License, however, prohibits any other entity from even "operat[ing] a . . . telecommunications network" on the Hawaiian home lands.[66] In any event, under Commission precedent, Section 253(a) bars State or local requirements that prevent competitors from "utiliz[ing] their own facilities to provide service."[67]

B.     Section 253(b) Analysis

19.     We conclude that the Exclusive License is not protected by Section 253(b). That provision preserves from preemption certain State or local requirements that are "competitively neutral" and "necessary" to achieve the public interest objectives enumerated therein, even if the requirements violate Section 253(a).[68]

20.     Consistent with Commission precedent, we find that the Exclusive License is not competitively neutral. The "proper inquiry" under Section 253(b) is "whether the effect of the [State or local legal requirement] will be competitively neutral."[69] In the *New England Order* and *Texas Order*, the Commission found that the State legal requirements at issue were not competitively neutral because they singled out a class of entities and imposed a disadvantage on them that significantly affected or even eliminated their ability to compete in the provision of certain telecommunications services.[70] Similarly, in the *Minnesota Order*, the Commission concluded that the agreement at issue was not competitively neutral because it granted a single entity exclusive physical access to valuable freeway rights-of-way for a period of ten years with an option to renew for another ten years and thereby disadvantaged facilities-based competitors.[71] Likewise, here, the Exclusive License expressly grants a single entity the exclusive right, in perpetuity, to construct and operate a telecommunications network on the Hawaiian home lands and thus effectively prohibits the provision of telecommunications services by competitors.

21.     Our conclusion that the Exclusive License is not competitively neutral is dispositive on the question of whether the Section 253(b) exception applies. Even if that were not the case, however, we find no basis for concluding that the Exclusive License is "necessary" to advance universal service or any of the other public interest objectives listed in Section 253(b). The burden of proving that the State or

---

[63] Crown Castle Comments at 2.

[64] *Id.*

[65] Waimana Reply Comments at 15-16; *see also* Hee Reply Comments at 1.

[66] Exclusive License at 2.

[67] *Texas Order*, 14 FCC Rcd at 21708, para. 21.

[68] 47 U.S.C. § 253(b); *see also Minnesota Order*, 14 FCC Rcd at 21724, para. 50.

[69] *Minnesota Order*, 14 FCC Rcd at 21724-25, para. 51.

[70] *See New England Order*, 11 FCC Rcd at 19721-22, para. 20; *Texas Order*, 13 FCC Rcd at 3500, para. 82.

[71] *Minnesota Order*, 14 FCC Rcd at 21725, para. 52.

local requirement comes within the exceptions of Section 253 falls on the party claiming that the exemption applies.[72]  Here, Sandwich Isles asserts that the public interest objectives in Section 253(b) "are exactly the basis on which the [Exclusive License] was based."[73]  However, Sandwich Isles does not elaborate on or provide any support for this claim, let alone demonstrate that the Exclusive License is "necessary" to achieve those public interest objectives.[74]  And Waimana does not even reference Section 253(b) in its reply comments.

**C.      Section 253(c) Analysis**

22.      Waimana suggests that the Exclusive License is protected from preemption under Section 253(c).[75]  That provision states that "[n]othing in this section affects the authority of the State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government."[76]  However, Waimana fails to demonstrate how or why the Exclusive License constitutes "manage[ment of] rights-of-way" by DHHL.  Instead, Waimana merely quotes language from a federal district court case regarding the purpose of Section 253(c).[77]  In fact, the district court there expressly distinguished the exclusive franchise to operate payphones on city sidewalks at issue in that case with a "restriction[] on the building of networks through the rights of way to serve the broader community,"[78] which is precisely the type of restriction at issue here.

23.      While the Act does not define "manage[ment of] rights-of-way," the Commission has previously recognized in the context of Section 253(c) that "[l]ocal governments must be allowed to perform the range of vital tasks necessary to preserve the physical integrity of streets and highways, to control the orderly flow of vehicles and pedestrians, [and] to manage gas, water, cable . . . and telephone facilities that crisscross the streets and public rights-of-way."[79]  The Commission in turn has described the "types of activities that fall within the sphere of appropriate rights-of-way management" as including "coordination of construction schedules, determination of insurance, bonding and indemnity requirements, establishment and enforcement of building codes, and keeping track of various systems using the rights-of-way to prevent interference between them."[80]  By contrast, here, the Exclusive License does much more than simply enable DHHL to engage in these or similar types of activities.  Rather, as discussed above, the Exclusive License grants one entity the exclusive right to "operate a . . . telecommunications network" for the provision of telecommunication services on the Hawaiian home lands,[81] and it thus has the effect of precluding any other entity from providing telecommunications services to the residents of those lands.  Finding that such a restriction falls within Section 253(c) would

---

[72] *Id.* at 21704, n.26.

[73] Sandwich Isles Reply Comments at 4-5.

[74] *Id.* at 4.

[75] Waimana Reply Comments at 12.

[76] 47 U.S.C. § 253(c).

[77] *See* Waimana Reply Comments at 12 (quoting *Telebeam Telecomms. Corp. v. City of New York*, 194 F.Supp.3d 178, 187 (E.D.N.Y. 2016)).

[78] *Telebeam Telecomms.*, 194 F.Supp.3d at 188.

[79] *TCI Cablevision of Oakland County, Inc.*, Memorandum Opinion and Order, 12 FCC Rcd 21396, 21441, para. 103 (1997).

[80] *Id.*; *see also Minnesota Order*, 14 FCC Rcd at 21729, n.129.

[81] Exclusive License at 2.

9

allow the rights-of-way management exception to "swallow whole the broad congressional preemption"[82] under Section 253(a) and render that statutory provision meaningless.

24.       Moreover, even assuming that the Exclusive License constituted rights-of-way management, such management must be "competitively neutral" and "nondiscriminatory" to receive protection under Section 253(c).[83]   Again, "the burden of proving that a statute, regulation, or legal requirement comes within the exemptions found in [S]ections 253(b) and (c) falls on the party claiming that exception applies."[84]   Here, however, Waimana does not even acknowledge that a State's rights-of-way management must be both "competitively neutral" and "nondiscriminatory" under Section 253(c), let alone demonstrate that the Exclusive License meets these two requirements.

### D.       Preemption Under Section 253(d)

25.       Because the Exclusive License violates Section 253(a) and is not saved by the exceptions in Section 253(b) or (c), we are required to preempt enforcement of its exclusivity provision under Section 253(d).[85]   That statutory provision requires the Commission to "preempt the enforcement" of "a State or local legal requirement that violates Section 253(a) or 253(b) "to the extent necessary to correct such violation or inconsistency."[86]   We therefore preempt enforcement of the exclusivity provision of the Exclusive License[87] because it has the effect of prohibiting the ability of any entity other than Sandwich Isles to provide telecommunications services on the Hawaiian home lands.   We note that the Exclusive License also contains a provision which states that "[a]fter LICENSEE activates the existing and/or new telecommunications infrastructure, [DHHL] agrees not to allow any other telecommunications provider to use any remaining telecommunications infrastructure to continue to provide or initiate service on [DHHL's] lands."[88]   We also find it necessary to preempt enforcement of this provision to the extent that it acts as a restatement or extension of the exclusivity provision.

### E.       Waimana's and Sandwich Isles' Remaining Arguments

26.       None of Waimana's remaining arguments alter our conclusion that we must preempt enforcement of the exclusivity provision of the Exclusive License.   First, the fact that a State legal requirement prohibiting competition in the provision of telecommunications services may have benefitted the State or some of its residents[89] does not render it lawful.[90]   Second, Waimana argues that the Exclusive License "was required by the Rural Utilities Service ('RUS') as a condition" of obtaining an RUS loan.[91] Waimana, however, fails to cite any support for this claim.   Nor are we aware of any RUS requirement

---

[82] *City of Auburn v. Qwest Corp.*, 260 F.3d 1160, 1180 (9th Cir. 2001), *overruled on other grounds by Sprint Telephony PCS, L.P. v. County of San Diego*, 543 F.3d 571 (9th Cir. 2008) (en banc).

[83] 47 U.S.C. § 253(c); *see also Minnesota Order*, 14 FCC Rcd at 21729, para. 61.

[84] *Minnesota Order*, 14 FCC Rcd at 21704, n.26.

[85] 47 U.S.C. § 253(d).

[86] *Id.*

[87] *See* Exclusive License at 2 (granting "[Waimana], and its legal successors and assigns, the exclusive right and privilege to build, construct, repair, maintain, and operate a broad band [*sic*] telecommunications network including poles, overhead and/or underground lines, appliances, microwave and/or types of equipment over, across, under and throughout all lands under the administration and jurisdiction of [DHHL]").

[88] *Id.* at 3.

[89] Waimana Reply Comments at 9-10.

[90] *See Minnesota Order*, 14 FCC Rcd at 21716, para. 35 (finding that the State's "extraction of benefits in exchange for exclusive physical access to rights-of-way is fundamentally inconsistent with the 1996 Act, which endeavors to replace exclusive monopoly rights with open competition").

[91] Waimana Reply Comments at 10; *see also* Hee Reply Comments at 1.

that an entity obtain an exclusive license from the State in order to receive financing. And even if RUS imposed such a condition, Waimana makes no showing as to why a condition imposed by RUS could act to effectively preempt or nullify Section 253 of the Act. Third, the Commission's knowledge of the Exclusive License's existence prior to DHHL's request for guidance[92] is irrelevant to the Section 253 analysis. The Commission has never examined the issue of whether the Exclusive License comports with Section 253(a),[93] let alone "signed off on" or "approved" it as Waimana asserts.[94]

27.      Finally, we reject Sandwich Isles' claims of "procedural irregularities" in this proceeding.[95] In particular, Sandwich Isles complains that the issue of whether the Exclusive License conflicts with Section 253(a) was not raised in either the *Sandwich Isles Improper Payments Order* or *Sandwich Isles NAL* issued in December 2016.[96] The Commission did not receive DHHL's request for guidance on this issue,[97] however, until after those items were released and there is no procedural bar to taking action at this time pursuant to Section 253(a). We also disagree with Sandwich Isles' contention that the Public Notice seeking comment on DHHL's request was framed in a manner that would not result in examination of all of the relevant issues.[98] The language used in the Public Notice does not presume a violation but instead asks "whether [the Exclusive License] conflicts with Section 253(a)."[99] In response to the Public Notice, the Commission has received comments highlighting factors relevant to this inquiry, suggesting that the notice provided therein was sufficient. And as this Order makes clear, we have carefully considered whether the Exclusive License falls within the scope of Section 253(a), whether it violates Section 253(a), and whether it is protected from preemption by Section 253(b) or (c), and we find that we are obligated to preempt enforcement of the exclusivity provision in the Exclusive License under Section 253(d).

---

[92] Waimana Reply Comments at 11-12.

[93] In a 2005 order granting Sandwich Isles a study area waiver, the Wireline Competition Bureau declined to address Hawaiian Telcom's argument that the Exclusive License may pose a barrier to entry in violation of Section 253 on the basis that the issue was "better addressed in the context of a [S]ection 253 proceeding." *Sandwich Isles Communications, Inc., Petition for Waiver of the Definition of "Study Area" Contained in Part 36, Appendix-Glossary and Sections 36.611 and 69.2(hh) of the Commission's Rules*, Order, 20 FCC Rcd 8999, para. 23 (WCB 2005).

[94] Waimana Reply Comments at 11.

[95] Sandwich Isles Reply Comments at 1-2. Among other issues, Sandwich Isles complains that the Commission did not address its request to extend the deadline for reply comments on the *Section 253 Public Notice* from February 27, 2017 to March 10, 2017. Sandwich Isles Reply Comments at 2; *see also* Sandwich Isles Request for Extension of Time, WC Docket No. 10-90, CC Docket No. 96-45, at 1 (filed Feb. 23, 2017). In any event, Sandwich Isles filed reply comments on March 9, 2017, and we consider those reply comments herein. Therefore, we deem Sandwich Isles' argument moot.

[96] Sandwich Isles Reply Comments at 1.

[97] *See generally* DHHL Letter.

[98] Sandwich Isles Reply Comments at 1, 4-5.

[99] *Section 253 Public Notice* at 1.

**Federal Communications Commission**                                      **FCC 17-85**

## III.   ORDERING CLAUSES

    28.    Accordingly, IT IS ORDERED, pursuant to Section 253 of the Communications Act of 1934, as amended, 47 U.S.C. § 253, that the enforcement of the exclusivity provision in the Exclusive License IS PREEMPTED.

    29.    IT IS FURTHER ORDERED that this Order and the obligations set forth herein ARE EFFECTIVE upon release of this Order.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

12

**Federal Communications Commission**      **FCC 17-85**

## STATEMENT OF COMMISSIONER MIGNON L. CLYBURN

Re:     *Connect America Fund et al.*, WC Docket No. 10-90 et al.

      This Order highlights the importance of—and the Commission's commitment to—removing barriers to competitive entry. It preempts the Department of Hawaiian Home Lands' grant of an exclusive license to Waimana Enterprises, the parent company of Sandwich Isles. I am hopeful that our limited preemption will result in better service for consumers living on the Hawaiian Home Lands.

      It also highlights the importance of section 253 of the Communications Act in enabling competition. And how useless it will likely be in a broadband-only world, if the Commission's majority moves forward with its plan to reclassify broadband as an information service. Breaking down barriers to infrastructure deployment without Title II is about as effective demolishing a wall by staring at it. Without a Title II telecommunications service at issue, today's Order would not have been possible.

**Date Signed:**
**May 31, 2022**



SO ORDERED.

_____

Robert J. Faris
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| In re | Case No. 18-01319<br>(Chapter 11) |
| PANIOLO CABLE COMPANY, LLC, | |
| Debtor. | |
| WAIMANA ENTERPRISES INC. and<br>SANDWICH ISLES<br>COMMUNICATIONS INC., | Adversary Proceeding No. 22-90008 |
| Plaintiffs, | ORDER GRANTING MOTION BY<br>HAWAIIAN TELCOM, INC. TO<br>DISMISS THE COMPLAINT IN ITS<br>ENTIRETY, OR IN THE<br>ALTERNATIVE, TO STAY THE<br>ADVERSARY PROCEEDING, FILED<br>APRIL 11, 2022, AND GRANTING<br>PLAINTIFFS LEAVE TO AMEND<br>COMPLAINT |
| v. | |
| HAWAIIAN TELCOM INC., | |
| Defendant. | |

Hearing
Date: May 20, 2022
Time: 10:00 a.m.
Judge: Robert J. Faris

ORDER GRANTING MOTION BY HAWAIIAN TELCOM, INC. TO DISMISS
THE COMPLAINT IN ITS ENTIRETY, OR IN THE ALTERNATIVE, TO
STAY THE ADVERSARY PROCEEDING, FILED APRIL 11, 2022 AND
GRANTING PLAINTIFFS LEAVE TO FILE AMENDED COMPLAINT

Defendant Hawaiian Telcom, Inc.'s Motion to Dismiss the Complaint in its

Entirety, or in the Alternative, to Stay the Adversary Proceeding, filed April 11,

2022 [ECF No. 6, the "Motion") came on for hearing before the Honorable Robert

J. Faris, on May 20, 2022 at 10:00 a.m. via Zoom videoconference.  Melissa Y.

Boey, Esq., David G. Brittin, Esq., Andrew J. Gallo, Esq., and Ted N. Pettit, Esq.,

appeared on behalf of Hawaiian Telcom, Inc.  William Meheula, Esq., appeared on

behalf of Waimana Enterprises Inc.  Lex R. Smith, Esq., appeared on behalf of

Sandwich Isles Communications, Inc.

The Court, having duly considered the Motion, the written memoranda and

exhibits filed by the parties, the argument of counsel at the hearing, the record and

files in this matter, and being fully apprised of the circumstances of the case, and

good cause appearing therefor,

IT IS HEREBY ORDERED THAT Hawaiian Telcom, Inc.'s Motion to

Dismiss the Complaint in Its Entirety, or in the Alternative, to Stay the Adversary

2

Proceeding, filed April 11, 2022 is granted for the reasons set forth in the Tentative

Ruling filed on May 18, 2022 (ECF No. 22) except that footnote 1 is withdrawn

and Plaintiffs are granted leave to file an Amended Complaint on or before

May 27, 2022.

### END OF ORDER

SULLIVAN MEHEULA LEE
A Limited Liability Law Partnership

WILLIAM MEHEULA          (2277)
D. KAENA HOROWITZ        (9836)
Pacific Guardian Center, Makai Tower
733 Bishop Street, Suite 2900
Honolulu, Hawai'i 96813
Telephone: (808) 599-9555
Facsimile: (808) 533-2467
Email: meheula@smlhawaii.com; kaena@smlhawaii.com

Attorneys for Plaintiff
WAIMANA ENTERPRISES INC.

**APPROVED AS TO FORM:**

/s/ Ted N. Pettit
TED N. PETTIT
DAVID G. BRITTIN
ANDREW J. GALLO
MELISSA Y. BOEY


Attorneys for HAWAIIAN TELCOM, INC.

/s/ Lex R. Smith
LEX R. SMITH

Attorneys for SANDWICH ISLES COMMUNICATIONS, INC.

3

H9022a (12/15)

**Information to identify the case:**

| | | |
|---|---|---|
| Debtor(s) | **Paniolo Cable Company, LLC** | **United States Bankruptcy Court**<br>**District of Hawaii** |
| Parties | Waimana Enterprises Inc, et al. | |
| | Plaintiff(s) | |
| | v. | |
| | Hawaiian Telcom Inc., | Bankruptcy Case number:  **18–01319**<br>Chapter:  **11** |
| | Defendant(s) | Adversary Proceeding No:  **22–90008** |

# NOTICE OF ENTRY OF ORDER OR JUDGMENT

NOTICE IS GIVEN THAT:

The court entered the following order or judgment on the date below,

**Order Granting Motion By Hawaiian Telcom, Inc to Dismiss the Complaint in its Entirety, or in the Alternative, to Stay the Adversary Proceeding, Filed April 11, 2022, and Granting Plaintiffs Leave to File Amended Complaint (Related Doc # 6) Date of Entry: 5/31/2022. (LL)**

The order or judgment may be viewed at the Clerk's Office. It may also be viewed online using PACER, the federal judiciary's electronic records system. Information about obtaining and using a PACER account is available at the court website, www.hib.uscourts.gov.

Date:  May 31, 2022

Clerk's Office:
1132 Bishop Street, Suite 250
Honolulu, Hawaii 96813
(808) 522–8100
www.hib.uscourts.gov

Michael B. Dowling
Clerk

CASE LOMBARDI & PETTIT
A LAW CORPORATION

TED N. PETTIT                                    4287-0
Email: tnp@caselombardi.com
DAVID G. BRITTIN                            8686-0
Email: dbrittin@caselombardi.com
Pacific Guardian Center, Mauka Tower
737 Bishop Street, Suite 2600
Honolulu, Hawaii  96813
Telephone: (808) 547-5400 | Fax: (808) 523-1888

MORGAN, LEWIS & BOCKIUS LLP
ANDREW J. GALLO *(Pro Hac Vice)*
One Federal Street
Boston, MA 02110-1726
Phone: +1 (617) 951-8117
Email:  andrew.gallo@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
MELISSA Y. BOEY *(Pro Hac Vice)*
1400 Page Mill Road | Palo Alto, CA 94304
Phone: 1 (650) 843-4000
Email:  melissa.boey@morganlewis.com

Attorneys for HAWAIIAN TELCOM, INC.

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>PANIOLO CABLE COMPANY, LLC,<br><br>     Debtor. | CASE NO. 18-01319<br>(Chapter 11) |

| | |
|---|---|
| WAIMANA ENTERPRISES INC.,<br>PA MAKANI LLC,<br>CLEARCOM, INC.,<br><br>         Plaintiffs,<br><br>    vs.<br><br>HAWAIIAN TELCOM INC.,<br><br>         Defendant. | ADV NO.  22-90008<br>MOTION BY HAWAIIAN<br>TELCOM, INC. TO DISMISS<br>THE FIRST AMENDED<br>COMPLAINT<br>IN ITS ENTIRETY<br><br>Hearing:<br>Date:  July 15, 2022<br>Time:  10:00 a.m.<br>Judge:  Honorable Robert J. Faris |

## MOTION BY HAWAIIAN TELCOM, INC. TO DISMISS
## THE FIRST AMENDED COMPLAINT IN ITS ENTIRETY

Defendant Hawaiian Telcom, Inc. ("HTI"), by and through its counsel, respectfully moves this Court to dismiss, in its entirety, the operative *First Amended Complaint* in the above-captioned adversary proceeding.

This motion (the "Motion") is made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, as made applicable to this case by Rule 7012 of the Federal Rules of Bankruptcy Procedure, and is based on the supporting memorandum filed simultaneously herewith.

DATED:      Honolulu, Hawaii, June 10, 2022.

CASE LOMBARDI & PETTIT

_____/s/ Ted N. Pettit_____
TED N. PETTIT
DAVID G. BRITTIN
and
MORGAN, LEWIS & BOCKIUS LLP
ANDREW J. GALLO
MELISSA Y. BOEY

Attorneys for HAWAIIAN TELCOM, INC.

3

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re: | CASE NO. 18-01319 |
| | (Chapter 11) |
| PANIOLO CABLE COMPANY, LLC, | |
| Debtor. | |
| WAIMANA ENTERPRISES INC., PA MAKANI LLC, CLEARCOM, INC., | ADV NO.  22-90008 |
| | **MEMORANDUM IN SUPPORT OF MOTION BY HAWAIIAN TELCOM, INC. TO DISMISS THE FIRST AMENDED COMPLAINT IN ITS ENTIRETY** |
| Plaintiffs, | |
| vs. | |
| HAWAIIAN TELCOM INC., | |
| Defendant. | |

**MEMORANDUM IN SUPPORT OF
MOTION BY HAWAIIAN TELCOM, INC. TO DISMISS
THE FIRST AMENDED COMPLAINT IN ITS ENTIRETY**

# TABLE OF CONTENTS

I.  INTRODUCTION .......................................................................................1

II. BACKGROUND .......................................................................................3

III. ARGUMENT.............................................................................................5

    A.  Legal Standard for Rule 12(b)(6) Dismissals.......................................5

    B.  The First Amended Complaint rises and falls entirely on Waimana's misinterpretation of License 372 .....................................7

    C.  The Plaintiffs' first three causes of action have already been determined by the Court, and are foreclosed as a matter of law........11

    D.  The Plaintiffs' newly added fourth cause of action lacks a cognizable legal theory, as the Plaintiffs' purported exclusive easement under License 372 is wholly inconsistent with the language and operation of the license. ...............................................14

    E.  The Plaintiffs' newly added fifth cause of action similarly lacks all merit.................................................................................................16

        a.  The Plaintiffs' first request for declaratory relief is untimely and has already been rejected as a matter of law. .................................................................................16

        b.  The Plaintiffs' second request for declaratory relief is based on an absurd, fabricated allegation and fails to state a plausible claim for relief.........................................18

        c.  The Plaintiffs' third request for declaratory relief also lacks a cognizable legal theory ..........................................22

IV. CONCLUSION.........................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ace Quality Farm Prod., LLC v. Hanh,*
   136 Haw. 373, 362 P.3d 806 (Ct. App. 2015) ............................................ 15-16

*Acevedo v. Allsup's Convenience Stores, Inc.,*
   600 F.3d 516 (5th Cir. 2010) ...................................................................2

*Amina v. WMC Fin. Co.,*
   329 F. Supp. 3d 1141 and 1153 (D. Haw. 2018),
   *aff'd,* 812 F. App'x 509 (9th Cir. 2020) ...........................................................7

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007)....................................................................... 5-6

*Coleman v. Quaker Oats Co.,*
   232 F.3d 1271 (9th Cir. 2000) ...................................................................2

*Coto Settlement v. Eisenberg,*
   593 F.3d 1031 (9th Cir. 2010) ...................................................................7

*Godecke v. Kinetic Concepts, Inc.,*
   937 F.3d 1201 (9th Cir. 2019) ...................................................................6

*In re Gucci,*
   126 F.3d 380 (2d Cir. 1997) ..................................................................13

*Khoja v. Orexigen Therapeutics, Inc.,*
   899 F.3d 988 (9th Cir. 2018) ...................................................................7

*Meridian Mortg., Inc. v. First Hawaiian Bank,*
   109 Haw. 35, 122 P.3d 1133 (Ct. App. 2005) ...................................................15

*SBC Communications v. FCC,*
   138 F.3d 410 (D.C. Cir. 1998)..................................................................21

*In re Stac Elecs. Sec. Litig.,*
   89 F.3d 1399 (9th Cir. 1996) ...................................................................6

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) ...................................................................6

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007)....................................................................................6

*In re Trism, Inc.*,
   328 F.3d 1003 (8th Cir. 2003) .................................................................13

*W. Mining Council v. Watt*,
   643 F.2d 618 (9th Cir. 1981) .....................................................................6

## Statutes and Rules

11 U.S.C. § 363 .................................................................................................18

47 U.S.C. § 153(50) ..........................................................................................21

Fed. R. Bankr. P. 7020 .......................................................................................2

Fed. R. Civ. P. 12(b)(6).................................................................................5, 6

Fed. R. Civ. P. 20 ...............................................................................................2

## FCC Reports and Orders

*Appropriate Framework for Broadband Access to the*
*Internet Over Wireline Facilities*,
   20 F.C.C.R. 14853 (2005)........................................................................21

*Business Data Services in an Internet Protocol Environment*,
   32 F.C.C.R. 3459 (2017)..........................................................................21

## I.    INTRODUCTION

Defendant Hawaiian Telcom, Inc. ("HTI") moves to dismiss, in its entirety, the operative *First Amended Complaint* [Docket No. 28] (the "First Amended Complaint") in the above-captioned adversary proceeding.  Despite the Court's multiple clear rulings regarding the scope of the assets that were transferred to HTI through the court-approved sale under Section 363 of the Bankruptcy Code (the "363 Sale"), the Plaintiffs continue to rehash the same arguments time and time again, in an attempt to chip away at the scope of HTI's acquired assets.

The initial complaint (at Docket No. 1-1, the "Initial Complaint") in this adversary proceeding was dismissed by the Court at a hearing on May 20, 2022 (the "First Dismissal Hearing").  At the First Dismissal Hearing, counsel for plaintiff Waimana Enterprises, Inc. ("Waimana") requested leave to amend certain select portions of the Initial Complaint.  *See* Transcript of First Dismissal Hearing [Docket No. 30] at 5:6-14 (requesting permission to amend one particular section with specific language, drop SIC as a plaintiff, and "accordingly make other amendments.")  The Court proceeded to permit amendment "along the lines discussed by [Waimana's counsel]." *Id.* at 9:14-15.

The First Amended Complaint, however, goes far beyond the scope of the

amendments described by Waimana to the Court at the First Dismissal Hearing.[1] Among other amendments, two entirely new counts of relief – Counts IV and V – have been added to the complaint.  Two new plaintiffs (both affiliates of Waimana and former plaintiff Sandwich Isles Communications Inc. ("SIC")) have also been joined into the complaint, without Waimana having first sought the Court's permission or otherwise establishing compliance with Federal Rule of Civil Procedure 20.[2]  *See, e.g., Acevedo v. Allsup's Convenience Stores, Inc.,* 600 F.3d 516, 521 (5th Cir. 2010) (courts have the discretion to refuse permissive joinder *even if* Fed. R. Civ. P. 20 is satisfied); *Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1296 (9th Cir. 2000) (similar).  The Plaintiffs' actions have reflected a consistent disregard for the Court's judgments and process.

Even if accepted in its filed form, the First Amended Complaint still fails to articulate claims to relief that are facially plausible or legally cognizable.  The Court has already dismissed the Plaintiffs' first three counts of relief in its Ruling on HTI's first motion to dismiss, and the Plaintiffs' new and amended allegations add no legal substance to the Complaint.  As further described below, the two newly added counts

---

[1] For the Court's ease of reference, a rough redline of the allegations in the First Amended Complaint, as compared to the allegations in the Initial Complaint, has been attached hereto as **Exhibit 1**.  Because both complaints were converted from PDF to Word to generate this redline, however, it is possible that minor inconsistencies may appear in the redline due to the computer software's ability to recognize text apart from formatting.

[2] This rule is made applicable to adversary proceedings by Fed. R. Bankr. P. 7020.

2

of relief similarly lack any form of supportable legal theory.  The First Amended Complaint should be dismissed in its entirety.

## II.   BACKGROUND

Prior to the First Dismissal Hearing, the Court issued its *Tentative Ruling on Motion to Dismiss* [Docket No. 22] (the "First Ruling"), which it later made final through an order issued on May 31, 2022 granting dismissal [Docket No. 31] (the "First Dismissal Order"), with the exception of one change.  *See* First Dismissal Order at 2-3 (granting HTI's motion to dismiss the Initial Complaint "for the reasons set forth in the Tentative Ruling . . . except that footnote 1 is withdrawn.")

Also prior to the First Dismissal Hearing, on May 17, 2022 the Court issued, in the above-captioned main bankruptcy case of Paniolo Cable Company, LLC ("Paniolo"), an *Order Granting Final Relief in Connection with Motion by Hawaiian Telcom, Inc. Enforcing the Court's Sale Order* [Paniolo Bankr., Docket No. 729] (the "Final Enforcement Order").  Among other findings, the Final Enforcement Order confirmed that HTI acquired the entirety of the Paniolo Buildings,[3] as well as

---

[3] The "Paniolo Buildings" are defined as the building structures, together with the associated systems, infrastructure, and appurtenances supporting a particular structure including, without limitation the conduits, manholes, hand holes, cross connects, meet-me cabinets and the fences installed by SIC and/or Paniolo surrounding such buildings.  Final Enforcement Order at 3 (incorporating into the order the definition used in Paniolo Bankr., Docket No. 637).

3

the assets that permit the operation of the Paniolo Network,[4] "including, without limitation, full rights of access to the Paniolo Premises,[5] including those certain portions of the 372 License . . . pertaining to the Paniolo Network and/or the Paniolo Premises that were formerly held by SIC."   Final Enforcement Order ¶¶ F, G.

The Initial Complaint sought three counts of relief against HTI, for (i) alleged trespass and use of the plaintiffs' "Licensed Property," (ii) alleged damage and conversion of such licensed property, and (iii) alleged unfair competition through HTI's alleged use of the plaintiffs' License Agreement No. 372 (the "<u>372 License</u>") without compensation.  *See* Initial Complaint at ¶¶ 40-52.  In addition to the facts previously alleged in the Initial Complaint, the First Amended Complaint inserts the following new or modified allegations:

- In 1996, Waimana made a partial assignment to SIC (the "<u>SIC Partial Assignment</u>") of the 372 License, which covered "certain rights, title and interest necessary to provide IntraLata and Intrastate telecommunication services."  *See* First Am. Compl. ¶ 16; *id.* Ex. B.

- Fifteen years later, in 2011, Waimana made a further partial assignment of the 372 License to Pa Makani LLC, for the provision of wireless communication

---

[4] The "<u>Paniolo Network</u>" is defined as that certain submerged marine fiber and terrestrial fiber telecommunications cable network formerly owned by Paniolo.  *See* Final Enforcement Order at 4 (incorporating definition).

[5] The "<u>Paniolo Premises</u>" are defined as "the easement areas surrounding the Paniolo Buildings." *See* Final Enforcement Order at 4 (incorporating definition).
The Plaintiffs, in their First Amended Complaint, have utilized the defined term "<u>License 372 Easement</u>" instead, but it is HTI's reasonable belief that these definitions cover the same geographical area and can be used interchangeably in this manner.  Accordingly, both of these terms are used interchangeably within this Motion when referring to the geographical area at issue.

4

services.  A further partial assignment of the 372 License was made in 2014 to Clearcom, Inc. for the provision of broadband communications services. *Id.* ¶¶ 18-19.

- Paniolo's appointed bankruptcy trustee (the "<u>Trustee</u>") levied and executed upon certain property owned by SIC, including SIC's interest in the 372 License, through a public auction (the "<u>Marshal Sale</u>").  *Id.* ¶¶ 24-27.

- Shortly thereafter, the Court approved a settlement agreement (the "<u>Settlement Agreement</u>") between the Trustee, the Plaintiffs, and several other parties (not including HTI, which had never participated in any such settlement discussions), which referenced a certain Master Relationship Agreement ("<u>MRA</u>") to be entered into between the settlement parties.  *Id.* ¶¶ 28, 29.  The First Amended Complaint cites to, and relies on, certain language in Schedule 2 of the MRA.  *See id.* ¶ 29.

- The Plaintiffs proceed to assert that HTI is a trespasser on Plaintiffs' License 372 Easement area and has no right to locate the assets it purchased through the 363 Sale on such easement area.  *Id.* ¶¶ 41-42.

- The Plaintiffs further assert that they possess an exclusive easement on the Paniolo Premises, which HTI is allegedly wrongfully interfering with, and which HTI allegedly induced the DHHL to breach through the DHHL's issuance of a separate right of entry to HTI.  *Id.* ¶¶ 44-46, 60.

- While the Plaintiffs do not claim an exclusive "Service Right" (as defined in the First Am. Compl.) to provide telecommunications services on HHL, they assert that HTI's operation of the Paniolo Network goes beyond the permitted scope of "IntraLata and Intrastate telecommunication services," which they incorrectly assert "is limited to local, intrastate, interstate and international telephone" on the Hawaiian Home Lands, which the Plaintiffs refer to as "voice only service".  *Id.* ¶¶ 16, 46, 54, 67.

## III.   ARGUMENT

### A.   Legal Standard for Rule 12(b)(6) Dismissals

To survive a Rule 12(b)(6) motion to dismiss, a complaint must articulate

"enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint must contain "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* at 555. A court may not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403 (9th Cir. 1996) (holding that "[c]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim.")

The determinative issue is whether the pleading's "factual content… allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," such that "it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca,* 652 F.3d 1202, 1216 (9th Cir. 2011). Thus, under Rule 12(b)(6), dismissal is proper when the complaint either (1) lacks a cognizable legal theory; or (2) fails to allege sufficient facts to support a cognizable legal theory. *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019).

When considering a motion to dismiss under Rule 12(b)(6), courts must examine the complaint in its entirety, "as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.,* 551 U.S. 308, 322 (2007).

A document is considered "incorporated" when "the complaint necessarily relies upon a document or the contents of the document are alleged in a complaint," provided that the document's authenticity is not in question and there is no dispute as to the "document's relevance." *Coto Settlement v. Eisenberg,* 593 F.3d 1031, 1038 (9th Cir. 2010). Separately, a court may take judicial notice of "matters of public record" without having to convert a motion to dismiss into a motion for summary judgment, applying the standards set forth in the Federal Rule of Evidence 201. *Khoja v. Orexigen Therapeutics, Inc.,* 899 F.3d 988, 999 (9th Cir. 2018). *See, e.g., Amina v. WMC Fin. Co.,* 329 F. Supp. 3d 1141, 1149 n. 4 and 1153 (D. Haw. 2018), *aff'd,* 812 F. App'x 509 (9th Cir. 2020) (a court takes judicial notice of "publicly available documents and the Court's own records" and "the pleadings, court orders, and other public records attached to the parties' briefs.")

### B.     The First Amended Complaint rises and falls entirely on Waimana's misinterpretation of License 372.

As an initial matter, the relief sought in the First Amended Complaint appears to primarily rely on the Plaintiffs' unreasonable, and critically flawed, theory that Waimana possesses an "exclusive easement" under License 372, which purportedly grants them the exclusive ability to access, or control access to, certain portions of the Hawaiian Home Lands, over and above the DHHL. The Plaintiffs' First Amended Complaint cuts and divides the 372 License into two portions: a right to provide telecommunications services on the Hawaiian Home Lands (the "Service

Right"), and an easement granted by the DHHL on the Hawaiian Home Lands to operate such Service Rights (the alleged, and allegedly exclusive, "License 372 Easement").  First Am. Compl. ¶ 20; *id.* at 7 n.1.  The Plaintiffs have admitted that the Service Right is no longer exclusive in light of the FCC's June 30, 2017 Memorandum Opinion and Order (the "FCC Preemption Order"), but maintain that the License 372 Easement is exclusive to Waimana under the terms of the 372 License.  *Id.* ¶¶ 44, 45.  This strained division of License 372, however, is entirely inconsistent with the actual language of the license and its operation.

> Originally issued in 1995, License 372 granted to Waimana the following:
>
> the **exclusive right and privilege to build**, construct, repair, maintain and operate a broad band telecommunications network, including poles . . . . over, across, under and throughout all lands under the administration and jurisdiction of [the DHHL], including the right to trim, **and including also the right of entry upon the easement area and adjoining land** of [the DHHL] for the construction, maintenance, operation and removal of [Waimana's] **line and appurtenances** over, across and under the LICENSE area.

*Id.* ¶ 20; *id.,* Ex. A (copy of 372 License) at 2 (emphasis added).  Based on the plain language of License 372, the language cited by Plaintiffs as establishing the License 372 Easement is a mere **right of entry** over DHHL land to and from the "line and appurtenances" that are actually constructed, not an independent grant of an exclusive easement.[6]  *See id.*

---

[6] If this were true, then the "right of entry upon the easement area **and adjoining land**," *see id.* Ex. A at 2 (emphasis added), would give Waimana an *exclusive* (i.e. the exclusive right to use

8

In contrast, the Plaintiffs' interpretation makes no sense upon a full reading of License 372.  The license only uses the word "easement" a few times.  *See* First Am. Compl.*,* Ex. A at 1, 2, 5.  The scope of the "easement area," referenced thrice in the agreement, is intentionally undefined, because License 372 required Waimana as licensee (and its assignees thereunder) to seek DHHL's approval for the construction of any improvements under License 372.  *Id.,* Ex. A ¶ 17.  This fact is undisputed.  Upon approval of the plans and specifications and construction of the telecommunication improvements, the location of the easement area would then be identified.[7]  The interpretation offered by the Plaintiffs does not logically align with Section 15, which discusses abandonment or non-use of the "easement area hereby granted," at which point "all rights granted hereunder shall terminate" and Waimana would have to remove all of its improvements and restore the land.  *Id.*, Ex. A ¶ 15. In other words, under this section, if the Service Rights were no longer in operation by Waimana as licensee, the easement would be terminated.   The Plaintiffs' interpretation also does not align with Section 16, which provides a substitute

and occupy) *easement* over all of the Hawaiian Home Lands.  That cannot have been what the DHHL intended.

[7] In the Plaintiffs' blockquote of language from License 372 at ¶ 20 of the First Amended Complaint, the Plaintiffs appear to have removed the term "easement area" from the 372 License language and, in an arguably misleading manner, have replaced it with a capitalized term "Easement."  *Compare* First Am. Compl. ¶ 20 (quoting License 372 as including "the right of entry upon the Easement and adjoining land") *with id.* at 2 (the actual language of License 372 states "the right of entry upon the easement area and adjoining land…") (underling added).  The capitalized/defined term "Easement" used by the Plaintiffs in their quotation is not actually used within the 372 License.

9

easement to Waimana under certain circumstances "to permit LICENSEE [Waimana] to effect relocation of **any facility** or portion thereof." *Id.,* Ex. A ¶ 16 (emphasis added). Nothing in the language of License 372 appears to grant an exclusive easement to Waimana over DHHL land.

In any event, the Plaintiffs' contrived division of the Service Rights from the License 372 Easement is also entirely inconsistent with their own operation of the 372 License. It is undisputed that SIC, not Waimana, obtained the approval of the construction plans for the Paniolo Premises and Paniolo Buildings. If such a division were in place and Waimana retained the exclusive License 372 Easement, then the construction of any improvements by SIC would have been in breach of Waimana's allegedly "exclusive easement" over the easement area covered by License 372.

Notably, Waimana and SIC have previously raised this exact argument, regarding a purported division of the Service Right from the License 372 Easement, to the FCC – and the FCC squarely rejected it. *See id.*, Ex. I (FCC Preemption Order) ¶¶ 15-18 ("Sandwich Isles argues that the Exclusive License does not violate Section 253(a) because it grants exclusivity only as to the construction of telecommunications '**infrastructure**' and therefore does not preclude competitors from providing '**service**' to the Hawaiian home lands. We **reject** this argument . . . On its face, the Exclusive License binds DHHL to prohibit the **construction or operation** of a telecommunications network by any entity other than Sandwich Isles

for the provision of telecommunications services on the Hawaiian home lands . . .
Waimana also suggests that the Exclusive License does not prohibit competition
because other telecommunications carriers could **lease access** to elements of
Sandwich Isles' network . . .  [But] under Commission precedent, Section 253(a)
bars State or local requirements that prevent competitors from '**utiliz[ing] their own
facilities** to provide service'.") (emphasis added).

The Plaintiffs' notion of an "exclusive easement" is entirely baseless, and as
further detailed below, their requests for relief – most of which rely at least in part
on this flawed notion – should be promptly dismissed.

### C.    The Plaintiffs' first three causes of action have already been determined by the Court, and are foreclosed as a matter of law.

The Plaintiffs' first three causes of action in the First Amended Complaint
(alleged trespass, conversion, and unfair competition) remain largely unchanged
from the Initial Complaint.  As before, "[a]ll of these claims rest on the proposition
that HTI did not acquire any interest in License 372 and that its conduct is
inconsistent with Waimana's . . . continued ownership of License 372."  Ruling at
5.  The Plaintiffs' newly added or amended allegations add nothing, and change
nothing, as the Court has already held, on multiple occasions, that these claims
asserted by the Plaintiffs have been "foreclose[d] as a matter of law."  *Id.*

In connection with Count 1 (trespass), the Plaintiffs assert that HTI "has no
license, nor any other legal right, to occupy Plaintiffs' License 372 Easement," and

thus seek to evict and bar HTI from accessing the easement area. First Am. Compl. ¶¶ 50-51. Similarly, Count 2 (conversion) asserts that HTI "willfully used and damaged Plaintiffs' License 372 Easement areas," whereas Count 3 (unfair competition) asserts that HTI engaged in unfair competition by "usurping Plaintiffs' License 372 Easements . . . without compensation."

Such arguments are complete non-starters. The Court's orders approving the Marshal Sale (the "Marshal Sale Order") and the 363 Sale (the "363 Sale Order," and together with the Marshal Sale Order, the "Sale Orders") held that the portion of the 372 License assigned by Waimana to SIC, as well as the other assets and entitlements that permit the operation of the Paniolo Network, were transferred to HTI free and clear of any claims and encumbrances, including any interest held by Waimana or any other plaintiff.[8] This has been confirmed by the Court in the Final Enforcement Order and the Ruling. *See* Final Enforcement Order ¶ G ("Through the Marshal Sale and the 363 Sale, HTI has properly acquired the assets that permit operation of the Paniolo Network including, without limitation, full rights of access

---

[8] *See, e.g.,* Marshal Sale Order [Adv. Pro. 19-90022, Docket No. 65] ¶ 7 ("Any and all other **encumbrances** affecting the [assets acquired through the Marshal Sale], or any part thereof . . . **are perpetually barred of and from any and all right, title and interest, and claims at law or in equit**y, in the [assets] or any part thereof.") (emphasis added); *see also, e.g.,* 363 Sale Order [Paniolo Bankr., Docket No. 366] ¶ 7 (the "Transferred Assets will be transferred to [HTI] **free and clear of all Interests or Claims** . . . that **existed prior to the Closing of any person**, including, without limitation, all such Interests or Claims specifically enumerated in the Sale Order, whether arising by agreement, by statute, or otherwise and whether occurring or arising before, on, or after the Petition Date, whether known or unknown, occurring, or arising prior to such transfer.") (emphasis added).

to the Paniolo Premises, including those certain portions of the 372 License pertaining to the Paniolo Network and/or the Paniolo Premises that were formerly held by SIC.") (internal parentheticals omitted).  *See* Ruling at 6-7 ("I . . . hold, as I have held before, that by virtue of the sale orders, HTI acquired all of Paniolo's and SIC's rights to the described assets, including SIC's rights as a partial assignee of License 372.")

The newly added or amended allegations in the First Amended Complaint, including the allegedly exclusive nature of the 372 License or any alleged breach of the Settlement Agreement (each further addressed below), cannot reasonably modify the terms of such final Sale Orders.[9]  *See* Ruling at 7 ("In effect, Waimana and its affiliates contend that the sale orders were incorrect . . . But those orders are now final, and I am not inclined to change them, particularly in view of HTI's reliance on those orders . . . Waimana's claim that it has an interest in the A.2 Assets comes too late.")[10]  The Court's prior orders have "preclude[d] th[e] proposition" that HTI did not acquire any interest in License 372, and the First Amended Complaint thus fails to state a cognizable claim on any of the first three counts.  *See* Ruling at 8.

---

[9] To the extent the Court may be inclined to re-examine its prior findings on this issue, HTI incorporates herein by reference its prior briefings on this issue.

[10] *See also In re Gucci*, 126 F.3d 380, 387 (2d Cir. 1997) (bankruptcy sales "maximize[] the purchase price of assets because without this assurance of finality [provided by Section 363], purchasers could demand a large discount for investing in a property that is laden with the risk of endless litigation as to who has rights to estate property."); *In re Trism, Inc.*, 328 F.3d 1003, 1006 (8th Cir. 2003) (discussing the finality of a bankruptcy sale, which "shields third parties who rely upon the bankruptcy court's order from endless litigation").

Because HTI properly acquired through the Marshal Sale and the 363 Sale (the "Sales") the right to use and occupy the Paniolo Premises in order to operate the Paniolo Network, including acquiring the portion of the 372 License formerly assigned to SIC and the addenda thereto, HTI cannot be trespassing as a matter of law, and there are no legal grounds for evicting HTI from the Paniolo Premises. Similarly, as HTI has the right to use and occupy the Paniolo Premises and the Paniolo Buildings, HTI has not wrongfully possessed any property belonging to the Plaintiffs, and thus there are also no legal grounds for any alleged claim of conversion of "Plaintiffs' License 372 Easement areas" or any alleged claim of "usurping Plaintiffs' License 372 Easements and their License 372 Service Rights without compensation." *See* First Am. Compl. ¶¶ 53, 58.

> **D.    The Plaintiffs' newly added fourth cause of action lacks a cognizable legal theory, as the Plaintiffs' purported exclusive easement under License 372 is wholly inconsistent with the language and operation of the license.**

Count IV of the First Amended Complaint alleges tortious interference by HTI to the 372 License, in that HTI allegedly "induced DHHL to breach th[e] [372 License] agreements with Plaintiffs . . . [and] encouraged and induced DHHL to breach its obligations to Plaintiffs under License 372 by entering into the Limited Right-of-Entry, making filings in this Court and potentially negotiating a new license with HTI." First Am. Compl. ¶ 64. The alleged breaches themselves, as well as the nature of the purported breaches, are not described in the Complaint. This alone

makes the claim subject to dismissal, particularly given the Plaintiffs' novel notion that HTI, through applying for its own license, interfered with someone else's license.  Under Hawaii law, in order to establish a cause of action against a third party for intentional interference with a contractual right, it "must be shown that the third party acted with intent and legal malice, i.e., the intentional doing of a harmful act without legal or social justification or excuse..." *Ace Quality Farm Prod., LLC v. Hanh*, 136 Haw. 373, 362 P.3d 806 (Ct. App. 2015) (quoting *Meridian Mortg., Inc. v. First Hawaiian Bank,* 109 Haw. 35, 45-46, 122 P.3d 1133, 1143-44 (Ct. App. 2005), as corrected (Oct. 13, 2005)).  *See also Meridian Mortg.,* 109 Haw. at 48, 122 P.3d at 1146 (the assertion of any rights to maximize economic interests is not sufficient to show requisite intent; it must be shown that the defendant "either pursued an improper objective of harming the plaintiff or used wrongful means that caused injury in fact").  HTI's act of filing an application with the DHHL for its own license is in no way a harmful, malicious, or wrongful act, nor an "improper objective."

The Plaintiffs have also failed to specifically allege any damages incurred through HTI's filing of its own license, despite that the First Amended Complaint quotes the requirement, set forth in *Ace Quality,* that the damages suffered as a consequence of the defendant's alleged conduct cannot be "speculative or conjectural losses."  *See* First Am. Compl. ¶¶ 63-64; *Ace Quality*, 109 Haw. at 44,

122 P.3d at 1142.

Even if the claim had been properly articulated, it appears to rest on the Plaintiffs' misguided notion, addressed above (*see supra* § B) that the allegedly exclusive easement it received from the DHHL through the 372 License was breached when the DHHL granted HTI a separate right-of-way over the Paniolo Premises (and undertook other related actions). Without the alleged exclusivity asserted by the Plaintiffs, there could not have been a breach by the DHHL of License 372 when it issued to HTI a separate right of entry to access the Paniolo Premises, and without a breach, there cannot have been any intentional interference by HTI with the License 372 contract. The Plaintiffs' Count IV lacks any cognizable legal theory, and should be dismissed.

**E.      The Plaintiffs' newly added fifth cause of action similarly lacks all merit.**

Count V of the First Amended Complaint seeks declaratory relief on three separate issues, all of which are facially implausible and legally unsupported.

> a.      *The Plaintiffs' first request for declaratory relief is untimely and has already been rejected as a matter of law.*

First, the Plaintiffs seek a determination that the Trustee did not obtain SIC's interest in License 372, purportedly because HTI did not assume the MRA. First Am. Compl. ¶ 66. But the Court has already confirmed that HTI has indeed acquired SIC's interest in License 372 (*see* Final Enforcement Order ¶ G; Ruling at 6-8), after

taking into account this exact argument previously raised by Waimana and SIC.[11] The Plaintiffs' conclusory allegations, which are mere rehashes of its former arguments already considered and rejected by this Court, do not create a cognizable claim for relief.

The Plaintiffs further assert, on amorphous equitable grounds, that it would be "unfair" to bind Plaintiffs to the "commitments made in the settlement agreement including the agreement to provide access to the Transferred Assets and Equipment," because the Trustee failed to ensure that HTI would be bound by the MRA.  *See* First Am. Compl. ¶ 66.  In other words, the Plaintiffs assert that in light of a breach of the MRA, the Plaintiffs are effectively withdrawing their consent to the Sales and wish to unwind them.

This argument is severely misguided for two reasons.  First, the assets sold, including SIC's interest in the 372 License and other access rights, are not tied to the MRA, which HTI is not a party to[12] and which (contrary to the Plaintiffs' contention at *id.*) HTI has never sought to enforce.   Second, the Plaintiffs appear to misunderstand the fundamental nature of the Sales.  Notwithstanding whether the Plaintiffs consented to the Marshal Sale, SIC's assets were acquired by Paniolo

---

[11] *See Sandwich Isles Communications, Inc.'s Statement of Objections to the Final Relief Requested by Hawaiian Telcom* [Paniolo Bankr., Docket No. 713] and *Waimana Enterprise Inc.'s Joinder* [Paniolo Bankr., Docket No. 715] in the same.

[12] The Court has already adjudicated this issue.  *See Order Granting Hawaiian Telcom Inc.'s Motion for Summary Judgment* [Adv. Pro. 21-90017, Docket No. 59].

through a public auction, and then sold to HTI free-and-clear under Section 363 of the Bankruptcy Code.  Neither of the Sales were conditioned in any way upon the Plaintiffs' consent, or upon the full compliance by all parties to the terms of the MRA or the Settlement Agreement.  In any event, the 363 Sale transferred the assets acquired thereunder to HTI free and clear of all such continuing Interests and Claims (as defined in the 363 Sale Order) by any party.  *See* 363 Sale Order ¶¶ S, T, 7, 9-10; *see also* 11 U.S.C. § 363(m) (prohibiting the reversal or modification of a sale to a good-faith buyer unless a stay of the sale is obtained).

> b.    *The Plaintiffs' second request for declaratory relief is based on an absurd, fabricated allegation and fails to state a plausible claim for relief.*

The Plaintiffs seek a second declaratory determination, in that the SIC Partial Assignment only provided SIC the ability to provide "voice only" service on the HHL.  *Id.* ¶ 67.  The Plaintiffs have not alleged a plausible claim for relief in connection with this request; their allegations on which this claim is based are falsely concocted, illogical, and appear to be based on a fundamental mischaracterization of the Paniolo Network that was acquired by HTI through the Sales.  The Plaintiffs' attempt to limit Paniolo to "voice only" services is another concocted attempt at narrowing the scope of the assets purchased by HTI, and is nothing but a baseless distraction.

At its core, the First Amended Complaint has incorrectly, and misleadingly, conflated the telecommunications services provided by the Paniolo Network with the services provided by SIC. The Plaintiffs note that SIC deployed "**telecommunications** facilities, including Central Offices . . . and underground conduits," and then "used those facilities for the provision of voice only services" on the Hawaiian Home Lands. *Id.* ¶ 21 (emphasis added). The Plaintiffs then assert that Paniolo has wrongfully used the SIC Partial Assignment beyond "voice only services." *Id., e.g.,* ¶ 54. But this is a fundamentally incorrect mischaracterization of the Paniolo Network that HTI purchased. As a "middle-mile" provider of connectivity to third party carriers, the Paniolo Network carries telecommunications transmissions of all types to and from the points where its network connects to the networks of its carrier customers. The Paniolo Network typically does not provide retail services to consumers of voice, data, or wireless services, but only provides wholesale telecommunications services to other carriers. In other words, the Paniolo Network does not provide any services directly to consumers on the Hawaiian Home Lands, but instead provides general telecommunications services of all types to "last-mile" carriers, such as SIC, which in turn provide voice, data, or wireless services to those consumers. These telecommunications services provided by the Paniolo Network have not substantively changed from the day Paniolo first connected to (what was formerly) SIC's facilities on the Hawaiian Home Lands to the present

day, and has never been constrained by the types of services SIC chose to provide to consumers.  The Plaintiffs' last-ditch attempt to impose a last-mile "voice only" limitation on the Paniolo Network is nothing but a red herring.

In any event, the Plaintiffs' allegations on this make no sense.  The First Amended Complaint alleges that:

> 16.    The SIC Partial Assignment is expressly limited to "***IntraLata and Intrastate telecommunication services***," which means "limited to local, intrastate, interstate and international telephone" on HHL.

First Am. Compl. ¶ 16 (bolding and italics in original).

The Plaintiffs do not cite a source for their quoted definition of "IntraLata and Intrastate telecommunication services."   *See id.*   It appears to be selectively excerpted, however, from the wording of License 372, which states:

> "LICENSOR determines that the LICENSE established herein is essential in order to provide broad band telecommunication services of all types (including but not <u>limited to local, intrastate, interstate and international telephone</u>; video on demand; interactive communication; cable television; medical and educational links; and electronic data transmission) to LICENSOR'S lands in a timely manner."

*Id.,* Ex. A at 1 (portion excerpted by the Plaintiffs underlined).

This excerpt by the Plaintiffs takes the broad, general grant to Waimana ("including **but not limited to**") under License 372 and imposes it, *deceptively* and post-hoc, on the SIC Partial Assignment ("**limited to**") to falsely support their position.  Beyond that, there exists a nonsensical inconsistency in the Plaintiffs' allegations: if the SIC Partial Assignment covers "IntraLata and Intrastate

20

telecommunication services," the Plaintiffs' interpretation of "IntraLata and IntraState" to cover "interstate" and "international," cannot be correct. *See* First Am. Compl. ¶ 16.[13]

In any event, by a plain reading of the SIC Partial Assignment, no such limitation to "voice only services" exists. *Id.,* Ex. B. The SIC Partial Assignment transfers to SIC, under License 372, the right to construct a broad band network to provide "IntraLata and Intrastate telecommunication services." *Id.* Moreover, this "voice only services" interpretation is incorrect as a matter of law. The FCC has long held that the term "telecommunication services" is not limited to "voice only services."[14]

---

[13] *See, e.g.*, *SBC Communications v. FCC*, 138 F.3d 410, 412 n.1 (D.C. Cir. 1998) ("**Inter**LATA service refers to what consumers know as long-distance service; **intra**LATA to what they know as local service (although some intraLATA calls may be "toll" calls, depending upon classifications made by the state regulatory bodies).") (emphasis added).

[14] Telecommunications is defined by federal statute as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(50). The statute does not limit telecommunications to voice traffic. In fact, as reflected in the FCC's categorization of telecommunications provided on an interstate basis for annual reporting requirements, the following services are considered telecommunications: wireless telephony, including cellular and personal communications services (PCS); paging services; dispatch and operator services; mobile radio services; access to interexchange service; business data services; wide area telecommunications services (WATS); subscriber toll-free and 900 services; message telephone services (MTS); private line; telex; telegraph; video services; satellite services; resale services; Frame Relay services; asynchronous transfer mode (ATM) services; Multi-Protocol Label Switching (MPLS) services; audio bridging services; and interconnected VoIP services. 2022 Telecommunications Reporting Worksheet Instructions (FCC Form 499-A) (approved by OMB Oct. 2021); *see also Business Data Services in an Internet Protocol Environment*, 32 F.C.C.R. 3459 (2017) (permitting carriers offering Business Data Services – defined as "dedicated point-to-point transmission of data at certain guaranteed speeds and service levels using high-capacity connections", at 3463 ¶ 6, as telecommunications services when offered on common carrier basis. 3575 n.700; *Appropriate Framework for Broadband Access to the Internet Over Wireline*

> c. *The Plaintiffs' third request for declaratory relief also lacks a cognizable legal theory.*

Finally, the Plaintiffs seek a third determination, in that the SIC Partial Assignment "did not include License 372 Easement areas." This request is a slightly modified version of the Plaintiffs' flawed argument that the non-exclusive Service Rights under License 372 can be severed from their alleged, and allegedly exclusive, License 372 Easement. Here, the Plaintiffs contend that because the Service Right can be severed from the alleged License 372 Easement, only the Service Right was transferred to SIC through the partial assignment. The Plaintiffs advance this contention without explaining how SIC could have, for many years, operated such Service Right without using or infringing the Plaintiffs' allegedly exclusive License 372 Easement (which use by SIC would render it no longer exclusive). For the reasons asserted above, *see supra* § B, this argument regarding severability, and this request for declaratory relief, lacks supportable legal grounds, and must be dismissed.

## III.   CONCLUSION

Based on the foregoing, HTI respectfully requests for the Court to (a) dismiss the Complaint in its entirety, and (b) grant to HTI such other and further relief as is just and proper.

---

*Facilities*, 20 F.C.C.R. 14853, 14909-10 ¶¶ 103 (2005) (finding that the transparent "transmission component" of broadband Internet access, when offered on a common carrier basis "is of course a telecommunications service").

22

DATED:      Honolulu, Hawaii, June 10, 2022.

CASE LOMBARDI & PETTIT

_____/s/ Ted N. Pettit_____
TED N. PETTIT
DAVID G. BRITTIN
and
MORGAN, LEWIS & BOCKIUS LLP
ANDREW J. GALLO
MELISSA Y. BOEY

Attorneys for HAWAIIAN TELCOM, INC.

23

## Exhibit 1

Redline of pleadings

### FIRST AMENDED COMPLAINT

Plaintiffs Waimana Enterprises Incorporated ("~~"~~**"Waimana"**~~) and~~ ~~Sandwich Isles Communications, Inc. **("SIC"**~~")~~, Pa Makani LLC ("**Pa Makani**") and Clearcom, Inc. ("**Clearcom**") for their ~~complaint~~First Amended Complaint against ~~Hawaiian Telcom **Inc. ("**~~Defendant Hawaiian Tel**")~~ ~~alleges~~ Inc. ("HTI") allege and ~~avers~~aver as follows.

1.    Waimana ~~and SIC are~~is the ~~owners~~primary owner and ~~holders~~holder of License 372 ~~requiring~~that requires Waimana ~~and SIC~~ to provide all infrastructure necessary to provide ~~modem~~modern telecommunications services ~~to every resident of the~~on Hawaiian Home Lands ("~~"~~**"HHL"**~~"~~), no matter how remote their residence may be. License 372 was issued to a native Hawaiian corporation in 1995 and the term is in perpetuity. Many of its customers do not have electricity or water and one family lives in a tent. License 372 mandates that no matter how expensive the infrastructure may be in order to provide such service, Waimana~~'s and SIC'~~'s monthly charge to the customer will be no more than is charged for comparable service in ~~urban~~the adjacent non-HHL areas ~~in the state of Hawaii~~. The provisions of License 372 are the reason the residents of the HHL have modern telecommunication service today, including in many cases fiber-optic cable to their homes. It is essential to sustaining, expanding and upgrading ~~modern~~non-voice telecommunications service to the HHL residents in the future that the requirements of License 372~~, or equivalent,~~ be continued. ~~Hawaiian Telcom does not have any license for the Paniolo facilities on Waimana's and SIC's Licensed Property under License 372 that it purchased in 2021 and, even if Hawaiian Tel had a license for the Licensed Property (which it does not), Hawaiian Tel is not meeting the requirements of License 372. This lawsuit is brought in order to remedy that critical situation which is damaging the residents of the Hawaiian Home Lands.~~

**EXHIBIT 1**

i.      SIC is a corporation organized and existing under the laws of the State of Hawaii.

2.      Plaintiff Waimana is a corporationorganizesiand.corporation organized and existing, under the laws ofof the State- of HawaiiHawai'i.

3.      Hawaiian Tel is a corporationPlaintiff Pa Makani is a limited liability company organized and existing under the laws of the State of HawaiiHawai'i.

4

4.      Plaintiff Clearcom is a corporation organized and existing under the laws of the State of Hawai'i.

5.      Defendant HTI is a corporation organized under the laws of the State of Hawai'i.

6.      Former Plaintiff but now non-party Sandwich Isles Communications, Inc. ("**SIC**") is a corporation organized and existing under the laws of the State of Hawai'i.

7.      Section 207(c)(1)(A) of the Hawaiian Homes Commission Act ("**"HHCA"**") authorizes the Hawaiian Homes Commission ("HHC")states: "The department is authorized to grant licenses, for lots, as easements for public purposes including utility facilities. railroads, telephone lines, electric power and light lines, gas mains, and the like." Emphasis added.

8.      Section 204(2) of the HHCA states "In the management of any retain available lands ... the department is expressly authorized to negotiate, prior to negotiations with the general public, the disposition of Hawaiian home lands or any improvement thereon to a native Hawaiian, or organization or associations owned or controlled by native Hawaiians, for commercial, industrial or other business purposes ..."

9.      Plaintiffs are native Hawaiian organizations as noted in License 372 and the Partial Assignments.

10.     Section 206 of the HHCA states:

"OTHER OFFICERS NOT TO CONTROL HAWAIIAN HOME LANDS; EXCEPTIONS. The powers and duties of the governor ... in respect to the lands of the State, shall not extend to lands having the status of Hawaiian home lands, except as specifically provided in this title."

11.    The Hawaii Public Utilities Commission ("**PUC**") is a division of the Governor's administration and therefore has no authority on HHL.

12.    Waimana is the owner and holder of License No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands ("**DHHL**") pursuant to authorization from the HHC (hereinafter "**License 372**"). A true copy of License 372 is attached hereto as **Exhibit "A"** and incorporated herein by this reference.

13.    License 372 granted Waimana a right to provide "telecommunication services of all types" to HHL, see Exhibit A at 1:

5

Licensor determines that the LICENSE established herein is essential in order to provide broad band telecommunication services of all types (including but not limited to local, intrastate, interstate and international telephone; video on demand interactive communication; cable television; medical and educational links; and electronic data transmission) to LICENSOR'S lands in a timely manner;

The added underscored words identify the type and area of telecommunication services assigned to SIC in the Partial Assignment of License, discussed below. The right to provide all other types of telecommunication services were retained by Waimana.

14.    Under HHCA 207(c)(1), License 372 is an interest in real estate property issued to Waimana pursuant to HHCA 207(c)(1) and Hawaii Administrative Rules 10-4-21 and 22. A true copy of License 372 is attached hereto as **Exhibit "A"** and incorporated herein by this reference.

615.   By instrument dated January 15, 1996, Waimana partially assigned License 372 to SIC (the "**"SIC Partial Assignment"). The Partial Assignment is expressly limited to "IntraLata and Intrastate telecommunication ("voice") services" on the Hawaiian Home Lands ("HHL"**"). A true copy of the Partial Assignment is attached hereto as **Exhibit ""B."** By instrument dated October 6, 2008, the HHC consented to the Partial Assignment. A true copy of the Consent is attached hereto as **Exhibit ""C""**.

16.     The SIC Partial Assignment remains in full force and effect, and SIC is not in breach of the License 372 and has not abandoned License 372.

7.     The DHHL has confirmed as recently as January 6, 2022 that License 372 remains in full force and effect, is valid and has not been cancelled. Waimana and SIC also are not in breach of the License 372 and have not abandoned License 372.

8.     License 372 in relevant part provides:

LICENSOR [DI-IHI 4 determines_that the LICENSR established herein is essential in order to provide broad band is expressly limited to "**IntraLata and Intrastate** telecommunication services of all types (including but not ", which means "limited to local, intrastate, interstate and international telephone; video" on demand; interactive communication; cable television; medical and educational links; and electronic data transmission) to LICENSOR'S lands in a timely manner; HHL ("**voice only service**"). Consistent with that voice only service limitation and area of service limitation, SIC was granted a Certificate of Authority from the Hawaii Public Utilities Commission to provide voice only services on HHL.

17.     Waimana caused other subsidiaries including Clearcom, Inc. and Pa Makani LLC to provide other telecommunications services (internet, wireless etc.) both on and off HHL.

18.   By instrument dated December 30, 2011, Waimana partially assigned License 372 to Pa Makani (the "**Pa Makani Partial Assignment**"), which granted "those certain rights, title and interest necessary to provide "***wireless communications services of all types***" under License 372. DHHL consented to the Pa Makani Partial Assignment. A true copy of the Partial Assignment is attached hereto as **Exhibit "D",**

19.   By instrument dated May 29, 2014, Waimana partially assigned License 372 to Clearcom (the "**Clearcom Partial Assignment**"), which granted "those certain rights, title and interest necessary to provide "***broadband communications services of all types***" under License 372. DHHL consented to the Clearcom Partial Assignment. A true copy of the Partial Assignment is attached hereto as **Exhibit "E",**

20.   License 372 in relevant part also provides:

LICENSOR believes and intends that the issuance of this Exclusive "Benefit" LICENSE will also fulfill the purpose of advancing the rehabilitation and welfare of native Hawaiians.

NOW THEREFORE, LICENSOR, in consideration of the services to be provided by LICENSEE [Waimana], and the terms, conditions and covenants herein contained on the part of LICENSEE to be kept, observed and performed, hereby grants and issues to LICENSEE, and its legal successors and assigns, the [1] exclusive right and privilege to build, construct, repair, maintain and operate a broad band telecommunications network including poles, overhead and/or underground lines, appliances, microwave and/or other types of equipment over, across, under and throughout all lands under the administration and jurisdiction of LICENSOR, and its legal successors and assigns, including the right to trim and keep trimmed any vegetation, shrubbery, bushes or trees in the way of its lines and appurtenances, and [2] including also the right of entry upon the ~~easement area~~Easement and adjoining land of LICENSOR for the construction,  maintenance, operation and removal of LICENSEE'S line and appurtenances over, across and under the LICENSE area.[1]

---

[1] Section [1] is the exclusive right to provide telecommunications services throughout HHL that the FCC Order preempted by its Memorandum Opinion and Order dated 7/3/17, where the FCC Order removed the exclusivity aspect of the service right on HHL. ("**License 372 Service Right**").

TO HAVE AND TO HOLD the same unto LICENSEE, its legal successors and assigns, in perpetuity, commencing on May 1, 1995, unless sooner terminated as hereinafter provided,

4.    ACCESS TO TELECOMMUNICATIONS INFRASTRUCTURE.  LICENSEE shall make available to LICENSOR the use of all available telecommunications equipment and services then under LICENSEE'S control at LICENSEE'S cost. LICENSOR'S use under this paragraph shall be limited to emergency, public and official purposes only.

5.    LEVEL OF TELECOMMUNICATION SERVICES. LICENSEE shall provide at a minimum the same level of telecommunication service being provided in adjacent areas not subject to this LICENSE. LICENSEE shall use its best effort to provide a higher level of telecommunication service than that being provided in adjacent areas not subject to this LICENSE. LICENSEE shall not provide a lower level of service than that level being provided in adjacent areas not subject to the LICENSE unless LICENSOR shall agree in writing.

Section [2] is the License exclusive easement granted by DHHL to Waimana in License 372 for certain areas of HHL, i.e. "the easement area and adjoining land of LICENSOR for the construction, maintenance, operation and removal of LICENSEE'S line and appurtenances over, across and under the LICENSE area." ("**License 372 Easement**").

6.    COST OF TELECOMMUNICATIONS SERVICES. LICENSEE shall provide to the beneficiaries of LICENSOR living in areas subject to this LICENSE, telecommunications services at a cost less than or equal to the cost for comparable services being provided in adjacent areas not subject to this LICENSE. LICENSEE shall not charge beneficiaries living in the LICENSE area more for telecommunication services than being charged in adjacent areas not subject to this LICENSE unless LICENSOR consents in writing.

9

7.    JOB TRAINING/EDUCATION. LICENSEE agrees to expend an amount equal to at least one-half percent (1/2%) of LICENSEE'S annual net profit for job training and/or educational opportunities for beneficiaries of LICENSOR each year. For purposes of demonstrating compliance with this paragraph, LICENSEE agrees to

allow LICENSOR access to LICENSEE'S financial statement, provided, that all material and information will be kept strictly confidential.

8.     EMPLOYMENT. LICENSEE agrees to offer employment opportunities to qualified beneficiaries of LICENSOR.

9.     CAPITAL EXPENDITURES/CONTRACTS. LICENSEE agrees to utilize qualified companies controlled or owned by beneficiaries of LICENSOR provided such beneficiary company is qualified to perform the terms of the contract and such beneficiary company's bid price is not more than 5% higher than the lowest bid from an equally qualified non-beneficiary company.

19.     BREACH. If LICENSEE shall substantially fail to observe or perform any of the conditions herein contained and on its part to be observed or performed and such failure or lack of substantial compliance shall continue for sixty (60) days after the receipt by certified mail or written notice of such failure to the address of LICENSEE, or if LICENSEE shall abandon the premises, then and in any such event LICENSOR may, at its option, cancel this LICENSE Agreement and, thereupon, take immediate possession of the premises, allowing LICENSEE reasonable time to remove its property therefrom, without prejudice to any remedy or right of action that LICENSOR may have against LICENSEE.[2]

21.     Pursuant to License 372, SIC developed telecommunications facilities, including Central Offices, warehouses and security fencing ("Licensee Buildings")and underground conduits throughout HHL to beneficiary lessee residences (collectively "Licensed Propertyon License 372 Easement.") SIC used those facilities for the provision of voice services. SIC was granted a Certificate of Authority from the Hawaii Public Utilities Commission to provide voiceonly services ONLYonly on HHL. Waimana caused other subsidiaries to providePlaintiffs developed other telecommunications services (internet, wireless etc.) by using, in part, the excess capacity on SIC's facilities on HHL.

---

[2] Although DHHL initially sent Waimana and SIC a notice of violation in March 2020 that notice was effectively withdrawn by DHHL in January 2021 when Waimana and SIC requested a contested case hearing, and since then, DHHL has not sent Plaintiffs any such notice of breach.

1022. Paniolo Cable Company Inc. ("**Paniolo**"), which is a third-party mainland undersea cable company not owned or controlled by Waimana, developed and leased to SIC, certain telecommunication facilities (undersea and underground cables and switches) outside of HHL which connected various HHL parcels on each Hawaiian island except Lanai. Paniolo's facilities were connected to and housed in SIC's existing facilities on the Licensed PropertyLicense 372 Easement, pursuant to SIC's joint use agreement with Paniolo. All of Paniolo's facilities were leased to SIC at a time when Paniolo was a third-party mainland undersea cable company not owned or controlled by Waimana nor any affiliate of Waimana. Paniolo had no interest in any HHL, as the Licensed PropertyLicense 372 Easement was licensed to Waimana pursuant to its rights under License 372 and SIC pursuant to its rights under its partial assignment. The assets owned by Paniolo and leased to SIC including the assets on the Licensed PropertyLicense 372 Easement are hereinafter referred to as the "**Paniolo Assets**."

1123. In 2018, an involuntary bankruptcy petition was filed against Paniolo and in 2019, the U.S. Bankruptcy Court appointed Michael Katzenstein to serve as the Trustee in Bankruptcy for Paniolo ("**Katzenstein**").

1224. Because SIC was delinquent in its rent payments to Paniolo, in 2019, Katzenstein sued SIC and obtained a money judgment against SIC for the amount of unpaid rent that SIC owed to Paniolo.

13

25.   With the money judgment, on February 4, 2020, Katzenstein obtainedfiled a WritNotice of Execution and caused the United States Marshal to hold an execution sale of certain specifically identified telecommunications assets of SIC all of which were on the Licensein Case No. 19-90022 (Dkt 36), which is attached hereto as Exhibit "M," that identified levied SIC property described in Exhibit "A" as **Real Property**, which is real property in Mililani on Oahu, and **Schedule A-2 Assets**, (collectively, "SIC Property"). Katzenstein, however, did

not acquire any interest in License Property as a result of the execution sale. (The SIC assets acquired by Katzenstein in the execution sale are.hereinafteurferred tai. the **"Katzenstein-Acquired SIC Assets."**)

14.    The Katzenstein-Acquired SIC Assets covered only a small specified portion of SIC's facilities on the Licensed Property. Katzenstein did not want SIC's "last mile" or "local loop" facilities **("last mile facilities")** that connect each home on HHL to the local, national and international communication networks or the warehouses and security fencing. Katzenstein and Hawaiian Tel did not want responsibility to service ALL customers on the HHL. Katzenstein and Hawaiian Tel wanted the assets that could be used to improve service to Hawaiian Tel's customers off of HHL. These assets continue to be owned by SIC and are essential to sustaining and expanding service to SIC's, Waimana's and/or Waimana's other subsidiaries' customers on the HHL.

15

26.    Schedule A-2 at the end of the section entitled "Licenses" stated:

All licenses necessary to build, construct, repair, maintain and operate the Schedule A.2 assets, including without limitation SIC's interest in License  Agreement No. 372 issued by the State of Hawaii Department of Hawaiian  Home Lands.

-All existing and pending entitlements (including without limitation, SIC's interests in memoranda of agreement, easements, leases, license agreements, letters of approval, special area management permits, rights of way or rights of interest, necessary to build, construct, repair, maintain and operate the Schedule A.2 assets.

Emphasis added.

27.    On March 6, 2020, pursuant to the Writ of Execution, the Trustee at a public auction purchased the SIC Property.

28.    By order enteredthe Rule 9019 Settlement Agreement effective as of March 166, 2020, and approved and entered by the U.S. Bankruptcy Court confirmedon June 4, 2020, attached hereto as **Exhibit "L,"** the sale ofCourt

approved the ~~Katzenstein-Acquired SIC Assets to Trustee Katzenstein. A true copy of the March 16, 2020 Order~~ is attached hereto as **Exhibit "D."**

~~16.     Katzenstein knew that he could not obtain rights to the Licensed Property. He therefore negotiated with SIC and obtained from SIC the right to use the Licensed Property. In exchange, Katzenstein committed to amongst other conditions not impair telecommunications service to HHL and granted SIC the right to use Paniolo Fiber Pairs on the Paniolo Assets to continue to provide telecommunications services to HHL. This agreement, entitled the Master Relationship Agreement dated March 6, 2020~~ **("MRA,")** ~~attached hereto as **Exhibit "E,"** , which was approved by the Bankruptcy Court by order dated June 4, 2020, allowed Katzenstein to use License 372 for the purposes authorized by SIC:~~

Rule 9019 Settlement Agreement between Trustee, Paniolo Creditors, SIC, and SIC Affiliates (Waimana, Pa Makani and Clearcom), which referenced, adopted and approved the Master Relationship Agreement (**"MRA"**), a copy of the MRA is attached hereto as **Exhibit "F."**

29.     Schedule 2, section 2.3 of the MRA states:

**2.3. Entitlements.** The Parties acknowledge and agree that: (a) that certain Department of Hawaiian Home Lands License Agreement No. 372 ("DHHL License"), together with (b) the easements, leases, license agreements, letters of approval, special area management permits, rights of way or rights of entry granted to SIC or an SIC Affiliate and identified on Exhibit B hereto (the "Entitlements") are necessary for the operation and maintenance of the Paniolo Network (or were necessary for the construction of the Paniolo Network). SIC hereby agrees to assign, transfer, or convey to Paniolo all  Entitlements **(other than the DHHL License)** that may by their terms be so  assigned or transferred and to the extent such assignment, transfer, or conveyance would not, in Paniolo's reasonable judgment, adversely affect service in the Hawaiian Home Lands. To the extent any Entitlement may not, by its terms, be so assigned or transferred, SIC shall (i) sublease or sublicense (as applicable) the Entitlement to Paniolo; or (ii) grant to Paniolo  the broadest possible right to use the Entitlement. For the avoidance of

doubt, the Parties acknowledge ~~Lind~~and agree ~~that~~that **DHHL License will not be  assigned by SIC to Paniolo**, but that SIC shall, and hereby does, grant to  Paniolo the full benefit and use of the DHHL License for the IRU Term provided Paniolo does not exercise its rights under such grant to impair service to HHL.

~~Id. at Schedule 2, section 2.3.~~

~~17.    Katzenstein then sold the Katzenstein-Acquired SIC Assets (together with Paniolo's Assets) to defendant Hawaiian Tel. A copy of~~

Emphasis added.

30.    Thus, regardless of whether the MRA was assumed by HTI, the SIC Property did not include and the Trustee did not obtain "SIC's interest in License Agreement No. 372 issued by the State of Hawaii Department of Hawaiian Home  Lands" listed in Schedule A-2 as the Trustee acknowledged that he did not obtain an assignment of SIC's interest in License 372 despite the wording in Schedule A2.

31.    In addition, the Trustee and HTI clearly did not obtain any portion of Waimana's interest in License 372 that was not assigned to SIC in the Partial Assignment, which includes Plaintiffs' right to provide (post FCC Order nonexclusive) telecommunications services other than voice only service on HHL including Pa Makani's Partial Assignment and Clearcom's Partial Assignment, and Plaintiffs' License 372 Easement areas that Plaintiffs developed on HHL.

32.    On November 30, 2020, without Waimana, Pa Makani, Clearcom or SIC's knowledge or concurrence, the Trustee and HTI entered into the Asset Purchase Agreement dated ~~November 30, 2020~~ ("~~"~~**APA**"~~"~~), a true copy of which is attached hereto as **Exhibit "~~F~~"G"** where Katzenstein agreed to sell SIC Property as limited by the MRA and Rule 9010 Settlement Agreement (together with Paniolo's Assets) to HTI.~~"~~

~~18~~33. On December 16, 2020, Ryan K. P. Kanakaole, Esq., the Deputy Attorney General representing DHHL filed papers in the Bankruptcy Court, a copy of which is attached hereto as **Exhibit "O,"** confirming that ~~because~~

Hawaiian Tel did not acquire the right to use License 372, "'The Buyer [HTI] will need to acquire a new license for the use of DHHL lands.'" The same

message was confirmed by HHC Chairman William Aila, in a emails dated January

6, 2021, to alhee@waimana.com that state states that License 372 has not

been cancelled, and: "'The License remains valid. DHHL informed the Court that any purchaser of the assets would require a license from DHHL.'" And by DHHL's filing on August 19, 2021 (Dkt 432), a copy of which is attached hereto as **Exhibit "P,"** DHHL reconfirmed that HTI needs a new license to build, construct, repair, maintain and operate on HHL.

19.    Katzenstein never had any rights to any real estate on HHL including the Licensed Property. License 372 was never assigned to Katzenstein. Because Katzenstein never owned any interest in License 372, he could not, and did not, sell to Hawaiian Tel any rights to occupy the Licensed Property.

20

34.    Moreover, even if HTI obtains a new license from DHHL, such easement cannot be in the same areas already granted to Plaintiffs under License 372 as that would constitute a breach of License 372 and breach of fiduciary duties by DHHL. In addition, even if for purposes of argument the Trustee obtained "SIC's interest in License Agreement No. 372 issued by the State of Hawaii  Department of Hawaiian Home Lands" listed in Schedule A-2 despite the Rule 9019 Settlement Agreement and the MRA (the determination of which involves discovery and questions of fact and a State Court determination of the scope of and rights under License 372), that does not eliminate Plaintiffs' License 372 Easement and right to provide non-voice telecommunications services on HHL.

35.    DHHL's 8/19/21 filing also disclosed the Limited Right-of Entry to HTI, which violates Plaintiffs' License 372 rights.[3] See, Plaintiffs lawsuit in First Circuit Court against DHHL for breach of License 372 and related claims, in Civil No. 1CCV-22-0000617, a copy of which without exhibits is attached hereto as **Exhibit "N."**

36.    On August 31, 2021, the APA sale to HTI closed.

37.    ~~Hawaiian Tel~~HTI had the opportunity to assume from Katzenstein ~~ail~~all of the benefits of MRA including the ~~use and enjoyment of SIC's rights under License 372~~defined Entitlements but decided not to assume it.

~~21~~38.    ~~Hawaiian Tel, however, chose not to assume that agreement that would have given it the right to use the Licensed Property.~~ At the time ~~Hawaiian Tel~~HTI made its choice not to assume this agreement with SIC, ~~Hawaiian Tel~~HTI knew that it was buying facilities located on ~~Waimana's and SIC's Licensed Property~~Plaintiffs' License 372 Easement.

~~22~~39.    ~~Hawaiian Tel'~~HTI's failure to assume ~~the right to use the Licensed Property~~this agreement was not inadvertent. ~~Hawaiian Tel~~HTI has repeatedly emphasized that its decision not to assume the agreement that allowed Katzenstein to use the License ~~Property~~372 Easement was deliberate and intentional. For example, in ~~Hawaiian Tel'~~HTI's motion filed in the U.S. Bankruptcy Court on November 16, 2021, attached hereto as **Exhibit "~~"~~"H,~~" Hawaiian Tel boldly~~"** HTI asserted that the agreements giving Paniolo the right to use License 372:

> were solely ~~"~~"Assignable Contracts~~"~~" which means they were contracts that could have been assigned by the Trustee to HTI at HTI~~'~~'s sole election. ... **HTI, however, did not elect to designate  any of the SIC Agreements as agreements to be assigned by the Trustee to HTI**

<u>Id.</u> at 14 (emphasis added).

---

[3] In section 13 of the Limited Right-of Entry, HTI refused to defend and indemnity DHHL for any claim brought by Waimana.

23.    Thus, Hawaiian Tel had the opportunity to acquire the right to use the Licensed Property but chose not to do so.

24.    On August 31, 2021, the APA sale of Paniolo's Assets from Katzenstein to Hawaiian Tel closed.

25.    Hawaiian Tel is a trespasser on the Licensed Property or in the alternative, a "hold over tenant" from Katzenstein's use rights under the MRA, which is unlikely because Hawaiian Tel knowingly rejected assignment of those rights.

26

40.    In addition, although Plaintiffs were parties to the 9019 Settlement Agreement approved by Order dated June 4, 2020 (Dkt 271), because HTI did not assume the MRA and Settlement Agreement, HTI cannot enforce Plaintiffs' commitments made therein including their agreement to provide access to the Transferred Assets and Equipment and HTI cannot bind Plaintiffs to commitments made therein as the settlement agreement included the representation that Plaintiffs entering into the settlement agreement was consideration for the Trustee entering into the MRA and committing that any assignor would be bound by the MRA.

41.    Thus, HTI is a trespasser on Plaintiffs' License 372 Easement.

42.    On and after August 31, 2021, Hawaiian TelHTI had no right to locate the assets it had purchased on the Licensed Property. Hawaiian TelPlaintiffs' License 372 Easement. HTI does not have a license allowing its assets to be on Licensed PropertyPlaintiffs' License 372 Easement.

27.    Hawaiian Tel purchased from Katzenstein certain facilities located on the Licensed Property, but has absolutely no interest in the land surrounding and under facilities. The rights to that land are held by Waimana and SIC pursuant to License 372.  Hawaiian Tel has no license nor any other right to use the Licensed Property under and surrounding its facilities on HHL.

~~28.    License 372 places strict and expensive obligations on Waimana and SIC to assure service to every customer on HHL.~~

~~29.    Hawaiian Tel acknowledges that it needs a license to operate its facilities on HHL, but to date has not obtained one.~~

~~30.    In License 372, DHHL granted Waimana the exclusive right to provide telecommunication service on HHL ("Exclusive **Service Right").** However, in addition to this Exclusive Service Right, License 372 also granted Waimana the exclusive right to possess the Licensed Property.~~

~~31.    Hawaiian Tel~~

43.    Plaintiffs are not aware whether DHHL has granted HTI any right to provide telecommunications services on HHL, and if DHHL is contemplating doing so, DHHL would breach fiduciary duties to its beneficiaries if that license does not include the same strict obligations that Waimana assumed in License 372 including paragraphs 6-9 of License 372 and if allowed use of the same easement areas licensed to Plaintiffs who are native Hawaiian entities.

44.    HTI may argue that the Federal Communications Commission ("**"FCC"**") order dated July 3, 2017 ("**"FCC Order"**"), attached hereto as **Exhibit "**"**I,"**"**

requires DHHL to provide access to the ~~Licensed Property~~License 372 Easement on the grounds that the FCC Order prohibits DHHL from granting an exclusive license to only one company to provide telecommunications services on HHL, i.e. the ~~Exclusive~~License 372 Service Right. However, the order does not require ~~Waimana and SIC~~Plaintiffs to share use of ~~the Licensed Property~~their License 372 Easement areas. The FCC Order only preempts the portion of the License that:

> grants one entity the "**"**"exclusive"**"** right "**"**to build, construct, repair, maintain and operate a . . . telecommunications network"**"** for the purpose of providing service to the residents of the Hawaiian home

lands and therefore prohibits other entities from doing so.

Id. at Page 7, Paragraph 16

~~32~~45. Under the severability provision of the License 372 at ~~section~~paragraph 22, while the ~~Exclusive~~exclusive License 372 Service Right may have been invalidated by the FCC Order, the order did not invalidate, and FCC does not have jurisdiction to invalidate ~~Waimana's and SIC's right to exclusive possession of the Licensed Property subject to DHHL's rights set forth in~~Plaintiffs' License 372 Easement or its non-exclusive License 372. ~~Waimana and SIC~~ Service Rights. Plaintiffs require exclusive possession to perform its telecommunications ~~obligationsrequired~~obligations required under License 372. Thus, ~~Waimana's and SIC's~~Plaintiffs' right to exclusive possession of ~~the Licensed Property~~their License 372 Easement areas survived the FCC Order, as did their rights and obligations to provide telecommunications services to HHL. An internal DHHL memo to the HHC dated January 18, 2022, a copy of which is attached hereto as **Exhibit "J",** states "~~"~~"DHHL has informed its lessees, tenants, and permittees that under Federal law they may obtain broadband telecommunications services from any provider of their choice.~~"~~"; confirming that the FCC ~~ORDER~~Order dealt with License 372 ~~Exclusive~~ Service Right, a copy of which is attached hereto as **Exhibit "G."**

~~33~~46. ~~Waimana and SIC are the owners of~~Plaintiffs own numerous improvements on the ~~properties licensed under~~License 372 Easement that were not obtained by Katzenstein and thus were **not** purchased by ~~Hawaiian Tel~~HTI and are still owned, maintained and used by ~~SIC and/or Waimana and/or Waimana's other subsidiaries~~Plaintiffs to provide service to their HHL customers. ~~Hawaiian Tel'~~HTI's destructive actions are interfering with ~~Waimana and its subsidiaries' including SIC's ability to continue to provide service to the residents of the HHL. Hawaiian Telcom are using these Licensed Properties~~Plaintiffs. HTI is using Plaintiffs' License 372 Easement and non-exclusive post FCC Order

License 372 Service Right for non-voice only telecommunications services on HHL without authorization or paying for such use.

34.    Waimana and SIC have repeatedly urged Hawaiian Tel to negotiate terms on which Hawaiian Tel can be allowed to use the Licensed Property, as Katzenstein did. Hawaiian Tel has refused to do so. Hawaiian Tel wants something it and Katzenstein knew was illegal and unfair - Hawaiian Tel wants to use the Licensed Property for free and without committing to not impair telecommunications service to HHL and the obligations of License 372 which DHHL and the HHC granted Waimana and SIC.

35.    BecausekIa_waiian **Tel has.no right** to locate its fArtilities.on **Waimana and** SIC's Licensed Property, and Hawaiian Tel has refused to negotiate satisfactory terms for the use of those licensed lands, and Hawaiian Tel continues to damage assets they do not own, Waimana had no choice but to demand that Hawaiian Tel remove its facilities from Waimana and SIC's licensed lands. A true copy of the February 10, 2022, demand letter is attached as **Exhibit "J".**

36.    Since August 31, 2021, Hawaiian Tel has changed the locks on SIC warehouses, continues to damage SIC's security fencing, including cutting SIC's locking mechanisms, and has caused SIC to cut Hawaiian Tel's locks to gain access to Waimana and SIC's facilities located on Waimana and SIC's licensed lands. Numerous police reports of these incidents have been made.

37.    Despite SIC's and Waimana's demands to follow its security protocols, Hawaiian Tel has failed and refused to stop destroying SIC's property trespassing and remove its facilities from Waimana and SIC's licensed lands.

38.    License 372 *grants* Waimana and SIC an interest **in land.**

39.    Despite warnings from Waimana and SIC, Hawaiian Tel has repeatedly cut locks and damaged Waimana's and SIC's improvements that Katzenstein has never owned and therefore Hawaiian Tel does not, and could not

~~own. A copy of Hawaiian Tel's letter asserting their alleged "justification" for doing so is attached hereto as~~ **Exhibit "K,"** ~~which only proves that Hawaiian Tel is unfairly competing with Waimana and SIC by usurping Waimana's and SIC's Licensed Property and SIC's "last mile" facilities without compensation, and destroying relations with DHHL and HHL customers~~

47.    HTI's letter March 11, 2022 asserting their rights under the FCC Order and Limited Right of Entry attached hereto as **Exhibit "K,"** only proves that HTI is wrongly using Plaintiffs' License 372 Service Rights and Plaintiffs' License 372 Easement areas.

COUNT I - TRESPASS

~~40~~48. ~~Waimana and SIC~~Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through ~~39~~45 hereinabove.

~~41~~49. ~~Hawaiian Tel~~HTI is a trespasser ~~or holdover tenant, squatting on land licensed to Waimana and SIC pursuant to License 372 and~~ preventing ~~Waimana and SIC~~Plaintiffs from ~~using the Licensed Property and serving~~exclusive unimpeded use and occupancy of their License 372 Easement areas to serve HHL lessees.

~~42~~50. ~~Hawaiian Tel~~HTI has no license, nor any other legal right, to occupy ~~SIC's and Waimana's Licensed Property~~Plaintiffs' License 372 Easement.

~~43~~51. ~~SIC is~~Plaintiffs are entitled to: (a) an injunction barring ~~Hawaiian Tel~~HTI from access to ~~the Licensed Property~~their License 372 Easement, and/or a similar judgment for possession of ~~the Licensed Property under~~their License 372 Easement areas and an order evicting of ~~Hawaiian Tel~~HTI from ~~the Licensed Property~~their License 372 Easement areas and an order to remove any property of ~~Hawaiian Tel~~HTI located thereon, (b) damages for wrongfully using ~~the Licensed Property~~Plaintiffs' License 372 Easement areas in violation of ~~Waimana and SIC'~~Plaintiff's rights under License 372 including damages for use of the ~~Licensed~~

~~Property~~License 372 Easement and disgorgement of ~~Hawaiian Tel~~HTI profits; and (c) punitive damages.

## COUNT II – CONVERSION

~~44~~52. ~~Waimana and SIC~~Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through ~~43~~49 hereinabove.

~~45~~53. ~~Hawaiian Tel~~HTI has willfully used and damaged ~~Waimana's~~Plaintiffs' License 372 Easement areas and ~~SIC's~~ property located on ~~Waimana's and SIC's licensed premises, and~~thereon, which constitutes conversion.

54.    HTI has also willfully used without Plaintiffs' authorization ~~or compensation SIC's "last mile" facilities that~~their License 372 Service Right for all telecommunications services on HHL except voice only services granted to Plaintiffs as native Hawaiian organizations under Section 204(2) of the HHCA, which constitutes conversion.

~~46~~55. ~~Waimana and SIC~~Plaintiffs are entitled to judgment for damages in an amount to be proved at trial for: (a) the property damage caused by ~~Hawaiian Tel'~~HTI's tortious actions in

deliberately, repeatedly damaging ~~Waimana's and SIC's~~Plaintiffs' property; (b) lost profits and compensation for use of the ~~Licensed Property  and slisgorgementAf HawaiianIeLprofitsior use of SIC's lastraile" facilities~~License 372 Easement areas and License 372 Service Rights; (c) disgorgement of HTI profits for use of Plaintiffs' License 372 Easement areas and License 372 Service Rights; and (c) punitive damages.

## COUNT III – UNFAIR COMPETITION

~~47~~56. ~~Waimana and SIC~~Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through ~~46~~52 hereinabove.

~~48~~57. ~~Hawaiian Tel~~HTI is a competitor with ~~Waimana and SIC~~Plaintiffs in the telecommunications business.

49 58. Hawaiian Telecom HTI engaged in unfair methods of competition by usurping Waimana and SIC's land rights under the Plaintiffs License 372 Easements and SIC's "last mile" facilities their License 372 Service Rights without compensation, and destroying relations with their DHHL and HHL customers.

50 59. Hawaiian Tel' HTI's above-described conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

51 60. Hawaiian Tel' HTI's conduct negatively affects competition and harms fair competition as provided for in the Telecommunications Act of 1996 by impeding Waimana and SIC's operation Plaintiffs' operations on HHL.

52 61. Waimana and SIC Plaintiffs have been damaged in its business and property by Hawaiian Tel' HTI's unfair methods of competition in an amount to be proven at trial.

COUNT IV – INTENTIONAL INTERFERENCE OF CONTRACT

62.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 58 hereinabove.

63.   The elements of tortious interference with contractual relations include:

1) a contract between the plaintiff and a third party; 2) the defendant's knowledge of the contract; 3) the defendant's intentional inducement of the third party to breach the contract; 4) the absence of justification on the defendant's part ; 5) the subsequent breach of the contract by the third party; and 6) damages to the plaintiff. It is of the essence in an action for wrongful interference with contractual relationships that the plaintiff suffer damages as a consequence of the defendant's conduct, and these damages cannot be speculative or conjectural losses.

Ace Quality Farm Prods., Ltd. Liab. Co. v. Hahn, 136 Hawai'i 373, 362 P.3d 806 (App. 2015).

64.    Here, 1) Plaintiffs have License 372 agreements with DHHL; 2) HTI knew of them; 3) HTI intentionally enticed, encouraged and induced DHHL to breach these agreements with Plaintiffs; 4) For numerous reasons HTI had no justification for doing so, including but not limited to rejecting the MRA and 9019 Settlement Agreement and over reaching by using Plaintiffs' License 372 rights that clearly were never transferred to HTI, particularly for data (non-voice) telecommunications; 5) encouraged and induced DHHL to breach its obligations to Plaintiffs under License 372 by entering into the Limited Right-of Entry, making filings in this Court and potentially negotiating a new license with HTI that violate Plaintiffs rights under License 372 and Partial Assignments to Pa Makani and Clearcom; and 6) which damaged Plaintiffs' business on HHL.

COUNT V – DECLARATORY RELEIF

65.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 61 hereinabove.

66.    Plaintiffs are entitled to a declaratory relief determination that by entering into the Rule 9019 Settlement Agreement and MRA that were approved by Order dated June 4, 2020 (Dkt 271), attached hereto as **Exhibit "L,"** even though HTI did not assume these agreements, (a) the Trustee nonetheless did not obtain "SIC's interest in License Agreement No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands" listed in Schedule A-2 as the Trustee acknowledged in Schedule 2, section 2.3 of the MRA that SIC did not assign its interests in License 372, which Plaintiffs have an interest in because they use SIC's excess capacity to provided non-voice telecommunications services; and (b) although Plaintiffs were parties to the 9019 Settlement Agreement, because HTI also refused to assume the MRA, HTI cannot enforce Plaintiffs' commitments made in the settlement agreement including the agreement to provide access to the Transferred Assets and Equipment as it would be unfair to continue to bind Plaintiffs to those commitments as Trustee's agreement to enter into the MRA and

including the commitment that any "purchaser or assignee approved by the Court shall be bound by the terms of the" MRA, was consideration for Plaintiffs entering into the settlement agreement.

67.   Plaintiffs are entitled to a declaratory relief determination that the SIC Partial Assignment only provided SIC with the right to provide voice only service on HHL and no other telecommunications services throughout Hawaii, including wireless that was assigned to Pa Makani and broadband that was assigned to Clearcom.

68.   Plaintiffs are entitled to a declaratory relief determination that the SIC Partial Assignment did not include Plaintiffs' License 372 Easement areas.

WHEREFORE, Plaintiffs ~~pray~~prays the Court grant the following relief:

1.   Issuance of a judgment for eviction against ~~Hawaiian Tel~~HTI, evicting ~~Hawaiian Tel~~HTI from ~~Licensed Areas~~Plaintiffs License 372 Easement areas and to remove its property therefrom;

2.   Issuance of a Writ of Possession in favor of ~~plaintiffs~~Plaintiffs and against ~~defendant Hawaiian Tel~~HTI directing the sheriff to remove ~~Hawaiian Tel~~HTI from the lands covered by ~~plaintiffs'~~Plaintiffs' License 372 Easement areas;

3.   For a temporary restraining order and preliminary and permanent injunctions enjoining HTI from occupying ~~the~~ ~~licensed Property~~the Plaintiffs' License 372 Easement areas and prohibiting ~~Hawaiian~~ ~~Zel~~ HTI from ~~–~~ damaging ~~Wamana's and SIC's~~Plaintiffs' facilities and property located ~~on the Licensed Property and last mile facilities~~ on HHL.

4.   For damages in an amount to be determined at trial.

5.   For treble damages in an amount be determined at trial.

6.   For punitive damages in an amount to be determined at trial.

7.   Declaratory relief set forth in Count V.

8.     For plaintiffs' reasonable costs and attorneys' fees incurred herein.

89.    For such other and further relief as the Court deems just.

DATED: Honolulu, Hawai'i, May 27, 2022.

Document comparison by Workshare 10.0 on Thursday, June 9, 2022 12:10:54 PM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\mp019088\Documents\WS\Complaint Against HTI.docx |
| Description | Complaint Against HTI |
| Document 2 ID | file://C:\Users\mp019088\Documents\WS\Amended Complaint against HTI (#28).docx |
| Description | Amended Complaint against HTI (#28) |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 326 |
| Deletions | 270 |
| Moved from | 16 |
| Moved to | 16 |
| Style changes | 0 |
| Format changes | 0 |
| Total changes | 628 |

MEHEULA LAW, LLLC
A Limited Liability Law Company

WILLIAM MEHEULA          (2277)
D. KAENA HOROWITZ        (9836)
Pacific Guardian Center, Makai Tower
733 Bishop Street, Suite 2900
Honolulu, Hawai'i 96813
Telephone: (808) 599-9555
Facsimile: (808) 533-2467
Email: meheula@smlhawaii.com; kaena@smlhawaii.com

Attorneys for Plaintiffs
WAIMANA ENTERPRISES INC.,
PA MAKANI LLC and CLEARCOM, INC.

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| In re<br><br>PANIOLO CABLE COMPANY, LLC,<br><br>Debtor.<br>_____<br><br>WAIMANA ENTERPRISES INC., PA MAKANI LLC, CLEARCOM, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>HAWAIIAN TELCOM INC.,<br><br>Defendant.<br>_____ | Case No. 18-01319<br>(Chapter 11)<br><br><br>Adversary Proceeding No. 22-90008<br><br>PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION BY HAWAIIAN TELCOM, INC. TO DISMISS THE FIRST AMENDED COMPLAINT IN ITS ENTIRETY, FILED JUNE 10, 2022 [DKT. 35]<br><br>HEARING:<br>Date: Friday, July 15, 2022<br>Time: 10:00 a.m.<br>Judge: The Honorable Robert J. Faris |

TABLE OF CONTENTS

I.     LEAVE TO FILE FIRST AMENDED COMPLAINT ALLOWED
       PLAINTIFFS TO ASSERT ALLEGATIONS AND CLAIMS TO
       PROTECT THEIR INTERESTS.......................................................1

II.    THE ORDER GRANTING THE TENTATIVE RULING ALSO
       GRANTED LEAVE TO FILE AN AMENDED COMPLAINT...................1

III.   THE FINAL ENFORCEMENT ORDER IS SUBJECT TO
       RECONSIDERATION BASED ON FAC.......................................1

IV.    PLAINTIFFS' INTERPRETATION OF LICENSE 372 IS REASONABLY
       BASED ON ITS TERMS ...............................................................2

V.     MOTION DOES NOT ADDRESS THE MERITS OF FAC ¶¶ 28-30...........8

VI.    MOTION DOES NOT ADDRESS PLAINTIFFS' LICENSE 372
       RIGHTS.....................................................................................11

VII.   CONCLUSION..........................................................................12

## TABLE OF AUTHORITIES

**Cases**

In re T.H.G. Marital Trs.,
   139 Hawai'i 37, 383 P.3d 140 (App. 2016) ........................................................2

Kiehm v. Adams,
   109 Hawai'i 296, 126 P.3d 339 (2005) ...............................................................7

**Other Authorities**

Hawaii Admin. Rules §10-4-22 ..................................................................................4

Hawaiian Homes Commission Act, Section 207(c)(1)(A) .......................................4

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION BY
HAWAIIAN TELCOM, INC. TO DISMISS THE FIRST AMENDED
<u>COMPLAINT IN ITS ENTIRETY, FILED JUNE 10, 2022 [DKT. 35]</u>

HTI's Motion to Dismiss the First Amended Complaint ("**Motion**") should

be rejected because:

## I.   LEAVE TO FILE FIRST AMENDED COMPLAINT ALLOWED PLAINTIFFS TO ASSERT ALLEGATIONS AND CLAIMS TO PROTECT THEIR INTERESTS

Leave to file the First Amended Complaint ("**FAC**") allowed Plaintiffs to

drop SIC as a plaintiff and to assert allegations and claims to protect Plaintiffs'

interests in License 372.  The FAC did that and the Plaintiffs needed to make the

most of this amendment opportunity because as the Court noted at the hearing:

"There's a strong preference for allowance of at least one amendment in this

process."

## II.   THE ORDER GRANTING THE TENTATIVE RULING ALSO GRANTED LEAVE TO FILE AN AMENDED COMPLAINT

The order granting the Tentative Ruling [Dkt #31] also "granted leave to file

an Amended Complaint".

## III.   THE FINAL ENFORCEMENT ORDER IS SUBJECT TO RECONSIDERATION BASED ON FAC

The Final Enforcement Order filed on May 17, 2022 does not automatically

restrict the First Amended Complaint because Waimana filed a motion for

reconsideration [Dkt # 740] that incorporated by reference the FAC.  Thus, HTI's

Motion to Dismiss should address the merits of the FAC.

## IV.   PLAINTIFFS' INTERPRETATION OF LICENSE 372 IS REASONABLY BASED ON ITS TERMS

Plaintiffs' interpretation of License 372 as creating exclusive possessory rights on areas of HHL that Waimana or its assignees developed is reasonably based on language of License 372.  On the other hand, HTI's interpretation "strains the contract language beyond its reasonable and ordinary meaning", In re T.H.G. Marital Trs., 139 Hawaiʻi 37, 383 P.3d 140 (App. 2016), and if the Court determines that License 372 is ambiguous then a trial in State Court with DHHL as a necessary party is required, and that case is probably Civil No. 1CCV-22-0000617, attached to the FAC as Exhibit "N."

Plaintiffs' interpretation is explained in the FAC.  The FAC in ¶20 at 7 quoted the "NOW THEREFORE paragraph" of License 372 and inserted **[1]** and **[2]** and **footnote 1** as follows:

> NOW THEREFORE, LICENSOR, in consideration of the services to be provided by LICENSEE [Waimana], and the terms, conditions and covenants herein contained on the part of LICENSEE to be kept, observed and performed, hereby grants and issues to LICENSEE, and its legal successors and assigns, the **[1]** exclusive right and privilege to build, construct, repair, maintain and operate a broad band telecommunications network including poles, overhead and/or underground lines, appliances, microwave and/or other types of equipment over, across, under and throughout all lands under the administration and jurisdiction of LICENSOR, and its legal successors and assigns, including the right to trim and keep trimmed any vegetation, shrubbery, bushes or trees in the way of its lines and appurtenances, and **[2]** including also the right of entry upon the **Easement [easement area]** and adjoining land of LICENSOR for the construction, maintenance, operation and removal of LICENSEE'S line and appurtenances over, across and under the LICENSE area. **[Footnote 1]**

2

Footnote 1:

> Section [1] is the exclusive right to provide telecommunications services throughout HHL that the FCC Order preempted by its Memorandum Opinion and Order dated 7/3/17, where the FCC Order removed the exclusivity aspect of the service right on HHL. ("**License 372 Service Right**").[1]
>
> Section [2] is the License exclusive easement granted by DHHL to Waimana in License 372 for certain areas of HHL, i.e. "the <u>**easement area**[2] and adjoining land of LICENSOR for the construction, maintenance, operation and removal of LICENSEE'S line and appurtenances over, across and under the LICENSE area</u>." ("**License 372 Easement**").

The second paragraph of Footnote 1, hereinafter referred to as "**Section [2]**" is the

Plaintiffs' interpretation.  Importantly, while  "LICENSE area" is all of HHL, the

---

[1] The Motion at 10-11 argues that the FCC Order rejected SIC's argument that the exclusivity only applies to construction of telecommunications infrastructure because on its face the exclusive license binds DHHL to prohibit construction and operation of a telecommunications network.  Plaintiffs are not repeating that argument.  Plaintiffs concede that the effect of the FCC Order is the DHHL must allow other carriers to provide service on DHHL and to develop on DHHL. However, the FCC Order did not and could not order a transfer Plaintiffs' License 372 or their improvements to other carriers, and under the severability provision of the License 372 at § 22, while the exclusive License 372 Service Right may have been invalidated by the FCC Order, the order did not invalidate Plaintiffs' rights to their Premises or easement area which survived the FCC Order.  <u>See</u> FAC at ¶45.

[2] The Motion at footnote 7 noted the misquote of "Easement" instead of "easement area".  That was a clerical mistake.  Note that "easement area" is correctly quoted in Footnote 1.  Plaintiff's interpretation did not rely on use of "Easement" instead "easement area" , and in fact the interpretation relies on "easement area" because the easement area is limited to the HHL area that Waimana or its assignees developed.

"easement area" is only those areas of HHL that Waimana or its assignees developed.

The Motion at 8 argues that this "easement area" is a "mere right of entry" but Waimana and DHHL understood that Waimana or its approved assignees would have an exclusive right to possess and use the areas of HHL that they developed under License 372. Why would Waimana or its approved assignees expend large sums to develop telecommunications improvements on parts of HHL if DHHL could share it with other carriers without Waimana or its assignees' consent?

HTI's interpretation is inconsistent with Section 207(c)(1)(A) of the Hawaiian Homes Commission Act ("**HHCA**") that is referenced in License 372 at 1. Section 207(c)(1)(A) provides:

> **(1)** The department is authorized to grant licenses as easements for railroads, **telephone lines**, electric power and light lines, gas mains, and the like. The department is also authorized to grant licenses for lots within a district in which lands are leased under the provisions of this section, for:
> **(A)** Churches, hospitals, public schools, post offices, and other improvements for public purposes;

DHHL administrative rule HAR §10-4-22 similarly states

> Licenses as easements for railroads, telephone lines, electric power and light lines, gas mains and the like, and licenses for improvements for public purposes, including but not limited to schools, post offices, parks, beaches, fire stations, and other public facilities may be granted, in perpetuity or a specified term, subject to reverter to the department upon termination or abandonment, on such terms and conditions as may be prudently and reasonably set by the department.

4

The term of License 372 is in perpetuity.  License 372 at 1 states: "TO HAVE AND TO HOLD the same unto LICENSEE, its legal successors and assigns, in perpetuity, commencing on May 1, 1995, unless sooner terminated as hereinafter provided".

The provisions of License 372 support Plaintiffs' interpretation.  Sections 19, 20 and 23 state:

> 19.    <u>BREACH</u>.  If LICENSEE shall substantially fail to observe or perform any of the conditions herein contained and on its part to be observed or performed and such failure or lack of substantial compliance shall continue for sixty (60) days after the receipt by certified mail or written notice of such failure to the address of LICENSEE, or if LICENSEE shall abandon the premises, then and in any such event LICENSOR may, at its option, cancel this LICENSE Agreement <u>and, thereupon, take immediate possession of the premises, allowing LICENSEE reasonable time to remove its property therefrom</u>, without prejudice to any remedy or right of action that LICENSOR may have against LICENSEE.

> 20.    RIGHT OF ENTRY.  LICENSOR and its duly authorized representatives shall have the <u>right to enter the Premises at all times for the purposes of conducting its own inspection and to ensure that LICENSEE is in compliance with the provisions of this LICENSE</u>.

> 23.    <u>DEFINITION</u>.  The word **"premises"**, when it appears herein, includes and shall be deemed to <u>include the **lands** described above and **improvements** whenever and wherever erected or placed thereon</u>.

Emphasis added.  These sections support Plaintiffs' interpretation because DHHL only reserved for itself the types of limited rights that lessors' retain to enforce any breach and to conduct reasonable inspections.  The definition of **"Premises"** as land that Waimana erects improvements upon is completely consistent with

5

Plaintiffs' interpretation and inconsistent with HTI's interpretation that License 372 did not grant Waimana exclusive possessory rights to the areas it developed but only a right to enter, meaning DHHL reserved the right to allow others to enter those areas that Waimana developed.  License 372 does not support this interpretation.

The Motion at 9 argues that Section 17 requires DHHL to approve plans and specifications.  Of course, but once DHHL approves a development plan for certain HHL areas, when that development is completed, those "lands" and "improvements" become "Premises" and "easement areas", which under License 372 are the synonymous.

The Motion also cites to Section 15 regarding abandonment, but Plaintiffs have not abandoned its "Premises" and "easement areas".  Similarly, Section 16 regarding relocation does not apply because DHHL has not sought to relocate Waimana or its assignees.  Again, in Section 15 and 16, DHHL reserved limited lessor-type rights to terminate possession where Waimana abandoned the "Premises" or to relocate Waimana only where "continued exercise of the easement rights granted herein constitutes an undue interference with a subdivision or other development of the land over which the granted easement crosses."

6

The exclusive right to use the premises and easement areas is also supported by DHHL's communications to Plaintiffs and HTI that License 372 remains valid and HTI needs its own license.  See FAC ¶ 33 states:

> 33.    On December 16, 2020, Ryan K. P. Kanakaole, Esq., the Deputy Attorney General representing DHHL filed papers in the Bankruptcy Court, a copy of which is attached hereto as **Exhibit "O,"** confirming that, "The Buyer [HTI] will need to acquire a new license for the use of DHHL lands."   The same message was confirmed by HHC Chairman William Aila, in emails dated January 6, 2021, to alhee@waimana.com that states that License 372 has not been cancelled, and: "The License remains valid. DHHL informed the Court that any purchaser of the assets would require a license from DHHL."  And by DHHL's filing on August 19, 2021 (Dkt 432), a copy of which is attached hereto as **Exhibit "P,"** DHHL reconfirmed that HTI needs a new license to build, construct, repair, maintain and operate on HHL.

Based on the provisions in License 372, under Hawaii law, it is more a kin to a lease than a license and regardless is an interest in real property.  <u>Kiehm v. Adams</u>, 109 Hawaiʻi 296, 297, 126 P.3d 339, 340 (2005) ("Whether an agreement is a license or a lease depends on the intention of the parties as ascertained from the nature of the agreement. There are several factors that a court should consider in determining whether an agreement is a lease or a license: (1) most importantly, does the grantee have the right to occupy a distinct and separate part of the premises; (2) is the grantee's right to possession assignable (suggesting a lease) or is it a personal privilege (suggesting a license); and (3) is the agreement for a fixed term (suggesting a lease).")  License 372 satisfies the three factors for a lease.

7

In summary, based on the allegations in the FAC and documents referenced therein, the "factual content…allows the court to draw the reasonable inference that" License 372 provides Plaintiffs and SIC with exclusive possessory rights to the Premises and easement areas subject to DHHL's limited rights discussed above.  Thus, HTI clearly has no rights to Plaintiffs' License 372 "Premises" or "easement area".  If the Court finds any merit to HTI's interpretation, then License 372 is ambiguous and a State Court determination with DHHL as a necessary party is required to resolve it.

## V.   MOTION DOES NOT ADDRESS THE MERITS OF FAC ¶¶ 28-30

HTI does not address the merits of FAC ¶¶28-30 that clearly demonstrates that under the Rule 9019 Settlement Agreement and the MRA that were approved by this Court, the Trustee never obtained SIC's interest in License 372, and even though HTI did not assume those agreements, that does not change the fact that the Trustee nonetheless agreed that he did not obtained title to SIC's interest in License 372.

FAC at ¶¶28-30 clearly establish that the Trustee never obtained SIC's interests in License 372:

> 28.    By the Rule 9019 Settlement Agreement effective as of March 6, 2020, and approved and entered by the Bankruptcy Court on June 4, 2020, attached hereto as **Exhibit "L,"** the Court approved the Rule 9019 Settlement Agreement between Trustee, Paniolo Creditors, SIC, and SIC Affiliates (Waimana, Pa Makani and Clearcom), which referenced, adopted

8

and approved the Master Relationship Agreement ("**MRA**"), a copy of the MRA is attached hereto as **Exhibit "F."**

29.     Schedule 2, section 2.3 of the MRA states:

**2.3. Entitlements.** The Parties acknowledge and agree that: (a) that certain Department of Hawaiian Home Lands License Agreement No. 372 ("**DHHL License**"), together with (b) the easements, leases, license agreements, letters of approval, special area management permits, rights of way or rights of entry granted to SIC or an SIC Affiliate and identified on Exhibit B hereto (the "**Entitlements**") are necessary for the operation and maintenance of the Paniolo Network (or were necessary for the construction of the Paniolo Network). <u>**SIC hereby agrees to assign**, transfer, or convey to Paniolo all Entitlements **(other than the DHHL License)** that may by their terms be so assigned or transferred and to the extent such assignment, transfer, or conveyance would not, in Paniolo's reasonable judgment, adversely affect service in the Hawaiian Home Lands. **To the extent any Entitlement may not, by its terms, be so assigned or transferred, SIC shall** (i) sublease or sublicense (as applicable) the Entitlement to Paniolo; or (ii) grant to Paniolo the broadest possible right to use the Entitlement. For the avoidance of doubt, the Parties acknowledge and agree that **DHHL License will not be assigned by SIC to Paniolo**, but that SIC shall, and hereby does, grant to Paniolo the full benefit and use of the DHHL License for the IRU Term provided Paniolo does not exercise its rights under such grant to impair service to HHL.</u>

Emphasis added.

30.     Thus, regardless of whether the MRA was assumed by HTI, the SIC Property did not include and the Trustee did not obtain "<u>SIC's interest in License Agreement No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands</u>" listed in Schedule A-2 as the Trustee acknowledged that he did not obtain an assignment of SIC's interest in License 372 despite the wording in Schedule A-2.

Instead of attempting to address these allegations on the merits, HTI relies

on the Marshall Sale Order, the 363 Sale Order and the Final Enforcement Order.

9

They, however, do not vest or re-vest the Trustee with "SIC's interests in License Agreement No. 372".

The Marshall Sale Order was superseded by the Rule 9019 Settlement Agreement and the MRA approved on June 4, 2020, attached to the FAC as Exhibit "L".

The 363 Sale Order at section 7 states that Transferred Assets are free of all interests and claims but under the Rule 9019 Settlement Agreement and the MRA, SIC's interest in License 372 was never obtained by the Trustee.  Thus, SIC's interests in License 372 was not a Transferred Asset.

And as noted above, the Final Enforcement Order is being challenged by Waimana's motion for reconsideration that incorporated by reference the FAC.

Thus, dismissal is inappropriate.  Instead, discovery and a trial on the how MRA, Schedule 2, section 2.3 came about, what the MRA parties including the Trustee understood it meant as far as the transfer of SIC's interest in License 372,[3] and the effect of HTI not assuming the Rule 9019 Settlement Agreement and the MRA.  These types of inquires will inform the trier of fact as to whether there was a meeting of minds regarding any transfer of SIC's interest in License 372.

---

[3] MRA at § 13 requires good faith negotiation between SIC and the Trustee before resorting to litigation.

10

## VI.   MOTION DOES NOT ADDRESS PLAINTIFFS' LICENSE 372 RIGHTS

The Motion also does not address Plaintiffs' License 372 rights, apart of SIC's, because at best the Trustee only acquired SIC rights but not Waimana's, Pa Makani's or Clearcom's interests in License 372.  Moreover, SIC's interests in License 372 (even if they were acquired by the Trustee and they were not) only apply to voice and not wireless or broadband.  Finally, by not assuming the Rule 9019 Settlement Agreement and MRA, HTI cannot enforce Plaintiffs' commitments made therein including their agreement to provide access to the Transferred Assets and Equipment.   See FAC ¶31 and ¶40 that state:

> 31.    In addition, the Trustee and HTI clearly did not obtain any portion of Waimana's interest in License 372 that was not assigned to SIC in the Partial Assignment, which includes Plaintiffs' right to provide (post FCC Order non-exclusive) telecommunications services other than voice only service on HHL including Pa Makani's Partial Assignment and Clearcom's Partial Assignment, and Plaintiffs' License 372 Easement areas that Plaintiffs developed on HHL.

> 40.    In addition, although Plaintiffs were parties to the 9019 Settlement Agreement approved by Order dated June 4, 2020 (Dkt 271), because HTI did not assume the MRA and Settlement Agreement, HTI cannot enforce Plaintiffs' commitments made therein including their agreement to provide access to the Transferred Assets and Equipment and HTI cannot bind Plaintiffs to commitments made therein as the settlement agreement included the representation that Plaintiffs entering into the settlement agreement was consideration for the Trustee entering into the MRA and committing that any assignor would be bound by the MRA.

The Motion did not address these allegations that require discovery and summary judgment or a trial to resolve.

11

## VII. CONCLUSION

Therefore, based on the FAC and documents referenced therein:

(a) Plaintiffs' FAC claims should not be dismissed as: (i) the Trustee did not purchase Waimana, Pa Makani and Clearcom assets and rights including their License 372 rights from the Marshall Sale, (ii) SIC's interests in License 372 (even if they were acquired by the Trustee and they were not) only apply to voice and not wireless or broadband, and (iii) HTI did not assume the Rule 9019 Settlement Agreement, thus HTI cannot enforce any of Plaintiffs' commitments made therein including their agreement to provide access to the Transferred Assets and Equipment; and

(b) Plaintiffs should be able to use SIC's interests in License 372 because the Trustee agreed that he did not obtain them in the Court approved MRA, and HTI's decision to not assume the MRA did not vest or re-vest the Trustee with SIC's interests in License 372.

DATED:  Honolulu, Hawaiʻi, July 1, 2022.

/s/ William Meheula
WILLIAM MEHEULA
D. KAENA HOROWITZ

Attorneys for Plaintiffs
WAIMANA ENTERPRISES INC.,
PA MAKANI LLC, and CLEARCOM, INC.

12

**File a Response to a Motion:**

22-90008 Waimana Enterprises Inc et al v. Hawaiian Telcom Inc.

Type: ap                              Office: 1 (Honolulu)                        Judge: rjf
Lead Case: 1-18-bk-1319          Case Flag: TRANSIN, JuryTrial

## United States Bankruptcy Court

## District of Hawaii

Notice of Electronic Filing

The following transaction was received from William K. Meheula entered on 7/1/2022 at 4:36 PM HST and filed on 7/1/2022

**Case Name:**         Waimana Enterprises Inc et al v. Hawaiian Telcom Inc.
**Case Number:**       22-90008
**Document Number:** 40

**Docket Text:**
Opposition to Motion by Hawaiian Telcom, Inc. to Dismiss the First Amended Complaint in Its Entirety, Filed June 10, 2022 . Filed by Plaintiffs Clearcom, Inc., Pa Makani LLC, Waimana Enterprises Inc. (Related document(s):[35] Motion to Dismiss Complaint / Claim). (Meheula, William)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** 2022-07-01 Opp Mtn Dismiss FAC_Final.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1018307671 [Date=7/1/2022] [FileNumber=4399822-0]
[6fc2ccd08345f1ed081f1b92567223e7aa153996c8d866a2f6ca9c0e343736f3cae4
8fe75f0b212ba5a91fc3086151ab5951a672213f2b61ef0529dff78fe75f]]

**22-90008 Notice will be electronically mailed to:**

William K. Meheula, III on behalf of Plaintiff Clearcom, Inc.
bill@meheulalaw.com, sandi@smlhawaii.com

William K. Meheula, III on behalf of Plaintiff Pa Makani LLC
bill@meheulalaw.com, sandi@smlhawaii.com

William K. Meheula, III on behalf of Plaintiff Waimana Enterprises Inc
bill@meheulalaw.com, sandi@smlhawaii.com

Ted N. Pettit on behalf of Defendant Hawaiian Telcom Inc.
tnp@caselombardi.com, mav@caselombardi.com;elm@caselombardi.com;paa@caselombardi.com

Lex R. Smith on behalf of Plaintiff Sandwich Isles Communications, Inc.
lsmith@ksglaw.com, jkeane@ksglaw.com;myw@ksglaw.com

**22-90008 Notice will not be electronically mailed to:**

CASE LOMBARDI & PETTIT
A LAW CORPORATION

TED N. PETTIT                                   4287-0
Email: tnp@caselombardi.com
DAVID G. BRITTIN                                8686-0
Email: dbrittin@caselombardi.com
Pacific Guardian Center, Mauka Tower
737 Bishop Street, Suite 2600
Honolulu, Hawaii  96813
Telephone: (808) 547-5400 | Fax: (808) 523-1888

MORGAN, LEWIS & BOCKIUS LLP
ANDREW J. GALLO *(Pro Hac Vice)*
One Federal Street
Boston, MA 02110-1726
Phone: +1 (617) 951-8117
Email:  andrew.gallo@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
MELISSA Y. BOEY *(Pro Hac Vice)*
1400 Page Mill Road | Palo Alto, CA 94304
Phone: +1 (650) 843-4000
Email:  melissa.boey@morganlewis.com

Attorneys for HAWAIIAN TELCOM, INC.

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>PANIOLO CABLE COMPANY, LLC,<br><br>Debtor. | Case No. 18-01319 (RJF)<br>Chapter 11<br><br><br>*(Caption Continued to the Following Page)* |

WAIMANA ENTERPRISES INC.,
PA MAKANI LLC,
CLEARCOM, INC.,

                  Plaintiffs,

        vs.

HAWAIIAN TELCOM INC.,

                Defendant.

ADV NO. 22-90008

**REPLY IN SUPPORT OF MOTION BY HAWAIIAN TELCOM, INC. TO DISMISS THE FIRST AMENDED COMPLAINT IN ITS ENTIRETY**

Hearing:
Date:   July 15, 2022
Time:   10:00 a.m.
Judge:   Honorable Robert J. Faris

**REPLY IN SUPPORT OF
MOTION BY HAWAIIAN TELCOM, INC. TO DISMISS THE
<u>FIRST AMENDED COMPLAINT IN ITS ENTIRETY</u>**

## TABLE OF CONTENTS

I.      Introduction............................................................................................1

II.     The Plaintiffs' desire for parallel, repeated litigations is untenable..............3

III.    The Plaintiffs' interpretation of license 372 lacks a cognizable
        legal theory ..........................................................................................7

        a.      The Plaintiffs' interpretation of License 372 is inconsistent
                with their own operation of the 372 License........................................8

        b.      The Plaintiffs' interpretation of License 372 is inconsistent
                with a plain reading of the license and is unsupported by law ..........10

IV.     The remainder of the Plaintiffs' opposition does not offer any
        legitimate grounds precluding dismissal  ....................................................12

V.      Dismissal with prejudice is warranted..........................................................15

VI.     Conclusion ..............................................................................................17

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bolden v. McCabe, Weisberg & Conway, LLC*,
    Case No. 13-1265, 2014 WL 994066 (D. Md. Mar. 13, 2014),
    *aff'd,* 584 F. App'x 68 (4th Cir. 2014) ...............................................................17

*Bond Opportunity Fund II, LLC v. Heffernan*,
    340 F. Supp. 2d 146 (D.R.I. 2004) ....................................................................17

*Gavin v. Dep't of Air Force*,
    314 F. Supp. 3d 297 (D.D.C. 2018) ...................................................................16

*In re Gonzalez*,
    Case No. 08-01756, 2012 WL 603747
    (B.A.P. 9th Cir. Feb. 2, 2012) ..............................................................................4

*Hamlin v. Robinson*,
    Case No. 07-3025, 2007 WL 1583591
    (E.D. Wash. May 31, 2007) ............................................................................ 4-5

*In re Hillis Motors, Inc.*,
    120 B.R. 556 (Bankr. D. Haw. 1990) ...................................................................4

*Johnson v. Buckley*,
    356 F.3d 1067 (9th Cir. 2004) ...........................................................................15

*Larson v. Liberty Mut. Fire Ins. Co.*,
    Case No. 09-00308, 2010 WL 1962942 (D. Haw. May 13, 2010),
    *aff'd,* 509 F. App'x 641 (9th Cir. 2013) ...........................................................17

*Levy v. Wells Fargo Bank*,
    Case No. 11-00159, 2011 WL 4104155 (D. Haw. Sept. 14, 2011).....................4

*M.R. v. Girl Scouts of Greater Chicago & Nw. Indiana*,
    Case No. 1:12-CV-06066, 2012 WL 12542828
    (N.D. Ill. Dec. 20, 2012) ....................................................................................17

*Orthocraft, Inc. v. Sprint Spectrum L.P.*,
    Case No. 98-5007, 2002 WL 31640477 (E.D.N.Y. Nov. 16, 2002) .................17

*In re RadLAX Gateway Hotel, LLC*,
  447 B.R. 570 (Bankr. N.D. Ill. 2011) ........................................................... 10-11

*In re Stac Elecs. Sec. Litig.*,
  89 F.3d 1399 (9th Cir. 1996) ........................................................................ 13-14

*Starr v. Baca*,
  652 F.3d 1202 (9th Cir. 2011) ......................................................................5, 14

*W. Mining Council v. Watt*,
  643 F.2d 618 (9th Cir. 1981) ............................................................................14

iii

Defendant Hawaiian Telcom, Inc. ("HTI") files this reply in support of its *Motion to Dismiss the First Amended Complaint in its Entirety* [Docket No. 35] (the "Motion").[1]   This Reply is made in response to the *Plaintiffs' Memorandum in Opposition* [Docket No. 40] (the "Opposition") in the above-captioned adversary proceeding.

## I.    INTRODUCTION

The First Amended Complaint, along with the Opposition, contains a rough hodge-podge of arguments in a brazen attempt by the Plaintiffs to "see what sticks." Despite the Plaintiffs' best attempts at creating confusion – whether intentionally or as a byproduct of muddled strategy – when the pleadings are carefully parsed through, it becomes readily apparent that each of the causes of action asserted by the Plaintiffs lacks all legal merit or a cognizable legal theory.  The Motion to Dismiss should be granted, without further leave to amend.

The Plaintiffs' First Amended Complaint consists of five causes of action, the last of which is a three-part request for declaratory relief: (1) alleged trespass, (2) conversion, (3) unfair competition, (4) international interference of contract, (5(a)) declaratory relief regarding the Settlement Agreement and MRA, (5(b)) declaratory relief regarding an alleged voice-only limitation on the 372 License; and (5(c))

---

[1] All capitalized terms used but not defined herein hold the meanings ascribed to them in the Motion.

declaratory relief regarding the SIC Partial Assignment.  The Motion seeks dismissal of each of these causes of action in their entirety.

First, the Motion seeks dismissal of (1), (2), (3), and (5(a)) on the grounds that the Court's prior rulings foreclosed further disputes on these items as a matter of law.  In the Opposition, the Plaintiffs have asserted that their pending reconsideration motion invalidates the Final Enforcement Order.  This is a baseless argument, and a blatant attempt by the Plaintiffs to re-litigate issues the Court has already determined.  For the reasons previously articulated by HTI in its prior pleadings, and the Court in its prior rulings, these counts should be dismissed.

The Opposition does not challenge HTI's dismissal of (4) at all, a cause of action newly added by the Plaintiffs to the First Amended Complaint.  The Opposition only challenges (5(b)) through a single, conclusory sentence, which in no way responded to or addressed the multiple pages of briefing provided by HTI in the Motion regarding dismissal of this request for declaratory relief.

Finally, the remaining (5(c)) rests solely on the Plaintiffs' irrational and unsupportable interpretation of License 372.  The Opposition spills much ink on this issue, but fails to provide any cogent argument that would withstand dismissal of this cause of action.  Instead, the Plaintiffs seemingly urge the Court away from making a ruling at all, and instead encourages delegation of this issue to state court, just as they have done in the past.

2

Such efforts are nothing but tiresome for all parties involved. The Plaintiffs' old arguments, previously asserted by SIC, are now being re-hashed by Waimana, Pa Makani, and Clearcom on multiple fronts. The First Amended Complaint should be dismissed, with prejudice, on both legal and equitable grounds.

## II. THE PLAINTIFFS' DESIRE FOR PARALLEL, REPEATED LITIGATIONS IS UNTENABLE.

In its Motion, HTI asserted that the Plaintiffs' first three causes of action in the First Amended Complaint ((1), (2), and (3)) as well as their first request for declaratory relief (5(a)) had already been determined by the Court on multiple occasions, and were thus foreclosed as a matter of law. Motion at 11-14, 16-17.[2] In their Opposition, the Plaintiffs' only response has been to suggest that the Court's prior orders are invalid in light of their pending motion for reconsideration of the Final Enforcement Order (the "Motion for Reconsideration," filed at the Paniolo Bankr. at Docket No. 740). Opp. at 1. But the parties have already litigated these issues twice before, in connection with the Court's approval of the Sales and in connection with the Final Enforcement Order. The parties will potentially be re-litigating these issues a third time, in connection with the Motion for Reconsideration, for which a hearing has been scheduled for August 1, 2022. *See* Paniolo Bankr., Docket Nos. 740, 743. The Plaintiffs' untenable position is that it

---

[2] *See also* First Ruling at 8 ("Because the plaintiffs' three causes of action rely on the proposition that HTI did not acquire any interest in License 372, and because my prior final orders preclude that proposition, I am inclined to hold that the complaint does not state a cognizable claim.")

3

would like the parties to litigate these issues a fourth time, in this adversary proceeding.

This position holds no legal support, invites unnecessary confusion, and is a waste of the Court's and the parties' time and resources.  A court order is not invalidated by the mere filing of a motion for reconsideration – it remains binding on the parties and in effect unless a stay is obtained, or until the reconsideration motion is decided.  Just as motions for reconsideration are not tolerated when their chief purpose is to relitigate old issues, *see, e.g., In re Hillis Motors, Inc.,* 120 B.R. 556, 558 (Bankr. D. Haw. 1990); *Levy v. Wells Fargo Bank*, Case No. 11-00159, 2011 WL 4104155, at *2 (D. Haw. Sept. 14, 2011), the Plaintiffs here similarly cannot use the pending status of the Motion for Reconsideration as an excuse for the re-litigation of decided issues either in the reconsideration motion itself or in a separate proceeding.  *See, e.g., In re Gonzalez,* Case No. 08-01756, 2012 WL 603747, at *6 (B.A.P. 9th Cir. Feb. 2, 2012) (denying a motion for reconsideration that was merely a "rehash" of the same arguments previously presented) ("The standard for granting a motion to reconsider is strict in order to preclude repetitive arguments that have already been fully considered by the court.").  In *Hamlin v. Robinson,* for instance, after the dismissal of its first complaint, the plaintiff filed a new complaint based on the same underlying claim while its motion for reconsideration of the prior dismissal complaint was pending.  Case No. 07-3025,

2007 WL 1583591, at *1 (E.D. Wash. May 31, 2007).  The Court dismissed the new complaint with prejudice, finding that the plaintiff's dissatisfaction with the dismissal and the pending reconsideration motion did not "give Plaintiff license to start over before another judicial officer."  *Id.*

The same is true for the Plaintiffs in this action.  To the extent the Plaintiffs are seeking reconsideration of the Final Enforcement Order, the Motion for Reconsideration will be addressed in the Paniolo Bankruptcy.  The Plaintiffs cannot seek to collaterally re-litigate the merits of the Final Enforcement Order – or the Sale Orders – through this proceeding or through a new proceeding in another court.  *See id.* (discussing *res judicata* principles).  Doing so would introduce unnecessary confusion into the dispute through parallel pending proceedings and is a plain waste of judicial resources.  Motions to dismiss are particularly appropriate tools for eliminating such forms of inefficiencies and wasted costs.[3]

The Plaintiffs proceed to accuse HTI of failing to address the merits of paragraphs 28-30 of the First Amended Complaint.  *See* Opp. at 8-10.  These paragraphs in the First Amended Complaint and the Opposition, however, merely re-assert an argument that was already raised to the Court and considered on its merits in connection with the Court's grant of the Final Enforcement Order.  Within

---

[3] *Cf. Starr v. Baca,* 652 F.3d 1202, 1216 (9th Cir. 2011) (to survive dismissal, a claim must plausibly suggest entitlement to relief such that it is not "unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.")

these cited paragraphs, the Plaintiffs have argued, yet again, that the Marshal Sale Order was "superseded by the Rule 9019 Settlement Agreement and the MRA approved on June 4, 2020," and hence "the Trustee did not obtain SIC's interest in License Agreement No. 372." Opp. at 10; First Am. Compl. ¶¶ 28-30. This exact argument has been thoroughly addressed both in filed pleadings and at oral argument. *See Sandwich Isles Communications, Inc.'s Statement of Objections to the Final Relief Requested by Hawaiian Telcom* [Paniolo Bankr., Docket No. 713 (the "MTE Opp.")] at 10 ("The Trustee and SIC agreed to remove SIC's license from the A1 and A2 assets as part of the 9019 Settlement Agreement.") (complete joinder to this pleading was filed by Waimana Enterprises Inc. at Docket No. 715); HTI's *Further Reply in Support of Motion by Hawaiian Telcom, Inc. for Final Relief Enforcing the Court's Sale Order* [Paniolo Bankr., Docket No. 721 (the "MTE Further Reply")] at 11-13 ("SIC also appears to raise for the first time an alternative argument, which suggests that the Trustee and SIC had, by contract, modified the language of Schedule A.2 to exclude SIC's portion of the 372 License from being transferred under the Marshal Sale . . ."). *See also* Transcript of May 16, 2022 Hearing [Paniolo Bankr., Docket No. 739] at 6:18-7:25; 13:18-14:12 (arguments raised by SIC's counsel and HTI's counsel).

The filing of a reconsideration motion does not automatically trigger, as the Plaintiffs contend, "discovery and a trial . . . regarding any transfer of SIC's interest

in License 372" in this adversary proceeding. Opp. at 10. The Final Enforcement Order has already confirmed this Court's prior Sale Orders, which held that HTI acquired (among other assets) "certain portions of the 372 License pertaining to the Paniolo Network and/or the Paniolo Premises that were formerly held by SIC." *See* Final Enforcement Order ¶ G; *see* Marshal Sale Order ¶¶ 6-7. Accordingly, these causes of action in the First Amended Complaint do not state a claim to relief that is plausible on its face. *See* Motion at 11-14.

## III.   THE PLAINTIFFS' INTERPRETATION OF LICENSE 372 LACKS A COGNIZABLE LEGAL THEORY.

In their Opposition, the Plaintiffs have doubled down on their alleged division of the "License 372 Service Right," which they admit is no longer exclusive under the FCC Preemption Order, from the "License 372 Easement," which they allege remains exclusive to Waimana. Opp. at 2-3. This alleged exclusivity is championed by the Plaintiffs in an attempt to justify the declaratory relief request in (5(c)) and strengthen their position in connection with causes of action (1), (2), and (3). The Plaintiffs have characterized the License 372 Easement as covering the "areas of HHL that Waimana or its assignees developed," purportedly giving Waimana full control over access to the portions of the Hawaiian Home Lands where the Paniolo Network sits, including the power to impose upon HTI access fees or restrictions (or otherwise impede HTI from access entirely), notwithstanding the terms of the Final Enforcement Order and the Sale Orders. *Id.* at 3-4.

7

The Opposition attempts to portray HTI's interpretation of the 372 License as strained, or alternatively, urges the Court to deem License 372 ambiguous, inviting a trial in state court. *Id.* at 2, 8. The interpretation offered by the Plaintiffs, however, is inconsistent with undisputed facts, inconsistent with the language of the 372 License, and unsupported under Hawaii law.

   a.    *The Plaintiffs' interpretation of License 372 is inconsistent with their own operation of the 372 License.*

The Opposition conveniently avoids any discussion of the undisputed facts which directly contradict Waimana's notion of exclusivity. *See* Motion at 10-11. It is undisputed that SIC, not Waimana, obtained the sole approval of the construction plans for certain Paniolo Premises and Paniolo Buildings that were later sold to HTI. *See Declaration of Daniel Masutomi in Support of Motion by Hawaiian Telcom, Inc. for Interim and Final Relief Enforcing the Court's Sale Order* [Paniolo Bankr., Docket No. 639], Ex. M-5 to M-10 (copies of the addenda); *see also Sandwich Isles Communications, Inc.'s Statement of Objections to the Final Relief Requested by Hawaiian Telcom* [Paniolo Bankr., Docket No. 713] at 38-39. If Waimana had in fact retained exclusivity in connection with the License 372 Easement, then the construction of improvements by SIC would have been in clear breach of Waimana's allegedly "exclusive easement" over the easement area covered by License 372. The Plaintiffs have not alleged, nor could they allege, any new facts or legal theories regarding exclusivity which would not directly contradict these prior actions and the

8

language of the addenda.   To the extent Waimana attempts to assert that any exclusivity was implicitly waived by Waimana to SIC, such argument still does not hold, as HTI specifically acquired SIC's interests in the 372 License, not a competing license.

The Opposition further asserts that the Court is able to infer that "License 372 provides Plaintiffs **and SIC** with exclusive possessory rights to the Premises and easement areas subject to DHHL's limited rights discussed above."   Opp. at 8 (emphasis added).   This makes no sense.   If License 372 were exclusive to all of the Plaintiffs as well as SIC, HTI could not possibly be in breach of any purported exclusivity by having taken over SIC's interests in the 372 License.   The Plaintiffs' exclusivity arguments are shoddy attempts at confusing the Court or shifting the Court's attention away from its jurisdiction over the Sales – likely in an attempt to obtain a more favorable outcome in a different court.[4]

---

[4] The Plaintiffs assert that if the Court finds that the terms of License 372 are ambiguous, "then a trial in State Court with DHHL as a necessary party is required, and that case is probably Civil No. 1CCV-22-0000617."   Opp. at 2.   This cited civil case (the "DHHL Litigation") is a lawsuit the Plaintiffs have filed against the DHHL and the Hawaiian Homes Commission, asserting that the DHHL breached the terms of License 372, and breached their fiduciary duties, by granting HTI a limited right of entry over the Hawaiian Home Lands and potentially negotiating a new license with HTI.   *See* First Am. Compl., Ex. N at 13-15.   The lawsuit, filed on the same day as the First Amended Complaint, also seeks the **exact same** (5(b)) declaratory relief determination sought here, and a similar (5(c)) determination.   *Id.* at 15.

9

b.     *The Plaintiffs' interpretation of License 372 is inconsistent with a plain reading of the license and is unsupported by law.*

The Plaintiffs maintain that the words "including also the right of entry upon the easement area and adjoining land" in License 372 actually constitutes a grant of an "exclusive easement." Opp. at 2-3. They do not cite any statute, rule, or case law, however, that supports their unreasonable transformation of a "right of entry" into an "exclusive easement." To be clear, HTI does not dispute that License 372 creates an inchoate easement right that becomes identified upon approval of construction plans and construction of physical improvements. *See* Motion at 8. However, when the granting clause of License 372 is read in its entirety, it becomes clear that the language the Plaintiffs are twisting to support their claim of an exclusive easement is merely a customary right of entry providing the licensee with access over Hawaiian Home Lands for the construction, maintenance and operation of "lines and appurtenances." *See* Motion at 8-11.

At its core, the Plaintiffs appear to fundamentally misunderstand the nature of the rights they are claiming. A grant of an exclusive easement gives the grantee the right to exclude all parties, including the grantor, and are generally disfavored under law and cannot be granted implicitly. *See, e.g., In re RadLAX Gateway Hotel, LLC*, 447 B.R. 570, 575 (Bankr. N.D. Ill. 2011) ("The very idea of an easement that transfers a possessory interest is a contradiction . . . Such exclusive easements . . . are extremely disfavored by the law. To prove a possessory interest created by an

10

exclusive easement, the claimant must show a clear indication that the parties to the agreement intended such a transfer.") (internal citations and quotations omitted) (discussing California property law).  The grant by DHHL to Waimana of a truly exclusive easement would provide Waimana with the right to exclude even the DHHL from the alleged easement area.  Nothing in License 372 reflects such an intention – to the contrary, the license remains subject to DHHL's express "right to enter" at "all times."  First Am. Compl., Ex. A ¶ 20.  *See also* Motion at 9-10.

The Plaintiffs have attempted to save their contrived interpretation of License 372 with an equally contrived new notion, whereby they equate License 372 to a form of a lease in order to explain the DHHL's continued rights under the terms of the agreement.  *See* Opp. at 5 ("DHHL only reserved for itself the types of limited rights that lessors' [sic] retain to enforce any breach and to conduct reasonable inspections."); *id.* at 7-8 ("Based on the provisions in License 372, under Hawaii law, it is more a kin [sic] to a lease than a license and regardless is an interest in real property.")  But the very rule and statute the Plaintiffs have cited and relied on, *see* Opp. at 4, only refer to the DHHL's ability to grant licenses as easements, not licenses as leases.[5]  The case cited by the Plaintiffs, *Kiehm* (Opp. at 7) deals with a common law roommate in a single-family residence, not the DHHL or exclusive

---

[5] Notably, the entirety of the 372 License does not use the words "lease," "lessor," or "lessee" even once.  The words "license," "licensee," and "licensor" are collectively used over 150 times.

11

easements. This argument plainly lacks all merit. Even if License 372 was to be construed in a manner similar to a lease, there is nothing within its terms, or within the nature of a lease, which would support the Plaintiffs' purported division between a non-exclusive "License 372 Service Right" and an exclusive "License 372 Easement."

The notion of the "divided" 372 License lacks a cognizable legal theory, and is plainly a manufactured interpretation offered by the Plaintiffs to sidestep the Court's prior rulings in light of their dissatisfaction with the Marshal Sale and the resulting transfer of assets. Notwithstanding that the FCC has already rejected this very interpretation within the FCC Preemption Order, *see* Motion at 10-11, the Plaintiffs have continued to stubbornly re-litigate this point both in this Court and in the DHHL Litigation.

## IV. THE REMAINDER OF THE PLAINTIFFS' OPPOSITION DOES NOT OFFER ANY LEGITIMATE GROUNDS PRECLUDING DISMISSAL.

The Plaintiffs' final section of their Opposition similarly holds no legal merit; it appears to be a jumbled collection of arguments that are simply inapplicable or have otherwise already been addressed.

First, the Plaintiffs assert that the Motion "does not address Plaintiffs' License 372 rights, apart from SIC's, because at best, the Trustee only acquired SIC rights but not Waimana's, Pa Makani's or Clearcom's interest in License 372." Opp. at 11. *See also* First Amended Compl. ¶ 31 ("[T]he Trustee and HTI clearly did not

12

obtain any portion of Waimana's interest in License 372 that was not assigned to SIC in the Partial Assignment."). This has never been disputed. The Final Enforcement Order specifically refers to the acquisition by HTI of "those certain portions of the 372 License pertaining to the Paniolo Network and/or the Paniolo Premises that were formerly held by SIC," not any portions of the 372 License held by any of SIC's affiliates. Final Enforcement Order ¶ G. The First Amended Complaint does not contain any allegations regarding use or infringement by HTI of Waimana, Pa Makani, or Clearcom's respective portions of License 372, nor could any such arguments be validly supported.[6] This argument in the Opposition is a non-starter.

The Plaintiffs proceed to state that SIC's interests in License 372 "only apply to voice and not wireless or broadband." Opp at 11. This single, conclusory statement appears to be the Plaintiffs' only response or challenge to over three pages of briefing by HTI regarding this alleged "voice-only" limitation which the Plaintiffs have asserted in connection with their second request for declaratory relief. *See* Motion at 18-21. Conclusory allegations of law or fact are insufficient to defeat a motion to dismiss. *See, e.g., In re Stac Elecs. Sec. Litig.,* 89 F.3d 1399, 1403 (9th

---

[6] In any event, the legal merits of such an argument has previously been addressed by HTI in the briefing in connection with the Final Enforcement Order. *See Motion by Hawaiian Telcom, Inc. for Interim and Final Relief Enforcing the Court's Sale Order* [Paniolo Bankr., Docket No. 637] at 47-49. None of the Plaintiffs asserted objections or oppositions in connection with this particular point during the enforcement dispute.

13

Cir. 1996) (holding that "[c]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim.")

Finally, the Plaintiffs assert that "by not assuming the Rule 9019 Settlement Agreement and MRA, HTI cannot enforce Plaintiffs' commitments made therein including their agreement to provide access to the Transferred Assets and Equipment."  Opp. at 11; *accord* First Am. Compl. ¶ 40.  This is another non-starter. HTI has never sought to enforce the Plaintiffs' commitments made under the Rule 9019 Settlement Agreement or the MRA.  The Plaintiffs have similarly not discussed how they believe any such commitments made under the Settlement Agreement or the MRA are being allegedly enforced by HTI, a third-party without contractual privity under either of these agreements.  As HTI's rights to operate the Paniolo Network – and accordingly, to access the Paniolo Premises – were obtained through the Sales, and not from a contractual arrangement, the allegations in the First Amended Complaint do not lead the Court to a "reasonable inference" that HTI is liable for any misconduct alleged in the First Amended Complaint.  The Complaint should be promptly dismissed.  *See Starr v. Baca,* 652 F.3d 1202, 1216 (9th Cir. 2011) (describing the legal standard for dismissals); *see also W. Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir. 1981) (a court may not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations.")

14

## V.    DISMISSAL WITH PREJUDICE IS WARRANTED.

While the Court has previously noted a strong preference towards allowing at least one amendment, the First Amended Complaint is largely an attempt to relitigate already decided issues.  *See* Transcript of May 20, 2022 Hearing on Motion to Dismiss Complaint [Docket No. 30] at 8:21-25.  The Plaintiffs did not use their leave to amend as an avenue to "plead[] around [the Court's] prior orders," *id.* at 8:25-9:5, but merely rehashed arguments they previously asserted, and introduced new facts in an attempt to relitigate decided issues.  Dismissal with prejudice of the First Amended Complaint, or at a minimum, dismissal of certain counts therein, is thus clearly warranted at this juncture.

"Five factors are taken into account to assess the propriety of a motion for leave to amend: bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the complaint." *Johnson v. Buckley,* 356 F.3d 1067, 1077 (9th Cir. 2004).  Futility alone, however, can justify the denial of a motion to amend, *id.,* and futility can be found in an amended complaint "if it merely restates the same facts as the original complaint in different terms, reasserts a claim on which the court previously ruled, fails to state a legal theory or could not withstand a motion to dismiss." *Greggs v. Autism Speaks,* Inc., 987 F. Supp. 2d 51, 54 (D.D.C. 2014) (*quoting Robinson v. Detroit News, Inc.,* 211 F. Supp. 2d 101, 114 (D.D.C. 2002)).

The Plaintiffs should not be permitted to reassert arguments they have already made, over and over again, nor should they be permitted to replace the party-in-interest with a company affiliate to remake such arguments. For instance, the allegation herein that the Master Relationship Agreement with the Trustee was modified to exclude SIC's portion of the 372 License from being transferred under the Marshal Sale has already been addressed not only in connection with the motion to dismiss the Plaintiffs' original complaint, but also in connection with the Motion to Enforce. *See* Opp. at 8-10; Docket No. 13 at 6 (Waimana opposition to first dismissal); Docket No. 15 at 3 (SIC opposition to first dismissal motion). *See also* MTE Opp. at 10; MTE Further Reply at 11-13. The record is replete with the Plaintiffs' continued attempts at relitigating decided issues – and here, it is evident that when the Court provided the Plaintiffs with a fair opportunity to amend, the Plaintiffs squandered that opportunity by largely redrafting the same dismissed points.

Accordingly, further amendment of the Complaint should be denied. *See, e.g., Gavin v. Dep't of Air Force,* 314 F. Supp. 3d 297, 305 (D.D.C. 2018) ("There is no doubt that the district court has the discretion to deny a plaintiff leave to amend his or her complaint to add claims already dismissed. That is particularly true where the plaintiff had a full and fair opportunity to respond to the merits of the defendant's arguments but did not do so.") (internal quotations omitted). Not only would

amendment be futile, but such amendments would also prejudice HTI by forcing it to incur further unnecessary costs in repeated litigation. *See Larson v. Liberty Mut. Fire Ins. Co.*, Case No. 09-00308, 2010 WL 1962942, at *3 (D. Haw. May 13, 2010), *aff'd,* 509 F. App'x 641 (9th Cir. 2013) (denying leave to amend to reassert previously-dismissed claims on the grounds of futility and prejudice).[7]

## VI.   CONCLUSION

Based on the foregoing, HTI respectfully requests for the Court to (a) dismiss the Complaint in its entirety, with prejudice, and (b) grant to HTI such other and further relief as is just and proper.

---

[7] *Accord, e.g., M.R. v. Girl Scouts of Greater Chicago & Nw. Indiana,* Case No. 1:12-CV-06066, 2012 WL 12542828, at *3 (N.D. Ill. Dec. 20, 2012) (denying leave to amend on the grounds of futility as the complaint merely rehashed arguments already rejected by the Court); *Bond Opportunity Fund II, LLC v. Heffernan*, 340 F. Supp. 2d 146, 152 (D.R.I. 2004) (denying amendment as the arguments were "no more persuasive the second time around"); *Bolden v. McCabe, Weisberg & Conway, LLC*, Case No. 13-1265, 2014 WL 994066, at *2 (D. Md. Mar. 13, 2014), *aff'd,* 584 F. App'x 68 (4th Cir. 2014) (amendment would be futile because the proposed amendments fail to cure the defects in the original complaint); *Orthocraft, Inc. v. Sprint Spectrum L.P.,* Case No. 98-5007, 2002 WL 31640477, at *3 (E.D.N.Y. Nov. 16, 2002) (denying leave to amend where the plaintiffs were attempting to relitigate already-decided issues) ("[W]here litigants have once battled for the Court's decision, they should not be required, nor without good reason permitted, to battle for it again, absent a clear conviction of error.") (internal parentheticals omitted).

DATED:     Honolulu, Hawaii, <u>July 8, 2022</u>.

CASE LOMBARDI & PETTIT

　　　　　*/s/ Ted N. Pettit*
TED N. PETTIT
DAVID G. BRITTIN
and
MORGAN, LEWIS & BOCKIUS LLP
ANDREW J. GALLO
MELISSA Y. BOEY

Attorneys for HAWAIIAN TELCOM, INC.

**Date Signed:**
**August 18, 2022**



SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

|  |  |
|---|---|
| In re: | CASE NO. 18-01319 |
| | (Chapter 11) |
| PANIOLO CABLE COMPANY, LLC, | |
| Debtor. | |
| | Adversary Proceeding No. 22-90008 |
| WAIMANA ENTERPRISES INC., PA MAKANI LLC, CLEARCOM, INC. | |
| Plaintiffs, | **ORDER GRANTING MOTION BY HAWAIIAN TELCOM, INC. TO DISMISS THE FIRST AMENDED COMPLAINT IN ITS ENTIRETY** |
| v. | |
| HAWAIIAN TELCOM INC., | |
| Defendant. | |
| | Hearing: |
| | Date: August 1, 2022 |
| | Time: 9:30 a.m. |
| | Judge: Honorable Robert J. Faris |

## ORDER GRANTING MOTION BY HAWAIIAN TELCOM, INC.
## TO DISMISS THE FIRST AMENDED COMPLAINT IN ITS ENTIRETY

The *Motion by Hawaiian Telcom, Inc. to Dismiss the First Amended Complaint in its Entirety,* which motion was filed on June 10, 2022 at Docket No. 35 in the above-captioned adversary proceeding (the "Motion to Dismiss") came on for hearing before the Honorable Robert J. Faris, on August 1, 2022 at 9:30 a.m. (the "Hearing").

The Court, having duly considered the Motion to Dismiss, all of the written memoranda and exhibits filed in connection with the Motion to Dismiss, the First Amended Complaint filed at Docket No. 28, the argument of all counsel at the Hearing, the record of the case, and good cause appearing therefor, it is HEREBY ORDERED that for the reasons set forth by the Court at the Hearing, the Motion to Dismiss is GRANTED.  The *First Amended Complaint*, filed at Docket No. 28 by Waimana Enterprises Incorporated, Pa Makani LLC, and Clearcom, Inc., and all claims asserted therein, are hereby DISMISSED in their entirety, WITH PREJUDICE.

**END OF ORDER**

2

APPROVED AS TO FORM:

_____*/s/ William K. Meheula, III*_____
William K. Meheula, III
D. Kaena Horowitz
MEHEULA LAW LLLC
Counsel for Waimana Enterprises Inc., Pa Makani LLC, and Clearcom, Inc.

Submitted by:

CASE LOMBARDI & PETTIT
A LAW CORPORATION
TED N. PETTIT                                          4287-0
Email: tnp@caselombardi.com
DAVID G. BRITTIN                                   8686-0
Email: dbrittin@caselombardi.com
Pacific Guardian Center, Mauka Tower
737 Bishop Street, Suite 2600
Honolulu, Hawaii  96813
Telephone: (808) 547-5400 | Fax: (808) 523-1888

MORGAN, LEWIS & BOCKIUS LLP
ANDREW J. GALLO *(Pro Hac Vice)*
One Federal Street | Boston, MA 02110-1726
Phone: +1 (617) 951-8117
Email:  andrew.gallo@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
MELISSA Y. BOEY *(Pro Hac Vice)*
1400 Page Mill Road | Palo Alto, CA 94304
Phone: 1 (650) 843-4000
Email:  melissa.boey@morganlewis.com

Attorneys for HAWAIIAN TELCOM, INC.

H9022a (12/15)

| **Information to identify the case:** | | |
|---|---|---|
| Debtor(s) | **Paniolo Cable Company, LLC** | United States Bankruptcy Court<br>District of Hawaii |
| Parties | Waimana Enterprises Inc, et al. | |
| | Plaintiff(s) | |
| | v. | |
| | Hawaiian Telcom Inc., | Bankruptcy Case number:  **18–01319** |
| | Defendant(s) | Chapter:  **11**<br>Adversary Proceeding No:  **22–90008** |

# NOTICE OF ENTRY OF ORDER OR JUDGMENT

NOTICE IS GIVEN THAT:

The court entered the following order or judgment on the date below,

**Order Granting Motion By Hawaiian Telcom, Inc. To Dismiss the First Amended Complaint In Its Entirety. (Related Doc # 35) Date of Entry: 8/18/2022. (LL)**

The order or judgment may be viewed at the Clerk's Office. It may also be viewed online using PACER, the federal judiciary's electronic records system. Information about obtaining and using a PACER account is available at the court website, www.hib.uscourts.gov.

Date:  August 18, 2022

Clerk's Office:
1132 Bishop Street, Suite 250
Honolulu, Hawaii 96813
(808) 522–8100
www.hib.uscourts.gov

Michael B. Dowling
Clerk

**Date Signed:**
**August 22, 2022**



SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>PANIOLO CABLE COMPANY,<br>LLC,<br><br>          Debtor.<br><hr><br>WAIMANA ENTERPRISES INC.,<br>PA MAKANI LLC,<br>CLEARCOM, INC.<br><br>          Plaintiffs,<br><br>   v.<br><br>HAWAIIAN TELCOM INC.,<br><br>          Defendant. | CASE NO. 18-01319<br>(Chapter 11)<br><br><br><br><br><br>Adversary Proceeding No. 22-90008<br><br><br>**ORDER DENYING PLAINTIFF<br>WAIMANA ENTERPRISES<br>INC.'S MOTION TO REMAND<br>CASE TO STATE COURT, OR IN<br>THE ALTERNATIVE, FOR<br>ABSTENTION**<br><br>Hearing:<br>Date: August 1, 2022<br>Time: 9:30 a.m.<br>Judge: Honorable Robert J. Faris |

## ORDER DENYING PLAINTIFF WAIMANA ENTERPRISES INC.'S MOTION TO REMAND CASE TO STATE COURT, OR <u>IN THE ALTERNATIVE, FOR ABSTENTION</u>

*Plaintiff Waimana Enterprises Inc.'s Motion to Remand Case to State Court, or in the Alternative, for Abstention,* which motion was filed on April 27, 2022 at Docket No. 10 (the "<u>Motion to Remand</u>"), came on for hearing before the Honorable Robert J. Faris, on August 1, 2022 at 9:30 a.m. (the "<u>Hearing</u>").

The Court, having duly considered the Motion to Remand, all of the written memoranda and exhibits filed in connection with the Motion to Remand, the argument of all counsel at the Hearing, the record of the case, and good cause appearing therefor, it is HEREBY ORDERED that for the reasons set forth by the Court at the Hearing, the Motion to Remand is DENIED as moot ~~given that the~~ ~~Court has entered judgment dismissing this proceeding with prejudice.~~

RJF

### **END OF ORDER**

APPROVED AS TO FORM:

_____*/s/ William K. Meheula, III*_____
William K. Meheula, III
D. Kaena Horowitz
MEHEULA LAW LLLC
Counsel for Waimana Enterprises Inc., Pa Makani LLC, and Clearcom, Inc.


Submitted by:

CASE LOMBARDI & PETTIT
A LAW CORPORATION
TED N. PETTIT                                          4287-0
Email: tnp@caselombardi.com
DAVID G. BRITTIN                                    8686-0
Email: dbrittin@caselombardi.com
Pacific Guardian Center, Mauka Tower
737 Bishop Street, Suite 2600
Honolulu, Hawaii  96813
Telephone: (808) 547-5400 | Fax: (808) 523-1888

MORGAN, LEWIS & BOCKIUS LLP
ANDREW J. GALLO *(Pro Hac Vice)*
One Federal Street | Boston, MA 02110-1726
Phone: +1 (617) 951-8117
Email:  andrew.gallo@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
MELISSA Y. BOEY *(Pro Hac Vice)*
1400 Page Mill Road | Palo Alto, CA 94304
Phone: 1 (650) 843-4000
Email:  melissa.boey@morganlewis.com

Attorneys for HAWAIIAN TELCOM, INC.

H9022a (12/15)

| **Information to identify the case:** | | |
|---|---|---|
| Debtor(s) | **Paniolo Cable Company, LLC** | **United States Bankruptcy Court**<br>**District of Hawaii** |
| Parties | Waimana Enterprises Inc, et al. | |
| | Plaintiff(s) | |
| | v. | |
| | Hawaiian Telcom Inc., | Bankruptcy Case number:  **18–01319** |
| | Defendant(s) | Chapter:  **11**<br>Adversary Proceeding No:  **22–90008** |

# NOTICE OF ENTRY OF ORDER OR JUDGMENT

NOTICE IS GIVEN THAT:

The court entered the following order or judgment on the date below,

**Order Denying Motion To Remand Case to State Court, Or in the Alternative, For Abstention (Related Doc # 10) Date of Entry: 8/22/2022. (LL)**

The order or judgment may be viewed at the Clerk's Office. It may also be viewed online using PACER, the federal judiciary's electronic records system. Information about obtaining and using a PACER account is available at the court website, www.hib.uscourts.gov.


Date:   August 22, 2022                                    Michael B. Dowling
                                                                      Clerk
Clerk's Office:
1132 Bishop Street, Suite 250
Honolulu, Hawaii 96813
(808) 522–8100
www.hib.uscourts.gov

H9022a (12/15)

| **Information to identify the case:** | | |
|---|---|---|
| Debtor(s) | **Paniolo Cable Company, LLC** | United States Bankruptcy Court<br>District of Hawaii |
| Parties | Waimana Enterprises Inc, et al. | |
| | Plaintiff(s) | |
| | v. | |
| | Hawaiian Telcom Inc., | Bankruptcy Case number:  **18–01319**<br>Chapter:  **11**<br>Adversary Proceeding No:  **22–90008** |
| | Defendant(s) | |

# NOTICE OF ENTRY OF ORDER OR JUDGMENT

NOTICE IS GIVEN THAT:

The court entered the following order or judgment on the date below,

**Order Denying Motion To Remand Case to State Court, Or in the Alternative, For Abstention (Related Doc # 10) Date of Entry: 8/22/2022. (LL)**

The order or judgment may be viewed at the Clerk's Office. It may also be viewed online using PACER, the federal judiciary's electronic records system. Information about obtaining and using a PACER account is available at the court website, www.hib.uscourts.gov.

Date:  August 22, 2022

Clerk's Office:
1132 Bishop Street, Suite 250
Honolulu, Hawaii 96813
(808) 522–8100
www.hib.uscourts.gov

Michael B. Dowling
Clerk

*Filer's Name, Address, Phone, Fax, Email:*

WILLIAM MEHEULA  (2277)
Meheula Law, LLLC
Three Waterfront Plaza, Suite 499
500 Ala Moana Boulevard
Honolulu, Hawai'i  96813
Telephone No.:  (808) 599-9554
Facsimile No.:  (808) 599-9610
Email: meheula@smlhawaii.com

Attorneys for Plaintiffs WAIMANA ENTERPRISES INC., PA
MAKANI LLC, and CLEARCOM, INC.

Form 417A (12/15)



**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF HAWAII**
**1132 BISHOP STREET, SUITE 250**
**HONOLULU, HI 96813**

| | | |
|---|---|---|
| Debtor(s): | Chapter: | Case No.: |
| Paniolo Cable Company, LLC | **11** | 18-01319 |

| | |
|---|---|
| *(If Adversary Proceeding)* Plaintiff(s): | A.P. No.: |
| Waimana Enterprises Inc., Pa Makani LLC, and Clearcom, Inc. | 22-90008 |

| | |
|---|---|
| *(If Adversary Proceeding)* Defendant(s): | Related Docket No.: |
| Hawaiian Telcom, Inc. | 70 |

## NOTICE OF APPEAL AND STATEMENT OF ELECTION

**Part 1: Identify the appellant(s)**

1. Name(s) of appellant(s):

   Waimana Enterprises Inc., Pa Makani LLC, and Clearcom, Inc.

2. Position of appellant(s) in adversary proceeding or bankruptcy case that is subject of this appeal:

For appeals in an adversary proceeding.

For appeals in a bankruptcy case and not in an adversary proceeding.

☒ Plaintiff
☐ Defendant
☐ Other (describe):

☐ Debtor
☐ Creditor
☐ Trustee
☐ Other (describe):

**Part 2: Identify the subject of this appeal**

1. Describe the judgment, order, or decree appealed from:

   Order Denying Plaintiff Waimana Enterprises Inc.'s Motion to Remand Case to State Court, or in the Alternative, for Abstention, filed August 22, 2022 [Dkt. 70], attached hereto as Exhibit A.

2. State the date on which the judgment, order, or decree was entered: August 22, 2022

**Part 3: Identify the other parties to the appeal**

List the names of all the parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

1. Party:                                                    Attorney:

   SEE ATTACHED PAGE

2. Party:                                                    Attorney:

**Part 4: Optional election to have appeal heard by District Court**

If a Bankruptcy Appellate Panel is available in this judicial district, the Bankruptcy Appellate Panel will hear this appeal unless, pursuant to 28 U.S.C. § 158(c)(1), a party elects to have the appeal heard by the United States District Court.  If an appellant filing this notice wishes to have the appeal heard by the United States District Court, check below.  Do not check the box if the appellant wishes the Bankruptcy Appellate Panel to hear the appeal.

☐ Appellant(s) elect(s) to have the appeal heard by the United States District Court rather than by the Bankruptcy Appellate Panel.

**Part 5: Sign below**

/s/ William Meheula                                    Date: August 30, 2022
_____                          _____
Signature of attorney for appellant(s) (or
appellant(s) if not represented by an attorney)

Name, address, and telephone number of attorney
(or appellant(s) if not represented by an attorney):

WILLIAM MEHEULA  (2277)
Three Waterfront Plaza, Suite 499
500 Ala Moana Boulevard
Honolulu, Hawaiʻi  96813
Telephone No.:  (808) 599-9554
Email: meheula@smlhawaii.com

Fee waiver notice: If appellant is a child support creditor or its representative and appellant has filed the form specified in § 304(g) of the Bankruptcy Reform Act of 1994, no fee is required.

**Part 3: Identify the other parties to the appeal**

List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

1. Party:   Hawaiian Telcom, Inc.   Attorney:   Ted N. Pettit, Esq.
David G. Brittin, Esq.
Case Lombardi & Pettit, A
Law Corporation
Pacific Guardian Center,
    Mauka Tower
737 Bishop Street, Suite 2600
Honolulu, HI 96813
Tel No.: (808) 547-5400

Attorney:   Andrew J. Gallo, Esq.
(*Pro Hac Vice*)
Morgan, Lewis & Bockius
LLP
One Federal Street
Boston, MA 02110-1726
Tel No.: +1 (617) 951-8117

Attorney:   Melissa Y. Boey, Esq.
(*Pro Hac Vice*)
Morgan, Lewis & Bockius
LLP
1400 Page Mill Road
Palo Alto, CA 94304
Tel No.: +1 (650) 843-4000

**Date Signed:**
**August 22, 2022**



SO ORDERED.

_____

Robert J. Faris
United States Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>PANIOLO CABLE COMPANY,<br>LLC,<br><br>        Debtor. | CASE NO. 18-01319<br>(Chapter 11) |
| WAIMANA ENTERPRISES INC.,<br>PA MAKANI LLC,<br>CLEARCOM, INC.<br><br>        Plaintiffs,<br><br>v.<br><br>HAWAIIAN TELCOM INC.,<br><br>        Defendant. | Adversary Proceeding No. 22-90008<br><br>**ORDER DENYING PLAINTIFF WAIMANA ENTERPRISES INC.'S MOTION TO REMAND CASE TO STATE COURT, OR IN THE ALTERNATIVE, FOR ABSTENTION**<br><br><u>Hearing</u>:<br>Date: <u>August 1, 2022      </u><br>Time: <u>9:30 a.m.         </u><br>Judge: <u>Honorable Robert J. Faris</u> |

EXHIBIT A

## ORDER DENYING PLAINTIFF WAIMANA ENTERPRISES INC.'S MOTION TO REMAND CASE TO STATE COURT, OR <u>IN THE ALTERNATIVE, FOR ABSTENTION</u>

*Plaintiff Waimana Enterprises Inc.'s Motion to Remand Case to State Court, or in the Alternative, for Abstention,* which motion was filed on April 27, 2022 at Docket No. 10 (the "<u>Motion to Remand</u>"), came on for hearing before the Honorable Robert J. Faris, on August 1, 2022 at 9:30 a.m. (the "<u>Hearing</u>").

The Court, having duly considered the Motion to Remand, all of the written memoranda and exhibits filed in connection with the Motion to Remand, the argument of all counsel at the Hearing, the record of the case, and good cause appearing therefor, it is HEREBY ORDERED that for the reasons set forth by the Court at the Hearing, the Motion to Remand is DENIED as moot ~~given that the Court has entered judgment dismissing this proceeding with prejudice.~~

RJF

### END OF ORDER

APPROVED AS TO FORM:

_____ /s/ William K. Meheula, III _____
William K. Meheula, III
D. Kaena Horowitz
MEHEULA LAW LLLC
Counsel for Waimana Enterprises Inc., Pa Makani LLC, and Clearcom, Inc.


Submitted by:

CASE LOMBARDI & PETTIT
A LAW CORPORATION
TED N. PETTIT                                          4287-0
Email: tnp@caselombardi.com
DAVID G. BRITTIN                                    8686-0
Email: dbrittin@caselombardi.com
Pacific Guardian Center, Mauka Tower
737 Bishop Street, Suite 2600
Honolulu, Hawaii  96813
Telephone: (808) 547-5400 | Fax: (808) 523-1888

MORGAN, LEWIS & BOCKIUS LLP
ANDREW J. GALLO *(Pro Hac Vice)*
One Federal Street | Boston, MA 02110-1726
Phone: +1 (617) 951-8117
Email:  andrew.gallo@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
MELISSA Y. BOEY *(Pro Hac Vice)*
1400 Page Mill Road | Palo Alto, CA 94304
Phone: 1 (650) 843-4000
Email:  melissa.boey@morganlewis.com

Attorneys for HAWAIIAN TELCOM, INC.

H9022a (12/15)

| **Information to identify the case:** | | |
|---|---|---|
| Debtor(s) | **Paniolo Cable Company, LLC** | **United States Bankruptcy Court**<br>**District of Hawaii** |
| Parties | Waimana Enterprises Inc, et al. | |
| | Plaintiff(s) | |
| | v. | |
| | Hawaiian Telcom Inc., | Bankruptcy Case number:  **18–01319**<br>Chapter:  **11** |
| | Defendant(s) | Adversary Proceeding No:  **22–90008** |

# NOTICE OF ENTRY OF ORDER OR JUDGMENT

NOTICE IS GIVEN THAT:

The court entered the following order or judgment on the date below,

**Order Denying Motion To Remand Case to State Court, Or in the Alternative, For Abstention (Related Doc # 10) Date of Entry: 8/22/2022. (LL)**

The order or judgment may be viewed at the Clerk's Office. It may also be viewed online using PACER, the federal judiciary's electronic records system. Information about obtaining and using a PACER account is available at the court website, www.hib.uscourts.gov.

Date:  August 22, 2022                                         Michael B. Dowling
                                                                              Clerk
Clerk's Office:
1132 Bishop Street, Suite 250
Honolulu, Hawaii 96813
(808) 522–8100
www.hib.uscourts.gov

H9022a (12/15)

**Information to identify the case:**

| | | |
|---|---|---|
| Debtor(s) | **Paniolo Cable Company, LLC** | **United States Bankruptcy Court**<br>**District of Hawaii** |
| Parties | Waimana Enterprises Inc, et al. | |
| | Plaintiff(s) | |
| | v. | |
| | Hawaiian Telcom Inc., | Bankruptcy Case number:  **18–01319** |
| | Defendant(s) | Chapter:  **11**<br>Adversary Proceeding No:  **22–90008** |

# NOTICE OF ENTRY OF ORDER OR JUDGMENT

NOTICE IS GIVEN THAT:

The court entered the following order or judgment on the date below,

**Order Denying Motion To Remand Case to State Court, Or in the Alternative, For Abstention (Related Doc # 10) Date of Entry: 8/22/2022. (LL)**

The order or judgment may be viewed at the Clerk's Office. It may also be viewed online using PACER, the federal judiciary's electronic records system. Information about obtaining and using a PACER account is available at the court website, www.hib.uscourts.gov.

Date:  August 22, 2022                                        Michael B. Dowling
                                                                          Clerk
Clerk's Office:
1132 Bishop Street, Suite 250
Honolulu, Hawaii 96813
(808) 522–8100
www.hib.uscourts.gov